## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____
                                          )
David B. Stevens                          )
                                          )
and                                       )
                                          )
Mae Whitley,                              )
                                          )
          Plaintiffs,                     )
                                          )
          v.                              ) Civil Action No. 1:05CV01924-RCL
                                          )
National Railroad Passenger Corporation   )
("Amtrak"),                               )
                                          )
          Defendant.                      )
_____ )

### PLAINTIFF DAVID STEVENS' OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Plaintiff David B. Stevens ("Stevens") hereby opposes Defendant National

Railroad Passenger Corporation's ("Amtrak") Motion to Dismiss or, in the alternative,

Motion for Summary Judgment.

## I.      BACKGROUND

This is a case of retaliatory termination.  Stevens was terminated after making

allegations of hostile environment, disability discrimination, and retaliation against his

employer, Amtrak.  Although Amtrak denies retaliatory intent and claims that Stevens

was terminated for cause, Stevens presents overwhelming evidence that the denials are

pretextual, such that a trial on the merits is required under the applicable law.

## II.     STATEMENT OF FACTS

Stevens began his employment with Amtrak on February 28, 1990, in the position

of mechanical cleaner at Amtrak's Ivy Center Station.  Stevens had been diagnosed as

HIV-positive in 1988 but had decided to keep his HIV-positive status a private matter and divulges this information only on a "need-to-know" basis.   He had not told anyone at Amtrak that he was HIV-positive.   Declaration of David B. Stevens ("Stevens Decl.") at ¶ 1.

In 2003, Stevens entered a drug rehabilitation program and took approved leave from work.  Stevens Decl. at ¶ 2.  On or around February 26, 2004, after Stevens returned to his duties, Shirley Snider ("Snider"), one of Plaintiff's co-workers, asked Stevens if he had been out sick because of AIDS.  Although Stevens told Snider that he did not have AIDS, Snider started spreading rumors among other Amtrak employees that he did. Stevens Decl. at ¶ 3.  The rumors regarding Stevens' condition spread throughout the facility and finally he confronted Snider about starting the rumors.  On March 10, 2004, Snider apologized to Stevens in a letter for spreading the rumor that he had AIDS but left the letter in public display on Stevens' work cart.  Stevens Decl. at ¶ 4; Stevens Decl. Exh. 1 – letter from Snider.

Soon after Snider had spread the rumors about Stevens, his co-workers and supervisors began treating Stevens differently, including avoiding physical contact with him or simply acting strangely around him.  His co-workers would go out of their way to avoid being in the same area with him.   In addition, the two Amtrak employees who were responsible for making work assignments, Cindy Williams Hemphill ("Hemphill") and Donna Blake ("Blake"), began assigning him a much heavier workload than the other cleaners, making Stevens more cars on each train than other cleaners.  Stevens Decl. at ¶ 5.  Frustrated by this situation, Stevens filed a complaint with Amtrak's Dispute Resolution Office during the last week of March 2004, alleging that due to the

rumors that he had AIDS, he was being subjected to a hostile work environment based on a perceived or actual disability.  Stevens Decl. ¶ 6.

Subsequent to his complaint, Amtrak began to give Stevens even less desirable and more difficult work assignments.  For example, on April 7, 2004, Stevens was assigned to clean a train car missing a trash receptacle and in whcih the refuse had accumulated in a pile several feet high.  The waste consisted of rotted food, spoiled milk, and used tissue, among other things.  Due to concerns for his health, Stevens did not want to clean the car without proper protective equipment.  He asked Donna Blake to assign someone to assist him in cleaning the car and/or to call the main office to report the missing trash receptacle, which had caused the health hazard.  Blake refused and told Stevens to clean the car.  Stevens Decl. ¶ 6.

After he finished cleaning the car, Stevens went to the lunchroom to take a break. After he left the lunchroom, Stevens went to see if there was another train to clean. Stevens Decl. ¶ 7.  While he was waiting for the train to pull up, the general foreman, Joseph Savoy ("Savoy"), asked what he was doing.  Stevens told Savoy he was waiting for the last train to come in so he could clean it if necessary.  Savoy told Stevens not to wait for the train and said that if he did not leave the area, he would write him up and Bernard Campbell ("Campbell"), the Assistant Superintendent, would suspend him. Stevens Decl. ¶ 8.  Stevens had seen other cleaners and Amtrak employees wait in this area without Savoy threatening them with suspension.  Stevens Decl. ¶ 9.

After this incident, Stevens felt the hostile environment had escalated to an intolerable level.  On the same day that Savoy threatened him, Stevens called Maya Theodore Dalton ("Dalton") in the Employee Assistance Program to discuss the hostile work environment.  Dalton knew about the Snider incident and instructed Stevens to

call his mental health professional.  Stevens Decl. ¶ 10.  In addition to Dalton, Stevens

also called Bernard Campbell, the Assistant Superintendent, to explain briefly what had

happened that day and to tell him that he had left work two hours early because of the

Savoy incident.  Campbell told Stevens not to worry and that he would take care of it.

Stevens Decl. ¶ 11.

On or around April 9, 2004, Eric LeHot ("LeHot"), Stevens' mental health

professional, faxed a letter to Amtrak's medical department stating that Stevens was

experiencing severe mental and emotional stress due to the hostile environment and

placed him on a temporary leave of absence.  Stevens Decl. ¶ 12; Stevens Decl. Exh. 2 –

April 9, 2004 letter from LeHot.  On April 12, 2004, Stevens delivered a copy of LeHot's

letter to the Master Superintendent, Michael Kapela ("Kapela") who approved a

temporary leave of absence for Stevens.  Stevens Decl. ¶ 13.

On April 19, 2004, however, Stevens learned from Jeff Thomas, a pipefitter at

Amtrak, that a copy of the April 9th letter from LeHot had been forwarded to Savoy.

Stevens additionally learned that Campbell and Lisa Coleman, who worked in Amtrak's

Dispute Resolution office, had also seen the letter.  There was no legitimate business

purpose for Savoy, Campbell, or Coleman to have seen the letter and Stevens was

shocked and outraged that such a sensitive document was being casually passed

around.  Stevens Decl. ¶ 14; Stevens Decl. Exh. 3  - fax coversheet.

