IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| David B. Stevens <br><br> and <br><br> Mae Whitley, <br><br> Plaintiffs, <br><br> v. <br><br> National Railroad Passenger Corporation ("Amtrak"), <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Civil Action No. 1:05CV01924-RCL |

**STATEMENT OF FACTS MATERIAL TO THIS CASE THAT ARE IN DISPUTE, IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

1. David Stevens ("Stevens") began working for Amtrak on February 28, 1990, as a mechanical cleaner at Amtrak's Ivy Center Station. Declaration of David Stevens ("Stevens Decl.") ¶ 1.

2. Sometime in 1988, Stevens was diagnosed as HIV-positive. Stevens Decl. ¶ 1.

3. Stevens decided to keep his HIV-positive status a private matter and tell only the people who needed to know this information. Stevens Decl. ¶ 1.

4. In 2003, Stevens voluntarily went into a drug rehabilitation program and took a leave of absence from work to do so. Stevens Decl. ¶ 2.

5. On or around February 26, 2004, after Stevens returned to work, he was assigned to the Union Station Facility. Stevens Decl. ¶ 3.

6. Shirley Snider ("Snider"), one of Stevens co-workers, asked him if he had been out sick because of AIDS. Stevens Decl. ¶ 3.

7. Stevens told Snider that he did not have AIDS. Stevens Decl. ¶ 3.

8. Despite his denial, Snider told other Amtrak employees that Stevens had AIDS. Stevens Decl. ¶ 3.

9. Rumors regarding Stevens alleged condition spread throughout the Union Station facility. Stevens Decl. ¶ 4.

10. Stevens confronted Snider about starting the rumors. Stevens Decl. ¶ 4.

11. On March 10, 2004, Snider apologized to Stevens in a letter for spreading the rumor that he had AIDS. Stevens Decl. ¶ 4.

12. Although Snider apologized, she also left the letter in public display on his work cart. Stevens Decl. ¶ 4; Stevens Decl. Exh. 1 – letter from Snider.

13. After Snider had spread the rumors about Stevens, his co-workers at Amtrak began treating him differently including avoiding physical contact or simply acting strangely when they were around him. Stevens Decl. ¶ 5.

14. People would go out of their way to not be in the same car as Stevens. Stevens Decl. ¶ 5.

15. The two Amtrak employees who were responsible for making work assignments, Cindy Williams Hemphill ("Hemphill") and Donna Blake ("Blake"), began assigning him a much heavier workload than the other cleaners. Stevens Decl. ¶ 5.

16. Stevens had to clean more cars on each train than other cleaners. Stevens Decl. ¶ 5.

17. During the last week of March, Stevens filed a complaint with Amtrak's Dispute Resolution Office alleging that due to the rumors that he had AIDS he was

being subjected to a hostile work environment based on a perceived or actual disability. Stevens Decl. ¶ 6.

18. Subsequent to this complaint, Amtrak began to give Stevens even less desirable and more difficult work assignments. Stevens Decl. ¶ 6.

19. For example, on April 7, 2004, Stevens was assigned to clean a train car where a trash receptacle was missing and over a week's worth of refuse had accumulated in pile several feet high. Stevens Decl. ¶ 6.

20. The waste consisted of rotted food, spoiled milk, and used tissue, among other things. Stevens Decl. ¶ 6.

21. Due to concerns for his health, Stevens did not want to clean this car without proper protective equipment. Stevens Decl. ¶ 6.

22. He asked Donna Blake to assign someone to assist him in cleaning the car and/or to call the main office to report the missing trash receptacle which had caused the health hazard. Stevens Decl. ¶ 6.

23. Blake refused and told Stevens to clean the car. Stevens Decl. ¶ 6.

24. After he finished cleaning the car, Stevens went to the lunchroom to take a break. Stevens Decl. ¶ 7.

25. After he left the lunchroom, Stevens went to see if there was another train to clean. Stevens Decl. ¶ 7.

26. While he was waiting for the train to pull up, the general foreman, Joseph Savoy ("Savoy"), asked what he was doing. Stevens Decl. ¶ 8.

