## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____

David B. Stevens, et al.          )

                       )

          Plaintiffs       )

                       )

          v.           )       Civil Action No. 1:05CV01924-RCL

                       )

National Railroad Passenger Corporation  )

("Amtrak")                  )

          Defendant.    )

_____)

## DECLARATION OF DAVID B. STEVENS

I, David B. Stevens, do declare and state the following:

1.      I began working for Amtrak on February 28, 1990, as a mechanical cleaner at Amtrak's Ivy Center Station. Sometime in 1988, I was diagnosed as HIV-positive. I decided to keep my HIV-positive status a private matter and tell only the people who need to know this information.

2.      In 2003, I voluntarily went into a drug rehabilitation program and took a leave of absence from Amtrak to do so.

3.      On or around February 26, 2004, after I returned to work and was assigned to the Union Station Facility. Shirley Snider ("Snider"), one of my co-workers, asked me if I had been out sick because of AIDS. I told Snider that I did not have AIDS. Despite my denial, Snider told other Amtrak employees that I had AIDS.

4.      Rumors regarding my alleged condition spread throughout the Union Station facility. I confronted Snider about starting the rumors. On March 10, 2004, Snider apologized to me in a letter for spreading the rumor that I had AIDS. Although

Snider apologized, she also left the letter in public display on my work cart.  A copy of this letter is attached as Exhibit 1.

5.     After Snider had spread the rumors about me, my co-workers at Amtrak began treating me differently including avoiding physical contact with me or simply acting strangely when they were around me.  People would go out of their way to not be in the same car as me.  The two Amtrak employees who were responsible for making work assignments, Cindy Williams Hemphill and Donna Blake, began assigning me a much heavier workload than the other cleaners.  I had to clean more cars on each train than other cleaners.

6.     During the last week of March, I filed a complaint with Amtrak's Dispute Resolution Office alleging that due to the rumors that he had AIDS I was being subjected to a hostile work environment based on a perceived or actual disability.   Subsequent to this complaint, Amtrak assigned me even less desirable and more difficult work assignments.   For example, on April 7, 2004, I was assigned to clean a train car where a trash receptacle was missing and over a week's worth of refuse had accumulated in pile several feet high.  The waste consisted of rotted food, spoiled milk, and used tissue, among other things.  Due to concerns for my health, I did not want to clean this car without proper protective equipment. I asked Donna Blake to assign someone to assist me in cleaning the car and/or to call the main office to report the missing trash receptacle which had caused the health hazard. Blake refused and told me to clean the car.

7.     After I finished cleaning this car, I went to the lunchroom to take a break. After I left the lunchroom, I went to see if there was another train for me to clean.

8.      While I was waiting for the train to pull up, the general foreman, Joseph Savoy ("Savoy"), asked what I was doing.   I told him I was waiting for the last train to come in so I could clean it if necessary.  Savoy told me not to wait for the train and if I did not leave the area, he would write me up and Bernard Campbell ("Campbell"), the Assistant Superintendent, would suspend me.

9.      I had seen other cleaners and Amtrak employees wait in this area without Savoy threatening them with suspension.

10.      After this incident, I felt the hostile environment had escalated to an intolerable level.  The same day that Savoy threatened me, I called Maya Theodore Dalton in the Employee Assistance Program to talk about the hostile work environment. Dalton knew about the Snider incident and instructed me to call my mental health professional.

11.      I also called Campbell, to explain briefly what had happened that day and to tell him that I had left work two hours early because of the Savoy incident. Campbell told me not to worry and that he would take care of it.

12.      On or around April 9, 2004, Eric LeHot ("LeHot"), my mental health professional, faxed a letter to Amtrak's medical department stating that I was experiencing severe mental and emotional stress due to the hostile environment and placing me on a temporary leave of absence.  This letter is attached as Exhibit 2..

13.      On April 12, 2004, I also delivered a copy of LeHot's letter to the Master Superintendent, Michael Kapela ("Kapela"). Kapela approved a temporary leave of absence.

14.      On April 19, 2004, however, I learned that a copy of LeHot's April 9th letter had been forwarded to Savoy, Campbell and Amtrak's  Diversity Office.  Jeff

Thomas, a pipe fitter, told me that he had seen the letter in Savoy's office.   I then went

to the Diversity Office in the corporate office and Lisa Coleman showed me a fax

coversheet showing that Campbell had forwarded LeHot's letter to the Diversity Office.

