

## GEORGETOWN UNIVERSITY LAW CENTER
## INSTITUTE FOR PUBLIC REPRESENTATION

Hope M. Babcock
Angela J. Campbell
David C. Vladeck
Directors

Eric D. Albert+*
James A. Bachtell
Lisa Goldman
Karen Henein+**
Richard McKewen
Staff Attorneys

600 New Jersey Avenue, NW, Suite 312
Washington, DC 20001-2075
Telephone: 202-662-9535
TDD: 202-662-9538
Fax: 202-662-9634
*Writer's Direct Dial:* 202-662-9546
*Writer's E-mail:* rm322@law.georgetown.edu

May 21, 2004

Melissa Rogers, Esq.
National Railroad Passenger Corporation
Law Department
60 Massachusetts Ave.
Washington, DC  20002

RE:   David Stevens

Dear Ms. Rogers:

I represent David Stevens, who is currently employed by Amtrak at Union Station as a mechanical cleaner. I write regarding the unauthorized disclosures to other employees of highly sensitive, confidential medical information. In addition to contributing to a hostile work environment, these disclosures constitute serious violations of the privacy provisions of the American with Disabilities Act as well as D.C. tort law. These disclosures have had a profound, debilitating effect on Mr. Stevens' mental health and well-being, and must be remedied promptly.

Mr. Stevens has worked at Amtrak since 1990. Not long before he began his employment with Amtrak, he was diagnosed as HIV-positive. Mr. Stevens decided, however, to keep HIV-status private. He divulges his status to others on only a "need-to-know" basis.

In 2003, Mr. Stevens' health declined precipitously, and he was forced to take a significant amount of time off from work. His health eventually improved, and in January 2004, he returned to work. Around that time, Mr. Stevens encountered one of his coworkers, Shirley Snider. Ms. Snider asked him if he had been out sick with AIDS. Mr. Stevens responded that he did not have AIDS.

Despite Mr. Stevens' denial, Ms. Snider began to tell Mr. Stevens' coworkers that he had "full-blown AIDS." Rumors about Mr. Stevens' condition spread throughout the crew, and one coworker identified Ms. Snider as the source of the rumors. After Mr. Stevens' confronted Ms. Snider regarding the rumors, she left a two-page letter on top of his work cart. Left open for passers-by to see, the letter apologized for spreading rumors about Mr. Stevens' health.

Despite this apology, Mr. Stevens' work situation did not improve. The rumors continued to spread, and Mr. Stevens found that his coworkers were now treating him differently. Some refused to shake his hand anymore, claiming that "there are colds going

around." Others would recoil and react strangely whenever he came into physical contact with them. The last week of March, Mr. Stevens filed a complaint with Amtrak's Dispute Resolution Office (DRO) regarding this situation, explaining that he believed he was now being subject to a hostile work environment on account of a perceived or actual disability.

Aggravating matters further, Mr. Stevens' work assignments started to change; he was given the most difficult cars to clean. On April 7, Mr. Stevens was assigned to a car so filthy – one of the bathrooms was missing its trash receptacle and a pile of refuse had collected several feet high – that he did not want to risk cleaning it without proper protection. Mr. Stevens cleaned as much as he thought he safely could without protective gear, and then he took a much-needed break before attempting to clean the rest.

While he was taking that break, Mr. Joseph Savoy, the general foreman, approached Mr. Stevens and brusquely told Mr. Stevens to "get off the block" and get back to work or he would be written up and put out of service. This last encounter proved too much for Mr. Stevens. He told Maya Theodore-Dalton in the Employee Assistance Program, and Bernard Campbell, the assistant superintendent, that he was unable to continue working that day because of the hostile working conditions, and that he needed to see his mental health professional.

Two days later, Mr. Stevens contacted his licensed mental health professional, Eric LeHot of the Center for Contemporary Psychotherapy. Following a thorough clinical evaluation, Mr. LeHot determined that Mr. Stevens' work environment was causing significant mental and emotional distress, and that Mr. Stevens therefore needed to take a temporary leave of absence. On April 9, Mr. LeHot faxed a letter to Amtrak's medical department in Philadelphia explaining his diagnosis and recommendation. On April 12, Mr. Stevens went to see Michael Copella, the master superintendent, and provided him with a copy of the letter Mr. LeHot had faxed to the medical department. Mr. Stevens explained that in accordance with Mr. LeHot's recommendation, he needed to take a temporary leave of absence. Mr. Copella approved a leave without pay for Mr. Stevens. (Mr. Stevens' had exhausted his disability and sick leave in 2003.)

On April 19, Mr. Stevens ran into a coworker, Jeff Thomas. Mr. Thomas told him that he had found out "what was going on." He indicated that he had seen a copy of the April 9 letter from Mr. LeHot on the fax machine in the public aread outside Mr. Savoy's office. Mr. Thomas said he had seen the fax approximate a week earlier.

Mr. Stevens immediately went to see Wanda McLaren, Amtrak's drug and alcohol health services manager to complain about this unauthorized dissemination of the April 9 letter. Ms. McLaren telephoned Mr. Savoy's office, and second-line foreman Kevin Noose answered the phone. Mr. Noose confirmed to Ms. McLaren that the letter was currently in Mr. Savoy's office. Ms. McLaren instructed Mr. Noose to "get rid of the letter."

Mr. Stevens then telephoned Lisa Coleman in the DRO office to complain about the fact that the April 9 letter had been disclosed to so many people without his permission. Ms. Coleman responded by telling Mr. Stevens that Mr. Campbell had, in fact, provided her with a copy of that letter as well. She assumed she had received the letter in error and instructed her assistant Glenda Atkinson to fax the letter to the medical department.

    Thus, while the April 9 letter had been provided in confidence to only Mr. Copella and Amtrak's medical department, within one week it had been shared with at least six other unauthorized employees, if not more. Mr. Stevens is extremely upset about these disclosures, and they have exacerbated the emotional distress, humiliation, and embarrassment that he has already suffered because of his hostile work environment. Therefore, first and foremost, Mr. Stevens wants to ensure that his private information is disclosed no further. He is also eager to return to work, but he does not believe he could return to same position given the demonstrated hostile work environment and the repeated disclosures of highly sensitive, confidential medical information.

    Please have someone contact me to discuss ways in which we can resolve this situation promptly and amicably. While Mr. Stevens is willing to pursue this matter before the EEOC and in court, I believe that this matter can be resolved satisfactorily without recourse to litigation. I look forward to hearing from you.

                                            Very Truly Yours,

                                            Richard McKewen