RE: AMTRAK FORMAL INVESTIGATION :
                                  :
                                  :
                                  :
                                  :
DAVID B. STEVENS                  :
                   Claimant  : NO: 04.465

- - -
Tuesday, January 18, 2005
DAY ONE
- - -

Formal Investigation of DAVID B. STEVENS,
taken pursuant to notice at AMTRAK HEARING OFFICE,
900 Second Street, N.E., REA Building - Lower
Level, Washington, DC, on the above date,
commencing at 11:10 a.m.

---------------------------------------------

FAST ACCURATE SKILLED TRANSCRIPTION
Rosemarie Corapi, Partner
Linda McCullough, Partner
2307 Oakdale Avenue
Glenside, Pennsylvania 19038-4210
(215) 728-6157 (Ofc.)/(215) 728-6157 (Fax)

---

Page 2

[ 1]                    E X H I B I T S
[ 2] NUMBER          DESCRIPTION                    MARKED
[ 3] COMPANY'S
[ 4] Exhibit A    Notice of Formal Investigation
                  Dated 1/1/2005 (2 pages)            7
[ 5] Exhibit B    Postponement/Rescheduling
                  Letter Dated 1/10/05 (1 page)       9
[ 6] Exhibit C    Letter Dated 1/9/05 from
[ 7]              Michael McMillan to B. L.
                  Campbell (1 page)                  11
[ 8] Exhibit D    Rescheduling Letter
                  Dated 1/27/05 (1 page)             22
[ 9] Exhibit E    Trust and Honesty and Alcohol
                  and Drugs Standards from Amtrak's
                  Standards of Excellence (2 pages)  27
[10] Exhibit F    Note to B.L. Campbell from
[11]              Andrea and Drug Test Results
                  for David Stevens (5 pages)        28
[12] Exhibit G    Fitness For Duty Testing (Non-
                  Regulated) Section of PERS-19,
[13] Exhibit H    Pages 16 and 17 (2 pages)          43
                  Chart #3 - Refusal to Test
[14]              from PERS-19, Drug and
                  Alcohol Guidelines (1 page)        43
[15] Exhibit I    Chain of Custody Form for
                  David Stevens Dated 12/13/04
                  (1 page)                           56
[16]
[17] ORGANIZATION'S
[18] Exhibit 1    Emergency Room Records for David
                  Stevens (12/13 and 12/14/04) and
[19]              Discharge Instructions (4 pages)  120
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 3

[ 1]
[ 2]                    I N D E X
[ 3] WITNESS                            PAGE
     MAIA DALTON-THEODORE
[ 4]    Examination by Mr. Talley       22
        Examination by Mr. McMillan     32
[ 5] JOSEPH ALLIONE (BY TELEPHONE)
        Examination by Mr. Talley       39, 63
[ 6]    Examination by Mr. McMillan     52, 62, 64, 65
        Examination by Mr. D'Alessandro 61, 64
[ 7] DEMETRIA HUDLEY - CONCENTRA
        (BY TELEPHONE)
[ 8]    Examination by Mr. Talley       66, 85, 94
        Examination by Mr. McMillan     70, 76, 78,
[ 9]                                    86, 92
        Examination by Mr. Stevens      74, 77, 90
[10] EBONIE BEATY - CONCENTRA
        (BY TELEPHONE)
[11]    Examination by Mr. Talley       97, 105
        Examination by Mr. McMillan     98, 107
[12]    Examination by Mr. Stevens      104
     DAVID STEVENS
[13]    Examination by Mr. McMillan     113, 156
        Examination by Mr. Talley       146, 160
[14] CLOSING SUMMATION
        By Mr. Talley                   161
[15]    By Mr. McMillan                 162
        By Mr. Stevens                  168
[16]
[17]              - - -
[18]
[19]
[20]
[21]
[22]
[23]
[24]
[25]

---

Page 4

[ 1]              P R O C E E D I N G S
[ 2]     MR. D'ALESSANDRO:  This is a Formal
[ 3] Investigation being conducted by myself, Arthur
[ 4] D'Alessandro, Hearing Officer, Washington
[ 5] Division.  Today's date is January the 18th.  The
[ 6] time now is 10 minutes after 11:00.
[ 7] (Unintelligible; clicking noise) the REA Building,
[ 8] 900 Second Street, N.E., Lower Level, Washington,
[ 9] DC 20002.
[10]     For the record this Investigation is being
[11] taped and will be transcribed at a later date.  It
[12] is most important that everyone speak in a clear
[13] and distinct voice, somewhat slower and louder
[14] than normal to ensure each word is recorded for
[15] inclusion in the transcribed account of these
[16] proceedings.
[17]     The Investigation will be conducted in the
[18] following manner.  Only one person will speak at a
[19] time.  The person being asked the question will
[20] make sure that the question has been completed
[21] before attempting to give his or her answer.  Both
[22] the Charging Officer and the Employee and his
[23] representative will have an opportunity to
[24] question each witness.  At the conclusion of the
[25]

**Page 5**

[1]   Investigation, the Accused and his representative

[2]   and the Charging Officer will be allowed to make

[3]   closing statements.

[4]        I will now read the Notice of Investigation

[5]   into the record.  Notice of Formal Investigation,

[6]   dated January 1, 2005.  It's sent out FedEx

[7]   Airbill to Mr. David Stevens, 1114 "F" Street,

[8]   N.E., Apt. #3, Washington, DC 20002.

[9]        "Dear Mr. Stevens:  You are hereby

[10]  instructed to appear for a formal investigation as

[11]  indicated below:

[12]       "Date:  Monday, January 10, 2005; Time:

[13]  9:00 a.m.; Place:  Amtrak Investigations Office,

[14]  900 Second Street, N.E., REA Building, Lower

[15]  Level, Washington, DC 20002.

[16]       "The purpose of this investigation is to

[17]  develop the facts and determine your

[18]  responsibility, if any, in connection with the

[19]  following charge:

[20]       "Charge I:  Violation of Amtrak's Drug and

[21]  Alcohol Policy (PERS-19) and Amtrak's Standards of

[22]  Excellence, specifically those sections pertaining

[23]  to 'Alcohol and Drugs' and 'Trust and Honesty'.

[24]       "Specification I:  It is alleged that on

[25]

**Page 6**

[1]   December 13, 2004, as a part of a company return

[2]   to duty physical examination, you provided a urine

[3]   specimen that was not within acceptable

[4]   temperature range.

[5]        "Charge II:  Violation of Amtrak's Drug and

[6]   Alcohol Policy (PERS-19), specifically that

[7]   section pertaining to 'Fitness for Duty Testing',

[8]   which states in part '...if an employee refuses

[9]   a test or fails to cooperate with the testing

[10]  procedures, the employee will be subject to the

[11]  same consequences as testing positive for alcohol

[12]  and/or drugs...'.

[13]       "Specification II:  It is alleged that on

[14]  December 13, 2004, as a part of a company return

[15]  to duty physical examination, you left the testing

[16]  facility without providing a second urine specimen

[17]  after you were advised and you acknowledged that

[18]  the first specimen you provided was not within

[19]  acceptable temperature range which violated the

[20]  Alcohol and Drug Waiver Agreement signed by you on

[21]  March 10, 2003.

[22]       "You may produce any witnesses you so

[23]  desire and you may be accompanied by a

[24]  representative as provided for in your current

[25]

**Page 7**

[1]   Bargaining Agreement without expense to the

[2]   National Railroad Passenger Corporation.

[3]        "All requests for postponement of this

[4]   investigation must be handled through the

[5]   Investigations Office at (202) 906-3382 or by mail

[6]   at Amtrak Hearing Office, REA Building, 900 Second

[7]   Street, N.E., Lower Level, Washington, DC 20002.

[8]        "Sincerely," signed by "B.L. Campbell,

[9]   Charging Officer," and it's cc'd to Mr. McMillan,

[10]  Union Representative; Margaret Tierney, HR

[11]  Officer; Ebonie Beaty, Concentra Medical Center is

[12]  a witness; Demetria Hudley, Concentra Medical

[13]  Center - Witness; Maia Dalton-Theodore, EAP

[14]  Counselor, Amtrak - Witness; Hearing Officer; and

[15]  the Employee's file.

[16]       That will be Exhibit A.

[17]       (Exhibit A marked for identification.)

[18]       MR. D'ALESSANDRO:  We have a Postponement

[19]  Letter dated January 10, 2005, to Mr. Stevens:

[20]       "Mr. David Stevens, 1114 "F" Street, N.E.,

[21]  Apt. #3, Washington, DC 20002; File No. 04.465.

[22]       "Dear Mr. Stevens:  Your investigation that

[23]  was scheduled to take place on January 10, 2005,

[24]  and postponed upon the request of the Organization

[25]

**Page 8**

[1]   has been rescheduled.  The rescheduled day, date

[2]   and time are as follows:

[3]        "Day:  Tuesday; Date:  January 18, 2005;

[4]   Time:  8:30 a.m.; Location:  ODI Office - Lower

[5]   Level, REA Building, 900 Second Street, N.E.,

[6]   Washington, DC 20002.

[7]        "Your failure to present yourself at the

[8]   above scheduled investigation may result in same

[9]   being conducted in absentia.

[10]       "All other particulars as indicated in the

[11]  original Notice of Investigation remain in effect.

[12]  If you have any questions regarding the above, you

[13]  may telephone my office at 202-906-2383 or direct

[14]  written correspondence to Amtrak Hearing Office,

[15]  REA Building, 900 Second Street, N.E., Lower

[16]  Level, Washington, DC 20002.  All requests for

[17]  postponements are handled through the Hearing

[18]  Office by Susan Mangatal at phone number

[19]  202-906-3382.

[20]       "Very truly yours, A. D'Alessandro,"

[21]  myself, and it's (unintelligible) and signed by

[22]  Mr. Michael Talley and Mr. Michael H. McMillan.

[23]       That will be Exhibit B.

[24]       (Exhibit B marked for identification.)

[25]

[ 1]     MR. D'ALESSANDRO:  I also have some

[ 2]     correspondence; it's a letter from -- hold on one

[ 3]     moment.

[ 4]          (Off the record.)

[ 5]     MR. D'ALESSANDRO:  There was an

[ 6]     interruption in the tape.  I'm going to read a

[ 7]     letter dated January the 9th, 2005, and the time

[ 8]     is now 16 after 11:00.

[ 9]          Okay.  It's from the Brotherhood of Railway

[10]     Carmen Division, Transportation Communications

[11]     International Union, AFL-CIO; Mr. Michael H.

[12]     McMillan, Chairman of Lodge 6364; dated January 9,

[13]     2005.  It was hand carried and acknowledged

[14]     receipt, to Mr. Michael Talley, the Charging

[15]     Officer, and it's dated he -- he signed it on the

[16]     10th of January.

[17]          It was to B. L. Campbell, the original

[18]     Charging Officer, Assistant Superintendent, NRPC,

[19]     1401 "W" Street, N.E., Washington, DC 20018.

[20]          "Ref:  Investigation for David Stevens.

[21]          "Dear Mr. Campbell:  This letter is in

[22]     regards to Coach Cleaner David Stevens'

[23]     investigation that is scheduled for January 10,

[24]     2005 at 9:00 a.m.  Unfortunately, the Organization

[25]

---

[ 1]     will not be able to provide a suitable defense for

[ 2]     Mr. Stevens given the short period of time between

[ 3]     the notice and the investigation.  The

[ 4]     Organization respectfully requests that the

[ 5]     investigation be postponed until Thursday, January

[ 6]     20, 2005, at 10:00 a.m.  The Organization also

[ 7]     requests all documents and statements by the

[ 8]     witnesses listed in the Charges be provided five

[ 9]     days prior to the investigation.

[10]          "The Organization asks that the witnesses

[11]     named in the Charges be available and present on

[12]     the date of the investigation so as to allow the

[13]     Organization and Mr. Stevens to cross-examine

[14]     them.  Mr. Stevens has retained an attorney,

[15]     Patrick J. Wojahn, and he requests that Mr. Wojahn

[16]     also be present at the investigation.  The

[17]     Organization agrees with his request to have his

[18]     attorney present.

[19]          "The Organization formally requests that

[20]     due to Mr. Stevens' illness and condition and his

[21]     voluntary attempt to return to work that this

[22]     matter can be resolved.  Once Mr. Stevens is

[23]     completely over his illness, the Organization

[24]     requests that he be allowed to retake the drug and

[25]

---

Page 11

[ 1]     alcohol test as required by PERS-19 Policy and

[ 2]     return to work.

[ 3]          "If you have any questions, please do not

[ 4]     hesitate to contact me on 703-768-1611.

[ 5]          "Respectfully, Michael H. McMillan,

[ 6]     Chairman, Local Lodge 6364."  And it's cc'd to

[ 7]     Mr. Stevens and myself.  Unfortunately, you

[ 8]     misspelled my name, but that's okay.  And the

[ 9]     address is 1118 Collingwood Road, Alexandria,

[10]     Virginia 22308, and it has phone numbers, also,

[11]     I'm not going to read into the record.

[12]          That will be letter "C".

[13]          (Exhibit C marked for identification.)

[14]     MR. D'ALESSANDRO:  That will take care of

[15]     the documents.

[16]          Starting from my immediate right, could you

[17]     please identify yourself for the record, please.

[18]     MR. STEVENS:  David B. Stevens.

[19]     MR. McMILLAN:  Mike McMillan, Local

[20]     Chairman, representing Mr. Stevens.

[21]     MR. WOJAHN:  Patrick Wojahn, Attorney

[22]     representing Mr. Stevens.

[23]     MS. LEE-JONES:  Foreman 2, Barbara A.

[24]     Lee-Jones.

[25]

---

Page 12

[ 1]     MR. TALLEY:  Michael W. Talley, Charging

[ 2]     Officer.

[ 3]     MR. D'ALESSANDRO:  Mr. Stevens, I have some

[ 4]     questions for you that I am going to ask and a

[ 5]     verbal response will be necessary.

[ 6]     MR. McMILLAN:  First of all, Mr. Hearing

[ 7]     Officer, I'd like to know how -- where my letter

[ 8]     stands as far as the request for the witnesses,

[ 9]     and also, the request that -- my request that

[10]     Mr. Stevens be granted my request that he be

[11]     returned to the Concentra to do the drug and

[12]     alcohol test.  So I'd like to know where my letter

[13]     stands with the answer on that before we proceed,

[14]     please.

[15]     MR. D'ALESSANDRO:  Mr. Talley, do you have

[16]     any answer to those questions?

[17]     MR. TALLEY:  Yes, sir.  I sure do.

[18]          Due to the system we have in place now,

[19]     Mr. Stevens had a prior Rule G Waiver imposed upon

[20]     him, and within that timeframe, you have to not

[21]     have a positive test.  In his -- as we'll get

[22]     through in the case that we're gonna -- that I'm

[23]     gonna present, the fact is that there's no

[24]     opportunity for him to give another sample.  He

[25]

[ 1]  had an opportunity at that time to give them one.

[ 2]  They told him that he would have to give another

[ 3]  specimen at that particular time, which he

[ 4]  acknowledged that he could not do, and they

[ 5]  acknowledged to him that you must give one or it's

[ 6]  gonna be considered a positive test.

[ 7]       With that being done, being under -- being

[ 8]  a Rule G Waiver participant, he has violated

[ 9]  Amtrak's policy and there is no opportunity to

[10]  have another test done.

[11]       MR. D'ALESSANDRO:  Okay.  Mr. McMillan?

[12]       MR. McMILLAN:  The witnesses, are they

[13]  available, which --

[14]       MR. D'ALESSANDRO:  Are the witnesses

[15]  available --

[16]       MR. TALLEY:  They will be available by

[17]  phone.  Yes.  And I -- if I'm not mistaken,

[18]  Ms. Maia Dalton is here.  We can call her in here

[19]  if we -- if need be.

[20]       MR. D'ALESSANDRO:  Also.

[21]       MR. McMILLAN:  We'll proceed, only over

[22]  objections, because we did ask and request that

[23]  they be here.

[24]       MR. D'ALESSANDRO:  That's understandable.

[25]

---

[ 1]       MR. McMILLAN:  Before us.

[ 2]       MR. D'ALESSANDRO:  Okay.

[ 3]       MR. TALLEY:  That can still be arranged.

[ 4]  Ms. Tierney can be down here, as well.

[ 5]       MR. D'ALESSANDRO:  Okay.

[ 6]       MR. McMILLAN:  Well if we can arrange that,

[ 7]  too, then.  If you can -- if you can get these

[ 8]  people down here, we can cross-examine them;

[ 9]  that's what my letter says; and I don't think

[10]  there's a problem.  If you can get them down here

[11]  we can cross-examine --

[12]       MR. TALLEY:  They'd still be cross --

[13]       MR. McMILLAN:  -- I wouldn't object --

[14]       MR. TALLEY:  -- examined over the phone.

[15]  So --

[16]       MR. McMILLAN:  No.

[17]       MR. TALLEY:  -- (unintelligible; both

[18]  speaking).

[19]       MR. McMILLAN:  No.  No.  I'm talking about

[20]  here.  I'm not talking about over the phone.

[21]       MR. TALLEY:  (Unintelligible.)

[22]       MR. McMILLAN:  If he's gonna get them here,

[23]  we'll -- we'll recess it.  We'll be -- we're able

[24]  to do that if he can get them --

[25]

---

Page 15

[ 1]       MR. TALLEY:  I can give a call.

[ 2]       MR. D'ALESSANDRO:  Do you want to take a

[ 3]  couple minutes to produce --

[ 4]       MR. TALLEY:  Well before -- before we go

[ 5]  off the record, the Concentra personnel, they do

[ 6]  not have to be here because they are not Amtrak

[ 7]  employees.

[ 8]       MR. McMILLAN:  Okay.  Well let's -- let's

[ 9]  see who the employees are that we requested?

[10]       MR. TALLEY:  It would be Margaret Tierney

[11]  and Maia Dalton-Theodore; will be the only two.

[12]       MR. McMILLAN:  Okay.

[13]       MR. D'ALESSANDRO:  Alright.  Back to --

[14]       MR. McMILLAN:  So you gonna make the call?

[15]       MR. TALLEY:  Yeah.

[16]       MR. McMILLAN:  You want to call

[17]  Ms. Tierney.

[18]       MR. D'ALESSANDRO:  Okay.

[19]       MR. McMILLAN:  You want to go through that?

[20]       MR. D'ALESSANDRO:  Well it's six of one,

[21]  half a dozen of the other.  It doesn't make any

[22]  difference.  She's right up at 60 Massachusetts

[23]  Avenue.

[24]       MR. TALLEY:  Yes, she is.

[25]

---

Page 16

[ 1]       MR. D'ALESSANDRO:  Let me take a recess to

[ 2]  let her(sic) call --

[ 3]       MR. McMILLAN:  That's fine.

[ 4]       MR. D'ALESSANDRO:  -- and by that time,

[ 5]  I'll --

[ 6]       MR. McMILLAN:  We'll do that.

[ 7]       MR. D'ALESSANDRO:  -- go through my other

[ 8]  rendition, okay.  It's 22 after 11:00.

[ 9]       (Recess.)

[10]       MR. D'ALESSANDRO:  Back on the record.

[11]  It's 11:31.  There's some questions -- I'm gonna

[12]  pick up where I left off.

[13]       Mr. Stevens, there's some questions I am

[14]  going to ask you and a verbal response will be

[15]  necessary.

[16]       Did you receive notice to report to this

[17]  office today for the Notice of -- Investigation

[18]  being conducted in connection with the Notice of

[19]  Investigation, I previously read into the record?

[20]       MR. STEVENS:  Yes.

[21]       MR. D'ALESSANDRO:  Were you notified you

[22]  could be accompanied by a representative of your

[23]  own choosing subject to the terms of the

[24]  Bargaining Agreement without expense to the

[25]

[ 1]     National Railroad Passenger Corporation?

[ 2]          MR. STEVENS:  Yes.

[ 3]          MR. D'ALESSANDRO:  Are you accompanied by

[ 4]  such representative?

[ 5]          MR. STEVENS:  Yes.

[ 6]          MR. D'ALESSANDRO:  If you are, please

[ 7]  identify him for the record?

[ 8]          MR. STEVENS:  Chairman Mike McMillan.

[ 9]          MR. D'ALESSANDRO:  Do you understand you

[10]  will be expected to be present during the entire

[11]  proceeding and you and your representative may

[12]  question any witnesses who testify?

[13]          MR. STEVENS:  Yes.

[14]          MR. D'ALESSANDRO:  Do you and your

[15]  representative understand you may present or have

[16]  presented in your behalf any pertinent evidence?

[17]          MR. STEVENS:  Yes.

[18]          MR. D'ALESSANDRO:  At this point, are you

[19]  willing to proceed?

[20]          MR. STEVENS:  Yes -- no.

[21]          MR. D'ALESSANDRO:  No.

[22]          Mr. McMillan, could you expand on that?

[23]          MR. McMILLAN:  Yes.  We're requesting that

[24]  the witnesses be made available and Company has

[25]

---

[ 1]  made statements that they will -- made statements

[ 2]  that they will get witness, I believe Tierney, is

[ 3]  it?

[ 4]          MR. STEVENS:  Tierney.  Margaret Tierney.

[ 5]          MR. McMILLAN:  Ms. Tierney, and they will

[ 6]  make available Ms. Dalton, and we're willing to

[ 7]  recess.

[ 8]          MR. D'ALESSANDRO:  Okay.  So I understand

[ 9]  it that Ms. Tierney and Ms. Dalton aren't

[10]  available at this particular time?

[11]          MR. TALLEY:  Yes, sir.  That's correct.

[12]          MR. D'ALESSANDRO:  And they're necessary

[13]  for Mr. McMillan's case, apparently; Mr. McMillan?

[14]          MR. McMILLAN:  Yes, sir.  They are.

[15]          MR. D'ALESSANDRO:  What we're going to do

[16]  is we are going to recess until the availability

[17]  of the witnesses, and that will be as soon as

[18]  possible.  So if you get -- try and overnight you

[19]  something you know so it will be a quick response.

[20]  Okay.

[21]          And the time now is 11:36.  Thank you.

[22]  (End of Tape 1/Side A; remainder of Side A is

[23]  blank.)

[24]          (In recess to future date.)

[25]

---

NATIONAL RAILROAD PASSENGER CORPORATION


RE:  AMTRAK FORMAL INVESTIGATION   :
                                   :
                                   :
                                   :
                                   :
                                   :
DAVID B. STEVENS                   :
                      Claimant     : NO: 04.465

                       - - -
           Monday, January 31, 2005
                     DAY TWO
                       - - -

     Continuation of Formal Investigation of DAVID
B. STEVENS, taken pursuant to notice at AMTRAK
HEARING OFFICE, 900 Second Street, N.E., REA
Building - Lower Level, Washington, DC, on the
above date, commencing at 12:35 p.m.


-----------------------------------------------
        FAST ACCURATE SKILLED TRANSCRIPTION
            Rosemarie Corapi, Partner
            Linda McCullough, Partner
                2307 Oakdale Avenue
          Glenside, Pennsylvania 19038-4210
      (215) 728-6157 (Ofc.)/(215) 728-6157 (Fax)

---

Page 20

[ 1]              P R O C E E D I N G S

[ 2]          (Begins on Tape 1/Side B.)

[ 3]          MR. D'ALESSANDRO:  We're on the record for

[ 4]  a gentleman by the name of Stevens, 04.465.  We're

[ 5]  on the second side of the first tape.  There is a

[ 6]  blank section of the first tape.

[ 7]          The time is 12:35, and it's January the

[ 8]  31st and we'll go around the room.

[ 9]          MR. STEVENS:  David Stevens, Cleaner.

[10]          MR. McMILLAN:  Mike McMillan, Local

[11]  Chairman, representing Mr. Stevens.

[12]          MR. WOJAHN:  Patrick Wojahn, Attorney for

[13]  Mr. Stevens.

[14]          MS. DALTON-THEODORE:  Maia Dalton-Theodore,

[15]  Employee Assistance Manager.

[16]          MR. TALLEY:  Michael W. Talley, Charging

[17]  Officer.

[18]          MR. D'ALESSANDRO:  Okay.  We have the

[19]  Postponement Notice, I am going to read into the

[20]  record.  It was Federal Expressed to Mr. Stevens,

[21]  and he may not have gotten it.  But he's here, so

[22]  it's not -- it's a moot issue.  And it's sent to

[23]  1114 "F" Street, N.E., Apt. #301, Washington, DC

[24]  20002; File No. 04.465.

[25]

Page 21

[ 1]         "Dear Mr. Stevens:  Your investigation that

[ 2]  was scheduled and held on January 18, 2005, was

[ 3]  recessed upon the request of the Organization and

[ 4]  the Carrier, to provide time for witnesses to be

[ 5]  present.  Your investigation has been rescheduled

[ 6]  and below you will find the rescheduled day, date

[ 7]  and time:

[ 8]         "Day:  Monday; Date:  January 31, 2005;

[ 9]  Time:  10:00 a.m.; Location:  ODI Office - Lower

[10]  Level, REA Building, 900 Second Street, N.E.,

[11]  Washington, DC 20002.

[12]         "Your failure to present yourself at the

[13]  above scheduled investigation may result in same

[14]  being conducted in absentia.

[15]         "All other particulars as indicated in the

[16]  original Notice of Investigation remain in effect.

[17]  If you have any questions regarding the above, you

[18]  may telephone my office at 202-906-2383 or direct

[19]  written correspondence to Amtrak Hearing Office,

[20]  REA Building, 900 Second Street, N.E., Lower

[21]  Level, Washington, DC 20002.  All requests for

[22]  postponements are handled through the Hearing

[23]  Office by Susan Mangatal at phone number

[24]  202-906-3382."

[25]

Page 22

[ 1]         And it's signed by myself and Mr. Talley

[ 2]  got a fax and Mr. McMillan got a Federal Express.

[ 3]         (Exhibit D marked for identification.)

[ 4]         MR. D'ALESSANDRO:  I think we left off at

[ 5]  apparently Mr. Talley is going to supply some

[ 6]  witnesses?

[ 7]         MR. TALLEY:  Right.

[ 8]         MR. D'ALESSANDRO:  That will be Exhibit D,

[ 9]  by the way.

[10]         UNIDENTIFIED SPEAKER:  Which one?

[11]         MR. D'ALESSANDRO:  The last document that I

[12]  read --

[13]         (Unintelligible; more than one speaking.)

[14]         MR. D'ALESSANDRO:  -- January 27th.

[15]         MR. TALLEY:  "D"?

[16]         MR. D'ALESSANDRO:  "D".

[17]         Okay.  Mr. Talley, we have a witness in the

[18]  room.  Could you identify yourself for the record,

[19]  please?

[20]         MR. TALLEY:  Yes, sir.  I have Ms. Maia

[21]  Dalton -- Theodore-Dalton, and could you state

[22]  your name, occupation, how long you've been here?

[23]         MS. DALTON-THEODORE:  Maia Dalton-Theodore,

[24]  Employee Assistance Manager.  I've been at Amtrak

[25]

Page 23

[ 1]  for six years.

[ 2]         MR. TALLEY:  Okay.  Thank you.

[ 3]         Ms. Dalton, I'm gonna give you some

[ 4]  information that needs to be read in as evidence,

[ 5]  and we're charging Mr. Stevens with two charges.

[ 6]  One is violation of Amtrak's Drug and Alcohol

[ 7]  Policy, PERS-19, and Amtrak's Standards of

[ 8]  Excellence, those sections pertaining to Alcohol

[ 9]  and Drugs and Trust and Honesty.

[10]         The first Charge, I have -- I need to be

[11]  read into record -- I'm pretty sure I think I gave

[12]  all you guys this (unintelligible), Professional

[13]  and Personal Conduct --

[14]         MR. McMILLAN:  Yes.

[15]         MR. TALLEY:  -- two-page; we'll make this

[16]  Exhibit --

[17]         MR. D'ALESSANDRO:  Be "E".

[18]         MR. TALLEY:  -- "E".  You got one.

[19]         MR. D'ALESSANDRO:  What do you mean I got

[20]  one?

[21]         MR. TALLEY:  Yeah, I gave -- I gave you

[22]  one.  But if you want one, I can get you another

[23]  one.

[24]         MR. D'ALESSANDRO:  It's not evidence, I

[25]

Page 24

[ 1]  don't have....  Will be "E".

[ 2]         MR. TALLEY:  Exhibit E.

[ 3]         Could you read the asterisked area for me,

[ 4]  please -- it's a two-page document, by the way.

[ 5]         MS. DALTON-THEODORE:  "...Amtrak's policy

[ 6]  on alcohol and drugs is very strict:  'While on

[ 7]  Amtrak property, employees must be drug- and

[ 8]  alcohol-free.  Both the use and possession of

[ 9]  these substances are inconsistent with this

[10]  policy'."

[11]         MR. TALLEY:  And that came out of the

[12]  Standards of Excellence book, to your knowledge?

[13]         MS. DALTON-THEODORE:  Yes --

[14]         MR. TALLEY:  Comes out of the

[15]  (unintelligible).

[16]         MS. DALTON-THEODORE:  Right.

[17]         MR. TALLEY:  Okay.  I have the second page

[18]  under "Trust and Honesty"; could you read those

[19]  asterisked areas, starting from here?

[20]         MS. DALTON-THEODORE:  "...When you become

[21]  part of our Company we place our trust in you.  In

[22]  turn, you must conduct yourself honestly and in a

[23]  way that reflects credit upon Amtrak.

[24]         "Because honesty is so important" and to

[25]

Page 25

[ 1] trust -- excuse me.

[ 2]        "Because honesty is so important to trust

[ 3] and our ability to work together as a team, Amtrak

[ 4] has no tolerance for employees who are dishonest."

[ 5]        MR. TALLEY:  Thank you.

[ 6]        MR. McMILLAN:  I object to that.  I don't

[ 7] (unintelligible) comprehend where that addresses

[ 8] the Charges of Trust and Honesty.

[ 9]        MR. TALLEY:  Well it addresses the cold(?)

[10] test that was given.

[11]        MR. D'ALESSANDRO:  That's Charge 1, in

[12] Charge 1.

[13]        MR. McMILLAN:  I see where it is, but I

[14] don't see -- I don't see how that deals with Trust

[15] and Honesty.  If it's just that his urine was not

[16] at the temperature, I don't know -- I don't know

[17] what's --

[18]        MR. TALLEY:  Well I'll --

[19]        MR. McMILLAN:  -- trust and honesty issue.

[20]        MR. D'ALESSANDRO:  They're making the

[21] accusation that it was intentionally --

[22] intentionally (inaudible) --

[23]        MR. TALLEY:  That's correct.  There was an

[24] intentional --

[25]

Page 26

[ 1]        (Unintelligible; more than one speaking.)

[ 2]        MR. D'ALESSANDRO:  -- that's the Charge

[ 3] part.

[ 4]        MR. McMILLAN:  I don't see that in the

[ 5] Charges, though.

[ 6]        MR. TALLEY:  Well yeah --

[ 7]        MR. McMILLAN:  (Inaudible; both

[ 8] speaking) --

[ 9]        MR. TALLEY:  -- where trust and honesty

[10] comes from, Mike.  It says:  It is alleged that on

[11] December 13th as part of a Company return to duty

[12] physical that you provided a urine specimen that

[13] was not within acceptable temperature range.

[14] Which his body temperature was 97.6 and the urine

[15] sample was under 90 degrees.

[16]        MR. McMILLAN:  Okay.  So -- but I'm still

[17] gonna object --

[18]        MR. TALLEY:  And --

[19]        (Unintelligible; Mr. McMillan and

[20] Mr. Talley speaking over one another.)

[21]        MR. TALLEY:  -- in our opinion that's what

[22] we're saying, it was intentionally done.

[23]        MR. McMILLAN:  Well I'm gonna object

[24] because I don't see that -- I don't see those

[25]

Page 27

[ 1] Charges here.

[ 2]        MR. TALLEY:  The Charges is right there

[ 3] under Specification I --

[ 4]        (Unintelligible; speaking over one

[ 5] another.)

[ 6]        MR. D'ALESSANDRO:  We're not here to

[ 7] discuss the Charges.  I know you're not happy,

[ 8] either one of you, with the Charges.

[ 9]        MR. McMILLAN:  I'm just saying it does not

[10] say that.

[11]        MR. D'ALESSANDRO:  Can I have a copy?

[12]        MR. TALLEY:  Oh, okay.

[13]        MR. McMILLAN:  The Charges under objection

[14] is not -- it is not specific.

[15]        MR. D'ALESSANDRO:  Okay.  Like I said, that

[16] exhi -- that's Exhibit E.

[17]        (Exhibit E marked for identification.)

[18]        MR. D'ALESSANDRO:  Do you need a minute,

[19] Mr. Talley?

[20]        MR. TALLEY:  Yeah.  Just bear with me for a

[21] second.  I just want to make sure I don't go out

[22] of sequence with what I'm doing.

[23]        Ms. Dalton, I'm going to hand you a

[24] four-page document with a cover sheet.

[25]

Page 28

[ 1]        MR. D'ALESSANDRO:  Okay.

[ 2]        MR. TALLEY:  Exhibit F.

[ 3]        (Exhibit F marked for identification.)

[ 4]        MR. D'ALESSANDRO:  Thank you, Mr. Talley.

[ 5]        MR. TALLEY:  (Inaudible) --

[ 6]        MR. McMILLAN:  -- we please see that

[ 7] document (unintelligible) --

[ 8]        MR. TALLEY:  You have a copy --

[ 9]        MR. McMILLAN:  -- make sure we have a copy

[10] of it --

[11]        MR. TALLEY:  (Unintelligible; more than one

[12] speaking) --

[13]        MR. McMILLAN:  -- I don't know what you

[14] gave (unintelligible).

[15]        MR. TALLEY:  You have that.  It says --

[16] it's a cover sheet with B.L.'s name on it.

[17]        MR. McMILLAN:  First one?

[18]        MR. TALLEY:  No.  No.  (Unintelligible.)

[19] Yes.  Yes, Mike.  You got it.

[20]        MR. McMILLAN:  We have --

[21]        MR. TALLEY:  (Unintelligible; both

[22] speaking.)

[23]        MR. McMILLAN:  -- have that sentence across

[24] the top line?

[25]

Page 29

[1] MR. TALLEY: Right. Right. You got it.

[2] You just showed it to (unintelligible).

[3] MR. McMILLAN: Okay. So this is -- this is

[4] what we're putting in?

[5] MR. TALLEY: Right.

[6] MR. McMILLAN: Okay.

[7] MR. TALLEY: I'm putting this information

[8] in, and if you can, Ms. Dalton, just gonna take a

[9] section for -- third page.

[10] MR. McMILLAN: Well first of all, I'd like

[11] to object to this being (unintelligible) because I

[12] thought we was gonna have Ms. Tierney here today.

[13] MR. TALLEY: Well we will --

[14] MR. McMILLAN: -- that's why we recessed.

[15] MR. TALLEY: We will have Mr. Joe Allione

[16] in her spot.

[17] MR. D'ALESSANDRO: Over the phone.

[18] MR. TALLEY: Over the phone, and he'll be

[19] able to answer --

[20] MR. McMILLAN: So our request for her being

[21] here in person is being denied, over our

[22] objections.

[23] MR. D'ALESSANDRO: Apparently they -- they

[24] want to do it over the phone.

[25]

Page 30

[1] MR. TALLEY: Right.

[2] MR. D'ALESSANDRO: That --

[3] MR. McMILLAN: Over our --

[4] MR. D'ALESSANDRO: That's what I was told.

[5] MR. McMILLAN: -- our objection. We're

[6] gonna object to that, because that's why we

[7] recessed this.

[8] MR. D'ALESSANDRO: I understand --

[9] MR. TALLEY: They can --

[10] MR. McMILLAN: (Inaudible; both speaking)

[11] MR. TALLEY: -- do it over the phone. They

[12] have been doing it over the phone over -- that's

[13] what -- the way they've been doing it, Mike, and

[14] I'm pretty sure you've been in a few of these

[15] where they've done it over the phone.

[16] MR. McMILLAN: Yeah, but don't agree with

[17] none of it.

[18] MR. TALLEY: (Unintelligible) --

[19] MR. D'ALESSANDRO: This is not a discussion

[20] period.

[21] MR. TALLEY: -- want to let him know --

[22] MR. D'ALESSANDRO: I just want to let you

[23] know this is not a discussion period.

[24] MR. TALLEY: Right.

[25]

Page 31

[1] MR. D'ALESSANDRO: Just going to stick to

[2] what's going on. He objected, and I understand

[3] that and we'll address that.

[4] MR. TALLEY: Okay.

[5] Alright. Ms. Dalton, there's -- on the

[6] third page, do you recognize that form and could

[7] you tell us what that form is?

[8] MS. DALTON-THEODORE: This is the Amtrak

[9] Alcohol and Drug Waiver Agreement, otherwise known

[10] as Rule G.

[11] MR. TALLEY: And that document that you

[12] have, is -- is that what we normally use to

[13] employees who have violated Rule G?

[14] MS. DALTON-THEODORE: Yes, sir.

[15] MR. TALLEY: Okay. Could you read what it

[16] states, starting with: On February 25th?

[17] MS. DALTON-THEODORE: "On February 25,

[18] 2003, David B. Stevens was tested for drugs during

[19] a Company return to duty testing event. This is

[20] to advise you that based on an analysis by

[21] certified laboratory and a review by the Medical

[22] Review Officer (MRO), the result was reported by

[23] the MRO as positive for cocaine metabolites.

[24] Accordingly, the employee is medically

[25]

Page 32

[1] disqualified from performing service."

[2] MR. TALLEY: Okay. And the signatures down

[3] here, the EAP Counselor?

[4] MS. DALTON-THEODORE: Uh-huh. That would

[5] be myself, Maia Dalton-Theodore, on March 11,

[6] 2003, I believe.

[7] MR. TALLEY: Okay. So he's still under the

[8] Rule G Waiver?

[9] MS. DALTON-THEODORE: Correct.

[10] (Inaudible.)

[11] MR. TALLEY: Thank you.

[12] At this -- at this time, that's all I have

[13] for Ms. -- Ms. Dalton.

[14] MR. D'ALESSANDRO: Mr. McMillan, do you

[15] have any questions for this young lady?

[16] MR. McMILLAN: Yes. Ms. Dalton, how are

[17] you today?

[18] MS. DALTON-THEODORE: Good, thanks.

[19] MR. McMILLAN: Sorry we had to bring you in

[20] here to spend your day, but anyway, you spoke of

[21] the Alcohol and Drug Waiver signed by Mr. Stevens,

[22] I believe on February -- what was -- you read the

[23] statement said February 23rd(sic), '03.

