# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAE L. WHITLEY,                          )
                                         )
          Plaintiff,                  )
                                         )       **Civil Action No. 03-00636 (RCL)**
         v.                          )
                                         )
**NATIONAL RAILROAD PASSENGER**          )
**CORPORATION,**                         )
         Defendant.                  )
_____)

## MEMORANDUM OPINION

This matter comes before the Court on defendant's Motion for Summary Judgment [#11] pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiff Mae L. Whitley has filed a sexual harassment suit for violations of Title VII (42 U.S.C. §200e et seq.), 42 U.S.C. §1981, and the District of Columbia Human Rights Act (D.C. Code Ann. §§ 2-1401.01 to 2-1403.17 (2002)). For relief, she requests this Court to issue a declaratory judgment that the acts and practices of National Railroad Passenger Corporation ("Amtrak") violate federal laws and the laws of the District of Columbia. The plaintiff also seeks actual damages for her potentially lost wages, lost benefits and other lost compensation; a promotion to restore her allegedly rightful place in her career; compensatory and punitive damages for each alleged Title VII violation and reasonable attorney's fees and litigation expenses incurred in this matter. Also before this Court is defendant's Motion to Compel [#10]. Upon consideration of the parties' filings, the applicable law and the facts of this case, this Court finds that the defendant's Motion for Summary Judgment, should be GRANTED.

## I. BACKGROUND

Plaintiff Mae L. Whitley ("plaintiff"), an African-American female, was hired by Amtrak ("defendant") in 1977 for the position of coach cleaner. Comp. ¶ 4 (Mar. 7, 2003). Then, in approximately 1992, she was promoted to the Foreman I position. Comp. ¶ 4. In her capacity as a Foreman I, her duty was to supervise coach cleaners and laborers. Whitley Dep. 7-8 (Oct. 27, 2003).

Plaintiff alleges that starting in the 1980s, one of her supervisors, Frank Cover ("Cover") started to make unwelcome sexual advances towards her. Whitley Dep. at 21. Though there is some dispute as to whether this contact did in fact occur in this manner, it will be assumed that Cover's actions did constitute unwelcome sexual advances.[1] See Cover Dep. at 108-09 (Dec. 10, 2003). On one occasion, plaintiff contends that Cover even "put both his hands on [her] shoulders and slithered his hands down to [her] breasts." Comp. ¶11.

The plaintiff alleges that Cover had cornered her several times to proposition her in exchange for promotion to a Foreman II position for which he was on a panel of advisors. Whitley Dep. 59; Stiggers Dep. 114 (Nov. 13, 2003). The plaintiff alleges that Cover assured her that she would be guaranteed to pass the interview if she "would go out with him…[h]e would make sure that [she] would pass the interview…and wouldn't have any problem getting the job." Whitley Dep. at 72. Plaintiff further alleges that during these conversations, Cover made uncomfortable sexual advances by "poking his tongue out talking about what he could do with it." Whitley Dep. at 74; 81-85, 89-90.

---

[1] Since under the Court's summary judgment analysis, "evidence of the nonmovant is to be believed" and inferences drawn from the facts must be viewed in the light most favorable to the nonmovant, the Court will apply this standard to the nonmovant's facts. See Anderson, 477 U.S. at 250; Adickes v. S.H. Kress & Co.,

Cover had established a training program to train and promote Foremen I, which the plaintiff alleges was targeted towards the plaintiff and another female African-American, Althea Stiggers ("Stiggers"). Whitley Dep. 61-62. Stiggers was placed in the training program, while a temporary position was created for the plaintiff since the two women could not go through the six month training program simultaneously. Whitley Dep. 61-62. After Stiggers had completed the program, the plaintiff would then undergo the training necessary to be promoted. Whitley Dep. 68. A promotion however, was contingent upon an interview to test the employee's mechanical skills and Foreman I knowledge. Id. According to Cover and Michael Kapela[2] ("Kapela"), since the plaintiff interviewed poorly despite Cover's assistance in preparation for the interview, she was not promoted. Cover Dep. at t 56, 69, 79; Kapela Dep. 63.

In March 1999, Cover became the plaintiff's immediate supervisor. Shortly thereafter the plaintiff describes an incident in which Cover scolded a group of predominantly white males, for their time cards. Whitley Dep. at 48-52. Cover said to her, "I told you about messing with those time cards. Get your __ over there with them employees, with them car cleaners." Whitley Dep. at 51. The plaintiff then ran out of the office crying to another supervisor, Bob Frank ("Frank"). In her deposition she explains that this incident was so shocking to her merely because "everything that [Cover] does is shocking to me." Whitley Dep. at 52. After Frank tried to calm the plaintiff down, he told her to take the rest of the day off. Whitley Dep. at 54. From home, she then called Daryl Pesce ("Pesce") and he responded by saying that he "had to report this" to the EEO within the company. Whitley Dep. at 54. Pesce also told the plaintiff to take a few days since he did not want to let her go back to work under Cover. Whitley Dep. at 54, 99-100. Pesce

---

[2] An Amtrak supervisor who supervised the plaintiff subsequently.

contacted "in-house EEO" Saynji Fyffe ("Fyffe"), who called the plaintiff at home and assured

the plaintiff that she would "take care of it." Whitley Dep. at 104.

