## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ──────────────────────────────── )<br><br>DAVID B. STEVENS )<br> )<br>and )<br> )<br>MAE WHITLEY, )<br> )<br>      Plaintiffs, )<br> )<br>    v. )<br> )<br>NATIONAL RAILROAD PASSENGER )<br>CORPORATION, )<br> )<br>      Defendant. )<br>──────────────────────────────── ) | Civil Action No. 05-1924 (RCL) |

### <u>MEMORANDUM OPINION</u>

This matter comes before the Court based on defendant's Motion to Dismiss plaintiff Mae Whitley's Claims or, in the Alternative, for Summary Judgement [7, 9] pursuant to Rule 12(b)(6) and Rule 56(c) of the Federal Rules of Civil Procedure.  Defendant also filed a Motion to Dismiss plaintiff David Stevens' Claims, or in the Alternative, for Summary Judgement [8] pursuant to Rule 12(b)(6) and Rule 56(c) of the Federal Rules of Civil Procedure.

Plaintiffs have made three claims against National Railroad Passenger Corporation ("Amtrak") in their Second Amended Complaint.  Plaintiff David Stevens makes a claim of unlawful retaliation in violation of the District of Columbia Human Rights Act.  (D.C. Code Ann. § 2-1402.61 (2006)); (Pls. Second Am. Compl. 7-8.)   Plaintiff Mae Whitley makes claims of unlawful retaliation and sex discrimination in violation of the District of Columbia Human Rights Act.  (Pls. Second Am. Compl. 7-8.)

1

Plaintiffs originally filed their Complaint in the Superior Court for the District of Columbia.  On September 29, 2005, defendant removed the action to this Court pursuant to 28 U.S.C. § 1441.  For relief, plaintiffs request that this Court issue a declaratory judgment that the conduct of Amtrak violated their rights under District of Columbia law.  Plaintiffs also seek compensatory damages for emotional, non-pecuniary harm and for consequential financial harm for lost wages, retirement and other benefits; punitive damages; prejudgment and post-judgment interest; reasonable attorneys' fees, expenses and costs incurred in this matter and a trial by jury on all issues of fact and damages raised in this case.  Additionally, Mr. Stevens requests that he be reinstated to employment if he elects to return.  Id.  Also before this Court are plaintiffs' Motion for Leave to File Surreplies [19].

Upon consideration of the parties' filings, the applicable law and the facts of this case, this Court finds that the plaintiffs' Motion for Leave to File Surreplies [19] shall be GRANTED and the defendant's Motions to Dismiss, or, in the Alternative Summary Judgment [7, 9] and [8] shall be DENIED.

## I.  Background

### A.  David Stevens

Plaintiff David Stevens began working for Amtrak on February 28, 1990 as a mechanical cleaner.  (Stevens' Opp'n 1.)  In 1988, Mr. Stevens was diagnosed as HIV-positive.  Id. at 1-2.  In February 2004, one of Mr. Stevens' co-workers, Shirley Snider, told other Amtrak employees that he had AIDS.  Id.  On March 10, 2004 Ms. Snider sent Mr. Stevens a letter apologizing for disclosing his medical condition.  Id.

Mr. Stevens alleges that because Ms. Snider told others that he had AIDS, his co-workers

and superiors began treating him differently.  <u>Id.</u>  Specifically, he alleges that Cindy Williams

Hemphill and Donna Blake gave him more cleaning assignments than the other cleaners.  <u>Id.</u>  As

a result, in March 2004, Mr. "Stevens filed a complaint with Amtrak's Dispute Resolution Office

. . . alleging that due to the rumors that he had AIDS, he was being subjected to a hostile work

environment based on a perceived or actual disability."  <u>Id.</u> at 2-3.

 After filing his complaint, Mr. Stevens alleges that the hostile work environment

continued and reached an "intolerable level."  <u>Id.</u> at 3.  On April 7, 2004, Mr. Stevens was

assigned to clean a very dirty train car.  He asked Ms. Blake to assign someone to help him, but

she refused.  <u>Id.</u>  After cleaning the car and taking a short break, Mr. Stevens waited for another

train to arrive to see if it needed to be cleaned.  <u>Id.</u>  The general foreman, Joseph Savoy, saw Mr.

