IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID B. STEVENS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:05CV01924-RCL |
| | ) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S MOTION FOR SUMMARY JUDGMENT
REGARDING THE CLAIMS FILED BY PLAINTIFF MAE WHITLEY**

# APPENDIX

PART I:

Excerpts from the Transcript of the Deposition of Mae Whitley

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA
                                        MAR 1 4 2007
 3

 4   DAVID B. STEVENS and        )
                                     ORIGINAL
 5   MAE WHITLEY,                )

 6          Plaintiffs,          )

 7       vs.                     ) Civil Action No.

 8   NATIONAL RAILROAD           ) 1:05CV01924-RCL

 9   PASSENGER CORPORATION       )

10   ("AMTRAK"),                 )

11          Defendant.           )

12          *        *        *        *        *

13

14

15          The deposition of MAE (MARY) JONES WHITLEY

16   was taken on Tuesday, February 27, 2007, commencing

17   at 10:17 a.m., at the offices of National Railroad

18   Passenger Corporation, 60 Massachusetts Avenue,

19   N.E., Washington, D.C., before Victoria L. Wilson,

20   Notary Public.

21

22          *        *        *        *        *
```

```
 1      Q.    Doing waiting work, waitressing work or --
 2      A.    The Congressional Country Club, yes, that
 3  was basically, like, a waiter job.
 4      Q.    Okay.
 5      A.    The little carryout I worked out, I can't
 6  think of the name of it, that was, like, a cashier
 7  job.
 8      Q.    Okay.  After you left Safeway, what did you
 9  do after that?
10      A.    I went to Amtrak.  That's when I was hired
11  from Amtrak.
12      Q.    Can you remember roughly when it was you
13  were hired at Amtrak?
14      A.    I was hired at Amtrak in 1977.
15      Q.    What position were you hired into?
16      A.    Car cleaning.
17      Q.    How long were you a car cleaner?
18      A.    From 1977 until 1985, that's when I became
19  a foreman 1.
20      Q.    And you have been a foreman 1 for the
21  remainder of your career at Amtrak?
22      A.    No -- yes, I have been foreman 1, but I
```

```
 1    issue in more detail.  So other than the discipline

 2    issue, anything else that Mr. Campbell did or

 3    Mr. Kapela did that I haven't asked you about?

 4            MR. GOLDSMITH:  Objection.  Objection to

 5    the form.

 6            THE WITNESS:  A lot -- hiring people that

 7    was less qualified than me.

 8            BY MR. FISCHLER:

 9        Q.    And that's what I want to get to next.

10            Tell me, what does a foreman 2 do?

11        A.    Okay.  Foreman 2 responsibility, they

12    supervise foreman 1s and the mechanica-craft

13    employees.

14        Q.    What are the mechanical-craft employees?

15        A.    Car repairman, electrician -- car

16    repairman, electrician --

17        Q.    Pipe fitters?

18        A.    Pipe fitters, yes.

19        Q.    Anybody else?

20        A.    That's it.

21        Q.    Okay.  Did you ever work as a car

22    repairman?
```

1       A.    Not directly, no.

2       Q.    What do you mean, "not directly"?  Did you

3  ever work indirectly as a car repairman?

4       A.    I work closely with them during the

5  inspection as the foreman 2 that I had to do on a

6  car, basically, cover the responsibility that a car

7  repairman would do if they inspecting the interior

8  of the car.

9       Q.    Okay.  So you said the inspection you did

10 as a foreman 2.

11      A.    The inspection as a foreman 1.  I'm sorry.

12 If I said foreman 2, I'm sorry, I meant foreman 1.

13      Q.    So the inspection that you did in

14 supervising the couch cleaners is comparable to what

15 you would have to do in supervising a car repairman?

16      A.    I -- I would give them orders if I needed

17 them to do something and stuff but what I was

18 talking about, if I can explain what I was saying,

19 you know, I worked closely with the foreman 2s, also

20 worked closely with all the craft that I just

21 mentioned.

22      Q.    Okay.

1     A.    Even my laborers worked with the pipe

2     fitters.  I have to give one of my employees to the

3     pipe fitter, help them work, so that mean I have

4     to -- to be involved in that.  You know, and there's

5     a lot of time that I have participated in that job.

6     Q.    Okay.  But did you ever hold the title "car

7     repairman"?

8     A.    No, I never held the title of a car

9     repairman.

10    Q.    Did you ever perform the duties of a car

11    repairman?

12    A.    Indirectly.

13    Q.    Did you ever --

14    A.    No.

15    Q.    Okay.  Did you ever hold the title of

16    electrician?

17    A.    No.

18    Q.    Did you ever perform the duties of an

19    electrician?

20    A.    No.

21    Q.    Did you ever hold the title of pipe fitter?

22    A.    No.

1      Q.    Did you ever perform the duties of a pipe
2  fitter?
3      A.    I have.
4      Q.    Tell me when.
5      A.    I have helped -- don't know the exact time.
6  In the period of my career with Amtrak, like I said,
7  my employees have to work with pipe fitters
8  sometimes.  It is times that we would be short of
9  pipe fitters or I might be short of my employees so
10 I have to assist.  That's the job of a foreman; you
11 have to assist sometimes.
12     Q.    Okay.  And in doing that, you performed the
13 duties of a pipe fitter?
14     A.    I have helped put water in there and drop
15 the little tablets in the toilets and that's the job
16 of a pipe fitter.
17     Q.    That's the job of a pipe fitter?
18     A.    Some parts of it, yes.
19     Q.    Are there other parts of a pipe fitter job?
20     A.    Yes.  I actually never had to work with the
21 part that they have to hook the hose up to to clean
22 the tanks out from, you know, urine and feces and

1    stuff like that, ah, ah, ah --

2        Q.    You can't explain it like that.    The court

3    reporter cannot write that down.

4        A.    Okay.    I'm so sorry.

5              I never performed the duty actually when

6    they have to dump the hoppers.    They call it dump

7    the hoppers.

8        Q.    And that's the waste that's in the

9    bathroom?

10       A.    That's the waste in the bathroom.    I

11   observed it, but I never actually had to do it

12   myself.

13       Q.    The part that you have done is -- tell me

14   that again.    What part have you done?

15       A.    It is, like, help putting the water into

16   the tanks.    You have to put the water back into the

17   hopper.    We call it the hopper, which is from the

18   bathroom.    You stick the hose and you fill it back

19   up.    After they dump it, you have to rinse it out

20   two or three different times to clean it, so I --

21   sometimes I will have to help that if I didn't have

22   a person up top.    They call up top.    Down the bottom

1    is the person actually did the dumping.  Up top was

2    the person that rinsed out.  So a lot of times, like

3    I said, we were short, I would help.  I would do the

4    rinsing out, put the tablets in and stuff like that,

5    you know, putting them little safety stuff on,

6    gloves and all that, the whole works.

7        Q.    But you never did the bottom part?

8        A.    I actually never did it but I assist them

9    by watching them, making sure, you know, if they did

10   it properly.

11       Q.    So you have done a part of the pipe fitter?

12       A.    I did a part of the pipe fitter, yes.

13       Q.    Okay.  Let me show you what I am going to

14   mark as Exhibit 3.  Give me 1 second.

15            (Whitley Deposition Exhibit 3 was marked

16   for identification.)

17       A.    Thank you.  (Reviewing document.)

18            MR. GOLDSMITH:  I'm sorry, Keith.  Did you

19   ask her a question?

20            MR. FISCHLER:  No, I'm just asking her to

21   look at it.  There is no question pending.

22            THE WITNESS:  Okay.

```
1        A.    Okay.  (Reviewing document.)

2              Yes, we have here 238 tier 1 train-brake

3    test.  I'm starting from the bottom.  I should have

4    started from the front but I'm going to do that.

5              MR. GOLDSMITH:  Do you want her to tell you

6    which ones are which?

7              BY MR. FISCHLER:

8        Q.    Yes, if you would, please.

9        A.    Okay.  The -- it say 2004.  Okay.

10   That's -- let me make sure I do it right so -- okay.

11   The 238 tier 1 train-brake test; 238 tier 1

12   train brake test, that's the same 1.

13       Q.    It looks like there is three in a row.

14       A.    1, 2, 3, 4, 5, 6, 7, 8, 9, 10 -- 1, 2, 3,

15   4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16.  What

16   I see here, starting from the top, 7/23/2004, all

17   the way down to 238 tier 1 train brake test, which

18   was 3/17/2004.

19       Q.    Okay.  And it looks like as though there is

20   three in a row?

21       A.    Yes --

22       Q.    Do you see where I am?
```

1      A.    -- sir.

2      Q.    Were there three parts to the test or why

3  is it listed three times; do you know?

4      A.    Actually, they have got -- they have the

5  same date for two of them, which is 3/17 --

6  3/17/2004, the same exact date.

7      Q.    Right.

8      A.    And then they have another one, which is

9  10/22 -- oh, that's 2000 -- all of them is 17.

10  Well --

11      Q.    Do you remember what happened?  Do you know

12  why that was three times?

13      A.    Wait a minute.  Wait a minute.  Because I

14  think the class consist of 2, 3 days.

15      Q.    Okay.  And so those --

16      A.    That's why.

17      Q.    Those are the days that you took it?

18      A.    Well, they have the same date there, so if

19  I took it different days, it should have a different

20  date, but -- okay.  They have one right here for

21  3/17 -- they have got 18 hours.

22      Q.    Right.

1      A.    And then the next one was 18 hours.

2      Q.    All three look like they are 18 hours.

3      A.    All 18 hours, oh.

4      Q.    Maybe the total is 18 hours because they

5   all say three days and you couldn't have gotten

6   three days on one.

7      A.    Okay.  Maybe -- I can't answer how they --

8      Q.    Okay.  But when you held this certification

9   was after you completed the course?

10     A.    Yes, sir.

11     Q.    Okay.  Who paid for you to take the course?

12     A.    I got paid straight time, eight hours from

13  the company for going through the class.

14     Q.    Okay.  Did the company give you permission

15  to take the class?

16     A.    Yes, sir.

17     Q.    Was there a charge for the class?

18     A.    Yes, sir.  I got paid for coming in that

19  day.  What do you mean?

20     Q.    No, was there, like, a tuition charge or a

21  payment that the company made for you to take the

22  class?

```
 1       A.    They paid me to come in that day to take

 2   the class.

 3       Q.    Okay.  That's all you know about it?

 4       A.    Yes, sir.

 5       Q.    Fair enough.

 6             Did anybody question -- when you asked to

 7   take the class, did anybody try to prevent you from

 8   taking class?

 9       A.    When I first wanted to get into some of the

10   mechanical classes because I knew that I needed to

11   get the qualification and -- yes.

12       Q.    Okay.  When was that?

13       A.    That was, like, probably -- I would say

14   2 -- 2000 -- I think maybe around 2002 and 2003.

