IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID B. STEVENS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:05CV01924-RCL |
| | ) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S MOTION FOR SUMMARY JUDGMENT
REGARDING THE CLAIMS FILED BY PLAINTIFF MAE WHITLEY**

# APPENDIX

PART II:

Excerpts from the Transcript of the Deposition of Bernard Campbell
Excerpts from the Transcript of the Deposition of Michael Kapela
Excerpts from the Transcript of the Deposition of Sarah E. Ray
Excerpts from the Transcript of the Deposition of Joseph Tana
Excerpts from the Transcript of the Deposition of Ronald Truitt

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3

4    - - - - - - - - - - - - - - - x        FEB 2   2007

5    MAE L. WHITLEY,                 :

6    DAVID B. STEVENS, et al.,       :

7                Plaintiffs,         :

8                                    :   Civil Action No.

9        v.                          :

10                                    :   1:05CV01924RCL

11   NATIONAL RAILROAD PASSENGER      :

12   CORPORATION (AMTRAK),            :

13                Defendant.          :

14   - - - - - - - - - - - - - - - x

15

16        Deposition of BERNARD LEE CAMPBELL

17

18                          Washington, D.C.

19                          Friday, February 9, 2007

20

21   Reported by:

22            Elizabeth L.Wasserman

1      Q     And you know her also?

2      A     Very familiar.

3      Q     Now, are you aware of the fact that Ms.

4  Whitley was attempting to get promoted at various

5  times during her employment at Amtrak?

6      A     Just about all of her employment there,

7  yes.

8      Q     When Ms. Whitley was trying to get

9  promoted, was she attempting to get promoted into

10  positions that were also within your chain of command

11  at Amtrak?

12      A     Yes.

13      Q     Now, over the past four or five years, has

14  Mr. Kapela been your second line supervisor at

15  Amtrak?

16      A     Yes.

17      Q     Now, with regard to Ms. Whitley's attempts

18  to get promoted, she attempted at times to get

19  promoted to a position of Foreman II, correct?

20      A     Correct.

21      Q     Now, over the past several years, when she

22  attempted to do that, who had the final authority for

1    determining whether she would be promoted to Foreman

2    II?

3         A     I would have to say HR.

4         Q     Is there a particular person at HR?

5         A     No.

6         Q     And who else would have had input into

7    whether Ms. Whitley would be promoted to Foreman II?

8         A     I don't know.

9         Q     Did you have any input into that?

10        A     Absolutely not, except for trying to help

11   her.

12        Q     What about your immediate supervisor, Mr.

13   Truitt?  Would he have had any input into whether Ms.

14   Whitley would be promoted?

15        A     You'd have to ask Mr. Truitt.

16        Q     Well, from your observation and your years

17   working at Amtrak, is it your impression that he

18   would have input into that or that he would not?

19             MR. FISCHLER:  I'm going to object to the

20   question, but you can answer.

21             THE WITNESS:  I don't know.  You'd have to

22   ask Mr. Truitt.

1        Q       How is it that you know that you discussed

2    it with Mr. Truitt, if you don't remember what was

3    discussed and what the result of the discussion of

4    the discussion was?

5        A       Because what you asked me, Mary was

6    probably discussed.

7        Q       So are you saying that you think she would

8    have been discussed or that she was discussed?

9        A       I said Mary probably was discussed.   I

10   can't remember exactly what we talked about.   It's

11   been such a long time ago.

12       Q       So you're saying she probably was

13   discussed but it's possible she wasn't?

14       A       No, I didn't say that.

15       Q       So are you saying it's certain that she

16   was discussed?

17       A       I said it's probably certain that she was

18   discussed.

19       Q       When Mr. Truitt and yourself discussed Ms.

20   Whitley and her prospects for promotion to Foreman

21   II, would you have told Mr. Truitt that you thought

22   she was a good candidate to be promoted to Foreman

1    II?

2        A    She would have been a decent, given an

3    opportunity to try, yes.

4        Q    So do you think you would have said that

5    to Mr. Truitt?

6        A    I can tell you that that's my recollection

7    of Mary Whitley as trying out to be a Foreman II.

8            MR. FISCHLER:  That's not the question

9    he's asking you.

10           THE WITNESS:  What is the question?

11           BY MR. GOLDSMITH:

12       Q    Did you tell Mr. Truitt that you thought

13   Ms. Whitley would have been a decent candidate for

14   Foreman II?

15       A    I don't remember the conversation with Mr.

16   Truitt.

17       Q    Is that what you would have told Mr.

18   Truitt at the time, based on what you know about your

19   views of Ms. Whitley's candidacy?

20           MR. FISCHLER:  Objection.  Calls for

21   speculation.  You can answer.

22           THE WITNESS:  I would say yes.

1      Q     Do you know if there's any sort of

2  screening process that candidates are put through by

3  Human Resources?

4      A     Yes, there is.

5      Q     What do you know about that process?

6  What's it all about?

7      A     Well, I know individuals go in there, they

8  ask questions, and they determine through the process

9  who is going to get the job.

10     Q     Do the people at Human Resources consult

11 with anyone else before they decide who's going to

12 get the job?

13          MR. FISCHLER:  Objection.  You can answer.

14          THE WITNESS:  You have to talk to them.

15          BY MR. GOLDSMITH:

16     Q     You don't know if they do that or not?

17     A     Sometimes I don't even know who the people

18 are.

19     Q     So is it generally the case that people in

20 Human Resources would consult you with regard to a

21 Foreman II position before they make a selection?

22     A     No.

1        Q      How is it determined whether an individual

2    will have an interview?

3        A      Usually by application for an interview.

4        Q      Do all applicants get an interview?

5        A      No.

6        Q      How is it determined which ones will get

7    an interview and which ones won't?

8        A      Well, I think they look at discipline,

9    they look at attendance, they look at the work

10   history, and they pick those that are in the top part

11   to give an interview.

12       Q      Who is the "they" that you were referring

13   to?

14       A      I would have to say HR.

15       Q      Do they ever consult with you in that

16   process?

17       A      No.

18       Q      Do you know why not?

19       A      It's not my job.

20       Q      Does Mr. Truitt ever play a role, before

21   he left did he ever play a role in determining who

22   would be on a panel?

1      A      I think it's 90 days.

2      Q      What's the purpose of the probationary

3  period?

4      A      To watch the employee, see if they hold

5  the qualifications basically to work the job.

6      Q      If an employee, at the conclusion of the

7  90-day probationary period for a Foreman II, do you

8  play any role in determining whether the employee

9  stays on the job or whether the employee is released?

10      A      That would be determined by evaluation,

11  sir.