In or around May 2004, Stevens sought advice from an attorney at The

Georgetown University Law Center's Institute for Public Representation regarding the

hostile environment at his workplace.  On May 21, 2004, Richard McKewen, a staff

attorney with the Georgetown University Law Center, wrote to Amtrak's Law

Department, stating that Stevens had been experiencing disability discrimination and a

hostile work environment and that he had complained to Theodore-Dalton and Campbell. The letter also stated that Campbell had disseminated a copy of LeHot's letter to people who had no legitimate reason for seeing the letter and that Stevens was willing to pursue his discrimination and hostile environment charges before the EEOC and in court. Stevens Decl. ¶15; Stevens Decl. Exh. 4 – May 21, 2004 letter from McKewen.

On May 30, 2004, after beginning his leave of absence, Stevens went to the Amtrak Ivy City facility to retrieve some medication he had left in his best friend, Darryl Hollis' car. Hollis, who was also an Amtrak employee, had agreed to meet Stevens outside the building to return the medicine. Another friend of Stevens', Terrell Williams ("Williams"), had driven him to pick up the medication. After Hollis did not come outside to meet Stevens as planned, Stevens walked about ten feet inside the building. Stevens Decl. ¶16.

Stevens had only been in the building for about a minute when Campbell saw him. Stevens knew that he should have been wearing a hard hat and safety glasses when inside the building, so he quickly exited and got back into the car with Williams. Campbell, who was not wearing a hard hat or safety glasses, followed him outside to the car and yelled at Stevens that he was not allowed on the premises. Campbell then told Stevens that he was not one to be "fucked" with. Campbell said: "you see I like you but you are going to put my name in that fucking shit, but you are better off fucking with those white people than fucking with me." Terrell Dec. ¶ 3. Campbell threatened Stevens: "I will destroy a mother fucker like you," and: "if you ever put my name in anything else, you would wish you didn't." Stevens Decl. ¶¶ 16-17. Stevens remained quiet during Campbell's tirade. Stevens Decl. ¶ 18. Notably, he had never been told by anyone he was not allowed on the premises during his leave. Stevens Decl. ¶ 19.

Williams signed a sworn statement corroborating Stevens' version of events.  Pl.

Statement of Material Facts, Exh. 18 – Statement of Terrell Williams.

On June 21, 2004, Richard McKewen, wrote a second letter to Amtrak stating that

Stevens would like to return to work but sought a transfer to a different department in

light of the harassment by his co-workers and supervisors and unauthorized disclosure

of his medical records and also recounted Campbell's verbal abuse and threats toward

Stevens on May 30.   Stevens Decl. ¶ 20; Stevens Decl. Exh. 5 – June 21, 2004 letter from

McKewen.  On June 21, 2004, Stevens submitted a formal request for an accommodation

for his disability through a transfer to a different department.  Stevens Decl. ¶ 21.  On

June 23, 2004, Stevens again engaged in protected activity when he filed a charge of

discrimination with the EEOC.  Stevens Decl. ¶ 22; Stevens Decl. Exh. 6 – EEOC charge.

Soon after, Campbell continued and escalated his campaign of retaliation against

Stevens for his complaints of discrimination and hostile environment.   On July 1, 2004,

Campbell sent Stevens a letter stating that the documentation was not sufficient and that

he must provide further documentation to support his leave of absence or he would be

terminated.   Stevens Decl. ¶ 23; Stevens Decl. Exh. 7 – July 1, 2004 letter from Campbell.

Attempting to comply with Campbell's request, on July 8, 2004, Stevens had his mental

health care provider complete and return Amtrak's medical status report form.  Stevens

Decl. ¶ 24; Stevens Decl. ¶ 8 – July 8, 2004 medical status report.

On July 23, 2004, however, Campbell sent another letter to Stevens stating that

the medical documents he provided were still not sufficient and to respond by August 6,

2004, with additional medical documentation or he would be terminated.  Stevens Decl.

¶ 25; Stevens Decl. Exh. 9 – July 23, 2004 letter from Campbell.  In response, on August

11, 2004, Stevens had his attorney submit a detailed medical status report from Stevens'

health care provider. Stevens Decl. ¶ 26. On August 20, 2004, Campbell sent yet another letter stating that the medical documentation was still insufficient and that if Stevens did not provide further documentation, he would be terminated. Stevens Decl. ¶ 27; Stevens Decl. Exh. 10 – August 20, 2004 letter from Campbell. Stevens had submitted similar medical documentation in the past and no one had ever questioned the sufficiency of the documentation. Stevens Decl. ¶ 28. On August 23, 2004, McKewen sent a letter to the EEOC stating that Stevens considered Campbell's rejection of his medical documentation to be retaliation for Stevens' prior complaints and requested that Stevens' EEOC charge be amended to assert a claim for retaliation. Stevens Decl. ¶ 29; Stevens Decl. Exh. 11 – August 23, 2004 letter from McKewen.

In approximately August 2004, Stevens' co-Plaintiff in this case, Mae Whitley, asked Bernard Campbell why she didn't receive a promotion. Whitley Decl. ¶ 25. Whitley pointed out to Campbell that Whitley had never been in trouble or counseled. Whitley Decl. ¶ 26. He answered her by referring to her prior lawsuit, reminding her that she had gone after "those white motherfuckers," and asking her: "do you think those motherfuckers are gonna forget?" Whitley Decl. ¶ 27. For emphasis, he added: "do you think that?" Whitley Decl. ¶ 28. Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them. Whitley Decl. ¶ 29. Campbell's response was to the effect that they were not retaliating, but rather were "just not moving" her. Whitley Decl. ¶ 30. Campbell then said that, to retaliate, they would have to do something like fire Whitley. Whitley Decl. ¶ 31. Campbell said that: "It's a thing they say to you in court: no harm, no foul." Whitley Decl. ¶ 32. Exasperated, Whitley asked him if she would have to wait a whole year to get promoted. Whitley Decl. ¶ 33. He responded: "Oh you might have to wait a

whole year and a half.  Whitley Decl. ¶ 34.  He also asked her: "Why did you think you could do that?  Whitley Decl. ¶ 35.