27. Stevens told Savoy he was waiting for the last train to come in so he could clean it if necessary. Stevens Decl. ¶ 8.

28. Savoy told Stevens not to wait for the train and said that if he did not leave the area, he would write him up and Bernard Campbell ("Campbell"), the Assistant Superintendent, would suspend him. Stevens Decl. ¶ 8.

29. Stevens had seen other cleaners and Amtrak employees wait in this area without Savoy threatening them with suspension. Stevens Decl. ¶ 9.

30. After this incident, Stevens felt the hostile environment had escalated to an intolerable level. Stevens Decl. ¶ 10.

31. The same day that Savoy threatened him, Stevens called Maya Theodore Dalton ("Dalton") in the Employee Assistance Program to talk about the hostile work environment. Stevens Decl. ¶ 10.

32. Dalton knew about the Snider incident and instructed Stevens to call his mental health professional. Stevens Decl. ¶ 10.

33. Stevens also called Bernard Campbell, the Assistant Superintendent, to explain briefly what had happened that day and to tell him that he had left work two hours early because of the Savoy incident. Stevens Decl. ¶ 11.

34. Campbell told Stevens not to worry and that he would take care of it. Stevens Decl. ¶ 11.

35. On or around April 9, 2004, Eric LeHot ("LeHot"), Stevens mental health professional, faxed a letter to Amtrak's medical department stating that Stevens was experiencing severe mental and emotional stress due to the hostile environment and placed him on a temporary leave of absence. Stevens Decl. ¶ 11; Stevens Decl. Exh.2 – April 9, 2004 letter from LeHot.

36. On April 12, 2004, Stevens also delivered a copy of LeHot's letter to the Master Superintendent, Michael Kapela ("Kapela"). Stevens Decl. ¶ 13.

37. Kapela approved a temporary leave of absence. Stevens Decl. ¶ 13.

38. On April 19, 2004, however, Stevens learned that a copy of LeHot's April 9th letter had been forwarded to Savoy, Campbell and Amtrak's Diversity Office. Stevens Decl. ¶ 14;.

39. Jeff Thomas, a pipe fitter, told Stevens that he had seen the letter in Savoy's office. Stevens Decl. ¶ 14.

40. Stevens went to the Diversity Office in the corporate office and an employee named Lisa Coleman showed him a fax coversheet showing that Campbell had forwarded LeHot's letter to the Diversity Office. Stevens Decl. ¶ 14; Stevens Decl. Exh. 3 – fax coversheet showing dissemination of letter.

41. There was no legitimate business purpose for Savoy, Campbell or the Diversity Office to have ever seen the letter. Stevens Decl. ¶ 14.

42. Stevens was shocked and outraged that such a personal document had been passed around his workplace. Stevens Decl. ¶ 14.

43. In or around May of 2004, Stevens sought advice from an attorney at The Georgetown University Law Center's Institute for Public Representation regarding the hostile environment at his workplace. Stevens Decl. ¶ 15.

44. On May 21, 2004, Richard McKewen, a staff attorney with the Georgetown University Law Center, wrote to Amtrak's Law Department explaining that Stevens had been experiencing disability discrimination and a hostile work environment and that he had complained about the situation to Theodore-Dalton and Campbell. Stevens Decl. ¶ 15; Stevens Decl. Exh. 4 - May 21, 2004 letter from McKewen.

45. The letter also stated that Campbell had disseminated a copy of LeHot's letter to people who had no legitimate reason for seeing the letter. Stevens Decl. ¶ 15; Stevens Decl. Exh. 4 - May 21, 2004 letter from McKewen.

46. McKewen's letter further stated that Stevens was willing to pursue these matters before the EEOC and in court. Stevens Decl. ¶ 15; Stevens Decl. Exh. 4 - May 21, 2004 letter from McKewen.

47. On May 30, 2004, after beginning his leave of absence, Stevens went to the Amtrak Ivy City facility to retrieve some medication he had left in my best friend, Darryl Hollis' car. Stevens Decl. ¶ 16.

48. Hollis was also an Amtrak employee. Stevens Decl. ¶ 16.

49. Another friend of Stevens', Terrell Williams ("Williams"), had driven him to pick up the medication. Stevens Decl. ¶ 16.