There was no legitimate business purpose for Savoy, Campbell or the Diversity Office to

have ever seen the letter.  I was shocked and outraged that this document had been

casually passed around.  A copy of the fax coversheet showing that the letter was

forwarded to Campbell is attached as Exhibit 3.

15.     In or around May of 2004, I sought advice from an attorney at The

Georgetown University Law Center's Institute for Public Representation regarding the

hostile environment at my workplace.  On May 21, 2004, Richard McKewen

(McKewen"), a staff attorney with the Georgetown University Law Center, wrote to

Amtrak's Law Department, explaining that I had been experiencing disability

discrimination and a hostile work environment and that I had complained about the

situation to Theodore-Dalton and Campbell.  The letter also stated that Campbell had

disseminated a copy of LeHot's letter to people who had no legitimate reason for seeing

the letter. McKewen's letter further stated that I was willing to pursue these matters

before the EEOC and in court.  A copy of the May 21, 2004 letter from McKewe is

attached as Exhibit 4.

16.     On May 30, 2004, I had to go to the Amtrak Ivy City facility to retrieve

some medication I had left in my best friend, Darryl Hollis' ("Hollis") car.  Hollis was

also an Amtrak employee.  My friend, Terrell Williams ("Williams") had driven me to

pick up the medication.  After Hollis did not come outside to meet me as planned, I

walked about ten feet inside the building.  I had only been in the building for about a

minute when Campbell saw me there.

17.    I knew that I should have been wearing a hard hat and safety glasses when inside the building so I left the building quickly and got back into the car with Williams.  Campbell, who was not wearing a hard hat or safety glasses, followed me outside to the car and told me that I was not allowed on the premises.  Campbell told me that he was not one to be "fucked" with.  Campbell said "you see I like you but you are going to put my name in that fucking shit."  Campbell then told me "I will destroy a mother fucker like you."  Campbell also told me "if you ever put my name in anything else, you would wish you didn't."

18.    I did not respond to Campbell's tirade.

19.    I do not know why Campbell said I was not allowed on the premises. No one at Amtrak had ever told me that while I was on leave I would not be allowed to enter any of the Amtrak facilities.

20.    On June 21, 2004, McKewen, the attorney with The Georgetown University Law Center wrote a letter to Amtrak stating that I would like to return to work but wanted a transfer to a different department in light of the harassment by my co-workers and supervisors and unauthorized disclosure of my medical records.  The letter also recounted Campbell's verbal abuse and threats on May 30, 2004.  A copy of McKewen's June 21, 2004 letter is attached as Exhibit 5.

21.    On June 21, 2004, I also submitted a formal request for an accommodation for his disability through a transfer to a different department.

22.    On June 23, 2004, I filed a charge of discrimination with the EEOC.  A copy of the EEOC charge.is attached as Exhibit 6.

23.    After I filed my charge, Campbell began harassing me regarding the medical documentation I was required to provide to support my leave of absence.  On

July 1, 2004, Campbell sent me a letter stating that the documentation was not sufficient and that I had to provide further documentation to support my leave of absence or I would be terminated.  A copy of the July 1, 2004 letter from Campbell is attached as Exhibit 7.

24.    On July 8, 2004, my mental health care provider, LeHot, completed and returned Amtrak's medical status report form.  A copy of the July 8, 2004 medical status report form is attached as Exhibit 8.

25.    On July 23, 2004, Campbell sent me another letter stating that the medical documents I provided were still not sufficient and to respond by August 6, 2004, with additional medical documentation or I would be terminated.  A copy of the July 23, 2004 letter from Campbell is attached as Exhibit 9.

26.    On or around August 11, 2004, I submitted additional medical documentation, as requested.

27.    On August 20, 2004, Campbell sent me yet another letter stating that the medical documentation was still insufficient and that if I did not provide further documentation, I would be terminated.  A copy of the August 20, 2004 letter from Campbell is attached as Exhibit 10.

28.    I had submitted similar medical documentation in the past and no one had ever questioned the sufficiency of the documentation.

29.    On August 23, 2004, McKewen sent a letter to the EEOC stating that Campbell's rejection of the medical documentation was in retaliation for my prior complaints and requested that the EEOC charge be amended to assert a claim for retaliation and for failure to accommodate.   A copy of the August 23, 2004 letter from McKewen is attached as Exhibit 11.