[24] MS. DALTON-THEODORE: Uh-huh.

[25]

[ 1]     MR. McMILLAN:  I believe you were -- came
[ 2] and saw you to execute the Waiver?
[ 3]     MS. DALTON-THEODORE:  Right.
[ 4]     MR. McMILLAN:  And the Waiver basically
[ 5] goes through what is expected of Mr. Stevens;
[ 6] correct?
[ 7]     MS. DALTON-THEODORE:  Right.
[ 8]     MR. McMILLAN:  And that he must maintain
[ 9] periodic contact with you for a two-year period --
[10]     MS. DALTON-THEODORE:  Right.
[11]     MR. McMILLAN:  -- that correct?
[12]     And I believe Mr. Stevens' situation, he's
[13] been out sick maybe for quite some time?
[14]     MS. DALTON-THEODORE:  Right.
[15]     MR. McMILLAN:  I don't know the exact and I
[16] won't ask you to -- to remember that, because I'm
[17] sure you cannot.  But was he out sick during
[18] the -- during this time that -- do you know
[19] whether he was out sick during the time that
[20] this -- these Charges were brought against him?
[21]     MS. DALTON-THEODORE:  Yeah.  He was --
[22] returned to work in Jan -- when was that dated,
[23] March 2003; right.  He was returned to work in
[24] January of 2004 after successfully completing his
[25]

[ 1] treatment.
[ 2]     MR. McMILLAN:  Okay.  And -- and evidently
[ 3] he went to the Concentra to do a -- it was -- it
[ 4] was a return-to-duty physical, to the best of your
[ 5] knowledge when he --
[ 6]     MS. DALTON-THEODORE:  I believe so.
[ 7]     MR. McMILLAN:  -- went to Concentra?
[ 8]     MS. DALTON-THEODORE:  I believe so.
[ 9]     MR. McMILLAN:  It -- it wasn't a -- you
[10] didn't call him in for a test or it wasn't a --
[11]     MS. DALTON-THEODORE:  No, because that not
[12] the -- no, that's not the (unintelligible) the
[13] EAP.  No.  Uh-uh.
[14]     MR. McMILLAN:  So basically the quarterly
[15] testing is done not by the EAP but by the Company;
[16] is that correct?
[17]     MS. DALTON-THEODORE:  Correct.
[18]     MR. McMILLAN:  And his Waiver basically
[19] that he signed says that he would submit and pass
[20] unannounced drug and alcohol tests --
[21]     MS. DALTON-THEODORE:  Right.
[22]     MR. McMILLAN:  -- by urine and by breath at
[23] least four times per year?
[24]     MS. DALTON-THEODORE:  Right.
[25]

Page 35

[ 1]     MR. McMILLAN:  But this was not one of
[ 2] those tests, to your knowledge that he -- that he
[ 3] went --
[ 4]     MS. DALTON-THEODORE:  In January --
[ 5]     MR. McMILLAN:  -- he's charged --
[ 6]     MS. DALTON-THEODORE:  -- 2004 or that he's
[ 7] being charged with?
[ 8]     MR. McMILLAN:  Uh yes, December 13th, 2004?
[ 9]     MS. DALTON-THEODORE:  No.  This was another
[10] test.  This was another return-to-duty because
[11] Mr. Stevens then went out again on medical from
[12] March of 2004 until -- just until that
[13] return-to-work physical was --
[14]     MR. McMILLAN:  Okay.
[15]     MS. DALTON-THEODORE:  -- or test was done.
[16]     MR. McMILLAN:  Okay.  And during the time
[17] that they're out, if they're out for an illness or
[18] what have you, do they basically have to stay in
[19] contact with you in those periods?
[20]     MS. DALTON-THEODORE:  If -- yes.  They
[21] can -- they can be in touch with me, yes.
[22]     MR. McMILLAN:  Has David stayed in touch
[23] with you during the periods --
[24]     MS. DALTON-THEODORE:  Yes.
[25]

Page 36

[ 1]     MR. TALLEY:  Objection.
[ 2]     MR. D'ALESSANDRO:  What's your objection,
[ 3] sir?
[ 4]     MR. TALLEY:  Relevance.  What's that have
[ 5] to do with the Charges at hand, whether he's been
[ 6] contacting her.  He's been charged with violation
[ 7] of the Rule G.
[ 8]     MR. D'ALESSANDRO:  That's understandable.
[ 9] It's credibility --
[10]     MR. McMILLAN:  Well he's --
[11]     MR. D'ALESSANDRO:  -- what the charges --
[12]     MR. McMILLAN:  -- charged with violating
[13] the Rule G Waiver.  So --
[14]     MR. D'ALESSANDRO:  Right.  Exactly.
[15]     MR. McMILLAN:  -- this is --
[16]     MR. D'ALESSANDRO:  And he's questioning the
[17] document of the Rule G Waiver that you gave him
[18] for an exhibit, Mike, which is "F"; am I correct,
[19] is that what you're --
[20]     MR. McMILLAN:  Yes.
[21]     MR. D'ALESSANDRO:  -- off of?
[22]     MR. McMILLAN:  Yes.  This is what he
[23] presented as evidence, is the Rule G Waiver.
[24]     MR. TALLEY:  Okay.
[25]

Page 37

[ 1]    MR. McMILLAN: So I think in the beginning
[ 2] you said he successively(sic) completed the
[ 3] program back when he signed it, after that.
[ 4]        MS. DALTON-THEODORE: Uh-huh.
[ 5]    MR. McMILLAN: And that he's been out ill
[ 6] for some time and he was on a return-to-duty
[ 7] physical when the Charges of December the 13th
[ 8] occurred, far as you know?
[ 9]        MS. DALTON-THEODORE: As far as I know.
[10]    MR. McMILLAN: So it was not a quarterly
[11] test?
[12]        MS. DALTON-THEODORE: No.
[13]    MR. McMILLAN: Okay. I don't have any
[14] other questions for Ms. Dalton right now.
[15]    May be David --
[16]    MR. D'ALESSANDRO: Mr. Stevens, do you have
[17] any questions for this young lady?
[18]    MR. STEVENS: For Maia, no.
[19]    MR. D'ALESSANDRO: Nothing else?
[20]    MR. TALLEY: Not at this time.
[21]    MR. D'ALESSANDRO: That all, okay.
[22]    Okay. For the time being, you're dismissed
[23] Ms. Dalton.
[24]        MS. DALTON-THEODORE: Thank you.
[25]

Page 38

[ 1]    MR. D'ALESSANDRO: And don't discuss the
[ 2] case by yourself.
[ 3]    MR. McMILLAN: Don't discuss it by
[ 4] yourself.
[ 5]    MR. TALLEY: Don't talk to yourself.
[ 6]    MR. D'ALESSANDRO: It's 12:50.
[ 7]    (Off the record.)
[ 8]    MR. D'ALESSANDRO: Do you have any other
[ 9] witnesses, Mr. Talley?
[10]    MR. TALLEY: Yes. At this time, I'd like
[11] to get ahold of Mr. Joe Allione who is in the
[12] department for (unintelligible) testing. (Starts
[13] to spell Mr. Allione's last name.)
[14]    MR. D'ALESSANDRO: A-L-L-I-O-N-E.
[15]    MR. TALLEY: Right.
[16]    MR. STEVENS: Can I ask a question? What's
[17] the -- what does he have to do with this if that
[18] wasn't the person who made contact --
[19]    (Unintelligible; more than one speaking.)
[20]    MR. TALLEY: He works for Margaret. He can
[21] just attest to the same information that's on the
[22] paperwork. That's all he's attesting to.
[23]    MR. STEVENS: Okay.
[24]    (Unintelligible; more than one speaking.)
[25]

Page 39

[ 1]    MR. McMILLAN: -- we've already objected.
[ 2]    MR. D'ALESSANDRO: You already objected to
[ 3] it.
[ 4]    MR. STEVENS: Okay.
[ 5]    MR. McMILLAN: They're not gonna bring her
[ 6] in.
[ 7]    (Off the record.)
[ 8]    MR. D'ALESSANDRO: Okay. We're back on the
[ 9] record. It's -- I guess it's 12:55 and
[10] Mr. Allione, could you identify yourself for the
[11] record please, sir?
[12]    MR. ALLIONE: My name is Joseph Allione.
[13] I'm an HR Officer for the Health Services Drug and
[14] Alcohol Programs for Amtrak.
[15]    MR. D'ALESSANDRO: Okay.
[16]    Mr. Talley.
[17]    MR. TALLEY: Yes, sir. Good afternoon,
[18] Mr. Allione.
[19]    MR. ALLIONE: (Cuts out), sir.
[20]    MR. TALLEY: I have some information here I
[21] need you to verify --
[22]    (Off the record.)
[23]    MR. D'ALESSANDRO: Okay. We're back on the
[24] record. It's 1:50 -- 12:55. We have a witness,
[25]

Page 40

[ 1] Mr. Allione. Could you identify yourself for the
[ 2] record, please?
[ 3]    MR. ALLIONE: Joseph Allione, Human
[ 4] Resources Officer for Health Services Drug and
[ 5] Alcohol Programs for Amtrak.
[ 6]    MR. D'ALESSANDRO: Mr. Talley.
[ 7]    MR. TALLEY: Okay. Mr. Allione, again,
[ 8] good afternoon.
[ 9]    MR. ALLIONE: Good afternoon.
[10]    MR. TALLEY: We have paperwork that is
[11] generated when someone has done a test at
[12] Concentra and that paperwork is generated and it
[13] gets recorded by your Department; is that correct?
[14]    MR. ALLIONE: That is correct.
[15]    MR. TALLEY: Alright. And we have fitness
[16] for duty --
[17]    (Cell phone ringing; comments regarding
[18] same.)
[19]    MR. TALLEY: Excuse me.
[20]    Alright. We have Drug and Alcohol
[21] Guidelines and it's page 16 of the PERS-19 Rules
[22] and Regulations.
[23]    MR. ALLIONE: Yes, sir.
[24]    MR. TALLEY: Alright. On page 16 it says:
[25]

**Page 41**

[1]  "Fitness for Duty Testing (Non-regulated)".

[2]    MR. ALLIONE:  Correct.

[3]    MR. TALLEY:  We want to go down to the

[4]  fifth paragraph where it says:  "Refusal to Submit

[5]  to a Test".

[6]    MR. ALLIONE:  Yes, sir.

[7]    MR. TALLEY:  Can your read that section for

[8]  me, please?

[9]    MR. ALLIONE:  "Refusal to Submit to a Test:

[10]  If an employee refuses a test, or fails to

[11]  cooperate with the testing procedures, the

[12]  employee will be subject to the same consequences

[13]  as testing positive for alcohol and/or drugs.

[14]  (See Chart #3)."

[15]    MR. TALLEY:  Okay.

[16]    MR. ALLIONE:  "An employee who

[17]  intentionally interferes with the integrity of a

[18]  test sample and will be charged with violating

[19]  Amtrak's Standards of Excellence and will be

[20]  subject to disciplinary" -- disciplinary "action

[21]  up to and including termination."

[22]    MR. TALLEY:  Okay.  Now there's page 51 of

[23]  the PERS-19 Policy says "Refusal to Test".  Can

[24]  you read Step 1 for me, please, and just the first

[25]

**Page 42**

[1]  paragraph?

[2]    MR. McMILLAN:  Excuse me.  Can we -- can we

[3]  get up to date here with what page --

[4]    MR. TALLEY:  Oh, page -- page 51.

[5]    MR. McMILLAN:  -- give us a chance to go to

[6]  that --

[7]    MR. TALLEY:  I'm sorry.

[8]    MR. McMILLAN:  -- (inaudible; both

[9]  speaking).

[10]    MR. TALLEY:  That would be Exhibit --

[11]    MR. D'ALESSANDRO:  I don't have it.  You

[12]  didn't give me any of this.

[13]    MR. TALLEY:  I'm sorry.  We're up to "G"

[14]  now; right?

[15]    MR. D'ALESSANDRO:  You just give them to me

[16]  and I'll give you --

[17]    MR. TALLEY:  Okay.

[18]    MR. D'ALESSANDRO:  -- the number.

[19]    MR. TALLEY:  Alright.

[20]    MR. D'ALESSANDRO:  I don't want to be laid

[21]  off.

[22]    MR. TALLEY:  It's two-page -- two-page

[23]  document.

[24]    MR. D'ALESSANDRO:  Two-page document.  It

[25]

**Page 43**

[1]  will be Exhibit G, and it's PERS-19, page 16 and

[2]  17.

[3]    (Exhibit G marked for identification.)

[4]    MR. D'ALESSANDRO:  Okay.

[5]    MR. McMILLAN:  Page fif -- page 41,

[6]  which --

[7]    MR. D'ALESSANDRO:  Page --

[8]    MR. TALLEY:  -- 51.

[9]    MR. McMILLAN:  Page 51.

[10]    MR. TALLEY:  Right.  Okay.

[11]    MR. McMILLAN:  Alright.  We're good.

[12]    MR. D'ALESSANDRO:  Okay.  You have page --

[13]    (Unintelligible; more than one speaking.)

[14]    MR. D'ALESSANDRO:  Page 51 of the same

[15]  policy is -- will be Exhibit H.

[16]    (Exhibit H marked for identification.)

[17]    MR. D'ALESSANDRO:  Continue, Mr. Talley.

[18]    MR. TALLEY:  Yes, sir.  Mr. Allione, Page

[19]  51, which is Exhibit H (unintelligible), can you

[20]  read Step 1 and just that first paragraph, ending

[21]  at "The employee"?

[22]    MR. ALLIONE:  Yes, sir.

[23]    "Regulated and Non-regulated:  Any employee

[24]  who refuses to submit to testing or refuses to

[25]

**Page 44**

[1]  cooperate with testing procedures will be removed

[2]  from service and charged with violating Amtrak's

[3]  Standards of Excellence and/or applicable Federal

[4]  regulation (e.g. FRA 49 CFR 219.107 or FHWA 49 CFR

[5]  382.211).  The employee...."

[6]    MR. TALLEY:  And there's, same Step, at the

[7]  bottom there, can you read

[8]  that, please; in italics?

[9]    MR. ALLIONE:  Yes, sir.

[10]    "If an employee has previously violated a

[11]  drug and/or alcohol prohibition and refuses to

[12]  test or cooperate with testing procedures during a

[13]  second testing occasion, the employee will not be

[14]  eligible for a waiver or letter of determination.

[15]  The employee will undergo a disciplinary hearing

[16]  in accordance with his/her collective bargaining

[17]  agreement or subject to disciplinary action up to

[18]  and including termination.  (Go to Step #2)"

[19]    MR. TALLEY:  Now has that happened in this

[20]  instance?

[21]    MR. ALLIONE:  Are you asking has this

[22]  employee had a previous positive?

[23]    MR. TALLEY:  Yes, sir.

[24]    MR. ALLIONE:  Give me one second, please.

[25]

Page 45

[ 1]    MR. TALLEY:  Yes, sir.

[ 2]        MR. ALLIONE:  Yes, sir.

[ 3]    MR. TALLEY:  Okay.  Now Step 2 of "Refusal

[ 4] to Test", can you read the first paragraph or the

[ 5] first sentence in Step 2?

[ 6]        MR. ALLIONE:  "If found guilty, the

[ 7] employee will be subject to termination.  Once the

[ 8] employee has been officially terminated, he or she

[ 9] will not be eligible for Amtrak Employee

[10] Assistance Program."

[11]    MR. TALLEY:  Okay.  Thank you.

[12]        We're going to continue on, Joe with

[13] information that was written to Mr. B. L. Campbell

[14] by Ms. Tierney, Margaret Ann Tierney.

[15]    MR. ALLIONE:  Yes, sir.

[16]    MR. TALLEY:  Do you have that paperwork in

[17] front of you?

[18]    MR. ALLIONE:  I do.

[19]    MR. McMILLAN:  First of all, I'd like to

[20] object to the questioning in leading the witness,

[21] and also, Mr. Allione is going to read Step 1,

[22] Step 2, read the entire paragraph; don't just pick

[23] out a sentence and read it.

[24]    MR. TALLEY:  Didn't need the whole

[25]

Page 46

[ 1] paragraph --

[ 2]        MR. McMILLAN:  I -- I'd like Mr. Allione --

[ 3]    MR. TALLEY:  -- read.

[ 4]    MR. McMILLAN:  -- to go ahead and read

[ 5] "Regulated/Non-regulated" employees.

[ 6]    MR. D'ALESSANDRO:  You'll have an

[ 7] opportunity to cross-examine him.  You could as

[ 8] him that question, okay.

[ 9]        Do you want to continue, Mr. Talley?

[10]    MR. TALLEY:  Yes, sir.

[11]    MR. D'ALESSANDRO:  And tell him what you're

[12] reading off of --

[13]    MR. TALLEY:  Yes, sir.  I'm --

[14]    MR. D'ALESSANDRO:  -- (inaudible; both

[15] speaking).

[16]    MR. TALLEY:  I'm reading off a comminque

[17] distributed --

[18]    MR. McMILLAN:  Just make -- want to make my

[19] point here, though.  I want him -- if he's gonna

[20] read a paragraph, read the entire paragraph.

[21]    MR. STEVENS:  Yes.

[22]    MR. McMILLAN:  I -- my objection is he is

[23] picking parts out of here and we can do that all

[24] day long if you want to play that game.

[25]

Page 47

[ 1]    MR. D'ALESSANDRO:  Okay.

[ 2]    MR. McMILLAN:  My objection is he's not

[ 3] reading full -- if he's gonna read

[ 4] Regulated/Non-regulated employee, he should read

[ 5] the entire paragraph; not just part of the

[ 6] (inaudible).

[ 7]    MR. D'ALESSANDRO:  Understand --

[ 8]    MR. McMILLAN:  Okay.  For the record.

[ 9]    MR. D'ALESSANDRO:  -- Mr. McMillan.

[10]    MR. TALLEY:  Continue?

[11]    MR. D'ALESSANDRO:  Okay.

[12]    MR. TALLEY:  Alright.  The communique

[13] between Mr. Campbell and Ms. Tierney is a

[14] Confidential, National Railroad Passenger

[15] Corporation, Human Resources - Health Services

[16] Department memo, Interoffice Memo -- Memorandum.

[17] Do you have that in front of you?

[18]    MR. ALLIONE:  I do.  Dated December 15th,

[19] 2004.

[20]    MR. TALLEY:  That is correct, sir.

[21]        Could you read that for us, please, in the

[22] record?

[23]    MR. ALLIONE:  Yes, sir.

[24]        "To:  Bernard Campbell; From --

[25]

Page 48

[ 1]    MR. McMILLAN:  I --

[ 2]    MR. ALLIONE:  -- Margaret Ann --

[ 3]    MR. McMILLAN:  I have another objection

[ 4] here for the record, that we requested that

[ 5] Ms. Tierney be here in person today; that was the

[ 6] purpose of recessing this, and she is not here and

[ 7] I object to Mr. Allione reading anything into the

[ 8] record.  We need Mr. -- Ms. Tierney.

[ 9]    MR. D'ALESSANDRO:  That's understandable,

[10] but we're gonna go --

[11]    MR. McMILLAN:  For the record.

[12]    MR. D'ALESSANDRO:  -- (unintelligible; more

[13] than one speaking) --

[14]    MR. McMILLAN:  Dock(?) it(?).

[15]    MR. D'ALESSANDRO:  -- for the record,

[16] it's --

[17]    MR. McMILLAN:  Dock it.

[18]    MR. D'ALESSANDRO:  I'll dock it.

[19]    MR. McMILLAN:  Thank you.

[20]    MR. D'ALESSANDRO:  Okay.

[21]    MR. TALLEY:  Continue on, Mr. Allione.

[22] Sorry for the interruption.

[23]    MR. ALLIONE:  Okay.

[24]        "To:  Bernard Campbell; From:  Margaret Ann

[25]

Page 49

[ 1]  Tierney, HR Officer; Subject: Drug Test Result
[ 2]  for Stevens, David, Personnel #00054828.
[ 3]      "This is to inform you that David Stevens
[ 4]  previously tested positive during a Company return
[ 5]  to duty testing event March 15, 1999. Mr. Stevens
[ 6]  did not sign a Conditional Waiver before being
[ 7]  released to return to duty.  On March 25, 2003,
[ 8]  David Stevens tested positive during a Company
[ 9]  required return to duty test event.  Attached is a
[10]  copy of the employee's Alcohol and Drug Waiver
[11]  Agreement signed on March 10, 2003.
[12]      "Subsequently, on December 13, 2004, as
[13]  part of a company return to duty physical
[14]  examination, Mr." Steven -- "Stevens was tested
[15]  for drugs. This is to advise you that according
[16]  to the statement provided by the testing
[17]  technician, Mr. Stevens provided a specimen that
[18]  was cold. The testing technician explained to the
[19]  employee that he would have to provide another
[20]  specimen under direct observation, which would be
[21]  supervised by someone of the same gender, after he
[22]  completed his physical examination.  Mr. Stevens
[23]  left the premises without providing a second urine
[24]  specimen.
[25]

Page 50

[ 1]      "According tot he testing technician's
[ 2]  statement, the employee's actions of not providing
[ 3]  a subsequent sample constitutes a refusal to test.
[ 4]  Any employee who refuses or intentionally
[ 5]  interferes with the testing process will be
[ 6]  subject to the same consequences as testing
[ 7]  positive.  Furthermore, the testing technician's
[ 8]  statement that the employee provided a cold
[ 9]  specimen violates the Standards of Excellence.
[10]      "In accordance with PERS-19, an employee
[11]  who violates the Standards of Excellence is
[12]  subject to dismissal.  Your department is
[13]  responsible for taking" necess -- "taking
[14]  disciplinary action.  If the employee is an
[15]  agreement-covered employee, a Union official or
[16]  an" expected -- excuse me, "excepted employee who
[17]  still holds seniority in a craft, the disciplinary
[18]  action must comply with the requirements of the
[19]  applicable collective bargaining agreement.  If
[20]  you have any questions concerning this discipline
[21]  process, please contact Labor Relations.
[22]      "The results/events of an employee's test
[23]  should be kept confidential.  However, evidence of
[24]  the results/event may be introduced into any
[25]

Page 51

[ 1]  discipline investigation that results from the
[ 2]  test(s).
[ 3]      "Further, please fax a copy of the hearing
[ 4]  charges and signed Drug and Alcohol Waiver (if
[ 5]  applicable) to my attention at ATS 777-2786 or
[ 6]  Bell (202) 906-2786.
[ 7]      "I am notifying you of the above facts in
[ 8]  accordance with Amtrak policy so that you may
[ 9]  initiate appropriate disciplinary actions.
[10]      "Attachments." Copy to:  "EAP Counselor;
[11]  Health Services - Mid-Atlantic Division."
[12]      MR. TALLEY:  Thank you, Mr. Allione.
[13]      MR. ALLIONE:  -- welcome.
[14]      MR. TALLEY:  And also there's a form that
[15]  was filled out at Concentra.  It's called a
[16]  Unusual Collection Form.  Do you have that in your
[17]  presence?
[18]      MR. ALLIONE:  I do.
[19]      MR. TALLEY:  Okay.  Could you read that for
[20]  us, and go down to:  "Specimen Temperature Out of
[21]  Range" and read that information?
[22]      MR. ALLIONE:  Yes, sir.
[23]      "Unusual Collection Form.  Donor Name:
[24]  David Stevens; Social Security No. 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.
[25]

Page 52

[ 1]      "I, the undersigned donor, certify that I
[ 2]  understand the following procedures that have been
[ 3]  explained to me:  ....
[ 4]      "Specimen Temperature Out of Range.  I
[ 5]  understand that the first specimen I attempted to
[ 6]  provide was not within" applicable -- excuse me,
[ 7]  "acceptable temperature range (90 to 100 degrees
[ 8]  Farenheit).  I have been advised that:
[ 9]      "A same gender collector will immediately
[10]  collect a second urine sample under direct
[11]  observation."
[12]      Signed by the Donor; dated 12/13/04.
[13]      Signed by the Collector, D. Hudley; 12/13/04.
[14]      "Note to the Collector:  All information
[15]  regarding the above circumstances should be
[16]  documented on a Custody and Control Form."
[17]      MR. TALLEY:  Okay.  Thank you, Mr. Allione.
[18]  At this time I do not have anymore questions for
[19]  you, sir.
[20]      MR. D'ALESSANDRO:  Do you have any
[21]  questions, Mr. McMillan?
[22]      MR. McMILLAN:  Yes, sir.
[23]      Joe.
[24]      MR. ALLIONE:  Michael.
[25]

Page 53

[ 1]     MR. McMILLAN: Mike here; how you doing.

[ 2]     You evidently is not -- you're not

[ 3] Ms. Tierney today; right?

[ 4]     MR. ALLIONE: No, I am not. I'm a Human

[ 5] Resources Officer for Drug and Alcohol.

[ 6]     MR. McMILLAN: Did she request you fill in

[ 7] or did the Company call you and ask you --

[ 8]     MR. TALLEY: Objection.

[ 9]     MR. D'ALESSANDRO: What's your objection?

[10]     MR. TALLEY: (Unintelligible) he just told

[11] he was an officer of that department. He doesn't

[12] know whether he's coming in for her or not. He's

[13] giving the same information as she would give.

[14]     MR. McMILLAN: Well we requested she be

[15] present today --

[16]     MR. D'ALESSANDRO: (Inaudible; both

[17] speaking) --

[18]     MR. McMILLAN: -- were told she would be

[19] present.

[20]     MR. D'ALESSANDRO: -- would be present.

[21] That's why he's questioning (unintelligible).

[22]     MR. TALLEY: Okay.

[23]     MR. McMILLAN: Were you requested to fill

[24] in for Ms. Tierney today, Mr. Allione?

[25]

Page 54

[ 1]     MR. ALLIONE: Yes, I was. Ms. Tierney is

[ 2] out of the State today. She is attending a

[ 3] training class in Wilmington, Delaware.

[ 4]     MR. McMILLAN: Okay. I believe you read

[ 5] the document here to Mr. Campbell, that

[ 6] Mr. Stevens provided a specimen that was cold. Do

[ 7] you have any information in front of you to give

[ 8] us the temperature of the -- the specimen?

[ 9]     MR. ALLIONE: Hold on a second.

[10]     On the Custody and Control Form, No.

[11] 13020546, it states under "Remarks" -- excuse me,

[12] under "Step 2: Completed by Collector. Read

[13] specimen temperature within 4 minutes. Is

[14] temperature between 90 and 100 degrees Farenheit?"

[15] It is checked off "No. Enter Remark."

[16]     The remark stated: "1st, specimen not

[17] within temp; #2: to follow observed."

[18]     MR. McMILLAN: Do we (unintelligible) have

[19] a copy of that document, Mr. Allione -- I don't

[20] know. Let me see if Mr. Talley has a copy of that

[21] document.

[22]     So the document you have says just --

[23] doesn't give you a temperature; it just says it's

[24] not within the 90 to 100 degree range, is that

[25]

Page 55

[ 1] what you're telling me?

[ 2]     MR. ALLIONE: I have a copy of the Chain of

[ 3] Custody Form. If I'm not mistaken, it's reading

[ 4] 102.

[ 5]     MR. D'ALESSANDRO: We don't -- we don't

[ 6] have a Chain of Custody Form, Joseph.

[ 7]     MR. ALLIONE: Okay.

[ 8]     MR. D'ALESSANDRO: Is there any way you can

[ 9] fax that to us?

[10]     MR. ALLIONE: Yes, sir. I can fax you a

[11] copy of it.

[12]     MR. D'ALESSANDRO: Yeah. That's all.

[13]     It's -- the fax number is 777-2105, and

[14] we'll take a recess until that fax comes.

[15]     MR. McMILLAN: Well I can question him

[16] about these other things, the other --

[17]     MR. D'ALESSANDRO: Well he's gonna have to

[18] do it.

[19]     MR. McMILLAN: Oh, okay.

[20]     MR. D'ALESSANDRO: Okay.

[21]     MR. McMILLAN: Okay.

[22]     MR. D'ALESSANDRO: It's nine minutes after

[23] 1:00. We'll just -- we're gonna hold on till you

[24] do that, okay, Joseph.

[25]

Page 56

[ 1]     MR. ALLIONE: Okay.

[ 2]     (Off the record.)

[ 3]     MR. D'ALESSANDRO: It's 13 minutes after

[ 4] 1:00 and we're back on the record. Mr. Allione

[ 5] has faxed us a copy of a Chain of Custody letter

[ 6] that's -- and hopefully, he'll explain what it is,

[ 7] what the document is. It'll be Exhibit I, okay.

[ 8]     (Exhibit I marked for identification.)

[ 9]     MR. D'ALESSANDRO: Would you explain what

[10] this document is, sir?

[11]     MR. ALLIONE: Okay. The Chain of Custody

[12] Control Form is a form that follows the specimen

[13] once it's collected, from the collection site to

[14] the laboratory. This document, a copy of it is

[15] left with the Collector; a copy of it is sent to

[16] Health Services; a copy of it is sent to the MRO,

[17] the Medical Review Officer. Basically, the Chain

[18] of Custody Form is just that, it's the chain of

[19] custody that follows with the specimen from the

[20] Collector to the -- from the Donor and Collector

[21] to the laboratory to ensure that no tampering has

[22] been in -- taken place.

[23]     On the Custody and Control Form -- did you

[24] want me to explain it all, Mr. D'Alessandro?

[25]

[ 1]        MR. D'ALESSANDRO:  Well I think we were

[ 2]  talking -- and I don't want to put any words in

[ 3]  anybody's mouth -- I think we were talking about

[ 4]  Step 2; is -- that was the question, Mr. --

[ 5]        MR. McMILLAN:  Yes.

[ 6]        MR. D'ALESSANDRO:  -- McMillan?

[ 7]        MR. ALLIONE:  That is correct.

[ 8]        Step 2 is the section to be completed by

[ 9]  the Collector.  As you notice towards the right it

[10]  says a split specimen is required.  Just

[11]  underneath Step 2 it reads:  Read specimen

[12]  temperature within four minutes.  Is temperature

[13]  between 90 degrees and 100 degrees Farenheit?  In

[14]  this particular Chain of Custody Form it is

[15]  checked off "no", and just under "Enter Remark", I

[16]  believe it says 102.

[17]        MR. D'ALESSANDRO:  That's the temperature

[18]  of the specimen?

[19]        MR. ALLIONE:  I believe that's the

[20]  temperature of the specimen.  I don't have a very

[21]  clear copy; I don't have the original.

[22]        MR. D'ALESSANDRO:  Okay.

[23]        MR. ALLIONE:  Next to that:  Specimen

[24]  Collection; split is also checked off.

[25]

[ 1]        Next line under Remarks:  1st specimen --

[ 2]  and this is handwritten by the Collector -- 1st

[ 3]  specimen not within temperature; #2 to follow

[ 4]  observed.

[ 5]        MR. McMILLAN:  Meaning?

[ 6]        MR. ALLIONE:  Meaning it will be the second

[ 7]  specimen will be collected under direct

[ 8]  supervision -- or direct observation, excuse me,

[ 9]  in accordance with the DOT poli -- or the FRA

[10]  policy on drug collection.

[11]        MR. McMILLAN:  Okay.  Alright.

[12]        Could we go back to the -- back to the

[13]  Chart that you read from under Regulated and

[14]  Non-regulated, second paragraph on page 51; do you

[15]  have that in front of you?

[16]        MR. ALLIONE:  (Unintelligible), yes.

[17]        MR. McMILLAN:  Alright.  You read the first

[18]  part, No. 2 - Regulated and Non-regulated.

[19]        MR. ALLIONE:  Correct.

[20]        MR. McMILLAN:  I think you read the part

[21]  that if you are found guilty, the employee will be

[22]  subject to termination, right, once the employee

[23]  has been officially terminated...will not be

[24]  eligible for Amtrak EAP?

[25]

---

Page 59

[ 1]        MR. ALLIONE:  Correct.

[ 2]        MR. McMILLAN:  Alright.  Could you read the

[ 3]  second sentence there for me?

[ 4]        MR. ALLIONE:  If found not guilty, the

[ 5]  employee will be returned to work and made whole

[ 6]  for time withheld from service.

[ 7]        MR. McMILLAN:  Yeah.  And I -- and I think

[ 8]  it -- Step 1, at the top, you read the -- first of

[ 9]  all, do you know whether Mr. -- in this case, was

[10]  this gentleman a regulated or non-regulated

[11]  employee?

[12]        MR. ALLIONE:  This gentleman is a

[13]  non-regulated employee.

[14]        MR. McMILLAN:  Okay.

[15]        MR. ALLIONE:  If I'm wrong, Mr. McMillan,

[16]  he's a Coach Cleaner?

[17]        MR. McMILLAN:  Yes, sir.  He is.

[18]        MR. ALLIONE:  He is non-regulated.  He

[19]  doesn't fall under hours of service or CDL.

[20]        MR. McMILLAN:  Okay.  Alright.

[21]        Go back to the letter that was sent to

[22]  Mr. Campbell from Ms. Tierney, okay, and the

[23]  second paragraph it states that:  This is to

[24]  advise you that according to the statement

[25]

Page 60

[ 1]  provided by the testing technician, Mr. Stevens

[ 2]  provided a specimen that was cold.

[ 3]        MR. ALLIONE:  Correct.

[ 4]        MR. McMILLAN:  Alright.  And I -- and I

[ 5]  think you stated, you testified that it should be

[ 6]  between 90 and 100 degrees Farenheit?

[ 7]        MR. ALLIONE:  Correct.

[ 8]        MR. McMILLAN:  And also that it was one --

[ 9]  I don't know from what looks like it was 100.2?  I

[10]  mean that's the way it looks and I think that's

[11]  what you stated for the record; is that correct?

[12]        MR. ALLIONE:  I cannot -- I cannot make

[13]  this out clearly.

[14]        MR. McMILLAN:  By --

[15]        MR. ALLIONE:  Looks like one, zero; I

[16]  can't -- I can't tell what the next

[17]  (unintelligible) is, and then it looks like a two.

[18]        MR. McMILLAN:  Well it could either -- it

[19]  has to be either 10.2 or 100.2; correct?

[20]        MR. ALLIONE:  (No response.)

[21]        MR. McMILLAN:  You don't have a

[22]  clear-cut -- clear copy in front of you?

[23]        MR. ALLIONE:  No, I don't.  My copy's as

[24]  clear as yours.  I don't have the original.  The

[25]

Page 61

[1] testing technician could answer that question.

[2]     MR. McMILLAN: Okay. Are we gonna have

[3] them on the phone, someone --

[4]     MR. TALLEY: Yes.

[5]     MR. McMILLAN: -- on the phone?

[6]     Okay. I guess you're just reading from the

[7] document; you couldn't tell me. So --

[8]     MR. ALLIONE: Correct.

[9]     MR. McMILLAN: -- we'll ask the testing

[10] technician that question.

[11]     MR. D'ALESSANDRO: One -- one question for

[12] Mr. Allione.

[13]     MR. McMILLAN: Uh-huh.

[14]     MR. D'ALESSANDRO: Does this testing

[15] technician have the original?

[16]     MR. ALLIONE: The testing technician has

[17] a -- the Chain of Custody Form is in multiple

[18] copies.

[19]     MR. D'ALESSANDRO: Right.

[20]     MR. ALLIONE: She has an original copy.

[21]     MR. D'ALESSANDRO: Okay.

[22]     MR. McMILLAN: Okay.

[23]     MR. D'ALESSANDRO: Alright.

[24]     MR. ALLIONE: Does that make sense to you?

[25]

Page 62

[1]     MR. D'ALESSANDRO: Yeah. I understand what

[2] you're saying.

[3]     MR. TALLEY: Yes.

[4]     MR. McMILLAN: Okay. So Mr. Allione, to

[5] follow up the last question, is -- then basically,

[6] you're reading this for Ms. Tierney, which is the

[7] Human Resources Officer; is that correct, in

[8] regards to this test?

[9]     MR. ALLIONE: Correct.

[10]     MR. McMILLAN: And you're just reading from

[11] a document that she provided to you?

[12]     MR. ALLIONE: I have the packet that was

[13] provided to me, yes.

[14]     MR. McMILLAN: Okay. On Mr. Stevens;

[15] correct?

[16]     MR. ALLIONE: Yes.

[17]     MR. McMILLAN: Okay. Well I don't have any

[18] further questions for Mr. Allione, unless David

[19] does.

[20]     MR. D'ALESSANDRO: Mr. Stevens, do you have

[21] any questions of this gentleman?

[22]     MR. STEVENS: No, I don't.

[23]     MR. D'ALESSANDRO: Mr. Talley, do you have

[24] any other questions for this gentleman?

[25]

Page 63

[1]     MR. TALLEY: Yeah. Maybe one or two.

[2]     Mr. Allione, is this a standard form,

[3] standard procedure when someone is doing a test,

[4] be it fail or pass the test or not?

[5]     MR. ALLIONE: Is what a normal --

[6]     MR. TALLEY: The -- the paperwork that has

[7] been generated?

[8]     MR. ALLIONE: Yes, sir.

[9]     MR. TALLEY: That's normal for when someone

[10] has either violated a test or whether they -- the

[11] test is negative or positive; correct?

[12]     MR. ALLIONE: A Chain of Custody Form is

[13] always completed. Yes.

[14]     MR. TALLEY: Thank you. So this is nothing

[15] out of the ordinary?

[16]     MR. ALLIONE: Absolutely not. It's

[17] protocol.

[18]     MR. TALLEY: Thank you. Thank you, sir.

[19]     I have no more questions for Mr. Allione at

[20] this time.

[21]     Hey, Joe, before you hang up --

[22]     MR. D'ALESSANDRO: I'm not finished with

[23] him.

[24]     MR. TALLEY: Oh, okay.

[25]

Page 64

[1]     MR. D'ALESSANDRO: I've got one question

[2] for this gentleman.

[3]     This Chain of Custody, when was this test

[4] actually done?

[5]     MR. ALLIONE: According to the Chain of

[6] Custody, it was done on 12/13/04.

[7]     MR. D'ALESSANDRO: Okay. Alright.

[8]     MR. McMILLAN: I have one question of

[9] Mr. Allione, before he goes.

[10]     MR. ALLIONE: What's up.

[11]     MR. McMILLAN: Joe, you -- you weren't at

[12] the facility when Mr. Stevens was there being

[13] tested, were you?

[14]     MR. ALLIONE: No, I was not.

[15]     MR. McMILLAN: Okay. Thank you.