In March of 1999, Amtrak's internal dispute resolution office investigated the plaintiff's

allegations pursuant to Amtrak's sexual harassment policy.[2] Whitley Dep. at 100; Comp. ¶15.

Before the plaintiff was permitted to return to work, Fyffe arranged a meeting with the plaintiff,

Cover, Frank, Mike Kapela ("Kapela") and a few other Amtrak supervisors to discuss the last

incident of alleged harassment and to ameliorate the plaintiff's working conditions.[3] Whitley

Dep. at 120-21. In this meeting, the plaintiff failed to voice her concerns regarding the sexual

nature of her accusations.[4] Whitley Dep. at 116-17. The plaintiff was also reassured by Pesce that

no one would act to retaliate against her for her complaints. Whitley Dep. at 119-20.

Following this meeting, the defendant's supervisors had not yet decided where to place

the plaintiff because one of the supervisors was concerned about her returning to work under

Cover. Whitley Dep. at 123. The plaintiff was told to sit in to temporarily observe the training

sessions with Stiggers. Id. Approximately a week later, the plaintiff was transferred to a new

training position in which she did not have any contact with Cover and was therefore safeguarded

from further harassment. Whitley Dep. at 125-26, 129. The plaintiff was placed in this training

---

[2] Plaintiff's clearly states in her complaint that Whitley filed a written complaint on March 29, 1999. Pl.'s Compl. ¶15 (Mar. 12, 2003). However, in her deposition, Whitley explicitly denied the existence of a written complaint. Whitley Dep. at 128-29.

[3] Plaintiff was unclear as to the exact purpose and result of this meeting. In Plaintiff's Complaint, she contends that in this meeting the management "committed" to provide the the training necessary to become a Foreman II. Compl. ¶19.

[4] Plaintiff stated that since she had complained of the sexual nature of the complaints to Fyffe and Pesce, it was their duty to raise these issues at the meeting, "Because [Fyffe] told me she was going to take care of it. So I'm figuring she's supposed to be defending me. She should have brought it up. And Darrell Pesce was sitting there. He knew about it. So neither one of them said anything." Whitley Dep. at 121.

position from March 1999 through October 1999 under the supervision of a female.[5] Whitley

Dep. at 125.

In this new position, the plaintiff complained that her new second line supervisor, Kapela,

harassed her as well.[6] Within this new training position, the plaintiff alleges that she and her

office mate, Paul Hemphill endured harassment from Kapela, but plaintiff explicitly denies the

inclusion of any sexual undertones. Whitley Dep. at 136-37, 141. The plaintiff further alleges that

the defendant's harassment continued in the form of retaliation, by not being permitted to work

overtime hours.[7] Whitley Dep. at 138.  The plaintiff reported these incidents to Pesce and Cover

who spoke to Kapela about his alleged harassment of the plaintiff. Whitley Dep. at 142.

Plaintiff alleges that upon returning from a business meeting in July 2000, she learned

that not only had her position been terminated, but the entire training program had been

abolished.[8] Whitley Dep. at 160. Although the plaintiff contended that the training program was

cancelled because of her specific complaints, other Amtrak employees were unable to complete

---

[5] The permanent nature of this position was questionable. The defendant's Ex. 3 is a special notice advertising the Foreman I position as temporary. Def.'s Ex. 3. When asked if the position was permanent or temporary, the plaintiff responded, "It was permanent. I mean, it was temporary at the time; but my boss, Carol Evans, after I worked the job for 30 days, she told me that I was doing a good job and that I didn't have anything to owrry about; that the job was going to be permanent." Whitley Dep. at 150. When pushed for a further clarification as to whether the job was in fact explicitly guaranteed to her as a permanent position, she responded, "No more than what I just said." Whitley Dep. at 151.

[6] Plaintiff alleges that from the beginning, Kapela harassed her, but the defendant contends that this alleged harassment did not have a sexual component because plaintiff stated that Kapela treated her office mate, Paul Hemphill, in the same manner. D. Rep. at 2.

[7] Stiggers stated that and employee could volunteer to work overtime, which would then be approved based on the employee's seniority and how much overtime they had already completed. Therefore, if one employee had completed more hours of overtime, then another employee with less total overtime would be given the extra work. Stiggers Dep. at 81.