Stevens waiting and threatened him with suspension if he did not leave the area.  <u>Id.</u>  Mr. Stevens

believed that this threat was further evidence of the hostile work environment and left work two

hours early.  <u>Id.</u> at 4.  He then called Maya Theodore Dalton to discuss the situation.  <u>Id.</u> at 3.

Ms. Dalton instructed him to contact his mental health professional.  <u>Id.</u> at 3-4.  Mr. Stevens also

called the Assistant Superintendent, Bernard Campbell, and told him about the incident with Mr.

Savoy.  <u>Id.</u>  Mr. Campbell "told him not to worry and that he would take care of it."  <u>Id.</u>

 On April 9, 2004, Mr. Stevens' mental health professional, Eric LeHot, recommended in

a letter to the Amtrak Medical Department that Mr. Stevens "remain out of work temporarily due

to a hostile work environment."  <u>Id.</u>  On April 12, 2004, Mr. Stevens gave a copy of Mr. LeHot's

letter to the Master Superintendent, Michael Kapela.  <u>Id.</u>  Mr. Kapela approved Mr. Stevens'

temporary leave.  <u>Id.</u>  One week later, on April 19, 2004, Mr. Stevens learned that Mr. Savoy,

Mr. Campbell, and Lisa Coleman had all seen a copy of Mr. LeHot's letter.  <u>Id.</u>

3

In May 2004, Mr. Stevens obtained legal advice on his hostile work environment claim from Richard McKewen, a staff attorney at the Georgetown University Law Center's Institute for Public Representation. Id. On May 21, 2004, Mr. McKewan sent a letter to the Amtrak Law Department describing Mr. Stevens' allegations and accusing Mr. Campbell of disseminating Mr. LeHot's letter. Id. at 4-5. Mr. McKewan's letter also stated that Mr. "Stevens was willing to pursue his discrimination and hostile environment charges before the EEOC and in court." Id. at 5.

On May 30, 2004, while on leave, Mr. Stevens returned to work to retrieve some medication he had left in his friend, Darryl Hollis' car. Id. Another friend, Terrell Williams, drove Mr. Stevens to the Amtrak facility. Id. While there, Mr. Campbell saw Mr. Stevens and told him he was not allowed on the premises. Id. According to Mr. Williams' sworn statement, Mr. Campbell yelled at Mr. Stevens: "You know you're wrong. You are going to put my name in that shit, but you are better off fucking with those goddamn white people than fucking with me. I will fucking destroy your ass." (Williams Decl. ¶ 3.) Mr. Stevens also added in his declaration that Mr. Campbell stated that "if you ever put my name in anything else, you would wish you didn't." (Stevens' Opp'n 5.)

On June 21, 2004, Mr. McKewan sent another letter to the Amtrak Law Department that stated Mr. Stevens would like to return to work but requested a transfer to a different department. Id. Mr. Stevens requested the transfer because of the harassment allegations, the allegations that Mr. Campbell disseminated Mr. LeHot's letter to other employees, and Mr. Campbell's May 30, 2004 statements. Id.

On June 23, 2004, Mr. Stevens filed a Charge of Discrimination with the D.C. Office of

Human Rights and the EEOC.  In that complaint, Mr. Stevens charged that he was discriminated against because of his disability.  He again alleged that Ms. Snider told co-workers about his medical condition and that behavior led to the hostile work environment.  He also alleged that his work assignments changed after he filed his complaint with the Dispute Resolution Office.  He further alleged that his "work assignments changed, and Joseph Savo[y] began to constantly monitor and scrutinize my work."  (Stevens' Decl. Ex. 6.)  He also made the allegations that Mr. LeHot's letter was disseminated to other employees.  Id.

On July 1, 2004, Mr. Campbell sent Mr. Stevens a letter requesting that further medical documentation be sent to the Amtrak Medical Department to support Mr. Stevens' absence from work.  (Stevens' Decl. Ex. 7.)  That letter further issued Mr. Stevens a direct order to provide the medical documentation by July 16, 2004 or he would be "considered as having resigned from the service and will be removed from the seniority roster."  Id.  On July 8, 2004, Mr. LeHot completed and returned the Amtrak "Treating Physician Medical Status Report, Statement of Disability" to the Amtrak Health Services office.  (Stevens' Decl. Ex. 8.)  This form asks the question: "Does the individual currently have any physical or mental limitations that interfere with the patient's ability to travel to and from work, be at work, or perform assigned duties at work?  Please explain the objective medical basis for your answer."  Id.  In response, Mr. LeHot wrote: "pending litigation, hostile wk environment," followed by some unintelligible words and then "high risk of cocaine relapse."  Id.