15   That's when I really became interested in trying to

16   get into some of the mechanical classes.

17       Q.    Did you take mechanical classes?

18       A.    Yes.

19       Q.    Okay.  Where are they reflected on here?

20       A.    Okay.

21       Q.    And "here" is Exhibit 4.  I need to be

22   clear about that.
```

1    A.    Uh-huh.  Okay.  We have here, like -- okay.

2  The 238 tier brake, they have got that in 2003.

3    Q.    Which class is that?

4    A.    I was saying there is three of them but

5  they have ten -- that's when I completed that, I

6  guess.  That was 10/22/2003.

7    Q.    Ten -- which class is this?

8    A.    It is -- we are on 238 tier 1 -- tier 1

9  train-brake test.

10    Q.    Okay.

11    A.    Then they have --

12    Q.    That was that three-day test that looks

13  like it was completed in March of 2004; is that

14  right?

15    A.    Yes, sir.

16    Q.    Okay.

17    A.    Now, we have a leadership development.

18  That was in 2000.  Also have a -- we have --

19    Q.    I'm sorry.  Was that a technical class?

20    A.    You mean -- you mean mechanical?

21    Q.    Yes.  You said there were mechanical

22  classes that you wanted to get involved with.

1     A.   Okay.  Let me just go through this just

2  shortly.

3     Q.   Take your time.

4     A.   Okay.  1999, lock-out/tag-out network

5  instructor train -- instruct and train.

6     Q.   Okay.

7     A.   That's a mechanical class.  There is

8  another one in '98, lock-out/tag-out procedure.

9  Here they have one lift-truck instructor refreshing.

10  That's a mechanical.  You dealing with the trucks on

11  the train.

12     Q.   Okay.

13     A.   Network instructor confer.  Now, that could

14  include some mechanical --

15     Q.   Okay.

16     A.   -- skills.  Even the leadership

17  development, it also could be a mechanical

18  experience.

19     Q.   Okay.

20     A.   Both of those because we talk -- you know,

21  those are leadership classes, supervisor, so they

22  teach you about the different things that you would

M.A.R. REPORTING GROUP               PLATT & DAWSON
Professional Court Reporters
www.mar-reporting.com
(703) 534-1225

```
 1   do if you were supervisor, which is, basically, it

 2   is a higher level than foreman 1.

 3        Q.   Okay.  On this work experience list, also,

 4   it says, "Technically sound with all Amtrak's

 5   rolling stock."  Do you see where I am?

 6        A.   No.  Where --

 7        Q.   In work experience, starts on the third

 8   line down, about halfway across.

 9        A.   Oh, you are back on 3.

10        Q.   I'm sorry.  Back on Exhibit 3.

11        A.   What did you ask me, again?

12        Q.   Yes.  It says, "Technically sound with all

13   Amtrak's rolling stock."  It is on the third and

14   fourth line of work experience.

15        A.   "Technically sound with all Amtrak rolling

16   stock."  Yes, I see that.

17        Q.   Okay.  Do you believe that during the

18   relevant time period you were technically sound with

19   all of Amtrak's rolling stock?

20        A.   You mean at the time I got my

21   certification?

22        Q.   Well --
```

1       A.    Just overall?

2       Q.    Overall.

3       A.    Yes.

4       Q.    Okay.  I hear some reservation.  Why is

5    there reservation?

6       A.    I'm saying yes because, like I said before

7    in one of my statements, that I knew I was qualified

8    to be a foreman 2, just being there that many years

9    and being a supervisor and working closely with

10   these people.  Only thing I was really concerned

11   about was being certified so I would be able to work

12   the job.

13      Q.    Okay.  And when were you certified?

14      A.    I was certified in -- I think I finished my

15   classes here, May -- wait the minute.  Let me look

16   up here.  I think it was -- I believe it was

17   10/22/2003.  I think that's -- wait a minute.  Wait

18   a minute.  Take that off.  I'm not sure.  I think it

19   was March of -- I want to say 2005 when I finished

20   my training.

21      Q.    Okay.  Is that reflected on this sheet?

22   You look like you are testifying from memory and I'm

 1   okay with however you want to do it but I'm not

 2   trying to trick you.

 3       A.   No, I know you are not Mr. Fischler, and I

 4   want to be correct, also.

 5       Q.   Take your time.

 6       A.   Do you have -- it don't say here -- I'm not

 7   sure because, like, all the classes I took, you

 8   know, it would tell you, but this air-brake

 9   certification, I believe it was March 17th of 2004

10   when I completed my training.

11       Q.   Okay.  And that's shown from the --

12       A.   I'm looking on this --

13       Q.   -- train-brake test?

14       A.   Yes, I'm looking on this training history

15   that you have given me because all of the class

16   would fall up under -- because Mr. B. L. stated

17   that, also, that all training falls up under the

18   title of 238 certification.

19       Q.   Okay.  So at that point you were certified?

20       A.   Yes, and -- yes, sir.  I believe that is

21   the correct date from looking at this training

22   history.

1    these look like the jobs that I actually applied

2    for.

3            BY MR. FISCHLER:

4        Q.    Do you remember -- that's seven total.  Do

5    you remember applying for any more than seven?

6        A.    I don't think so.  I -- I did tell you it

7    was at least four or more, but yes.

8        Q.    Okay.  Did you ever receive an interview

9    for a foreman 2 position?

10       A.    Yes, sir.

11       Q.    Okay.  Do you remember when that interview

12   took place?

13           MR. GOLDSMITH:  Object to the form.

14           THE WITNESS:  I'm trying to remember the

15   date.  I believe I went to the interview in 2000

16   and -- I want to say 2004 and 2005.

17           BY MR. FISCHLER:

18       Q.    So there were two interviews, the way you

19   remember?

20       A.    It could have been more but I do remember

21   those two.

22       Q.    Okay.  The interview in 2004 would have

```
 1   been, I'm guessing, either August or October?

 2           MR. GOLDSMITH:  Object to the form.

 3           BY MR. FISCHLER:

 4      Q.   Is that right?  Is that your recollection?

 5      A.   Could have been, yes, August.

 6      Q.   Okay.  And then you --

 7      A.   Or before August.  Around that time,

 8   August, yes.

 9      Q.   You recall an interview in 2005?

10      A.   I'm trying to remember the exact time in

11   2005.  I believe -- I believe I did -- I believe I

12   was interviewed in 2005.  I believe.

13      Q.   Do you know what position that would have

14   been for?

15      A.   It would have been for the foreman 2

16   position.

17      Q.   Would it have been for the one that you

18   applied for in October of 2004?  That looks like the

19   last one.

20           MR. GOLDSMITH:  Object to the form.

21           THE WITNESS:  I'm not sure of the date

22   really because I was interviewed -- I do know, like
```

1    I said, twice in that time frame but I can't

2    remember exactly the date that you asked me for

3    around that -- I know one was before August 19th, I

4    was interviewed.

5           BY MR. FISCHLER:

6      Q.    Do you remember applying for a job prior to

7    August 19th, a foreman 2 job prior to August 19th?

8           MR. GOLDSMITH:  Object to the form.

9           THE WITNESS:  Yes.

10          BY MR. FISCHLER:

11     Q.    Okay.  Was it prior to August 6th, 2004, as

12   best you recall?

13     A.    Okay.  Yes, I believe -- I knew September.

14   I believe I applied for one in September of 2004, I

15   believe.

16     Q.    Okay.

17     A.    And -- and I want to say August and, like I

18   said, it could have been other ones that I was

19   interviewed for but those two really stuck to my

20   head for the time frame.

21     Q.    Okay.  The 2004 interview, do you remember

22   where that interview took place?

1    A.    Yes.  Personnel office.  That's where they

2    do -- they perform their interviews.

3    Q.    Do you remember who was there?

4    A.    Okay.  I believe the first one -- I believe

5    Ms. Sarah Ray, Al -- I'm trying to pronounce his

6    name correctly -- Aaronson, Anderson, Aaronson.  His

7    first name is Al.

8    Q.    Al, A-L?

9    A.    Yes.

10    Q.    Aaronson is his last name?

11    A.    Yes, that's how I was trying to pronounce

12    it.  Thank you.

13          I believe Bob Frank.  I believe the union

14    rep that was there for me was -- I want to say

15    Mr. Paul Higgs.

16    Q.    Paul Higgs?

17    A.    Yes.

18    Q.    H-I-G-G-S?

19    A.    Yes.  That's how you spell the name, I

20    believe.  I did say Bob Frank, right?

21    Q.    Yes.

22    A.    Okay.  The second one, it was Bob Frank,

1    A.    No.

2    Q.    Do you know anything about his supervisory

3  experience?

4    A.    No.  I was -- my understanding, he didn't

5  have supervisory experience.

6    Q.    I'm sorry?

7    A.    My understanding that he didn't have any

8  supervisory experience.  You know, railroad talk.

9    Q.    And that's just from railroad talk?

10    A.    Railroad talk and I really didn't see it

11  here.  I might have overlooked it.  But when I was

12  going through the list of the foremans that they

13  hired and the information that came from personnel

14  explaining the qualifications, I really don't

15  remember seeing, you know, that he had supervisory

16  experience.

17    Q.    Okay.  You talked a couple of times about

18  the fact that you are not currently working at

19  Amtrak.  Is that accurate?

20    A.    No, I'm not -- yes, it is.  I'm not working

21  for Amtrak now.

22    Q.    What's your current status?

1          A.     Occupation disability.

2          Q.     When did you start your disability?

3          A.     I went out June 2nd, 2005, so --

4    disability -- I was off sick.  I went out in 2000 --

5    June 2nd, 2005.

6          Q.     And what's the basis of your disability?

7          A.     Well, it was occupation disabilities.

8          Q.     What happened?

9          A.     I hurt -- I fell off of the sidewalk and I

10   was injured.

11         Q.     Fell off the sidewalk?

12         A.     Yes.

13         Q.     And how were you injured?

14         A.     My whole right side, neck, back, knee, leg.

15   I injured my whole right side.

16         Q.     So you have been out for a year and -- I

17   guess it is 20 months, total -- a year and

18   eight months; is that about right?

19         A.     Yes, sir.

20         Q.     Do you know, is that short-term disability

21   or long-term disability?

22         A.     Might be long-term disability at this time.

1     A.    When I -- when I went to her, before I went

2  out with my injury, she referred me to the doctor --

3  I have information that -- a document that she

4  called them and referred them and told them I was

5  coming and why I was coming and that's -- that's the

6  only thing I can think of -- documentation, as far

7  as the information.

8          MR. FISCHLER:  Just for the record, no

9  documents have been produced regarding that and

10  there is no reference to that at all in the

11  interrogatory responses.

12          BY MR. FISCHLER:

13     Q.    To your knowledge, are you currently on the

14  Amtrak payroll?

15     A.    No, I'm not on the Amtrak --

16     Q.    When were you taken off the Amtrak payroll?

17     A.    I believe -- I believe they took me off --

18  when I went out in 2005, I was getting sick leave.

19  Yes, I think it was, like, November 2000 -- the

20  end -- 2005, around November.  Because my

21  disability -- the disability started in December, I

22  believe.

1          MR. GOLDSMITH:  Before you ask the next

2     question, is there something that you think you

3     should have that you don't have because I want to

4     make sure I make a good record of it if that's the

5     case and I can check on it.

6          MR. FISCHLER:  Well, I'm not clear.  There

7     is new claims that we're hearing about that we've

8     never heard about before.  They are not mentioned

9     anywhere in the interrogatory answers.  They are not

10    mentioned --

11         MR. GOLDSMITH:  And you are saying that she

12    went to the EAP and --

13         MR. FISCHLER:  That's part of it, yes.

14         MR. GOLDSMITH:  Is there anything else?

15    I'm just trying to make a note of it so I can fix it

16    if there is a problem.

17         MR. FISCHLER:  Whatever her claims are, I

18    think you have got a duty to respond in the

19    interrogatories and they are not there, so if there

20    is --

21         MR. GOLDSMITH:  Whatever her claims are

22    about disability, is that what you are --

1          MR. FISCHLER:  About disability, about

2     whatever went on at Amtrak.  There is new stuff that

3     she is mentioning today that contradicts our

4     interrogatory answers and I think you -- if that's

5     what you intend to pursue, I think you have got a

6     duty to supplement all of that.

7          THE WITNESS:  Could I --

8          MR. GOLDSMITH:  Go on.

9          THE WITNESS:  Could I have another minute?

10    Could I have two minutes?

11         MR. FISCHLER:  A break?

12         THE WITNESS:  Yes, a two-minute break,

13    please.

14         MR. FISCHLER:  Oh, absolutely.  Sure.

15         (A recess was taken.)

16         BY MR. FISCHLER:

17    Q.   You testified that you were taken off the

18    payroll in November of 2005; is that right?

19    A.   I believe that's the time I was taken off

20    the payroll.

21    Q.   Are you eligible for rehire?

22    A.   That would be up to my doctors.