12      Q      Who does the evaluation?

13      A      Whoever that person is working for, the

14  General Foreman.

15      Q      And when the General Foreman does the

16  evaluation, would you then be apprised of what was in

17  the evaluation?

18      A      That is correct.

19      Q      And then would you decide whether or not

20  to retain the person?

21      A      I could possibly have an input if that

22  person was working for Turnaround Services.

1          A      I can't recall now.  I'm having a block

2      here.

3          Q      If you think of anything else as we're

4      here today, why don't you point that out to me?

5      Okay?

6          A      Surely.

7          Q      Was Ms. Whitley a hard worker?

8          A      Yes, sir.

9          Q      Now, there was a time when Amtrak had a

10     training program specifically designed to see that a

11     Foreman I could get promoted to Foreman II.  Do you

12     remember that?

13         A      Yes.

14         Q      Did you write a letter of recommendation

15     for Ms. Whitley to participate in that?

16         A      Probably did.

17         Q      What were the essence of Ms. Whitley's

18     duties as a Foreman I?

19         A      She was in charge of making sure the

20     trains were clean.

21         Q      Did she do a good job of making sure the

22     trains were clean?

1      Q      So the answer--

2      A      Although I'm not sure.  She might have

3   took a waiver.  I'm not sure of that.  There was a

4   problem with Foreman I's not doing their job.  Not

5   only did Ms. Whitley get a letter, Ms. Moncree got a

6   letter, Ms. Johnson got a letter, because they let

7   $2,000 worth of equipment go broke, and they were in

8   an enhancement program, and they were supposed to

9   shampoo at least one train a day.  It did not get

10  done, and then they received something for that.

11     Q      So why did you tell me that you didn't

12  propose any discipline against Ms. Whitley?

13     A      I'm telling you what I'm remembering.  If

14  I didn't remember it perfectly, then I'm sorry, but

15  I'm only trying to tell you what I know.  And if I

16  did, then--

17     Q      So are you telling me now that you did

18  propose discipline against her on this equipment that

19  you're referring to?

20     A      I'm saying that I did give Ms. Whitley

21  something.  I thought it was a written warning.  If

22  you have that in your files and let me see it, maybe

1    waiver relating to discipline that you proposed

2    against her.

3         A    I know of no process that I would have put

4    in place.

5         Q    No process for them to become aware of it,

6    is that what you mean?

7         A    No.  I know of no process--what you asked

8    me, was there a process?--no process that I know of

9    that took place by me to make them aware of a waiver

10   in Ms. Whitley's file.

11        Q    And the same would be true as to them

12   becoming aware of any removal of a waiver.  Is that

13   true?

14        A    That's true.

15        Q    Was it your impression that the waiver

16   executed by Ms. Whitley would affect her chances of

17   being promoted to Foreman II?

18        A    I had no inkling about that at the time of

19   the waiver.  The waiver was for employees not doing

20   their job that they were told to do, and it was not

21   picked on Ms. Whitley.  It was picked on all Foreman

22   I's that worked in the S&I, sir.  They all failed to

1   do their job.

2      Q    Did you ever develop an impression as to

3  whether Ms. Whitley's chances of being promoted to

4  Foreman II would be impacted by her having executed

5  that waiver?

6      A    I had nothing to do with an impression of

7  what that waiver would do.  That waiver was done

8  because an employee failed to do their job.  What

9  effects it had was not on anything that I would even

10  care about at the time that that was happening.

11      Q    Did Ms. Whitley ever tell you that she had

12  developed an impression that the waiver was impacting

13  her promotion prospects?

14         MR. FISCHLER:  I'm going to object on

15  relevance grounds, but you can answer.

16         THE WITNESS:  Not that I recall.

17         BY MR. GOLDSMITH:

18      Q    Is there anything that would refresh your

19  memory as to whether that ever happened?

20      A    If I think of it, I'll let you know.

21      Q    Do you know whether Ms. Whitley was ever

22  promoted to Foreman II?

1    was assessed against her on April 6, 2004?

2         A    Can't recall.

3         Q    Do you know of anything that would refresh

4    your recollection?

5         A    If I do, I'll let you know.

6         Q    Now, the discipline, the notice to impose

7    discipline against Ms. Whitley related to a shampoo

8    wand.  Is that correct?

9         A    No.

10        Q    What did it relate to?

11        A    Shampoo machines.  The wands I think might

12   have been all broken, so the machines were

13   inoperative.

14        Q    Who discovered that the machines were

15   inoperative?

16        A    If I'm not mistaken, I did.

17        Q    Do you know when you discovered it?

18        A    No.

19        Q    Do you know for how long the machines had

20   been inoperative?

21        A    No.

22        Q    How many machines were there?

1      Q      You don't know, or he did not?

2      A      I don't know.

3      Q      Let me show you Exhibit 47.  Exhibit 47 is

4  a letter of recommendation Mr. Louers wrote on Ms.

5  Whitley.  Have you ever seen this before?

6      A      I can't recall.

7      Q      Would it surprise you if you had seen it

8  before?

9      A      No.

10     Q      It says, Mr. Louers is saying that Ms.

11 Whitley has shown him many reasons why she would be

12 capable of transforming into the Foreman II ranks.

13 You would agree or disagree with that statement?

14     A      Agree.

15     Q      It says, "With transitional support and

16 training through the Mechanical Department and her

17 own diligent attitude, along with her safety

18 background and backbone, she has what is most

19 desperately needed in the Foreman II ranks."  Would

20 you agree with that or disagree with it?

21     A      I don't know about the "desperately

22 needed" but I thought she deserved a shot at it.

1        Q       Did Ms. Whitley ever ask you personally to

2    take any actions to help her get promoted to Foreman

3    II?

4        A       Yes.

5        Q       What did she ask you to do?

6        A       Let her take 238 courses.

7        Q       Did you do that?

8        A       Yes.

9        Q       Did she pass the courses?

10        A       She said she did.

11        Q       Did she get certification, 238

12    certification?

13        A       She had 238 certification.

14        Q       Was there anything else that she asked you

15    to do to help her get promoted to Foreman II?

16        A       I don't remember.

17        Q       Is there anything else that you recall

18    doing to assist her prospects in getting promoted to

19    Foreman II?

20        A       Just paying for her 238 training.

21        Q       Did you ever talk to Ms. Whitley after she

22    got her 238 certification, about her prospects for

1    eventually, when they get on the job.  If they're

2    not, I have no problem removing them.

3         Q    Have you ever had a Foreman II enter on

4    duty who was not 238-certified?

5         A    Yes.

6         Q    What do you do in that situation?

7         A    Depends on where they're working.

8         Q    How so?

9         A    I don't know if I have to explain 238

10   certifications in here.