On or around September 13, 2004, Stevens sought to return to work.  He became sick soon after, however, and his return was delayed.  Stevens Decl. ¶ 30.  While he was still on leave, on November 7, 2004, Amtrak's retaliation against Stevens reached a new level when he found a note on his door stating, "you will lose. you got aids."  Stevens filed a police report on this incident and on November 17, 2004.  Stevens Decl. ¶ 31; Stevens Decl. Exh. 12 – police report.  On November 10, 2004, Stevens amended his EEOC charge to include retaliatory harassment by Campbell based on Campbell's threat's to terminate him if he did not provide additional medical documentation. Stevens Decl. ¶ 32; Stevens Decl. Exh. 13.

In December 2004, Stevens was ready to return to work and scheduled a "return-to-work" physical.  On December 13, 2004, Stevens reported to Concentra, a facility that provides job-related physicals and drug testing to undergo the physical examination, which included a drug test.  Stevens provided a urine sample for the drug test, as requested, but the personnel at Concentra told him that the sample's temperature was outside the acceptable temperature range. He was told he would have to provide a second sample and agreed to do so.  Stevens was then taken to a room to wait for someone to collect the sample.  Stevens Decl. ¶ 33.

Due to the fact that he is HIV-positive and had suffered from serious illnesses, including pneumonia, in the past, Stevens became very frightened at the idea that something was wrong with his urine and thought he might have another serious illness. He waited approximately 45 minutes alone in the room at which time he finally asked a Concentra employee when someone would see him.  He was told that it would be

shortly, but after approximately another twenty minutes no one came to see him.

Stevens Decl. ¶¶ 33-34.

       At this point, Stevens had become extremely upset and worried that he might be ill. Stevens' doctors had previously told him to be very mindful of his body temperature because, being HIV-positive, he is more susceptible to infections. His doctors had also told him that if his body temperature rose to above 100.5 degrees to immediately go to the hospital. He had not been told whether his urine had been hot or cold but he knew that Concentra was not equipped to treat someone with serious health conditions like himself. Stevens Decl. ¶¶ 34-36.

       After approximately another twenty minutes of waiting for someone to see him, Stevens became extremely upset and worried that he might be ill. Stevens told the employees at Concentra that he was going to see a doctor and offered to come back to provide a second sample later. He was told that Concentra needed to call Amtrak to see if he could leave the facility without providing a second sample. A woman named Ebonie called Margaret Tierney of Amtrak's medical department to ask for instructions on how to handle the situation. Stevens was present when Ebonie made the call and heard Ebonie leave a message on Tierney's voice mail stating that David Stevens' urine sample was not at the right temperature and to please call Concentra back to inform them of the procedures they should follow. Stevens Decl. ¶ 37; Stevens Decl. Exh. 14 – December 13, 2004 memorandum from Concentra.

       Stevens waited an additional ten minutes for Amtrak to call back. Stevens Decl. ¶ 38. By this time, however, Stevens had become very afraid that he was sick. After waiting as long as he felt was safe, Stevens left Concentra and went straight to the Emergency Room at George Washington University Hospital. At the Emergency Room,

Stevens was diagnosed with a viral bronchial infection and abdominal pain. Stevens Decl. ¶ 39; Stevens Decl. Exh. 15 – Emergency Room record.

Despite the fact that Stevens offered to return to provide a second sample and was suffering from an illness the day of the test, Amtrak instituted procedures to terminate Stevens' employment in December 2004. Stevens Decl. ¶ 40. On January 18, 2005 and January 31, 2005, Amtrak held a hearing as part of its procedures necessary to terminate Stevens' employment. Campbell was listed as the Charging Officer bringing the action against Stevens. See Stevens Decl. Exh. 16 – Hearing Transcript p. 7. During the hearing, Stevens testified without contradiction that he had only left the testing facility because he feared he might have a serious condition and that he was not told that he could have been fired if he left without providing a second sample at that time. Stevens Decl. ¶ 41; Stevens Decl. Exh. 16 – Hearing transcript pp. 116-118, 139-140, 153-154. At the conclusion of the hearing, Amtrak fired Stevens for allegedly Amtrak's Drug and Alcohol policy. Stevens Decl. ¶ 43.

However, despite the circumstances under which he left the facility, it is undisputed that neither Campbell nor anyone else at Amtrak ever asked him to provide a second sample after December 13, 2004. Nor did anyone from Amtrak ever contact Stevens before the hearing to hear his side of the story before instituting termination proceedings. Moreover there is no evidence that Amtrak ever attempted to contract Stevens' union representative or his former counsel to discuss the incident either. Stevens Decl. ¶ 42.

### III.    ARGUMENT: DEFENDANT'S MOTION MUST BE  DENIED

Defendant has filed a motion to dismiss or in the alternative motion for summary judgment in this case.  Defendant contends that Mr. Stevens' complaint does not state a claim because he admits to leaving the testing facility after the urine sample he provided indicated the temperature was out of range.  Defendant argues that under Amtrak's Drug and Alcohol Policy, an employee who refuses to complete a drug and/or alcohol test becomes subject to termination.  Defendant further argues that Mr. Stevens' conduct provides Amtrak a legitimate, nondiscriminatory basis to terminate his employment and thus, there is no issue left to be decided.

### IV.    THE MOTION TO DISMISS MUST BE DENIED  AND SHOULD  PROPERLY BE TREATED AS A MOTION FOR SUMMARY JUDGMENT

Though styled in part as a Motion to Dismiss, Defendant does not appear to have made any arguments that would support a dismissal under Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Kenneda v. United States, 880 F.2d 1439, 1442 (D.C.  Cir. 1989).  The factual allegations of the complaint must be presumed true and construed in the light most favorable to the plaintiff.  Zoelsch v. Arthur Andersen & Co., 262 U.S. App. D.C. 300; *824 F.2d 27, 33 (D.C. Cir. 1987;)*; Shear v. National Rifle Ass'n of Am., 196 U.S. App. D.C. 344, 606 F.2d 1251, 1253 (D.C. Cir. 1979).  Moreover, the plaintiff is entitled to all favorable inferences that may be drawn from those allegations.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In this case, the Complaint states that Stevens engaged in protected activity on numerous occasions.  Complaint ¶¶ 24, 26, 27.  Subsequent to his complaint, Stevens underwent a employment-related drug test.  The temperature of his urine sample was out of range, however.  Complaint ¶¶ 31-32.  Stevens left the testing facility to go to the Emergency Room after waiting for approximately 90 minutes to be retested.  Complaint ¶ 33.  Stevens was allegedly terminated for having left the facility without having his urine retested.  Complaint  ¶ 35.  Drawing all inferences in Mr. Stevens favor, as the Court must when ruling on a motion to dismiss, the Court could infer that Stevens was terminated not for leaving the facility before having his urine retested but because he had complained of unlawful discrimination.   Thus, to the extent that Defendant's motion could possibly be construed as a motion to dismiss under Rule 12(b)(6) (which it should not), the motion must fail.