50. After Hollis did not come outside to meet Stevens as planned, Stevens walked about ten feet inside the building. Stevens Decl. ¶ 16.

51. He had only been in the building for about a minute when Campbell saw him. Stevens Decl. ¶ 16.

52. Stevens knew that he should have been wearing a hard hat and safety glasses when inside the building so he quickly left the building and got back into the car with Williams. Stevens Decl. ¶ 17.

53. Campbell, who was not wearing a hard hat or safety glasses, followed him outside to the car and told Stevens that he was not allowed on the premises. Stevens Decl. ¶ 17.

54. Campbell told Stevens that he was not one to be "fucked" with. Stevens Decl. ¶ 17.

6

55. Campbell said "you see I like you but you are going to put my name in that fucking shit." Stevens Decl. ¶ 17.

56. Campbell then told Stevens "I will destroy a mother fucker like you." Stevens Decl. ¶ 17.

57. Campbell also told Stevens "if you ever put my name in anything else, you would wish you didn't." Stevens Decl. ¶ 17.

58. Stevens did not respond to Campbell's tirade. Stevens Decl. ¶ 18.

59. Stevens had never been told he was not allowed on the premises. Stevens Decl. ¶ 19.

60. Williams submitted a sworn declaration drafted in connection with Stevens' EEOC charge corroborating Stevens' version of events. Exh. 18 – Sworn statement by Terrell Williams ("Williams sworn statement").

61. Williams stated that Campbell threatened Stevens "You are going to put my name in that shit, but you are better off fucking with those goddamn white people than fucking with me. I will fucking destroy your ass!" Exh. 18 – Williams sworn statement ¶ 3.

62. On June 21, 2004, McKewen, the attorney with The Georgetown University Law Center wrote a letter to Amtrak stating that Stevens would like to return to work but wanted a transfer to a different department in light of the harassment by co-workers and supervisors and unauthorized disclosure of medical records. Stevens Decl. ¶ 20; Stevens Decl. Exhibit 5 - June 21, 2004 letter from McKewen.

63. On June 21, 2004, Stevens also submitted a formal request for an accommodation for his disability through a transfer to a different department. Stevens Decl. ¶ 21.

7

64.     On June 23, 2004, Stevens filed a charge of discrimination with the EEOC. Stevens Decl. ¶ 22; Stevens Decl. Exhibit 6 - EEOC charge.

65.     On July 1, 2004, Campbell began harassing Stevens regarding the medical documentation he was required to provide to support his leave of absence. Stevens Decl. ¶ 23.

66.     On July 1, 2004, Campbell sent Stevens a letter stating that the documentation he had provided was not sufficient and that Stevens had to submit further documentation to support his leave of absence or he would be terminated. Stevens Decl. ¶ 23; Stevens Decl. Exh. 7 - July 1, 2004 letter from Campbell.

67.     On July 8, 2004, LeHot completed and returned Amtrak's medical status report form. Stevens Decl. ¶ 24; Stevens Decl. Exh. 8 – July 8, 2004 Medical Status Report.

68.     On July 23, 2004, Campbell sent Stevens another letter stating that the medical documents he provided were still not sufficient and to respond by August 6, 2004, with additional medical documentation or he would be terminated. Stevens Decl. ¶ 25; Stevens Decl. Exhibit 9 - July 23, 2004 letter from Campbell.

69.     On or around August 11, 2004, Stevens had his attorney submit additional medical documentation, as requested. Stevens Decl. ¶ 26.

70.     On August 20, 2004, Campbell sent yet another letter stating that the medical documentation Stevens had provided was still insufficient and that he did not provide further documentation, he would be terminated. Stevens Decl. ¶ 27; Stevens Decl. Exh. 10 - August 20, 2004 letter from Campbell.

8

71. Stevens had submitted similar medical documentation in the past and no one from Amtrak had ever questioned the sufficiency of the documentation. Stevens Decl. ¶ 28.