30.     On or around September 13, 2004, I requested to be allowed to return to work.  Unfortunately I got sick after I requested to return to work, which delayed my return.

31.     On November 7, 2004, I found a note on the door of my home stating, "you will lose. you got aids." I filed a police report on this incident.  I have no idea who left the note although I suspect that it was someone from Amtrak.   A copy of the police report is attached as Exhibit 12.

32.     On November 10, 2004, I amended my EEOC charge to include retaliatory harassment by Campbell based on Campbell's threat's to terminate me if I did not provide additional medical documentation.  A copy of the amended EEOC charge is attached as Exhibit 13.

33.     On December 13, 2004, I reported to Concentra, a facility that provides job-related physicals and drug-testing, to undergo a return to duty physical examination, which included a drug test.  The physical was voluntary to the extent that I could have scheduled it at any time before returning to work.  When I arrived, I provided a urine sample for the drug test, as requested.  The Concentra employee to whom I gave the sample told me that my urine was not at the right temperature and that I needed to provide a second sample.  I agreed to provide a second sample.  I was then taken into a room to wait until someone could take a second sample.  I waited approximately 45 minutes at which time I finally asked a Concentra employee when someone would see me.

34.     Due to the fact that I am HIV-positive and have suffered from serious illnesses, including pneumonia, in the past, I became very frightened at the idea that something was wrong with my urine.  I thought I might have another serious illness.

My doctors had previously told me to be very mindful of my body temperature because, being HIV-positive, I am more susceptible to infections. My doctors had also told me that if my body temperature rose to above 100.5 degrees to immediately go to the hospital.

35.    The people at Concentra did not tell me whether my urine sample was too hot or too cold.  All I knew is that the temperature was not the right temperature.

36.    Although Concentra was a clinic, I believed that Concentra was not equipped to treat someone with serious health condition like myself.

37.    After approximately another twenty minutes of waiting for someone to see me, I became extremely upset and worried that I might be ill.  I told the employees at Concentra that I was going to see a doctor and offered to come back to provide a second sample later.  I was told that Concentra needed to call Amtrak to see if I could leave the facility without providing a second sample. A woman named Ebony called Margaret Tierney of Amtrak's medical department to ask for instructions.  I was with Ebony when she made the call.  Ebony got Tierney's voice mail and left a message saying David Stevens' urine sample is not at the right temperature and to please call Concentra back to inform them of the procedures they should follow.   A copy of the memorandum from Concentra I received regarding my drug test on December 13, 2004 is attached as Exhibit 14.

38.    I waited an additional ten minutes for Amtrak to call back.

39.    By this time, I was very afraid that I was sick.  I left Concentra and went straight to the Emergency Room at George Washington University Hospital.  At the Emergency Room, I was diagnosed with a viral bronchial infection and abdominal pain. See Exhibit 15 - Emergency Room Record.

40.     Amtrak subsequently tried to terminate my employment for allegedly refusing to comply with the drug test

41.     Amtrak held a hearing as part of the formal investigation into the efforts to terminate my employment on January 18, 2005 and January 31, 2005.  During the hearing, I testified that I had only left the testing facility because I feared I might have a serious medical condition.  I also stated that I was not told that I could be fired if I left without providing a second sample at that time.  A copy of the hearing transcript is attached as Exhibit 16.

42.     I have never been asked to retake the drug test even though I only left because I was afraid I was sick and considered the situation to be an emergency.  No one from Amtrak ever contacted me before the hearing to hear my side of the story.  To the best of my knowledge, Amtrak did not try to contract either my union representative or my counsel to discuss the incident either.

43.     Amtrak told me I was terminated for refusing to complete the drug test.

44.     My union appealed my termination asserting that I only left the Concentra facility to seek medical treatment and that I was not guilty of the charges Amtrak asserted against me.  See Exhibit 17 – March 14, 2005 appeal letter from Michael McMillan to Amtrak.

45.     Amtrak denied my appeal.  See Exhibit 18 – April 11, 2005 letter from Amtrak.

46.     I believe that I was terminated in retaliation for my complaints of hostile environment and disability discrimination and not because I failed to comply with Amtrak's policies on drug testing.

I declare under penalty of perjury that the foregoing is true and correct. Executed on November 25, 2005.

_____          __11 / 25 / 05_____
David B. Stevens                                              Date