[16]     MR. D'ALESSANDRO: I gotta do this.

[17]     Do you want to ask any questions,

[18] Mr. Stevens?

[19]     MR. STEVENS: No.

[20]     MR. D'ALESSANDRO: Okay. Mr. Talley,

[21] anything else?

[22]     MR. TALLEY: Just to get the telephone

[23] numbers for the Concentra personnel.

[24]     MR. D'ALESSANDRO: Well he can locate that.

[25]

Page 65

[ 1]     Do you have another question for this
[ 2] gentleman?
[ 3]     MR. McMILLAN:  Yeah.  One -- one other
[ 4] question.  May, may not be able to help me.
[ 5]     The "Specimen Bottle Released To", do you
[ 6] know who that is?  In the middle of the page,
[ 7] right-hand side, says: "Specimen Bottle(s)
[ 8] Released To: ...  Name of Delivery Service
[ 9] Transferring Specimen to Lab"?
[10]     MR. ALLIONE:  I'm trying to -- I don't
[11] recognize that name, Mike.  I would -- I would --
[12]     MR. D'ALESSANDRO:  You could --
[13]     MR. ALLIONE:  -- (cuts out) the technician.
[14]     MR. McMILLAN:  Okay.  Alright.  Thanks.
[15]     Thanks, Joe.
[16]     MR. D'ALESSANDRO:  We're gonna go off the
[17] record for a minute.  We're finished questioning
[18] this gentleman; am I correct in assuming?
[19]     (No audible responses.)
[20]     MR. D'ALESSANDRO:  Mr. Talley wants to get
[21] some phone numbers off of him.  It's 22 minutes
[22] after 1:00.  (This is the end of the first tape of
[23] Side B.  I'm going to take it out a little early.
[24] We're going to start a new tape.)
[25]

Page 66

[ 1]     (Off the record.  Tape 2/Side A begins.)
[ 2]     MR. D'ALESSANDRO:  This is the first side
[ 3] of the second tape.  I started over because we got
[ 4] a new witness.
[ 5]     (Off the record.)
[ 6]     MR. D'ALESSANDRO:  We're back on the
[ 7] record.  Could you identify yourself for the
[ 8] record, please?
[ 9]     MS. HUDLEY:  Demetria Hudley.
[10]     MR. D'ALESSANDRO:  Okay.  And Mr. Talley.
[11]     MR. TALLEY:  Yes, ma'am.  Ms. Hudley, good
[12] afternoon.
[13]     MS. HUDLEY:  Hi.
[14]     MR. TALLEY:  Okay.  On the date of December
[15] 13th, 2004, did you have the opportunity to see a
[16] Mr. David Stevens at your facility?
[17]     MS. HUDLEY:  Yes.
[18]     MR. TALLEY:  Could you -- there's a letter
[19] that you sent out.  Could you read that letter to
[20] us in the record, please?
[21]     MS. HUDLEY:  The entire letter?
[22]     MR. TALLEY:  Yes, ma'am, please.
[23]     MS. HUDLEY:  "On December 13th, 2004, David
[24] Stevens, Social Security No. 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, reported
[25]

Page 67

[ 1] to Concentra Medical Centers for a return to work
[ 2] physical and drug screen.
[ 3]     "The first urine drug screen collection was
[ 4] not within body temperature range" which is 90
[ 5] Farenhiet to 100.  "Mr. Stevens was then provided
[ 6] with the DOT Federal Guidelines for unusual
[ 7] collection.  He was then processed for this
[ 8] physical - it should be noted that his temperature
[ 9] at that time was 97.8 Farenheit.  He then informed
[10] another Concentra staff" employee -- or "member,
[11] Ebonie Beaty, that he was unable to stay at the
[12] center any longer as he had another doctor
[13] appointment.  Ebonie informed him that he needed
[14] to submit a second specimen before leaving.  He
[15] stated that he could not" do that "and that he
[16] would return, which is unacceptable according to
[17] the DOT Federal Guidelines.
[18]     "Ebonie called the company and left a
[19] message.  The aforementioned information was
[20] presented to Ms. Margaret Tierney of Amtrak on
[21] 12/14/04."
[22]     MR. TALLEY:  And is that your signature?
[23]     MS. HUDLEY:  Yes.
[24]     MR. TALLEY:  And this is the statement that
[25]

Page 68

[ 1] was sent to Amtrak; correct, Ms. Tierney?
[ 2]     MS. HUDLEY:  Yes.
[ 3]     MR. TALLEY:  Okay.  Did you deal with this
[ 4] gentleman, personally?
[ 5]     MS. HUDLEY:  On his drug collection and my
[ 6] part of his physical, yes.
[ 7]     MR. TALLEY:  Yes, ma'am.
[ 8]     Now there's a form that was filled out, a
[ 9] Collection -- Completed by Collector or
[10] Employee(sic) Representative form; I forget what
[11] it's --
[12]     MS. HUDLEY:  The Unusual Collection Form?
[13]     MR. D'ALESSANDRO:  No.  It's a Chain of
[14] Custody Form.
[15]     MR. TALLEY:  Chain of Custody Form.  Are
[16] you familiar with that Form?
[17]     MS. HUDLEY:  Yes.
[18]     MR. TALLEY:  There's a section under Step
[19] 2: Completed by Collector; do you have that form
[20] in front of you?
[21]     MS. HUDLEY:  I'm getting it, sir.
[22]     MR. TALLEY:  Okay.
[23]     MS. HUDLEY:  Uh-huh.
[24]     MR. TALLEY:  Alright.  It says:  Read
[25]

Page 69

[ 1]  specimen temperature within four minutes --

[ 2]    MS. HUDLEY:  Uh-huh.

[ 3]    MR. TALLEY:  -- and then you give whether

[ 4]  the temperature was between 90 and 100 degrees

[ 5]  Farenheit and answer is "no"; and what is that,

[ 6]  that you entered under "Enter Remark"?

[ 7]    MS. HUDLEY:  First specimen not within

[ 8]  temperature; #2 to follow observed.

[ 9]    MR. TALLEY:  Okay.  Now what's that

[10]  above -- after the word "specimen" is there

[11]  something right underneath "Enter Remark"?

[12]    MS. HUDLEY:  That's 1 of 2.

[13]    MR. TALLEY:  One of two.  Okay.

[14]    MS. HUDLEY:  Right.

[15]    MR. TALLEY:  Thank you.

[16]    MS. HUDLEY:  That should have been the

[17]  first specimen, and the second one would have been

[18]  to follow.

[19]    MR. TALLEY:  Okay.  And did he complete the

[20]  second one?

[21]    MS. HUDLEY:  No.  He -- he left.

[22]    MR. TALLEY:  He left.  Okay.

[23]    Thank you.  At this time I have no more

[24]  questions for you.

[25]

Page 70

[ 1]    MR. D'ALESSANDRO:  Do -- could you get

[ 2]  Ms. Beaty?

[ 3]    MS. HUDLEY:  Do you want me to get --

[ 4]    MR. McMILLAN:  No.  (Unintelligible)

[ 5]  question her while you have her.

[ 6]    MR. D'ALESSANDRO:  Yeah.  Okay.

[ 7]    Mr. McMillan's going to ask you some

[ 8]  questions.

[ 9]    Go ahead, Mike.

[10]    MR. McMILLAN:  Yeah.  Hi, Ms. Hudley.  I'm

[11]  Mr. Stevens' Union Rep.

[12]    MS. HUDLEY:  Uh-huh.

[13]    MR. McMILLAN:  I'd like to refer you back

[14]  to the Concentra Medical Center's letter that you

[15]  signed along with Ms. Beaty.

[16]    MS. HUDLEY:  Uh-huh.

[17]    MR. McMILLAN:  And I think you signed the

[18]  statement there stating that he was -- Mr. Stevens

[19]  was provided with DOT Federal Guidelines --

[20]    MS. HUDLEY:  Uh-huh.

[21]    MR. McMILLAN:  -- for unusual collection --

[22]    MS. HUDLEY:  Uh-huh.

[23]    MR. McMILLAN:  -- and are you -- what are

[24]  you referring to, exactly?

[25]

Page 71

[ 1]    MS. HUDLEY:  The Unusual Collection Form

[ 2]  that he signed and dated, it was -- it explained

[ 3]  to him that his specimen was out of range and that

[ 4]  he had to submit a second one.

[ 5]    MR. McMILLAN:  Okay.  So this was a form;

[ 6]  this is not the Department of Transportation

[ 7]  guidelines?

[ 8]    MS. HUDLEY:  It's a form from Concentra

[ 9]  stating the Department of Transportation

[10]  guidelines.

[11]    MR. McMILLAN:  Okay.  And did you also sign

[12]  that document?

[13]    MS. HUDLEY:  Yes, I did.

[14]    MR. McMILLAN:  This other document.

[15]    And I believe it also states that he was

[16]  then processed for the physical; should be noted

[17]  that his temperature at that time was 97.8

[18]  Farenheit?

[19]    MS. HUDLEY:  Right.

[20]    MR. McMILLAN:  Who took the temperature?

[21]    MS. HUDLEY:  I did.

[22]    MR. McMILLAN:  And that was your reading,

[23]  97.8?

[24]    MS. HUDLEY:  Yes.

[25]

Page 72

[ 1]    MR. McMILLAN:  Is that fairly normal?

[ 2]    MS. HUDLEY:  Yes.

[ 3]    MR. McMILLAN:  Okay.  And then I guess he

[ 4]  didn't inform you that he had to leave, he had

[ 5]  another doctor's appointment, did he?  Did he

[ 6]  inform you or someone else?

[ 7]    MS. HUDLEY:  He informed someone else.

[ 8]    MR. McMILLAN:  Okay.  And then at that

[ 9]  point did you turn the patient over to Ms. Ebonie

[10]  Beaty, was that what happened the (unintelligible;

[11]  both speaking) --

[12]    MS. HUDLEY:  No.  The patient was in the

[13]  room waiting on his physical.

[14]    MR. McMILLAN:  Okay.

[15]    MS. HUDLEY:  And somewhere in there he

[16]  flagged to Ebonie Beaty down and told her that he

[17]  couldn't leave -- I mean that he had to leave.

[18]    MR. McMILLAN:  Okay.  Do you know how long

[19]  he waited at that time?

[20]    MS. HUDLEY:  I can get -- no, I wouldn't

[21]  know, because he was in the room for a physical.

[22]    MR. McMILLAN:  Right.  Well did he tell you

[23]  that he had to leave?

[24]    MS. HUDLEY:  He did tell me that he had a

[25]

Page 73

[ 1]   doctor's appointment, but --

[ 2]       MR. McMILLAN:  Right.

[ 3]       MS. HUDLEY:  -- I told him that he had to

[ 4]   submit that second specimen before his doctor's

[ 5]   appoint -- before he left for his doctor's

[ 6]   appointment; if not, I would have to contact

[ 7]   Amtrak.

[ 8]       MR. McMILLAN:  Okay.  Did you -- did you

[ 9]   check the temperature on his urine?

[10]       MS. HUDLEY:  Well the urine specimen

[11]   collection cup comes with a temperature strip.

[12]       MR. McMILLAN:  So -- so what does it say on

[13]   the strip?

[14]       MS. HUDLEY:  It didn't have a temperature.

[15]       MR. McMILLAN:  Had no temperature at all?

[16]       MS. HUDLEY:  Not at all.

[17]       MR. McMILLAN:  So the temperature strip's

[18]   set up to be -- has to be between 90 --

[19]       MS. HUDLEY:  And a hundred.

[20]       MR. McMILLAN:  -- and a hundred.  So if

[21]   it's over a hundred, would it register?

[22]       MS. HUDLEY:  No.  If it's --

[23]       MR. McMILLAN:  And if it's --

[24]       MS. HUDLEY:  -- over a hundred it won't

[25]

Page 74

[ 1]   register, and if it's under 90 it won't register,

[ 2]   which is why they had to do the second collection

[ 3]   or third.

[ 4]       MR. McMILLAN:  Okay.  So do -- can you tell

[ 5]   by that whether it's either hot or cold?

[ 6]       MS. HUDLEY:  By the temperature strip?

[ 7]       MR. McMILLAN:  Yes.

[ 8]       MS. HUDLEY:  No.  You can just tell that

[ 9]   it's not within guidelines.

[10]       MR. McMILLAN:  Okay.  So you don't know

[11]   whether it's hotter or colder?

[12]       MS. HUDLEY:  When we pick the cup up, you

[13]   can tell if it's cold, but we can't judge it from

[14]   that.

[15]       MR. McMILLAN:  Okay.  So you don't know

[16]   whether it's hot or cold (inaudible)?

[17]       MS. HUDLEY:  Right.

[18]       MR. McMILLAN:  Okay.  I don't have any

[19]   other questions for -- for you right now.

[20]       MR. D'ALESSANDRO:  Mr. Stevens, do you have

[21]   any questions for this young lady?

[22]       MR. STEVENS:  Yes.  Hi, Demetria.

[23]       MS. HUDLEY:  Hi.

[24]       MR. STEVENS:  You have here on the form

[25]

Page 75

[ 1]   that you faxed which said that you took a

[ 2]   temperature of 97.8 --

[ 3]       MS. HUDLEY:  Uh-huh.

[ 4]       MR. STEVENS:  -- when did you take my

[ 5]   temperature?

[ 6]       MS. HUDLEY:  When you -- when we were in a

[ 7]   room and I was doing a part of your physical where

[ 8]   I did your height, weight, temperature, blood

[ 9]   pressure, and pulse.

[10]       MR. STEVENS:  But we didn't never get to

[11]   that second part of the physical.

[12]       MS. HUDLEY:  Yes, we did.  When we were

[13]   sitting in the room; you were sitting --

[14]       MR. STEVENS:  Sitting in what room --

[15]       MS. HUDLEY:  -- table and I took your

[16]   temperature, because that was during the time that

[17]   you told me that you had another doctor's

[18]   appointment.

[19]       MR. STEVENS:  Okay.  Which was then when I

[20]   got pretty curious of the -- the temperature

[21]   change in my urine.  I'm just trying to figure out

[22]   'cause I don't remember -- the only thing I

[23]   remember is you taking my height and weight.

[24]       MS. HUDLEY:  Your blood pressure was

[25]

Page 76

[ 1]   128/80; your pulse was 88; and your temperature

[ 2]   was 97.8.

[ 3]       MR. STEVENS:  Okay.  Do we have -- do I

[ 4]   have anything that you could send --

[ 5]       MR. McMILLAN:  Well do you have that

[ 6]   document in front of you --

[ 7]       MS. HUDLEY:  Yes.

[ 8]       MR. McMILLAN:  -- Ms. Hudley?

[ 9]       MS. HUDLEY:  Yes.

[10]       MR. STEVENS:  That's all I have.

[11]       MR. McMILLAN:  Ms --

[12]       MR. D'ALESSANDRO:  Mr. McMillan?

[13]       MR. McMILLAN:  Yes.  Ms. -- Ms. Hudley,

[14]   were you there when Mr. Stevens said he had to

[15]   leave?

[16]       MS. HUDLEY:  No.  Not when he was speaking

[17]   to Ms. Beaty.

[18]       MR. McMILLAN:  Okay.  So you didn't hear

[19]   him say he would come back or any of that?

[20]       MS. HUDLEY:  No.

[21]       MR. McMILLAN:  Okay.

[22]       MS. HUDLEY:  She just documented

[23]   everything.

[24]       MR. McMILLAN:  You -- you speak of the DOT

[25]

[ 1] Federal Guidelines here.  Is there a place there
[ 2] where you have copies of the guidelines for the
[ 3] employees when they come in?
[ 4]        MS. HUDLEY:  If they have a Unusual
[ 5] Collection Form --
[ 6]        MR. McMILLAN:  Uh-huh.
[ 7]        MS. HUDLEY:  -- the form that he signed, it
[ 8] informs them what we have to do for a specimen
[ 9] temperature out of range.
[10]        MR. McMILLAN:  Do -- do -- did David sign
[11] this form when he first come in or do you --
[12]        MS. HUDLEY:  He signed it as soon as I told
[13] him his specimen was not within body temperature
[14] range.  I explained it to him; he signed it and
[15] dated it.
[16]        MR. STEVENS:  When we were -- this is
[17] David, again.
[18]        When we were standing up at your counter?
[19]        MS. HUDLEY:  Yes.
[20]        MR. STEVENS:  Okay.  Along -- so that form
[21] came along with the signatures of when we -- when
[22] you was placing those things in the vials;
[23] right -- it's two different vials that you placed
[24] them in?
[25]

[ 1]        MS. HUDLEY:  Right.
[ 2]        MR. STEVENS:  Okay.  When I put in my
[ 3] initials.
[ 4]        MS. HUDLEY:  Right.
[ 5]        MR. STEVENS:  Did you also present that --
[ 6] that form to me, as well?
[ 7]        MS. HUDLEY:  Yes.
[ 8]        MR. STEVENS:  Okay.
[ 9]        MR. McMILLAN:  Ms. Hudley, this is
[10] Mr. McMillan, again.
[11]        MS. HUDLEY:  Uh-huh.
[12]        MR. McMILLAN:  The sample, what happens to
[13] the sample, the first sample?
[14]        MS. HUDLEY:  If we don't have a second
[15] sample to follow, it gets discarded.
[16]        MR. McMILLAN:  Meaning "thrown out" or --
[17]        MS. HUDLEY:  Right.
[18]        MR. McMILLAN:  Okay.  Are you familiar with
[19] the -- the Amtrak --
[20]        MR. TALLEY:  Objection.  She's familiar
[21] with what happens at Concentra; what does that
[22] have to do with....
[23]        MR. McMILLAN:  I didn't say that --
[24]        MR. D'ALESSANDRO:  Finish --
[25]

Page 79

[ 1]        MR. McMILLAN:  -- let me finish the
[ 2] question.
[ 3]        MR. D'ALESSANDRO:  Let him finish the
[ 4] question.
[ 5]        MR. TALLEY:  Okay.
[ 6]        MR. McMILLAN:  Are you familiar with the
[ 7] form that goes to Timothy McLaughlin, 30th -- 30th
[ 8] and Market Streets, Philadelphia, in regards to --
[ 9] it says Concentra Medical Center -- you just read
[10] on that document where you said it was 1 of 2 --
[11]        MS. HUDLEY:  Uh-huh.
[12]        MR. McMILLAN:  -- first specimen, and then
[13] #2 follow observed; 1 of 2?
[14]        MS. HUDLEY:  Uh-huh.
[15]        MR. McMILLAN:  It says on there "specimen
[16] bottle" --
[17]        MS. HUDLEY:  Uh-huh.
[18]        MR. McMILLAN:  -- "released to," who is
[19] that ma'am; could you tell me who that is?
[20]        MS. HUDLEY:  Courier.
[21]        MR. McMILLAN:  Courier; courier?
[22]        MS. HUDLEY:  Courier.  Yeah.  That's who we
[23] release them to.
[24]        MR. McMILLAN:  So you release it to them
[25]

Page 80

[ 1] and then they -- they get rid of them or destroy
[ 2] them; is that (inaudible) --
[ 3]        MS. HUDLEY:  Oh, no.  We discarded it.  If
[ 4] he would have completed the second one, they both
[ 5] would have went in to the courier.
[ 6]        MR. McMILLAN:  Okay.  So you signed that --
[ 7]        MS. HUDLEY:  -- don't have a second one --
[ 8]        MR. McMILLAN:  Okay.
[ 9]        MS. HUDLEY:  -- to go through; so it's
[10] discarded.
[11]        MR. McMILLAN:  Okay.  So you signed that
[12] document before he gave the second specimen; it
[13] was --
[14]        MS. HUDLEY:  Right.
[15]        MR. McMILLAN:  -- gonna be released.  Okay.
[16] To the courier.  Okay.  Got it.
[17]        Is it possible, ma'am, that you have
[18] employees sign these forms, a packet when they
[19] first come in the door?
[20]        MS. HUDLEY:  The -- what packet?
[21]        MR. McMILLAN:  Do you have a package there
[22] for them to sign when they come in the door in
[23] regards to any instance that may occur?
[24]        MR. TALLEY:  Objection.  She asked -- she
[25]

[ 1]    answered that question already.  She said she gave

[ 2]    him that form after he did not submit for the

[ 3]    second test and explained to him that this was

[ 4]    what was gonna happen if he didn't submit it.

[ 5]        MR. D'ALESSANDRO:  That wasn't his

[ 6]    question.

[ 7]        MR. TALLEY:  It was.

[ 8]        MR. D'ALESSANDRO:  His question was did --

[ 9]    do they sign --

[10]        MR. TALLEY:  Do he get that package ahead,

[11]    and (unintelligible) saying that he'd given -- he

[12]    had given -- she had given him these whole

[13]    packages and he signed it without knowledge is

[14]    what he's alluding to, which she had already

[15]    stated she did not --

[16]        MR. McMILLAN:  Well --

[17]        MR. TALLEY:  -- when she said she --

[18]        MR. McMILLAN:  -- I'm not alluding to

[19]    anything.  I'm asking the lady a question.

[20]        MR. D'ALESSANDRO:  He's asking if she signs

[21]    the document prior to the test.

[22]        MR. TALLEY:  No.  That's not what he asked.

[23]    He asked did --

[24]        MR. D'ALESSANDRO:  That's --

[25]

---

[ 1]        MR. TALLEY:  -- she give him --

[ 2]        MR. D'ALESSANDRO:  That's what I --

[ 3]        MR. TALLEY:  -- the information.

[ 4]        MR. D'ALESSANDRO:  -- understood.

[ 5]        MR. TALLEY:  Okay.

[ 6]        MR. D'ALESSANDRO:  Okay.  What I

[ 7]    understood.

[ 8]        MR. TALLEY:  Okay.

[ 9]        MR. D'ALESSANDRO:  It wasn't --

[10]        MR. McMILLAN:  Do you understand the

[11]    question, ma'am?

[12]        MS. HUDLEY:  Can you repeat it?

[13]        MR. McMILLAN:  Is it okay to repeat the

[14]    question?

[15]        MR. D'ALESSANDRO:  Yeah.

[16]        MR. McMILLAN:  I know you deal with a lot

[17]    of people there, okay.  Is it possible that you

[18]    have a packet for when employees come in to do

[19]    their return to duty or follow-up or whatever,

[20]    sign a packet because it's Amtrak employees --

[21]        MR. TALLEY:  What I just objected to,

[22]    that's exactly what he's asking her right now:

[23]    Did she give him this paperwork --

[24]        MR. McMILLAN:  No, I'm not --

[25]

---

[ 1]        MR. TALLEY:  -- before --

[ 2]        MR. McMILLAN:  Saying that.

[ 3]        MR. D'ALESSANDRO:  He didn't say nothing

[ 4]    about that paper.  He's talking about --

[ 5]        MR. McMILLAN:  May I finish --

[ 6]        MR. D'ALESSANDRO:  -- whole packet of

[ 7]    paper.

[ 8]        MR. McMILLAN:  -- my question.

[ 9]        MR. D'ALESSANDRO:  Let him finish the

[10]    question.

[11]        MR. McMILLAN:  And then if you want to

[12]    object that's fine.

[13]        MR. TALLEY:  Right.

[14]        MR. McMILLAN:  Ma'am, we'll go back over

[15]    this again.  Do you have a packet for Amtrak

[16]    employees when they come in to take a

[17]    return-to-duty physical, or any other physical

[18]    there, that they sign a document prior to being

[19]    treated?

[20]        MS. HUDLEY:  No.  They have front desk

[21]    information that they need to fill out to get put

[22]    into the system, which is patient information, but

[23]    that's every employee -- that's every patient that

[24]    comes in here.

[25]

---

[ 1]        MR. McMILLAN:  Okay.  So they just fill out

[ 2]    patient... and the -- and the forms in pa -- forms

[ 3]    are not involved in that; it's just basic

[ 4]    information about the employee, is that what you

[ 5]    are saying?

[ 6]        MS. HUDLEY:  It's basic infor -- yes.

[ 7]        MR. McMILLAN:  No particular documents?

[ 8]        MS. HUDLEY:  No.

[ 9]        MR. McMILLAN:  And your statement here was

[10]    typed.  Who -- do you know who typed this

[11]    statement?

[12]        MS. HUDLEY:  Supervisor.

[13]        MR. McMILLAN:  And who would that be?

[14]        MS. HUDLEY:  (Unintelligible.)

[15]        MR. McMILLAN:  Ms. who, Beaty?

[16]        MS. HUDLEY:  Lisa Shave.

[17]        MR. McMILLAN:  Lisa Shaves?

[18]        MS. HUDLEY:  S-H-A-V-E.

[19]        MR. McMILLAN:  S-H-A-V-E?

[20]        MS. HUDLEY:  Yes.

[21]        MR. McMILLAN:  Lisa.

[22]        Is there any particular reason why her name

[23]    isn't on this document?

[24]        MS. HUDLEY:  Because she was the

[25]

**Page 85**

[ 1]  (unintelligible) that -- the person that typed it.

[ 2]  We gave -- I gave her the information on my side;

[ 3]  Ms. Beaty gave her her side; she typed it.

[ 4]       MR. McMILLAN:  Okay.  So you gave her your

[ 5]  statement, and she added your statement in with

[ 6]  Ms. Beaty's; is that correct?

[ 7]       MS. HUDLEY:  Exactly.

[ 8]       MR. McMILLAN:  Okay.  No further questions.

[ 9]       MR. D'ALESSANDRO:  Mr. Stevens?

[10]       MR. STEVENS:  No.  No questions.

[11]       MR. D'ALESSANDRO:  Mr. Talley?

[12]       MR. TALLEY:  Yeah.  Ms. Hudley, I'm gonna

[13]  go back to this Unusual Collection Form, and I

[14]  know I'm being redundant.  We're just gonna go

[15]  over this one more time just to make sure it's

[16]  clear in my head.

[17]       This Unusual Collection Form signed by

[18]  Mr. Stevens, you gave it to him after you told him

[19]  that the test that he provided, the specimen the

[20]  provided, was a out-of-range test; correct?

[21]       MS. HUDLEY:  Yes.

[22]       MR. TALLEY:  And you explained to him what

[23]  the consequences were if he left the premises?

[24]       MS. HUDLEY:  Yes.

[25]

**Page 86**

[ 1]       MR. TALLEY:  Okay.  And he signed that

[ 2]  knowing the fact that that's what would happen if

[ 3]  he did not complete that second test?

[ 4]       MS. HUDLEY:  Yes.

[ 5]       MR. TALLEY:  Alright.  Thank you.

[ 6]       I have no more questions.

[ 7]       MR. D'ALESSANDRO:  Michael?

[ 8]       MR. McMILLAN:  Yes.  Ms. Hudley, you said

[ 9]  you -- that you explained to him the -- what would

[10]  take place if he did not follow through with the

[11]  second test?  That's just what you stated and I

[12]  (unintelligible) put words in your mouth; I want

[13]  to make sure that's what you said?

[14]       MS. HUDLEY:  Yes.

[15]       MR. McMILLAN:  You -- and you explained to

[16]  Mr. Stevens -- what would happen if he didn't take

[17]  the second test?

[18]       MS. HUDLEY:  We would have to call Amtrak

[19]  and he would be disqualified.

[20]       MR. McMILLAN:  He would be disqualified

[21]  from what?

[22]       MS. HUDLEY:  The specimen would be

[23]  disqualified.

[24]       MR. McMILLAN:  Okay.  So the specimen would

[25]

**Page 87**

[ 1]  be disqualified, not Mr. Stevens; correct?

[ 2]       MS. HUDLEY:  Right.

[ 3]       MR. McMILLAN:  And from that, if he doesn't

[ 4]  give a second specimen, then what does that mean

[ 5]  as far as Concentra; if he comes back there -- he

[ 6]  tells you he can come back tomorrow and he wants

[ 7]  to come back tomorrow to give a second specimen?

[ 8]       MS. HUDLEY:  He would have to contact --

[ 9]  contact Amtrak.  I --

[10]       MR. McMILLAN:  Okay.  So he would have to

[11]  contact Amtrak to be able to do that; they would

[12]  have to notify you, is that correct?

[13]       MS. HUDLEY:  Right.

[14]       MR. McMILLAN:  Okay.  Was Mr. Stevens

[15]  offered any liquids to drink?

[16]       MS. HUDLEY:  Yes.

[17]       MR. McMILLAN:  How much -- how much was he

[18]  offered?

[19]       MS. HUDLEY:  Four(?) cups of water.

[20]       MR. McMILLAN:  How many?

[21]       MS. HUDLEY:  Well we have a cup and a water

[22]  fountain.  So he was offered 40 ounces of liquid.

[23]       MR. McMILLAN:  All at one time?

[24]       MS. HUDLEY:  He has to drink it over a

[25]

**Page 88**

[ 1]  three-hour period.

[ 2]       MR. McMILLAN:  Okay.  And did you tell him

[ 3]  that?

[ 4]       MS. HUDLEY:  Yes.

[ 5]       MR. McMILLAN:  How come he didn't check

[ 6]  that box on the Unusual Collection?

[ 7]       MS. HUDLEY:  Because the specimen volume

[ 8]  wasn't inadequate.  The temperature was out of

[ 9]  range.

[10]       MR. McMILLAN:  Okay.  But -- but if he's

[11]  already given specimen and he can't make water,

[12]  then wouldn't it be up to you to offer him the

[13]  water?

[14]       MS. HUDLEY:  We offered him the water.

[15]       MR. McMILLAN:  And you're saying you

[16]  offered him 40 ounces of water?

[17]       MS. HUDLEY:  He can drink up to 40 ounces

[18]  of liquid.

[19]       MR. McMILLAN:  Did you offer him, did you

[20]  show him the water fountain --

[21]       MR. TALLEY:  Objection.

[22]       (Unintelligible comment; more than one

[23]  speaking.)

[24]       MR. McMILLAN:  -- I want you to --

[25]

[ 1]    MR. TALLEY:  Asked and answered three times

[ 2]    already.  She said she offered him 40 ounces of

[ 3]    water over a three-hour period.  How many times is

[ 4]    he going to ask that question?

[ 5]        MR. D'ALESSANDRO:  Move along, Michael.

[ 6]    MR. McMILLAN:  Well I guess my concern, is

[ 7]    she said the water fountain was there.  So...

[ 8]        MR. TALLEY:  She said --

[ 9]        MR. D'ALESSANDRO:  I heard --

[10]        MR. TALLEY:  -- she had a water cooler and

[11]    a cup where he could drink up to 40 ounces of

[12]    water in a three-hour period.

[13]        MR. McMILLAN:  And my question was:  Did

[14]    you offer him 40 ounces --

[15]        MR. TALLEY:  And she said --

[16]        MR. McMILLAN:  -- of liquid --

[17]        MR. TALLEY:  -- yes.

[18]        MR. D'ALESSANDRO:  She said yes.  That's

[19]    what she said.

[20]        MR. McMILLAN:  Could you answer my question

[21]    why it wasn't check, though, again?

[22]        MS. HUDLEY:  That box is for "Inadequate

[23]    Specimen Volume".  I checked the "Specimen

[24]    Temperature Out of Range" because that's what --

[25]

---

[ 1]    what (inaudible) fell under.

[ 2]        MR. McMILLAN:  Do you know if Mr. Stevens

[ 3]    was offered a same gender person to observe the

[ 4]    urine, the second specimen?

[ 5]        MS. HUDLEY:  He knew when he had to provide

[ 6]    a second specimen, he would have to be observed.

[ 7]    That's what the observed comment in remarks is

[ 8]    about.

[ 9]        MR. McMILLAN:  How do you know he new that?

[10]        MS. HUDLEY:  Because I explained it to him.

[11]        MR. McMILLAN:  Okay.  No further questions

[12]    for Ms. Hudley.

[13]        MR. D'ALESSANDRO:  Mr. Stevens.

[14]        MR. McMILLAN:  Reserve the right to recall.

[15]        MR. STEVENS:  Yes.  Demetria, you did not

[16]    offer me any water; you sent me in the back; I

[17]    stayed --

[18]        MR. McMILLAN:  Ask -- ask her a question --

[19]        MR. STEVENS:  -- in the back.

[20]        MR. McMILLAN:  You need to ask her a

[21]    question.

[22]        MR. STEVENS:  When did you offer me this

[23]    water?

[24]        MS. HUDLEY:  Sir, after you provided your

[25]

---

Page 91

[ 1]    specimen, did we not discuss the whole situation?

[ 2]        MR. STEVENS:  I'm asking you when did

[ 3]    you --

[ 4]        MS. HUDLEY:  (Inaudible; cuts out) specimen

[ 5]    was out of range; you need to drink up to 40

[ 6]    ounces of liquid; you would have to be observed;

[ 7]    you signed the form that explains everything that

[ 8]    I explained to you verbally; and then we went to

[ 9]    the room to do your physical.  I --

[10]        MR. STEVENS:  Did you --

[11]        MS. HUDLEY:  -- told you about the water

[12]    then.

[13]        MR. STEVENS:  No further questions.

[14]        MR. D'ALESSANDRO:  Mr. Talley -- wait a

[15]    minute.  Mr. McMillan?

[16]        MR. McMILLAN:  Ms. Hudley, did Mr. Stevens

[17]    say -- say anything to you about having bronchitis

[18]    or pneumonia?

[19]        MR. TALLEY:  Objection.  Relevance?

[20]        MR. D'ALESSANDRO:  Where are we going,

[21]    Michael?

[22]        MR. McMILLAN:  I think it's relevant.  I

[23]    think it's relevant.  The man has a problem with

[24]    his urine.  If he had pneumonia, may be a prob --

[25]

---

Page 92

[ 1]    may be a problem with his -- his uh -- the --

[ 2]        MR. TALLEY:  Speculation.

[ 3]        MR. D'ALESSANDRO:  Think you ought to

[ 4]    rephrase the question.  (Inaudible.)

[ 5]        MR. McMILLAN:  Did Mr. Stevens state to you

[ 6]    at any time that he had had some illness or

[ 7]    problems?

[ 8]        MR. TALLEY:  Objection.

[ 9]        MR. McMILLAN:  Physically?

[10]        MR. TALLEY:  Objection.  Has nothing --

[11]        MR. D'ALESSANDRO:  Medical facility --

[12]        MR. TALLEY:  -- to do with the test.

[13]        MR. D'ALESSANDRO:  -- Michael.

[14]        MR. TALLEY:  It has nothing to do with the

[15]    test.

[16]        MR. D'ALESSANDRO:  She's -- she's not a

[17]    physician, granted.  But it's a medical facility;

[18]    he's taking a return-to-duty physical.

[19]        MR. TALLEY:  That's correct.

[20]        MR. D'ALESSANDRO:  I don't know what she

[21]    asked or what he asked her or he asked -- she

[22]    asked him, and that's --

[23]        MR. McMILLAN:  She's testified --

[24]        MR. D'ALESSANDRO:  -- what I'm try --

[25]

Page 93

[ 1]     MR. McMILLAN: -- to all this stuff about

[ 2] him being --

[ 3]     (Inaudible; more than one speaking.)

[ 4]     UNIDENTIFIED SPEAKER: -- temperatures and

[ 5] height and weight --

[ 6]     MR. McMILLAN: -- any complaints; did he

[ 7] complain to you, Ms. Hudley, about his...?

[ 8]     MS. HUDLEY: (No response.)

[ 9]     MR. McMILLAN: Can you answer the question?

[10]     MS. HUDLEY: -- not complain to me. There

[11] weren't any complaints.

[12]     MR. McMILLAN: So he never spoke to you

[13] about being ill?

[14]     MR. TALLEY: Objection. Asked and

[15] answered. He's --

[16]     MR. McMILLAN: (Unintelligible) complain --

[17]     MR. TALLEY: -- badgering the witness.

[18]     MR. McMILLAN: I am not. (Unintelligible)

[19] complain something --

[20]     UNIDENTIFIED SPEAKER: -- put it in a

[21] different way.

[22]     MS. HUDLEY: Hello. He stated to me that

[23] he was sick and had just got out of the hospital.

[24] We were talking.

[25]

Page 94

[ 1]     MR. McMILLAN: I'm sorry. Could you repeat

[ 2] that; I couldn't hear you. The heat just kicked

[ 3] on here. I'm sorry.

[ 4]     MS. HUDLEY: He did state to me that he had

[ 5] been (inaudible) released from the hospital.

[ 6]     MR. McMILLAN: Okay. And you -- could you

[ 7] finish up with the rest?

[ 8]     MS. HUDLEY: We were talking.

[ 9]     MR. McMILLAN: Okay. Thank you.

[10]     No further questions.

[11]     MR. D'ALESSANDRO: Mr. Stevens?

[12]     MR. STEVENS: No further questions.

[13]     MR. D'ALESSANDRO: Mr. Talley?

[14]     MR. TALLEY: One more question, Ms. Hudley.

[15]     What was his temperature, again, after you

[16] took his temperature?

[17]     MS. HUDLEY: 97.8.

[18]     MR. TALLEY: Okay. Thank you.

[19]     MR. D'ALESSANDRO: Anything else,

[20] Mr. McMillan?

[21]     MR. McMILLAN: Not right now. Thank you.

[22]     MR. D'ALESSANDRO: Okay. Mr. Stevens --

[23] I've got to ask you -- Mr. Stevens?

[24]     MR. STEVENS: No.

[25]

Page 95

[ 1]     MR. D'ALESSANDRO: Okay. Do you want to

[ 2] get this other young lady --

[ 3]     MR. TALLEY: Yeah. Ms. Hudley, could you

[ 4] get Ms. -- Ms. Beaty?

[ 5]     MS. HUDLEY: Okay. Hold on.

[ 6]     MR. TALLEY: Alright. Thank you.

[ 7]     MR. D'ALESSANDRO: It's 1:55.

[ 8]     MS. BEATY: Hello.

[ 9]     MR. TALLEY: Hello.

[10]     MS. BEATY: Hi.

[11]     MR. TALLEY: Hi. Is this Ms. Beaty

[12] (pronounced as "Bate-y")?

[13]     MS. BEATY: Yes.

[14]     MR. TALLEY: (Pronounces last name in a

[15] different way, e.g. Beat-y.) I'm not -- I'm not

[16] sure how to pronounce your name.

[17]     MS. BEATY: It's Beaty. (Pronounced as:

[18] Beat-y.)

[19]     MR. TALLEY: Okay. It's Beaty.

[20]     Ms. Beaty, we just got finished talking

[21] with Ms. Hudley -- oh, I'm Michael Talley, General

[22] Foreman and Charging Officer for Amtrak, and we

[23] are at a hearing for Mr. David Stevens.

[24]     MS. BEATY: Okay.