[8] There are conflicting explanations as to why this position was abolished. The plaintiff believes that the position was abolished because of her sexual harassment complaints. Whitley Dep. at 167. The plaintiff further alleges that her fear of retaliation by Cover was substantiated when she was denied the training for a Foreman II position and her position was abolished. Compl. ¶20. Management explains that the position was abolished due to budgetary concerns. Whitley Dep. at 168. Stiggers stated that Amtrak's severe lack of funds was reported on national news. Stiggers Dep. at 118.

the training program because it was discontinued for all participants equally. Def.'s Statement of

Material Facts no in Dispute ¶¶ 34-35. The plaintiff also complained that she was not selected to

participate in training to a Foreman II position while her colleagues were being promoted. The

plaintiff alleges that these colleagues were less qualified than she, but Amtrak contends that the

employees who were selected for this training program were better qualified than the plaintiff.

Def.'s Statement of Material Facts not in Dispute ¶29.  Stiggers, for example, had completed the

training program and was promoted.[9] Whitley Dep. at 218-19.

After the plaintiff learned that her FDA training position would be abolished, she was

taken to the emergency room where she was diagnosed with a nervous breakdown. Whitley Dep.

at 162-63. Consequently, she was out of work on disability leave from July through September

2000. Whitley Dep. at 164-65.

When she returned to work in late October, early November 2000, the plaintiff accepted a

position in which she would have contact with Cover. Whitley Dep. at 192-93. The plaintiff's

shift would overlap with Cover's shift between 5:30 am and 8. Whitley Dep. at 194. While in

this position, Whitley complained that this new environment was hostile as well because "most

of the supervisors [said] that they had a problem working with me." Whitley Dep. at 214.

In January 2001, the plaintiff contends that Cover continued to sexually harass her. Whitley

Dep. at 217-18; Compl. ¶33. She alleges that he made sexual comments to her and stated that he

"grabb[ed] me, forcing me to kiss him on his mouth…" coupled with inappropriate comments.

---

[9] The plaintiff alleges that Stiggers was promoted because of a rumored relationship between Stiggers and a
supervisor. Whitley Dep. at 218. "There was a rumor, I'm going to say rumor -- because I can't prove it – that Mr.
Kapela and Ms. Stiggers had a relationship going on…[and a relationship] Also with Tom Winbush [another
supervisor]." Id.

Whitley Dep. at 217-18. During this period, the plaintiff further alleges that she was denied overtime opportunities and filed grievances with Cover.[10] Whitley Dep. at 228.

In April 3, 2001, the plaintiff alleges that she was forced to take another sick leave because of the death of her close friend and because of an incident in which Cover had grabbed her and forced her to kiss him. Whitley Dep. at 233. As a result, she took sick leave from April 2001 to June 2002. Whitley Dep. at 235; Compl. ¶34.

Since the plaintiff never filed a complaint to report this series of alleged sexual harassment incidents, Amtrak first learned of these complaints while she was on disability leave. Def.'s Statement of Material Facts no in Dispute ¶¶ 51, 53. The defendant responded by assigning the plaintiff a new assignment working under Gary Lewis. Id at ¶53. In this position, she reports that she has been treated well and has never been harassed . Whitley Dep. At 234-35.

On September 24, 2002 plaintiff filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC"). Compl. ¶35. A representative of the EEOC responded to the plaintiff's complaint by responding that her charge was dismissed by the Director because there was inadequate evidence to show that she was discriminated against because of her sex. Def.'s Ex. 12.

## II. ANALYSIS

Summary judgment is "not [regarded] as a disfavored procedural shortcut." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). It has been incorporated "as an integral" component of the

---

[10] The plaintiff described, "The young lady that was working the job that I bidded on with Mr. Cover – we have a lot of specials around that time of the year, special trains. So it be a lot of overtime. They would call her in, even call her from home to work the overtime. And I'm right there. I would ask could I work; but they tell – you know, they said, no, that I couldn't work it. So I went to Mr. Cover concerning it since he was chairman of the union board. He said he would look into it. And that's what I mean by the hostile environment that I was in with some of the other supervisors. " Whitley Dep. at 228. Whether this overtime allocation was within Cover's control is questionable. Whitley Dep. at 230.

Federal Rules of Civil Procedure to secure the "just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327. Summary Judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c)).

To survive a motion for summary judgment, the nonmovant has the burden of designating specific facts to show that there is a "genuine issue for trial." Celotex, 477 U.S. at 324. In considering these facts, the "evidence of the nonmovant is to be believed" and inferences drawn from the facts must be viewed in the light most favorable to the nonmovant. Anderson, 477 U.S. at 250; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The D.C. Circuit has stated that the nonmoving party may not, however, rely solely on mere conclusory allegations. Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 46 (D.D.C. 2003) (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993)).

The Court's role is "not to try disputed issues of fact, but only to ascertain whether such an issue is present" and to determine whether there is a need for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986); Abraham v. Graphic Arts Int'l Union, 660 F.2d 811 (D.C. Cir. 1981). The judge scrutinizes this evidence through the prism of the applicable legal standard controlling the issues raised to question whether a fair-minded jury could return a verdict for the plaintiff. Anderson, 477 U.S. at 251-54. "[I]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50.