On July 23, 2004, Mr. Campbell sent Mr. Stevens a similar letter that stated: "Dr. Pinsky, in the Amtrak Medical department states, your absent [sic] is declined '[p]ending [l]itigation, hostile work environment' are not legitimate medical reasons for this absence.  You must provide

current objective medical information to support your [l]eave of [a]bsent [sic]." (Stevens' Decl. Ex. 9.) This letter also issued Mr. Stevens a direct order to provide the medical documentation on or before August 6, 2004 or he would be "considered as having resigned from the service and will be removed from the seniority roster." Id. Mr. Stevens claims that on August 11, 2004, he "had his attorney submit a detailed medical status report from Stevens' health care provider." (Stevens' Opp'n 6-7.) A copy of this status report was not included with the plaintiffs' brief.

On August 20, 2004, Mr. Campbell sent Mr. Stevens another identical letter but extended the deadline for submitting additional documentation to August 31, 2004. (Stevens' Decl. Ex. 10.) On August 23, 2004, Mr. McKewan sent a letter to Theresa B. Kerns, Federal Investigator, U.S. EEOC, requesting that Mr. Stevens' EEOC charge against Amtrak be amended to include a charge of retaliation. The letter states that Mr. Stevens had "submitted similar medical documentation in the past, and prior to July 2004, no one at Amtrak had ever questioned the sufficiency of this documentation." (Stevens' Decl. Ex. 11.) Mr. Stevens alleges that "Campbell's rejection of his medical documentation to be retaliation for Stevens' prior complaints." (Stevens' Opp'n 7.)

On November 10, 2004, Mr. Stevens amended his discrimination charge with the EEOC. (Stevens' Decl. Ex. 13.) "Specifically, Bernard Campbell harassed me about providing additional information regarding my disability, and he threatened to terminate my employment if I did not provide sufficient information." Id. Mr. Stevens further states in his amendment that "I believe that the Respondent denied me a transfer, harassed, and threatened to terminated [sic] my employment in reprisal for my EEOC complaint of employment discrimination." Id.

In December 2004, Mr. Stevens "was ready to return to work and scheduled a 'return to

6

work' physical."  (Stevens' Opp'n 8.)  On December 13, 2004, Mr. Stevens went to Concentra

Medical Centers to undergo the physical and submit to a drug screen.  <u>Id.</u>  He provided a urine

sample, but was told by the Concentra personnel that the sample "was not within body

temperature range (90F to 100F)."  (Stevens Decl. Ex. 14.)  Mr. Stevens contends that "he was

told he would have to provide a second sample and agreed to do so."  (Stevens' Opp'n 8.)  He

further contends that he waited for over ninety minutes to give a second urine sample and

because he is HIV positive, he became frightened that since his urine was outside the normal

temperature range, he might be sick.  <u>Id.</u>  Mr. "Stevens' doctors had previously told him to be

very mindful of his body temperature because, being HIV positive, he is more susceptible to

infections.  His doctors also told him that if his body temperature ever rose to above 100.5

degrees to immediately go to the hospital."  <u>Id.</u> at 9.  According to Mr. Stevens, he then told the

Concentra personnel "that he was going to see a doctor and offered to provide a second sample

later."  <u>Id.</u>  He then contends that:

> [a] woman named Ebonie called Margaret Tierney of Amtrak's medical department
> to ask for instructions on how to handle the situation.  Stevens was present when
> Ebonie made the call and heard Ebonie leave a message on Tierney's voice mail
> stating that David Stevens' urine sample was not at the right temperature and to
> please call Concentra back to inform them of the procedures they should follow.

<u>Id.</u>

Mr. Stevens further contends that he "waited an additional ten minutes for Amtrak to call back."

<u>Id.</u>  At that point, he went to the George Washington University Hospital Emergency Room and

was diagnosed with bronchitis and abdominal pain.  <u>Id</u>; (Stevens Decl. Ex. 16.)