```
 1    conversation that I taped were actually, basically,

 2    was in the office or most of the abuse that was

 3    going on towards me, it was 2000 -- I know I taped

 4    in 2004.

 5         Q.    Was it after your first suit was dismissed?

 6         A.    Was it after the first suit?

 7         Q.    The first time you taped conversations.

 8         A.    Yes.

 9         Q.    Whose conversations did you tape?

10         A.    B. L. Campbell, of course, for one, the

11    foremans that was in the office, Michael Tally,

12    Barbara Montcree, Gibson, McIntyre.

13         Q.    Do you have any tapes of them making

14    inappropriate comments?

15         A.    Yeah.  Yes.

16         Q.    Have all those been produced?

17         A.    Amtrak -- some of my tapes were not

18    returned -- was taken from me and wasn't returned to

19    me, but it was turned -- a lot of my tapes were

20    turned over to Mr. Kapela and I am told by -- they

21    were turned over to Mr. Kapela.

22         Q.    Are all the ones that you have custody
```

```
 1   of -- have those been produced?

 2         MR. GOLDSMITH:  They have, Counsel.

 3   Whatever she had, you have -- every last scratch.

 4         MR. FISCHLER:  Okay.  I heard them.

 5         BY MR. FISCHLER:

 6     Q.    Did you tell anybody you were taping them?

 7   Is there anybody in the office who knew that you

 8   were taping conversations?

 9     A.    No.

10     Q.    You were the only one?

11     A.    (Nodding head.)

12     Q.    How frequently did you tape conversations?

13     A.    Basically, during the day because it was a

14   lot of abuse going on all day, and I wanted it to be

15   on tape so that I would be able to present this to

16   whoever I needed to present this to to protect me.

17     Q.    Did you ever report that to anybody

18   internally in Amtrak?

19         MR. GOLDSMITH:  Object to the form.

20         BY MR. FISCHLER:

21     Q.    You can answer.  You wanted to protect

22   yourself.  Did you ever provide those tapes to
```

1  anyone internally in Amtrak?

2      A.    No, because I didn't know who to turn them

3  to.  I was -- I was afraid to go to anyone and --

4  within Amtrak at that point because of my previous

5  case.  I didn't know who to trust.  I didn't know

6  who were going to help me.

7      Q.    Do you have any understanding of Amtrak's

8  policies about tape recording conversations with

9  coworkers?

10     A.    Not taping conversation.  They had

11  something out about radios and -- I mean walking

12  around with talking on telephones and their little

13  CD players and the ear things and they wasn't

14  permitted on the company -- I mean on the property

15  while working.

16     Q.    That's not my question.  Was there any

17  policy to your knowledge about tape recording

18  conversations with coworkers?

19     A.    They had -- they actually didn't have -- it

20  was a policy they put out but actually they didn't

21  have tape recorder on it but they did have -- what

22  the word to use --

```
 1        Q.    Tell me as best you recall.  I'm not
 2   looking for a direct quote.
 3        A.    I got it on the tip of my tongue.  Can't
 4   get it out there, the word they would use for
 5   bringing in different things like that.
 6        Q.    Electronic equipment?
 7        A.    Electronic.  Thank you.
 8        Q.    Okay.  What was the policy about that?
 9        A.    It was saying that they didn't allow those
10   on the property while working.
11        Q.    And so you violated that policy?
12        A.    Yes, I violated that policy because the
13   manager and the foremans, they violated -- they
14   violated all kinds of policy that Amtrak had out so,
15   I mean, I didn't really have any choice, like I told
16   you, but to do what I had to do to try to protect
17   myself.
18        Q.    How did you tape record them?  Was it a
19   tape recorder you used?
20        A.    Yes.
21        Q.    What do you use to tape record them?
22        A.    What did I use?
```

```
 1       A.   Yes.

 2       Q.   -- alleging sexual harassment?

 3       A.   Yes.

 4       Q.   And Jessie Jackson helped her win her case?

 5       A.   Yes.  She had quite a few civil -- she had

 6  a couple -- yes, Jessie Jackson, civil right leader,

 7  he helped her.

 8       Q.   So she said that she could help you also

 9  and that Jessie Jackson needed your tapes?

10       A.   Yes, he needed my tapes and my information.

11       Q.   So you gave them to her?

12       A.   Yes.

13       Q.   And then she turned them over to Mike

14  Kapela?

15       A.   She gave them to her Amtrak supervisor and

16  they gave them to Mike Kapela.

17       Q.   And what was the next thing you heard about

18  your tapes?