11        Q    Why don't you go ahead and explain it?

12        A    I can't because I don't really have that

13   kind of time, but I can tell you that 238

14   certifications, there are six or seven different

15   certifications.  And what you needed on my side was

16   turnaround service and inspection.

17             And in my area, if you didn't have the

18   certs, I'd have to put a QMP along with you until you

19   got your certifications.  And the FRA says that they

20   can't sign any documents, they can't make any

21   decisions, without a 238 certification.

22        Q    What was the acronym that started with a

1      "Q" that you just used?

2              A      I don't know.

3              Q      You said something about a Q-something.

4              A      QMP.

5              Q      What's a QMP?

6              A      Qualified maintenance person.

7              Q      So you'd have to have somebody working

8      with the individual who didn't have the certification

9      yet?

10             A      Because if you didn't have the 238 you'd

11     be a QP.

12             Q      Who would be better qualified to work in

13     your area, somebody who had 238 certification or

14     someone who didn't?

15             A      They are all 238 certifications in my

16     building.

17             Q      But you just testified that you have had

18     people come on duty who weren't 238-certified.  Isn't

19     that true?

20             A      That is true.

21             Q      So who would be better qualified, someone

22     who was 238-certified or someone who wasn't?

1          BY MR. GOLDSMITH:

2          Q    No, meaning it didn't happen, or you don't

3     remember if it happened?

4          A    I'm going to say I have no recollection of

5     her talking about this, at that time, holding her up

6     for promotion.  This has nothing to do with her

7     promotion as far as I was concerned.  This has

8     everything to do with Mary and the other Foreman I's

9     not doing what they were told to do about the shampoo

10    machines.

11         Q    So do you deny that she said something to

12    you about concerns about promotion in the context of

13    doing that waiver, or do you just say that you don't

14    remember if she did?

15         A    I don't recall her saying anything to me.

16         Q    Now, did you ever tell Ms. Whitley

17    anything in particular about how you were going to

18    handle that waiver if she signed it?

19         A    I don't handle waivers after they're

20    signed.

21         Q    So would the answer then be no?

22         A    I don't really know what you was asking.

1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF COLUMBIA

3

4                                      FEB 2   2007

5

6    - - - - - - - - - - - - - - x

7    DAVID B. STEVENS, et. al      :

8          Plaintiffs,            :        Civil Action Number

9      vs.                        :        1:05CV01924-RCL

10   NATIONAL RAILROAD PASSENGER :

11   CORPORATION ("Amtrak")       :

12          Defendant.            :

13   - - - - - - - - - - - - - - x

14

15          DEPOSITION OF MICHAEL J. KAPELA

16

17                          Washington, DC

18                          Monday, February 12, 2007

19

20

21   REPORTED BY:

22      CARMEN SMITH

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700        800-336-6646

1   with the assistant superintendent then make a

2   decision as to who would actually be selected for a

3   position; is that correct?

4        A    That's correct.  But HR also is part of

5   that decision-making too, I said.

6        Q    All right.  So an interview panel has some

7   involvement in a final selection; correct?

8        A    Yes.

9        Q    Assistant superintendent has some

10  involvement in a final selection; correct?

11       A    Yes.

12       Q    HR has some involvement in a final

13  selection; correct?

14       A    That's correct.

15       Q    What about you personally?  Do you have

16  any involvement in that?

17       A    No.

18       Q    What about the superintendent?  Would he

19  have any involvement in that?

20       A    Depends -- no, the superintendent doesn't

21  have anything like -- unless that superintendent was

22  involved in the interview process itself, there's no

1     the person involved?

2          A     My standard saying is this:  If you pick

3     them, you have to live with them.  I don't get into

4     that level.

5          Q     Is that what you would always say, or

6     might there be times when you might say yeah, I

7     really like that person or not so sure about that

8     person?

9          A     I'm sure I've said that in the past.

10         Q     Both maybe positively --

11         A     Yes.

12         Q     -- and not so positively?

13         A     Correct.

14         Q     All right.  Let me ask you about the area

15    of discipline for employees.  Do you have any

16    responsibility in that area?

17         A     Yes.

18         Q     What's your responsibility there?

19         A     Not -- if it's a simple discipline case,

20    nothing.  If it's a discipline case that's going to

21    require some type of suspension or termination, then

22    I have all the responsibility.

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4        - - - - - - - - - - - - - - - -x

5     DAVID B. STEVENS, ET. AL,            :

6                Plaintiffs,        : Civil Action No.

7             v.                    : 1:05CV01924-RCL

8     NATIONAL RAILROAD PASSENGER          :

9     CORPORATION ("AMTRAK")               :

10       - - - - - - - - - - - - - - - -x

11

12

13              DEPOSITION OF SARAH E. RAY

14

15

16                       Washington, DC

17                       Monday, January 8, 2007

18

19    REPORTED BY:

20              DAVID L. HOFFMAN

21

22

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646

1    an objection interposed here and there.  If he does,

2    he may instruct you not to answer a question, but if

3    he doesn't do that, just let him say what he has to

4    say, make his objection and then go ahead and answer

5    the question any way.

6         A    Yes.

7         Q    Is there any reason why today is not a

8    good day for you to sit and answer questions in terms

9    of any medical conditions or anything like that?

10        A    No.

11        Q    Please state your full name for the

12   record.

13        A    Sarah Elizabeth Ray.

14        Q    Where do you reside?

15        A    Washington, D.C.

16        Q    Are you still employed by Amtrak?

17        A    Yes, sir.

18        Q    How long have you been employed by Amtrak?

19        A    Approximately 25 years.

20        Q    Have you been in the Human Resources area

21   now?

22        A    Yes, sir.

1      Q      Have you been in that area for the 25

2   years?

3      A      Yes, sir.

4      Q      What's your current title there?

5      A      Human Resources manager.

6      Q      Who is your immediate supervisor there?

7      A      John Miller.

8      Q      What's his title?

9      A      Senior Director, Human Resources.

10     Q      Where is your duty station?

11     A      900 2nd Street, N.E., Washington, D.C.

12     Q      What about Mr. Miller?  Where is his duty

13  station?

14     A      Chicago, Illinois.

15     Q      One person who's had some involvement in

16  some of the matters we'll be discussing today is

17  Taylor Cannon.  Who is Taylor Cannon?

18     A      He's a human resources officer.

19     Q      Is he a subordinate of yours?

20     A      Yes, sir.

21     Q      Are you his first-line supervisor?

22     A      Yes.

1    Carolina, South Carolina, Georgia and over to

2    Alabama.

3        Q    What other kinds of things are done in the

4    Mid-Atlantic Division office in addition to what you

5    just described?