In this case, Defendant has relied completely on matters outside the pleadings. Fed R. Civ. P. 12(c) states that: "If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56."  In its motion, Defendant relies on the Declaration of Bernard Campbell and a copy of Amtrak's Drug and Alcohol Policy attached as Exhibit A.  Since it is apparent that Defendant's argument for dismissal hinges on facts outside the pleadings, Plaintiff respectfully requests that the Motion to Dismiss be denied, and that the Court apply the Fed. R. Civ. P. 56 standards to the instant Motion.

## V.    ARGUMENT: THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED

### A.    APPLICABLE PRINCIPLES FOR SUMMARY JUDGMENT

The standards for considering defendant's motion are well known:

Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The district judge, in ruling on a summary judgment motion, must assume the truth of the nonmovant's evidence, and draw all justifiable inferences in that party's favor.  Bayer v. United States Dep't of the Treasury, 294 U.S. App. D.C. 44, 956 F.2d 330, 333 (1992), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

"The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).  The court must view the evidence in the light most favorable to the nonmoving party and must not assess witness credibility.  See Aka v. Washington Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284, 1288, 1298 (D.C. Cir. 1998;) (en banc); Mackey v. United States, 8 F.3d 826, 829 (D.C. Cir. 1993).  "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those positions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Furthermore, "the record must show the movant's right to [summary judgment] with such clarity as to leave no room for controversy," and must demonstrate that the opposing party "would not be entitled to [prevail] under any discernible circumstances." McKinney v. Dole, 765 F. 2d 1134, 1135 (D.C. Cir. 1985,), citing Williams v. W.M.A.T.A., 721 F.2d at 1415.  The burden of making such a showing is on the party moving for summary judgment.  McKinney v. Dole, 765 F.2d at 1134-35.

### B.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT HERE, SINCE STEVENS PRESENTS DIRECT EVIDENCE THAT DEFENDANT ACTIONABLY THREATENED HIM IN RETALIATION FOR HIS PROTECTED ACTIVITY, IN VIOLATION OF THE HUMAN RIGHTS ACT

D.C. Code § 2-1402.61, on "coercion or retaliation," states as follows:

(a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.

The D.C. Court of Appeals has held explicitly that threatening an employee's employment status in retaliation for his protected activity violates the Human Rights Act. Arthur Young & Co. v. Sutherland, 631 A.2d 354 (D.C. 1993), citing Atlantic Richfield Co. v. District of Columbia Com. on Human Rights, 515 A.2d 1095, 1001 (D.C. 1986) (threatening employee that "she would never work in the District of Columbia again if she pressed her discrimination claim" amounted to unlawful retaliation under section 1-2525 (a)).  In this respect, the Human Rights Act clearly differs from Title VII of the Civil Rights Act of 1964, under which retaliatory threats are not independently actionable.

Here, Stevens can place this case squarely before the jury to weigh credibility and resolve fact disputes simply by presenting the evidence, as described above, p. 5, that

14

Defendant's agent, Bernard Campbell, repeatedly threatened him for his having named

Campbell in successive anti-discrimination contacts.  Thus, Campbell within a week

after McKewen sent the May, 2004 letter on Steven's behalf alleging hostile environment

and unauthorized disclosure of his medical records, Campbell verbally attacked Stevens

in a parking lot, threatening that he would "destroy [Stevens'] ass" and: ". . . you are

going to put my name in that fucking shit, No I will destroy a mother fucker like

[Stevens]," and that "if [Stevens] ever put [Campbell's] name in anything else, [he]

would wish [he] didn't."  Exh. 18 - Statement of Terrell Williams.

Based on the above, a material issue of fact clearly exists as to whether Defendant

has violated the Human Rights Act by making actionable retaliatory threats.

Accordingly, summary judgment must be denied.

**C.     DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT HERE, SINCE STEVENS HAS PRESENTED SUFFICIENT EVIDENCE OF RETALIATORY MOTIVE AND/OR PRETEXT, WITH REGARD TO STEVENS' CLAIM THAT DEFENDANT UNLAWFULLY TERMINATED HIM IN RETALIATION FOR HIS PROTECTED ACTIVITY, IN VIOLATION OF THE HUMAN RIGHTS ACT**

1.     Applicable Principles

The District of Columbia Human Rights Act, D.C. Code § 2-1402.61, prohibits

employers from undertaking adverse employment actions "on account of" an

employee's activities protected by that Act.  Summary judgment is unavailable where a

Plaintiff presents sufficient evidence "from which a reasonable jury could find that the

decision to terminate Plaintiff was motivated" by discriminatory reasons.[1] Rishel v.

Nationwide Mut. Ins. Co., 297 F. Supp. 2d 854, 866 (D.N.C. 2003). Thus, if a plaintiff can

---

[1]     Also See D.C. Code § 2-1402.11 forbidding actions due "wholly or partially" to an unlawful discriminatory motive.

demonstrate that there is a genuine issue of material fact that his termination was motivated by an impermissible criterion, he survives a defendant's motion for summary judgment. Id., citing Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F. Supp. 2d 1180, 1197 (D. Iowa 2003).

Discrimination and retaliation are as susceptible to proof by circumstantial evidence as any other factual issue. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983). "Since direct evidence of discriminatory treatment is rarely present [in an employment discrimination case], plaintiff ordinarily must rely on 'circumstantial' rather than direct evidence to infer such motivation." Jones v. Trailways Corp., 477 F.Supp. 642, 646 (D.D.C. 1979). See Also Aka, 156 F.3d at 1288-89.