72. On August 23, 2004, McKewen sent a letter to the EEOC stating that Campbell's rejection of the medical documentation was in retaliation for Stevens' prior complaints and requested that the EEOC charge be amended to assert a claim for retaliation and for failure to accommodate. Stevens Decl. ¶ 29; Stevens Decl. Exh. 11 - August 23, 2004 letter from McKewen.

73. In approximately August 2004, Stevens' co-Plaintiff in this case, Mae Whitley, asked Bernard Campbell why she didn't receive a promotion. See Declaration of Mae Whitley ("Whitley Decl.") ¶ 25.

74. Whitley pointed out to Campbell that Whitley had never been in trouble or counseled. Whitley Decl. ¶ 26.

75. Campbell answered her by referring to her prior lawsuit, reminding her that she had gone after "those white motherfuckers," and asking her: "do you think those motherfuckers are gonna forget?" Whitley Decl. ¶ 27.

76. For emphasis, he added: "do you think that?" Whitley Decl. ¶ 28.

77. Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them. Whitley Decl. ¶ 29.

78. Campbell's response was to the effect that they were not retaliating, but rather were "just not moving" her. Whitley Decl. ¶ 30.

79. Campbell then said that, to retaliate, they would have to do something like fire Whitley. Whitley Decl. ¶ 31.

80. Campbell said that: "It's a thing they say to you in court: no harm, no foul." Whitley Decl. ¶ 32.

81. Exasperated, Whitley asked him if she would have to wait a whole year to get promoted. Whitley Decl. ¶ 33.

82. He responded: "Oh you might have to wait a whole year and a half. See Whitley Decl. ¶ 34.

83. Campbell also asked her: "Why did you think you could do that? Whitley Decl. ¶ 35.

84. On or around September 13, 2004, Stevens requested to be allowed to return to work. Stevens Decl. ¶ 30.

85. Unfortunately he got sick after making the request and his return was delayed. Stevens Decl. ¶ 30.

86. On November 7, 2004, Stevens found a note on the door of his home stating, "you will lose. you got aids." Stevens Decl. ¶ 31.

87. Stevens filed a police report on this incident. Stevens Decl. ¶ 31; Stevens Decl. Exh. 12 – copy of police report.

88. While Stevens has no proof, he suspects that someone from Amtrak left the note. Stevens Decl. ¶ 31.

89. On November 17, 2004, Stevens amended his EEOC charge to include retaliatory harassment by Campbell based on Campbell's threat's to terminate him if he did not provide additional medical documentation. Stevens Decl. ¶ 32; Stevens Decl. Exh. 13 - amended EEOC charge.

90. On December 13, 2004, Stevens reported to Concentra, a facility that provides job-related physicals and drug-testing, to undergo a return to duty physical examination, which included a drug test. Stevens Decl. ¶ 33.

91. Stevens provided a urine sample for the drug test, as requested. Stevens Decl. ¶ 33.

92. The Concentra employee to whom Stevens gave the sample told him that his urine was not at the right temperature and that he needed to provide a second sample. Stevens Decl. ¶ 33.

93. Stevens agreed to provide a second sample. Stevens Decl. ¶ 33.

94. Stevens was taken into a room to wait until someone could take a second sample. Stevens Decl. ¶ 33.

95. He waited approximately 45 minutes at which time he finally asked a Concentra employee when someone would see him. Stevens Decl. ¶ 33.

96. Due to the fact that he is HIV-positive and has suffered from serious illnesses in the past, including pneumonia, Stevens became very frightened at the idea that something was wrong with his urine. Stevens Decl. ¶ 34.

97. He thought he might have another serious illness. Stevens Decl. ¶ 34.

98. Stevens' doctors had previously told him to be very mindful of his body temperature because, being HIV-positive, he is more susceptible to infections. Stevens Decl. ¶ 34.

99. His doctors had also told him that if his body temperature rose to above 100.5 degrees to immediately go to the hospital. Stevens Decl. ¶ 34.

100. The people at Concentra did not tell Stevens whether his urine sample was too hot or too cold. Stevens Decl. ¶ 35.

101. All Stevens knew is that the temperature was not the right temperature. Stevens Decl. ¶ 35.

102. Although Concentra was a clinic, Stevens believed that Concentra was not equipped to treat someone with serious health condition like himself. Stevens Decl. ¶ 36.