[25]

Page 96

[ 1]     MR. TALLEY: And Ms. Hudley gave us some

[ 2] information that was typed by you guys'

[ 3] supervisor, and the information that she has in

[ 4] front of her. Can you --

[ 5]     MR. D'ALESSANDRO: Could you hold on for a

[ 6] minute?

[ 7]     MR. TALLEY: Yes, sir.

[ 8]     MR. D'ALESSANDRO: Before I get laid off

[ 9] from my job --

[10]     MR. TALLEY: Oh.

[11]     MR. D'ALESSANDRO: -- if you're just gonna

[12] keep on going down this road.

[13]     MR. TALLEY: Sorry. What'd I do.

[14]     MR. D'ALESSANDRO: You are an employee of

[15] Concentra?

[16]     MS. BEATY: Yes, I am.

[17]     MR. D'ALESSANDRO: The -- you're going to

[18] be taped. I am the Hearing Officer.

[19]     MS. BEATY: Okay.

[20]     MR. D'ALESSANDRO: And you are going to

[21] be -- Mr. Talley is going to interrogate you, and

[22] Mr. McMillan is going to interrogate you, and

[23] Mr. Stevens will probably ask you some questions.

[24]     I just want to make you aware that you are

[25]

**Page 97**

[ 1]     being taped, okay?

[ 2]         MS. BEATY:  Okay.

[ 3]         MR. D'ALESSANDRO:  Alright.  Thank you.

[ 4]     Now, Mr. Talley, you can carry on.

[ 5]         MR. TALLEY:  I apologize for jumping in

[ 6]     there like that, Mr. D'Alessandro.

[ 7]         Ms. Beaty, could you elaborate as to what

[ 8]     happened on the date of 12 -- December 13th, 2004,

[ 9]     with Mr. Stevens' situation, please?

[10]         MS. BEATY:  Well I was -- I just happened

[11]     to be walking past Mr. Stevens' room, and he asked

[12]     me how long it was gonna be before he could see

[13]     the doctor here, and I told him that you know

[14]     it'll be a few minutes.  And I pulled the chart

[15]     and I noticed that the specimen he gave that

[16]     Ms. Dudley -- Hudley collected --

[17]         MR. TALLEY:  Uh-huh.

[18]         MS. BEATY:  -- was out of temperature range

[19]     and that I informed him that he would have to do

[20]     another specimen even after he saw the doctor.  So

[21]     it was gonna be a while.

[22]         MR. TALLEY:  Okay.  And did -- what, if

[23]     anything, did he say to you?

[24]         MS. BEATY:  He told me he had a doctor's

[25]

**Page 98**

[ 1]     appointment and he needed to leave soon.

[ 2]         MR. TALLEY:  And did you respond in any --

[ 3]     in any way after he said that?

[ 4]         MS. BEATY:  I reiterated the point that he

[ 5]     had to do a second specimen.  He could not leave

[ 6]     until he did that second specimen.

[ 7]         MR. TALLEY:  Why would -- why would he not

[ 8]     be able to leave until he did the second specimen?

[ 9]         MS. BEATY:  Because it's DOT regulation.

[10]         MR. TALLEY:  Thank you.  I have no more

[11]     questions for her at this time.

[12]         MS. BEATY:  Okay.

[13]         MR. TALLEY:  Hold on.  Hold on.  I got

[14]     somebody else that might --

[15]         MR. D'ALESSANDRO:  (Inaudible.)

[16]         MR. TALLEY:  -- have some.

[17]         MR. D'ALESSANDRO:  Mr. McMillan, do you

[18]     have any questions for this young lady?

[19]         MR. McMILLAN:  Yes.  Ms. Beaty, how you

[20]     doing?

[21]         MS. BEATY:  I'm fine.

[22]         MR. McMILLAN:  You know the DOT Federal

[23]     Guidelines --

[24]         MS. BEATY:  Uh-huh.

[25]

**Page 99**

[ 1]         MR. McMILLAN:  -- right; are you familiar

[ 2]     with those?

[ 3]         MS. BEATY:  Yes, I am.

[ 4]         MR. McMILLAN:  Are the employees when they

[ 5]     come in there given copies of those guidelines?

[ 6]         MS. BEATY:  It's actually on the Chain of

[ 7]     Custody Form.

[ 8]         MR. McMILLAN:  On the Chain of Custody

[ 9]     Form.  On the Amtrak Chain of Custody Form?

[10]         MS. BEATY:  I believe it's on the back

[11]     side, the instructions of the Collect....

[12]         MR. McMILLAN:  No.  I don't think we -- I

[13]     don't think we have that.

[14]         MS. BEATY:  Amtrak's Chain of Custody may

[15]     be different, but....

[16]         MR. McMILLAN:  But -- but I'm looking at a

[17]     statement --

[18]         MS. BEATY:  Yes, they are.  They're all on

[19]     the back of the Chain of Custody Form, the last

[20]     page; the Donor's copy.  There's a list of

[21]     instructions as to what will happen during the

[22]     collection.

[23]         MR. McMILLAN:  Are you talking about on the

[24]     Completed by Collect --

[25]

**Page 100**

[ 1]         MS. BEATY:  That's "A" through "K".

[ 2]         MR. McMILLAN:  Well we don't have that

[ 3]     here, I don't think.  Do you have that Mr. Talley?

[ 4]         MR. TALLEY:  No, it must be -- since they

[ 5]     just faxed us --

[ 6]         MR. McMILLAN:  (Inaudible; both speaking.)

[ 7]         MR. TALLEY:  -- that's this one, it didn't

[ 8]     get -- could you fax us the back -- never mind.

[ 9]         MS. BEATY:  We can fax it.

[10]         MR. D'ALESSANDRO:  Fax it to 2105 -- could

[11]     you do the front and back of a blank form, please?

[12]         MS. BEATY:  I'm sorry?

[13]         MR. D'ALESSANDRO:  Do you have a blank

[14]     form?

[15]         MS. BEATY:  A blank?  Yes.  We can fax it

[16]     over.

[17]         MR. D'ALESSANDRO:  Yeah.  If you have a

[18]     blank form, I would appreciate a blank form --

[19]         MS. BEATY:  Okay.

[20]         MR. D'ALESSANDRO:  -- front and back.

[21]     Okay.

[22]         MR. McMILLAN:  Well I'm more interested in

[23]     the guidelines, the DOT's guidelines.

[24]         MR. D'ALESSANDRO:  Okay.  Hold on.  She --

[25]

Page 101

[1] that's on the back of the form.

[2]     MS. BEATY: Okay.

[3]     MR. D'ALESSANDRO: Okay. And the fax

[4] number is 202-906-2105.

[5]     MS. BEATY: You said "2105"?

[6]     MR. D'ALESSANDRO: Yes, ma'am.

[7]     You can continue questioning while the fax

[8] is (inaudible). Okay.

[9]     MR. McMILLAN: Ms. Beaty?

[10]     MS. BEATY: Yes.

[11]     MR. McMILLAN: I notice that you and

[12] Ms. Hudley signed a -- signed a statement

[13] together?

[14]     MS. BEATY: Yes, we did.

[15]     MR. McMILLAN: And uh -- who typed that

[16] statement?

[17]     MS. BEATY: Lisa Shave, my Supervisor.

[18]     MR. McMILLAN: You put a statement together

[19] with Ms. Hudley, or did you write a separate

[20] statement?

[21]     MS. BEATY: It was done together, yes.

[22]     MR. McMILLAN: Okay. Then you both signed

[23] it; correct?

[24]     MS. BEATY: Yes.

[25]

---

Page 102

[1]     MR. McMILLAN: Is this your statement that:

[2] He stated...he could not and that he would return,

[3] which is unacceptable according to DOT Federal

[4] Guidelines?

[5]     MS. BEATY: Yes.

[6]     MR. McMILLAN: And that -- was that in

[7] regards to him having another doctor's

[8] appointment?

[9]     MS. BEATY: Yes.

[10]     MR. McMILLAN: Did he -- did he say

[11] anything to you about his health or his illness or

[12] being sick or anything?

[13]     MS. BEATY: Yes, he did mention it.

[14]     MR. McMILLAN: And he -- did he say

[15] anything he was under the doctor's care?

[16]     MS. BEATY: Yes. I believe so.

[17]     MR. McMILLAN: Did he -- did he ask to see

[18] the doctor there?

[19]     MS. BEATY: Well he was supposed to see the

[20] doctor here.

[21]     MR. McMILLAN: Right. Right.

[22]     So did -- you didn't -- did you give him

[23] any part of the physical?

[24]     MS. BEATY: I'm sorry?

[25]

---

Page 103

[1]     MR. McMILLAN: Did you do any part of the

[2] physical or was that Ms. Hudley?

[3]     MS. BEATY: That was Ms. Hudley.

[4]     MR. McMILLAN: So basically you -- you came

[5] in and were you gonna do the second -- give him

[6] the second test or?

[7]     MS. BEATY: I could have, but no, I did

[8] not.

[9]     MR. McMILLAN: Did he inform you he was

[10] leaving, though?

[11]     MS. BEATY: Yes, he did.

[12]     MR. McMILLAN: And did he say he would come

[13] back?

[14]     MS. BEATY: I believe he said he could come

[15] back.

[16]     MR. McMILLAN: Okay. And then I guess you

[17] stated that under the Guidelines, he could not; is

[18] that correct?

[19]     MS. BEATY: Right. I explained to him that

[20] it would be a refusal if he left.

[21]     MR. McMILLAN: Okay. No further questions

[22] for Ms. Beaty right now.

[23]     MR. D'ALESSANDRO: Mr. Stevens, do you have

[24] anything?

[25]

---

Page 104

[1]     MR. STEVENS: Yes.

[2]     Hi, Ms. Beaty; how you doing?

[3]     MS. BEATY: I'm fine; and you?

[4]     MR. STEVENS: Okay.

[5]     When I did leave, do you remember me

[6] calling you from the -- do you remember calling me

[7] when I was at the hospital?

[8]     MS. BEATY: I believe you called -- didn't

[9] you call here?

[10]     MR. STEVENS: No. You called me and told

[11] me you had spoke with Margaret Tierney on my cell

[12] phone.

[13]     MS. BEATY: I don't recall that.

[14] (Unintelligible) --

[15]     MR. STEVENS: Yes, and then you called

[16] me --

[17]     MS. BEATY: -- calling me in -- calling me

[18] you were in the hospital.

[19]     MR. STEVENS: Okay. And then do you

[20] remember speaking with Ms. Tierney and calling me

[21] back?

[22]     MS. BEATY: I spoke to Ms. Tierney about

[23] you leaving, but I don't recall calling you. I

[24] thought you called me from the hospital.

[25]

Page 105

[ 1]     MR. STEVENS: Okay. Uh --

[ 2]     MS. BEATY: And I called Ms. Tierney back

[ 3]  to let her know you were at the hospital. You

[ 4]  told me you were in the hospital.

[ 5]     MR. STEVENS: Okay. So you don't remember

[ 6]  calling me at --

[ 7]     MS. BEATY: I may have. I'm not --

[ 8]     MR. TALLEY: Objection. Relevance?

[ 9]     MR. D'ALESSANDRO: It's a conversation he

[10]  must have had. Trying to --

[11]     MR. STEVENS: At 6:33 p.m. on December

[12]  13th?

[13]     MS. BEATY: I may have. I'm not sure.

[14]     MR. STEVENS: Okay.

[15]     MS. BEATY: I do remember talking to you,

[16]  yes.

[17]     MR. STEVENS: Okay.

[18]     MR. D'ALESSANDRO: Just move along.

[19]     MR. STEVENS: No -- no further questions.

[20]     MS. BEATY: Okay.

[21]     MR. D'ALESSANDRO: Do you have any

[22]  questions?

[23]     MR. TALLEY: Yeah. Ms. Beaty?

[24]     MS. BEATY: Yes.

[25]

Page 106

[ 1]     MR. TALLEY: This is Michael Talley, again.

[ 2]     MS. BEATY: Okay.

[ 3]     MR. TALLEY: If the testing -- the test,

[ 4]  the second one he was supposed to do and he didn't

[ 5]  do it, and it's considered a -- a refusal --

[ 6]     MS. BEATY: Yes.

[ 7]     MR. TALLEY: -- what type of test does that

[ 8]  constitute; what type of test is that?

[ 9]     MS. BEATY: For the second testing?

[10]     MR. TALLEY: Yeah. Well if he did not

[11]  complete the testing, what is it considered?

[12]     MS. BEATY: A refusal.

[13]     MR. TALLEY: Alright. Now if it's a

[14]  refusal, what is that considered; what type of

[15]  test is that considered?

[16]     MS. BEATY: I don't understand what

[17]  you're --

[18]     MR. TALLEY: Is that considered a positive

[19]  test?

[20]     MS. BEATY: Right.

[21]     MR. TALLEY: Thank you.

[22]     MS. BEATY: Refuses, basically yes.

[23]     MR. TALLEY: Thank you.

[24]     MS. BEATY: Positive.

[25]

Page 107

[ 1]     MR. TALLEY: That -- that's all I have.

[ 2]     MS. BEATY: Okay.

[ 3]     MR. TALLEY: At this time.

[ 4]     MR. D'ALESSANDRO: Michael?

[ 5]     MR. McMILLAN: Yeah. Ms. Beaty, how would

[ 6]  you know that that would be considered a refusal

[ 7]  test?

[ 8]     MS. BEATY: It's DOT Guidelines.

[ 9]     MR. McMILLAN: And do you -- do you have a

[10]  copy of Amtrak's Drug and Alcohol Guidelines,

[11]  Return to Duty, Regulated and Non-Regulated

[12]  Employees?

[13]     MS. BEATY: No. I was not aware they had

[14]  one.

[15]     MR. McMILLAN: You're not aware that they

[16]  had one?

[17]     MS. BEATY: They just ask us to follow DOT

[18]  Guidelines.

[19]     MR. McMILLAN: Do you know whether

[20]  Mr. Stevens is a regulated or a non-regulated --

[21]     MR. TALLEY: Objection.

[22]     MR. D'ALESSANDRO: (Inaudible) --

[23]     MS. BEATY: This was a non-regulated drug

[24]  screen, but --

[25]

Page 108

[ 1]     MR. TALLEY: You don't have to answer that.

[ 2]     MS. BEATY: Okay.

[ 3]     MR. D'ALESSANDRO: She's not aware of

[ 4]  Amtrak's Policy.

[ 5]     MR. TALLEY: Exactly. She already --

[ 6]     MR. McMILLAN: These came from the DOT.

[ 7]     MR. D'ALESSANDRO: She already stated that.

[ 8]     MR. McMILLAN: She just --

[ 9]     MR. TALLEY: That's --

[10]     MR. McMILLAN: -- obviously knows --

[11]     (Unintelligible; more than one speaking.)

[12]     MR. TALLEY: That's Amtrak's policy.

[13]     MR. McMILLAN: Thank you for answering the

[14]  question, ma'am.

[15]     MS. BEATY: Okay. Is that it? Do you need

[16]  to (inaudible).

[17]     MR. McMILLAN: Just one second.

[18]     I believe Mr. Stevens followed up on if you

[19]  had called him sometime that evening to let him

[20]  know that you had talked to Amtrak --

[21]     MR. TALLEY: Objection. She did not say

[22]  she called him. She said she remembered --

[23]     MS. BEATY: But like I --

[24]     MR. TALLEY: -- having a conversation.

[25]

**Page 109**

[ 1]         MS. BEATY: -- I don't recall. I may have,

[ 2] but I do remember speaking to him --

[ 3]         MR. TALLEY: Don't put words in her

[ 4] mouth --

[ 5]         MR. D'ALESSANDRO: Okay.

[ 6]         MR. TALLEY: -- Mike.

[ 7]         MR. McMILLAN: (Unintelligible), what's the

[ 8] number on your --

[ 9]         MR. D'ALESSANDRO: It doesn't -- what's the

[10] relevance of who called who?

[11]         MR. TALLEY: Exactly.

[12]         MR. D'ALESSANDRO: If he called -- if she

[13] called --

[14]         MR. McMILLAN: Well my -- my question to

[15] her is: Why -- why did you call Mr. Stevens that

[16] evening, at 6:13 --

[17]         MS. BEATY: Like I said, I do not recall

[18] calling him. I did --

[19]         MR. TALLEY: Objection.

[20]         MS. BEATY: -- (inaudible)

[21]         MR. TALLEY: -- you don't have to answer

[22] that question. This is -- that has nothing to do

[23] with his testing, whether who called whom.

[24]         MR. D'ALESSANDRO: What's the relevance of

[25]

**Page 110**

[ 1] this?

[ 2]         MR. McMILLAN: The relevance is that she

[ 3] called David and told him he did not have to come

[ 4] back and take the test because he was gon --

[ 5]         MS. BEATY: No, I did not.

[ 6]         MR. McMILLAN: -- he was gonna come back

[ 7] and take the test. He told her that.

[ 8]         MR. D'ALESSANDRO: She's -- she's

[ 9] claiming --

[10]         MR. McMILLAN: But didn't --

[11]         MR. D'ALESSANDRO: -- that she didn't --

[12]         MR. McMILLAN: -- didn't he tell you he was

[13] gonna come back and take the test, Ms. Beaty?

[14]         MS. BEATY: Okay. This is after I spoke to

[15] Ms. Tierney --

[16]         MR. McMILLAN: Okay.

[17]         MS. BEATY: -- and she said there was no

[18] need for her(?) to call back -- come back. If he

[19] had any questions that he has to contact her

[20] because she's the drug -- substance -- I guess

[21] substance testing person (inaudible) --

[22]         MR. McMILLAN: Okay.

[23]         MS. BEATY: -- Human Resources or whomever.

[24]         MR. McMILLAN: So you just wanted --

[25]

**Page 111**

[ 1]         MS. BEATY: But he would have to contact

[ 2] her.

[ 3]         MR. McMILLAN: Okay. So you wanted him to

[ 4] know that; correct?

[ 5]         MS. BEATY: She wanted him to know that and

[ 6] he needed to call her.

[ 7]         MR. McMILLAN: Alright.

[ 8]         MS. BEATY: To get that information, but

[ 9] yeah, there was no need for him to come back --

[10]         MR. McMILLAN: Okay.

[11]         MS. BEATY: -- at that point; once you

[12] leave, there's really no need. I was just calling

[13] Ms. Tierney to notify her of the situation.

[14]         MR. McMILLAN: Right. But he did tell you

[15] that he would come back if he could?

[16]         MS. BEATY: He said that he -- yeah, he

[17] would come back if he could but --

[18]         MR. McMILLAN: Okay.

[19]         MS. BEATY: -- I'm not the person to say:

[20] No, you can't come back.

[21]         MR. McMILLAN: I understand.

[22]         Thank you.

[23]         MS. BEATY: Okay.

[24]         MR. D'ALESSANDRO: Are we finished with

[25]

**Page 112**

[ 1] this young lady?

[ 2]         MR. STEVENS: No further questions.

[ 3]         MR. D'ALESSANDRO: Mr. Talley?

[ 4]         MR. TALLEY: I'm done with her, sir.

[ 5]         MR. D'ALESSANDRO: Okay. Is there anybody

[ 6] else at this facility you want to talk to?

[ 7]         MR. TALLEY: No. Those were the only two

[ 8] names.

[ 9]         MR. D'ALESSANDRO: Okay. Thank you very

[10] much for your trouble.

[11]         MS. BEATY: Thank you.

[12]         MR. D'ALESSANDRO: And have a nice day.

[13]         MS. BEATY: You, too.

[14]         MR. TALLEY: Alright. Thank you,

[15] Ms. Beaty.

[16]         MS. BEATY: Your welcomed. Bye.

[17]         MR. TALLEY: And thank -- and thank

[18] Ms. Hudley for me, as well.

[19]         MS. BEATY: Okay.

[20]         MR. D'ALESSANDRO: It's seven minutes after

[21] 2:00.

[22]         (Off the record.)

[23]         MR. D'ALESSANDRO: Okay. It's eight

[24] minutes after 2:00. We're back on the record, and

[25]

[ 1]    Mr. Talley doesn't have any other witnesses?

[ 2]        MR. TALLEY:  No, sir.  I do not.

[ 3]        MR. D'ALESSANDRO:  Okay.  And the next

[ 4]    witness would be -- I'll turn it over to

[ 5]    Mr. McMillan.

[ 6]        MR. McMILLAN:  Mr. Stevens, on December the

[ 7]    13th, I believe it is, you were charged with:

[ 8]    Charge I:  Violation of Amtrak's... PERS-19...

[ 9]    Amtrak's Standards of Excellence, specifically

[10]    those sections pertaining to Alcohol and Drugs and

[11]    Trust and Honesty.

[12]        Do you know what PERS-19 is?

[13]        MR. STEVENS:  No, I don't.

[14]        MR. McMILLAN:  Have you ever been given a

[15]    copy of PERS-19?

[16]        MR. STEVENS:  No, I haven't.

[17]        MR. McMILLAN:  It states basically that you

[18]    violated the Alcohol and Drug Policy.

[19]        Charge II:  Violation of Amtrak's Drug

[20]    and... Policy (PERS-19), specifically...

[21]    Pertaining to Fitness for Duty Testing, which

[22]    states in part:  ...if an employee refuses a test

[23]    or fails to cooperate with the testing procedures,

[24]    the employee will be subject to the same

[25]

---

[ 1]    consequences as testing positive for alcohol and

[ 2]    drugs.

[ 3]        Did you test positive for alcohol and

[ 4]    drugs, on this date?

[ 5]        MR. STEVENS:  On the 13th?

[ 6]        MR. McMILLAN:  Yes.

[ 7]        MR. STEVENS:  No.

[ 8]        MR. McMILLAN:  And did you give a sample on

[ 9]    December the 13th, (inaudible; speaking too low)?

[10]        MR. STEVENS:  Yes.

[11]        MR. McMILLAN:  And when you gave the

[12]    sample, you gave it to which one of these

[13]    individuals?

[14]        MR. STEVENS:  Ms. Hudley.

[15]        MR. McMILLAN:  And then from there could

[16]    you tell me what took place after you gave it to

[17]    Ms. Hudley?

[18]        MR. STEVENS:  After I had given it to

[19]    Ms. Hudley, she had made me aware that it was not

[20]    in the range, the temperature range, and she

[21]    advised me that I needed to stay and give a second

[22]    sample.  I said, yes.

[23]        In the midst of that, she took me in the

[24]    back; sit me in this room.  I waited as long as I

[25]

---

Page 115

[ 1]    could.  In the meantime, if someone tells me

[ 2]    within the last eight months that my temperature

[ 3]    and my urine is inaccurate -- I've had pneumonia

[ 4]    twice -- that sends out red flags for me because I

[ 5]    am HIV positive, and that's the most important

[ 6]    thing in my life right now and anytime that

[ 7]    something is said about that, about my body, that

[ 8]    sends me into a tailspin.

[ 9]        So I sat in the back until I was further

[10]    instructed by Ms. Ebonie Beatley or whatever her

[11]    name is.

[12]        MR. McMILLAN:  Ebonie -- Ebonie Beaty

[13]    (inaudible)?

[14]        MR. STEVENS:  Yeah, Beaty.

[15]        MR. McMILLAN:  And how long did you wait

[16]    for the second screen?

[17]        MR. STEVENS:  Well when they sent me in the

[18]    back, first of all, no one offered me any water or

[19]    anything to me.  Let the record show for that,

[20]    didn't offer me nothing.

[21]        I stayed in the back for about an hour.

[22]        MR. McMILLAN:  Nobody came to check on you

[23]    or anything?

[24]        MR. STEVENS:  When I stopped Ms. -- when I

[25]

---

Page 116

[ 1]    stopped Ebonie in the hallway, it was running

[ 2]    until about 45 minutes at that time, I was still

[ 3]    in the back.  That was the reason that I stopped

[ 4]    her to ask her what was going on and when was I

[ 5]    gonna be seen, and she, in turn, told me that she

[ 6]    would go and find out.  Took her about five

[ 7]    minutes.  Then she came back, and she said:  Well

[ 8]    I'm not really sure, but someone will be with you

[ 9]    shortly.

[10]        So I waited again for about 15 to 20 more

[11]    minutes.  During the course of me waiting, due to

[12]    the fact that I have these fatal illnesses, I got

[13]    up, put my shirt back on, and asked them what was

[14]    going on.  When I got up in the front, there was

[15]    Demetria, Ebonie, and I didn't never see a male

[16]    person who was supposed to have been observing my

[17]    urine.  At that time I said:  Well look, what I

[18]    need to do is I need to call my doctor and find

[19]    out if there's a temperature change in my urine.

[20]    If I call my doctor, I can see you know what's

[21]    going on because I'm too far out of here.  If

[22]    something is going on with me, there's nothing at

[23]    that facility that's gonna be able to accommodate

[24]    me.

[25]

Page 117

[1]        Nevertheless, I did -- still did not

[2]    refuse -- I didn't refuse to leave(sic).  I still

[3]    wanted to stay and have a second urine because

[4]    there's nothing that I really have to hide.

[5]    Especially when it's something that I could have

[6]    waited and went back and took the test before even

[7]    going out there that day.  So....

[8]        MR. McMILLAN:  Well when they told you that

[9]    your specimen -- did they tell you that your

[10]   specimen was cold --

[11]       MR. STEVENS:  No, she --

[12]       MR. McMILLAN:  -- (inaudible; both

[13]   speaking)?

[14]       MR. STEVENS:  -- when I asked Ms. Hudley,

[15]   she didn't know what the temperature of the urine

[16]   was.

[17]       MR. McMILLAN:  And why was that your

[18]   concern at that point?

[19]       MR. STEVENS:  Why was concerned, because

[20]   having pneumonia numerous times if there's

[21]   something going on in my body --

[22]       MR. McMILLAN:  Well is --

[23]       MR. STEVENS:  -- uh --

[24]       MR. McMILLAN:  -- that brings me to the

[25]

Page 118

[1]    point, this document here.

[2]        MR. STEVENS:  Right.

[3]        MR. McMILLAN:  Did you go -- after you

[4]    waited there for 45 minutes, did you go directly

[5]    to your -- to the hospital?

[6]        MR. STEVENS:  When I left Concentra, I went

[7]    immediately to Washington Hosp -- uh G.W.

[8]        MR. McMILLAN:  And why is that?

[9]        MR. STEVENS:  Because if -- when they --

[10]   when this facility is saying something is -- a

[11]   temperature change in my urine, the first thing

[12]   I'm thinking is if I'm -- something is going on in

[13]   my body.  I need to go to the hospital, quick.

[14]   That's exactly where I had went prior to leaving

[15]   there.  When I arrived to GW, come to find out I

[16]   had a viral bronchitis infection, along with

[17]   abdominal pain.

[18]       MR. McMILLAN:  Is this the documents they

[19]   gave you?

[20]       MR. STEVENS:  Yes, it is.

[21]       MR. McMILLAN:  Mr. Talley, do you have

[22]   these documents?

[23]       MR. TALLEY:  No, sir, I do not.

[24]       MR. McMILLAN:  I thought we provided you

[25]

Page 119

[1]    those documents --

[2]        MR. TALLEY:  No.  They didn't provide

[3]    anything to me --

[4]        MR. McMILLAN:  -- (inaudible; speaking too

[5]    low and both speaking).

[6]        MR. TALLEY:  -- Mr. McMillan.

[7]        MR. McMILLAN:  Be glad --

[8]        MR. D'ALESSANDRO:  Do you want to provide

[9]    him --

[10]       MR. McMILLAN:  -- (inaudible; more than one

[11]   speaking).

[12]       MR. D'ALESSANDRO:  -- copy.

[13]       MR. McMILLAN:  Let's see...  Do you have

[14]   another copy there, David?

[15]       MR. D'ALESSANDRO:  Do you want to refer to

[16]   this --

[17]       MR. McMILLAN:  Here we go.

[18]       UNIDENTIFIED SPEAKER:  Here we go.

[19]       MR. D'ALESSANDRO:  Mr. McMillan, are you

[20]   gonna refer....

[21]       MR. McMILLAN:  Yes.  We need to refer to

[22]   this.

[23]       MR. D'ALESSANDRO:  Be -- be Exhibit 1.

[24]       MR. McMILLAN:  What have you got there,

[25]

Page 120

[1]    Mike?

[2]        MR. D'ALESSANDRO:  Will be four --

[3]        (Unintelligible; more than one speaking.)

[4]        MR. D'ALESSANDRO:  -- pages; will be

[5]    Exhibit 1.

[6]        (Exhibit No. 1 marked for identification.)

[7]        MR. TALLEY:  Two.  Two, Mike.

[8]        MR. D'ALESSANDRO:  Okay.

[9]        UNIDENTIFIED SPEAKER:  That's it right

[10]   there.

[11]       MR. STEVENS:  No, that's not.  That's not

[12]   part of it.  That's something else.

[13]       MR. D'ALESSANDRO:  Wait a minute.

[14]       MR. McMILLAN:  (Inaudible) get this.

[15]       (Unintelligible.)

[16]       MR. STEVENS:  That was.

[17]       MR. TALLEY:  Oh.

[18]       MR. STEVENS:  Yeah.  That wasn't it; right.

[19]   This is something totally --

[20]       MR. TALLEY:  What's that; is that it?

[21]       (Unintelligible; more than one speaking.)

[22]       MR. D'ALESSANDRO:  This is a four-page --

[23]       (Unintelligible.)

[24]       MR. D'ALESSANDRO:  This is a four-page

[25]

**Page 121**

[ 1]  document.  It's dated -- I don't see a date on it,

[ 2]  but that's immaterial.  No.  That gives your birth

[ 3]  date; I know you didn't go on your birthday.

[ 4]      MR. McMILLAN:  Let's see what you've got,

[ 5]  Mike, what you've got (inaudible).

[ 6]      MR. STEVENS:  The date of --

[ 7]      MR. McMILLAN:  You got four pages?

[ 8]      MR. D'ALESSANDRO:  Oh --

[ 9]      MR. TALLEY:  Yeah.

[10]      UNIDENTIFIED SPEAKER:  Sorry.

[11]      MR. D'ALESSANDRO:  Dated on the 13th, '04.

[12]      MR. McMILLAN:  Would you like to look that

[13]  over Mike, before we....

[14]      MR. TALLEY:  Sure.  I need a couple minutes

[15]  to look this over.

[16]      MR. D'ALESSANDRO:  Sure.  Okay.

[17]  Like I said it's --

[18]      MR. McMILLAN:  I'm gonna --

[19]      MR. D'ALESSANDRO:  -- four-pages --

[20]      MR. McMILLAN:  I'm gonna need that one to

[21]  look back over, though.  (Inaudible) --

[22]      MR. D'ALESSANDRO:  Okay.  I'll give you a

[23]  break this time.

[24]      It's 2:15.

[25]

**Page 122**

[ 1]      (Off the record.)

[ 2]      MR. D'ALESSANDRO:  It's 20 minutes after

[ 3]  2:00.  We're back on the tape.

[ 4]      I guess, Mr. McMillan, you gave me a

[ 5]  document, and it's Exhibit 1, four pages.  Could

[ 6]  you expand on this; were you gonna question

[ 7]  Mr. Stevens?

[ 8]      MR. McMILLAN:  Yes.  This is the document

[ 9]  Mr. Stevens, when he went to the doctor --

[10]      MR. TALLEY:  I want an objection.

[11]      MR. D'ALESSANDRO:  What's your objection?

[12]      MR. TALLEY:  The relevance of this

[13]  document; what does that have to do with him

[14]  leaving the testing site?

[15]      MR. McMILLAN:  Well through questioning, I

[16]  will explain that.

[17]      MR. D'ALESSANDRO:  Well I'm gonna go a

[18]  little bit -- one step further.  The -- the --

[19]  according to the document in front of me that the

[20]  doctor stamped on the top of the document, it was

[21]  done on the 13th of December, and that's what the

[22]  relevance is because that's when the man went for

[23]  his test.

[24]      MR. TALLEY:  Okay.

[25]

**Page 123**

[ 1]      MR. D'ALESSANDRO:  That's the only reason I

[ 2]  accepted it.

[ 3]      MR. TALLEY:  Alright.

[ 4]      MR. D'ALESSANDRO:  Okay.  It's the same

[ 5]  date as --

[ 6]      MR. TALLEY:  Just gotta note my objection.

[ 7]      MR. D'ALESSANDRO:  Okay.

[ 8]  Mr. McMillan.

[ 9]      MR. McMILLAN:  Yes, sir.

[10]      Mr. Stevens, I think you were told that

[11]  your -- at Concentra when you went to the return

[12]  to duty physical, right?

[13]      MR. STEVENS:  Uh-huh.

[14]      MR. McMILLAN:  First of all, did --

[15]      MR. STEVENS:  Yes.

[16]      MR. McMILLAN:  -- did anyone explain to you

[17]  that once you started the urine sample, the urine

[18]  test that you had -- had to, indeed, provide a

[19]  sample that day?

[20]      MR. STEVENS:  When I started it?

[21]      MR. McMILLAN:  Yes.  When you started --

[22]  well let's back up a minute.

[23]      Why did you go to Concentra that day:  Was

[24]  it a return-to-duty physical?

[25]

**Page 124**

[ 1]      MR. STEVENS:  It was a return-to-duty

[ 2]  physical.

[ 3]      MR. McMILLAN:  So had you been off ill for

[ 4]  some time?

[ 5]      MR. STEVENS:  Well I had been off since

[ 6]  April 7th of 2004.

[ 7]      MR. McMILLAN:  Okay.

[ 8]      MR. STEVENS:  And I was returning to work

[ 9]  on -- I was --

[10]      (Inaudible comment.)

[11]      MR. STEVENS:  -- for the return-to-work

[12]  physical, 12/13/04.

[13]      MR. McMILLAN:  Okay.  So why -- why was you

[14]  so concerned when they told you that your urine

[15]  was not of -- that you had a cold sample?

[16]      MR. STEVENS:  Well --

[17]      MR. McMILLAN:  Did they explain to you what

[18]  a cold sample was?

[19]      MR. STEVENS:  Well not initially, because

[20]  the only thing that -- that was done at that time

[21]  was I went and gave her the urine sample; I set it

[22]  on the counter; and the first thing that she said,

[23]  she looked at it and said:  Well it's not in

[24]  range, in temperature range.  I said:  Okay.  Well

[25]

[ 1]  what is temperature range?  She said:  Well it's
[ 2]  either over a hundred -- I mean in between; it's
[ 3]  not over a hundred or she didn't know.
[ 4]      So at that point by her not knowing and
[ 5]  being that I'm in the medical situation that I'm
[ 6]  in, that sends up red flags for me.  I don't know
[ 7]  if anybody else in this room is experiencing what
[ 8]  I'm dealing with.  I don't know.  All I know is
[ 9]  that sends up red flags for me, due to the fact
[10]  that I've had pneumonia twice in 2004, that's very
[11]  severe for a person that's in my condition.  So
[12]  that made me very nervous throughout the whole
[13]  time that I was there.  I was not concerned about
[14]  a physical at that moment.  I was more concerned
[15]  about, is this another -- am I gonna be sick
[16]  again.  Does this mean that if it's a temperature
[17]  change in my urine, am I gonna go back in the
[18]  hospital.  Okay.
[19]      That's when I approached Ebonie and I told
[20]  her:  Look, I need to call my doctor; find out if
[21]  I can be seen today.  If I can be seen today, then
[22]  what other step is it that I need to do, and
[23]  then --
[24]      MR. McMILLAN:  Well --
[25]

[ 1]      MR. STEVENS:  -- when I --
[ 2]      MR. McMILLAN:  Go ahead.  I'm sorry.  I
[ 3]  didn't mean to --
[ 4]      MR. STEVENS:  Prior to that -- my main
[ 5]  concern at that time was that I was too far away
[ 6]  from my -- from any hospital that would be
[ 7]  familiar with what I'm going through.  I don't
[ 8]  have time to sit down and explain to another
[ 9]  physician:  We'll I'm HIV positive/AIDS, that this
[10]  is something that's going on in my body.  I need
[11]  to get to the facility that's actually familiar
[12]  with my illness, quick.
[13]      MR. McMILLAN:  And so did you do that?
[14]      MR. STEVENS:  That's exactly what I did.
[15]      MR. McMILLAN:  And did you tell Ms. Beaty
[16]  and Ms --
[17]      UNIDENTIFIED SPEAKER:  Hudley.
[18]      MR. McMILLAN:  -- Hudley and Ms. Beaty
[19]  exactly what you needed to do?
[20]      MR. STEVENS:  Well I didn't have to
[21]  communicate with Ms. Hudley anymore because of the
[22]  first part of the physical.  So I --
[23]      MR. McMILLAN:  Okay.
[24]      MR. STEVENS:  -- only told Ms. Beaty --
[25]

Page 127

[ 1]      MR. McMILLAN:  Beaty, yeah.
[ 2]      MR. STEVENS:  Ms. Beaty.
[ 3]      MR. McMILLAN:  Ebonie.
[ 4]      MR. STEVENS:  Yes.  And she asked me to
[ 5]  give her my cell phone number so she can call me
[ 6]  when she contacts Ms. Tierney.  I said:  Okay,
[ 7]  fine.  Is said -- at this point now I know what I
[ 8]  need to do.
[ 9]      MR. McMILLAN:  And then what was that?
[10]      MR. STEVENS:  To get to the hospital as
[11]  quick as I could.
[12]      MR. McMILLAN:  When -- when they told you
[13]  your urine was not of -- it was cold, did that
[14]  mean something to you?
[15]      MR. STEVENS:  Well first of all, the whole
[16]  point of the matter, if they're saying that my
[17]  urine is cold, obviously they're saying that I
[18]  tampered.  That's the whole point, okay.  We ain't
[19]  gonna even play the games of that, and I'm --
[20]      MR. McMILLAN:  Right.
[21]      MR. STEVENS:  -- like, okay.  No.  I know
[22]  that I haven't done anything.  I been -- I've
[23]  been an addict a long time.  I know what to do if
[24]  I want to play games.  I don't have time for that.
[25]

Page 128

[ 1]  I've been out too long.  I've been penniless.
[ 2]      MR. McMILLAN:  Did -- did someone tell you
[ 3]  that you tampered with the urine or did you see it
[ 4]  on the form some....?
[ 5]      MR. STEVENS:  I just seen something on the
[ 6]  form.
[ 7]      MR. McMILLAN:  Right.
[ 8]      MR. STEVENS:  But nobody never told me
[ 9]  that.
[10]      MR. McMILLAN:  Right.
[11]      So you told Ms. Beaty that you were going
[12]  to go to your doctor to make sure you were okay --
[13]      MR. STEVENS:  Exactly.
[14]      MR. McMILLAN:  -- that you had had
[15]  pneumonia --
[16]      MR. STEVENS:  And that she needed to
[17]  contact Amtrak, whatever she needed to do, then do
[18]  it.  But my first priority at that time was to get
[19]  to the hospital as soon as I could, and that's
[20]  exactly what I did.
[21]      MR. McMILLAN:  Well I noticed on here it
[22]  says:  "Return promptly or contact your doctor if
[23]  any of the following occur:
[24]      "-- Fever over 100.5 for more than three
[25]

Page 129

[ 1]  days.