## A. Title VII Sexual Harassment Claims

Title VII of the Civil Rights Act of 1964 explicitly prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or

-8-

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42. U.S.C. § 20002-2(a)(1). In this clause, Title VII only expressly prevents an 'employer' from discriminating on the basis of sex thereby remaining silent on the issue of what delineates sexual harassment limits between coworkers. The courts have not offered any further guidance to establish a definitive rule which imposes liability upon an employer for sexual harassment of one employee on another. Gary v. Long, 59 F.3d 1391, 1396 (D.C. Cir. 1995).

Courts have looked towards agency principles for guidance in this area. Gary, 59 F.3d at 1395 (citing Meritor Savings Bank v. Vinson, 477 U.S. 57, 64 (1986)). Congress implied that an employee should be acting within the scope of his employment if the employer is to be liable for his actions. Accordingly, Congress precludes strict liability on an employer for all employee actions by placing "some limits on the acts of employees for which employers under Title VII are to be held liable." Meritor, 477 U.S. at 72; Gary, 59 F.3d at 1395. The Court has distinguished between "quid pro quo" and "hostile environment" sexual harassment claims because the former incurs strict liability upon the employer whereas the latter does not. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752 (1998).

## 1.  *Quid Pro Quo*

In order to assert a *quid pro quo* claim, the plaintiff employee must show that a tangible job benefit or privilege was explicitly conditioned upon her response to "sexual blackmail" proposed by her employer or an agent thereof. Gary, 59 F.3d at 1396. Tangible aspects include an employee's compensation, terms, conditions or privileges of employment. Gary, 59 F.3d at 1396 (citing Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987). The supervisor must have actually exploited the authority entrusted to him to subject the victim to a tangible job

consequence, which resulted from her submission or refusal to submit to his sexual advances. Gary, 59 F.3d at 1396.

In Gary, the D.C. Circuit Court of Appeals found that although the plaintiff alleged that the defendant repeatedly threatened her with adverse job consequences, since those threats were not carried out, the court found no valid *quid pro quo* claim. 59 F.3d at 1396. The plaintiff in the instant case fails to establish a *quid pro quo* action. Gary, 59 F.3d at 1395. Although the plaintiff claims that her supervisor, Cover, propositioned her in exchange for a promotion, since she did not benefit or suffer from any tangible action related to her employment, nor did she engage in any sexual act with Cover, she does not assert a viable *quid pro quo* claim. See Gary, 59 F.3d at 1395-95; see also Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 648 (6th Cir. 1986) (finding no *quid pro quo* action because the "record [was] totally devoid of any evidence tending to demonstrated that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by" the defendant).

The plaintiff alleges that the defendant's "failure to promote" and limitation of overtime work constitute a tangible employment action, but an omission to act is not an act within itself. Moreover, the plaintiff does not provide any substantial proof for a fair minded jury to find that the defendant's "failure to promote" and alleged limitation of overtime opportunities were conditioned upon the plaintiff failure to submit to sexual advances made by her supervisors.

The plaintiff contends that the defendant is not entitled to an affirmative defense because the defendant is strictly liable, Pl.'s Mem. Opp'n 13 (Mar. 10, 2004). Although this is the correct law for *quid pro quo* claims, this not applicable to the plaintiff in the instant case. Since the plaintiff fails to raise a viable *quid pro quo* claim in the absence of proof of a tangible

-10-

discriminatory act, the defendant is not precluded from raising an affirmative defense. The

defendant's motion for summary judgment on this count of the plaintiff's complaint is entered in

favor of the defendant. See Gary, 59 F.3d at 1396.

**2.  Hostile Environment**

To determine whether a work environment is "hostile" or "abusive" is not a

"mathematically precise test." Harris, 510 U.S. at 22. A work environment can be classified as

hostile by surveying all the circumstances, including "the frequency of the discriminatory

conduct; whether it is physically threatening or humiliating, or a mere offensive utterance and

whether it unreasonably interferes with an employee's work performance. The effect on the

employee's well-being is, of course, relevant to determining whether the plaintiff actually found

the environment abusive." Harris, 510 U.S. at 22. Not one single factor is dispositive, but rather

it is a totality these factors that courts should utilize in their determination. See Harris, 510 U.S.

at 23.

For sexual harassment to be actionable, it must be sufficiently severe or pervasive.

Meritor, 477 U.S. at 67. The alleged act must "alter the conditions of [the victim's] employment

and create an abusive working environment." Meritor, 477 U.S. at 67. The discrimination is not

required to be of an economic or tangible nature, but plaintiffs are precluded from filing claims

based upon any arbitrary "epithet which engenders offensive feelings." Harris v. Forklift

Systems, Inc., 510 U.S. 17, 21 (1993); Meritor, 477 U.S. at 64. Although Title VII does not

require plaintiffs to show concrete psychological harm, a reasonable person must perceive the

work environment to be hostile and abusive, otherwise the plaintiff's claim is outside the

purview of Title VII. Harris, 510 U.S. at 21. Accordingly, the Court has imposed reasonable

boundaries between "allowing any conduct that is merely offensive to be actionable and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21.