Concentra, however, gave a much different account of the events at their facility on

December 13, 2004.  After Mr. Stevens was informed that his first urine sample was out of the

temperature range,

> Mr. Stevens was then provided with DOT Federal Guidelines for unusual collection. He was then processed for this physical - it should be noted that his temperature at that time was 97.8F. He then informed another Concentra staff member, Ebonie Beaty, that he was unable to stay at the center any longer as he had another doctor appointment. Ebonie informed him that he needed to submit a second specimen before leaving. He stated that he could not and that he would return, which is unacceptable according to DOT Federal Guidelines. Ebonie called the company and left a message. The aforementioned information was presented to Ms. Margaret Terney of Amtrak on 12/14/04.

(Stevens Decl. Ex. 15.)

On January 18, 2005 and January 31, 2005, Amtrak held a hearing to terminate Mr. Stevens' employment for refusing to provide a second drug sample. (Stevens' Opp'n 10.); (Def.'s Mem. In Supp. Of Mot. To Dismiss 2.) Mr. "Campbell was listed as the Charging Officer bringing the action against" Mr. Stevens. (Stevens's Opp'n 10.) Arthur D'Alessandro, the hearing officer, conducted the hearing and ultimately rendered the decision to terminate Mr. Stevens' employment with Amtrak. According to Amtrak's Drug and Alcohol Policy, an employee is prohibited from "refusing a drug and/or alcohol-testing event." (Def.'s Mem. In Supp. Of Mot. To Dismiss Ex. A.) The policy also states that "An employee found to have violated any provisions of this policy . . . shall result in the employee's termination from Amtrak in all capacities." Id.

## B. Mae Whitley

Plaintiff Mae Whitley began working for Amtrak in 1977 as a coach cleaner. (Whitley Opp'n 2.) Since 1985, she has served in a Foreman I position. Id. "In her capacity as a Foreman I, her duty was to supervise coach cleaners and laborers." Whitley v. National Railroad Passenger Corp., No. 03-636 (RCL), slip op. at 2, (D.D.C. June 9,

2004) (memorandum opinion granting defendant's motion for summary judgement).   Ms.
Whitley contends that "[t]he Foreman I position is a supervisory position located in
Amtrak's Mechanical Department."  (Whitley Opp'n 2.)

On March 7, 2003, Ms. Whitley filed a complaint in this Court "against Amtrak
alleging sexual harassment, sex discrimination, and retaliation."  Id.  On June 9, 2004,
this Court granted Amtrak's motion for summary judgment.  Id; Whitley, slip op. at 2.

Since 2003, Ms. Whitley has applied and been rejected for promotion to several
Foreman II positions.  (Whitley Opp'n 2.); (Mem. In Supp. Of Def.'s Mot. To Dismiss 2.)
The Foreman II position involves supervising "Amtrak's skilled craft employees."
(Whitley Opp'n 2.)  "An applicant may qualify for a Foreman II position through either
mechanical experience or by completing one of the Foreman II training classes offered at
Amtrak."  Id.  In 2001, for economic reasons, the Foreman II training classes were
discontinued.  (Mem. In Supp. Of Def.'s Mot. To Dismiss 4.)  According to the job
reference listing provided to the Court by Amtrak, a Foreman II applicant "must have
some mechanical experience."  (Mem. In Supp. Of Def.'s Mot. To Dismiss Ex. A.)

Ms. Whitley contends that by June of 2004, she completed the training necessary
to qualify her for a Foreman II position.  (Whitley Opp'n 3.)  To support this claim, she
provided this Court a copy of her "Amtrak Certification" card.  She believes that
"[d]espite having completed the program, however, [she] was not selected for a Foreman
II position."  Id.  Ms. Whitley was "interviewed numerous times for Foreman II
vacancies."  (Whitley Decl. ¶ 13.)  Amtrak acknowledges that Ms. Whitley completed
training courses, but contends that it hired better qualified applicants for the Foreman II

positions.  (Mem. In Supp. Of Def.'s Mot. To Dismiss 3.)  They contend that since a Foreman II supervises mechanical craft employees, "[t]he critical component is actual time spent performing the job."  (Def.'s Reply 2.)