19       A.   That Mike Kapela had my tapes, B. L. had my

20  tapes, and the word out that they were going to fire

21  me because I had taped conversation of them, which

22  it was conversation of all kind of Amtrak rules that
```

1    they violated, the manager and the foremans.

2         Q.    Were there conversations with Mr. Kapela

3    that were on the tapes?

4         A.    I -- I don't believe.

5         Q.    Okay.  When was this, about?

6         A.    The time --

7         Q.    Yes.

8         A.    -- that this happened?  When I was taping;

9    is that what you are asking?

10        Q.    No, when the tapes were turned over to

11   Mr. Kapela -- when was that, about?

12        A.    I want to say 2005.

13        Q.    Do you know what month?  Was it before or

14   after you went out on disability?

15        A.    It was before.

16        Q.    How much before?

17        A.    I got hurt in June so I'm -- I'm

18   assuming -- I'm quite sure that it was in 2005 so

19   maybe -- I would say between the first and -- the

20   first of -- the first of 2005 and -- I would say

21   maybe about three or four months within the

22   beginning of 2005.  I'm not sure but I'm roughly

1    thinking that's what happened.

2        Q.    All right.  And you said that you were told

3    that they were going the fire you about the tape

4    recordings.  Do you know why you were going to get

5    fired about the tape recordings?

6            MR. GOLDSMITH:  Object to the form.

7            THE WITNESS:  Basically, because -- they

8    said B. L. was really upset because he was on the

9    tape recorder so that anybody was violating all

10   Amtrak policy and he was very upset and the word out

11   that he had it in for me and he were going to fire

12   me.

13       Q.    What happened?  Did he fire you?

14       A.    No, because I went out with the injury

15   and --

16       Q.    So it was shortly before you went out on

17   your injury?

18       A.    I'm going to just add something to it.

19   Did -- I think when I went out on my injury -- I'm

20   trying to sort of be correct with my facts -- I

21   don't know whether B. L. wrote me up pertaining to

22   the tapes after I went out on my injury or -- I



FILED

MAR - 7 2003

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAE L. WHITLEY
823 GLEN ALLEN
BALTIMORE, MD 21229,

   Plaintiff,

  v.

NATIONAL RAILROAD PASSENGER
CORPORATION
60 MASSACHUSETTS AVE., SE.
FOURTH FLOOR
WASHINGTON, D.C. 20002,

   Defendant.

\*
\*
\*
\*
\*
CASE NUMBER 1:03CV00636

JUDGE: Royce C. Lamberth

DECK TYPE: Employment Discrimination

DATE STAMP: 03/**/2003

JURY ACTION

\*
\*
\*
\*

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION
## SEEEKING COMPENSATORY AND PUNITIVE DAMAGES

### Introduction

1. The Plaintiff, Ms. Mae Whitley, a current employee of Defendant National Railroad

Passenger Corporation ("Amtrak") brings this action pursuant to Title VII of the Civil

Rights Act of 1964, as amended, 42 U.S.C. §2000e et seq. and the District of Columbia

Human Rights Act, (DCHRA), D.C. Code Ann. 2-1401.01 to 2-1403.17 (2002). Ms.

Whitley seeks redress for gender-based discrimination in the form of a hostile work

environment and quid pro quo sexual harassment. Plaintiff also seeks relief for the

retaliatory disciplinary actions and abolishment of her position by Defendant, when she

complained of hostile work environment and sexual harassment. Finally, pursuant to the



DEPOSITION
EXHIBIT
Whitley 1A
2/27/07

District of Columbia's common law tort for negligent supervision, Plaintiff Whitley seeks redress for the injuries she suffered from Amtrak's negligent supervision of its employee, Mr. Frank Covers.

### Jurisdiction

2. Jurisdiction in this matter is invoked pursuant to 42 U.S.C. §2000e-5(f), and 28 U.S.C. §§1331, 1343(4), 1346 and 1367 and pursuant to 28 U.S.C. §1367 (Supplemental Jurisdiction).

3. All actions complained of herein have taken place within the jurisdiction of the District of Columbia and involve a Plaintiff and a Defendant who have an employment relationship, the subject of this complaint, within its jurisdictional boundaries.

### Parties

4. Ms. Whitley, a United States citizen, was employed by Defendant National Passenger Railroad Corporation ("Amtrak") since 1977. She began her employment with Amtrak as a coach cleaner and prior to her filing EEO complaints, Ms. Whitley's employment history with Amtrak was blemish-free. Her current job title is Foreman I, a supervisory position located in Defendant's Mechanical Department.

5. Defendant Amtrak is a railroad service headquartered in Washington, DC. Amtrak is an "employer" within the meaning of Title VII and of the D.C. Human Rights Act. Amtrak was Ms. Whitley's employer at all times relevant to this action.

### Statement of Material Facts

6. Mr. Frank Covers' unwelcome sexual advances and other acts of sexual harassment against Plaintiff Whitley began early in 1999. At that time, he was her immediate supervisor.

7. From the start, Mr. Covers made lewd, blatantly sexual gestures to Ms. Whitley. He would consistently talk about sex to Plaintiff, specifically discussing oral sex and sticking his tongue out to make crude gestures.

8. On several occasions Mr. Covers cornered Ms. Whitley and told her that if she had sexual relationships with him she would be able to participate in the training which would provide her the qualifications she needed for promotion to the Foreman II position. While talking he would stare at her breasts or slowly look her up and down with a lewd smile on his face.

9. At first Ms. Whitley was afraid of Mr. Cover's unwelcome advances; but her fear quickly changed to rage and she told him unequivocally that she wanted him to stop the offensive sexual and harassing behavior.

10. Mr. Covers exploited his supervisory position to create situations where he and Ms. Whitley would be alone so he could press his body onto hers. At times he would do this even in front of Ms. Whitley's coworkers.

11. During one instance, he put both his hands on Ms. Whitley's shoulders and slithered his hands down to Ms. Whitley's breasts. Plaintiff told him clearly "Stop, don't do that."

12. Starting early in 1999, Ms. Whitley informed Defendant Amtrak, by telling Mr. Daryl Pesce, that she was being sexually harassed by her immediate supervisor, Frank Covers.

13. Mr. Pesce told Plaintiff that he would make the harassment stop.

14. Despite her complaints to management, the sexual harassment by Mr. Covers continued.

15. On or about March 22, 1999, Ms. Whitley filed a written complaint. At the request of Mr. Pesce, and relying on his commitment to stop Mr. Covers' harassment of her,

Plaintiff did not include the sexual aspect when describing the hostile environment created by her supervisor.

16. Shortly thereafter, as a result of the harassment by Mr. Covers, Plaintiff needed to take sick leave and seek medical treatment.

17. When Plaintiff returned, Mr. Wayne Brody, the Manager of Mechanical Department, removed Ms. Whitley from having to work with Mr. Covers and assigned her to work for him.

18. In that same time period, a meeting to attempt resolution of Plaintiff's complaints took place with Mr. Pesce, Mr. Brody, Ms. Saunji Fyffe, the manager of Defendant's EEO office, two other Amtrak managers, Mr. Covers and Ms. Whitley. In this meeting, Mr. Pesce again assured Ms. Whitley that the harassment would stop.

19. In this same meeting, management committed to providing Ms. Whitley the training to become a Foreman II.

20. Ms. Whitley had been afraid to complain about Mr. Cover's behavior because she feared that Mr. Covers would exploit his superior position to retaliate against her. Her fears were confirmed when she was denied the training for Foreman II positions and when her position was abolished.

21. These actions caused Plaintiff Whitley to file another EEO complaint.

22. In October, 1999, Ms. Whitley was awarded a temporary Foreman II position.

23. Management did not provide the promised training, however. Others, even those with less seniority, were instead provided the Foreman II training.

24. In April, 2000, Ms. Whitley was informed that her position had become permanent.

25. Later that same month, she learned that the position was not permanent and, in fact, that her temporary Foreman II position was abolished and she was returned to a Foreman I pay level.

26. Ms. Whitley continued to perform the duties of a Foreman II.

27. In October, 1999, Mr. Michael Kapela became Plaintiff's second line supervisor. From the beginning, he harassed Ms. Whitley, exacerbating the hostility she encountered in the workplace of Defendant.

28. During the first half of 2000, Ms. Whitley informed other Amtrak management of the continued harassment. She was told that the harassment and hostility were inevitable since she would not sleep with Amtrak managers.

29. In July, 2000, Ms. Whitley had to go to the emergency room where she was diagnosed as having a nervous breakdown.

30. When Ms. Whitley's position was abolished, another position was advertised with the same duties she had been performing, but with the requirement of having the training she was denied. Plaintiff was considered not qualified for the position she had been performing.

31. When her position was abolished, the only position available for her was one working for Mr. Frank Covers. She had to take the job and began in January, 2001.

32. Thereafter, the sexual harassment by Mr. Covers began again.

33. Mr. Covers also created more hostility in the job, including repeatedly denying Ms. Whitley the opportunity to work overtime, that was given to others and to her prior to her complaints against Covers.

34. In April, 2001, Ms. Whitley again was forced to take sick leave and seek medical treatment resulting from the harassment and hostility she suffered from Frank Covers and other Amtrak managers.

### Procedural History

35. On September 24, 2001, Ms. Whitley filed a charge of discrimination with the United States Equal Employment Opportunity Commission ("EEOC").

36. The EEOC processed the Complaint from Ms. Whitley and issued a "Right to Sue" letter on December 4, 2002. Ms. Whitley received the Right to Sue letter on December 9, 2002.

### Causes of Action Against Defendant Amtrak

**COUNT I   Sex Discrimination in Violation of Title VII.**

37. On the basis of the actions and inactions alleged in paragraphs 1 to 36, Plaintiff Whitley asserts that, because of her sex, Defendant has violated Section 703 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-2.

**COUNT II   Retaliation for Reporting Sexual Harassment in Violation of Title VII.**

38. On the basis of the actions and inactions alleged in paragraphs 1 to 36, Plaintiff Whitley asserts that, because of her opposition to actions made unlawful by Title VII, Defendant has violated Section 704 of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3.

6

**COUNT III** <u>Retaliation for Protected Activity in Violation of the D.C. Human Rights Act.</u>

39. On the basis of the actions and inactions alleged in paragraphs 1 to 36, Plaintiff Whitley

asserts that Defendant Amtrak violated the prohibition against retaliation for engaging in

protected activity contained in the District of Columbia Human Rights Act, D.C. Code

Ann. §§ 1-2501 to 1-2557 when after her hostile work environment complaint against

Mr. Covers, he further created a hostile work environment by sexually harassing Plaintiff

Whitley.

**COUNT IV**    <u>Retaliation for Protected Activity in Violation of the D.C. Human Rights Act.</u>

40.    On the basis of the actions and inactions alleged in paragraphs 1 to 36, Plaintiff Whitley

asserts that Defendant Amtrak violated the prohibition against retaliation for engaging in

protected activity contained in the District of Columbia Human Rights Act, D.C. Code

Ann. §§ 1-2501 to 1-2557 when it denied Plaintiff training and abolished her position.

**COUNT V**    <u>Negligent Supervision of Employee/Agent Tort.</u>

41. On the basis of the actions and inactions alleged in paragraphs 1 to 36, Plaintiff Whitley

asserts that after being informed of the sexually harassing and retaliatory conduct of Mr.

Covers, Defendant failed to exercise reasonable care in its supervision of Mr. Covers and

that Amtrak's improper supervision of Mr. Covers was the proximate cause of the

injuries she suffered after she complained and resulted in continued preventable harm to

Plaintiff.

## Relief Requested

WHEREFORE, Ms. Whitley respectfully requests this Court to:

1.  Issue a declaratory judgment that acts and practices of Amtrak complained of violate federal laws and the laws of the District of Columbia;

2.  Award Ms. Whitley actual damages for her lost wages, lost benefits and other lost compensation;

3.  Award Ms. Whitley a promotion or promotions to restore her to her rightful place in her career.

4.  Award Ms. Whitley compensatory and punitive damages for each violation of Title VII, the D.C. Human Rights Act and the common law of the District of Columbia;