6        A    We handle the files for employees.  We

7    handle approximately, I guess, 3000 personnel files.

8    Any information that needs to go into those files we

9    put them in there.  We do employee relations.  If any

10    employees have issues, they come to us.  We work with

11    Labor Relations, the Union on issues, FMLA.  We file

12    that paperwork.  We do data entry for every position

13    that we fill.  There's a job file folder and we have

14    to enter that information into the computer and

15    maintain that job file folder.

16        Q    How many people work in the regional

17    office?

18        A    In my office, two Human Resources

19    officers, which are the recruiting officers and I

20    have two HR specialists -- Human Resources

21    specialists.  One basically works at the front desk

22    and does a lot of data entry on the phones and the

1    Q    Would it be your job to assign either

2    LeVar, Wardell or Taylor to handle the file in an

3    ongoing way with regard to recruitment for a Foreman

4    2 position?

5    A    The way we had it set up is certain

6    officers had certain departments.  So when Wardell

7    was there, he was helping with Mechanical.  Right not

8    Taylor handles all Mechanical.  But there are some

9    situations where we're all busy and if this comes up,

10   I may have to do it or LeVar or Taylor may have to do

11   it.  It just depends on what's going on.  But right

12   now, Taylor handles all Mechanical.  When Wardell was

13   there, I think he handled some Mechanical.  I think

14   we were busy and we had to throw LeVar into it.  At

15   any given time, any of us could handle it.

16   Q    Do you have an understanding of what it is

17   that an incumbent do in the Foreman 2 position?

18   A    I have a basic understanding.  I won't say

19   I have a full understanding.

20   Q    What's your basic understanding of that?

21   A    They're the ones that supervise the

22   skilled craft -- your pipe fitters, your

1    electricians, your machinists and your carman

2    positions to make sure they're doing their jobs to

3    get the train out.

4        Q    How did you develop the understanding you

5    have about what people do in the Foreman 2 position?

6        A    I've been around for 25 years, almost 25

7    years and I've handled Mechanical before in the past,

8    and I know the steps like Foreman 1, Foreman 3,

9    General Foreman and so forth.

10        Q    Who supervises Foreman 2?

11        A    General Foreman.

12        Q    Who assigns work to Foreman 2?

13        A    I would imagine the general foreman.  Let

14    me just say this.  I don't know.  I mean I would

15    imagine that's the progression.

16        Q    You would imagine that the progression is

17    the general foreman supervise Foreman 2?

18        A    Yes.

19        Q    Do the Foreman 2 supervise anybody else?

20        A    You say did the --

21        Q    Did the Foreman 2 have individuals whom

22    they supervised?

1              BY MR. GOLDSMITH:

2         Q      There's a summary of duties next to No. 1

3     a little further down.  Do you see that?

4         A      Yes.

5         Q      Is that something that comes to you from

6     the Mechanical Department?

7         A      Yes.

8         Q      And your office puts it down on the form

9     for the vacancy announcement?

10        A      Yes, that's how we typed up this form

11    previously.

12             MR. FISCHLER:  That's Exhibit 2 that the

13    witness is referring to, just so the record is clear.

14             MR. GOLDSMITH:  Very good.

15             BY MR. GOLDSMITH:

16        Q      It says under No. 3 "Must have

17    demonstrated mechanical experience."  Do you see

18    that?

19        A      Yes.

20        Q      Below that, No. 4, it says, "Other

21    Requirements - must hold air brakes certification."

22    Do you see that?

1    A    Under No. 3, where it says, "Work

2    experience preferred?"

3    Q    Actually, the next line down.  I skipped

4    one.

5    A    No. 4?

6    Q    Right.

7    A    "Other Requirements?"

8    Q    Right.

9    A    Yes.

10    Q    Both the mechanical experience and the air

11    brakes certification are requirements that you were

12    informed of by the Mechanical Department.  Right?

13    A    Yes.

14    Q    That's their job to know that.  Correct?

15    A    Yes, they'll have to get those

16    certifications.

17    Q    The applicants will have to get the

18    certifications and the Mechanical Department is

19    telling you that they're required to have the

20    certifications.  Correct?

21    A    Yes, they must have the certifications.

22    Yes.

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700            800-336-6646

23143
DAV/gh

117

1    conversation, that her telling you during that

2    conversation was the first time you became aware of

3    the fact that she was taking course to become

4    eligible for Foreman 2?

5         A    You're telling me that this was the first

6    time I was aware of her becoming -- I mean taking

7    courses?

8         Q    I'm asking you whether you said something

9    like that to her or not?

10        A    I don't recall.

11        Q    Would you have had any reason to say that

12   or to not say that?

13        A    To say that this is the first time you're

14   taking it?  I'm confused.

15        Q    I'm trying to find out whether you had any

16   information before she told you in that conversation

17   that she was taking the courses.  Did you have any

18   such information?

19        A    Not that I recall.

20        Q    Do you deny that you might have?

21        A    I don't know.  I can't remember.

22        Q    Did you ever discuss Ms. Whitley's

1    qualifications for Foreman 2 with anyone else besides

2    Ms. Whitley?

3         A    I'm sure with the HR staff.  We would have

4    discussed the candidates.

5         Q    Would that include Mr. Cannon?

6         A    Yes.  It could have been Cannon, LeVar or

7    Thomas.

8         Q    What do recall being said about Ms.

9    Whitley in those conversations?

10        A    I don't recall.

11        Q    Is there anything that would refresh your

12   recollection?

13        A    No, I can't recall about any of them, any

14   of the candidates.  It was a long time ago.

15        Q    Did you ever develop a point of view as to

16   whether Ms. Whitley was or wasn't qualified to be a

17   Foreman 2?

18        A    In all the years that I've worked for

19   Amtrak to promote to a Foreman 2, you must have been

20   in the craft of electrician, pipe fitter, machinist

21   or carmen and I think Mae will attest to that.  You

22   promote from those into Foreman 2 from the skilled

1  crafts.  Ms. Whitley was a Foreman 1, which

2  supervised coach cleaners, so they could not promote.

3  She did not come from a skilled craft to go into a

4  Foreman 2 position.  They then -- because they

5  complained that they didn't have a career path, we

6  had a training program set up so that they would have

7  a career path to promote to Foreman 2, but that

8  program is no longer in existence.  We did send

9  approximately three candidates, maybe, to that

10  training class to promote from where Ms. Whitley was,

11  Foreman 1, into that craft.

12      Q      When Ms. Whitley told you about the

13  courses she was taking, did you tell her she wasn't

14  qualified?

15      A      No, we didn't even discuss that.  We

16  discussed -- she just told me she was taking some

17  courses.  I can't remember.