Discrimination or retaliation can always be proved by circumstantial evidence alone; employer confessions or admissions, otherwise known as "direct evidence," are not required. Reeves v. Sanderson Plumbing, 530 U.S. 133 (2000). In Reeves, Justice O'Connor wrote for the Court that this holding was consistent with the general principle of law that a jury may consider a party's dishonesty as evidence of guilt. The unanimous opinion made it clear that the fact finder may find for the employee based on inferences alone, except in the rare instance of a case where the employer's asserted rationale is disproved, but there exists independent evidence that discrimination did not really motivate the adverse action. Reeves was consistent with the Supreme Court's earlier holding in Hicks v. St. Mary's Honor Center, 509 U.S. 502, 511 (1993), that in Title VII- type cases, "the fact-finder's disbelief of the reasons put forward by defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of a prima facie case, suffice to show intentional discrimination."

The plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981).  The burden "is not onerous."  Id.  As adapted from the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), line of cases, the elements of the plaintiff's prima facie case of retaliation as follows:  the plaintiff must establish that he engaged in protected activity, that the employer took an adverse employment action against him, and that there was a nexus between the adverse action and the exercise of his rights."  Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000); Carter-Obayuwana v. Howard University, 764 A.2d 779 (D.C. 2001), citing McKenna v. Weinberger, 234 App. D.C. 297, 729 F.2d 783, 790 (D.C. Cir. 1984); Arthur Young & Co., 631 A.2d at 367.  Where there is close temporal proximity between the discrimination complaint and the adverse action, the facts are sufficient to establish the requisite causal connection.  Cones, 199 F.3d at 521.

Once a plaintiff has established a prima facie case, however modest it may appear, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the challenged action.  Guerra v. Dept. of the Treasury, 42 FEP Cases 1149, 1152 (D.D.C. 1987), citing Burdine, 450 U.S. at 254.  "To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the [adverse personnel action].  The explanation provided must be legally sufficient to justify a judgment for the defendant."  Id. at 255.  "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts.  In general, the more idiosyncratic or questionable the employer's reasons, the easier it will be to expose it as a pretext, if indeed it is one."  Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979).

If the defendant meets its burden of production, "the plaintiff must then offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic (mixed-motives alternative).'" Rachid v. Jack in the Box, Inc., 376 F.3d 305, 312 (5th Cir. 2004).

  2. Applicable Principles For Proving Retaliation By Showing The Employer Was Motivated By Retaliatory Animus

As the Eleventh Circuit has held, it would be inappropriate to grant summary judgment to Defendant where Plaintiff has provided *direct evidence of discriminatory motive*, because the issue turns largely on whose witnesses are believed: "Such a credibility determination can be made only after trial. . ." Wright v. Southland Corporation, 187 F.3d 1287, 1305 (11th Cir. 1999).

In Dunbar v. Pepsi-Cola Gen. Bottlers of Iowa, Inc., 285 F. Supp. 2d at 1197, the United States District Court for the District of Iowa held that, in applying Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), and 42 U.S.C. § 2000e-2(m), once the McDonnell Douglas framework "disappears" because the defendant proffers a legitimate reason for its conduct, the plaintiff can survive summary judgment even without showing that the employer's proffered reason is false.  The plaintiff may survive summary judgment simply by showing that even if the defendant's reason is true, there exists a genuine issue of material fact that another "motivating factor" for the defendant's conduct was the employee's protected characteristic. Such evidence adequately manifests a "mixed motive." Dunbar, 285 F.Supp. 2d at 1197.

The <u>Dunbar</u> analysis applies to claims brought under the Human Rights Act, not just under the federal Title VII, because the <u>Dunbar</u> logic is equally applicable to the Human Rights Act, which, like Title VII, also has an absence of any heightened proof standards in its text.  Thus, in <u>Rachid v. Jack in the Box, Inc</u>., 376 F.3d 305, 312 (5th Cir. 2004), the Fifth Circuit held that "given that the language of the relevant provision of the ADEA is [like the pre-1991 Title VII] silent as to the heightened direct evidence standard, and the presence of heightened pleading requirements in other statutes, we hold that direct evidence of discrimination is not necessary to receive a mixed-motives analysis for an ADEA claim." <u>Id</u>.  Accord <u>Estades-Negroni v. Assocs. Corp. of N. Am</u>., 345 F.3d 25, 31 (1st Cir. 2003) (holding that after <u>Desert Palace</u> the mixed-motives analysis applies in ADEA cases even without direct evidence of discrimination); <u>Strauch v. Am. College of Surgeons</u>, 301 F. Supp. 2d 839, 844 (N.D. Ill. 2004) ("Given the similarities in text and purpose between Title VII and ADEA, as well as the consistent trend of transferring the various proof methods and their accompanying rules from one statute to the other, this Court considers it likely that whatever doctrinal changes emerge as a result of <u>Desert Palace</u> in the Title VII context will be found equally applicable in the ADEA arena."); <u>Thompson v. Proviso Twp. High Schs. Dist</u>. 209, 2003 U.S. Dist. LEXIS 12015, No. 01-C-5743, 2003 WL 21638808, at *8 (N.D. Ill. July 10, 2003).

    3.    <u>Applicable Principles For Proving Retaliatory Intent By Showing Pretext</u>

To proceed by showing pretext, the plaintiff must show either "that the asserted reasons were insufficient to explain the employer's decision or were not applied in a nondiscriminatory fashion, or by proving that a discriminatory reason more likely motivated the employer."  <u>Burdine</u>, <u>supra</u>, 450 U.S. at 256; <u>McDonnell-Douglas</u>, <u>supra</u>, 411 U.S. at 804-05.

The United States Court of Appeals for the D.C. Circuit has recently attempted to clarify what is required of a plaintiff at this stage, holding that:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka., 156 F.3d at 1289.

Once the Plaintiff has shown a causal connection, even absent direct evidence of retaliatory animus, there must be a trial if there is evidence of pretext.  One form of evidence from which a jury may be able to infer discriminatory intent is "evidence the plaintiff presents to attack the employer's proffered explanation for its actions." McGill v. MuNoz, 2000 U.S. App. Lexis 2418 (D.C. Cir. 2000), citing Aka, 156 F.3d at 1288, 1298 (noting that the "sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case").