103. After approximately another twenty minutes of waiting for someone to see him, Stevens became extremely upset and worried that he might be ill. Stevens Decl. ¶ 37.

104. Stevens told the employees at Concentra that he was going to see a doctor and offered to come back to provide a second sample later. Stevens Decl. ¶ 37; Stevens Decl. Exh. 14 – memorandum from Concentra..

105. Stevens was told that Concentra needed to call Amtrak to see if he could leave the facility without providing a second sample. Stevens Decl. ¶ 37.

106. A woman named Ebonie called Margaret Tierney at Amtrak to ask for instructions. Stevens Decl. ¶ 37.

107. Stevens was present when Ebonie made the call. Stevens Decl. ¶ 37.

108. Ebony got Tierney's voice mail and left a message saying David Stevens' urine sample is not at the right temperature and to please call Concentra back to inform them of the procedures they should follow. Stevens Decl. ¶ 37.

109. Stevens waited an additional ten minutes for Amtrak to call back. Stevens Decl. ¶ 38.

110. By this time, Stevens had become very afraid that he was sick. Stevens Decl. ¶ 39.

12

111. Stevens left Concentra and went straight to the Emergency Room at George Washington University Hospital. Stevens Decl. ¶ 39.

112. At the Emergency Room, Stevens was diagnosed with a viral bronchial infection and abdominal pain. Stevens Decl. ¶ 39; Stevens Decl. Exh. 15 – Emergency Room record.

113. Amtrak subsequently tried to terminate Stevens' employment for allegedly refusing to comply with the drug test. Stevens Decl. ¶ 40.

114. Amtrak held a hearing as part of the efforts to terminate his employment on January 18, 2005 and January 31, 2005. Stevens Decl. ¶ 41; Stevens Decl. Exh. 16 - Hearing transcript.

115. Campbell was the Charging Officer who instituted proceedings against Stevens. Stevens Decl. Ex. 16 – Hearing transcript p. 7.

116. During the hearing, Stevens testified that he had only left the testing facility because he feared he might have a serious medical condition. Stevens Decl. ¶ 41; Exhibit 16 - Hearing transcript at 116-118, 139-140, 153-154.

117. He also stated that he was not told that he could be fired if he left without providing a second sample at that time. Stevens Decl. ¶ 41; Stevens Decl. Exh. 16 - Hearing transcript at 153.

118. Stevens has never been asked to retake the drug test even though he only left because he was afraid he was sick and considered the situation to be an emergency. Stevens Decl. ¶ 42.

119. No one from Amtrak ever contacted Stevens before the hearing to listen to his side of the story. Stevens Decl. ¶ 42.

120. To the best of my knowledge, Amtrak did not try to contract either Stevens' union representative or his counsel to discuss the incident either. Stevens Decl. ¶ 42.

121. Amtrak told Stevens he was terminated violating Amtrak's policies, which included refusing to complete a drug test. Stevens Decl. ¶ 43.

122. After his termination, Michael McMillan ("McMillan"), the Chairman of Stevens' union wrote a letter appealing Stevens' termination. Stevens Decl.Exh.17 - March 14, 2005 appeal letter.

123. McMillan pointed out that the return to work physical was voluntary and Stevens could have cancelled it at any time. Stevens Decl. Exh.17 - March 14, 2005, letter to Blair.

124. Stevens could have scheduled the physical at any time before he came back to work. Stevens Decl. ¶ 33.

125. Stevens was terminated in retaliation for his complaints of hostile environment and disability discrimination and not because he failed to comply with Amtrak's policies on drug testing. Stevens Decl. ¶ 46.

          Respectfully submitted,

          THE GOLDSMITH LAW FIRM

          /S/
          _____
          Leizer Z. Goldsmith
          D.C. Bar No. 419544
          1900 L Street, N.W., Suite 614
          Washington, D.C. 20036
          Telephone: (202) 775-0040
          Facsimile: (202) 318-0798
          Attorney For Plaintiff

Dated: November 30, 2005.