[ 2]       "-- Trouble breathing, wheezing... pain ...

[ 3]  breathing.

[ 4]       "-- Coughing up blood... increased amounts

[ 5]  of colored" -- I don't know; I can't even say it:

[ 6]  "Sputum" --

[ 7]       MR. STEVENS:  Sputum.

[ 8]       MR. McMILLAN:  "-- Weakness, drowsiness,

[ 9]  headache, facial pain, ear pain... stiff neck."

[10]       I mean, I'm not saying that's part of

[11]  your -- I circled that, but I don't know, was that

[12]  part of your --

[13]       MR. STEVENS:  That was actually part of the

[14]  reason that I went back the next day because some

[15]  of the symptoms were still there?

[16]       MR. McMILLAN:  So you did a follow-up?

[17]       MR. STEVENS:  Which was next -- the very

[18]  next day.

[19]       MR. McMILLAN:  And you went there initially

[20]  on the same day that you left the Concentra --

[21]       MR. STEVENS:  Yes.  The 13th.

[22]       MR. McMILLAN:  And could you go over the

[23]  Emergency Department Medical Records, and

[24]  enlighten me on what that -- that means there on

[25]

Page 130

[ 1]  page, I guess page 3; is that your -- is that your

[ 2]  name at the top?

[ 3]       MR. STEVENS:  Yes, that's my name.

[ 4]       MR. McMILLAN:  The date of birth?

[ 5]       MR. STEVENS:  My -- the date of birth --

[ 6]       MR. McMILLAN:  Right.

[ 7]       MR. STEVENS:  -- 3/30/64; age 40; admitted

[ 8]  date was 12/14/04 --

[ 9]       MR. TALLEY:  Objection.  Again, relevance

[10]  to the Charges at hand?  What does this have to do

[11]  with him not submitting to a second test?

[12]       MR. D'ALESSANDRO:  I think he's -- what

[13]  he's trying to do is establish that he had medical

[14]  problems at the testing -- testing site.  Then he

[15]  went to another -- another facility to be checked.

[16]  That's what he's basically saying.  Okay.  That's

[17]  what it's for.

[18]       Go ahead, Mr. --

[19]       (Unintelligible; two speak at once.)

[20]       MR. TALLEY:  Okay.

[21]       MR. McMILLAN:  Well did -- when you went to

[22]  Washington Hospital Center, did they explain what

[23]  was going on with you --

[24]       MR. STEVENS:  This is --

[25]

Page 131

[ 1]       UNIDENTIFIED SPEAKER: -- which one is "3"?

[ 2]       MR. McMILLAN:  It's got page 3 at the

[ 3]  bottom.  (Unintelligible) very corner, it says

[ 4]  page 3 --

[ 5]       UNIDENTIFIED SPEAKER:  Oh, okay.

[ 6]       MR. McMILLAN:  -- page 4.

[ 7]       (Unintelligible; barely audible.)

[ 8]       MR. McMILLAN:  Okay.  So basically when you

[ 9]  went there, were you ill.... (Tape 2/Side A ends.)

[10]       (Off the record.  Tape 2/Side B begins.)

[11]       MR. D'ALESSANDRO:  Okay.  Do you want to

[12]  re-ask the question, Mr. McMillan?

[13]       MR. McMILLAN:  Yes.  I think you stated you

[14]  were coming back; this was a return-to-duty --

[15]       MR. STEVENS:  Uh-huh.

[16]       MR. McMILLAN:  -- physical to go back to

[17]  work, back to being off from April --

[18]       MR. STEVENS:  Uh-huh.

[19]       MR. McMILLAN:  -- and you said you had

[20]  pneumonia couple times?

[21]       MR. STEVENS:  Uh-huh.

[22]       MR. McMILLAN:  Did this throw up a red flag

[23]  since you are, and you stated you were -- are, HIV

[24]  positive --

[25]

Page 132

[ 1]       MR. STEVENS:  Uh-huh.

[ 2]       MR. McMILLAN:  -- that your health has been

[ 3]  I guess on the ropes and you've had some problems.

[ 4]  Did that throw up a red flag that you needed to

[ 5]  see your doctor as soon as you could?

[ 6]       MR. STEVENS:  Well yes, because not only am

[ 7]  I HIV positive, I also have bronchitis and

[ 8]  emphysema.  So there's like a (unintelligible) of

[ 9]  that, that will send up a signal for me --

[10]       MR. McMILLAN:  Right.

[11]       MR. STEVENS:  -- that will make me you know

[12]  very nervous, very uncomfortable, and especially

[13]  if I'm in a place to where I'm not feeling safe

[14]  anyway.  So....

[15]       MR. McMILLAN:  Alright.  What was your

[16]  diagnosis on the --

[17]       MR. STEVENS:  The diagnosis on the 13th or

[18]  the 14th?

[19]       MR. McMILLAN:  The 13th; that's the day you

[20]  went there?

[21]       MR. STEVENS:  It was a viral infection;

[22]  it's bronchitis -- bronchitis infection, actually,

[23]  which is a CODPA or something like that.

[24]       MR. McMILLAN:  Did you see your doctor or

[25]

[ 1]    did you see Emergency Room doctors?

[ 2]         MR. STEVENS:  No.  These was Emergency Room

[ 3]    doctors.

[ 4]         MR. McMILLAN:  So this was not your doctor,

[ 5]    then?

[ 6]         MR. STEVENS:  No.

[ 7]         MR. McMILLAN:  So --

[ 8]         MR. STEVENS:  No.

[ 9]         MR. McMILLAN:  And the Emergency Room

[10]    doctor diagnosis was, could you tell me --

[11]         MR. STEVENS:  COPD.

[12]         MR. McMILLAN:  What's --

[13]         MR. STEVENS:  Which exacerbation --

[14]         MR. McMILLAN:  What's that mean?

[15]         MR. STEVENS:  -- of bronchitis which is a

[16]    viral infection, bronchitis.

[17]         MR. McMILLAN:  And -- and did he do -- ask

[18]    you to do a follow-up?

[19]         MR. STEVENS:  Yes.  If I didn't improve

[20]    within 24 hours or follow up with Dr. Taleb and

[21]    Dr. Touzon.  Dr. Taleb is my primary care doctor;

[22]    Dr. Touzon is my infectionous(sic) disease doctor.

[23]    I did a follow up with Dr. Touzon on -- at a later

[24]    date.

[25]

---

[ 1]         MR. McMILLAN:  Did he prescribe any

[ 2]    medications for you on this date?

[ 3]         MR. STEVENS:  Yes.  I have -- I have copies

[ 4]    of my prescriptions here.  I didn't want to bring

[ 5]    my bottles in.  I have -- I have -- which ones do

[ 6]    I have.  I have Motrin 600 mg, and I also have

[ 7]    Zara -- Zaraban -- Zarabex, I'm sorry; I may be

[ 8]    saying it wrong.  And I also have --

[ 9]         MR. TALLEY:  Relevance?

[10]         MR. STEVENS:  Okay.

[11]         MR. TALLEY:  Objection.  Relevance to

[12]    what's going on with the Charges.  That has

[13]    nothing to do with the Charges, all of that -- all

[14]    of the medication.

[15]         MR. D'ALESSANDRO:  He's showing that he was

[16]    sick at the time of the testing is what he's

[17]    trying to verify.  That's where he's going; am I

[18]    correct (inaudible) --

[19]         UNIDENTIFIED SPEAKER:  That's correct.

[20]         MR. McMILLAN:  And it could very well have

[21]    something to do with the temperature.

[22]         Do you mind presenting the copies -- can we

[23]    put the copies of this --

[24]         MR. D'ALESSANDRO:  Just put copies in

[25]

---

Page 135

[ 1]    the -- we'll run it through the copy machine.

[ 2]         MR. STEVENS:  Okay.

[ 3]         MR. McMILLAN:  (Unintelligible) --

[ 4]         MR. D'ALESSANDRO:  Not that I can

[ 5]    understand what they write any --

[ 6]         MR. STEVENS:  No.  No.

[ 7]         MR. D'ALESSANDRO:  Michael.

[ 8]         MR. McMILLAN:  Yeah.  Mr. -- Mr. Stevens,

[ 9]    are you familiar with this document?

[10]         MR. STEVENS:  Yes.

[11]         MR. McMILLAN:  This is a Alcohol and Drug

[12]    Waiver Agreement you signed --

[13]         MR. STEVENS:  Yes.

[14]         MR. McMILLAN:  -- with Amtrak; is that

[15]    correct?

[16]         MR. STEVENS:  Uh-huh.

[17]         MR. McMILLAN:  And I think that is entered

[18]    as part of the evidence; is it not?

[19]         MR. STEVENS:  Yes.

[20]         MR. McMILLAN:  And have you went by this

[21]    Waiver since you've been -- since you've signed

[22]    it?

[23]         MR. STEVENS:  Yes.

[24]         MR. McMILLAN:  Stayed in contact with

[25]

---

Page 136

[ 1]    Ms. -- Ms. Dalton --

[ 2]         MR. STEVENS:  Yes.

[ 3]         MR. McMILLAN:  -- is that correct?

[ 4]         And you even stayed in contact while you

[ 5]    were off -- while you were off ill with your --

[ 6]         MR. STEVENS:  Yes.

[ 7]         MR. McMILLAN:  -- pneumonia?

[ 8]         MR. STEVENS:  Yes.

[ 9]         MR. McMILLAN:  This is where we need to

[10]    take a recess for five minutes?

[11]         MR. D'ALESSANDRO:  Okay.

[12]         MR. McMILLAN:  Can we do that before we

[13]    finish up?

[14]         MR. D'ALESSANDRO:  It's 2:32.

[15]         (Off the record.)

[16]         MR. D'ALESSANDRO:  Okay.  It's 2:50.  We're

[17]    back on the record.

[18]         You had more questions, Mr. McMillan?

[19]         MR. McMILLAN:  Yes, sir.

[20]         David, I have a copy of Ms. Tierney's

[21]    statement here to Mr. Campbell.  Did you have a

[22]    chance to read over that, by chance?

[23]         MR. STEVENS:  Some of it, yes.

[24]         MR. McMILLAN:  Well she states in there

[25]

[ 1]  that you provided a specimen that was cold; do

[ 2]  you -- can you explain or did anybody explain to

[ 3]  you what a cold sample was?

[ 4]       MR. STEVENS:  No.  When I gave the

[ 5]  specimen, the only thing that was said to me that

[ 6]  it was out of range.  That's the only reason that

[ 7]  it sent up a flag for me.  But no one said it was

[ 8]  hot or cold.

[ 9]       MR. McMILLAN:  So no one told you if the --

[10]  the sample was hot or cold or...?

[11]       MR. STEVENS:  No.  It was just that it was

[12]  out of range.  No one said anything else.

[13]       MR. McMILLAN:  Do you see any -- anywhere

[14]  in the Standards of Excellence that a cold

[15]  specimen violates the Standards of Excellence,

[16]  have you seen that anywhere in there?

[17]       MR. STEVENS:  No.

[18]       MR. McMILLAN:  Have you seen anywhere else

[19]  today where the Company has provided you that a

[20]  specimen between the 90-degree to 100-degree

[21]  temperature range is a violation of any policy

[22]  here today?

[23]       MR. STEVENS:  No.

[24]       MR. McMILLAN:  At Concentra, on the dates

[25]

---

Page 138

[ 1]  that you went over there on December the 13th, did

[ 2]  you refuse to provide a specimen to Concentra?

[ 3]       MR. STEVENS:  No.

[ 4]       MR. McMILLAN:  And did you give them a -- a

[ 5]  urine specimen?

[ 6]       MR. STEVENS:  Yes, I did.

[ 7]       MR. McMILLAN:  And to your knowledge, how

[ 8]  would you know whether it was in acceptable range

[ 9]  or not?

[10]       MR. STEVENS:  I wouldn't have known.  I'm

[11]  not the one that's doing the test.  I provided

[12]  what they asked and that's what I did.

[13]       MR. McMILLAN:  And someone did ask you to

[14]  hang around or stay to do a second one?

[15]       MR. STEVENS:  Yes.

[16]       MR. McMILLAN:  And did you hang around

[17]  there for some time?

[18]       MR. STEVENS:  For about an hour.

[19]       MR. McMILLAN:  No one offered you --

[20]  offered to give you the second sample -- or the

[21]  second -- do the second specimen?

[22]       MR. STEVENS:  Not for -- no.

[23]       MR. McMILLAN:  No one gave you a bottle or

[24]  anything then?

[25]

---

Page 139

[ 1]       MR. STEVENS:  No.

[ 2]       MR. McMILLAN:  Did anyone give you water to

[ 3]  drink or anything (inaudible) --

[ 4]       MR. STEVENS:  No.

[ 5]       MR. McMILLAN:  At that point, did you tell

[ 6]  someone that you needed to leave and go see your

[ 7]  doctor --

[ 8]       MR. STEVENS:  Yes.

[ 9]       MR. McMILLAN:  -- at that point you weren't

[10]  feeling very well, that you needed to follow up?

[11]       MR. STEVENS:  At that point I was beginning

[12]  to be very uncomfortable and very frightened for

[13]  my own health.

[14]       MR. McMILLAN:  And was -- the document that

[15]  we presented as evidence on your behalf as the

[16]  Exhibit -- Art, did you give me that exhibit

[17]  number?

[18]       MR. D'ALESSANDRO:  One.

[19]       MR. McMILLAN:  Exhibit 1.

[20]       UNIDENTIFIED SPEAKER:  What is Exhibit 1;

[21]  (inaudible)?

[22]       MR. D'ALESSANDRO:  The hospital --

[23]       MR. McMILLAN:  The (inaudible) --

[24]       MR. D'ALESSANDRO:  -- paperwork.

[25]

---

Page 140

[ 1]       MR. McMILLAN:  Yeah.  The hospital

[ 2]  paperwork.

[ 3]       MR. STEVENS:  Yes.  Did what now?

[ 4]       MR. McMILLAN:  The hospital where -- you

[ 5]  went to the Washington Hospital Center, I believe?

[ 6]       MR. STEVENS:  No.  That was George

[ 7]  Washington Hospital.

[ 8]       MR. McMILLAN:  George Washington Hospital.

[ 9]  I'm sorry.

[10]       MR. STEVENS:  And what was the question

[11]  again.  I didn't hear you?

[12]       MR. McMILLAN:  After -- after waiting  for

[13]  45 minutes to an hour and then after being

[14]  concerned about your health after having pneumonia

[15]  and you went and went to the -- was it George

[16]  Washington Hospital (inaudible) --

[17]       MR. STEVENS:  Yes.

[18]       MR. McMILLAN:  Okay.  George Washington

[19]  Hospital -- University Hospital.

[20]       MR. STEVENS:  Yes.

[21]       MR. McMILLAN:  And that's when you were

[22]  diagnosed there with these (unintelligible) of

[23]  illnesses which (inaudible; speaking too low) --

[24]       MR. STEVENS:  Yes.

[25]

"Mr. David  7/20

## #

#00054828  49/2
#2  44/18, 54/17, 58/3, 69/8, 79/13
#3  2/13, 5/8, 7/21, 41/14
#301  20/23

## '

'...if  6/8
'03  32/23
'04  121/11
'Alcohol  5/23
'cause  75/22, 151/2, 153/21, 169/19
'Fitness  6/7
'Trust  5/23
'While  24/6

## 0

04.465  1/8, 7/21, 19/8, 20/4, 20/24

## 1

1  2/5, 2/7, 2/8, 2/14, 2/15, 2/18, 5/6, 25/11, 25/12, 41/24, 43/20, 45/21, 59/8, 69/12, 79/10, 79/13, 119/23, 120/5, 120/6, 122/5, 139/19, 139/20
1/1/2005  2/4
1/10/05  2/5
1/27/05  2/8
1/9/05  2/6
1/Side  18/22, 20/2
10  4/6, 5/12, 6/21, 7/19, 7/23, 9/23, 49/11
10.2  60/19
100  52/7, 54/14, 54/24, 57/13, 60/6, 67/5, 69/4, 164/3, 164/7
100-degree  137/20
100.2  60/9, 60/19
100.5  128/24
102  55/4, 57/16
104  3/12
105  3/11
107  3/11
10:00  10/6, 21/9
10th  9/16, 146/5, 162/22
11  2/7, 32/5, 160/17
1114  5/7, 7/20, 20/23
1118  11/9
113  3/13
11:00  4/6, 9/8, 16/8
11:10  1/17
11:31  16/11
11:36  18/21
12  97/8, 150/7
12/13  2/18, 150/8
12/13/04  2/15, 52/12, 52/13, 64/6, 124/12
12/14/04  2/18, 67/21, 130/8
120  2/19
128/80  76/1
12:35  19/17, 20/7
12:50  38/6
12:55  39/9, 39/24
13  6/1, 6/14, 49/12, 56/3
13020546  54/11
13th  26/11, 35/8, 37/7, 66/15, 66/23, 97/8, 105/12, 113/7, 114/5, 114/9, 121/11, 122/21, 129/21, 132/17, 132/19, 138/1, 149/2
1401  9/19
146  3/13
14th  132/18
15  49/5, 116/10
156  3/13
15th  47/18
16  2/12, 9/8, 40/21, 40/24, 43/1
160  3/13
161  3/14
162  3/15
168  3/15
17  2/12, 43/2
18  1/10, 8/3, 21/2
18th  4/5
19  169/23
19038-4210  1/22, 19/22
1999  49/5
1:00  55/23, 56/4, 65/22
1:50  39/24
1:55  95/7

## 2

2  2/4, 2/9, 2/12, 11/23, 45/3, 45/5, 45/22, 54/12, 57/4, 57/8, 57/11, 58/18, 68/19, 69/12, 79/10, 79/13
2/Side  26/1, 131/9, 131/10
20  10/6, 116/10, 122/2
20002  4/9, 5/8, 5/15, 7/7, 7/21, 8/6, 8/16, 20/24, 21/11, 21/21
20018  9/19
2003  6/21, 31/18, 32/6, 33/23, 49/7, 49/11, 148/23, 149/7, 149/13, 149/15, 149/17, 150/17, 162/22
2004  6/1, 6/14, 33/24, 35/6, 35/8, 35/12, 47/19, 49/12, 66/15, 66/23, 97/8, 124/6, 125/10, 149/2
2005  1/10, 5/6, 5/12, 7/19, 7/23, 8/3, 9/7, 9/13, 9/24, 10/6, 19/10, 21/2, 21/8
202  7/5, 51/6
202-906-2105  101/4
202-906-2383  8/13, 21/18
202-906-3382  8/19, 21/24
2105  100/10, 101/5
2135  1/22, 19/22
219.107  44/4
22  2/8, 3/4, 16/8, 65/21
22308  11/10
2307  1/21, 19/21
23rd  32/23
24  133/20
25  31/17, 49/7
253  169/9
25th  31/16, 149/7
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  51/24, 66/24
27  2/9
27th  22/14
28  2/11
283  169/8
2:00  112/21, 112/24, 122/3
2:15  121/24
2:32  136/14
2:50  136/16

## 3

3  130/1, 131/1, 131/2, 131/4
3/30/64  130/7
30th  79/7
31  19/10, 21/8
31st  20/8
32  3/4
382.211  44/5
39  3/5
3:00  156/16

## 4

4  2/19, 54/13, 131/6
40  87/22, 88/16, 88/17, 89/2, 89/11, 89/14, 91/5, 130/7
41  43/5, 141/23, 143/2, 143/7, 164/12, 164/14
41-42  168/11
43  2/12, 2/14
45  116/2, 118/4, 140/13
49  44/4

## 5

5  2/11
51  41/22, 42/4, 43/8, 43/9, 43/14, 43/19, 58/14
52  3/6
56  2/15

## 6

60  15/22
600  134/6
61  3/6
62  3/6
63  3/5
6364  9/12, 11/6
64  3/6
65  3/6
66  3/8
6:13  109/16
6:33  105/11

## 7

7  2/4
70  3/8

768-188 1/22
728-6157  1/22, 19/22
74  3/9
76  3/8
77  3/9
777-2105  55/13
777-2786  51/5
78  3/8
7th  124/6

## 8

85  3/8
86  3/9
88  76/1
8:30  8/4

## 9

9  2/5, 9/12
90  3/9, 26/15, 52/7, 54/14, 54/24, 57/13, 60/6, 67/4, 69/4, 73/18, 74/1, 164/3, 164/7, 164/12
90-degree  137/20
900  1/15, 4/8, 5/14, 7/6, 8/5, 8/15, 19/15, 21/10, 21/20
906-2786  51/6
906-3382  7/5
92  3/9
94  3/8
97  3/11
97.6  26/14
97.8  67/9, 71/17, 71/23, 75/2, 76/2, 94/17
98  3/11
9:00  5/13, 9/24
9th  9/7

## A

A-L-L-I-O-N-E  38/14
a.m  1/17, 5/13, 8/4, 9/24, 10/6, 21/9
abdominal  118/17
ability  25/3
absentia  8/9, 21/14
acceptable  6/3, 6/19, 26/13, 52/7, 138/8
accepted  123/2
accommodate  116/23
accompanied  6/23, 16/22, 17/3
account  4/15
accountable  163/8
ACCURATE  1/20, 19/20
accusation  25/21
accusations  169/2, 169/3
Accused  5/1, 169/17
action  41/20, 44/17, 50/14, 50/18
actions  50/2, 51/9
active  167/4
added  85/5
addict  127/23
address  11/9, 31/3
addresses  25/7, 25/9
admitted  130/7
adulter  167/10
adulterates  164/20
advise  31/20, 49/15, 59/24
advised  6/17, 52/8, 114/21
AFL-CIO  9/11
afternoon  39/17, 40/8, 40/9, 66/12
age  130/7
agree  30/16, 142/2
agreeimg  142/12
Agreement  6/20, 7/1, 16/24, 31/9, 44/17, 49/11, 50/19, 135/12, 145/16, 145/20, 146/4, 146/8, 158/7, 162/21
agreement-covered  50/15
agrees  10/17
Airbill  5/7
Alcohol  2/8, 2/14, 5/21, 6/6, 6/11, 6/20, 11/1, 12/12, 23/6, 23/8, 24/6, 31/9, 32/21, 34/20, 39/14, 40/5, 40/20, 41/13, 44/11, 49/10, 51/4, 53/5, 107/10, 113/10, 113/18, 114/1, 114/3, 135/11, 142/7, 144/12, 144/17, 146/4, 149/8, 157/6, 157/7, 158/6, 162/21, 164/13, 164/16, 166/17, 166/18, 167/13, 168/11
alcohol-free  24/8
alcohol/drug  168/2
Alexandria  11/9
alive  170/9
alleged  5/24, 6/13, 26/10
allegedly  145/8
ALLIONE  3/5, 29/15, 38/11, 39/12, 40/3, 162/10
allow  10/12, 167/24
allowed  5/2, 10/24
alluding  81/14, 81/18

63/5, 63/20, 63/21, 63/24, 64/4, 64/5, 64/8, 64/9, 64/14, 65/10, 65/13
Mr. Allione's  38/13
Mr. B  45/13
Mr. Campbell  9/21, 47/13, 54/5, 59/22, 136/21
Mr. D'Alessandro  3/6, 4/2, 7/18, 9/1, 9/5, 11/14, 12/3, 12/15, 13/11, 13/14, 13/20, 13/24, 14/2, 14/5, 15/2, 15/13, 15/18, 15/20, 16/1, 16/4, 16/7, 16/10, 16/21, 17/3, 17/6, 17/9, 17/14, 17/18, 17/21, 18/8, 18/12, 18/15, 20/3, 20/18, 22/4, 22/8, 22/11, 22/14, 22/16, 23/17, 23/19, 23/24, 25/11, 25/20, 26/2, 27/6, 27/11, 27/16, 27/18, 28/1, 28/4, 29/17, 29/23, 30/2, 30/4, 30/8, 30/19, 30/22, 31/1, 32/14, 36/2, 36/8, 36/11, 36/14, 36/16, 36/21, 37/16, 37/19, 37/21, 38/1, 38/6, 38/8, 38/14, 39/2, 39/8, 39/15, 39/23, 40/6, 42/11, 42/15, 42/18, 42/20, 42/24, 43/4, 43/7, 43/12, 43/14, 43/17, 46/6, 46/11, 46/14, 47/1, 47/7, 47/9, 47/11, 48/9, 48/12, 48/15, 48/18, 48/20, 52/20, 53/9, 53/16, 53/20, 55/5, 55/8, 55/12, 55/17, 55/20, 55/22, 56/3, 56/9, 56/24, 57/1, 57/6, 57/17, 57/22, 61/11, 61/14, 61/19, 61/21, 61/23, 62/1, 62/20, 62/23, 63/22, 64/1, 64/7, 64/16, 64/20, 64/24, 65/12, 65/16, 65/20, 66/2, 66/6, 66/10, 68/13, 70/1, 70/6, 74/20, 76/12, 78/24, 79/3, 81/5, 81/8, 81/20, 81/24, 82/2, 82/4, 82/6, 82/9, 82/21, 83/3, 83/6, 83/9, 85/9, 85/11, 86/7, 89/5, 89/9, 89/18, 90/13, 91/14, 91/20, 92/3, 92/11, 92/13, 92/16, 92/20, 92/24, 94/11, 94/13, 94/19, 94/22, 95/1, 95/7, 96/5, 96/8, 96/11, 96/14, 96/17, 96/20, 97/3, 97/6, 98/15, 98/17, 100/10, 100/13, 100/17, 100/20, 100/24, 101/3, 101/6, 103/23, 105/9, 105/18, 105/21, 107/4, 107/22, 108/3, 108/7, 109/5, 109/9, 109/12, 109/24, 110/8, 110/11, 111/24, 112/3, 112/5, 112/9, 112/12, 112/20, 112/23, 113/3, 119/8, 119/12, 119/15, 119/19, 119/23, 120/2, 120/4, 120/8, 120/13, 120/22, 120/24, 121/8, 121/11, 121/16, 121/19, 121/22, 122/2, 122/11, 122/17, 123/1, 123/4, 123/7, 130/12, 131/11, 134/15, 134/24, 135/4, 135/7, 136/11, 136/14, 136/16, 139/18, 139/22, 139/24, 144/1, 146/21, 147/23, 148/5, 148/9, 156/10, 156/14, 156/22, 160/5, 160/15, 160/17, 160/21, 161/1, 161/4, 161/10, 161/15, 162/16, 168/8, 168/17, 170/17
Mr. David  5/7, 66/16, 95/23
Mr. Hearing  12/6
Mr. Joe  29/15, 38/11
Mr. Joseph  162/9
Mr. Kapela  159/16
Mr. McMillan  3/4, 3/6, 3/8, 3/11, 3/13, 3/15, 7/9, 11/19, 12/6, 13/11, 13/12, 13/21, 14/1, 14/6, 14/13, 14/16, 14/19, 14/22, 15/8, 15/12, 15/14, 15/16, 15/19, 16/3, 16/6, 17/22, 17/23, 18/5, 18/13, 18/14, 20/10, 22/2, 23/14, 25/6, 25/13, 25/19, 26/4, 26/7, 26/16, 26/19, 26/23, 27/9, 27/13, 28/6, 28/9, 28/13, 28/17, 28/20, 28/23, 29/3, 29/6, 29/10, 29/14, 29/20, 30/3, 30/5, 30/10, 30/16, 32/4, 32/16, 32/19, 33/1, 33/4, 33/8, 33/11, 33/15, 34/2, 34/7, 34/9, 34/14, 34/18, 34/22, 35/1, 35/8, 35/14, 35/16, 35/22, 36/10, 36/12, 36/15, 36/20, 36/22, 37/1, 37/5, 37/10, 37/13, 38/3, 39/1, 39/5, 42/2, 42/5, 42/8, 43/5, 43/9, 43/11, 45/19, 46/2, 46/4, 46/18, 46/22, 47/2, 47/8, 47/9, 48/1, 48/3, 48/11, 48/14, 48/17, 48/19, 52/21, 52/22, 53/1, 53/6, 53/14, 53/18, 53/23, 54/4, 54/18, 55/15, 55/19, 55/21, 57/5, 58/5, 58/11, 58/17, 58/20, 59/2, 59/7, 59/14, 59/15, 59/17, 59/20, 60/4, 60/8, 60/14, 60/18, 60/21, 61/2, 61/5, 61/9, 61/13, 61/22, 62/4, 62/10, 62/14, 62/17, 64/8, 64/11, 64/15, 65/4, 65/14, 70/4, 70/10, 70/13, 70/17, 70/21, 70/23, 71/5, 71/11, 71/14, 71/20, 71/22, 72/1, 72/3, 72/8, 72/14, 72/18, 72/22, 73/2, 73/8, 73/12, 73/15, 73/17, 73/20, 73/23, 74/4, 74/7, 74/10, 74/15, 74/18, 76/5, 76/8, 76/11, 76/12, 76/13, 76/18, 76/21, 76/24, 77/6, 77/10, 78/9, 78/10, 78/12, 78/16, 78/18, 78/23, 79/1, 79/6, 79/12, 79/15, 79/18, 79/24, 80/6, 80/8, 80/11, 80/15, 80/21, 81/16, 81/18, 82/10, 82/13, 82/16, 82/24, 83/2, 83/5, 83/8, 83/11, 83/14, 84/1, 84/7, 84/9, 84/13, 84/15, 84/17, 84/19, 84/21, 85/4, 85/8, 86/8, 86/15, 86/20, 86/24, 87/3, 87/10, 87/14, 87/17, 87/20, 87/23, 88/2, 88/5, 88/10, 88/15, 88/19, 88/24, 89/6, 89/13, 89/16, 89/20, 90/2, 90/9, 90/11, 90/14, 90/18, 90/20, 91/15, 91/16, 91/22, 92/5, 92/9, 92/23, 93/1, 93/6, 93/9, 93/12, 93/16, 93/18, 94/1, 94/6, 94/9, 94/20, 94/21, 96/22, 98/17, 98/19, 98/22, 99/1, 99/4, 99/8, 99/12, 99/16, 99/23, 100/2, 100/6, 100/22, 101/9, 101/11, 101/15, 101/18, 101/22, 102/1, 102/11, 102/14, 102/14, 102/17, 102/21, 103/1, 103/4, 103/9, 103/12, 103/16, 103/21, 107/5, 107/9, 107/15, 107/19, 108/6, 108/8, 108/10, 108/13, 108/17, 109/7, 109/14, 110/2, 110/6, 110/10, 110/12, 110/16, 110/22, 110/24, 111/3, 111/7, 111/10, 111/14, 111/18, 111/21, 113/5, 113/6, 113/14, 113/17, 114/6, 114/8, 114/11, 114/15, 115/12, 115/15, 115/22, 117/8, 117/12, 117/17, 117/22, 117/24, 118/3, 118/8, 118/18, 118/21,
119/19, 119/21, 119/24, 120/14, 121/4, 121/7, 121/12, 121/18, 121/20, 122/4, 122/8, 122/15, 123/8, 123/9, 123/14, 123/16, 123/21, 124/3, 124/7, 124/13, 124/17, 125/24, 126/2, 126/13, 126/15, 126/18, 126/23, 127/1, 127/3, 127/9, 127/12, 127/20, 128/2, 128/7, 128/10, 128/14, 128/21, 129/8, 129/16, 129/19, 129/22, 130/4, 130/6, 130/21, 131/2, 131/6, 131/8, 131/12, 131/13, 131/16, 131/19, 131/22, 132/2, 132/10, 132/15, 132/19, 132/24, 133/4, 133/7, 133/9, 133/12, 133/14, 133/17, 134/1, 134/20, 135/3, 135/8, 135/11, 135/14, 135/17, 135/20, 135/24, 136/3, 136/7, 136/9, 136/12, 136/18, 136/19, 136/24, 137/9, 137/13, 137/18, 137/24, 138/4, 138/7, 138/13, 138/16, 138/19, 138/23, 139/2, 139/5, 139/9, 139/14, 139/13, 139/23, 140/1, 140/4, 140/8, 140/12, 140/18, 140/21, 141/1, 141/5, 141/8, 141/10, 141/15, 141/18, 141/21, 142/2, 142/7, 142/10, 142/13, 142/16, 142/19, 142/21, 142/23, 143/2, 143/4, 143/7, 143/16, 143/20, 143/23, 144/3, 144/6, 144/9, 144/12, 144/15, 144/17, 144/20, 144/22, 145/1, 145/4, 145/7, 145/10, 145/14, 145/16, 145/19, 145/22, 146/1, 146/3, 146/7, 146/10, 146/12, 146/15, 146/19, 147/7, 147/9, 147/12, 147/13, 147/14, 147/18, 147/20, 148/8, 148/17, 148/20, 156/10, 156/12, 156/18, 156/19, 156/23, 157/9, 157/13, 157/17, 157/20, 157/24, 158/3, 158/9, 158/16, 158/20, 159/1, 159/3, 159/5, 159/7, 159/10, 159/12, 159/14, 159/16, 159/18, 159/20, 160/1, 160/3, 160/16, 160/20, 160/22, 161/3, 161/6, 161/12, 162/16, 162/17, 168/9
Mr. McMillan's  18/13, 70/7
Mr. Michael  8/22, 9/11, 9/14
Mr. Stevens  3/9, 3/12, 3/15, 5/9, 7/19, 7/22, 10/2, 10/13, 10/14, 10/22, 11/7, 11/18, 11/20, 11/22, 12/3, 12/10, 12/19, 16/13, 16/20, 17/2, 17/5, 17/8, 17/13, 17/17, 17/20, 18/4, 20/9, 20/11, 20/13, 20/20, 21/1, 23/5, 32/21, 33/5, 35/11, 37/12, 37/18, 38/16, 38/23, 39/4, 46/21, 49/5, 49/17, 49/22, 54/6, 60/1, 62/14, 62/20, 62/22, 64/12, 64/18, 64/19, 67/5, 70/18, 74/20, 74/22, 74/24, 75/4, 75/10, 75/14, 75/19, 76/3, 76/10, 76/14, 77/16, 77/20, 78/2, 78/5, 78/8, 85/9, 85/10, 85/18, 86/16, 87/1, 87/14, 90/2, 90/13, 90/15, 90/19, 90/22, 91/2, 91/10, 91/13, 91/16, 92/5, 94/11, 94/12, 94/22, 94/23, 94/24, 96/23, 103/23, 104/1, 104/4, 104/10, 104/15, 104/19, 105/5, 105/11, 105/14, 105/17, 105/19, 107/20, 108/18, 109/15, 112/2, 113/6, 113/13, 113/16, 114/5, 114/7, 114/10, 114/14, 114/18, 115/14, 115/17, 115/24, 117/11, 117/14, 117/19, 117/23, 118/2, 118/6, 118/9, 118/20, 120/11, 120/16, 120/18, 121/6, 122/7, 123/2, 123/10, 123/13, 123/20, 124/1, 124/5, 124/8, 124/11, 124/16, 124/19, 126/1, 126/4, 126/14, 126/20, 126/24, 127/2, 127/4, 127/10, 127/15, 127/21, 128/5, 128/8, 128/13, 128/16, 129/7, 129/13, 129/17, 129/21, 130/1, 130/5, 130/7, 130/24, 131/15, 131/18, 131/21, 132/1, 132/6, 132/11, 132/17, 132/21, 132/23, 133/6, 133/8, 133/11, 133/13, 133/15, 133/19, 134/3, 134/10, 135/2, 135/4, 135/8, 135/10, 135/13, 135/15, 135/19, 135/23, 136/2, 136/6, 136/8, 136/23, 137/4, 137/11, 137/17, 137/23, 138/3, 138/6, 138/10, 138/15, 138/18, 138/22, 139/1, 139/4, 139/8, 139/11, 140/3, 140/6, 140/10, 140/17, 140/20, 140/24, 141/4, 141/7, 141/9, 141/14, 141/16, 141/20, 142/1, 142/5, 142/9, 142/11, 142/15, 142/18, 142/20, 142/22, 143/1, 143/5, 144/8, 144/11, 144/14, 144/16, 144/19, 144/21, 144/24, 145/3, 145/6, 145/9, 145/13, 145/15, 145/18, 145/20, 146/2, 146/5, 146/9, 146/11, 146/14, 146/18, 146/20, 146/23, 146/24, 147/2, 147/4, 148/24, 149/4, 149/9, 149/15, 149/20, 149/22, 150/4, 150/7, 150/11, 150/14, 150/18, 150/21, 150/23, 151/2, 151/5, 151/12, 151/24, 153/1, 153/6, 153/13, 153/15, 154/18, 154/21, 154/24, 155/16, 156/7, 156/14, 157/8, 157/11, 157/16, 157/19, 157/23, 158/1, 158/8, 158/14, 158/22, 159/2, 159/4, 159/6, 159/11, 159/13, 159/15, 159/17, 159/19, 159/23, 160/2, 160/4, 160/6, 160/7, 160/10, 160/13, 161/9, 161/20, 162/10, 162/13, 162/18, 162/9, 164/24, 167/18, 168/12, 168/15, 168/17, 168/19
Mr. Stevens'  10/20, 33/12, 70/11, 97/9, 97/11
Mr. Talley  3/4, 3/5, 3/8, 3/11, 3/13, 3/14, 12/1, 12/15, 12/17, 13/16, 14/3, 14/12, 14/14, 14/17, 14/21, 15/1, 15/4, 15/10, 15/15, 15/24, 18/11, 20/16, 22/1, 22/5, 22/7, 22/13, 22/17, 22/22, 23/2, 23/15, 23/18, 23/21, 24/2, 24/11, 24/14, 24/17, 25/5, 25/9, 25/18, 25/23, 26/6, 26/9, 26/18, 26/20, 26/21, 27/2, 27/12, 27/19, 27/20, 28/2, 28/4, 28/5, 28/8, 28/11, 28/15, 28/18, 28/21, 29/1, 29/5, 29/7, 29/13, 29/15, 29/18, 30/1, 30/9, 30/11, 30/18, 30/21, 30/24, 31/4, 31/11, 31/15, 32/2, 32/7, 32/11, 36/1, 36/4, 36/24, 37/20, 38/5, 38/9, 38/10, 38/13, 38/16, 39/16, 39/17, 39/20, 40/6, 40/7, 40/10, 40/15, 40/19, 40/24, 41/3,
41/5, 41/7, 41/11, 41/21, 42/3, 42/7, 42/10, 42/13, 42/17, 42/19, 42/22, 43/8, 43/10, 43/17, 43/18, 44/6, 44/19, 44/23, 45/1, 45/3, 45/11, 45/16, 45/24, 46/3, 46/9, 46/10, 46/13, 46/16, 47/10, 47/12, 47/20, 48/21, 51/12, 51/14, 51/19, 52/17, 53/8, 53/10, 53/22, 54/20, 61/4, 62/3, 62/23, 63/1, 63/6, 63/9, 63/14, 63/18, 63/24, 64/20, 64/22, 65/20, 66/10, 66/1, 66/14, 66/18, 66/22, 67/2, 67/24, 68/3, 68/7, 68/15, 68/18, 68/22, 68/24, 69/3, 69/9, 69/13, 69/15, 69/19, 69/22, 78/20, 79/5, 80/24, 81/7, 81/10, 81/17, 81/22, 82/1, 82/3, 82/5, 82/8, 82/21, 83/1, 83/13, 85/11, 85/12, 85/22, 86/1, 86/5, 88/21, 89/1, 89/8, 89/10, 89/15, 89/17, 91/14, 91/19, 92/2, 92/8, 92/12, 92/14, 92/19, 93/4, 93/13, 94/3, 94/14, 94/18, 95/3, 95/5, 95/11, 95/18, 95/23, 96/16, 96/23, 97/4, 97/10, 97/22, 98/2, 98/7, 98/10, 98/13, 98/16, 100/3, 100/4, 100/7, 105/8, 105/23, 106/1, 106/3, 106/7, 106/10, 106/13, 106/18, 106/21, 106/23, 107/1, 107/3, 107/21, 108/1, 108/5, 108/9, 108/12, 108/21, 108/24, 109/3, 109/6, 109/11, 109/19, 109/21, 112/3, 112/4, 112/7, 112/14, 112/17, 113/1, 113/2, 113/22, 118/21, 119/2, 119/6, 120/7, 120/17, 120/20, 120/22, 120/23, 122/12, 120/20, 121/19, 122/12, 122/16, 123/16, 120/23, 121/18, 122/13, 123/13, 123/16, 124/11, 124/20, 124/23, 124/24, 125/2, 125/5, 125/7, 125/9, 125/12, 125/18, 126/24, 127/2, 128/11, 155/14, 166/7, 166/8
Ms. Beaty's  85/6
Ms. Dalton  18/6, 18/9, 23/3, 27/23, 29/8, 31/5, 32/13, 32/16, 37/14, 37/23, 136/1, 167/2
MS. DALTON-THEODORE  20/14, 22/23, 24/5, 24/13, 24/16, 24/20, 31/8, 31/14, 31/17, 32/4, 32/9, 32/18, 32/24, 33/3, 33/7, 33/10, 33/14, 33/21, 34/6, 34/8, 34/11, 34/17, 34/21, 34/24, 35/4, 35/6, 35/9, 35/15, 35/20, 35/24, 35/24, 37/4, 37/9, 37/12, 37/24
Ms. Dudley  97/16
Ms. Ebonie  72/9, 115/10
MS. HUDLEY  66/9, 66/11, 66/13, 66/17, 66/21, 66/23, 67/23, 68/2, 68/5, 68/12, 68/17, 68/21, 68/23, 69/2, 69/7, 69/12, 69/14, 69/16, 69/21, 70/3, 70/10, 70/12, 70/16, 70/20, 70/22, 71/1, 71/8, 71/13, 71/19, 71/21, 71/24, 72/2, 72/7, 72/12, 72/15, 72/20, 72/24, 73/3, 73/10, 73/14, 73/16, 73/19, 73/22, 73/24, 74/6, 74/8, 74/12, 74/17, 74/23, 75/3, 75/6, 75/12, 75/15, 75/24, 76/7, 76/8, 76/9, 76/13, 76/16, 76/20, 76/22, 77/4, 77/7, 77/12, 77/19, 78/1, 78/4, 78/7, 78/9, 78/11, 78/14, 78/17, 79/11, 79/14, 79/17, 79/20, 79/22, 80/3, 80/7, 80/9, 80/14, 80/20, 80/22, 81/2, 83/20, 84/6, 84/8, 84/12, 84/14, 84/16, 84/18, 84/20, 84/24, 85/7, 85/12, 85/21, 85/24, 86/4, 86/8, 86/14, 86/18, 86/22, 87/2, 87/8, 87/13, 87/16, 87/19, 87/21, 87/24, 88/4, 88/7, 88/14, 88/17, 89/22, 90/5, 90/10, 90/12, 90/24, 91/4, 91/11, 91/16, 93/7, 93/8, 93/10, 93/22, 94/4, 94/8, 94/14, 94/17, 95/3, 95/5, 95/21, 96/1, 101/12, 101/19, 103/2, 103/3, 112/18, 114/14, 114/17, 114/19, 117/14, 126/21, 166/7
MS. LEE-JONES  11/23
Ms. Maia  13/18, 22/20
Ms. Margaret  67/20
Ms. Theodore-Dalton  162/9
Ms. Tierney  14/4, 15/17, 18/5, 18/9, 29/12, 45/14, 47/13, 48/5, 48/8, 53/3, 53/24, 54/1, 59/22, 62/6, 68/1, 104/20, 104/22, 105/2, 110/15, 111/13, 127/6
Ms. Tierney's  136/20
Ms. who  84/15