**a. Timeliness Issue**

The plaintiff alleges that she has suffered a hostile work environment created by Cover. The plaintiff further alleges that all those actions collectively since the 1980s to present day "fit within the Morgan parameter of comprising one claim of hostile environment." Pl.'s Mem. Opp'n at 12. However, this Court is not convinced that this is the correct application of Morgan. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-10 (2002).

Although time limitations are relevant within hostile environment claims, they do not limit the separation of two or more distinct hostile environment situations. See Morgan 536 U.S. at 109-10. Subsequent events may be part of one claim but, each discrete act or group of acts sets off a new clock for filing charges. See id.

To survive a motion for summary judgment under this test, the plaintiff must raise a genuine issue of disputed fact as to (1) the existence of a continuing violation—be it serial or systematic and (2) the continuation of the violation into the limitations period. Since the plaintiff, herself, fails to ascertain adequate linkage to confirm the continuing violation, she fails to corroborate that these three incidents be taken as sufficiently related to present a genuine issue of disputed fact as to whether a continuing violation in fact existed. See id at 108. The Court therefore finds that the plaintiff in this case presents three distinct hostile environment claims.

During the early 1980s when the plaintiff was sporadically supervised by Cover, in the position of a coach cleaner, she claims she experienced a hostile work environment.[11] Whitley

---

[11] In her deposition, Whitley fails to provide further clarification on the exact dates she alleges that Cover started to sexually harass her. "It was in 1980, in the '80s and stuff, you know. Because, like I said, I worked with Mr. Cover

Dep. at 21. These years can be contrasted with a separate period beginning in 1999, during which the plaintiff was directly stationed under Cover as a Foreman I. Since the plaintiff cannot remember precisely who her supervisors were and the extent of her contact with Cover during the early period in the 1980s into 1999, these two incidents should be considered two distinct hostile environments. See Morgan, 536 U.S. at 107. In response to a question regarding whether any acts occurred between 1980 and 1999, she was only able to respond vaguely. [12] Since the plaintiff herself cannot verify when and to what degree there was a continuing violation, the Court is not convinced that these 1980 and 1999 incidents should be examined as a "continuing violation." See id at 107-08. Mere continuity of employment, without more, is insufficient to prolong the life of a cause of action for employment discrimination. See id at 112-13 (citing Ricks, 449 U.S. 250, 253 (1980)).

The second series of acts the plaintiff posits to in 1999 should also be distinguished from those of 2001 because the plaintiff voluntarily elected to return to a precarious environment after the supervisors had taken affirmative action to remove her from direct contact with Cover. The defendant's affirmative act to respond to her claims severs the two periods of sexual harassment in 1999 and in 2001. See Morgan, 536 U.S. at 117-18. The defendant correctly assesses the

---

different times from the time I first started there; but I can't remember all the dates all the way back...I can say in the early '80s different times that he made sexual advancement." Whitley Dep. 21.

[12] Q: So there was nothing between sometime in the '80s until 1999?
A: No, not really, because, like I say, I – you know, you get bumped around different shifts and stuff. So I probably wasn't working under him during some of that period of time, but I can't remember the exact date when – where I were or what shift I was working.
Q: Okay. But you think that for most of the '90s, 1990 through 1998, you didn't report to Mr. Cover at all.
A: I'm not sure. I – I can't answer that, because I'm really not sure. It's so far back with those dates. I can't remember exactly...what date or what period I actually worked with Mr. Cover.
Q: Okay. But you don't recall anything happening during that period of time.
A: I would have to think about that. Maybe come back after I -- I tried to get some – you know, right now I can't really. Whitley Dep. at 29-30.

Morgan Court's instructions "that where conduct is unrelated or where the employer intervenes, an employee cannot tie all his/her claims together into one continuing violation." Id. Despite the fact that the plaintiff contends that this harassment continued under separate guises in 2001, she was assuming responsibility for her own well-being after the defendant's agents had taken appropriate measures to remove the plaintiff from Cover's supervision.

Although this Court refuses to recognize the plaintiff's claim as one collective hostile environment claim, this Court is, however, willing to consider these claims as three distinct hostile environments. See Morgan, 536 U.S. at 122. Each group of hostile environment claims constitutes a discrete act. See id. Since the plaintiff assumed three different job positions (1980s: coach cleaner; 1999: Foreman I position; and 2001: a new Foreman I position) each hostile environment claim should be scrutinized distinctly. Since these three alleged incidents are isolated, sporadic and discrete, these three incidents cannot be regarded as one collective hostile environment claim. See Morgan, 536 U.S. at 107. Accordingly, this Court will examine the plaintiff's hostile environment claim as three separate hostile environment claims.