According to Amtrak records, eleven Foreman II positions were filled in 2004 and early 2005.  (Mem. In Supp. Of Def.'s Mot. To Dismiss Ex. B.)  On January 12, 2004, Andrew Horne, Glenn Shiffel, Dean Swain and Derrick Linsey were hired as Foremen II. Id.  On March 19, 2003, Jane Ladson was hired as a Foreman II.  Id.  On May 4, 2004, Harold Burrows was hired as a Foreman II.  Id.  On May 25, 2004, Leslie White and Thomas Carter were hired as Foremen II.  Id.  On September 8, 2004, Michael Aikens was hired as a Foreman II.  Id.  On October 13, 2004, Rodney Wilson was hired as a Foreman II.  Id.  On January 19, 2005, Robert Grimes was hired as a Foreman II.  Id.

Ms. Whitley alleges that Amtrak did not promote her to the Foreman II position "in retaliation for her prior complaints and lawsuit."  (Whitley Opp'n 4.)  In August 2004, Ms. Whitley asked Bernard Campbell why she was not promoted.  "He answered her by referring to her prior lawsuit, reminding her that she had gone after 'those white motherfuckers,' and asking her: 'do you think those motherfuckers are gonna forget?'" She responded by telling "him that she was not surprised that upper management would retaliate against her because she went after them.  Id.  Mr. Campbell responded by saying that "they were not retaliating, but rather were 'just not moving' her . . . to retaliate, they would have to do something like fire her . . . '[i]t's a thing they say to you in court; no harm no foul.'"  Id. at 4-5.  Ms. Whitley then asked Mr. Campbell "if she would have to wait a whole year to get promoted."  Id.  Mr. Campbell then said "Oh, you might have to

10

wait a whole year and a half . . . Why did you think you could do that?"  Id.  Ms. Whitley

contends that these statements show that Amtrak, "through their agents including Bernard

Campbell, retaliated against her in refusing to promote her despite her qualifications."

(Pls.' Second Am. Compl. ¶ 57.)

Ms. Whitley also alleges that "Amtrak also engaged in sex discrimination in

regard to the Foreman II promotion."  (Whitley Opp'n 5.)  Ms. Whitley and defendant

Amtrak agree that of the eleven Foreman II selections made in 2004 and early 2005, nine

selectees were men.  Id; (Mem. In Supp. Of Def.'s Mot. To Dismiss Ex. B.)

## II.  Applicable Legal Standards

### A.  Motion to Dismiss

In order for the defendant to succeed on a motion to dismiss for failure to state a

claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), this Court

must interpret the allegations and facts in the complaint in the light most favorable to the

plaintiff and give the plaintiff the benefit of all inferences that can be derived from the

alleged facts.  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); Barr v. Clinton, 370 F.3d

1196, 1199 (D.C. Cir.2004) (citing Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276

(D.C. Cir.1994)).  However, this Court need not accept inferences or allegations that are

not supported by the facts stated in the complaint.  Kowal, 16 F.3d at 1276.  Ultimately,

this Court will dismiss a claim pursuant to Fed. R. Civ. P. 12(b)(6) only if the defendant

can show "beyond doubt that the plaintiff can prove no set of facts in support of his claim

which would entitle him to relief."  Conley, 355 U.S. at 45-46.

**B. Summary Judgment**

A motion for summary judgment may be granted pursuant to Fed. R. Civ. P. 56(c) when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affadavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). In order to ascertain whether facts are "material," this Court must look to the substantive law on which each claim rests. Anderson v. Liberty Lobby, Inc, 477 U.S. 242, 252 (1986). A "genuine issue" is one that if resolved could prove an element of the claim or defense and influence the outcome of the action. Celotex, 477 U.S. at 322.

In ruling on a motion for summary judgment, this Court must draw all reasonable inferences in the nonmoving party's favor and accept their evidence as true. Anderson, 477 U.S. at 255. However, the nonmoving party must establish more than a "mere existence of a scintilla of evidence" to further their position. Id. at 252. If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," this Court may grant the motion for summary judgment. Celotex, 477 U.S. at 322.