5.  Award reasonable attorney's fees and litigation expenses incurred in this matter;

6.  Order any further relief this Court deems just and proper.

## Jury Demand

Ms. Whitley hereby asserts her right to a jury trial for each claim asserted herein.

Respectfully Submitted

Gary T. Brown
D.C. Bar No. 246314
Gary T. Brown & Associates
Suite 1000
1400 K Street, N.W.
Washington, D.C. 20005
(202) 393-4900
Attorney for Plaintiff,
Ms. Mae Whitley

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MAE L. WHITLEY,                          )
                                         )
      **Plaintiff,**                  )
                                         )          Civil Action No. 03-00636 (RCL)
      **v.**                         )
                                         )
NATIONAL RAILROAD PASSENGER              )
CORPORATION,                             )
      **Defendant.**                  )
_____)

## <u>MEMORANDUM OPINION</u>

This matter comes before the Court on defendant's Motion for Summary Judgment [#11] pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. Plaintiff Mae L. Whitley has filed a sexual harassment suit for violations of Title VII (42 U.S.C. §200e et seq.), 42 U.S.C. §1981, and the District of Columbia Human Rights Act (D.C. Code Ann. §§ 2-1401.01 to 2-1403.17 (2002)). For relief, she requests this Court to issue a declaratory judgment that the acts and practices of National Railroad Passenger Corporation ("Amtrak") violate federal laws and the laws of the District of Columbia. The plaintiff also seeks actual damages for her potentially lost wages, lost benefits and other lost compensation; a promotion to restore her allegedly rightful place in her career; compensatory and punitive damages for each alleged Title VII violation and reasonable attorney's fees and litigation expenses incurred in this matter. Also before this Court is defendant's Motion to Compel [#10]. Upon consideration of the parties' filings, the applicable law and the facts of this case, this Court finds that the defendant's Motion for Summary Judgment, should be GRANTED.



DEPOSITION
EXHIBIT
Whitley 1B
2/27/07 whw
PENGAD 800-631-6989

# I. BACKGROUND

Plaintiff Mae L. Whitley ("plaintiff"), an African-American female, was hired by Amtrak ("defendant") in 1977 for the position of coach cleaner. Comp. ¶ 4 (Mar. 7, 2003). Then, in approximately 1992, she was promoted to the Foreman I position. Comp. ¶ 4. In her capacity as a Foreman I, her duty was to supervise coach cleaners and laborers. Whitley Dep. 7-8 (Oct. 27, 2003).

Plaintiff alleges that starting in the 1980s, one of her supervisors, Frank Cover ("Cover") started to make unwelcome sexual advances towards her. Whitley Dep. at 21. Though there is some dispute as to whether this contact did in fact occur in this manner, it will be assumed that Cover's actions did constitute unwelcome sexual advances.[1] See Cover Dep. at 108-09 (Dec. 10, 2003). On one occasion, plaintiff contends that Cover even "put both his hands on [her] shoulders and slithered his hands down to [her] breasts." Comp. ¶11.

The plaintiff alleges that Cover had cornered her several times to proposition her in exchange for promotion to a Foreman II position for which he was on a panel of advisors. Whitley Dep. 59; Stiggers Dep. 114 (Nov. 13, 2003). The plaintiff alleges that Cover assured her that she would be guaranteed to pass the interview if she "would go out with him…[h]e would make sure that [she] would pass the interview…and wouldn't have any problem getting the job." Whitley Dep. at 72. Plaintiff further alleges that during these conversations, Cover made uncomfortable sexual advances by "poking his tongue out talking about what he could do with it." Whitley Dep. at 74; 81-85, 89-90.

---

[1] Since under the Court's summary judgment analysis, "evidence of the nonmovant is to be believed" and inferences drawn from the facts must be viewed in the light most favorable to the nonmovant, the Court will apply this standard to the nonmovant's facts. See Anderson, 477 U.S. at 250; Adickes v. S.H. Kress & Co.,

Cover had established a training program to train and promote Foremen I, which the plaintiff alleges was targeted towards the plaintiff and another female African-American, Althea Stiggers ("Stiggers"). Whitley Dep. 61-62. Stiggers was placed in the training program, while a temporary position was created for the plaintiff since the two women could not go through the six month training program simultaneously. Whitley Dep. 61-62. After Stiggers had completed the program, the plaintiff would then undergo the training necessary to be promoted. Whitley Dep. 68. A promotion however, was contingent upon an interview to test the employee's mechanical skills and Foreman I knowledge. Id. According to Cover and Michael Kapela[2] ("Kapela"), since the plaintiff interviewed poorly despite Cover's assistance in preparation for the interview, she was not promoted. Cover Dep. at t 56, 69, 79; Kapela Dep. 63.

In March 1999, Cover became the plaintiff's immediate supervisor. Shortly thereafter the plaintiff describes an incident in which Cover scolded a group of predominantly white males, for their time cards. Whitley Dep. at 48-52. Cover said to her, "I told you about messing with those time cards. Get your __ over there with them employees, with them car cleaners." Whitley Dep. at 51. The plaintiff then ran out of the office crying to another supervisor, Bob Frank ("Frank"). In her deposition she explains that this incident was so shocking to her merely because "everything that [Cover] does is shocking to me." Whitley Dep. at 52.  After Frank tried to calm the plaintiff down, he told her to take the rest of the day off. Whitley Dep. at 54. From home, she then called Daryl Pesce ("Pesce") and he responded by saying that he "had to report this" to the EEO within the company. Whitley Dep. at 54. Pesce also told the plaintiff to take a few days since he did not want to let her go back to work under Cover. Whitley Dep. at 54, 99-100. Pesce

---

[2] An Amtrak supervisor who supervised the plaintiff subsequently.

contacted "in-house EEO" Saynji Fyffe ("Fyffe"), who called the plaintiff at home and assured the plaintiff that she would "take care of it." Whitley Dep. at 104.

In March of 1999, Amtrak's internal dispute resolution office investigated the plaintiff's allegations pursuant to Amtrak's sexual harassment policy.[2] Whitley Dep. at 100; Comp. ¶15. Before the plaintiff was permitted to return to work, Fyffe arranged a meeting with the plaintiff, Cover, Frank, Mike Kapela ("Kapela") and a few other Amtrak supervisors to discuss the last incident of alleged harassment and to ameliorate the plaintiff's working conditions.[3] Whitley Dep. at 120-21. In this meeting, the plaintiff failed to voice her concerns regarding the sexual nature of her accusations.[4] Whitley Dep. at 116-17. The plaintiff was also reassured by Pesce that no one would act to retaliate against her for her complaints. Whitley Dep. at 119-20.

Following this meeting, the defendant's supervisors had not yet decided where to place the plaintiff because one of the supervisors was concerned about her returning to work under Cover. Whitley Dep. at 123. The plaintiff was told to sit in to temporarily observe the training sessions with Stiggers. Id. Approximately a week later, the plaintiff was transferred to a new training position in which she did not have any contact with Cover and was therefore safeguarded from further harassment. Whitley Dep. at 125-26, 129. The plaintiff was placed in this training

---

[2] Plaintiff's clearly states in her complaint that Whitley filed a written complaint on March 29, 1999. Pl.'s Compl. ¶15 (Mar. 12, 2003). However, in her deposition, Whitley explicitly denied the existence of a written complaint. Whitley Dep. at 128-29.

[3] Plaintiff was unclear as to the exact purpose and result of this meeting. In Plaintiff's Complaint, she contends that in this meeting the management "committed" to provide the the training necessary to become a Foreman II. Compl. ¶19.

[4] Plaintiff stated that since she had complained of the sexual nature of the complaints to Fyffe and Pesce, it was their duty to raise these issues at the meeting, "Because [Fyffe] told me she was going to take care of it. So I'm figuring she's supposed to be defending me. She should have brought it up. And Darrell Pesce was sitting there. He knew about it. So neither one of them said anything." Whitley Dep. at 121.

position from March 1999 through October 1999 under the supervision of a female.[5] Whitley

Dep. at 125.

In this new position, the plaintiff complained that her new second line supervisor, Kapela,

harassed her as well.[6] Within this new training position, the plaintiff alleges that she and her

office mate, Paul Hemphill endured harassment from Kapela, but plaintiff explicitly denies the

inclusion of any sexual undertones. Whitley Dep. at 136-37, 141. The plaintiff further alleges that

the defendant's harassment continued in the form of retaliation, by not being permitted to work

overtime hours.[7] Whitley Dep. at 138.  The plaintiff reported these incidents to Pesce and Cover

who spoke to Kapela about his alleged harassment of the plaintiff. Whitley Dep. at 142.

Plaintiff alleges that upon returning from a business meeting in July 2000, she learned

that not only had her position been terminated, but the entire training program had been

abolished.[8] Whitley Dep. at 160. Although the plaintiff contended that the training program was

cancelled because of her specific complaints, other Amtrak employees were unable to complete

---

[5] The permanent nature of this position was questionable. The defendant's Ex. 3 is a special notice advertising the Foreman I position as temporary. Def.'s Ex. 3. When asked if the position was permanent or temporary, the plaintiff responded, "It was permanent. I mean, it was temporary at the time; but my boss, Carol Evans, after I worked the job for 30 days, she told me that I was doing a good job and that I didn't have anything to owrry about; that the job was going to be permanent." Whitley Dep. at 150. When pushed for a further clarification as to whether the job was in fact explicitly guaranteed to her as a permanent position, she responded, "No more than what I just said." Whitley Dep. at 151.

[6] Plaintiff alleges that from the beginning, Kapela harassed her, but the defendant contends that this alleged harassment did not have a sexual component because plaintiff stated that Kapela treated her office mate, Paul Hemphill, in the same manner. D. Rep. at 2.

[7] Stiggers stated that and employee could volunteer to work overtime, which would then be approved based on the employee's seniority and how much overtime they had already completed. Therefore, if one employee had completed more hours of overtime, then another employee with less total overtime would be given the extra work. Stiggers Dep. at 81.

[8] There are conflicting explanations as to why this position was abolished. The plaintiff believes that the position was abolished because of her sexual harassment complaints. Whitley Dep. at 167. The plaintiff further alleges that her fear of retaliation by Cover was substantiated when she was denied the training for a Foreman II position and her position was abolished. Compl. ¶20. Management explains that the position was abolished due to budgetary concerns. Whitley Dep. at 168. Stiggers stated that Amtrak's severe lack of funds was reported on national news. Stiggers Dep. at 118.

the training program because it was discontinued for all participants equally. Def.'s Statement of

Material Facts no in Dispute ¶¶ 34-35. The plaintiff also complained that she was not selected to

participate in training to a Foreman II position while her colleagues were being promoted. The

plaintiff alleges that these colleagues were less qualified than she, but Amtrak contends that the

employees who were selected for this training program were better qualified than the plaintiff.

Def.'s Statement of Material Facts not in Dispute ¶29.  Stiggers, for example, had completed the

training program and was promoted.[9] Whitley Dep. at 218-19.

     After the plaintiff learned that her FDA training position would be abolished, she was

taken to the emergency room where she was diagnosed with a nervous breakdown. Whitley Dep.

at 162-63. Consequently, she was out of work on disability leave from July through September

2000. Whitley Dep. at 164-65.

     When she returned to work in late October, early November 2000, the plaintiff accepted a

position in which she would have contact with Cover. Whitley Dep. at 192-93. The plaintiff's

shift would overlap with Cover's shift between 5:30 am and 8. Whitley Dep. at 194. While in

this position, Whitley complained that this new environment was hostile as well because "most

of the supervisors [said] that they had a problem working with me." Whitley Dep. at 214.