18      Q      Did your office ever generate any

19  information delivered to Ms. Whitley to tell her she

20  wasn't qualified to be a Foreman 2?

21      A      Well, I don't know.  I'm sure, if she

22  didn't meet the qualifications back then of carmen,

1      Q      Is there anything in it that you asserted

2    that you learned to have been mistaken since then?

3      A      Not to my knowledge.  I would have to read

4    it.

5      Q      It's not that long.  Feel free to read it.

6      MR. FISCHLER:  Go ahead and read it.

7      (Pause.)

8      THE WITNESS:  Okay.

9      BY MR. GOLDSMITH:

10     Q      Let me ask you about the second page,

11   paragraph 17.  You said all the successful candidates

12   had significant experience working in skilled craft

13   positions.  Do you see that?

14     A      Yes.

15     Q      What is a "skilled craft position?"

16     A      Electrician, pipe fitter, diesel mechanic,

17   carman -- technical experience in certain areas.

18     Q      Paragraph 19 it says, "Under Amtrak

19   policy, she (referring to Ms. Whitley), was

20   disqualified from applying for a promotion for one

21   year as a result of this discipline."  Is that

22   correct?

1    A    Yes.

2    Q    Have you ever discussed Ms. Whitley's

3    candidacy for Foreman 2 with Ron Truitt?

4    A    Yes, it would have been with working on

5    this case.

6    Q    What about when she was applying?

7    A    When she was applying, I didn't handle the

8    position when she was applying.

9    Q    So did you discuss it with Ron Truitt when

10    she was applying?

11    A    I didn't handle the position.

12    Q    So is that a yes or no?

13    A    No.

14    Q    Did you discuss Ms. Whitley's application

15    for Foreman 2 with Ron Frank at the time that she was

16    applying?

17    A    I don't recall any conversations with him

18    about it.

19    Q    What about her lawsuits?

20    A    I may have talked to any of the assistant

21    superintendents, anybody who had anything to do with

22    the case during my information that I had to provide

1    You have to have mechanical experience in a skilled

2    craft.  We'll still looking for that experience and

3    when we fill positions that's what we're looking for,

4    people with electrical or diesel mechanical or pipe

5    fitting, that skilled craft experience.

6        Q    And that hasn't changed at all since 1999?

7        A    I don't want to say.  I don't know.

8        Q    You don't know if that's changed?

9        A    That part hasn't changed.

10       Q    Has some other part changed?

11       A    I don't know.

12       Q    Who would know?

13       A    We'd have to review the documents that's

14   provided back in '99 versus '07 with the department.

15       Q    All right.  But if I show you a job

16   posting from '99 and one from '08, you could compare

17   them for me and tell me what's changed or not

18   changed?

19       A    I could tell you what's added.

20       Q    What we were just looking at, which is No.

21   21 --

22            MR. FISCHLER:  I'm going to object on

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700          800-336-6646

1    if it had been a vacancy job posting or not?

2         A    We would use the requirements of the

3    position posted on the Job 2002 when we interviewed

4    or made a selection.

5         Q    Which is the same thing you would do for a

6    job posting, isn't it?

7         A    Yes, but they don't have that on this

8    sheet.

9         Q    Returning your attention to Exhibit 2, I'm

10   going to look at No. 2 and No. 21 at the same time.

11        A    All right.

12        Q    Both of these are notices of one kind or

13   another indicating recruitment for Foreman 2.

14   Correct?

15        A    Yes.

16        Q    You testified earlier, I believe, that

17   Exhibit 2 indicated that the only mandatory

18   requirements were a high school diploma and some

19   mechanical experiences on that exhibit.  Correct?

20        A    Say that again.

21        Q    You indicated earlier, you testified

22   earlier, before lunch, that there were two mandatory

1        A        Go ahead.

2        Q        Taylor Cannon works for you.  Correct?

3        A        Yes.

4        Q        He filled out this form.  Correct?  Page

5    806, right?

6        A        Yes.

7        Q        This is a routine form, an applicant flow

8    log that your office completes all the time.  Right?

9        A        Okay.

10        Q        You testified earlier that in order to be

11    interviewed a person had to be screened and shown to

12    be qualified to get an interview.  Correct?

13        A        Uh-huh.

14        Q        Without asking you whether it was a

15    mistake or not, I'm simply asking you whether this

16    form being completed this way indicates that your

17    office treated Ms. Whitley as being qualified at the

18    time that she got an interview on March 28, 2004.  Is

19    that fair?

20        A        I recall that the Mechanical Department

21    decided to interview all of the Foreman 1s for

22    positions.  So that probably was about the time that

23143
DAV/gh

230

1    that happened.

2        Q    Did that show that she was being treated

3    by your office as qualified?

4        A    She had an interview.

5        Q    Did that show she was being treated at the

6    time as qualified, whether mistakenly or not?

7        A    I'm being honest.  I'm just trying to --

8    not me, the Mechanical Department decided at some

9    point during this process to interview all of the

10   Foreman 1s, which we did.

11       Q    I'm not asking you about anyone else.  Let

12   me ask you the question one more time.

13       A    You're asking me --

14       Q    Was she treated by your office when she

15   was interviewed on March 28, 2004 as being qualified?

16       A    At that point, I guess, yes.

17            (Pause.)

18       Q    You say that around March of '04 that all

19   the Foreman 1s were interviewed for Foreman 2s.

20       A    I don't know if this was March of '04.

21       Q    When do you think that happened?

22       A    I have no idea.  I know that they

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

COPY

-------------------------x

DAVID B. STEVENS et al.,        :

                                :        MAR 2 9 2007

        Plaintiffs,             :

                                :

        v.                      : No. 1:05: CV01924-RCL

                                :

NATIONAL RAILROAD               :

PASSENGER CORPORATION,          :

                                :

        Defendant.              :

-------------------------x

                                Washington, D.C.

                                Wednesday, March 14, 2007

Deposition of

JOSEPH TANA

a witness, called for examination by counsel for
Plaintiffs, pursuant to notice and agreement of
counsel, beginning at approximately 10:31 a.m., at
the law offices of Leizer Goldsmith, 5335 Wisconsin
Avenue, Washington, D.C., before M. Bryce Hixson of
Beta Court Reporting, notary public in and for the
District of Columbia, when were present on behalf
of the respective parties:

24

```
 1       A    Okay.

 2       Q    Did you ever talk to Mr. Campbell

 3   about Ms.  Whitley's qualifications for

 4   becoming a Foreman II?

 5       A    Yes, I did.

 6       Q    And did Mr. Campbell tell you that

 7   he wanted to give her a shot?

 8       A    Yes, he did.

 9       Q    Did you talk to Mr. Kapela about

10   that?

11       A    About Mae, no.  That at least I

12   don't remember talking to Kapela.  I remember

13   having several discussions with Mr. Campbell.

14       Q    When did Mr. Campbell tell you that

15   he wanted to give Ms. Whitley a shot?

16       A    The first time Mae ever went to him

17   and said that she wanted to become a Foreman

18   II.

19       Q    And what timeframe would that have

20   been roughly?

21       A    Well, when I took over in 2004, Mae

22   wanted to be a Foreman II, and we told her
```

25

1    what she had to do to get qualified.