The Seventh Circuit, in a helpful formulation, stated that a plaintiff can avoid summary judgment in a discharge case by showing: (1) that the defendant's proffered reasons had no basis in fact; (2) that the proffered reasons did not actually motivate the discharge; or (3) that [the reasons] were insufficient to motivate the discharge.  Collier v. Budd Co., 66 F.3d 886, 890 (7th Cir. 1995).   When the non-movant plaintiff shows that at least some of the reasons asserted by the defendant for its actions are pretextual, such evidence is sufficient to defeat summary judgment.

Evidence of prior or subsequent retaliatory acts can be highly probative.

It is a general rule that other evidence of discrimination by the employer is admissible regarding an employer's motive in taking adverse action against an employee.  Hairston v. WMATA, 1997 U.S. Dist. Lexis 5188 (D.D.C. 1997)(Hogan, J.); Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1104 (1988)(interpreting Fed. R. Evid. 404).  Such evidence is admissible under Rule 404(b) of the Federal Rules of Evidence "to show motive and intent," "critical" issues in any discrimination or retaliation case.  Hogan v. American Tel. & Tel. Co., 812 F.2d 409, 410 (8th Cir. 1987); Accord, Phillips v. Smalley Maintenance Services, 711 F.2d 1524, 1532 (11th Cir. 1983); Morris v. Washington Metro. Area Transit Authority, 702 F.2d 1037, 1045 (D.C. Cir. 1983) (prior acts of employer admissible as bearing on whether improper motive was cause of retaliatory discharge); Goff v. Continental Oil Co., 678 F.2d 593, 597 n.3 (5th Cir. 1982); Miller v. Poretsky, 595 F.2d 780, 784 (D.C. Cir. 1978) (prior acts of landlord towards other black tenants admissible as to whether plaintiff, also a black tenant, was discriminated against).

**D.    AMTRAK TERMINATED STEVENS IN RETALIATION FOR HIS PROTECTED OPPOSITION TO ITS DISCRIMINATORY CONDUCT**

1.    Stevens' Prima Facie Case of Retaliation

In this case, Defendant has not challenged the sufficiency of Stevens' prima facie case.  Indeed, it is undisputed that Stevens satisfies all of the three prima facie elements.  As discussed below, Defendant relies instead pretends that its asserted non-retaliatory reason for firing Stevens is in fact the agreed sole motivation for the discharge.

Stevens engaged in statutorily protected activity, the first prima facie element, on several different occasions, beginning when he complained to Campbell and Dalton in April 2004, that he felt he was being subjected to a hostile working environment.  Stevens engaged in protected activity again on May 21, June 21, and August 23, 2004

when McKewen, the attorney from The Georgetown Law Center, sent letters to Amtrak asserting that Stevens had been experience a hostile work environment and retaliation. Stevens also filed an EEOC charge on June 23, 2004 and amended his charge on November 17, 2004.  Stevens was terminated, thereby satisfying the second prima facie element of adverse action.

Moreover, Defendant has not disputed that Stevens' complaints were received and reviewed by Amtrak's decision makers, and that Stevens began experiencing retaliation almost immediately, thus satisfying the causal connection requirement between the protected activity and the adverse action. See Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) ("Price has established a prima facie case of discrimination because a reasonable trier of fact could conclude that Robbins knew of the protected activity and because Robbins, at the first available opportunity, declined to hire Price"). For example, as shown in the facts, p. 5, within a week after McKewen sent the May, 2004 letter to Amtrak alleging hostile environment and unauthorized disclosure of his medical records, Campbell verbally attacked Stevens in a parking lot, threatening that he would "destroy a mother fucker like [Stevens]" and that "if [Stevens] ever put [Campbell's] name in anything else, [he] would wish [he] didn't."

A mere week had passed between McKewen's June 21, 2004 protest about the parking lot incident and Stevens' June 23, 2004 EEOC charge, when Campbell began threatening Stevens with termination, allegedly because of insufficient medical documentation. (Facts, pp. 6-7).  Finally, Amtrak terminated Stevens approximately one month after Stevens amended his EEOC charge to include a claim of retaliatory harassment, which he had asserted on account of Campbell's threats to terminate him if he did not provide additional medical documentation.

Moreover, as shown in the facts, p. 10, it was Campbell, the same official whom Stevens protested against repeatedly, who falsely charged Stevens with misconduct punishable by firing for leaving Concentra to go directly to the emergency room, an hour after he had been told to provide a second urine sample.

Accordingly, the jury could easily infer that there is a causal connection between Stevens' protected activity and Amtrak's termination of his employment. Barbour v. Merrill, 759 F. 2d 80, 86 (D.C. Cir. 1985); Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000)(strong timing evidence satisfies the prima facie requirement).

2.     Defendant's Alleged Legitimate, Non-Discriminatory Reason

Defendant (Br. at 2-3), contends that Amtrak terminated Stevens for leaving Concentra before providing a second urine sample. Amtrak argues that by leaving, Stevens refused to take the drug test.   First, Stevens unequivocally denies that he ever refused to take a drug test.  In fact, he appeared for the voluntary return to work physical and provided a urine sample, as requested.  Moreover, he was never informed that by leaving the facility before providing a second sample, he would have been accused of violating Amtrak's rules and regulations.  He further asserts that he waited for further testing as long as possible and only left when he felt his health was at risk.

Although Stevens denies that he refused to comply with a drug test, he does not dispute that refusing to take a drug test might satisfy Defendant's burden of proffering a legitimate, nondiscriminatory reason for his termination.  Stevens maintains, however, that this reason did not motivate his discharge.  Rather, Stevens was fired for his protected protests, a fact that is supported by the fact that Campbell was threatening to fire Stevens for other reasons shortly before the actual termination, the fact that Campbell admitted that he was threatening to carry out retaliatory actions against

Stevens before the actual firing, and the fact that Defendant pretextually exploited the

Concentra situation to fire Stevens, rather than handle it in a non-retaliatory fashion.