multiple 124/12
Myra 159/12

## N

N.E 1/15, 4/8, 5/8, 5/14, 7/7, 7/20, 8/5, 8/15, 9/19, 19/15, 20/23, 21/10, 21/20
name 11/8, 20/4, 22/22, 28/16, 38/13, 39/12, 51/23, 65/8, 65/11, 84/22, 95/14, 95/16, 115/11, 130/2, 130/3
named 10/11
names 112/8
NATIONAL 1/1, 7/2, 17/1, 19/1, 47/14
necess 50/13
necessary 12/5, 16/15, 18/12
neck 129/9
need 13/19, 23/10, 27/18, 39/21, 45/24, 48/8, 83/21, 90/20, 91/5, 108/15, 110/18, 111/9, 111/12, 116/18, 118/13, 119/21, 121/14, 121/20, 125/20, 125/22, 126/10, 127/8, 136/9, 152/5, 153/17, 160/23, 161/3, 161/4, 161/8, 169/10
needed 67/13, 98/1, 111/6, 114/21, 126/19, 128/16, 128/17, 132/4, 139/6, 139/10, 154/4, 152/21
needs 23/4
negating 162/1
negative 63/11
nervous 125/12, 132/12
new 65/24, 66/4, 90/9
nice 112/12
nine 55/22, 145/13, 156/15, 164/22
noise 4/7
non-detectable 169/6
non-hours 143/20
Non-regulated 41/1, 43/23, 58/14, 58/18, 59/10, 59/13, 59/18, 107/11, 107/20, 107/23, 141/3, 142/4, 143/12, 163/4, 164/13, 165/1, 165/14, 168/10
normal 4/14, 63/5, 63/9, 72/1
normally 31/12
Note 2/10, 52/14, 123/6
notice 1/14, 2/4, 5/4, 5/5, 8/11, 10/3, 16/16, 16/17, 16/18, 19/14, 20/19, 21/16, 57/9, 101/11
notified 16/21
notify 87/12, 111/13
notifying 16/7
NRPC 9/18
NUMBER 2/2, 8/18, 21/23, 42/18, 55/13, 101/4, 109/8, 127/5, 139/17, 154/10, 166/9
numbers 11/10, 64/23, 65/21, 169/12

## O

Oakdale 1/21, 19/21
object 14/13, 25/6, 26/17, 26/23, 29/11, 30/6, 45/20, 48/7, 83/12, 147/7, 147/9
objected 31/2, 39/1, 39/2, 82/21
objection 27/13, 30/5, 36/1, 36/2, 46/22, 47/2, 48/3, 53/8, 53/9, 78/20, 80/24, 88/21, 91/19, 92/8, 92/10, 93/14, 105/8, 107/21, 108/21, 109/19, 122/10, 122/11, 123/6, 130/9, 134/11, 143/19
objections 13/22, 29/22
observation 49/20, 52/11, 58/8
observe 90/3
observed 54/17, 58/4, 69/8, 79/13, 90/6, 90/7, 91/6
observing 116/16
occasion 44/13
occupation 22/22
ODI 8/4, 21/9
Ofc 1/22, 19/22
offer 88/12, 88/19, 89/14, 90/16, 90/22, 115/20, 156/3
offered 87/15, 87/18, 87/22, 88/14, 88/16, 89/2, 90/3, 115/18, 138/19, 138/20
OFFICE 1/14, 5/13, 7/5, 7/6, 8/4, 8/13, 8/14, 8/18, 16/17, 19/15, 21/9, 21/18, 21/19, 21/23
Officer 4/4, 4/22, 5/2, 7/9, 7/11, 7/14, 9/15, 9/18, 12/2, 12/7, 20/17, 31/22, 39/13, 40/4, 49/1, 53/5, 53/11, 56/17, 62/7, 95/22, 96/18
official 50/15
officially 45/8, 58/23
opinion 26/21
opportunity 4/23, 12/24, 13/1, 13/9, 46/7, 66/15
ordered 158/24
Organization 7/24, 9/24, 10/4, 10/6, 10/10, 10/13, 10/17, 10/19, 10/23, 21/3
ORGANIZATION'S 2/17
original 8/11, 9/17, 21/16, 57/21, 60/24, 61/15, 61/20
ounces 87/22, 88/16, 88/17, 89/2, 89/11, 89/14, 91/6
out-of-range 85/20
overnight 18/18

p.m 19/17, 105/11
pa 84/2
package 80/21, 81/10
packages 81/13
packet 62/12, 80/18, 80/20, 82/18, 82/20, 83/6, 83/15
pages 2/4, 2/9, 2/11, 2/12, 2/19, 120/4, 121/7, 122/5
paid 152/13
pain 118/17, 129/2, 129/9
paper 83/4, 83/7
paperwork 38/22, 40/10, 40/12, 45/16, 63/6, 82/23, 139/24, 140/2
paragraph 41/4, 42/1, 43/20, 45/4, 45/22, 46/1, 46/20, 47/5, 58/14, 59/23
part 6/1, 6/8, 6/14, 24/21, 26/3, 26/11, 47/5, 49/13, 58/18, 58/20, 68/6, 75/7, 75/11, 102/23, 103/1, 113/22, 120/12, 126/22, 129/10, 129/12, 129/13, 135/18, 157/19, 167/17
participant 13/8, 162/2
Partner 1/20, 1/21, 19/20, 19/21
parts 46/23
pass 34/19, 63/4, 166/22
PASSENGER 1/1, 7/2, 17/1, 19/1, 47/14
patient 72/9, 72/12, 83/22, 83/23, 84/2
Patrick 10/15, 11/21, 20/12
pay 154/4
PEER 169/23
penniless 128/1
Pennsylvania 1/22, 19/22
PER-19 146/13
performing 32/1
period 10/2, 30/20, 30/23, 33/9, 88/1, 89/3, 89/12, 164/18, 167/1, 170/14
periodic 33/9, 166/24
periods 35/19, 35/23
PERS-19 2/12, 2/13, 5/21, 6/6, 11/1, 23/7, 40/21, 41/23, 43/1, 50/10, 113/8, 113/12, 113/15, 113/20, 141/24, 157/1, 162/20, 163/7, 163/10
PERS-91 163/7
Personal 23/13
personally 68/4
personnel 15/5, 49/2, 64/23, 162/7
Philadelphia 79/8
phone 8/18, 11/10, 13/17, 14/14, 14/20, 21/23, 29/17, 29/18, 29/24, 30/11, 30/12, 30/15, 40/17, 61/3, 61/15, 65/21, 104/12, 127/5, 147/22, 166/9, 166/10
physical 6/2, 6/15, 26/12, 34/4, 35/13, 37/7, 49/13, 49/22, 67/2, 67/8, 68/6, 71/16, 72/13, 72/21, 75/7, 75/11, 83/17, 91/9, 92/18, 102/23, 103/2, 123/12, 123/24, 124/2, 124/12, 125/14, 126/22, 131/16, 144/4, 144/15, 149/2, 149/21, 151/1, 158/10, 158/17, 162/4, 163/1, 168/1
Physically 92/9, 166/3
physician 92/17, 126/9
pick 16/12, 45/22, 74/12
picking 46/23
Place 5/13, 7/23, 12/18, 24/21, 56/22, 77/1, 86/10, 114/16, 132/13
placed 77/23
placing 77/22
plan 166/21
play 46/24, 127/19, 127/24
pneumonia 91/18, 91/24, 115/3, 117/20, 125/10, 128/15, 131/20, 136/7, 140/14, 152/6, 152/7, 153/23, 163/16, 163/18, 169/20
point 17/18, 46/19, 72/9, 98/4, 111/11, 117/18, 118/1, 125/4, 127/7, 127/16, 127/18, 139/5, 139/9, 139/11, 150/22, 152/20, 153/21, 153/22, 154/12, 162/8, 170/5
poli 58/9
policies 164/5, 164/23
Policy 5/21, 6/6, 11/1, 13/9, 23/7, 24/5, 41/23, 43/15, 51/8, 58/10, 108/4, 108/12, 113/18, 113/20, 137/21, 145/12, 158/12, 161/21, 162/3, 166/23
policy' 24/10
positive 6/11, 12/21, 13/6, 31/23, 41/13, 44/22, 49/4, 49/8, 50/7, 63/11, 106/18, 106/24, 114/1, 114/3, 115/5, 133/24, 132/7, 146/7, 147/1, 147/8, 148/10, 148/23, 149/24, 150/3, 153/11, 157/5, 159/21, 163/16, 169/11
positive/AIDS 126/9
possession 24/8
possible 18/18, 80/17, 82/17
postponed 77/24, 10/5
postponement 7/3, 7/18, 20/19
Postponement/Rescheduling 2/5
postponements 8/17, 21/22
pray 170/12
premises 49/23, 85/23

presence 51/17
presented 17/16, 36/23, 67/20, 139/15, 166/4
presenting 134/22
pressure 75/9, 75/24
pretty 23/11, 30/14, 75/20
primary 133/21
priority 128/18
prob 91/24
problem 14/10, 91/23, 92/1, 168/24
problems 92/7, 130/14, 132/3, 168/23
procedure 63/3, 145/2
procedures 6/10, 41/11, 44/1, 44/12, 52/2, 113/23, 157/4, 157/18
proceed 12/13, 13/21, 17/19
proceeding 17/11
proceedings 4/16
process 50/5, 50/21
processed 67/7, 71/16
produce 6/22, 15/3
Professional 23/12
program 37/3, 45/10
Programs 39/14, 40/5
prohibition 44/11
promptly 128/22
pronounce 95/16
pronounced 95/12, 95/17
Pronounces 95/14
property 24/7
protocol 63/17
prove 163/12, 165/4, 169/18
proven 161/19, 165/10, 168/14
provide 10/1, 21/4, 49/19, 52/6, 90/5, 119/2, 119/8, 123/18, 138/2, 158/4
pull 165/16, 165/19
pulled 97/14
pulse 75/9, 76/1
purpose 5/16, 48/6
put 57/2, 78/2, 83/21, 86/12, 93/20, 101/18, 109/3, 116/13, 134/23, 134/24, 155/5
putting 29/4, 29/7

## Q

quarterly 34/14, 37/10, 146/8
question 4/19, 4/20, 4/24, 17/12, 38/16, 46/8, 55/15, 57/4, 61/1, 61/10, 61/11, 62/5, 64/1, 64/8, 65/1, 65/4, 70/5, 79/2, 79/4, 81/1, 81/6, 81/8, 81/19, 82/11, 82/14, 83/8, 83/10, 89/4, 89/13, 89/20, 90/18, 90/21, 92/4, 93/9, 94/14, 108/14, 109/14, 109/22, 122/6, 131/12, 140/10, 147/14, 147/17, 147/19, 148/2, 148/14, 148/17, 151/17, 153/5, 154/19, 156/15, 156/20
questioning 36/16, 45/20, 53/21, 65/17, 101/7, 122/15
questions 8/12, 11/3, 12/4, 12/16, 16/11, 16/13, 21/17, 32/15, 37/14, 37/17, 50/20, 52/18, 52/21, 62/18, 62/21, 62/24, 63/19, 64/17, 69/24, 70/8, 74/19, 74/21, 85/8, 85/10, 86/6, 90/11, 91/13, 94/10, 94/12, 96/23, 98/11, 98/18, 103/21, 105/19, 105/22, 110/19, 112/2, 136/18, 146/20, 146/23, 156/8, 156/13, 160/3
quick 18/19, 118/13, 126/12, 127/11

## R

RAILROAD 1/1, 7/2, 17/1, 19/1, 47/14, 164/18
Railway 9/9
range 6/4, 6/19, 26/13, 51/21, 52/4, 52/7, 54/24, 67/4, 71/3, 77/9, 77/14, 88/9, 89/24, 91/5, 97/18, 114/20, 124/24, 125/1, 137/6, 137/12, 137/21, 138/8, 152/3, 152/15, 152/16, 153/12, 155/3, 164/7, 167/11
ranges 164/3
RE 1/3, 19/3
re-ask 131/12
re-take 166/1, 166/13, 166/15
re-test 167/24, 168/7
re-tested 155/17
REA 1/15, 4/7, 5/14, 7/6, 8/5, 8/15, 19/15, 21/10, 21/20
read 5/4, 9/6, 11/11, 16/19, 20/19, 22/12, 23/4, 23/11, 24/3, 24/18, 31/15, 32/22, 41/7, 41/24, 43/20, 44/7, 45/4, 45/21, 45/22, 45/23, 46/3, 46/6, 46/20, 47/3, 47/4, 47/21, 51/19, 51/21, 54/4, 54/12, 57/11, 58/13, 58/17, 58/20, 59/2, 59/8, 68/14, 68/24, 79/9, 136/22, 163/6
reading 46/12, 46/16, 47/3, 48/7, 55/3, 61/6, 62/6, 62/10, 71/22, 143/2, 143/6
reads 57/11
reason 84/22, 116/3, 123/1, 129/14, 137/6, 154/15, 155/23

Case 1:04-cv-01024-RCL   Document 151-12   Filed 11/30/2005   Page 39 of 53

recall 87/16, 94/13, 95/3, 101/9, 111/7
receipt 9/14
receive 16/16
recess 14/23, 16/1, 16/9, 18/7, 18/16, 18/24, 55/14, 136/10
recessed 21/3, 29/14, 30/7
recessing 48/6
record 4/10, 5/5, 9/4, 11/11, 11/17, 15/5, 16/10, 16/19, 17/7, 20/3, 20/20, 22/18, 23/11, 38/7, 39/7, 39/9, 39/11, 39/22, 39/24, 40/2, 47/8, 47/22, 48/4, 48/8, 48/11, 48/15, 56/2, 56/4, 60/11, 65/17, 66/1, 66/5, 66/7, 66/8, 66/20, 112/22, 112/24, 115/19, 122/1, 131/10, 136/15, 136/17, 165/23, 168/10
recorded 4/14, 40/13
Records 2/18, 129/23
recourse 162/6
red 115/4, 125/6, 125/9, 131/22, 132/4, 152/3, 152/12
redundant 85/14
Ref 9/20
reflects 24/23
Refusal 2/13, 41/4, 41/9, 41/23, 45/3, 50/3, 103/20, 106/5, 106/12, 106/14, 107/6, 164/15
refuse 117/2, 138/2, 154/17, 164/9, 168/12
refused 166/16
refuses 6/8, 41/10, 43/24, 44/11, 50/4, 106/22, 113/22, 157/3, 164/11, 164/16
register 73/21, 74/1
Regulat 141/6
Regulated 2/12, 43/23, 58/13, 58/18, 59/10, 107/11, 107/20, 141/2, 142/3, 142/17, 142/21, 143/11, 163/5, 164/9, 164/10, 164/12, 164/20, 165/3, 167/8
Regulated/Non-regulated 46/5, 47/4
regulation 44/4, 98/9
Regulations 40/22, 164/22
Relations 50/21
release 79/23, 79/24
released 49/7, 65/5, 65/8, 79/18, 80/15, 94/5
releases 167/22
Relevance 36/4, 91/19, 105/8, 109/10, 109/24, 110/2, 122/12, 122/22, 130/9, 134/9, 134/11, 143/22
remain 8/11, 21/16
remainder 18/22
Remark 54/15, 54/16, 57/15, 69/6, 69/11
Remarks 54/11, 58/1, 90/7
remember 33/16, 75/22, 75/23, 104/5, 104/6, 104/20, 105/5, 105/15, 109/2, 144/22, 151/2, 151/12, 155/4, 155/7, 155/9, 155/11, 155/13
remembered 108/22
removed 44/1
rendition 16/8
Rep 70/11
repeat 82/12, 82/13, 94/1
rephrase 92/4
report 16/16
reported 31/22, 66/24
representative 4/23, 5/1, 6/24, 7/10, 16/22, 17/4, 17/11, 17/15, 68/10
representing 11/20, 11/22, 20/11
request 7/24, 10/17, 12/8, 12/9, 12/10, 13/22, 21/3, 29/20, 53/6
requested 15/9, 48/4, 53/14, 53/23
requesting 17/23
requests 7/3, 8/16, 10/4, 10/7, 10/15, 10/19, 10/24, 21/21
required 11/1, 49/9, 57/10, 166/23
requirements 50/18
rescheduled 8/1, 21/5, 21/6
Rescheduling 2/7
Reserve 90/14
resolved 10/22
Resources 40/4, 47/15, 53/5, 62/7, 110/23
respond 98/2
response 12/5, 16/14, 18/19, 60/20, 93/8, 153/16
responses 65/19
responsibility 5/18, 154/15
responsible 50/11
rest 94/7
result 8/8, 21/13, 31/22, 49/1
Results 2/10, 51/1, 149/3
results/event 50/24
results/events 50/22
retained 10/14
retake 10/24
return 6/1, 6/14, 10/21, 11/2, 26/11, 31/19, 49/4, 49/7, 49/9, 49/13, 67/1, 67/16, 82/19, 102/2, 107/11, 123/11, 128/22, 142/3, 149/1, 151/1, 158/24, 159/10, 162/3, 164/12, 166/1, 167/23, 168/2, 168/4
return-to-duty 34/4, 35/10, 37/6, 83/17, 92/18, 123/24, 124/1, 131/14, 141/12, 141/13, 141/17, 149/19, 158/10, 158/17, 163/1, 163/24, 165/15, 165/16

returned 12/11, 33/22, 33/23, 59/5, 141/12, 162/3
returning 124/8, 156/2
review 31/21, 31/22, 56/17
rid 80/1
right-hand 65/7
ringing 40/17
rings 147/22
Road 11/9, 96/12
Room 2/18, 20/8, 22/18, 72/13, 72/21, 75/7, 75/13, 75/14, 91/9, 97/11, 114/24, 125/7, 133/1, 133/2, 133/3
ropes 132/3
Rosemarie 1/20, 19/20
Rule 12/19, 13/8, 31/10, 31/13, 32/8, 36/7, 36/13, 36/17, 36/23, 145/9, 146/9, 147/1, 148/1, 148/3, 148/6, 148/11, 148/15, 149/6, 150/18, 162/2, 164/4, 164/7
Rules 40/21, 168/22, 168/24
run 135/1
running 116/1, 161/13

S

S-H-A-V-E 84/18, 84/19
safe 132/13
sample 12/24, 26/15, 41/18, 50/3, 52/10, 78/12, 78/13, 78/15, 114/8, 114/12, 114/22, 123/17, 123/19, 124/15, 124/18, 124/21, 137/3, 137/10, 138/20, 164/3, 164/6, 164/20, 165/9, 167/11, 169/4, 170/4
sat 115/9, 168/21
saw 33/2, 97/20
scam 165/16
schedule 144/6
scheduled 7/23, 8/8, 9/23, 21/2, 21/13, 141/10, 141/17, 158/18, 163/23, 166/16
screen 67/2, 67/3, 107/24, 115/16
Second 1/15, 4/8, 5/14, 6/16, 7/6, 8/5, 8/15, 19/15, 20/5, 21/10, 21/20, 24/17, 27/21, 44/13, 44/24, 49/23, 52/10, 54/9, 58/6, 58/14, 59/3, 59/23, 66/3, 67/14, 69/17, 69/20, 71/4, 73/4, 74/2, 75/11, 78/14, 80/4, 80/7, 80/12, 81/3, 86/3, 86/11, 86/17, 87/4, 87/7, 90/4, 90/6, 98/5, 98/6, 98/8, 103/5, 103/6, 106/4, 106/9, 108/17, 114/21, 115/16, 117/3, 130/11, 138/14, 138/20, 138/21, 151/20, 151/22, 151/23, 152/1, 155/8, 160/11, 162/11, 167/16, 169/4
Section 2/12, 6/7, 20/6, 29/9, 41/7, 57/8, 68/18
sections 5/22, 23/8, 113/10
Security 51/24, 66/24
send 76/4, 132/9, 155/19, 159/12, 159/14, 159/16
sends 115/4, 115/8, 125/6, 125/9
seniority 50/21
sense 61/24
sent 5/6, 20/22, 56/15, 56/16, 59/21, 66/19, 68/1, 90/16, 115/17, 137/7, 152/3, 152/12, 159/18
sentence 28/23, 45/5, 45/23, 59/3
separate 101/19
sequence 27/22
serves 148/5
service 32/1, 44/2, 59/6, 59/19, 65/8, 143/14, 143/17, 143/20, 163/3, 163/4, 164/11, 164/15, 164/17, 164/19, 167/4, 168/6
Services 39/13, 40/4, 47/15, 51/11, 56/16
set 73/18, 124/21, 144/3, 158/23
seven 112/20
severe 125/11
Shave 84/16, 101/17
Shaves 84/17
sheet 27/24, 28/16
shirt 116/13
short 10/2
show 88/20, 115/19
sick 33/13, 33/17, 33/19, 93/23, 102/12, 125/15, 134/16, 149/14, 149/17, 151/3, 163/15, 167/3
Side 18/22, 20/5, 65/7, 65/23, 66/2, 85/2, 85/3, 99/11
sign 49/6, 71/11, 77/10, 80/18, 80/22, 81/9, 82/20, 83/18, 154/20, 155/1
signal 132/9
signature 67/22, 155/11
signatures 32/2, 77/21
signed 6/20, 7/8, 8/21, 9/15, 22/1, 32/21, 34/19, 37/3, 49/11, 51/4, 52/12, 52/13, 70/15, 70/17, 71/2, 77/7, 77/12, 77/14, 80/6, 80/11, 81/13, 86/7, 91/7, 101/12, 101/22, 135/12, 135/21, 146/4, 148/6, 148/15, 148/18, 148/22, 150/19, 162/22
signing 155/4, 155/7, 155/9, 155/11
signs 81/20
sit 114/24, 126/8, 153/19
site 56/13, 122/14, 130/14
sitting 75/13, 75/14
situation 33/12, 91/1, 97/9, 111/13, 125/5, 154/4

SKILLED 1/20, 19/20
slower 4/13
Social 51/24, 66/24
SPEAKER 22/10, 93/4, 93/20, 119/18, 120/9, 121/10, 126/17, 131/1, 131/5, 134/19, 139/20, 151/15, 161/8
speci 166/18
Specification 5/24, 6/13, 27/3
specifications 166/19
specimen 6/3, 6/16, 6/18, 13/3, 26/12, 49/17, 49/20, 49/24, 50/9, 51/20, 52/4, 52/5, 54/6, 54/8, 54/13, 54/16, 56/12, 56/19, 57/10, 57/11, 57/18, 57/20, 57/23, 58/1, 58/3, 58/7, 60/2, 65/5, 65/7, 65/9, 67/14, 69/1, 69/7, 69/10, 69/17, 71/3, 73/4, 73/10, 77/8, 77/13, 79/12, 79/15, 80/12, 85/19, 86/22, 86/24, 87/4, 87/7, 87/7, 88/7, 88/11, 89/23, 90/4, 90/6, 91/1, 91/4, 97/15, 97/20, 98/5, 98/6, 98/8, 117/9, 117/10, 137/1, 137/5, 137/15, 137/20, 138/2, 138/5, 138/21, 151/23, 152/1, 158/5, 161/22, 161/23, 162/12, 164/1
Speculation 92/2
spell 38/13
spend 32/9
split 57/10, 57/24
spot 29/16
spread 169/10
Sputum 129/6, 129/7
staff 67/10, 152/18
stamped 122/20
standard 63/2, 63/3
Standards 2/9, 5/21, 23/7, 24/12, 41/19, 44/3, 50/9, 50/11, 113/9, 137/14, 137/15, 158/13, 161/20, 162/19
standing 77/18
stands 12/8, 12/13
start 65/24, 168/20
started 66/3, 123/17, 123/20, 123/21
Starting 11/16, 24/19, 31/16
Starts 38/12
state 22/11, 54/2, 92/5, 94/4
stated...he 102/2
statement 32/23, 49/16, 50/2, 50/8, 59/24, 67/24, 70/18, 84/9, 84/11, 85/5, 99/17, 101/12, 101/16, 101/18, 101/20, 102/1, 136/21, 149/11, 160/24
statements 5/3, 10/7, 18/1, 147/20, 160/19, 161/16
states 6/8, 31/16, 54/11, 59/23, 71/15, 113/17, 113/22, 136/24, 164/5
stay 35/18, 67/11, 114/21, 117/3, 138/14, 161/24
stayed 35/22, 90/17, 115/21, 135/24, 136/4, 155/22, 167/2
Step 41/24, 43/20, 44/6, 44/18, 45/3, 45/5, 45/21, 45/22, 54/12, 57/4, 57/8, 57/11, 59/8, 68/18, 122/18, 125/22
STEVENS 1/7, 1/13, 2/11, 2/15, 2/18, 3/12, 5/7, 7/20, 9/20, 11/18, 19/7, 19/14, 20/4, 20/9, 31/18, 49/2, 49/3, 49/8, 49/14, 51/24, 66/16, 66/24, 95/23
Stevens' 9/22
stick 31/1
stiff 129/9
stopped 115/24, 116/1, 116/3
Street 1/15, 4/8, 5/7, 5/14, 7/7, 7/20, 8/5, 8/15, 9/19, 19/15, 20/23, 21/10, 21/20
Streets 79/8
strict 24/6
strip 73/11, 73/13, 74/6
strip's 73/17
stuff 93/1, 170/13
stupid 159/24
subject 6/10, 16/23, 41/12, 42/20, 44/17, 45/7, 49/1, 50/6, 50/12, 58/22, 113/24, 157/4
submit 34/19, 41/4, 41/9, 43/24, 67/14, 71/4, 73/4, 81/2, 81/4, 161/23, 164/9, 164/15, 168/12
submitted 165/4
submitting 130/11, 161/21, 169/3
substance 110/20, 110/21
substances 24/9
substitutes 164/20
successfully 33/24
suitable 10/1
SUMMATION 3/14
Superintendent 9/18
supervised 49/21
supervision 58/8
Supervisor 84/12, 96/3, 101/17
supply 22/5
Susan 8/18, 21/23
symptoms 129/15
system 12/18, 83/22

[ 1]      MR. McMILLAN:  Okay.

[ 2]      Do you know whether you are a regulated or

[ 3] non-regulated employee?

[ 4]      MR. STEVENS:  No.

[ 5]      MR. McMILLAN:  Did anyone tell you when you

[ 6] went in there whether you were?

[ 7]      MR. STEVENS:  No.

[ 8]      MR. McMILLAN:  Went into Concentra?

[ 9]      MR. STEVENS:  No.

[10]      MR. McMILLAN:  So you scheduled this test

[11] yourself, or did you call the Company when you

[12] returned -- this return-to-duty -- this was a

[13] voluntary return-to-duty --

[14]      MR. STEVENS:  Yes.

[15]      MR. McMILLAN:  -- correct?

[16]      MR. STEVENS:  Uh-huh.  I did.  Yes.

[17] I scheduled it for return-to-duty.

[18]      MR. McMILLAN:  Who did you -- did you call

[19] someone with the Company, though, the --

[20]      MR. STEVENS:  Yes.  I called uh Jackie

[21] Cobb(?)?  Yeah.

[22]      MR. McMILLAN:  Have you ever seen this

[23] document, and this document is just page 41 of the

[24] PERS-19?

[25]

Page 142

[ 1]      MR. STEVENS:  No.

[ 2]      MR. McMILLAN:  Would you agree that it says

[ 3] there:  Return to Duty, Regulated and

[ 4] Non-regulated?

[ 5]      MR. STEVENS:  I don't even know what this

[ 6] document is.  So....

[ 7]      MR. McMILLAN:  See it says Drug and Alcohol

[ 8] Guidelines?

[ 9]      MR. STEVENS:  Right.

[10]      MR. McMILLAN:  Right.

[11]      MR. STEVENS:  I mean, but what would I be

[12] agreeing upon if I --

[13]      MR. McMILLAN:  I'm just asking you, does it

[14] say that?

[15]      MR. STEVENS:  Yes, it does.

[16]      MR. McMILLAN:  Regulat -- so you don't know

[17] whether you're regulated --

[18]      MR. STEVENS:  No.

[19]      MR. McMILLAN:  -- or non --

[20]      MR. STEVENS:  No, I don't.

[21]      MR. McMILLAN:  -- regulated?

[22]      MR. STEVENS:  No, I don't.

[23]      MR. McMILLAN:  Do you have a copy,

[24] Mr. Talley?

[25]

Page 143

[ 1]      MR. TALLEY:  Yes, sir.  I sure do.

[ 2]      MR. McMILLAN:  Page 41, we're reading from.

[ 3]      MR. TALLEY:  Uh-huh.

[ 4]      MR. McMILLAN:  So I --

[ 5]      MR. TALLEY:  Which -- which page are you

[ 6] reading?

[ 7]      MR. McMILLAN:  Oh, 41, but we're not

[ 8] gonna -- we're not gonna get into it.  I just

[ 9] wanted to see if he had ever seen the document,

[10] but you(sic) stated he has never seen the document

[11] and he doesn't know whether he's regulated or

[12] non-regulated.  So it's really irrelevant.

[13]      But you do know that you're not a hours of

[14] service employee; right?

[15]      MR. STEVENS:  Yes.

[16]      MR. McMILLAN:  And I guess the different --

[17] do you know that hours of service is a random

[18] testing and --

[19]      MR. TALLEY:  Objection.

[20]      MR. McMILLAN:  -- non-hours of service

[21] is --

[22]      MR. TALLEY:  Relevance?

[23]      MR. McMILLAN:  You know -- he doesn't know

[24] that.

[25]

Page 144

[ 1]      MR. D'ALESSANDRO:  If he don't --

[ 2]      (Unintelligible; several speaking at once.)

[ 3]      MR. McMILLAN:  So basically, you set up the

[ 4] physical --

[ 5]      MR. STEVENS:  Yes.

[ 6]      MR. McMILLAN:  -- or you schedule it, then

[ 7] you --

[ 8]      MR. STEVENS:  I told --

[ 9]      MR. McMILLAN:  -- (unintelligible) gonna go

[10] to Concentra; right?

[11]      MR. STEVENS:  Yes.

[12]      MR. McMILLAN:  To take a alcohol and drug

[13] test?

[14]      MR. STEVENS:  Yes.

[15]      MR. McMILLAN:  And a physical?

[16]      MR. STEVENS:  Yes.

[17]      MR. McMILLAN:  Did they give you an alcohol

[18] test while you were there?

[19]      MR. STEVENS:  No.

[20]      MR. McMILLAN:  No breathalyzer?

[21]      MR. STEVENS:  No.

[22]      MR. McMILLAN:  Do you remember them

[23] checking your temperature?

[24]      MR. STEVENS:  Not really, no.

[25]

Page 145

[ 1]    MR. McMILLAN: Did you interfere with the

[ 2]  drug testing procedure at this --

[ 3]    MR. STEVENS: No.

[ 4]    MR. McMILLAN: Did you -- do you know why

[ 5]  you're here today?

[ 6]    MR. STEVENS: Yes.

[ 7]    MR. McMILLAN: Why?

[ 8]    MR. STEVENS: Being allegedly charged with

[ 9]  violation of Rule G.

[10]    MR. McMILLAN: Where does it say that?

[11]  Here's the Charges; do you see that?

[12]    MR. STEVENS: The violation of the Policy

[13]  of PER nine --

[14]    MR. McMILLAN: Of your Waiver --

[15]    MR. STEVENS: -- PER --

[16]    MR. McMILLAN: -- Agreement; is that what

[17]  you're --

[18]    MR. STEVENS: Yeah.

[19]    MR. McMILLAN: -- referring to?

[20]    MR. STEVENS: Yeah. Waiver Agreement,

[21]  but --

[22]    MR. McMILLAN: Okay.

[23]    MR. STEVENS: -- that I don't know. I

[24]  don't --

[25]

Page 146

[ 1]    MR. McMILLAN: Are you --

[ 2]    MR. STEVENS: -- what that is?

[ 3]    MR. McMILLAN: Are you in violation of that

[ 4]  Drug and Alcohol Waiver Agreement that you signed

[ 5]  on March the 10th?

[ 6]    MR. STEVENS: I'm not. No.

[ 7]    MR. McMILLAN: Did you ever give a positive

[ 8]  test, quarterly test under that Agreement?

[ 9]    MR. STEVENS: Since I've been under Rule G?

[10]    MR. McMILLAN: Yes.

[11]    MR. STEVENS: No.

[12]    MR. McMILLAN: And I think you said the

[13]  PER-19, you have -- you don't know what that --

[14]    MR. STEVENS: I have no idea what that is.

[15]    MR. McMILLAN: -- have no idea what that

[16]  is. And you don't know whether you're a covered

[17]  or a uncovered employee?

[18]    MR. STEVENS: No.

[19]    MR. McMILLAN: I don't have any other

[20]  further questions for Mr. Stevens at the moment.

[21]    MR. D'ALESSANDRO: Okay.

[22]    MR. TALLEY: Yes, sir. I have a few

[23]  questions for Mr. Stevens.

[24]    Mr. Stevens, you just stated that you never

[25]

Page 147

[ 1]    gave a positive test while under Rule G?

[ 2]    MR. STEVENS: Yes.

[ 3]    MR. TALLEY: Waiver?