**b. 1980 Claims**

The plaintiff's claims from the 1980s are time barred. See Morgan, 536 U.S. at 109. The permissible time period guarantees the protection of civil rights to those who promptly assert their rights, but also protect the employer from the burden of defending claims, which arise from "employment decisions that are long past." Ricks, 449 U.S. at 257. Congress imposed "short deadlines...to encourage the prompt processing of all charges of employment discrimination." See Morgan, 536 U.S. at 109. Moreover, Title 42 U.S.C. §2000e-5(e)(1) explicitly lays out the precise prerequisites that a plaintiff must satisfy before filing a complaint. A plaintiff must file a

-14-

claim with the EEOC within three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. §2000e-5(e)(1); see also Morgan, 536 U.S. at 109.   Since the plaintiff failed to file the claim with the EEOC within the statute of limitations, her hostile environment claim from the 1980s are untimely filed and thus, no longer actionable. See Morgan, 536 U.S. at 115.

**c.  1999 Claims**

An employer may raise an affirmative defense to liability pursuant to a hostile environment claim, subject to proof by a preponderance of evidence. See Farragher v. City of Boca Raton, 524 U.S. 774, 778 (1998). If the employer can show (a) that he has exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Farragher, 524 U.S. at 778.

With respect to subsection (a), the Seventh Circuit required only that the employer "take steps reasonably likely to stop the harassment." Saxton v. Am. Tel. & Tel., 10 F.3d 526, 535-36 (7th Cir.1993). Whether the employer could have done more, however, is "irrelevant absent evidence that the employer's action was not reasonably likely to prevent the harassment from recurring." Saxton, 10 F.3d 526, 535-36 (7th Cir.1993). Liability has only been imposed on the employer when plaintiffs establish both employer knowledge or negligence with respect to the harassment and a failure to take prompt and adequate remedial action to correct the problem. See Kauffman v. Allied Signal Inc., 970 F.2d 178, 184 (6th Cir. 1992); Hodges v. Washington Tennis Service Int'l., 870 F. Supp. 386, 388 (D.D.C 1994); see also Dennis v. County of Fairfax, 55 F.3d 151, 155-56 (4th Cir. 1995) (finding that timely and adequate corrective measures will bar an employer's vicarious liability); Bouton v. BMW of North America, Inc., 29 F.3d 103, 107 (3rd

-15-

Cir. 1994) (stating, "under negligence principles, prompt and effective action by the employer will relieve it of liability"); Nash v. Electrospace System, Inc., 9 F.3d 401, 402 (5th Cir. 1993) (upholding a grant of summary judgment for defendant in a Title VII suit, finding, "[w]hen a company, once informed of allegations of sexual harassment, takes prompt remedial action to protect the claimant, the company may avoid Title VII liability").

In the instant case, the supervisors adequately and promptly responded to the plaintiff's complaints. When the plaintiff complained to her supervisors, she was immediately told to go home so that she would not be in a position in which she would have contact with Cover. Furthermore, Amtrak supervisors, Pesce and Frank, assisted the plaintiff in filing a complaint with the in house EEO office. From the EEO office, Fyffe investigated the plaintiff's complaints and held a meeting with several of the plaintiff's immediate supervisors to ameliorate her working conditions. Frank, one supervisor, was so concerned that he took immediate measures to remove the plaintiff from any contact with the plaintiff. From these facts, it is clear that defendant Amtrak took measures to stop any further potentially unlawful harassment. Gregg v. Hay-Adams Hotel, 942 F. Supp. 1, 7 (D.D.C. 1996) (Lamberth, J.) (finding an employer's formal warning to sexual harasser that further behavior would result in the immediate termination of his employment was adequate to constitute an affirmative defense). The Court finds that Amtrak responded adequately and effectively to negate liability. See Ryczek v. Guest Services, Inc., 877 F. Supp. 754, 758 (D.D.C. 1995).

Moreover, the employer may defeat its liability through subsection (b) of the aforementioned affirmative defense, if the defendant can "show that an employee knew or should have known the employer did not tolerate such conduct." Gregg, 942 F. Supp. at 8 (Lamberth, J.)

-16-

(citing Gary, 59 F.3d at 1398). An employer is not liable for a supervisor's hostile work environment harassment if the victimized employee either knew or should have known that the employer did not "tolerate such conduct and that she could report it to the employer without fear of adverse consequences." See Gary, 59 F.3d at 1398.