"However, summary judgment should ordinarily be entered only after the plaintiff has been given 'adequate time for discovery.'" Barry v. United States Capitol, 2005 WL 1026703, at 4 (D.D.C. May 2, 2005) (quoting Anderson, 477 U.S. at 257). Additionally, in an even more recent opinion, the D.C. Circuit explained: "before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation

12

of the required prima facie case in a particular case."  Johnson v. Powell, 440 F.3d 484,

488 (D.C. Cir 2006) (quoting Swierkiewicz v. Sorema N.A., 534 U.S. 506, 512 (2002)).

### C.  Claims Under the District of Columbia Human Rights Act (DCHRA)

"Under the DCHRA, it is unlawful for an employer 'to retaliate against an

employee due to [his] opposition to any practice made unlawful by the DCHRA.'"  Regan

v. Grill Concepts-D.C., Inc., 338 F. Supp. 2d 131, 138 (D.D.C. 2004) (quoting Grant v.

May Dep't Stores Co., 786 A.2d 580 (D.C. 2001)).  Additionally, "the DCHRA prohibits

an 'employer' from discriminating against its employees."  Regan, 338 F. Supp. 2d at

134.

The requirements necessary to establish a prima facie case for discrimination will

vary depending on the claim.  Id.; McDonnell Douglas v. Green, 411 U.S. 793, 804

(1973).  "[T]o establish a claim of retaliation, the [p]laintiff must prove that (1) he

engaged in statutorily protected activity; (2) he was subjected to adverse employment

action; and (3) that a causal connection exists between the two."  Regan, 338 F. Supp. 2d

at 134.  "[T]o establish a claim of gender discrimination, the [p]laintiff must show that

(1) he is a member of a protected class; (2) he suffered an adverse employment action;

and (3) the unfavorable action gives rise to an inference of discrimination."  Id.

McDonnell Douglas established a burden-shifting approach to discrimination and

retaliation claims.  Id.  First, the plaintiff has the burden of proving the elements of the

prima facie case by a preponderance of the evidence.  Id; McDonnell Douglas, 411 U.S.

at 802.  Then, the defendant has the burden "'to articulate some legitimate,

nondiscriminatory reason' for the action.  If the defendant, meets this burden, then the

presumption of discrimination is rebutted and drops from the case." <u>Regan</u>, 338 F. Supp. 2d at 134-35 (<u>quoting</u> <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 508 (1993)). Finally, the burden shifts back to the plaintiff to prove that the defendant's "articulated reason was a pretext and that the actual reason was discriminatory." <u>Regan</u>, 338 F. Supp. 2d at 135; <u>McDonnell Douglas</u>, 411 U.S. at 804.  However, "[a]t all times, the ultimate burden of persuasion remains with the [p]laintiff to prove that she was subjected to discrimination." <u>Regan</u>, 338 F. Supp. 2d at 135; <u>Hicks</u>, 509 U.S. at 507-08.

## III.  Analysis

### A.  David Stevens

#### 1. Unlawful Retaliation

As stated above, "to establish a claim of retaliation, the [p]laintiff must prove that (1) he engaged in statutorily protected activity; (2) he was subjected to adverse employment action; and (3) that a causal connection exists between the two." <u>Regan</u>, 338 F. Supp. 2d at 134.

At this point in this litigation, summary judgment is not appropriate. [S]ummary judgment should ordinarily be entered only after the plaintiff has been given 'adequate time for discovery.'" <u>Barry</u>, 2005 WL 1026703, at 4 (<u>quoting</u> <u>Anderson</u>, 477 U.S. at 257). Additionally, "before discovery has unearthed relevant facts and evidence, it may be difficult to define the precise formulation of the required prima facie case in a particular case." <u>Johnson</u>, 440 F.3d at 488 (<u>quoting</u> <u>Swierkiewicz</u>, 534 U.S. at 512).  Amtrak filed their Motion to Dismiss, or in the Alternative for Summary Judgment before the discovery phase of this litigation.