     In January 2001, the plaintiff contends that Cover continued to sexually harass her. Whitley

Dep. at 217-18; Compl. ¶33. She alleges that he made sexual comments to her and stated that he

"grabb[ed] me, forcing me to kiss him on his mouth…" coupled with inappropriate comments.

---

[9] The plaintiff alleges that Stiggers was promoted because of a rumored relationship between Stiggers and a
supervisor. Whitley Dep. at 218. "There was a rumor, I'm going to say rumor -- because I can't prove it – that Mr.
Kapela and Ms. Stiggers had a relationship going on…[and a relationship] Also with Tom Winbush [another
supervisor]." Id.

Whitley Dep. at 217-18. During this period, the plaintiff further alleges that she was denied

overtime opportunities and filed grievances with Cover.[10] Whitley Dep. at 228.

In April 3, 2001, the plaintiff alleges that she was forced to take another sick leave

because of the death of her close friend and because of an incident in which Cover had grabbed

her and forced her to kiss him. Whitley Dep. at 233. As a result, she took sick leave from April

2001 to June  2002. Whitley Dep. at 235; Compl. ¶34.

Since the plaintiff never filed a complaint to report this series of alleged sexual harassment

incidents, Amtrak first learned of these complaints while she was on disability leave. Def.'s

Statement of Material Facts no in Dispute ¶¶ 51, 53. The defendant responded by assigning the

plaintiff a new assignment working under Gary Lewis. Id at ¶53. In this position, she reports that

she has been treated well and has never been harassed . Whitley Dep. At 234-35.

On September 24, 2002 plaintiff filed a charge of discrimination with the United States

Equal Employment Opportunity Commission ("EEOC"). Compl. ¶35. A representative of the

EEOC responded to the plaintiff's complaint by responding that her charge was dismissed by the

Director because there was inadequate evidence to show that she was discriminated against

because of her sex. Def.'s Ex.  12.

## II. ANALYSIS

Summary judgment is "not [regarded] as a disfavored procedural shortcut." Celotex Corp.

v. Catrett, 477 U.S. 317, 327 (1986). It has been incorporated "as an integral" component of the

---

[10] The plaintiff described, "The young lady that was working the job that I bidded on with Mr. Cover – we have a lot of specials around that time of the year, special trains. So it be a lot of overtime. They would call her in, even call her from home to work the overtime. And I'm right there. I would ask could I work; but they tell – you know, they said, no, that I couldn't work it. So I went to Mr. Cover concerning it since he was chairman of the union board. He said he would look into it. And that's what I mean by the hostile environment that I was in with some of the other supervisors. " Whitley Dep. at 228. Whether this overtime allocation was within Cover's control is questionable. Whitley Dep. at 230.

Case 1:03-cv-00636-RCL   Document 22   Filed 06/09/2004   Page 8 of 23

Federal Rules of Civil Procedure to secure the "just, speedy and inexpensive determination of every action." Celotex, 477 U.S. at 327. Summary Judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits" show that there is no genuine issue as to any material fact. Fed.R.Civ.P. 56(c)).

To survive a motion for summary judgment, the nonmovant has the burden of designating specific facts to show that there is a "genuine issue for trial." Celotex, 477 U.S. at 324. In considering these facts, the "evidence of the nonmovant is to be believed" and inferences drawn from the facts must be viewed in the light most favorable to the nonmovant. Anderson, 477 U.S. at 250; Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970). The D.C. Circuit has stated that the nonmoving party may not, however, rely solely on mere conclusory allegations. Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 46 (D.D.C. 2003) (citing Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999); Harding v. Gray, 9 F.3d 150, 154 (D.C. Cir. 1993)).

The Court's role is "not to try disputed issues of fact, but only to ascertain whether such an issue is present" and to determine whether there is a need for trial. Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986); Abraham v. Graphic Arts Int'l Union, 660 F.2d 811 (D.C. Cir. 1981). The judge scrutinizes this evidence through the prism of the applicable legal standard controlling the issues raised to question whether a fair-minded jury could return a verdict for the plaintiff. Anderson, 477 U.S. at 251-54. "[I]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249-50.

## A. Title VII Sexual Harassment Claims

Title VII of the Civil Rights Act of 1964 explicitly prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42. U.S.C. § 20002-2(a)(1). In this clause, Title VII only expressly prevents an 'employer' from discriminating on the basis of sex thereby remaining silent on the issue of what delineates sexual harassment limits between coworkers. The courts have not offered any further guidance to establish a definitive rule which imposes liability upon an employer for sexual harassment of one employee on another. Gary v. Long, 59 F.3d 1391, 1396 (D.C. Cir. 1995).

Courts have looked towards agency principles for guidance in this area. Gary, 59 F.3d at 1395 (citing Meritor Savings Bank v. Vinson, 477 U.S. 57, 64 (1986)). Congress implied that an employee should be acting within the scope of his employment if the employer is to be liable for his actions. Accordingly, Congress precludes strict liability on an employer for all employee actions by placing "some limits on the acts of employees for which employers under Title VII are to be held liable." Meritor, 477 U.S. at 72; Gary, 59 F.3d at 1395. The Court has distinguished between "quid pro quo" and "hostile environment" sexual harassment claims because the former incurs strict liability upon the employer whereas the latter does not. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 752 (1998).

## 1. *Quid Pro Quo*

In order to assert a *quid pro quo* claim, the plaintiff employee must show that a tangible job benefit or privilege was explicitly conditioned upon her response to "sexual blackmail" proposed by her employer or an agent thereof. Gary, 59 F.3d at 1396. Tangible aspects include an employee's compensation, terms, conditions or privileges of employment. Gary, 59 F.3d at 1396 (citing Hicks v. Gates Rubber Co., 833 F.2d 1406, 1414 (10th Cir. 1987). The supervisor must have actually exploited the authority entrusted to him to subject the victim to a tangible job

consequence, which resulted from her submission or refusal to submit to his sexual advances. Gary, 59 F.3d at 1396.

In Gary, the D.C. Circuit Court of Appeals found that although the plaintiff alleged that the defendant repeatedly threatened her with adverse job consequences, since those threats were not carried out, the court found no valid *quid pro quo* claim. 59 F.3d at 1396. The plaintiff in the instant case fails to establish a *quid pro quo* action. Gary, 59 F.3d at 1395. Although the plaintiff claims that her supervisor, Cover, propositioned her in exchange for a promotion, since she did not benefit or suffer from any tangible action related to her employment, nor did she engage in any sexual act with Cover, she does not assert a viable *quid pro quo* claim. See Gary, 59 F.3d at 1395-95; see also Highlander v. K.F.C. Nat'l Management Co., 805 F.2d 644, 648 (6th Cir. 1986) (finding no *quid pro quo* action because the "record [was] totally devoid of any evidence tending to demonstrated that plaintiff was denied a job benefit or suffered a job detriment as a result of her failure to engage in the activity suggested by" the defendant).

The plaintiff alleges that the defendant's "failure to promote" and limitation of overtime work constitute a tangible employment action, but an omission to act is not an act within itself. Moreover, the plaintiff does not provide any substantial proof for a fair minded jury to find that the defendant's "failure to promote" and alleged limitation of overtime opportunities were conditioned upon the plaintiff failure to submit to sexual advances made by her supervisors.

The plaintiff contends that the defendant is not entitled to an affirmative defense because the defendant is strictly liable, Pl.'s Mem. Opp'n 13 (Mar. 10, 2004). Although this is the correct law for *quid pro quo* claims, this not applicable to the plaintiff in the instant case. Since the plaintiff fails to raise a viable *quid pro quo* claim in the absence of proof of a tangible

discriminatory act, the defendant is not precluded from raising an affirmative defense. The

defendant's motion for summary judgment on this count of the plaintiff's complaint is entered in

favor of the defendant. See Gary, 59 F.3d at 1396.

**2. Hostile Environment**

    To determine whether a work environment is "hostile" or "abusive" is not a

"mathematically precise test." Harris, 510 U.S. at 22. A work environment can be classified as

hostile by surveying all the circumstances, including "the frequency of the discriminatory

conduct; whether it is physically threatening or humiliating, or a mere offensive utterance and

whether it unreasonably interferes with an employee's work performance. The effect on the

employee's well-being is, of course, relevant to determining whether the plaintiff actually found

the environment abusive." Harris, 510 U.S. at 22. Not one single factor is dispositive, but rather

it is a totality these factors that courts should utilize in their determination. See Harris, 510 U.S.

at 23.

    For sexual harassment to be actionable, it must be sufficiently severe or pervasive.

Meritor, 477 U.S. at 67. The alleged act must "alter the conditions of [the victim's] employment

and create an abusive working environment." Meritor, 477 U.S. at 67. The discrimination is not

required to be of an economic or tangible nature, but plaintiffs are precluded from filing claims

based upon any arbitrary "epithet which engenders offensive feelings." Harris v. Forklift

Systems, Inc., 510 U.S. 17, 21 (1993); Meritor, 477 U.S. at 64. Although Title VII does not

require plaintiffs to show concrete psychological harm, a reasonable person must perceive the

work environment to be hostile and abusive, otherwise the plaintiff's claim is outside the

purview of Title VII. Harris, 510 U.S. at 21. Accordingly, the Court has imposed reasonable

boundaries between "allowing any conduct that is merely offensive to be actionable and requiring the conduct to cause a tangible psychological injury." Harris, 510 U.S. at 21.

**a. Timeliness Issue**

The plaintiff alleges that she has suffered a hostile work environment created by Cover. The plaintiff further alleges that all those actions collectively since the 1980s to present day "fit within the Morgan parameter of comprising one claim of hostile environment." Pl.'s Mem. Opp'n at 12. However, this Court is not convinced that this is the correct application of Morgan. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109-10 (2002).

Although time limitations are relevant within hostile environment claims, they do not limit the separation of two or more distinct hostile environment situations. See Morgan 536 U.S. at 109-10. Subsequent events may be part of one claim but, each discrete act or group of acts sets off a new clock for filing charges. See id.

To survive a motion for summary judgment under this test, the plaintiff must raise a genuine issue of disputed fact as to (1) the existence of a continuing violation—be it serial or systematic and (2) the continuation of the violation into the limitations period. Since the plaintiff, herself, fails to ascertain adequate linkage to confirm the continuing violation, she fails to corroborate that these three incidents be taken as sufficiently related to present a genuine issue of disputed fact as to whether a continuing violation in fact existed. See id at 108. The Court therefore finds that the plaintiff in this case presents three distinct hostile environment claims.

During the early 1980s when the plaintiff was sporadically supervised by Cover, in the position of a coach cleaner, she claims she experienced a hostile work environment.[11] Whitley

---

[11] In her deposition, Whitley fails to provide further clarification on the exact dates she alleges that Cover started to sexually harass her. "It was in 1980, in the '80s and stuff, you know. Because, like I said, I worked with Mr. Cover

Dep. at 21.  These years can be contrasted with a separate period beginning in 1999, during

which the plaintiff was directly stationed under Cover as a Foreman I. Since the plaintiff cannot

remember precisely who her supervisors were and the extent of her contact with Cover during the

early period in the 1980s into 1999, these two incidents should be considered two distinct hostile

environments. See Morgan, 536 U.S. at 107. In response to a question regarding whether any acts

occurred between 1980 and 1999, she was only able to respond vaguely. [12] Since the plaintiff