2        Q    Did she do those things?

3        A    Yes, she did it with Mr. Campbell's

4    help, I would like to point out.

5        Q    And did Mr. Campbell give her a

6    shot?

7        A    Did Campbell?

8        Q    Yeah.

9        A    Mr. Campbell told her to -- in

10   order to -- I can show you.  You have to have

11   certain certifications to work mechanical

12   jobs.

13       Q    Yeah.

14       A    They are deemed necessary by the

15   federal government.  Mr. Campbell told Mae,

16   "You take the classes.

17           I'll make arrangements for you to

18   go during your work time.  If you go on your

19   day off, I will pay you."  And he told her

20   what she had to do, what certifications she

21   had to get, and everything else to become a

22   foreman.  And Mae did that.

26

1      Q    Was she selected to be a foreman?

2      A    No, she was not.

3      Q    Why not?

4      A    Because the other people felt she

5  wasn't mechanically qualified.

6      Q    Who were the people?

7      A    People that sat in on the

8  interview.

9      Q    And who were they?

10     A    The one gentleman was the young guy

11  that I was telling you about, I think his

12  name is Lavar.

13         MR. FISCHLER:  Lavar Freeman?

14         THE WITNESS:  Yeah, Mr. Freeman,

15  and Mr. Bobby Frank.  Mr. Campbell at no time

16  was ever involved in the interviewing of Mae.

17         BY MR. GOLDSMITH:

18     Q    Now, what did Mr. Freeman say about

19  her not being mechanically --

20     A    He just didn't feel that she was

21  mechanically qualified.

22     Q    Is Mr. Freeman a mechanic?

1     A    No.

2          MR. FISCHLER:  Let him finish his

3     question before you --

4          THE WITNESS:  Okay.

5          MR. FISCHLER:  -- start answering.

6     Just so the record is clear.

7          BY MR. GOLDSMITH:

8     Q    And you were in that interview

9     yourself with Mr. Freeman, correct?

10    A    Yes, I was.

11    Q    And what else did he say about --

12    what did you say to him when he said that he

13    didn't think she was mechanically qualified?

14    A    Well, I -- Mae wasn't mechanically

15    qualified.  She was very weak on the

16    mechanical aspect.

17    Q    But you thought she was

18    sufficiently qualified to get the job, right?

19    A    Yes, I did.

20    Q    And your testimony is that Mr.

21    Campbell told you that he thought so too,

22    correct?

28

1       A    Yes.

2       Q    And you never heard anything from

3  Mr. Kapela to the effect that he didn't think

4  so, right?

5       A    Mr. Kapela's opinion of doing

6  interviewing is, "You select them; you live

7  with your selection."  He does not interfere

8  in the selection of the candidate.  At least

9  to my knowledge, he has never done so.

10      Q    Mr. Campbell does though, right?

11      A    What do you mean?

12      Q    Well, he gets involved in the

13  selection of Foreman II --

14      A    If he is interviewing; he does.  If

15  the individuals that were in that room

16  management-wise, Labor Relations -- sorry,

17  personnel and the manager that sits in, they

18  do the selecting.  They will ask me for an

19  opinion.

20      Q    And in this case you gave the

21  opinion that she was qualified, right?

22      A    Not -- that mechanically she was

1    weak, but I felt that yes being -- she was a

2    supervisor, already a Foreman I that she

3    should be given a chance.  They had 91 days

4    to prove themselves.  And I felt that she

5    should be given the 91 days.  I felt that it

6    was only right.  Other people were being

7    given the 91-day, other women there, and

8    everything else.

9        Q    Are you familiar with a gentleman

10    named Rodney Wilson?

11        A    No, not to my recollection, no.

12        Q    What did Mr. Frank say about the

13    interview that you had with Ms. Whitley?

14        A    Mr. Frank was -- felt that she was

15    weak -- you know.  It was more or less Mr.

16    Freeman that felt that she was extremely

17    weak, and that there were other candidates

18    that were more mechanically suitable for the

19    position.

20        Q    And who did Mr. Freeman tell this

21    information to so that this result would

22    occur that Ms. Whitley wouldn't get the job?

30

1      A    Bobby Frank.

2      Q    Who else?

3      A    Myself that was in the room.

4      Q    Who else?

5      A    I guess he had to report back to

6  Sarah Ray.

7      Q    And is there someone higher up in

8  mechanical who a report would have to be made

9  to?

10      A    No.  Like I said, Mr. Kapela always

11  said, "You select them, you live with your

12  selection."

13      Q    Does Mr. Freeman still work for

14  Amtrak?

15      A    Yes, he does.

16      Q    Does he still work in personnel?

17      A    Yes, he does.

18      Q    Did you have conversations with Ms.

19  Whitley around the time of her interview

20  about how the interview had gone?

21      A    I felt -- you mean how I felt it

22  had gone.

1    Personally, I would have given her the shot.

2    Personally, I think Mr. Campbell would have

3    gave her the shot, but the two other

4    gentlemen in the interview felt that other

5    people were stronger on the mechanical end of

6    the interview.  I think Mae could have

7    handled it; that's my opinion.

8        Q    You just testified that Mr. Frank

9    lied to you about job related thing.  Tana,

10   do you remember that testimony?

11       A    Yes.

12       Q    Was that a commonplace occurrence?

13       A    With Mr. Frank?

14       Q    Yes.

15       A    I can only speak for myself.

16       Q    That means that the answer is yes.

17            MR. FISCHLER:  No, the answer --

18            THE WITNESS:  The answer is I can

19   only speak for myself.

20            BY MR. GOLDSMITH:

21       Q    Was it a commonplace occurrence for

22   you that he would lie to you about job

63

1    dismissed, but I guess it wasn't.  I think

2    this was like saying everybody fell for it.

3    I think it's a year; isn't that what the

4    waiver said, six months to a year?  Is this

5    -- is number 49 a waiver?

6        Q    Number 49 is a waiver, yes.

7             MR. FISCHLER:  Forty-nine.  I don't

8    have 49.

9             MR. GOLDSMITH:  I have two of them

10   here.