> 3.    There Exists Direct Evidence of Retaliatory Animus In This Case,
> Which Creates a Dispute of Fact That The Termination of Stevens Was
> Motivated By Retaliatory Animus, Sufficient To Require Trial

As shown below, even at this early, pre-discovery stage, Stevens is able to

produce direct evidence that Campbell harbored a retaliatory motive against him.  Only

a small inference will be required of the jury to conclude that Stevens' termination was a

result of that admitted animus.  Thus, as shown in the facts, p. 5, in this case, Campbell

openly signaled his retaliatory intent against Stevens in response to Stevens' protected

activity.  Campbell admitted that he intended to "destroy" Stevens on May 30,

approximately one week after McKewen's May 21 letter complaining of hostile

environment.  At that time, as shown in the facts, p. 5, Campbell followed Stevens

outside to a car and yelled at Stevens, among other things, that Campbell was not one to

be "fucked" with, and that Campbell  ". . . "will destroy a mother fucker like [Stevens],"

and: "if you ever put my name in anything else, you would wish you didn't."

Campbell's vengeful comments operate as admissions that Campbell had

intended to fire Stevens, or otherwise "destroy" him, if Stevens persisted in his EEO

activity, well before the Concentra incident ever happened. Without question, the jury

could permissibly infer from this context that the firing of Stevens by Campbell occurred

on account of retaliatory animus, and was going to occur anyway, notwithstanding

whatever happened at Concentra, and a trial is therefore required. See Wright, 187 F.3d

at 1305 ("it would be inappropriate to grant summary judgment to Defendant where

Plaintiff has provided *direct evidence of discriminatory motive*, because the issue turns

largely on whose witnesses are believed: "Such a credibility determination can be made only after trial. . ."); Dunbar, 285 F.Supp.2d at 1197.

Moreover, Defendant's motivation and intent to retaliate is further demonstrated by its treatment of Stevens' co-Plaintiff, Mae Whitley. Thus, as shown in the facts, p. 7, Campbell expressed Defendant's retaliatory mindset to Whitley openly in August 2004, during the same time period in which Campbell was attempting to oust Stevens. Campbell told her that she had not been promoted because she that she had "gone after" "those white motherfuckers," by filing an EEO lawsuit. Campbell asked Whitley rhetorically: "do you think those motherfuckers are gonna forget?" Whitley Decl. ¶ 27. For emphasis, he added: "do you think that?" Whitley Decl. ¶ 28. Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them. Whitley Decl. ¶ 29.

Campbell's response to Whitley's expression of lack of surprise that she was being retaliated against, was extremely telling. He said Amtrak was "***not retaliating,*** *but rather was "just not moving* [promoting]" her. (Emphasis added.) Whitley Decl. ¶ 30. Campbell then said that, in order to meet the legal definition of retaliation, Amtrak would have to do something like fire Whitley. Whitley Decl. ¶ 31. Campbell summed it up: "It's a thing they say to you in court: no harm, no foul."

Campbell threatened Stevens directly with retaliation, indeed, Campbell asserted that he would "destroy" him for asserting his right not to be discriminated against, warned him never to do it again, and then fired him when he did. The willfulness of Campbell's retaliation was illustrated clearly by his conversation with Whitley, in which he showed that he had given a lot of thought to what constituted unlawful retaliation and what he thought did not. His remarks to Whitley confirmed Amtrak

management's motivation and intent to punish those who would raise EEO contentions against it. Under the circumstances, there can be no doubt that Stevens has presented much, much more than is necessary to preclude summary judgment.

    4.    <u>There Exists a Sufficient Dispute of Fact That Defendant's Expressed Reason for the Termination of Stevens Was False and Pretextual, to Require Trial</u>

    a.    Campbell's Pre-Concentra Search For An Excuse To Fire Stevens Shows Pretext

As shown in the facts, pp. 6-7, Campbell's threats to fire Stevens for insufficient medical documentation carry the whiff of pretext. Thus, Stevens had submitted similar documentation in the past to justify a leave of absence from work with no complaint from Campbell. Furthermore, when Campbell improperly requested the additional documentation in 2004, Stevens willingly complied but Campbell again found the documentation provided to comply, which was provided by Stevens' attorney and mental health care provider, (pp. 6-7), insufficient. This further indicates that Campbell's actions were unfounded and merely a vehicle to retaliate against Stevens for daring to name him in his complaints.

    b.    The Temporal Proximity Between Stevens' Protected Activities and Amtrak's Retaliatory Actions, Shows Pretext

Proximate timing between the adverse action and the retaliation is also probative evidence of pretext, and can indeed provide a basis for denial of summary judgment in the presence of other suspicious circumstances (if not by itself). <u>Cones v. Shalala</u>, 199 F.3d at 521; <u>Ferguson v. Small</u>, 225 F. Supp. 2d 31, 41 (D.D.C. 2002) <u>Jalil v. Avdel Corporation</u>, 873 F.2d 701, 709 (3rd Cir. 1989) (timing rebuts defendant's proffered explanation)(citing <u>Dillon v. Coles</u>, 746 F.2d 998 (3d Cir. 1984)).

In this case, as shown in the facts, pp. 5-7, 9, Campbell had a practice of almost immediately retaliating against Stevens each time he complained. Thus, Campbell threatened to "destroy" Stevens on May 30, approximately one week after McKewen's May 21 letter on Stevens' behalf, complaining of hostile environment. Then, within just one week of McKewen's June 21, 2004 letter to Amtrak *specifically accusing Campbell* of retaliating against Stevens and contributing to the hostile work environment, Campbell threatened to terminate Stevens—relying at that time on the pretext of insufficient medical documentation. Campbell's actions in this regard telegraphed the fact that he was looking for a reason to fire Stevens and just waiting for his opportunity to do so.