[ 4]    MR. STEVENS: Uh-huh.

[ 5]    MR. TALLEY: We've got documentation to the

[ 6]  contrary that you gave a --

[ 7]    MR. McMILLAN: I'd object --

[ 8]    MR. TALLEY: -- positive test --

[ 9]    MR. McMILLAN: -- I'd object to that.

[10]  He's --

[11]    MR. TALLEY: Well you brought it out --

[12]    MR. McMILLAN: Yeah, but you can't ask --

[13]    MR. TALLEY: -- Mr. McMillan.

[14]    MR. McMILLAN: -- yourself a question and

[15]  answer it --

[16]    MR. TALLEY: I'm not asking myself a

[17]  question --

[18]    MR. McMILLAN: -- Mr. Talley.

[19]    MR. TALLEY: I'm asking him a question.

[20]    MR. McMILLAN: He's making statements

[21]  and --

[22]    (Cell phone rings.)

[23]    MR. D'ALESSANDRO: Excuse me.

[24]    MR. TALLEY: You asked him whether he had

[25]

Page 148

[ 1]    violated the Rule G Waiver, and he said no. I'm

[ 2]  asking him a question as he -- he -- when did he

[ 3]  not violate this particular Rule G. There's

[ 4]  information contrary to that.

[ 5]    MR. D'ALESSANDRO: If my memory serves me

[ 6]  correctly, he asked him: Since he signed a Rule

[ 7]  G --

[ 8]    MR. McMILLAN: Right.

[ 9]    MR. D'ALESSANDRO: -- has he been tested

[10]  and came up positive for drug (inaudible) -- has

[11]  he been tested since that Rule G, the first one.

[12]  That's the way I took it.

[13]    MR. TALLEY: Okay. Alright.

[14]  (Unintelligible) ask the same question: Since

[15]  that first Rule G that you signed, which was in

[16]  February --

[17]    MR. McMILLAN: My question was in regards

[18]  to the one he signed in February --

[19]    MR. TALLEY: That's what I'm --

[20]    MR. McMILLAN: Right.

[21]    MR. TALLEY: That's what I'm gonna ask him.

[22]  The one you signed in February, you said you have

[23]  not given a positive test since February 2003?

[24]    MR. STEVENS: Right.

[25]

**Page 149**

[ 1]  MR. TALLEY: Now your last return to duty

[ 2] physical, before the one December 13th, 2004, what

[ 3] was the results of that one?

[ 4]  MR. STEVENS: Wait a minute. Say those

[ 5] dates again?

[ 6]  MR. TALLEY: You -- you were under Rule G

[ 7] Waiver of February 25th, 2003; correct, per this

[ 8] Alcohol and Drug Waiver --

[ 9]  MR. STEVENS: Okay. Right. Okay.

[10]  MR. TALLEY: Per -- yeah -- per this

[11] statement here under, what was it Exhibit --

[12] Exhibit H, I think it was -- and you said you have

[13] been out -- since February 2003, you've gone out

[14] again sick; am I correct?

[15]  MR. STEVENS: In February 2003?

[16]  MR. TALLEY: After -- yeah. After February

[17] 2003, you've gone out sick again and when you had

[18] to come back to work, you had to do another

[19] return-to-duty --

[20]  MR. STEVENS: Uh-huh.

[21]  MR. TALLEY: -- physical?

[22]  MR. STEVENS: Uh-huh.

[23]  MR. TALLEY: And did that one come up as a

[24] positive?

[25]

**Page 150**

[ 1]  MR. STEVENS: No.

[ 2]  MR. TALLEY: That one did not come as a

[ 3] positive?

[ 4]  MR. STEVENS: The one that -- that was just

[ 5] tested for --

[ 6]  MR. TALLEY: Not -- not --

[ 7]  MR. STEVENS: -- 12 --

[ 8]  MR. TALLEY: No. 12/13, that one will

[ 9] be -- I'll -- I'll get to that one. I'm not on --

[10] I'm not there yet. You --

[11]  MR. STEVENS: Well can I --

[12]  MR. TALLEY: -- (unintelligible; both

[13] speaking) --

[14]  MR. STEVENS: -- confusing me. I don't

[15] know which one you're talking about.

[16]  MR. TALLEY: Okay. Between February

[17] 2003 --

[18]  MR. STEVENS: On the Rule G Waiver that I

[19] signed right here.

[20]  MR. TALLEY: -- till --

[21]  MR. STEVENS: This one.

[22]  MR. TALLEY: -- till this point --

[23]  MR. STEVENS: Till this present time.

[24]  MR. TALLEY: How many times have you had a

[25]

**Page 151**

[ 1] return to duty physical?

[ 2]  MR. STEVENS: Uh -- I don't remember 'cause

[ 3] I've been sick a lot. So --

[ 4]  MR. TALLEY: Right. I understand.

[ 5]  MR. STEVENS: Yeah. I've --

[ 6]  (Unintelligible; speaking over one

[ 7] another.)

[ 8]  MR. TALLEY: Right. You've been in --

[ 9]  (Unintelligible; speaking over one

[10] another.)

[11]  MR. TALLEY: Yeah. You've been in and out.

[12]  MR. STEVENS: I don't remember. But you

[13] asking me --

[14]  MR. TALLEY: (Unintelligible) --

[15]  UNIDENTIFIED SPEAKER: -- let's(?) just

[16] bring it up, okay.

[17]  MR. TALLEY: Okay. My -- my question now

[18] is if all this was going on, you -- they told you

[19] and gave you information as to what the

[20] consequences were for not giving a second test

[21] because this one came up cold, why did you not

[22] give a second test? Why did you not give them a

[23] second specimen?

[24]  MR. STEVENS: I never told them that I

[25]

**Page 152**

[ 1] wasn't gonna give them a second specimen. It's

[ 2] just that once I was told that my urine was out of

[ 3] range, that sent up a red flag for me for my own

[ 4] well-being that I needed to pay attention to that

[ 5] as well: Do I need to go to the hospital? Do

[ 6] I -- do I have pneumonia again? If I have

[ 7] pneumonia again, that's a really bad thing for me,

[ 8] because if I do, I'm not gonna be able to talk to

[ 9] you through my mouth anymore; it's gonna be a

[10] tra -- a (unintelligible) through my esophagus. I

[11] will not be able to talk.

[12]  That sent up a red flag. So after no one

[13] paid any attention to me after an hour of being

[14] there, after being told that my urine is out of

[15] range -- not that it's hot; not that it's cold;

[16] it's out of range -- I'm thinking about a

[17] temperature in my body. Something is going on.

[18] So I made the staff aware of what my health

[19] concerns are.

[20]  So at that point, I did the next -- the

[21] next best thing. I needed to get to the hospital

[22] and that's exactly what I did.

[23]  MR. TALLEY: Well you were made aware that

[24] if you did -- what you had to do --

[25]

Page 153

[ 1]      MR. STEVENS:  Ebonie did --

[ 2]      MR. TALLEY:  -- that they would not --

[ 3]      (Unintelligible; speaking over one

[ 4] another.)

[ 5]      MR. TALLEY:  Let me finish the question.

[ 6]      MR. STEVENS:  Okay.

[ 7]      MR. TALLEY:  You were made aware that if

[ 8] you did what you said you did -- you went to take

[ 9] care of yourself -- that if you left that facility

[10] right then and there it would be considered a

[11] positive test because the first test was out of

[12] range?

[13]      MR. STEVENS:  That's not what they told me.

[14]      MR. TALLEY:  Well --

[15]      MR. STEVENS:  They didn't know exactly what

[16] to do.  My -- the response from Ebonie and

[17] Demetria was we need to call Amtrak.  We called

[18] Amtrak.  They left a message with Margaret

[19] Tierney.  I was not about to sit there and wait

[20] until this woman calls them back and that my -- my

[21] health is in jeopardy at this point, 'cause at

[22] that point nothing is on my mind but me not having

[23] pneumonia again, if that's the case.

[24]      But that was not brought to my attention of

[25]

Page 154

[ 1] the consequences of me leaving.  They do

[ 2] nothing -- they never probably had -- I mean from

[ 3] what I understood, they never even had nobody

[ 4] to -- to actually be in the situation that I was

[ 5] in, which was whether to leave or not.  They

[ 6] didn't know what to do.

[ 7]      So what Ebonie did was at that time she

[ 8] called and left a message with Margaret Tierney.

[ 9] She said:  David, this is what I'll do, I'll get

[10] your number -- I'll get your cell number; I'll

[11] call you and let you know once I talk to them.

[12] But at this point they're not able to -- they're

[13] not equipped to help me if something is actually

[14] going on with me.  So they was not gonna take that

[15] responsibility for whatever reason.  I have no

[16] idea what they're trained with.  All I know is

[17] what I did.  I did not refuse.

[18]      MR. TALLEY:  Well, Mr. Stevens, let me ask

[19] you this question then:  If that was the case then

[20] why would you sign this Unusual Collection Form?

[21]      MR. STEVENS:  Because -- let me tell you

[22] something, Michael -- I mean, Mr. -- Mr. Talley.

[23]      MR. TALLEY:  That's fine.

[24]      MR. STEVENS:  All of those forms are --

[25]

Page 155

[ 1] it's so many forms that you sign when you walk in

[ 2] the door, okay.  At that moment if there was a

[ 3] cold or hot or out of range temperature in my

[ 4] urine, the only thing I remember signing is when

[ 5] they put the urine in the different vials and you

[ 6] initialed them off.  During the midst of that, I

[ 7] do not remember signing that particular form.

[ 8] Being in the back is what you're asking me, when I

[ 9] was in the back, I don't remember signing that

[10] form in the back.  I'm not saying that that's not

[11] my signature, but I do not remember signing that

[12] particular document in the back.

[13]      MR. TALLEY:  So do you even remember the

[14] conversation with Ms. Beaty doing the test of have

[15] to doing a second test?

[16]      MR. STEVENS:  No.  The only thing she said

[17] to me was that I'd have to be re-tested.  I said:

[18] Okay, fine.  What do I do next?  She said:  Well

[19] what I'll do is I'll send you in the back, you go

[20] in the back.  I went into the back.  I waited for

[21] an hour.  I didn't walk -- just jump up and leave.

[22] I went in the back and stayed there for an hour,

[23] for a whole hour.  If there was a reason for me to

[24] leave, I'd have just walked out the door.  But

[25]

Page 156

[ 1] that's not what I did.  I was waiting to see what

[ 2] was going on.  After not returning to let me know

[ 3] whether I was gonna be tested again, to offer me

[ 4] any water, they didn't do all that.  I waited in

[ 5] the back.  I waited as long as I could, and then I

[ 6] left.

[ 7]      MR. TALLEY:  Mr. Stevens, I really don't

[ 8] have any more questions for you.  I'm done with

[ 9] the witness.

[10]      MR. D'ALESSANDRO:  Okay.  Mr. McMillan, do

[11] you have anything else?

[12]      MR. McMILLAN:  No.  I don't think I have

[13] any other questions for the witness.

[14]      MR. D'ALESSANDRO:  Okay.  And Mr. Stevens

[15] can't question himself.  It's nine minutes after

[16] 3:00.

[17]      Do you have any other witnesses,

[18] Mr. McMillan?

[19]      MR. McMILLAN:  Yeah.  Well I probably

[20] should ask him one other question, and that is to

[21] follow up on what Mr. Talley, I guess --

[22]      MR. D'ALESSANDRO:  Okay.

[23]      MR. McMILLAN:  -- maybe asked him, and that

[24] was:  In one of the Charges, two, was Fitness for

[25]

Page 157

[ 1]     Duty Testing, under the PERS-19 again that you

[ 2]     said you didn't know about. Says: If employee

[ 3]     refuses a test or fails to cooperate with the

[ 4]     testing procedures, employee will be subject to

[ 5]     the same consequences as testing positive for

[ 6]     alcohol and drugs. I think you stated they never

[ 7]     gave you an alcohol test; right?

[ 8]          MR. STEVENS: No.

[ 9]          MR. McMILLAN: You were there for how long,

[10]     total?

[11]          MR. STEVENS: An hour and five minutes,

[12]     maybe.

[13]          MR. McMILLAN: And then they -- the

[14]     follow-up test which you hung around, you said an

[15]     hour, almost an hour --

[16]          MR. STEVENS: Uh-huh.

[17]          MR. McMILLAN: -- would you consider that

[18]     failing to cooperate with the testing procedures?

[19]          MR. STEVENS: Not -- not on my part, no.

[20]          MR. McMILLAN: Did they tell you if you

[21]     didn't hang around for two or three hours that you

[22]     was gonna be in --

[23]          MR. STEVENS: No.

[24]          MR. McMILLAN: -- violation --

[25]

Page 158

[ 1]          MR. STEVENS: They did not tell me that.

[ 2]     No one brought that to my attention.

[ 3]          MR. McMILLAN: Did they tell you if you

[ 4]     were going to not provide the second urine

[ 5]     specimen that you -- that you would be in

[ 6]     violation of your Drug and Alcohol Waiver

[ 7]     Agreement or anything?

[ 8]          MR. STEVENS: No.

[ 9]          MR. McMILLAN: Were you -- by going over

[10]     there and doing this return-to-duty physical, in

[11]     any way being -- violating their Trust and

[12]     Honesty -- Honesty Policy under the Amtrak

[13]     Standards of Excellence, you feel like?

[14]          MR. STEVENS: No. That I would be in

[15]     violation of Trust and Honesty?

[16]          MR. McMILLAN: Why would you -- why would

[17]     you go over to a return-to-duty physical; you --

[18]     that you scheduled, correct, you could --

[19]          MR. STEVENS: Right.

[20]          MR. McMILLAN: Could you have went a

[21]     given -- any given date?

[22]          MR. STEVENS: I could have went any time I

[23]     got ready because I set that up. It wasn't

[24]     ordered by Amtrak for me to return at that time.

[25]

Page 159

[ 1]          MR. McMILLAN: Right.

[ 2]          MR. STEVENS: It was --

[ 3]          MR. McMILLAN: So this was not a mandate?

[ 4]          MR. STEVENS: No.

[ 5]          MR. McMILLAN: This was your own --

[ 6]          MR. STEVENS: This was my own --

[ 7]          MR. McMILLAN: -- made -- done of your own

[ 8]     volition --

[ 9]          MR. STEVENS: Yes.

[10]          MR. McMILLAN: -- to return to duty?

[11]          MR. STEVENS: Yes.

[12]          MR. McMILLAN: So Myra(?) didn't send you?

[13]          MR. STEVENS: No.

[14]          MR. McMILLAN: Mr. Talley didn't send you?

[15]          MR. STEVENS: No.

[16]          MR. McMILLAN: Mr. Kapela didn't send you?

[17]          MR. STEVENS: No.

[18]          MR. McMILLAN: You sent yourself?

[19]          MR. STEVENS: Yes.

[20]          MR. McMILLAN: And for you to go in and

[21]     give a positive would be kind of foolish, wouldn't

[22]     it?

[23]          MR. STEVENS: It would have been very, very

[24]     stupid.

[25]

Page 160

[ 1]          MR. McMILLAN: And you didn't do that?

[ 2]          MR. STEVENS: No.

[ 3]          MR. McMILLAN: No further questions,

[ 4]     Mr. Stevens.

[ 5]          MR. D'ALESSANDRO: Mr. Talley?

[ 6]          MR. TALLEY: Mr. Stevens --

[ 7]          MR. STEVENS: (Inaudible) --

[ 8]          MR. TALLEY: -- did they tell you, you had

[ 9]     to do another test?

[10]          MR. STEVENS: Yes.

[11]          MR. TALLEY: Did you complete that second

[12]     test?

[13]          MR. STEVENS: No.

[14]          MR. TALLEY: Thank you.

[15]          MR. D'ALESSANDRO: Okay. We're completed?

[16]          MR. McMILLAN: Yes, sir.

[17]          MR. D'ALESSANDRO: Alright. It's 11

[18]     minutes after. We're ready for closing

[19]     statements?

[20]          MR. McMILLAN: Yes, we are. Unless --

[21]          MR. D'ALESSANDRO: Okay. You are?

[22]          MR. McMILLAN: -- you have some -- we

[23]     basically -- I need to explain to Dave that he can

[24]     make a closing statement, and -- and --

[25]

Page 161

[ 1]    MR. D'ALESSANDRO: Okay. You ready?

[ 2]    MR. TALLEY: Yes.

[ 3]    MR. McMILLAN: We need to take --

[ 4]    MR. D'ALESSANDRO: Do we need a couple

[ 5] minutes?

[ 6]    MR. McMILLAN: -- a little break or

[ 7] something; we okay?

[ 8]    UNIDENTIFIED SPEAKER: Yeah. We need to

[ 9] take a break.

[10]    MR. D'ALESSANDRO: Let's take a couple

[11] minutes.

[12]    MR. McMILLAN: Alright. Couple minutes.

[13]    (Tape still running. Conversation

[14] unrelated to testimony or hearing.)

[15]    MR. D'ALESSANDRO: Okay. These are the

[16] closing statements.

[17]    Mr. Talley.

[18]    MR. TALLEY: Yes, sir. In the hearing for

[19] Mr. Stevens, the Carrier has proven without a

[20] doubt that Mr. Stevens violated Amtrak's Standards

[21] of Excellence policy by submitting a tainted urine

[22] specimen to Concentra, and when confronted with

[23] having to submit another specimen, convenient --

[24] conveniently told the Tech that he could not stay,

[25]

Page 162

[ 1] therefore negating having to do the test.

[ 2]    He is a Rule G Waiver participant who

[ 3] violated that policy by not completing the Return

[ 4] to Duty Physical (unintelligible) not taking the

[ 5] urine test. With this violation, there is no

[ 6] recourse but termination.

[ 7]    The evidence given by Concentra personnel

[ 8] was factual and to the point as well as evidence

[ 9] given by Ms. Theodore-Dalton(sic) and Mr. Joseph

[10] Allione. Mr. Stevens was well aware of the

[11] consequences of not completing the second urine

[12] specimen, but chose to leave the facility anyway.

[13]    The Carrier feels Mr. Stevens is guilty and

[14] should be disciplined accordingly. That's the end

[15] of my closing.

[16]    MR. D'ALESSANDRO: Mr. McMillan.

[17]    MR. McMILLAN: Yes, sir.

[18]    Mr. Stevens, the Charges against

[19] Mr. Stevens of violating Amtrak's Standards of

[20] Excellence, PERS-19, and Fitness for Duty Testing

[21] and also the Alcohol and Drug Waiver Agreement

[22] signed March 10th, 2003, Carrier has not found him

[23] guilty of these charges. He basically returned to

[24] duty on his own.

[25]

Page 163

[ 1]    It was a return-to-duty physical. It was

[ 2] not a mandatory drug test. He was not -- he is

[ 3] not an hours of service employee. He is also a

[ 4] non-regulated employee. Hours of service is

[ 5] regulated employees.

[ 6]    And I just want to read to you here under

[ 7] the PERS-91(sic) -- and by the way -- PERS-19, I'm

[ 8] sorry, Mr. -- you can't hold someone accountable

[ 9] for something they've never seen in their life.

[10] He's never seen PERS-19; not familiar with it,

[11] even though that's what he was charged with.

[12]    He -- Carrier did not prove that he

[13] tampered with any test or that he gave a false --

[14] or that he in any way -- basically he's guilty of

[15] being sick. He's very ill. He's stated here

[16] today he's HIV positive. He's had pneumonia.

[17] He's been off and on for the last year with

[18] pneumonia. He's trying to get back to work. He

[19] wants to continue to work as long as he can and

[20] continue to keep his -- maintain his health

[21] insurance with Amtrak, which is very detrimental

[22] to him and his live -- his life, actually, and for

[23] to keep him going. And so he scheduled a

[24] return-to-duty; he came down; he took the -- he

[25]

Page 164

[ 1] gave them a specimen. They did not tell him, all

[ 2] they said was he's not guilt -- he's -- not give

[ 3] us a sample that ranges between 90 and 100.

[ 4]    There's no rule that I -- I see in Amtrak's

[ 5] (unintelligible) policies that states that he --

[ 6] that he's violated giving a sample that's not

[ 7] within the range of 90 to 100. There's no rule to

[ 8] be violated there. And even under Amtrak's

[ 9] regulated employees, a refuse(sic) to submit to

[10] testing -- and this is regulated -- hours of

[11] service employee who refuses, and this is on page

[12] 90 -- 41, of Return to Duty - Regulated and

[13] Non-regulated Employees, Drug and Alcohol

[14] Guidelines -- page 41, mind you at the bottom -- a

[15] refusal to submit to testing, any hours of service

[16] employee who refuses FRA-mandated drug and alcohol

[17] test will be disqualified for employment service

[18] any -- at any railroad for a period of none

[19] months. A hours of service employee who

[20] adulterates or substitutes urine sample, regulated

[21] testing, will be disqualified from employment for

[22] nine months, that violates the Federal Regulations

[23] and Amtrak's policies.

[24]    Now Mr. Stevens here, which is a

[25]

**Page 165**

[ 1]  non-regulated employee -- I mean here he is

[ 2]  cleaning coaches; he's not out driving trains like

[ 3]  these regulated people are -- you know, they're

[ 4]  saying that if they prove that he submitted then

[ 5]  he -- and he interferes with the testing, that he

[ 6]  could be terminated. But I'm comparing the two

[ 7]  together here.

[ 8]       We're -- we're all employees here, and he

[ 9]  did not tamper with the sample as Mr. Talley said.

[10]  That was not proven, clearly, today. No one over

[11]  there said that. They just said it wasn't a

[12]  temperature, okay. The man is ill. That's

[13]  probably had something to do with it, and he is a

[14]  non-regulated employee and it was a voluntary

[15]  return-to-duty drug test. Why he would go in and

[16]  try to pull some kind of scam on a return-to-duty

[17]  is, you know, I don't they they -- they've got to

[18]  give him a little more credit than that. I don't

[19]  think he's that dumb to try to pull off something

[20]  like that.

[21]       But he is here today to tell you that he's

[22]  not guilty of any of these Charges and that

[23]  regardless of the record here today, what he's

[24]  saying here today, he is wanting -- he wants to go

[25]

**Page 166**

[ 1]  back and re-take the test so he can return to duty

[ 2]  so he can come back to work, provided he's

[ 3]  physically okay.

[ 4]       And as we presented here today, some of the

[ 5]  documents, that -- that he was ill on that day.

[ 6]  He went directly to the hospital and he told

[ 7]  Ms. Beaty and Ms. Hudley that -- that he was gonna

[ 8]  do that, and even Ms. Beaty even -- I believe -- I

[ 9]  believe they -- he had the phone number on his

[10]  cell phone -- call him to see if he was okay, to

[11]  let him know that.... I'm not for sure, but I

[12]  think there was some confusion about him being

[13]  able to re-take the test and he believed that he

[14]  was ill; he was; and he was willing to come back

[15]  and re-take that test even as soon as he could.

[16]       But they refused that and scheduled him as

[17]  violating the Alcohol and Drug Waiver, and under

[18]  the Alcohol and Drug Waiver it gives four speci --

[19]  four specifications on there:

[20]       Able to complete the initial treatment

[21]  plan, okay. He did.

[22]       You must pass a medical examination

[23]  required by the Company policy. He did.

[24]       Must maintain periodic contact with EAP for

[25]

**Page 167**

[ 1]  a two-year period. He has done that; even

[ 2]  Ms. Dalton stated that he had stayed in contact

[ 3]  when he was off sick.

[ 4]       His -- he -- and -- ... in active service

[ 5]  six times or -- six times in the first year for

[ 6]  employees covered by Department of

[ 7]  Transportation.... That's again, too, gets into

[ 8]  the regulated employees.

[ 9]       And it does not say anything in here that,

[10]  you know, about adulter -- or about the specific

[11]  range or the urine sample has to be a specific

[12]  (inaudible) temperature. It doesn't say that in

[13]  here. He has not violated this Drug and Alcohol

[14]  Waiver.

[15]       Now the Company can come in here and say

[16]  because he didn't go back the second time, you

[17]  know, he did. That's a technicality on her part.

[18]  But Mr. Stevens showed up to do the test. He was

[19]  willing to come back and do the test. Okay.

[20]       He's clean. He's clean here today. He's

[21]  willing to go back and take that test again,

[22]  providing his doctor releases him and he can

[23]  return and that's what we're asking the Company to

[24]  do, is to allow him to go back and re-test; take

[25]

**Page 168**

[ 1]  the physical; take the drug test, whatever

[ 2]  alcohol/drug test; and return him to work. And

[ 3]  we'd also, for the time that he's been hanging out

[ 4]  here, not being able to return to work, ask for

[ 5]  the Carrier to compensate him for the time he's

[ 6]  been held out of service due to this not being

[ 7]  able to go back and re-test.

[ 8]       MR. D'ALESSANDRO: Okay.

[ 9]       MR. McMILLAN: But just -- just for the

[10]  record here, Mr -- it says non-regulated employees

[11]  on page 41-42 of the Drug and Alcohol Guidelines.

[12]  Mr. Stevens did not refuse to submit to a test.

[13]  He did not interfere with any test in any way.

[14]  That was not proven here today. So therefore, the

[15]  Charges against Mr. Stevens should be dropped

[16]  (inaudible). Thanks.

[17]       MR. D'ALESSANDRO: Mr. Stevens, do you have

[18]  anything?

[19]       MR. STEVENS: Yeah. First of all I want to

[20]  start out saying that I'm not guilty.

[21]       Secondly, you know, I've sat here and I've

[22]  heard all of these -- these rules and all of this

[23]  confusion that I have problems keeping up with my

[24]  own rules. But what I don't have a problem with

[25]

[ 1]    is keeping up with my health.

[ 2]        I'm here today on -- on accusations of me

[ 3]    tampering, accusations of me not submitting a

[ 4]    second urine sample.  In the last four months, I

[ 5]    have fought with my health so hard till I have now

[ 6]    a non-detectable (unintelligible).  That's because

[ 7]    I know that I've been doing the right thing.  I

[ 8]    have a two-eight -- I have a 283 (unintelligible).

[ 9]    I have a CD (unintelligible) count of 253.  If I

[10]    got those by using drugs, then I need to spread

[11]    the word to everybody who is positive to have

[12]    these numbers and do that same thing.  But that's

[13]    not why(?) I'm here.

[14]        What I will say is I'm not gonna jeopardize

[15]    my health like I have been throughout the years.

[16]    I'm not gonna do that anymore, and if that means

[17]    that being accused of something that I know I

[18]    haven't done, if I have to prove it to the end, to

[19]    the death of my bed 'cause I will not have

[20]    pneumonia again.  That's how -- I will not have it

[21]    again.

[22]        Some of these Charges I don't understand.

[23]    I don't know what the hell PEER(sic)-19 or

[24]    whatever it is, I don't know what that is.  I

[25]

[ 1]    don't.  What I do know is what I told the young

[ 2]    ladies at the facility.  I waited as long as I

[ 3]    could.  I did -- I didn't jump up and just leave

[ 4]    after giving the first sample.

[ 5]        I'm just -- I'm at the point now where I

[ 6]    just want to be treated fairly like everybody

[ 7]    else, and if that means defending myself for doing

[ 8]    something that I know is right and that's gonna

[ 9]    help keep me alive -- and that was to go directly

[10]    to the hospital after being told that there's a

[11]    temperature change in my body -- that's what I

[12]    did.  So, I'm not guilty.  And pray that I don't

[13]    have to go through this -- this type of stuff

[14]    again, period.  And all I want to do is come back

[15]    to work and work like and make a living like

[16]    everybody else.  That's all I have.

[17]        MR. D'ALESSANDRO:  Okay.  The testimony

[18]    presented here today will be transcribed and

[19]    carefully considered after I will render a

[20]    decision within the time limits provided in the

[21]    JCC Agreement, which is 15 days, and the time now

[22]    is 3:42.  Okay, Gentlemen, thank you.

[23]

[24]

[25]

table 75/15
tailspin 115/8
tainted 161/21
talk 38/5, 112/6, 152/8, 152/11, 154/11
talked 108/20
talking 14/19, 14/20, 57/2, 57/3, 83/4, 93/24, 94/8, 95/20, 99/23, 105/15, 150/15
Talley 8/22, 9/14, 12/1, 20/16, 95/21, 106/1
tamper 165/9
tampered 127/18, 128/3, 163/13
tampering 56/21, 169/3
tape 9/6, 18/22, 20/2, 20/5, 20/6, 65/22, 65/24, 66/1, 66/23, 122/3, 131/9, 131/10, 161/13
taped 4/11, 96/18, 97/1
team 25/3
Tech 161/24
technicality 167/17
technician 49/17, 49/18, 60/1, 61/1, 61/10, 61/15, 61/16, 65/13
technician's 50/1, 50/7
TELEPHONE 3/7, 3/10, 8/13, 21/18, 64/22
temp 54/17
temperature 6/4, 6/19, 25/16, 26/13, 26/14, 51/20, 52/4, 52/7, 54/8, 54/13, 54/14, 54/23, 57/12, 57/17, 57/20, 58/3, 67/4, 67/8, 69/1, 69/4, 69/8, 71/17, 71/20, 73/9, 73/11, 73/14, 73/15, 73/17, 74/6, 75/2, 75/5, 75/8, 75/16, 75/20, 76/1, 77/9, 77/13, 88/8, 89/24, 94/15, 94/16, 97/18, 114/20, 115/2, 116/19, 117/15, 118/11, 124/24, 125/1, 125/16, 134/21, 137/21, 144/23, 152/17, 155/3, 165/12, 167/12, 170/11
temperatures 93/4
terminated 45/8, 165/6
terminated...will 58/23
termination 41/21, 44/18, 45/7, 58/22, 162/6
terms 16/23
Test 2/10, 2/13, 6/9, 11/1, 12/12, 12/21, 13/6, 13/10, 25/10, 34/10, 35/10, 35/15, 37/11, 40/11, 41/5, 41/9, 41/10, 41/18, 41/23, 44/12, 45/4, 49/1, 49/9, 50/3, 50/22, 51/2, 62/8, 63/3, 63/4, 63/10, 63/11, 64/3, 81/3, 81/23, 85/19, 85/20, 86/3, 86/11, 86/17, 92/12, 92/15, 103/6, 106/3, 106/7, 106/8, 106/15, 106/19, 107/7, 110/4, 110/7, 110/13, 113/22, 114/3, 117/6, 122/23, 123/18, 130/11, 138/11, 141/10, 144/13, 144/18, 146/8, 147/1, 147/8, 148/23, 151/20, 151/22, 153/11, 155/14, 155/15, 157/3, 157/7, 157/14, 160/9, 160/12, 162/1, 162/5, 163/2, 163/13, 164/17, 165/15, 166/1, 166/13, 166/15, 167/18, 167/19, 167/21, 168/1, 168/2, 168/12, 168/13
tested 31/18, 49/4, 49/8, 49/14, 64/13, 148/9, 148/11, 150/5, 156/3
testified 60/5, 92/23
testify 17/12
testimony 161/14, 170/17
Testing 2/11, 6/9, 6/11, 6/15, 31/19, 34/15, 38/12, 41/1, 41/11, 41/13, 43/24, 44/1, 44/12, 44/13, 49/5, 49/16, 49/18, 50/1, 50/5, 50/6, 50/7, 60/1, 61/1, 61/9, 61/14, 61/16, 106/3, 106/9, 106/11, 109/23, 110/21, 113/21, 113/23, 114/1, 122/14, 130/14, 134/16, 143/18, 145/2, 157/1, 157/4, 157/5, 157/18, 162/20, 164/10, 164/15, 164/21, 165/5
Testing' 6/2
tests 34/20, 35/2
Thank 18/21, 23/2, 25/5, 28/4, 32/11, 37/24, 45/11, 48/19, 51/12, 52/17, 63/14, 63/18, 64/15, 69/15, 69/23, 86/5, 94/9, 94/18, 94/21, 95/6, 97/3, 98/10, 106/21, 106/23, 108/13, 111/22, 112/9, 112/11, 112/14, 112/17, 160/14
thanks 32/18, 65/14, 65/15, 168/16
Theodore-Dalton 22/21
they've 30/13, 30/15, 163/9, 165/17
third 29/9, 31/6, 74/3
three 89/1, 128/24, 157/21
three-hour 88/1, 89/3, 89/12
throw 131/22, 132/4
thrown 78/16
Thursday 10/5
Tierney 7/10, 15/10, 18/2, 18/4, 45/14, 49/1, 67/20, 104/11, 153/19, 154/8
till 55/23, 150/20, 150/22, 153/20, 169/5
time 4/6, 4/19, 5/12, 8/2, 8/4, 9/7, 10/2, 13/1, 13/3, 16/4, 18/10, 18/21, 20/7, 21/4, 21/7, 21/9, 32/12, 33/13, 33/18, 33/19, 35/16, 37/6, 37/20, 37/22, 38/10, 52/18, 59/6, 63/20, 67/9, 69/23, 71/17, 72/19, 75/16, 85/15, 87/23, 92/6, 98/11, 107/3, 116/2, 116/17, 121/23, 124/4, 124/20, 125/13, 126/5, 126/8, 127/23, 127/24, 128/18, 134/16, 138/17, 150/23, 154/7, 158/22, 158/24, 167/16, 168/3, 168/5
timeframe 12/20
times 34/23, 89/1, 89/3, 117/20, 131/20, 150/24, 167/5

tolerance 25/4
top 28/24, 59/8, 122/20, 130/2
tot 50/1
touch 35/21, 35/22
tra 152/10
trained 154/16
training 54/3
trains 165/2
transcribed 4/11, 4/15
TRANSCRIPTION 1/20, 19/20
Transferring 65/9
Transportation 9/10, 71/6, 71/9, 167/7
treated 83/19, 170/6
treatment 34/1, 166/20
trouble 112/10, 129/2
Trust 2/8, 23/9, 24/18, 24/21, 25/1, 25/2, 25/8, 25/14, 25/19, 26/9, 113/11, 158/11, 158/15
Tuesday 1/10, 8/3
turn 24/22, 72/9, 113/4, 116/5
two 151/1, 19/11, 23/5, 60/17, 63/1, 69/13, 77/23, 112/7, 120/7, 130/19, 156/24, 157/21, 165/6
two-eight 169/8
two-page 2/15, 24/4, 42/22, 42/24
two-year 33/9, 167/1
type 106/7, 106/8, 106/14, 170/13
typed 84/10, 85/1, 85/3, 96/2, 101/15

## U

unacceptable 67/16, 102/3
unannounced 34/20
uncomfortable 132/12, 139/12
uncovered 146/17
undersigned 52/1
understandable 13/24, 36/8, 48/9
UNIDENTIFIED 22/10, 93/4, 93/20, 119/18, 120/9, 121/10, 126/17, 131/1, 131/5, 134/19, 139/20, 151/15, 161/8
Unintelligible 4/7, 8/21, 14/17, 14/21, 22/13, 23/12, 24/15, 25/7, 26/1, 26/19, 27/4, 28/7, 28/11, 28/14, 28/18, 28/21, 29/2, 29/11, 30/18, 34/12, 38/12, 38/19, 38/24, 43/13, 43/19, 48/12, 53/10, 53/21, 54/18, 58/16, 60/17, 70/4, 72/10, 81/11, 84/14, 85/1, 86/12, 88/22, 93/16, 93/18, 104/14, 108/11, 109/7, 120/23, 120/15, 120/21, 120/23, 130/19, 131/3, 131/7, 132/8, 135/3, 140/22, 144/2, 144/9, 148/14, 150/12, 151/6, 151/9, 151/14, 152/10, 153/3, 162/4, 164/5, 169/6, 169/8, 169/9
Union 7/10, 9/11, 50/15, 70/11
University 140/19
urine 6/2, 6/16, 25/15, 26/12, 26/14, 34/22, 49/23, 52/10, 67/3, 73/9, 73/10, 75/21, 90/4, 91/24, 115/3, 116/17, 116/19, 117/3, 117/15, 118/11, 123/17, 124/14, 124/21, 125/17, 127/13, 127/17, 128/3, 138/5, 152/2, 152/14, 155/4, 155/5, 158/4, 161/21, 162/5, 162/11, 164/20, 167/11, 169/4

## V

verbal 12/5, 16/14
verbally 91/8
verify 39/21, 134/17
vials 77/22, 77/23, 155/5
violate 148/3
violated 6/19, 13/8, 31/13, 44/10, 63/10, 113/18, 148/1, 161/20, 162/3, 164/6, 164/8, 167/13
violates 50/9, 50/11, 137/15, 164/22
violating 36/12, 41/18, 44/2, 158/11, 162/19, 166/17
Violation 5/20, 6/5, 23/6, 36/6, 113/8, 113/19, 137/21, 145/9, 145/12, 146/3, 157/24, 158/6, 158/15, 162/5
viral 118/16, 132/21, 133/16
Virginia 11/10
voice 4/13
volition 159/8
volume 88/7, 89/23
voluntary 10/21, 141/13, 165/14

## W

wait 91/14, 115/15, 120/13, 149/4, 153/19
waited 72/19, 114/24, 116/10, 117/6, 118/4, 155/20, 156/4, 156/5, 170/2
waiting 72/13, 116/11, 140/12, 156/1
Waiver 6/20, 12/19, 13/8, 31/9, 32/8, 32/21, 33/2, 33/4, 34/18, 36/13, 36/17, 36/23, 44/14, 49/6, 49/10, 51/4, 135/12, 135/21, 145/14, 145/20, 146/4, 147/3, 148/1, 149/7, 149/8, 150/18, 158/6, 162/2, 162/21, 166/17, 166/18, 167/14
walk 155/1, 155/21

walking 97/11
Washington 1/16, 4/4, 4/8, 5/8, 5/15, 7/7, 7/21, 8/6, 8/16, 9/19, 19/16, 20/23, 21/11, 21/21, 118/7, 130/22, 140/5, 140/7, 140/8, 140/16, 140/18
water 87/19, 87/21, 88/11, 88/13, 88/14, 88/16, 88/20, 89/3, 89/7, 89/10, 89/12, 90/16, 90/23, 91/11, 115/18, 139/2, 156/4
Weakness 129/8
weight 75/8, 75/23, 93/5
welcome 51/13
welcomed 112/16
well-being 152/4
wheezing 129/2
willing 17/19, 18/6, 166/14, 167/19, 167/21
Wilmington 54/3
withheld 59/6
WITNESS 3/2, 4/24, 7/12, 7/13, 7/14, 18/2, 22/17, 39/24, 45/20, 66/4, 93/17, 113/4, 156/9, 156/13
witnesses 6/22, 10/8, 10/10, 12/8, 13/12, 13/14, 17/12, 17/24, 18/17, 21/4, 22/6, 38/9, 113/1, 156/17
Wojahn 10/15, 11/21, 20/12
woman 153/20
word 4/14, 69/10, 169/11
words 57/2, 86/12, 109/3
work 10/21, 11/2, 25/3, 33/22, 33/23, 59/5, 67/1, 124/8, 131/17, 149/18, 163/18, 163/19, 166/2, 168/2, 168/4, 170/15
works 38/20
write 101/19, 135/5
written 8/14, 21/19, 45/13
wrong 59/15, 134/8