In the instant case, it is clear that avenues of redress were available to the plaintiff as articulated in defendant Amtrak's sexual harassment policy. Amtrak promulgated a "Harassment Policy PERS-46" which was accessible to all employees. Def's Ex. 1. The policy statement explicitly stated, "Amtrak strictly prohibits harassment or other forms of discrimination based on an individual's gender...Violation of this policy constitutes an act of serious misconduct that can result in the disciplinary action, up to and including termination." Id. This policy defines verbal and physical harassment and expressly prohibits "unwelcome sexual conduct, whether verbal or physical, including, among other things, sexual advances, demands for sexual favors, or other verbal or physical conduct of a sexual nature..." Id. Moreover, in December 1999, a copy of this policy was distributed to all "Amtrak Colleagues" announcing the onset of diversity training. Def. Ex. 2. Since Amtrak adopted policies and implemented measures such that the plaintiff either knew or should have known that the defendant would not tolerate such conduct, the defendant may not be held liable for a supervisor's alleged hostile work environment harassment. See Gary, 59 F.3d at 1398.

**d. 2001 Claims**

In the plaintiff's third alleged hostile environment, she neglects to acknowledge that she placed herself back into a position in which she would have contact with Cover *after* the defendant's supervisors had taken affirmative action to remove her from contact with Cover.

-17-

Since the plaintiff failed to fulfill the corresponding obligation of reasonable care to avoid harm, such failure will normally suffice to relieve the employer of his burden under subsection (b) of the defendant's affirmative defense. See Farragher, 524 U.S. at 778. Demonstration that an employee failed to use a complaint procedure provided by the employer in response to sexual harassment by a supervisor will normally suffice to satisfy the employer's burden of demonstrating lack of reasonable care by employee to avoid harm, as element of affirmative defense to a vicarious liability claim under Title VII. Farragher, 524 U.S. at 778.

Even if the plaintiff's voluntary return to a precarious position is ignored, the Court finds that defendant Amtrak escapes liability for two reasons. First, the plaintiff did not report this new series of sexual harassment claims to the defendant. Second, when Amtrak supervisors did become aware of these incidents, they responded by promptly assigning the plaintiff a new supervisor, Gary Lewis ("Lewis"). Whitley Dep. At 234-35. During her tenure under Lewis, the plaintiff herself, reports that she has been treated well and has never been harassed . Id. On these grounds, the plaintiff's hostile environment complaints should be dismissed.

**B. Title VII Retaliation Claims**

*Prima facie* elements in retaliatory discrimination produce "proof of actions taken by the employer from which [the Court] can reasonably infer a discriminatory animus." Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981). In the absence of a *prima facie* claim, the plaintiff lacks direct evidence of discriminatory intent. See Simens v. Reno, 960 F. Supp. 6, 9 & n.4 (D.D.C. 1997) ("A plaintiff cannot just shoot into a barrel of fish--that would invariably open the door to the filing of frivolous and vexatious Title VII complaints"). If the courts do not impose a minimum threshold requirement upon which to rest a claim in the form of a prima facie claim,

-18-

the defendant would suffer "wide-reaching consequences for that defendant's reputation and resources." Id. Complainants under Title VII have the burden of providing evidence of a *prima facie* case of discrimination by a preponderance of the evidence. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell, 411 U.S. at 802. Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. McDonnell, 411 U.S. at 804. The Supreme Court has ascertained this test's applicability to cases involving the federal government. See Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711 (1983)).

For retaliation claims, the plaintiff must establish that (1) she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. Brown, 199 F.3d at 452 (citing Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985). This initial burden is not substantial because the plaintiff "merely needs to establish facts adequate to permit an inference of retaliatory motive." McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1999).

Although it is indisputable that the plaintiff was engaging in statutorily protected activity while working as an Amtrak employee, her retaliation claim fails on the second requirement. To satisfy the second step of the McDonnell Douglas test, the plaintiff must show that she has been subjected to some sort of adverse personnel or employment action. Brown v. Brody, 199 F.3d

-19-

446 at 452. "A common element required for discrimination and retaliation claims against federal

employers, and private employers, is thus some form of legally cognizable adverse action by the

employer." Brown, 199 F.3d 446 at 453 (citing Doe v. Dekalb County School Dist., 145 F.3d

1441, 1448 & n.10 (11th Cir. 1998)). An "employment decision does not rise to the level of an

actionable adverse action unless there is a tangible change in the duties or working conditions

constituting a material employment disadvantage." Stewart v. Evans, 275 F.3d 1126, 1134-35

(D.C. Cir. 2002). "A tangible employment action constitutes a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." Walker v. Washington

Metro Area Transit Authority, 102 F. Supp.2d 24, 29 (D.D.C. 2000). See also Brown, 199 F.3d at

452 (employee's lateral transfer and letter of admonishment did not constitute an adverse

personnel action); Burlington, 524 U.S. at 759; c.f. Carter-Obayuwana v. Howard University, 764

A.2d 779 (D.C. Cir. 2000) (salary reduction was "adverse action" for purposes of retaliation

claims).

        The plaintiff has not suffered a tangible detriment resulting from the defendant's alleged

retaliation. Since the plaintiff suffered no diminution in pay or benefits, she does not have a

legally cognizable adverse personnel action. See Stewart, 275 F.3d at 1134-35; Brown, 199 F.3d

at 452. Despite the plaintiff's claims that she was denied overtime opportunities, she proffers no

evidence to corroborate these allegations. Instead, plaintiff only proffers a supposition that a

coworker was promoted simply because she was engaged in a relationship with a supervisor at

Amtrak. If the court were to allow this evidence to substantiate a retaliation claim, there would

be few limits on the speculations permitted to come before the Court to corroborate a Title VII retaliation claim.

Based on the presentation of this case, a reasonable trier of fact would not be able to "to conclude that the plaintiff has suffered objectively tangible harm." See id. The filing of a Title VII action is a "serious matter" which is meant solely to shield employees from the discriminatory actions of their employers, it is not to be confused with an avenue of redress for poor job performance or impudence. See Gregg 942 F. Supp. at 9. (Lamberth, J.). Accordingly the court finds the plaintiff's allegations unfounded and will enter summary judgment on this charge in favor of the defendant

**C. Negligent Supervision**

The plaintiff claims that the defendant failed to exercise reasonable care in its supervision of Covers. Compl. ¶ 41. To invoke this theory of liability, a party must show that an employer knew or should have known that its employee behaved in a dangerous or otherwise incompetent manner, and that the employer, armed with that actual or construction knowledge, failed to adequately supervise the employee. Brown v. Argenbright Security Inc., 782 A.2d 752, 760 (D.C. 2001) (citing Giles v. Shell Oil Corp., 487 A.2d 610, 611-13 (D.C. 1985). The D.C. Court of Appeals prefaced its definition of negligent supervision on the Restatement (Second) of Torts, which states: "A person conducting an activity through servants or other agents is subject to liability for harm resulting from his conduct if he is negligent or reckless: (a) in giving improper or ambiguous orders or in failing to make proper regulations; or (b) in the employment of improper persons or instrumentalities in work involving risk or harm to others; or (c) in the supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious

-21-

conduct by persons, whether or not his servents or agents, upon premises or with instrumentalities under his control." Brown, 782 A.2d at 760.

For a negligent supervision claim to be actionable, the plaintiff must show that the defendant's failure to supervise Cover's actions proximately caused harm to the plaintiff. See Sokos, 283 F. Supp. 2d at 51. An action for negligent supervision and retention requires proof that the employer breached a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff. Phelan v. City of Mount Rainier, 805 A.2d 930, 940 (D.C. 2002). Since the plaintiff failed to present these essential elements,  the plaintiff's sexual harassment claims fails to pass muster. Accordingly, her claims for negligent supervision are dismissed because she fails to show that a reasonable jury could conclude that she suffered a proximate harm. See id. Although the issue of proximate cause is usually left for the jury, that is not the case when, as here, there are no facts or circumstances from which a jury can reasonably find that the defendant's failure to act proximately caused any harm to the plaintiff. See id at 52. A jury could not reasonably conclude that Amtrak did not exercise reasonable care to supervise its employees. Int'l Distrib. Corp. v. Am. Dist. Tel. Co., 569 F.2d 136, 139 (D.C. Cir. 1977). Although the plaintiff is entitled to all reasonable inferences in her favor, the plaintiff offers no substantial facts to corroborate her claim. She alleges that Pesce "denies totally ever hearing" from the plaintiff, but regardless of the veracity of this statement, the fact of the matter is that the defendant's supervisors did take adequate measures to respond to the plaintiff's complaints.

The plaintiff mistakenly relies on Brown because the plaintiff's case does not involve notice issues as the court was confronted with in Brown. 782 A.2d at 760.  In Brown, the Court

-22-

addressed whether the employer was aware of the harm occurring, but this issues is not relevant to the plaintiff's negligent supervision claim. Id. It is clear that in the plaintiff's case, her supervisors were well aware of her complaints and took appropriate remedial actions. See Cunningham v. District of Columbia, No. 87-0095 WL 68863 at *1 (D.D.C. June 20, 1988) (finding that the conscientious manner in which the Trial Board weighed the facts and evidence and considered the employee/supervisor in question, is not evidence of negligent supervision); see also Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 52 (D.D.C. 2003); c.f. Murphy v. Army Distaff Found., Inc., 458 A.2d 61 (D.C. 1983).

Given the evidence, the Court is compelled to conclude that the plaintiff did not meet the summary judgment standard that there was no genuine issue of material fact as to this aspect of the case. Murphy, 458 A.2d at 64. Since no facts would warrant an inference of negligent supervision against the defendant, summary judgment is properly entered for this claim. See Brown, 782 A.2d at 760.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the defendant's motion for summary judgment pursuant to 56(c) of the Federal Rules of Civil Procedure will be GRANTED. A separate order accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, United States District Judge, on June 9, 2004.