14

Mr. Stevens may very well be able to meet his burden and establish a prima facie case for retaliation by a preponderance of the evidence. Regan, 338 F. Supp. 2d at 134; McDonnell Douglas, 411 U.S. at 802.  Amtrak may very well be able to meet its burden "to articulate some legitimate, nondiscriminatory reason for" Mr. Stevens' termination. Id.  Then, according to the burden shifting approach of McDonnell Douglas, Mr. Stevens must prove that Amtrak's "articulated reason was a pretext and that the actual reason was discriminatory."  Regan, 338 F. Supp. 2d at 134-35; McDonnell Douglas, 411 U.S. at 804.  In order to survive Amtrak's motion for summary judgment, Mr. Stevens will have to "show that a jury could conclude 'by a preponderance of the evidence that the asserted reason is a pretext'"  Barry, 2005 WL 1026703, at 6 (quoting Holbrook, 196 F.3d 255 at 263).  To answer this question, "this Court must consider whether a jury could infer retaliation from (1) [Mr. Stevens'] prima facie case; (2) any evidence [Mr. Stevens] presents to attack [Amtrak's] proffered reason; and (3) any further evidence available to [Mr. Stevens]."  Barry, 2005 WL 1026703, at 6.  "This inquiry is necessarily fact intensive and granting a motion for summary judgment on this issue prior to providing the parties with any opportunity for discovery is clearly contrary to this Circuit's precedent."  Id. at 7.  Therefore, the defendant's Motion should be denied at this time.

**B.  Mae Whitley**

### 1. Unlawful Retaliation and Unlawful Sex Discrimination

Again, as stated above, "to establish a claim of retaliation, the [p]laintiff must prove that (1) [s]he engaged in statutorily protected activity; (2) [s]he was subjected to adverse employment action; and (3) that a causal connection exists between the two."

15

Regan, 338 F. Supp. 2d at 134.  "[T]o establish a claim of gender discrimination, the

Plaintiff must show that (1) [s]he is a member of a protected class; (2) [s]he suffered an

adverse employment action; and (3) the unfavorable action gives rise to an inference of

discrimination."  Id.

      Once again, at this point in this litigation, summary judgment is not appropriate.

[S]ummary judgment should ordinarily be entered only after the plaintiff has been given

'adequate time for discovery.'"  Barry, 2005 WL 1026703, at 4 (quoting Anderson, 477

U.S. at 257).  Additionally, "before discovery has unearthed relevant facts and evidence,

it may be difficult to define the precise formulation of the required prima facie case in a

particular case."  Johnson, 440 F.3d at 488 (quoting Swierkiewicz, 534 U.S. at 512).

Amtrak filed their Motion to Dismiss, or in the Alternative for Summary Judgment before

the discovery phase of this litigation.

      Ms. Whitley may very well be able to meet her burden and establish a prima facie

case for both retaliation and sex discrimination.  Regan, 338 F. Supp. 2d at 134;

McDonnell Douglas, 411 U.S. at 802.  Amtrak may very well be likely to meet its burden

"to articulate some legitimate, nondiscriminatory reason for" not hiring Ms. Whitley as a

Foreman II.  Id.  Then, according to the burden shifting approach of McDonnell Douglas,

Ms. Whitley must prove that Amtrak's "articulated reason was a pretext and that the

actual reason was discriminatory."  Regan, 338 F. Supp. 2d at 134-35; McDonnell

Douglas, 411 U.S. at 804.  In order to survive Amtrak's motion for summary judgment,

she will have to "show that a jury could conclude 'by a preponderance of the evidence

that the asserted reason is a pretext'"  Barry, 2005 WL 1026703, at 6 (quoting Holbrook,

16

196 F.3d at 263).  To answer this question, "this Court must consider whether a jury could infer retaliation [and discrimination] from (1) [Ms. Whitley's] prima facie case; (2) any evidence [Ms. Whitley] presents to attack [Amtrak's] proffered reason; and (3) any further evidence available to [Ms. Whitley]."  Barry, 2005 WL 1026703, at 6.  "This inquiry is necessarily fact intensive and granting a motion for summary judgment on this issue prior to providing the parties with any opportunity for discovery is clearly contrary to this Circuit's precedent."  Id. at 7.  Therefore, the defendant's Motion should be denied at this time.

## IV.  Conclusion

For the foregoing reasons, the Court finds that the plaintiffs' Motion to File Surreplies [19] shall be GRANTED and the defendant's Motions to Dismiss, or, in the Alternative Summary Judgment [7, 9] and [8] shall be DENIED.

A separate order accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, United States District Judge, on June 2, 2006.

17