herself cannot verify when and to what degree there was a continuing violation, the Court is not

convinced that these 1980 and 1999 incidents should be examined as a "continuing violation."

See id at 107-08. Mere continuity of employment, without more, is insufficient to prolong the life

of a cause of action for employment discrimination. See id at 112-13 (citing Ricks, 449 U.S. 250,

253 (1980)).

The second series of acts the plaintiff posits to in 1999 should also be distinguished from

those of 2001 because the plaintiff voluntarily elected to return to a precarious environment after

the supervisors had taken affirmative action to remove her from direct contact with Cover. The

defendant's affirmative act to respond to her claims severs the two periods of sexual harassment

in 1999 and in 2001. See Morgan, 536 U.S. at 117-18. The defendant correctly assesses the

---

different times from the time I first started there; but I can't remember all the dates all the way back...I can say in the early '80s different times that he made sexual advancement." Whitley Dep. 21.

[12] Q: So there was nothing between sometime in the '80s until 1999?
A: No, not really, because, like I say, I – you know, you get bumped around different shifts and stuff. So I probably wasn't working under him during some of that period of time, but I can't remember the exact date when -- where I were or what shift I was working.
Q: Okay. But you think that for most of the '90s, 1990 through 1998, you didn't report to Mr. Cover at all.
A: I'm not sure. I – I can't answer that, because I'm really not sure. It's so far back with those dates. I can't remember exactly...what date or what period I actually worked with Mr. Cover.
Q: Okay. But you don't recall anything happening during that period of time.
A: I would have to think about that. Maybe come back after I -- I tried to get some – you know, right now I can't really. Whitley Dep. at 29-30.

Morgan Court's instructions "that where conduct is unrelated or where the employer intervenes, an employee cannot tie all his/her claims together into one continuing violation." Id. Despite the fact that the plaintiff contends that this harassment continued under separate guises in 2001, she was assuming responsibility for her own well-being after the defendant's agents had taken appropriate measures to remove the plaintiff from Cover's supervision.

Although this Court refuses to recognize the plaintiff's claim as one collective hostile environment claim, this Court is, however, willing to consider these claims as three distinct hostile environments. See Morgan, 536 U.S. at 122. Each group of hostile environment claims constitutes a discrete act. See id. Since the plaintiff assumed three different job positions (1980s: coach cleaner; 1999: Foreman I position; and 2001: a new Foreman I position) each hostile environment claim should be scrutinized distinctly. Since these three alleged incidents are isolated, sporadic and discrete, these three incidents cannot be regarded as one collective hostile environment claim. See Morgan, 536 U.S. at 107. Accordingly, this Court will examine the plaintiff's hostile environment claim as three separate hostile environment claims.

**b. 1980 Claims**

The plaintiff's claims from the 1980s are time barred. See Morgan, 536 U.S. at 109. The permissible time period guarantees the protection of civil rights to those who promptly assert their rights, but also protect the employer from the burden of defending claims, which arise from "employment decisions that are long past." Ricks, 449 U.S. at 257. Congress imposed "short deadlines...to encourage the prompt processing of all charges of employment discrimination." See Morgan, 536 U.S. at 109. Moreover, Title 42 U.S.C. §2000e-5(e)(1) explicitly lays out the precise prerequisites that a plaintiff must satisfy before filing a complaint. A plaintiff must file a

-14-

claim with the EEOC within three hundred days after the alleged unlawful employment practice occurred. 42 U.S.C. §2000e-5(e)(1); see also Morgan, 536 U.S. at 109.  Since the plaintiff failed to file the claim with the EEOC within the statute of limitations, her hostile environment claim from the 1980s are untimely filed and thus, no longer actionable. See Morgan, 536 U.S. at 115.

**c.  1999 Claims**

An employer may raise an affirmative defense to liability pursuant to a hostile environment claim, subject to proof by a preponderance of evidence. See Farragher v. City of Boca Raton, 524 U.S. 774, 778 (1998). If the employer can show (a) that he has exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Farragher, 524 U.S. at 778.

With respect to subsection (a), the Seventh Circuit required only that the employer "take steps reasonably likely to stop the harassment." Saxton v. Am. Tel. & Tel., 10 F.3d 526, 535-36 (7th Cir.1993). Whether the employer could have done more, however, is "irrelevant absent evidence that the employer's action was not reasonably likely to prevent the harassment from recurring." Saxton, 10 F.3d 526, 535-36 (7th Cir.1993). Liability has only been imposed on the employer when plaintiffs establish both employer knowledge or negligence with respect to the harassment and a failure to take prompt and adequate remedial action to correct the problem. See Kauffman v. Allied Signal Inc., 970 F.2d 178, 184 (6th Cir. 1992); Hodges v. Washington Tennis Service Int'l., 870 F. Supp. 386, 388 (D.D.C 1994); see also Dennis v. County of Fairfax, 55 F.3d 151, 155-56 (4th Cir. 1995) (finding that timely and adequate corrective measures will bar an employer's vicarious liability); Bouton v. BMW of North America, Inc., 29 F.3d 103, 107 (3rd

-15-

Cir. 1994) (stating, "under negligence principles, prompt and effective action by the employer

will relieve it of liability"); Nash v. Electrospace System, Inc., 9 F.3d 401, 402 (5th Cir. 1993)

(upholding a grant of summary judgment for defendant in a Title VII suit, finding, "[w]hen a

company, once informed of allegations of sexual harassment, takes prompt remedial action to

protect the claimant, the company may avoid Title VII liability").

    In the instant case, the supervisors adequately and promptly responded to the plaintiff's

complaints. When the plaintiff complained to her supervisors, she was immediately told to go

home so that she would not be in a position in which she would have contact with Cover.

Furthermore, Amtrak supervisors, Pesce and Frank, assisted the plaintiff in filing a complaint

with the in house EEO office. From the EEO office, Fyffe investigated the plaintiff's complaints

and held a meeting with several of the plaintiff's immediate supervisors to ameliorate her

working conditions. Frank, one supervisor, was so concerned that he took immediate measures to

remove the plaintiff from any contact with the plaintiff. From these facts, it is clear that

defendant Amtrak took measures to stop any further potentially unlawful harassment. Gregg v.

Hay-Adams Hotel, 942 F. Supp. 1, 7 (D.D.C. 1996) (Lamberth, J.) (finding an employer's formal

warning to sexual harasser that further behavior would result in the immediate termination of his

employment was adequate to constitute an affirmative defense). The Court finds that Amtrak

responded adequately and effectively to negate liability. See Ryczek v. Guest Services, Inc., 877

F. Supp. 754, 758 (D.D.C. 1995).

    Moreover, the employer may defeat its liability through subsection (b) of the

aforementioned affirmative defense, if the defendant can "show that an employee knew or should

have known the employer did not tolerate such conduct." Gregg, 942 F. Supp. at 8 (Lamberth, J.)

(citing Gary, 59 F.3d at 1398). An employer is not liable for a supervisor's hostile work environment harassment if the victimized employee either knew or should have known that the employer did not "tolerate such conduct and that she could report it to the employer without fear of adverse consequences." See Gary, 59 F.3d at 1398.

In the instant case, it is clear that avenues of redress were available to the plaintiff as articulated in defendant Amtrak's sexual harassment policy. Amtrak promulgated a "Harassment Policy PERS-46" which was accessible to all employees. Def's Ex. 1. The policy statement explicitly stated, "Amtrak strictly prohibits harassment or other forms of discrimination based on an individual's gender...Violation of this policy constitutes an act of serious misconduct that can result in the disciplinary action, up to and including termination." Id. This policy defines verbal and physical harassment and expressly prohibits "unwelcome sexual conduct, whether verbal or physical, including, among other things, sexual advances, demands for sexual favors, or other verbal or physical conduct of a sexual nature..." Id. Moreover, in December 1999, a copy of this policy was distributed to all "Amtrak Colleagues" announcing the onset of diversity training. Def. Ex. 2. Since Amtrak adopted policies and implemented measures such that the plaintiff either knew or should have known that the defendant would not tolerate such conduct, the defendant may not be held liable for a supervisor's alleged hostile work environment harassment. See Gary, 59 F.3d at 1398.

**d. 2001 Claims**

In the plaintiff's third alleged hostile environment, she neglects to acknowledge that she placed herself back into a position in which she would have contact with Cover *after* the defendant's supervisors had taken affirmative action to remove her from contact with Cover.

-17-

Since the plaintiff failed to fulfill the corresponding obligation of reasonable care to avoid harm, such failure will normally suffice to relieve the employer of his burden under subsection (b) of the defendant's affirmative defense. See Farragher, 524 U.S. at 778. Demonstration that an employee failed to use a complaint procedure provided by the employer in response to sexual harassment by a supervisor will normally suffice to satisfy the employer's burden of demonstrating lack of reasonable care by employee to avoid harm, as element of affirmative defense to a vicarious liability claim under Title VII. Farragher, 524 U.S. at 778.

Even if the plaintiff's voluntary return to a precarious position is ignored, the Court finds that defendant Amtrak escapes liability for two reasons. First, the plaintiff did not report this new series of sexual harassment claims to the defendant. Second, when Amtrak supervisors did become aware of these incidents, they responded by promptly assigning the plaintiff a new supervisor, Gary Lewis ("Lewis"). Whitley Dep. At 234-35. During her tenure under Lewis, the plaintiff herself, reports that she has been treated well and has never been harassed . Id. On these grounds, the plaintiff's hostile environment complaints should be dismissed.

**B. Title VII Retaliation Claims**

*Prima facie* elements in retaliatory discrimination produce "proof of actions taken by the employer from which [the Court] can reasonably infer a discriminatory animus." Bundy v. Jackson, 641 F.2d 934, 951 (D.C. Cir. 1981). In the absence of a *prima facie* claim, the plaintiff lacks direct evidence of discriminatory intent. See Simens v. Reno, 960 F. Supp. 6, 9 & n.4 (D.D.C. 1997) ("A plaintiff cannot just shoot into a barrel of fish--that would invariably open the door to the filing of frivolous and vexatious Title VII complaints"). If the courts do not impose a minimum threshold requirement upon which to rest a claim in the form of a prima facie claim,

-18-

the defendant would suffer "wide-reaching consequences for that defendant's reputation and resources." Id. Complainants under Title VII have the burden of providing evidence of a *prima facie* case of discrimination by a preponderance of the evidence. See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 252-53 (1981). If the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." McDonnell, 411 U.S. at 802. Should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. McDonnell, 411 U.S. at 804. The Supreme Court has ascertained this test's applicability to cases involving the federal government. See Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir. 1999) (citing United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711 (1983)).

For retaliation claims, the plaintiff must establish that (1) she engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two. Brown, 199 F.3d at 452 (citing Mitchell v. Baldridge, 759 F.2d 80, 86 (D.C. Cir. 1985). This initial burden is not substantial because the plaintiff "merely needs to establish facts adequate to permit an inference of retaliatory motive." McKenna v. Weinberger, 729 F.2d 783, 790 (D.C. Cir. 1999).

Although it is indisputable that the plaintiff was engaging in statutorily protected activity while working as an Amtrak employee, her retaliation claim fails on the second requirement. To satisfy the second step of the McDonnell Douglas test, the plaintiff must show that she has been subjected to some sort of adverse personnel or employment action. Brown v. Brody, 199 F.3d

446 at 452. "A common element required for discrimination and retaliation claims against federal

employers, and private employers, is thus some form of legally cognizable adverse action by the

employer." Brown, 199 F.3d 446 at 453 (citing Doe v. Dekalb County School Dist., 145 F.3d

1441, 1448 & n.10 (11th Cir. 1998)). An "employment decision does not rise to the level of an

actionable adverse action unless there is a tangible change in the duties or working conditions

constituting a material employment disadvantage." Stewart v. Evans, 275 F.3d 1126, 1134-35

(D.C. Cir. 2002). "A tangible employment action constitutes a significant change in employment

status, such as hiring, firing, failing to promote, reassignment with significantly different

responsibilities, or a decision causing a significant change in benefits." Walker v. Washington

Metro Area Transit Authority, 102 F. Supp.2d 24, 29 (D.D.C. 2000). See also Brown, 199 F.3d at

452 (employee's lateral transfer and letter of admonishment did not constitute an adverse

personnel action); Burlington, 524 U.S. at 759; c.f. Carter-Obayuwana v. Howard University, 764

A.2d 779 (D.C. Cir. 2000) (salary reduction was "adverse action" for purposes of retaliation

claims).

      The plaintiff has not suffered a tangible detriment resulting from the defendant's alleged

retaliation. Since the plaintiff suffered no diminution in pay or benefits, she does not have a

legally cognizable adverse personnel action. See Stewart, 275 F.3d at 1134-35; Brown, 199 F.3d

at 452. Despite the plaintiff's claims that she was denied overtime opportunities, she proffers no

evidence to corroborate these allegations. Instead, plaintiff only proffers a supposition that a

coworker was promoted simply because she was engaged in a relationship with a supervisor at

Amtrak. If the court were to allow this evidence to substantiate a retaliation claim, there would

be few limits on the speculations permitted to come before the Court to corroborate a Title VII

retaliation claim.

Based on the presentation of this case, a reasonable trier of fact would not be able to "to

conclude that the plaintiff has suffered objectively tangible harm." See id. The filing of a Title

VII action is a "serious matter" which is meant solely to shield employees from the

discriminatory actions of their employers, it is not to be confused with an avenue of redress for

poor job performance or impudence. See Gregg 942 F. Supp. at 9. (Lamberth, J.). Accordingly

the court finds the plaintiff's allegations unfounded and will enter summary judgment on this

charge in favor of the defendant

## C. Negligent Supervision

The plaintiff claims that the defendant failed to exercise reasonable care in its supervision

of Covers. Compl. ¶ 41. To invoke this theory of liability, a party must show that an employer

knew or should have known that its employee behaved in a dangerous or otherwise incompetent

manner, and that the employer, armed with that actual or construction knowledge, failed to

adequately supervise the employee. Brown v. Argenbright Security Inc., 782 A.2d 752, 760 (D.C.

2001) (citing Giles v. Shell Oil Corp., 487 A.2d 610, 611-13 (D.C. 1985). The D.C.  Court of

Appeals prefaced its definition of negligent supervision on the Restatement (Second) of Torts,

which states: "A person conducting an activity through servants or other agents is subject to

liability for harm resulting from his conduct if he is negligent or reckless: (a) in giving improper

or ambiguous orders or in failing to make proper regulations; or (b) in the employment of

improper persons or instrumentalities in work involving risk or harm to others; or (c) in the

supervision of the activity; or (d) in permitting, or failing to prevent, negligent or other tortious

-21-

conduct by persons, whether or not his servents or agents, upon premises or with instrumentalities under his control." Brown, 782 A.2d at 760.

For a negligent supervision claim to be actionable, the plaintiff must show that the defendant's failure to supervise Cover's actions proximately caused harm to the plaintiff. See Sokos, 283 F. Supp. 2d at 51. An action for negligent supervision and retention requires proof that the employer breached a duty to the plaintiff to use reasonable care in the supervision or retention of an employee which proximately caused harm to plaintiff. Phelan v. City of Mount Rainier, 805 A.2d 930, 940 (D.C. 2002). Since the plaintiff failed to present these essential elements, the plaintiff's sexual harassment claims fails to pass muster. Accordingly, her claims for negligent supervision are dismissed because she fails to show that a reasonable jury could conclude that she suffered a proximate harm. See id. Although the issue of proximate cause is usually left for the jury, that is not the case when, as here, there are no facts or circumstances from which a jury can reasonably find that the defendant's failure to act proximately caused any harm to the plaintiff. See id at 52. A jury could not reasonably conclude that Amtrak did not exercise reasonable care to supervise its employees. Int'l Distrib. Corp. v. Am. Dist. Tel. Co., 569 F.2d 136, 139 (D.C. Cir. 1977). Although the plaintiff is entitled to all reasonable inferences in her favor, the plaintiff offers no substantial facts to corroborate her claim. She alleges that Pesce "denies totally ever hearing" from the plaintiff, but regardless of the veracity of this statement, the fact of the matter is that the defendant's supervisors did take adequate measures to respond to the plaintiff's complaints.

The plaintiff mistakenly relies on Brown because the plaintiff's case does not involve notice issues as the court was confronted with in Brown. 782 A.2d at 760. In Brown, the Court

-22-

addressed whether the employer was aware of the harm occurring, but this issues is not relevant to the plaintiff's negligent supervision claim. Id. It is clear that in the plaintiff's case, her supervisors were well aware of her complaints and took appropriate remedial actions. See Cunningham v. District of Columbia, No. 87-0095 WL 68863 at *1 (D.D.C. June 20, 1988) (finding that the conscientious manner in which the Trial Board weighed the facts and evidence and considered the employee/supervisor in question, is not evidence of negligent supervision); see also Sokos v. Hilton Hotels Corp., 283 F. Supp. 2d 42, 52 (D.D.C. 2003); c.f. Murphy v. Army Distaff Found., Inc., 458 A.2d 61 (D.C. 1983).

Given the evidence, the Court is compelled to conclude that the plaintiff did not meet the summary judgment standard that there was no genuine issue of material fact as to this aspect of the case. Murphy, 458 A.2d at 64. Since no facts would warrant an inference of negligent supervision against the defendant, summary judgment is properly entered for this claim. See Brown, 782 A.2d at 760.

### III. CONCLUSION

For the foregoing reasons, the Court concludes that the defendant's motion for summary judgment pursuant to 56(c) of the Federal Rules of Civil Procedure will be GRANTED. A separate order accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, United States District Judge, on June 9, 2004.

-23-

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

MAE L. WHITLEY,                          )
                                         )
            Plaintiff,                   )
                                         )        Civil Action No. 03-00636 (RCL)
        v.                               )
                                         )
NATIONAL RAILROAD PASSENGER              )
CORPORATION,                             )
            Defendant.                   )
_____)

## ORDER

Upon consideration of the parties' filings, the applicable law and statutes, and for the reasons set forth in the accompanying Memorandum Opinion, it is hereby **ORDERED** that defendant's Motion for Summary Judgment [#11] is **GRANTED**. Upon consideration of the record judgment is hereby entered for the defendant. This case shall stand dismissed with prejudice.

It is further **ORDERED** that plaintiff's Motion in Limine [#10] is **DENIED** as **MOOT**.

**SO ORDERED.**

Signed by Royce C. Lamberth, United States District Judge, on June 9, 2004.



# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 04-7101**                                    September Term, 2004

                                                        03cv00636

Filed On:

Mae L. Whitley,
                Appellant

v.

National Railroad Passenger Corporation,
                Appellee



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED

**NOV 1 9 2004**

CLERK

## ORDER

By order filed September 23, 2004, appellant was directed either to have new retained counsel enter an appearance in this case or advise the court that she is proceeding pro se and to comply with the Court's August 30, 2004, order directing the filing of initial submissions by November 1, 2004. To date, appellant has not complied with the court's orders. Upon consideration of the foregoing and appellee's motion to dismiss appeal for lack of prosecution, it is

**ORDERED** that this case be dismissed for lack of prosecution. See D.C. Cir. Rule 38. It is

**FURTHER ORDERED** that the motion to dismiss appeal for lack of prosecution be dismissed as moot.

The Clerk is directed to issue the mandate herein 30 days from the date of this order.

FOR THE COURT:
Mark J. Langer, Clerk

BY: _Linda Jones_
Linda Jones
Deputy Clerk

**MANDATE**
Pursuant to the provisions of Fed. R. App. Pro. 41(a)

ISSUED: _12/20/04_

BY: _____ Deputy Clerk

ATTACHED: ___ Amending Order
           ___ Opinion
           ___ Order on Costs

A True Copy:
United States Court of Appeals
for the District of Columbia Circuit

By: _____ Deputy Clerk

DEPOSITION
EXHIBIT
Whitley 10
2/27/07



# NOTICE OF INTENT TO IMPOSE DISCIPLINE

### <u>HAND DELIVERED</u>

March 30, 2004

TO:        MAE WHITLEY

CRAFT:    Foreman I

| M of E FILE: 04.063--GL/F |
| --- |

Dear Ms. Whitley:

You are hereby instructed to appear for a Notice of Intent to Impose Discipline meeting as indicated below:

> **DATE:**    TUESDAY, April 6, 2004
> **TIME:**    4:30 P.M.
> **PLACE:**    **General Foreman's Office—S&I**
> **Ivy City Maintenance Facility**
> **Washington, D.C.  20018**

**Charge I:**    Violation of Amtrak's Standards of Excellence, specifically that section pertaining to **"Attending to Duties"**.

**Specifications:**  It is alleged that on March 20, 2004, it came to your General Foreman's attention that the shampoo machine and its component parts, were in disrepair and was not being utilized by the facility's Turnaround Servicing Department.  You failed to follow a standing directive to assure the any equipment spotted in the service and inspection tracks are to be shampooed on a daily basis.  If any of the shampooing equipment needs repair, it is to be tagged and reported to your General Foreman in order that it can be repaired.  You failed to follow this process.

You may produce any witnesses that you desire and you may be accompanied a representative, as provided for in your current bargaining agreement without expense to the National Railroad Passenger Corporation.

ALL REQUESTS for the postponement of this meeting may be made by contacting Garry Louers at (202) 906-1536/1315 or ATS: 777-1536/1315.

Sincerely,

G. Louers
General Foreman

GL/sjh

cc:    J. Tana—Union Representative/Certified Mail No. 7002 0860 0006 9234 9549  & RRB
       B. Campbell
       Employee File



EX. 48

**AMTRAK**

## WASHINGTON TERMINAL SERVICES

# <u>WAIVER</u>

**M OF E FILE: 04.063—GL/F**

**ODI FILE NO.** _____

**NAME:**        **MAE WHITLEY**

**OCCUPATION:**    Foreman I

**Charge I:**    Violation of Amtrak's Standards of Excellence, specifically that section pertaining to **"Attending to Duties".**

**Specifications:**  It is alleged that on March 20, 2004, it came to your General Foreman's attention that the shampoo machine and its component parts, were in disrepair and was not being utilized by the facility's Turnaround Servicing Department.   You failed to follow a standing directive to assure the any equipment spotted in the service and inspection tracks are to be shampooed on a daily basis.   If any of the shampooing equipment needs repair, it is to be tagged and reported to your General Foreman in order that it can be repaired.  You failed to follow this process.

**I agree to waive my right** for a Formal Investigation in connection with the above quoted violation(s) and specification(s) and agree to accept the discipline assessed by the National Railroad Passenger Corporation.   In addition, I agree to waive my right to appeal the discipline assessed.

**DISCIPLINE ASSESSED:**    X  **FORMAL REPRIMAND**

_____        4-6-04
Employee Signature                Date

_____        April 6, 2004
Witness Signature                Date

GL/sjh

cc:    B.L.Campbell
      J. Tana—Union Representative
      Hearing Office
      Labor Relations

DEPOSITION
EXHIBIT
Whitley 8
2/27/07