11            MR. FISCHLER:  Well --

12            BY MR. GOLDSMITH:

13       Q    Forty-nine is a waiver.  Do you

14   recall Ms.  Whitley executing a waiver on

15   this issue?

16       A    Yes, everybody did.

17       Q    Did you ever have occasion to

18   discuss the -- this -- anything about this

19   shampoo incident, your discussions with Ms.

20   Whitley about it or your discussions with Mr.

21   Campbell about it or anything about it with

22   anyone else?

84

1   say as a union rep.

2       Q    Did Mr. Freeman ever tell you that

3   he disagreed with that?

4       A    No, he did not?

5       Q    Did anyone from personnel ever tell

6   you they disagreed with that?

7       A    No.

8       Q    Did Mr. Campbell ever say he

9   disagreed with that?

10      A    No.  Mister -- like I said Mr.

11  Campbell went out of his way to help Mae.

12      Q    Did Mr. Kapela ever say that he

13  disagreed with that?

14      A    I never heard anything from Mr.

15  Kapela either way about any of this.

16          MR. FISCHLER:  Are you done with

17  Exhibit 18?

18          MR. GOLDSMITH:  That's -- yeah, I'm

19  done.  And like I held it in my hand, so I

20  wouldn't steal it from you.

21          MR. FISCHLER:  That's fine.  I just

22  -- that's why I'm asking because otherwise, I

95

1      A      No.

2      Q      Was there ever a time when you

3  heard that there was discussion about who

4  would train Ms. Whitley to be a Foreman II?

5      A      The only discussion I remember

6  about training Ms. Whitley is when Mr.

7  Campbell got her to go in, and we sat down,

8  and I was there and Mae was there.  And it

9  happened on more than one occasion.  BL told

10  her, "You need to get your certifications.

11  If you get your certifications, that's going

12  to give you a better shot."

13          And he said he would do whatever it

14  would take to help her get the certs.  And he

15  let her go during the time when she was

16  supposed to be working as a Foreman I.  He

17  let her attend the class, take it, and she

18  passed the test.

19      Q      Did you ever have any conversations

20  with Mr. Campbell after the time when Ms.

21  Whitley passed the test, about why she

22  wasn't, you know, getting promoted even then?

97

1     Q    But that wasn't why she wasn't

2  promoted, as far as you knew?

3     A    To my knowledge, no.

4     Q    Did Mr. Campbell ever told you that

5  it was his understanding that Ms. Whitley had

6  interviewed poorly?

7     A    No.  He had no knowledge of her

8  interview.

9     Q    He didn't say he had heard it from

10  somewhere?

11     A    No.

12     Q    Did Mr. Frank ever say that he

13  thought she had interviewed poorly?

14     A    No, just that she was weak in the

15  mechanical aspect of it.

16     Q    What about Mr. Freeman?  Did he say

17  that she had interviewed poorly?

18     A    Yes.

19     Q    What did he say about it?

20     A    Just that she interviewed poorly,

21  and I can't speak for him.  But he was basing

22  it on the mechanical aspect too.

98

1    Q    So it wasn't so much the way that

2    she talked during the interview as what her

3    skills were -- it was -- as reflected in her

4    work history, is that right?

5    A    No.  It was the interview.  He has

6    no knowledge of her work history.

7    Q    So -- all right, so his -- the 

8    impression that he gave you was that he

9    thought that her performance in the interview

10   wasn't good?

11   A    Right, that it was weak

12   mechanically.

13   Q    Right.  But she wasn't performing

14   any mechanical tasks during the interview,

15   right?

16   A    No.

17   Q    So I'm just trying to parse out

18   whether he was talking about what he saw as

19   her experience or lack of experience in --

20   and the process of being interviewed.  Which

21   was more about as far as you could tell from

22   what he said to you?

1   interfere with any interview process.  I've

2   stated once.  I'll state it a thousand times.

3   Mr.  Kapela says, "You guys pick them.

4   You'll live with who you pick.  He is the

5   master mechanic."



6           BY MR. GOLDSMITH:

7       Q    And he says that because he is the

8   one who has the authority to tell them, "You

9   guys pick them, you guys live with it,"

10  right?

11          MR. FISCHLER:  Again, same

12  objection.  There is no foundation.  He

13  doesn't know what Mr. Kapela's authority is.

14  He doesn't know why Mr. Kapela is making

15  statements.  You're asking questions about

16  Mr. Kapela's thought process.

17          MR. GOLDSMITH:  And is your

18  lawyer's comment accurate?  You don't know

19  anything about what Mr. Kapela's authority is

20  at Amtrak, is that really true?

21          THE WITNESS:  No.

22          BY MR. GOLDSMITH:

111

1       Q    Okay.  What is Mr. Kapela's

2   authority?  If he wanted to, he could replace

3   all the assistant superintendents, right?

4       A    Yes.

5       Q    Okay.  And therefore, if he wanted

6   to, he could decide who the lowliest coach

7   cleaner was going to be if he wanted to,

8   right?

9       A    Not really.

10      Q    Well, he has the power to make the

11  decisions, right?

12          MR. FISCHLER:  You're just arguing

13  with the witness now, and taking up time.

14          THE WITNESS:  He is the master

15  mechanic.  He is the chief authority on that

16  property, but like anybody else, he has to

17  answer to people above him, and he better

18  have good justification why he took an

19  assistant superintendent off, why he took a

20  general off, why he took a foreman off.

21          BY MR. GOLDSMITH:

22      Q    All right.  And --

112

1     A     When you get into the position of

2    foreman and below, then you have the Union

3    process that takes over.  You just don't

4    dismiss somebody without having a hearing, an

5    investigation.  That's the purpose of the

6    Union; to make sure that they get a fair

7    trial and hearing --

8     Q     So you're --

9     A     -- that it goes through the process

10   of the Railway Labor Act; that's the purpose

11   of the Union.  And that's the way it is.

12    Q     So you've heard Mr. Kapela tell his

13   assistant superintendents, "You take care of

14   it.  You pick them, you live with them," is

15   that right?

16         MR. FISCHLER:  Asked and answered,

17   asked and answered.

18         THE WITNESS:  Not in that words,

19   but basically, yes.  You pick them, you live

20   with them.

21         BY MR. GOLDSMITH:

22    Q     What do you think the words were?

1      A    It's your choice.  Who you choose;

2    that's who you've got to live with.  You

3    know, I've said it.  Like I said, and I'll

4    say it a thousand times.  I have never known

5    Mr. Kapela to sit there and tell them, "Hire

6    this one, don't hire that one."  And I've

7    known Mr. Kapela since I came back in 2000 --

8    March 1, 2003.  I've never known him to

9    interfere in the hiring process.

10      Q    He leaves that to his assistant

11    superintendents.

12           MR. FISCHLER:  Asked and answered.

13           MR. GOLDSMITH:  Right?

14           THE WITNESS:  It depends.  I told

15    you if the assistant superintendent was in

16    the interview, yes.  If it was the general

17    foreman -- to the general foreman.

18           BY MR. GOLDSMITH:

19      Q    Do you know the other plaintiff in

20    this case, David Stevens?

21      A    No.  At least to my knowledge, I

22    don't know him.  If I see him I might --

1   to go some place else.

2       Q    With regard to Exhibit 50, again,

3   your note to Mr. Campbell.  Did you send a

4   similar note on behalf of anybody else who

5   was disciplined in that incident?

6       A    Not that I remember.

7       Q    Let's take a break.  What time is

8   it?

9            (Recess)

10           SPEAKER:  We are on record.

11           BY MR. GOLDSMITH:

12      Q    Did you have a chance to confer

13  with your counsel during that last break?

14      A    Yes.

15      Q    I don't have anything else.

16           MR. FISCHLER:  Okay.  I just have

17  one question I want to ask.

18           BY MR. FISCHLER::

19      Q    You testified earlier that part of

20  your job was to make sure that the questions

21  asked during interviews were fair and proper.

22  Is that right?

142

1    A    Yes.

2    Q    Were the questions asked during Ms.

3    Whitley's interview fair and proper?

4    A    Yes.

5    Q    Were they the same that were asked

6    to other people?

7    A    Yes, we have a -- when we go in for

8    interviews, personnel gives us a printed form

9    where -- as a matter of fact it was presented

10   to me, where we write down comments and

11   stuff, all the questions are asked the same

12   of all the employees that are interviewed

13   depending on the job that they are

14   interviewing for.

15   Q    Anything different about Ms.

16   Whitley's interviews?

17   A    No.

18         MR. GOLDSMITH:  That's all I have.

19         (Whereupon, at 12:56 p.m., the

20         deposition of JOSEPH TANA was

21         adjourned.)

22         *    *    *    *    *

1                IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF COLUMBIA

3
                                                    MAR 1 ⸱ 2007
4       - - - - - - - - - - - - - - - - - x

5       DAVID B. STEVENS, et al.,          :

6               Plaintiffs,               :

7                                          : Civil Action No.

8       v.                                 :

9                                          : 1:05CV01924-RCL

10      NATIONAL RAILROAD PASSENGER        :

11          CORPORATION                    :

12          Defendant.                     :

13                                         :

14      - - - - - - - - - - - - - - - - - x

15

16                              Washington, D.C.

17                              February 20, 2006

18

19

20      Reported by:

21              DANIEL W. HAWKINS

22

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646

1    Deposition of

2

3                     RONALD M. TRUITT

4

5    called for examination pursuant to notice of

6    deposition, on Tuesday, February 20, 2007, at The

7    Goldsmith Law Firm, LLC, 5335 Wisconsin Avenue, NW,

8    Suite 440, Washington, D.C. at 9:30 a.m., before

9    DANIEL W. HAWKINS, a Notary Public within and for the

10    District of Columbia, when were present on behalf of

11    the respective parties:

12

13            LEIZER Z. GOLDSMITH, ESQ.

14            The Goldsmith Law Firm, LLC

15            5335 Wisconsin Avenue, NW

16            Suite 440

17            Washington, D.C. 20015

18            T 202.895.1506

19            F 202.318.0798

20            E-mail lgoldsmith@goldsmithfirm.com

21            On Behalf of Plaintiffs

22

1    you this way:

2                What role did Mr. Kapela play in deciding

3    who would become a Foreman II?

4        A    I don't know that.  I can't answer.

5        Q    Why not?

6        A    Because I don't think he had a role.

7        Q    What about yourself.  Did you have a role?

8        A    No.  That was at the Assistant

9    Superintendent level.

10       Q    So that would have been -- I may not get

11   all the names; but Mr. Campbell, Mr. Ice, Mr. Frank -

12   - am I forgetting anybody who was an assistant

13   superintendent during your time?

14       A    That was it.

15       Q    So what was your understanding of that

16   process, what the role of the assistant

17   superintendents would be in selecting Foreman II?

18       A    I think the process was -- I believe, I

19   believe a general foreman did the interviews.  And

20   then the general foreman came back and sat down with

21   the assistant superintendents.

22       Q    I'm sorry, they did what the assistant

1    mean?

2         A    Yes.

3         Q    Anything else?

4         A    That's about the main.

5         Q    Were there particular certificates that

6    Foremen II had to have in order to serve?

7         A    Yes.

8         Q    Was it easy to find people who had those?

9         A    If we hire from outside, they wouldn't

10   have them, of course; but if we hired them from the

11   inside, they may not have them, either.

12        Q    So you would hire people -- you would hire

13   people who didn't necessarily have them even though

14   they were required?

15        A    Yes.

16        Q    And whose decision was it to do that?

17        A    They wouldn't have them; that's an in-

18   house certification.  It's recommended by the federal

19   government, FRA requires on the 238, 109 and 107

20   certain programs, and certifications that an

21   employee, a QMP must have.  And anybody supervising,

22   since we're talking supervisors, must have.

1          Q       So I believe it was your testimony that

2     some people would be hired to be Foreman II without

3     having those certifications.   Is that correct?

4          A       Yes.

5          Q       And who made the decision that individuals

6     who lacked those certifications would be in any case

7     hired?

8          A       Whoever was doing the interview.

9          Q       So do you know if there was some kind of

10    general corporate decision to let that requirement

11    slide, or?

12         A       You wouldn't have that if you hiring from

13    outside.   Nor would you have it from the inside if an

14    employee never had gone through the training.   You

15    have 90 days to get that once you become a foreman,

16    to get those certifications.

17         Q       And they take tests in order to get them,

18    right?

19         A       That's correct.

20         Q       And the pass rate isn't very high on those

21    tests, isn't that true?

22         A       80 percent.

1     Q     80 percent pass it?

2     A     Pass it.

3     Q     Is an individual who has passed those

4     certifications, is that a big help to them in terms

5     of being in a position to be hired to be a Foreman

6     II?

7     A     It would help in selection.

8     Q     It's a hurdle that they don't have to pass

9     during the 90 days.

10    A     Correct.

11    Q     Did you ever have any discussions about

12    who was or was not being selected for Foreman II

13    positions with Mr. Kapela?

14    A     Nope.

15    Q     Did you ever have any conversations like

16    that with Mr. Campbell?

17    A     Nope.

18    Q     Mr. Frank?

19    A     Nope.

20    Q     Mr. Ice?

21    A     Nope.

22    Q     That was just something that you didn't