Moreover, Campbell continued his retaliatory campaign when he terminated Stevens within just two months after Stevens amended his charge to include retaliatory harassment by Campbell based on Campbell's threats to terminate him if he did not provide additional medical documentation. See Womack v. Munson, 619 F.2d 1292, 1298 (8th Cir. 1990) (timing of discharge supports inference termination was because of complaint); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (retaliation at the first available opportunity is probative of retaliatory motive). All this evidence of temporal proximity illustrates Amtrak's retaliatory motive and necessitates a trial.

      c.      Amtrak's False Assertion That Stevens
                   Refused to Take A Drug Test Shows Pretext

Amtrak officials' reliance (Brf. at 2-3) on an assertion that it terminated Stevens for refusing to take a drug test evidences an attempt to cover up unlawful retaliation. Thus, as shown in the facts, p. 8, Amtrak did not order Stevens to report on any specific day. Stevens could have scheduled the return to work physical *at any time* prior to his return to work. Moreover, Stevens did not "refuse" to submit to the drug/alcohol test

once he arrived at Concentra, as Amtrak contends.  In fact, it is undisputed that Stevens

was extremely patient in providing Defendant with a urine sample and then, upon being

asked for a second sample, waiting for approximately an hour for that second sample to

be taken.  Stevens only left Concentra's facility when he felt his health was at risk, at

which time it is undisputed that he went directly to the emergency room.

It is undisputed that no one at Concentra or Amtrak ever informed Stevens that

he could be fired for leaving the testing facility without providing a second sample, and

that the Concentra personnel on the scene were unaware of this fact.  It is also

undisputed that Amtrak never took the obvious step of asking Stevens to return to

Concentra for an additional drug test or contacted him to investigate why he left

Concentra for the emergency room.   Absent a retaliatory motive, a rational employer

would be expected to attempt to discern the true facts of the situation before resorting to

the industrial death penalty, but Amtrak had such a motive, which caused it to seize the

perceived opportunity to rid itself of an EEO protester.

Under these circumstances, Amtrak's self-serving rationale for Stevens'

termination provides additional evidence of pretext.

> d.    Amtrak's Failure To Attempt to Discern
> Stevens' Explanation for the Concentra Incident
> Prior to Charging Him With a Terminable Offense
> and Firing Him, Shows Pretext

It is undisputed in this case that, as shown in the facts, p. 10, Campbell

proceeded directly from being informed that Stevens had left Concentra without being

tested a second time, to charging Stevens with terminable misconduct for.  It is

undisputed that Campbell never attempted to ascertain Stevens' explanation for what

happened, or investigate the events at Concentra, before convening a formal hearing to

28

fire Stevens.  This course of conduct diverged completely from what an employer not infected with retaliatory animus would be expected to do.  Campbell was so anxious to fire Stevens that he preferred not to even know what really happened. This demonstrated lack of interest in the true facts of the Concentra incident is further evidence that Defendant was not really motivated by the particulars of what occurred there at all, but rather, is using that incident as a pretext for retaliatorily firing Stevens.

As Stevens has shown that Defendant's reason for terminating his employment was pretextual, this Court should deny summary judgment and allow this case to proceed to trial.

## VI.    THIS CASE SHOULD BE ALLOWED TO PROCEED TO DISCOVERY

Defendant has filed the instant motion before the commencement of discovery. However, summary judgment at this stage of the case is obviously inappropriate.  At this point, the only materials Stevens has at his disposal are his own knowledge of events, his personal documents, and the hearing transcript of the firing hearing by Amtrak into the events surrounding his termination.    As discussed in our prior arguments, Stevens asserts that several material issues of disputed fact exist and that discovery in necessary in order for him to further ascertain Defendant's officials' motivation in threatening and terminating him, third-party witnesses' impressions of what occurred, circumstances other than his own that are probative of Amtrak's notice, intent and state of mind with regard to firing him, and many other matters.

Barry v. United States Capitol, 2005 U.S.Dist. LEXIS 8381 (May 2, 2005), is directly on point in this case.  There, the plaintiff had allegedly been terminated for misconduct after he had filed a complaint of discrimination and retaliation.  The defendant filed a motion for summary judgment alleging that the plaintiff could not

rebut the employer's legitimate nondiscriminatory reason for terminating his employment. The court opined that the inquiry into the employer's motivations was "necessarily fact intensive and [that] granting a motion for summary judgment on this issue prior to providing the parties with any opportunity for discovery [was] clearly contrary to this Circuit's precedent." Id. at 21-22.

Similarly, in Velikonja v. Mueller, 315 F.Supp.2d 66, 79-80 (2004), the court found that the plaintiff, who had also allegedly been terminated for misconduct, should be "afforded 'a reasonable opportunity to complete discovery[,]'" to identify any comparators with which to demonstrate pretext, "before grappling with a summary judgment motion'" (quoting Martin v. Malhoyt, 265 U.S. App. D.C. 89, 830 F.2d 237, 256 (D.C.Cir. 1987)). See also Information Handling Svcs. Inc. v. Defense Automated Priting Svcs., 338 F.3d 1024, 1032) (D.D.C. 2003) ("Summary judgment ordinarily is proper only after the chance to take discovery") (citations and internal quotations omitted); Paquin v. Fannie Mae, 119 F.3d 23, 28-29 (D.C. Cir. 1997) (plaintiff should have been provided opportunity to conduct discovery in order to refute defendant's legitimate nondiscriminatory reason for the adverse employment action).

By filing this motion for summary judgment prior to discovery, Defendant seeks to deprive Stevens of the opportunity to discover additional information that Defendant's reasons for terminating Stevens' employment was pretextual, and perhaps additional information bearing directly on its retaliatory motive. For example, Plaintiff would seek to discover whether other similarly situated employees received more favorable treatment. If discovery reveals that other individuals required to submit to a drug and alcohol test have been treated more favorably, this would provide powerful evidence that Stevens were terminated not for the alleged misconduct, but for his

30

complaints of harassment, discrimination and retaliation.  See Velikonja, 315 F.Supp 2d at 79 (discriminatory application of discipline evidence of pretext).

For the reasons set forth herein, Defendant's motion should be denied, discovery should proceed in preparation for trial.

## VII.    CONCLUSION

For the foregoing reasons, the Defendant's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment is utterly baseless, and should be denied by this Court.  Stevens was terminated in retaliation for his complaints of hostile environment and disability discrimination.  He respectfully requests that this Court set an early trial date.

Respectfully submitted,

THE GOLDSMITH LAW FIRM


/s/
_____
Leizer Z. Goldsmith
D.C. Bar No. 419544
1900 L Street, N.W., Suite 614
Washington, D.C. 20036
Telephone: (202) 775-0040
Facsimile: (202) 318-0798
Attorney For Plaintiff