## X

X 2/1, 3/1

## Y

year 34/23, 163/17, 167/5
years 23/1, 169/15
young 32/15, 37/17, 74/21, 95/2, 98/18, 112/1, 170/1

## Z

Zara 134/7
Zaraban 134/7
Zarabex 134/7
zero 60/15

1:05-cv-01924-RCL    Filed 11/30/2005    Page 49 of 53

amount 429/4
AMTRAK 1/3, 1/14, 3/13, 7/6, 7/14, 8/14, 15/6, 19/3, 19/14, 21/19, 22/24, 24/7, 24/23, 25/3, 31/8, 39/14, 40/5, 45/9, 51/8, 58/24, 67/20, 68/1, 73/7, 78/19, 82/20, 83/15, 86/18, 87/9, 87/11, 95/22, 99/9, 108/20, 128/17, 135/14, 153/17, 153/18, 158/12, 158/24, 163/21
Amtrak's 2/9, 5/20, 5/21, 6/5, 13/9, 23/6, 23/7, 24/5, 41/19, 44/2, 99/14, 107/10, 108/4, 108/12, 113/8, 113/9, 113/19, 161/20, 162/19, 164/4, 164/8, 164/23
analysis 31/20
Andrea 2/14
Ann 45/14, 48/2, 48/24
answer 4/21, 12/13, 12/16, 29/19, 61/1, 69/5, 89/20, 93/9, 108/1, 109/21, 147/15
answered 81/1, 89/1, 93/15
answering 108/13
apologize 97/5
applicable 44/3, 50/19, 51/5, 52/6
appoint 73/5
appointment 67/13, 72/5, 73/1, 73/6, 75/18, 98/1, 102/8
appreciate 100/18
approached 125/19
appropriate 51/9
April 124/6, 131/17
area 24/3
areas 24/19
arrange 14/6
arranged 14/3
arrived 118/15
Art 139/16
Arthur 4/3
Assistance 20/15, 22/24, 45/10
Assistant 9/18
asterisked 24/3, 24/19
ATS 51/5
Attached 49/9
Attachments 51/10
attempt 10/21
attempted 52/5
attempting 4/21
attending 54/2
attention 51/5, 152/4, 152/13, 153/24, 158/2
attest 38/21
attesting 38/22
attorney 10/14, 10/18, 11/21, 20/12
audible 65/19, 131/7
availability 18/16
available 10/11, 13/13, 13/15, 13/16, 17/24, 18/6, 18/10
Avenue 1/21, 15/23, 19/21

B

B.L. 2/10, 7/8
B.L.'s 28/16
bad 152/7
badgering 93/17
Barbara 11/23
Bargaining 7/1, 16/24, 44/16, 50/19
based 31/20
Bate-y 95/12
bear 27/20
Beat-y 95/15, 95/18
Beatley 115/10
BEATY 3/10, 7/11, 67/11, 72/10, 72/16, 84/15, 95/17, 95/19, 115/12, 115/14, 127/1
bed 169/19
Bell 51/6
Bernard 47/24, 48/24
birth 121/2, 130/4, 130/5
birthday 121/3
bit 122/18
blank 18/23, 20/6, 100/11, 100/13, 100/15, 100/18
blood 75/8, 75/24, 129/4
body 26/14, 67/4, 77/13, 115/7, 117/21, 118/13, 126/10, 152/17, 170/11
book 24/12
Bottle 65/5, 65/7, 79/16, 138/23
bottles 134/5
bottom 44/7, 131/3, 164/14
box 88/6, 89/22
break 121/23, 161/6, 161/9
breath 34/22
breathalyzer 144/20
breathing 129/2, 129/3
bring 32/19, 39/5, 134/4, 151/16
brings 117/24
bronchitis 91/17, 118/16, 132/7, 132/22, 133/15, 133/16
Brotherhood 9/9

Drought 13/24, 14/5, 162/3
Building 1/15, 4/7, 5/14, 7/6, 8/5, 8/15, 19/16, 21/10, 21/20
Bye 112/16

C

call 13/18, 15/1, 15/14, 15/16, 16/2, 34/10, 53/7, 86/18, 104/9, 109/15, 110/18, 111/6, 116/18, 116/20, 125/20, 127/5, 141/11, 141/18, 153/17, 154/11, 166/10
calls 153/20
came 24/11, 33/1, 77/21, 103/4, 108/6, 115/22, 116/7, 148/10, 151/21, 163/24
Campbell 2/7, 2/10, 7/8, 9/17, 45/13, 47/24, 48/24
care 11/14, 102/15, 133/21, 153/9
Carmen 9/10
carried 9/13
Carrier 21/4, 161/19, 162/13, 162/22, 163/12, 168/5
carry 97/4
case 12/22, 18/13, 38/2, 59/9, 153/23, 154/19
cc'd 7/9, 11/6
CD 169/6
CDL 59/19
Cell 40/17, 104/11, 127/5, 147/22, 154/10, 166/10
Center 7/11, 7/13, 67/12, 79/9, 130/22, 140/5
Center's 70/14
Centers 67/1
certified 31/21
certify 31/21
CFR 44/4
Chain 2/14, 55/2, 55/6, 56/5, 56/11, 56/17, 56/18, 57/14, 61/17, 63/12, 64/3, 64/5, 68/13, 68/15, 99/6, 99/8, 99/9, 99/14, 99/19
Chairman 9/12, 11/6, 11/20, 17/8, 20/11
chance 42/5, 136/22
change 75/21, 116/19, 118/11, 125/17, 170/11
charge 5/19, 5/20, 6/5, 23/10, 25/11, 25/12, 26/2, 113/8, 113/19
charged 35/5, 35/7, 36/6, 36/12, 41/18, 44/2, 113/7, 145/8, 163/11
Charges 10/8, 10/11, 23/5, 25/8, 26/5, 27/1, 27/2, 27/7, 27/8, 27/13, 33/20, 36/5, 36/11, 37/7, 51/4, 130/10, 134/12, 134/13, 145/11, 156/24, 162/18, 162/23, 165/22, 168/15, 169/22
Charging 4/22, 5/2, 7/9, 9/14, 9/18, 12/1, 20/16, 23/5, 95/22
Chart 2/13, 41/14, 58/13, 97/14
check 73/9, 88/5, 89/21, 115/22
checked 54/15, 57/15, 57/24, 89/23, 130/15
checking 144/23
choosing 16/23
chose 162/12
circled 129/11
circumstances 52/15
Claimant 1/8, 19/8
claiming 110/9
class 54/3
clean 167/20
Cleaner 9/22, 20/9, 59/16
cleaning 165/2
clear 4/12, 57/21, 60/22, 60/24, 85/16
clearly 60/13, 165/10
clicking 4/7
CLOSING 3/14, 5/3, 160/18, 160/24, 161/16, 162/18
Coach 9/22, 59/16
coaches 165/2
Cobb 141/21
cocaine 31/23
CODPA 132/23
cold 159/8, 167/18, 50/8, 54/6, 60/2, 74/5, 74/13, 74/16, 117/10, 124/15, 124/18, 127/13, 127/17, 137/1, 137/13, 137/8, 137/10, 137/14, 151/21, 152/15, 155/3
colder 74/11
collect 52/10, 99/11, 99/24
collected 56/13, 58/7, 97/16
Collection 51/16, 51/23, 56/13, 57/24, 58/10, 67/3, 67/7, 68/5, 68/9, 68/12, 70/21, 71/1, 73/11, 74/2, 77/5, 85/13, 85/17, 88/6, 99/22, 154/20
collective 44/16, 50/19
collector 52/9, 52/13, 52/14, 54/12, 56/15, 56/20, 57/9, 58/2, 68/9, 68/19
Collingwood 11/9
colored 129/5
commencing 1/17, 19/17
comment 88/22, 90/7, 124/10
comments 40/17
communique 46/16
communicate 126/21
Communications 9/10

company 6/1, 6/14, 17/24, 24/21, 26/11, 31/19, 34/15, 49/4, 49/8, 49/13, 53/7, 67/18, 137/19, 141/11, 141/19, 166/23, 167/15, 167/23
COMPANY'S 2/3
comparing 165/6
compensate 168/5
complain 93/7, 93/10, 93/16, 93/19
complaints 93/6, 93/11
complete 69/19, 86/3, 106/11, 160/11, 166/20
completed 4/20, 37/2, 49/22, 54/12, 57/8, 63/13, 68/9, 68/19, 80/4, 99/24, 160/15
completing 33/24, 162/3, 162/11
comply 50/18
comprehend 25/7
CONCENTRA 3/7, 3/10, 7/11, 7/12, 12/11, 15/5, 34/3, 34/7, 40/12, 51/15, 64/23, 67/1, 67/10, 70/14, 71/8, 78/21, 79/9, 87/5, 96/15, 118/6, 123/11, 123/23, 129/20, 137/24, 138/2, 141/8, 144/10, 161/22, 162/7
concern 89/6, 117/18, 126/5
concerned 117/19, 124/14, 125/13, 125/14, 140/14
concerns 152/19
conclusion 4/24
condition 10/20, 125/11
Conditional 49/6
Conduct 23/13, 24/22
conducted 4/3, 4/17, 8/9, 16/18, 21/14
Confidential 47/14, 50/23
confronted 161/22
confusing 150/14
confusion 166/12, 168/23
connection 5/18, 16/18
consequences 6/11, 41/12, 50/6, 85/23, 114/1, 151/20, 154/1, 157/5, 162/11
constitute 106/8
constitutes 50/3
contact 11/4, 33/9, 35/19, 38/18, 50/21, 73/6, 87/8, 87/9, 87/11, 110/19, 111/1, 128/17, 128/22, 135/24, 136/4, 166/24, 167/2
contacting 33/6
contacts 127/6
Continuation 19/13
Continue 43/17, 45/12, 46/9, 47/10, 48/21, 101/7, 163/19, 163/20
contrary 147/6, 148/4
Control 52/16, 54/10, 56/12, 56/23
convenient 161/23
conveniently 161/24
conversation 105/9, 108/24, 155/14, 161/13
cooler 89/10
cooperate 6/9, 41/11, 44/1, 44/12, 113/23, 157/3, 157/18
COPD 133/11
copies 61/18, 77/2, 99/5, 134/3, 134/22, 134/23, 134/24
copy 27/11, 28/8, 28/9, 49/10, 51/3, 51/10, 54/19, 54/20, 55/2, 55/11, 56/5, 56/14, 56/15, 56/16, 57/21, 60/22, 61/20, 99/20, 107/10, 113/15, 119/12, 119/14, 135/1, 136/20, 142/23
copy's 60/23
Corapi 1/20, 19/20
Corner 131/3
CORPORATION 1/1, 7/2, 17/1, 19/1, 47/15
correct 18/11, 25/23, 32/9, 33/6, 33/11, 34/16, 34/17, 36/18, 40/13, 40/14, 41/2, 47/20, 57/7, 58/19, 59/1, 60/3, 60/7, 60/11, 60/19, 61/8, 62/7, 62/9, 62/15, 63/11, 65/18, 68/1, 85/6, 85/20, 87/1, 87/12, 92/19, 101/23, 103/18, 111/4, 134/18, 134/19, 135/15, 136/3, 141/15, 149/7, 149/14, 158/18
correctly 148/6
correspondence 8/14, 9/2, 21/19
Coughing 129/4
Counselor 7/14, 32/3, 51/10
count 169/9
counter 77/18, 124/22
couple 15/3, 121/14, 131/20, 161/4, 161/10, 161/12
Courier 79/20, 79/21, 79/22, 80/5, 80/16
course 116/11
cover 27/24, 28/16
covered 146/16, 167/6
craft 50/17
credibility 36/9
credit 24/23, 165/18
cross 14/12
cross-examine 10/13, 14/8, 14/11, 46/7
cup 73/11, 74/12, 87/21, 89/11
cups 87/19
curious 75/20
Custody 2/14, 52/10, 54/10, 55/3, 55/6, 56/5, 56/11, 56/18, 56/19, 56/23, 57/14, 61/17, 63/12, 64/3, 64/6, 68/14, 68/15, 99/7, 99/8, 99/9, 99/14, 99/19

## D

D'Alessandro 4/4, 8/20
Dalton 13/18, 22/21
DALTON-THEODORE 3/3, 7/13, 15/11, 20/14, 22/23, 32/5
date 1/16, 4/5, 4/11, 5/12, 8/1, 8/3, 10/12, 18/24, 19/17, 21/6, 21/8, 42/3, 66/14, 97/8, 114/4, 121/1, 121/3, 121/6, 123/5, 130/4, 130/5, 130/8, 133/24, 134/2, 158/21
Dated 2/4, 2/5, 2/6, 2/8, 2/15, 5/6, 7/19, 9/7, 9/12, 9/15, 33/22, 47/18, 52/12, 71/2, 77/15, 121/1, 121/11
dates 137/24, 149/5
Dave 160/23
DAVID 1/7, 1/13, 2/11, 2/15, 2/18, 3/12, 9/20, 9/22, 11/18, 19/7, 19/11, 20/9, 31/18, 35/22, 37/15, 49/2, 49/3, 49/8, 51/24, 62/18, 66/23, 77/10, 77/17, 110/3, 119/14, 136/20, 154/7
DAY 1/11, 8/1, 8/3, 19/11, 21/6, 21/8, 32/20, 44/24, 112/1, 117/7, 123/19, 123/23, 129/14, 129/18, 129/20, 132/19, 166/5
days 10/9, 129/1
DC 1/16, 4/9, 5/8, 5/15, 5/15, 7/7, 7/21, 8/6, 8/16, 9/19, 19/16, 20/23, 21/11, 21/21
deal 68/3, 82/16
dealing 125/8
deals 25/14
death 169/19
December 6/1, 6/14, 26/11, 35/8, 37/7, 47/18, 49/12, 66/14, 66/23, 97/8, 105/11, 113/6, 114/9, 122/21, 138/1, 149/2
defending 170/7
defense 10/1
degree 54/24
degrees 26/15, 52/7, 54/14, 57/13, 60/6, 69/4
Delaware 54/3
Delivery 65/3
DEMETRIA 3/7, 7/12, 66/9, 74/22, 90/15, 116/15, 153/17
denied 29/21
department 38/12, 40/13, 47/16, 50/12, 53/11, 71/6, 71/9, 129/23, 167/6
DESCRIPTION 2/2
desire 6/23
desk 83/20
destroy 80/1
determination 44/14
determine 5/17
detrimental 163/21
develop 5/17
diagnosed 140/22
diagnosis 132/16, 132/17, 133/10
difference 15/22
direct 8/13, 21/18, 49/20, 52/10, 58/7, 58/8
discarded 78/15, 80/3, 80/10
Discharge 2/19
disciplinary 41/20, 44/15, 44/17, 50/14, 50/17, 51/9
discipline 50/20, 51/1
disciplined 162/14
discuss 27/7, 38/1, 38/3, 91/1
discussion 30/19, 30/23
disease 133/22
dishonest 25/4
dismissal 50/12
dismissed 37/22
disqualified 32/1, 86/19, 86/20, 86/23, 87/1, 164/17, 164/21
distributed 46/17
Division 4/5, 9/10, 51/11
Dock 48/14, 48/17, 48/18
doctor 67/12, 97/13, 97/20, 102/18, 102/20, 116/18, 116/20, 122/9, 122/20, 125/20, 128/12, 128/22, 132/5, 132/24, 133/4, 133/10, 133/21, 133/22, 139/7, 167/22
doctor's 72/5, 73/1, 73/4, 73/5, 75/17, 97/24, 102/7, 102/15
doctors 133/1, 133/3
document 22/11, 24/4, 27/24, 28/7, 31/11, 36/17, 42/23, 42/24, 54/5, 54/19, 54/21, 54/22, 56/7, 56/10, 56/14, 61/7, 62/11, 71/12, 71/14, 76/6, 79/10, 80/12, 81/21, 83/18, 84/23, 118/1, 121/1, 122/5, 122/8, 122/13, 122/19, 122/20, 135/9, 139/14, 141/23, 142/6, 143/9, 143/10, 155/12
documentation 147/5
documented 52/16, 76/22
documents 10/7, 11/15, 84/7, 118/18, 118/22, 119/1, 166/5
doesn't 15/21, 53/11, 54/23, 59/19, 87/3, 109/9, 113/1, 143/11, 143/23, 167/12
Donor's 99/20
door 80/19, 80/22, 155/2, 155/24
DOT 58/9, 67/6, 67/17, 70/19, 76/24, 98/9, 98/22, 102/3, 107/8, 107/17, 108/6
DOT's 100/23
doubt 161/20
dozen 15/21
Dr. Taleb 133/20, 133/21
Dr. Touzon 133/21, 133/22, 133/23
drink 87/15, 87/24, 88/17, 89/11, 91/5, 139/3
driving 165/2
dropped 168/15
drowsiness 129/8
Drug 2/10, 2/13, 5/20, 6/5, 6/20, 10/24, 12/11, 23/6, 24/7, 31/9, 32/21, 34/20, 39/13, 40/4, 40/20, 44/11, 49/1, 49/10, 51/4, 53/5, 58/10, 67/2, 67/3, 68/5, 107/10, 107/23, 110/20, 113/18, 113/19, 135/11, 142/7, 144/12, 145/2, 146/4, 148/10, 149/8, 158/6, 162/21, 163/2, 164/13, 164/16, 165/15, 166/17, 166/18, 167/13, 168/1, 168/11
Drugs 2/9, 23/9, 24/6, 31/18, 41/13, 49/15, 113/0, 114/2, 114/4, 156/6, 169/10
Drugs' 5/23
drugs...' 6/12
dumb 165/19
during 17/10, 31/18, 33/17, 33/18, 33/19, 35/16, 35/23, 44/12, 49/4, 49/8, 75/16, 99/21, 116/11, 155/6
Duty 2/11, 6/2, 6/7, 6/15, 26/11, 31/19, 40/16, 41/1, 49/5, 49/7, 49/9, 49/13, 82/19, 107/11, 112/21, 123/12, 142/3, 149/1, 151/1, 157/1, 159/10, 162/4, 162/20, 162/24, 164/12, 166/1

## E

e.g 44/4, 95/15
EAP 7/13, 32/3, 34/13, 34/15, 51/10, 58/24, 166/24
ear 129/9
EBONIE 3/10, 7/11, 67/11, 67/13, 67/18, 72/16, 115/12, 116/1, 116/15, 125/19, 127/3, 153/1, 153/16, 154/7
effect 8/11, 21/16
eight 112/23, 115/2
elaborate 97/7
eligible 44/6, 45/9, 58/24
Emergency 2/18, 129/23, 133/1, 133/2, 133/9
emphysema 132/8
Employee 4/22, 6/8, 6/10, 20/15, 22/24, 31/24, 41/10, 41/12, 41/16, 43/21, 43/23, 44/5, 44/10, 44/13, 44/15, 44/22, 45/7, 45/8, 45/9, 47/4, 49/19, 50/4, 50/8, 50/10, 50/14, 50/15, 50/16, 58/21, 59/5, 59/11, 59/13, 67/10, 68/10, 83/23, 84/4, 96/14, 113/22, 113/24, 141/3, 143/14, 146/17, 157/2, 157/4, 163/3, 163/4, 164/11, 164/16, 164/19, 165/1, 165/14
Employee's 7/15, 49/10, 50/2, 50/22
employees 15/7, 15/9, 24/7, 25/4, 31/13, 46/5, 77/3, 80/18, 82/18, 82/20, 83/16, 99/4, 107/12, 163/5, 164/9, 164/13, 165/8, 167/6, 167/8, 168/10
employment 164/17, 164/21
End 18/22, 65/22, 162/14, 169/18
ending 43/20
ends 131/9
enlighten 129/24
ensure 4/14, 56/21
Enter 54/15, 57/15, 69/6, 69/11
entered 69/6, 135/17
equipped 154/13
esophagus 152/10
establish 130/13
evening 108/19, 109/16
event 31/19, 49/5, 49/9
evidence 17/16, 23/4, 23/24, 36/23, 50/23, 135/18, 139/15, 162/7, 162/8
exacerbation 133/13
Examination 3/4, 3/5, 3/6, 3/8, 3/9, 3/11, 3/12, 3/13, 6/2, 6/15, 49/14, 49/22, 166/22
examined 14/4
Excellence 2/9, 5/22, 23/8, 24/12, 41/19, 44/3, 50/9, 50/11, 113/9, 137/14, 137/15, 158/13, 161/21, 162/20
excepted 50/16
excuse 15/1, 40/19, 42/2, 50/16, 52/6, 54/11, 58/8, 147/23
execute 33/2
exhi 27/16
Exhibit 2/4, 2/5, 2/6, 2/7, 2/8, 2/10, 2/11, 2/13, 2/14, 2/18, 7/16, 71/17, 8/23, 8/24, 11/13, 22/3, 22/8, 23/16, 24/2, 27/16, 27/17, 28/2, 28/3, 36/18, 42/10, 43/1, 43/3, 43/15, 43/16, 43/19, 56/7, 56/8, 119/23, 120/5, 120/6, 122/5, 139/16, 139/19, 139/20, 149/11, 149/12
expand 17/22, 122/6
expected 17/10, 33/5, 50/16
experiencing 125/7
Express 22/2
Expressed 20/20

## F

facial 129/9
facility 6/16, 64/12, 66/16, 92/11, 92/17, 112/6, 116/23, 118/10, 126/11, 130/15, 153/9, 162/12, 170/2
fact 12/23, 86/2, 116/12, 125/9
facts 5/17, 51/7
factual 162/8
fail 63/4
failing 157/18
fails 6/9, 41/10, 113/23, 157/3
failure 8/7, 21/12
fall 59/19
false 163/13
Farenheit 52/8, 54/14, 57/13, 60/6, 67/5, 67/9, 69/5, 71/18
FAST 1/20, 19/20
fatal 116/12
Fax 1/22, 19/22, 22/2, 51/3, 55/9, 55/10, 55/13, 55/14, 100/8, 100/9, 100/10, 100/15, 101/3, 101/7
faxed 55/7, 55/1, 100/5
February 31/16, 31/17, 32/22, 32/23, 148/16, 148/18, 148/22, 148/23, 149/7, 149/13, 149/15, 149/16, 150/16
Federal 20/20, 22/2, 44/3, 67/6, 67/17, 70/19, 77/1, 98/22, 102/3, 164/22
FedEx 5/6
fell 90/1
Fever 128/24
FHWA 44/4
fif 43/5
fifth 41/4
figure 75/21
file 75/11, 7/21, 20/24
fill 53/6, 53/23, 83/21, 84/1
filled 51/15, 68/8
find 21/6, 116/6, 116/18, 118/15, 125/20
fine 16/3, 83/12, 98/21, 104/3, 127/7, 154/23, 155/18
Finish 78/24, 79/1, 79/3, 83/5, 83/9, 94/7, 136/13, 153/5
finished 63/22, 65/17, 95/20, 111/24
Fitness 2/11, 40/15, 41/1, 113/21, 156/24, 162/20
five 10/8, 116/6, 136/10, 157/11
flag 131/22, 132/4, 137/7, 152/3, 152/12
flagged 72/16
flags 115/4, 125/6, 125/9
follow 54/17, 58/3, 62/5, 69/8, 69/18, 78/15, 79/13, 86/10, 107/17, 133/20, 133/23, 139/10, 156/21
follow-up 82/19, 129/16, 133/18, 157/14
followed 108/18
follows 8/2, 56/12, 56/19
foolish 159/21
Foreman 11/23, 95/22
Form 2/14, 31/6, 31/7, 51/14, 51/15, 51/23, 52/16, 54/10, 55/3, 55/6, 56/12, 56/18, 56/23, 57/14, 61/17, 63/2, 63/12, 68/8, 68/10, 68/12, 68/14, 68/15, 68/16, 68/19, 71/1, 71/5, 71/8, 74/24, 77/5, 77/7, 77/11, 77/20, 78/6, 79/7, 81/2, 85/13, 85/17, 91/7, 99/7, 99/9, 99/19, 100/11, 100/14, 100/18, 101/1, 128/4, 128/6, 154/20, 155/7, 155/10
FORMAL 1/3, 1/13, 2/4, 4/2, 5/5, 5/10, 19/3, 19/13
formally 10/19
forms 80/18, 84/2, 154/24, 155/1
fought 169/5
found 45/6, 58/21, 59/4, 162/22
fountain 87/22, 88/20, 89/7
four 34/23, 57/12, 69/1, 87/19, 120/2, 121/7, 122/5, 166/18, 166/19, 169/4
four-page 27/24, 120/22, 120/24
four-pages 121/19
FRA 44/4, 58/9
FRA-mandated 164/16
frightened 139/12
front 45/17, 47/17, 54/7, 58/15, 60/22, 68/20, 76/6, 83/20, 96/4, 100/11, 100/20, 116/14, 122/19
future 18/24

## G

G.W 118/7
game 46/24
games 127/19, 127/24
gender 49/21, 52/9, 90/3
generated 40/11, 40/12, 63/7
gentleman 20/4, 59/10, 59/12, 62/21, 62/24, 64/2,

65/2, 65/6, 65/9
Document 3/15-20
65 87
Page 51 of 53
Case 1:05-cv-01924-RCL
Document 15-20
Filed 11/30/2005
Page 51 of 53

George  140/6, 140/8, 140/15, 140/18
glad  119/7
Glenside  1/22, 19/22
gon  110/4
granted  12/10, 92/17
guess  39/9, 61/6, 72/3, 89/6, 103/16, 110/20, 122/4, 130/1, 132/3, 143/16, 156/21
Guidelines  2/14, 40/21, 67/6, 67/17, 70/19, 71/7, 71/10, 74/9, 77/1, 77/2, 98/23, 99/5, 100/23, 102/4, 103/17, 107/8, 107/10, 107/18, 142/8, 164/14, 168/11
guilt  164/2
guilty  45/6, 58/21, 59/4, 162/13, 162/23, 163/14, 165/22, 168/20, 170/12
guys  23/12
guys'  96/2
GW  118/15

H

half  15/21
hallway  116/1
hand  9/13, 27/23, 36/5, 130/10
handled  7/4, 8/17, 21/22
handwritten  58/2
hang  63/21, 138/14, 138/16, 157/21
hanging  168/3
happy  27/7
hard  169/5
head  85/16
headache  129/9
Health  39/13, 40/4, 47/15, 51/11, 56/16, 102/11, 132/2, 139/13, 140/14, 152/18, 153/21, 163/20, 169/1, 169/5, 169/15
heat  94/2
height  75/8, 75/23, 93/5
held  21/2, 168/6
hell  169/23
Hello  93/22, 95/8, 95/9
help  65/4, 154/13, 170/9
hesitate  11/4
Hi  66/13, 70/10, 74/22, 74/23, 95/10, 95/11, 104/2
hide  117/4
his/her  44/16
HIV  115/5, 126/9, 131/23, 132/7, 163/16
hold  9/2, 54/9, 55/23, 95/5, 96/5, 98/13, 100/24, 163/8
holds  50/17
honestly  24/22
Honesty  2/8, 23/9, 24/18, 24/24, 25/2, 25/8, 25/15, 25/19, 26/9, 113/11, 158/12, 158/15
Honesty'  5/23
Hosp  118/7
hospital  93/23, 94/5, 104/7, 104/18, 104/24, 105/3, 105/4, 118/5, 118/13, 125/18, 126/6, 127/10, 128/19, 130/22, 139/22, 140/1, 140/4, 140/5, 140/7, 140/8, 140/16, 140/19, 152/5, 152/21, 166/6, 170/10
hot  74/5, 74/16, 137/8, 137/10, 152/15, 155/3
hotter  74/11
hour  115/21, 138/18, 140/13, 152/13, 155/21, 155/22, 155/23, 157/11, 157/15
hours  59/19, 133/20, 143/13, 143/17, 157/21, 163/3, 163/4, 164/10, 164/15, 164/19
HR  7/10, 39/13, 49/11
HUDLEY  3/7, 7/12, 52/13, 66/9, 97/16, 126/17, 126/18
Human  40/3, 47/15, 53/4, 62/7, 110/23
hundred  73/19, 73/20, 73/21, 73/24, 125/2, 125/3
hung  157/14

I

idea  146/14, 146/15, 154/16
identification  7/17, 8/24, 11/13, 22/3, 27/17, 28/3, 43/3, 43/16, 56/8, 120/6
identify  11/17, 17/7, 22/18, 39/10, 40/1, 66/7
II  6/5, 6/13, 113/19
ill  37/5, 93/13, 124/3, 131/9, 136/5, 163/15, 165/12, 166/5, 166/14
illness  10/20, 10/23, 35/17, 92/6, 102/11, 126/12
illnesses  116/12, 140/23
immaterial  121/2
immediate  11/16
imposed  12/19
improve  133/19
inaccurate  115/3
inadequate  88/8, 89/22
inaudible  25/22, 26/7, 28/5, 30/10, 32/10, 42/8, 46/14, 47/6, 53/16, 74/16, 80/2, 90/1, 91/4, 92/4, 93/3, 94/5, 98/15, 100/6, 101/8, 107/22, 108/16, 109/20, 110/21, 114/9, 115/13, 117/12, 119/4, 119/10, 120/14, 121/5, 121/21, 124/10, 134/18,
160/7, 167/12, 168/16
inclusion  4/15
inconsistent  24/9
increased  129/4
indicated  5/11, 8/10, 21/15
infection  118/16, 132/21, 132/22, 133/16
infectionous  131/2
infor  84/6
inform  49/3, 72/4, 72/6, 103/9
information  23/4, 29/7, 38/21, 39/20, 44/7, 45/13, 51/21, 52/14, 53/13, 54/7, 67/19, 82/3, 83/21, 83/22, 84/4, 85/2, 96/2, 96/3, 111/8, 148/4, 151/19
informed  67/9, 67/13, 72/7, 97/19
informs  77/8
initial  166/20
initialed  155/6
initials  78/3
initiate  51/9
instructed  5/10, 115/10
Instructions  2/19, 99/11, 99/21
insurance  163/21
integrity  41/17
intentional  25/24
intentionally  25/21, 25/22, 26/22, 41/17, 50/4
interfere  145/1, 168/13
interferes  41/17, 50/5, 165/5
International  9/11
Interoffice  47/16
interrogate  96/21, 96/22
interruption  9/6, 48/22
introduced  50/24
INVESTIGATION  1/3, 1/13, 2/4, 4/3, 4/10, 4/17, 5/1, 5/4, 5/5, 5/10, 5/16, 7/4, 7/22, 8/8, 8/11, 9/20, 9/23, 10/3, 10/5, 10/9, 10/12, 10/16, 16/17, 16/19, 19/3, 19/13, 21/1, 21/5, 21/13, 21/16, 51/1
Investigations  5/13, 7/5
irrelevant  143/12
issue  20/22, 25/19
italic  44/7
italics  44/8

J

Jackie  141/20
Jan  33/22
January  1/10, 4/5, 5/6, 5/12, 7/19, 7/23, 8/3, 9/7, 9/12, 9/16, 9/23, 10/5, 19/10, 20/7, 21/2, 21/8, 22/14, 33/24, 35/4
jeopardize  169/14
jeopardy  153/21
job  96/9
Joe  45/12, 52/23, 63/21, 64/11, 65/15
JOSEPH  3/5, 39/12, 40/3, 55/6, 55/24
judge  74/13
jump  155/21, 170/3
jumping  97/5

K

kicked  94/2
knowledge  24/12, 34/5, 35/2, 81/13, 138/7
known  31/9, 138/10
knows  108/10

L

Lab  65/9
Labor  50/21
laboratory  31/21, 56/14, 56/21
ladies  170/2
lady  32/15, 37/17, 74/21, 81/19, 95/2, 98/18, 112/1
laid  42/20, 96/8
later  4/11, 133/23
leading  45/20
leave  72/4, 72/17, 72/23, 76/15, 98/1, 98/5, 98/8, 104/5, 111/12, 117/2, 139/6, 154/5, 155/24, 162/12, 170/3
leaving  67/14, 103/10, 104/23, 118/14, 122/14, 125/1
Lee-Jones  11/24
left  6/15, 16/12, 22/4, 49/23, 56/15, 67/18, 69/21, 69/22, 73/5, 85/23, 103/20, 118/6, 129/20, 153/9, 153/18, 154/8, 156/6
Letter  2/5, 2/6, 2/7, 7/19, 9/2, 9/7, 9/21, 11/12, 12/7, 12/12, 14/9, 44/14, 56/5, 59/21, 66/18, 66/19, 66/21, 70/14
Level  1/16, 4/8, 5/15, 7/7, 8/5, 8/16, 19/16, 21/10, 21/23
life  115/6, 163/9, 163/22
Linda  1/21, 19/21
line  28/24, 58/1

liquids  87/15
Lisa  84/16, 84/17, 84/21, 101/17
list  99/20
listed  10/8
little  65/23, 122/18, 161/6, 165/18
live  163/22
living  170/15
Local  11/6, 11/19, 20/10
locate  64/24
Location  8/4, 21/9
Lodge  9/12, 11/6
louder  4/13
low  114/9, 119/5, 140/23
Lower  1/15, 4/8, 5/14, 7/7, 8/4, 8/15, 19/16, 21/9, 21/20

M

machine  135/1
MAIA  3/3, 7/13, 15/11, 20/14, 22/23, 32/5, 37/18
mail  7/5
main  126/4
maintain  33/8, 163/20, 166/24
male  116/15
man  91/23, 122/22, 165/12
Manager  20/15, 22/24
mandate  159/3
mandatory  163/2
Mangatal  8/18, 21/23
manner  4/18
March  6/21, 32/5, 33/23, 35/12, 49/5, 49/7, 49/11, 146/5, 162/22
Margaret  7/10, 15/10, 18/4, 38/20, 45/14, 48/2, 48/24, 104/11, 153/18, 154/8
MARKED  2/2, 7/17, 8/24, 11/13, 22/3, 27/17, 28/3, 43/3, 43/16, 56/8, 120/6
Market  79/8
Massachusetts  15/22
matter  10/22, 127/16
McCullough  1/21, 19/21
McLaughlin  79/7
McMillan  2/6, 8/22, 9/12, 11/5, 11/19, 17/8, 20/10, 57/6
Meaning  58/5, 58/6, 78/16
Medical  7/11, 7/12, 31/21, 35/11, 56/17, 67/1, 70/14, 79/9, 92/11, 92/17, 125/5, 129/23, 130/13, 166/22
medically  31/24
medication  134/14
medications  134/2
member  67/10
memo  47/16
Memorandum  47/16
memory  148/5
mention  102/13
message  67/19, 153/18, 154/8
metabolites  31/23
mg  134/6
Michael  2/6, 11/5, 12/1, 20/16, 52/24, 86/7, 89/5, 91/21, 92/13, 95/21, 106/1, 107/4, 135/7, 154/22
Mid-Atlantic  51/11
middle  65/6
Mike  11/19, 17/8, 20/10, 26/10, 28/19, 30/13, 36/18, 53/1, 65/11, 70/9, 109/6, 120/1, 120/7, 121/5, 121/13
mind  100/8, 134/22, 153/22, 164/14
minute  27/18, 65/17, 91/15, 96/6, 120/13, 123/22, 149/4
minutes  4/6, 15/3, 54/13, 55/22, 56/3, 57/12, 65/21, 69/1, 97/14, 112/20, 112/24, 116/2, 116/7, 116/11, 118/4, 121/14, 122/2, 136/10, 140/13, 156/15, 157/11, 160/18, 161/5, 161/11, 161/12
misspelled  11/8
mistaken  13/17, 55/3
Monday  9/3, 125/14, 146/20, 155/2
Monday  5/12, 19/10, 21/8
months  12/5, 164/19, 164/22, 169/4
moot  10/22
Motrin  134/6
mouth  57/3, 86/12, 109/4, 152/9
Move  89/5, 105/18
Mr.  48/8, 57/4, 59/9, 130/18, 135/8, 154/22, 163/8
Mr. Allione  39/10, 39/12, 39/18, 39/19, 40/1, 40/3, 40/7, 40/9, 40/14, 40/23, 41/12, 41/16, 41/9, 41/16, 43/18, 43/22, 44/9, 44/21, 44/24, 45/2, 45/6, 45/15, 45/18, 45/21, 46/2, 47/18, 47/23, 48/2, 48/7, 48/21, 48/23, 51/12, 51/13, 51/18, 51/22, 52/17, 52/24, 53/4, 53/24, 54/1, 54/9, 54/19, 55/2, 55/7, 55/10, 56/1, 56/4, 56/11, 57/7, 57/19, 57/23, 58/6, 58/16, 58/19, 59/1, 59/4, 59/12, 59/15, 59/18, 60/3, 60/7, 60/12, 60/15, 60/20, 60/23, 61/8, 61/12, 61/16, 61/20, 61/24, 62/4, 62/9, 62/12, 62/16, 62/18, 63/2,

# HEARING/INVESTIGATION ATTENDANCE RECORD
### (PLEASE PRINT)

**NAME OF CASE:** Steven's D          **DATE:** 1/31/05

**FILE ODI NUMBER:** c4.465          **LOCATION:** WDC

DAY Two

| NAME<br>Please Print | TITLE<br>Please Print |
|---|---|
| DAVID STEVENS | Cal Cleaves |
| Patrick Wojahn | Attorney for Mr. Stevens |
| Maria Dalton-Theodore | EAP Manager |
| Michael W. Talley | Charging Officer |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

2) 265

# HEARING/INVESTIGATION ATTENDANCE RECORD
### (PLEASE PRINT)

NAME OF CASE: _STevens   D_    DATE: _1/18/05_

FILE ODI NUMBER: _04.465_    LOCATION: _WDC_

| **NAME** Please Print | **TITLE** Please Print |
| --- | --- |
| DAVID B STEVENC | CAR CleaneR |
| Patrick Wojahn | Attorney for Mr. Stevens |
| Mike McMillan | LOCAl CHAirman BRCHCY |
| Michael Washington | General Foreman |
| Michael W. Talley | General Foremon / Charge. Offcr. |
| Barbara A. Lee-Jones | FR 2 |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |