IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DAVID B. STEVENS | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil Action No. 1:05CV01924-RCL |
| | ) |
| NATIONAL RAILROAD PASSENGER CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**DEFENDANT NATIONAL RAILROAD PASSENGER
CORPORATION'S MOTION FOR SUMMARY JUDGMENT
REGARDING THE CLAIMS FILED BY PLAINTIFF DAVID STEVENS**

# APPENDIX

```
 1           IN THE UNITED STATES DISTRICT COURT

 2              FOR THE DISTRICT OF COLUMBIA

 3                                        MAR 1 4 2007

 4    DAVID B. STEVENS and      )
                                           ORIGINAL
 5    MAE WHITLEY,              )

 6            Plaintiffs,       )

 7      vs.                     ) Civil Action No.

 8    NATIONAL RAILROAD         ) 1:05CV01924-RCL

 9    PASSENGER CORPORATION     )

10    ("AMTRAK"),               )

11            Defendant.        )

12            *        *        *        *        *

13

14

15           The deposition of DAVID B. STEVENS was

16    taken on Thursday, March 1, 2007, commencing

17    at 10:12 a.m., at the offices of National Railroad

18    Passenger Corporation, 60 Massachusetts Avenue,

19    N.E., Washington, D.C., before Victoria L. Wilson,

20    Notary Public.

21

22            *        *        *        *        *
```

```
 1        A.    (Reviewing document.)  Okay.

 2        Q.    Is this the statement that your friend

 3   provided?

 4        A.    Yes.

 5        Q.    Have you seen this document before?

 6        A.    Yes.

 7        Q.    To your knowledge, is it accurate?

 8        A.    To my knowledge.

 9        Q.    Okay.  Have you ever been disciplined

10   during your employment with Amtrak?

11        A.    Meaning --

12        Q.    Have you ever had discipline issued against

13   you?

14        A.    Yes.

15        Q.    When?

16        A.    I believe it was '03.

17        Q.    What happened in 2003?

18        A.    I had to sign a rule G waiver.

19        Q.    And what's rule G?

20        A.    Rule G, in my case -- it can mean anything,

21   but in my case it was a drug testing positive.

22        Q.    And was that the first time you had a
```

1          MR. GOLDSMITH:  And for the record, I'm

2    just going to object to this exhibit on relevance

3    grounds.

4          MR. FISCHLER:  Okay.

5          BY MR. FISCHLER:

6    Q.    "I advised him that the urine specimen he

7    provided on March 15, 1999, was confirmed positive

8    for cocaine metabolites."

9    A.    Okay.

10   Q.    Do you remember that telephone

11   conversation?

12   A.    I don't remember the telephone conversation

13   but I remember this now.

14   Q.    You remember the incident?

15   A.    Yes.

16   Q.    The end of the second paragraph says, "At

17   no time during our discussion did he provide any

18   information that would establish a legitimate

19   explanation for the positive test results."  Do you

20   see where I am?

21   A.    Second paragraph?

22   Q.    Yes.  The last sentence of that second

1    paragraph.

2        A.    Yes, I see it.

3        Q.    Was there a legitimate explanation for the

4    positive test results?

5            MR. GOLDSMITH:  Objection.

6            THE WITNESS:  I don't remember this.  I

7    mean, I remember the positive but I don't remember

8    any of this in this letter.

9            BY MR. FISCHLER:

10       Q.    I'm not asking you whether -- I'm asking

11   you a different question.

12       A.    Say that again.

13       Q.    To your recollection, in 1999 when you

14   tested positive, was there a legitimate explanation

15   for that test result?

16           MR. GOLDSMITH:  Objection.

17           THE WITNESS:  No.

18           BY MR. FISCHLER:

19       Q.    And were you medically disqualified from

20   service?  That's the very last sentence of the memo.

21           MR. GOLDSMITH:  Objection.

22           THE WITNESS:  No.

FAXED
3-22-99

**NATIONAL RAILROAD PASSENGER CORPORATION**
**HEALTH SERVICES DEPARTMENT**
**INTEROFFICE MEMO**


DATE:      March 18, 1999

TO:        Wanda Smith McLaren

FROM:      Marilyn McCouch

SUBJECT:   **Drug Test Result**


Attached is the return to duty drug test result for David B. Stevens, SSN: 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.

This is Mr. Steven's first positive drug test; no other Rule G waivers or conditionals are on file for employee.

Verbal notice of "medical disqualification" has been given to Mary Cherry(ATS: 777-3338), Administrator Terminal Services, Washington, DC.

Please note the attached documentation regarding the confirming call with employee.

The "initial positive" letter can be sent to Mr. David B. Stevens 4824 Fort Totten Drive, NE – Apt 104, Washington, Dc 20011.  The cover letter and conditional agreement should be sent to Darryl Pesce c/o Mary Cherry, FAX 521-2104.

At your convenience, please forward a copy of letter sent to the employee for our files.



DEPOSITION
EXHIBIT

Stevens 11

3/1/07 mlw

PENGAD 800-631-6989

**Amtrak/Stevens**
**00265**

⋇⋇⋇   T R A N S M I S S I O N   R E P O R T   ⋇⋇⋇

MAR-22-99 09:53   ID:215 349 4401        AMTRAK MEDICAL DEPT.

JOB NUMBER                          663

INFORMATION CODE                    OK

TELEPHONE NUMBER        87772786

NAME(ID NUMBER)         2029062786

START TIME              MAR-22-99 09:52

PAGES TRANSMITTED       004        TRANSMISSION MODE    -   EMMR

RESOLUTION              STD        REDIALING TIMES          00

SECURITY                OFF        MAILBOX                  OFF

MACHINE ENGAGED         00'58


THIS TRANSMISSION IS COMPLETED.

LAST SUCCESSFUL PAGE    004


### FAX TRANSMISSION
*COVER SHEET*

## AMTRAK HEALTH SERVICES
30th Street Station, #67
Philadelphia, Pa 19104
Telephone: 215/349-2389 (ATS 728-2389)
Fax: 215/349-4401 (ATS 728-4401)


DATE:           March 22, 1999

TO:             Wanda McLaren

FROM:           Marianne Letterio, RN

SUBJECT:        RTW Drug Test: David Stevens, SS# 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

Number of pages including this cover sheet:     ⊄

Amtrak/Stevens
00266

# FAX TRANSMISSION
*COVER SHEET*

# AMTRAK HEALTH SERVICES
30th Street Station, #67
Philadelphia, Pa  19104
Telephone:  215/349-2389 (ATS 728-2389)
Fax:  215/349-4401 (ATS 728-4401)

**DATE:**          March 22, 1999

**TO:**            Wanda McLaren

**FROM:**          Marianne Letterio, RN

**SUBJECT:**        RTW Drug Test:  David Stevens, SS# 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

**Number of pages including this cover sheet:**

Amtrak/Stevens
00267

AMERICAN MEDICAL LABORATORIES, INC®
P.O. Box 10841 • 14225 Newbrook Drive
Chantilly, VA 20153-0841
Telephone: (703) 802-6900 • (800) 336-3718

*C. C 3/17/99 ML*
*3/17/99 Mary Cherry*
*Correction ML*

```
STEVENS, DAVID B              24541965/0   (ADULT ASSUMED)
  Page   1  From Chantilly         FOR                    JEN:11216
  COLLECTED:  03/15/1999      11216 AMTRAK DISPENSARY*
  RECEIVED:   03/16/1999         MARIANNE LETTERIO, R.N., BSN
  REPORTED:   03/17/1999         1 COMMERCE SQ/2100 MARKET/5 FL
1999/  0/ 11216/ 0/24541965       PHILADELPHIA PA 19103
  PATIENT ID: 261474375        TEST REASON:RTD
  SITE CODE:  NOT PROVIDED     COLL. SITE: LANHAM MD
  Please note:  NP
```

```
---------------TESTS-------------RESULTS-FLAG--REF. RANGE------UNITS
```

```
18057/Chantilly
Medicolegal Toxicology
      MEDICOLEGAL CHAIN-OF-CUSTODY REPORT.
      Chain of Custody document received and specimen
      seal intact.

56117/Chantilly
Confirmed Drug Profile #56, Urine
   Test results                                  Screen cutoff
      MARIJUANA METABOLITES         negative     @50 ng/mL
      PCP (PHENCYCLIDINE)           negative     @25 ng/mL
      AMPHETAMINES                  negative     @1000 ng/mL
      BARBITURATES                  negative     @300 ng/mL
      BENZODIAZEPINES               negative     @300 ng/mL
      COCAINE METABOLITES        *  POSITIVE     @300 ng/mL
      METHAQUALONE                  negative     @300 ng/mL
      OPIATE METABOLITES            negative     @300 ng/mL
      Creatinine, Urine             <6                        mg/dL
      Nitrites                      Negative
      pH                            within acceptable range of 4.5-9
   Confirmatory Tests
   Cocaine, Confirmation by GCMS, Urine
      COCAINE METABOLITE,
        BENZOYLECGONINE             240                       ng/mL


Please note:
      SSN CORRECTION


                      *** FINAL REPORT ***
   [P  5065]-[S 8641]
```

*See attached "Note to File."*

*Sil*

*202/529-7824*

**Amtrak/Stevens**
**00268**

Age and sex dependent reference ranges are printed when available
if age and sex are designated. Otherwise, adult values are given.
167074 R 1/96

**IRA D. GODWIN, M.D.**

DIRECTOR OF LABORATORIES

*AMTRAK HEALTH SERVICES/NEC*

<u>NOTE TO FILE</u>

**FILE NOTES RE:**     David B. Stevens

**DATE:**     **March 17, 1999**

**SSN:**     <u>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</u>
**COMMENTS:**

    I spoke to Mr. Stevens regarding his drug test results. I advised him that the urine specimen he provided on March 15, 1999 was confirmed positive for cocaine metabolites.

    During our telephone conversation, Mr. Stevens was provided an opportunity to offer a legitimate medical explanation, e.g., nasal surgery, which would cause the positive test results. However, at no time during our discussion did he provide me any information that would establish a legitimate explanation for the positive test results.

    I advised Mr. Stevens to seek help by calling an Amtrak EAP counselor. Mr. Stevens was also advised that if he is medically disqualified from service.

Marianne Letterio, RN

*Amtrak/Stevens*
*00269*

# Amtrak®                    ALCOHOL AND DRUG WAIVER AGREEMENT

**IMPORTANT:** This Alcohol and Drug Waiver will not be valid unless the charged employee is eligible to enroll in the Employee Assistance Program. Therefore, responsible management supervisor must advise the employee about the following enrollment conditions.

1. The employee cannot have been charged with violating Amtrak's Alcohol and Drug Policy and enrolled in the EAP since March 1, 1986 (February 6, 1986, for Hours of Service employees).
2. The employee cannot have been enrolled in the EAP as an Alcohol and or Drug Policy violator within the previous 10-year period. (Not applicable until 1996).
3. The employee cannot have had a positive drug screen during a company physical examination.

To verify eligibility, the responsible management supervisor must also contact Amtrak EAP Headquarters at (202) 906-4160 (ATS 777-4160) leaving his/her name and the employee's name and social security number. If there is no response within 48 hours, he/she should contact the local EAP Counselor to determine eligibility.

I desire to waive my right to an investigation/trial under the applicable collective bargaining agreement in connection with the following charge:

On February 25, 2003, David B. Stevens was tested for drugs during a Company, return to duty testing event. This is to advise you that based on an analysis by certified laboratory and a review by the Medical Review Officer (MRO), the result was reported by the MRO as positive for cocaine metabolites. Accordingly, the employee is medically disqualified from performing service.

**DEPOSITION EXHIBIT**
Stevens 14
3/1/07 rhw
PENGAD 800-631-6989

I admit that I violated Amtrak's Alcohol and Drug Policy as charged. I understand I am being withheld from service without pay except for medical coverage, vacation entitlement, compensatory time and other benefits to which I am entitled, pending my successful completion of treatment as recommended by the Employee Assistance Program Counselor or his/her designated representative. I agree to contact the EAP Counselor within 10 days from the date I sign this waiver and follow his/her recommendations. Should I fail to do so, I will accept discipline of dismissal for the above violation.

I understand that after successfully completing the initial treatment plan recommended by the EAP Counselor, I will be dismissed from service unless I comply with the following requirements:

1. After completing the initial treatment plan, I must undergo and pass any medical examination required by company policy. I understand medical examinations may include testing a sample of my urine for the presence of drugs and/or testing my breath for ▮▮▮▮▮ alcohol.
2. I must maintain periodic contact with the EAP Counselor for a two-year period after successfully completing the initial treatment program if directed to do so by said EAP Counselor.
3. I must adhere to any continuing care plan prescribed by the EAP Counselor.
4. I must submit to and pass an unannounced drug and/or alcohol test by urine and/or breath sample at least four times a year for the first two years of active service following my return to duty (six times in the first year for employees covered by Department or Transportation regulations). I further understand that if I test positive in any future drug/alcohol test, including tests taken as part of any physical examination, I will be dismissed from all Amtrak service.

DAVID B STEVENS                                         261 47 4875
Employee Name (printed)                                Employee Social Security Number

David Stevens                                          03/10/03
Employee Signature                                     Date

_[signature]_                                          03/10/03
Management Supervisor Signature                        Date

_[signature]_                                          3/11/03
EAP Counselor Signature (to be signed upon initial contact with employee)    Date

**White** - Employee;   **Canary** - EAP Counselor; **Pink** - Supervisor; **Goldenrod** - Division Occupational Health Nurse

NRPC 2585 (3/97)

Amtrak/Stevens
00333



# CONCENTRA
## MEDICAL CENTERS

DAVID STEVENS, 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

Date: 12/13/04

Per Demetria Hudley, MA:

On December 13, 2004, David Stevens, SSN 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, reported to Concentra Medical Centers for a return to work physical and drug screen.

The first urine drug screen collection was not within body temperature range (90F to 100F). Mr. Stevens was then provided with DOT Federal Guidelines for unusual collection. He was then processed for this physical - it should be noted that his temperature at that time was 97.8F. He then informed another Concentra staff member, Ebonie Beaty, that he was unable to stay at the center any longer as he had another doctor appointment. Ebonie informed him that he needed to submit a second specimen before leaving. He stated that he could not and that he would return, which is unacceptable according to DOT Federal Guidelines.

Ebonie called the company and left a message. The aforementioned information was presented to Ms. Margaret Terney of Amtrak on 12/14/04.


_____          10-14-04
Demetria Hudley                              Date


_____          12/14/04
Ebonie Beaty                                 Date

DEPOSITION
EXHIBIT
Stevens 16
3/1/07 vh

Amtrak/Stevens
00311

4451 G PARLIAMENT PLACE, LANHAM, MD 20706, (301) 459-9113, FAX (301) 459-1214

**CONFIDENTIAL**
NATIONAL RAILROAD PASSENGER CORPORATION
HUMAN RESOURCES – HEALTH SERVICES DEPARTMENT
Interoffice Memorandum
December 15, 2004

TO:        **Bernard Campbell**
FROM:      Margaret Ann Tierney
           HR Officer
SUBJECT:   Drug Test Result for **STEVENS, David, Personnel #: 00054828**

This is to inform you that **David Stevens** previously tested positive during a **Company return to duty** testing event **March 15, 1999**. Mr. Stevens did not sign a Conditional Waiver before being released to return to duty. On **March 25, 2003, David Stevens** tested positive during a **Company** required **return to duty** test event. Attached is a copy of the employee's Alcohol and Drug Waiver Agreement signed on March 10, 2003.

Subsequently, on **December 13, 2004** as part of a **company return to duty** physical examination, **Mr. Stevens** was tested for drugs. This is to advise you that according to the statement provided by the testing technician; Mr. Stevens provided a specimen that was cold. The testing technician explained to the employee that he would have to provide another specimen under direct observation, which would be supervised by someone of the same gender, after he completed his physical examination. Mr. Stevens left the premises without providing a second urine specimen.

According to the testing technician's statement the employees actions of not providing a subsequent sample constitutes a refusal to test. **Any employee who refuses or intentionally interferes with the testing process will be subject to the same consequences as testing positive.** Furthermore, the testing technician's statement that the employee provided a cold specimen violates the Standards of Excellence.

In accordance with PERS-19, an employee who violates the Standards of Excellence is subject to dismissal. Your department is responsible for taking disciplinary action. If the employee is an agreement-covered employee, a union official or an excepted employee who still holds seniority in a craft, the disciplinary action must comply with the requirements of the applicable collective bargaining agreement. If you have any questions concerning the discipline process, please contact Labor Relations.

The results/events of an employee's test should be kept confidential. However, evidence of the results/event may be introduced into any discipline investigation that results from the test(s).

Further, please fax a copy of the hearing charges and signed Drug and Alcohol Waiver (if applicable) to my attention at ATS 777-2786 or Bell (202) 906-2786.

I am notifying you of the above facts in accordance with Amtrak policy so that you may initiate appropriate disciplinary actions.

Attachments
cc:    EAP Counselor
       Health Services – MAD

(Tierney)

Plaintiff's Exhibit 38



DEPOSITION
EXHIBIT
Stevens 20
3/1/07

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4       ------------------------------X

5    DAVID B. STEVENS, et al.,        :

6              Plaintiffs,            :

7    v.                               :   Civil Action No.

8    NATIONAL RAILROAD PASSENGER      :   1:05CV01924-RCL

9    CORPORATION,                     :

10             Defendant.             :

11      ------------------------------X

12

13

14       DEPOSITION OF DEMETRIA HUDLEY

15

16                      Washington, D.C.

17                      Friday, March 2, 2007

18

19

20

21   REPORTED BY:

22        JULIE BAKER, RPR CRR

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700       800-336-6646       410-684-2550

1   to see him.

2        Q     The observer who's watching the person

3   give the urine can be anyone of the same sex; right?

4        A     Right, as long as it's the same sex and an

5   employee, one of us.

6        Q     Is the fact that sometimes it's hard to

7   get a male chaperone for a retest, is that something

8   that you would tell the patient if the patient is

9   waiting for a retest?

10       A     Yeah, we probably could. We probably

11   would let him know -- yeah, we would, that we're

12   waiting on the doctor to come chaperone.

13       Q     Do you have any recollection of collecting

14   a urine sample from Mr. Stevens in December of '04?

15       A     I'm not 100 percent sure. I think I do.

16   Just from the outline of it being an Amtrak and

17   Ebonie being a part of it, I remember going through

18   this before.

19       Q     Why don't you tell me what you remember

20   about that.

21       A     I think he was there for a return to work

22   physical and a drug screen. I did his drug screen,

1       Q      Do you think he had his physical before he

2    left?

3       A      Yeah, I think he completed the physical.

4       Q      So you think he completed the physical but

5    not -- I'm sorry.  You think he didn't give a second

6    sample?

7       A      He didn't give the second -- that's where

8    the chaos came in because he didn't give that second

9    specimen and he left.  Once you leave out the door,

10    with companies like Amtrak, they treat their

11    non-DOTs as equal with the DOTs.  Once he left out

12    that door, he was disqualified.

13       Q      His sample is disqualified?

14       A      Right, and Amtrak won't go any further.

15       Q      And do you know which doctor completed his

16    physical?

17       A      I'm seeing from the form, Dr. Hill.

18       Q      Let me return your attention to the

19    exhibit I showed you.  You're talking about Exhibit

20    84?

21       A      That's Dr. Hill's signature.

22       Q      What's the date on Exhibit 84 when he

1          Q     What kinds of things would she request?

2          A     Amtrak would request a status form.  Most

3     companies only want the drug screen paperwork.

4     Amtrak is really thorough so if she asked for it, I

5     may have faxed it to her.

6          Q     That being Exhibit 80?

7          A     80, right.

8          Q     Returning to Exhibit 81, it says that

9     first specimen not within temperature; is that

10    right?

11         A     Yes.

12         Q     Would you have told anyone at Amtrak that

13    the specimen was cold?

14         A     Yes.

15         Q     Why would you say that?

16         A     If it's under 90 degrees, it's considered

17    cold.

18         Q     How do you know if it was under 90 degrees

19    or not?

20         A     The temperature strip on the cup.  It

21    registers between 90 and 100.  As a collector, we

22    pay attention to 90 and 100.  If it doesn't light up

1    follow up with a second one with someone in there

2    who can actually say it's theirs, it has a

3    temperature, send it off.

4         Q    You're saying the protocol is to say it's

5    not within temperature range?

6         A    No.  If it's not within temperature range,

7    it's not within temperature.  Protocol is do a

8    second one observed.

9         Q    Let me have you take a look at Exhibit 42.

10   Do you recognize Exhibit 42?

11        A    Yes.

12        Q    What is Exhibit 42?

13        A    It's our unusual collection form.

14        Q    Is your handwriting on here?

15        A    Yes.

16        Q    Your signature?

17        A    Yes.

18        Q    And it looks like the donor gave a

19   signature?

20        A    Yes.

21        Q    There's some handwriting around the

22   section where it's checked for specimen temperature

64

1    out of range.  Do you see that?

2         A    Yes.

3         Q    Do you think that was your handwriting?

4         A    Yes.

5         Q    It says not within 90 to 100.  Do you see

6    that?

7         A    Yes.

8         Q    It says "the same gender collector

9    will immediately collect a second urine sample under

10   direct observation."  Do you see that?

11        A    Yes.

12        Q    But I believe your testimony was you

13   decided or that ultimately a decision was made to

14   have Mr. Stevens head toward a physical first rather

15   than a retest?

16        A    Yes.  He couldn't go to the bathroom.

17   This was his specimen.  The thing that he was saying

18   and most patients do say, that initial specimen,

19   whether it has a temperature or not, it's theirs.

20   So he can't go right again.  He just went.  While

21   we're waiting on him to be able to go, we normally

22   sit him in the hallway.  I sent him to complete his

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4        - - - - - - - - - - - - - - - - x        FEB 2 ○ 2007

5    MAE L. WHITLEY,                    :

6    DAVID B. STEVENS, et al.,          :

7                 Plaintiffs,           :

8                                       :   Civil Action No.

9         v.                           :

10                                      :   1:05CV01924RCL

11   NATIONAL RAILROAD PASSENGER        :

12   CORPORATION (AMTRAK),              :

13                 Defendant.           :

14   - - - - - - - - - - - - - - - - x

15

16          Deposition of BERNARD LEE CAMPBELL

17

18                              Washington, D.C.

19                              Friday, February 9, 2007

20

21   Reported by:

22          Elizabeth L.Wasserman

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage
202-347-3700          800-336-6646

1    Prince George's County?

2        A    That is correct.

3        Q    How did you learn about that?

4        A    E-mail.

5        Q    Who did you get the e-mail from?

6        A    I think Lateria, Margaret Ann Lateria.

7        Q    Would that be Margaret Tierney?

8        A    Yes.  You must know her.

9        Q    Where does she work?

10       A    Somewhere for Amtrak.  Philadelphia, I

11   think.

12       Q    And what was the essence of the e-mail?

13       A    It basically said that Mr. David Stevens

14   had reported for a return-to-duty physical.  He gave

15   an adulterated sample.  He was told that he had to

16   give another sample under observation.  He said he

17   was worried about his health.  He left.

18          He was told that if he didn't give that

19   sample, that he would be probably terminated, I

20   believe.  That's the policy.  No, excuse me, he would

21   be considered as a positive result or being a Rule G

22   violator.  His second hit would put him into the

1    arena of discipline, and it would be termination for

2    violating a Rule G waiver.

3         Q      What did you do when you got this e-mail

4    from Ms. Tierney?

5         A      Gave it to a charging officer.

6         Q      Who is the charging officer?

7         A      Michael Talley.

8         Q      And what does it mean to be a charging

9    officer?

10        A      He's like a lawyer but he didn't pass the

11   bar.

12        Q      Is he in fact someone who finished law

13   school?

14        A      No.  He's a General Foreman.

15        Q      And why do you give it to him?

16        A      Because he works for me and he's a

17   charging officer, and it was such an easy case that I

18   didn't want it.

19        Q      What did you tell Mr. Talley to do?

20        A      His job.

21        Q      Which would be what?

22        A      Hold the case.

1    union affairs.

2        Q        Who pays his salary in his function as a

3    hearing officer?

4        A        Amtrak.

5        Q        Had he been a hearing officer on other

6    cases that derived from your employees?

7        A        Yes.

8        Q        Approximately how many?

9        A        A couple hundred.

10        Q        Have you ever disagreed with any rulings

11    he has issued?

12        A        All the time.

13        Q        When you received the e-mail from Ms.

14    Tierney, did that signify to you that you were

15    responsible for bringing charges against Mr. Stevens?

16        A        That is my job.

17        Q        Did you find that to be something that was

18    within your discretion or something that was

19    mandatory for you to do?

20        A        Mandatory.

21        Q        How did you know that?

22        A        Because that's what it is when you violate

1        a Rule G waiver.  It's mandatory.

2            Q        Any other reason why it's mandatory?

3            A        It's company policy.

4            Q        What's company policy?

5            A        That it's mandatory that we proceed to

6        bring a Rule G waiver up in a hearing.  And

7        termination, once you violate the Rule G, the only

8        solution is termination.

9            Q        Who makes the determination as to whether

10       someone has violated a Rule G waiver such that it

11       could become mandatory to bring charges?

12           A        Policy, company policy.

13           Q        But who decides when that policy needs to

14       be invoked?

15           A        The employee.

16           Q        Well, the employee doesn't specifically

17       say "I want to be fired."  The employee commits an

18       act and then management decides to fire him, right?

19           A        No.  The employee specifically says "I

20       want to be fired" by signing that Rule G waiver which

21       clearly states what's going to happen to you.

22           Q        If you commit another violation.

1          Q      Are you personally familiar with any of

2    the employees at the Concentra Medical Center where

3    Mr. Stevens went for a drug test?

4          A      No.

5                 MR. GOLDSMITH:  Let's mark this as the

6    next exhibit.

7                                (Plaintiff's Exhibit  No.

8                                62 was marked for iden-

9                                tification.)

10                BY MR. GOLDSMITH:

11         Q      Showing you what has been marked--

12         A      It's a decision letter.

13         Q      Yes, a decision letter.

14                MR. FISCHLER:  Wait until you see it.

15                BY MR. GOLDSMITH:

16         Q      Exhibit 62, it looks like a two-page

17   decision letter and then a document signed by Mr.

18   Kapela relating to it.  You see that?

19         A      Yes.

20         Q      Have you seen this before?

21         A      Yes.

22         Q      When you got this decision letter, did you

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4     - - - - - - - - - - - - - - - x        FEB 2  2007

5     MAE L. WHITLEY,                    :

6     DAVID B. STEVENS, et al.,          :

7              Plaintiffs,               :

8                                        :   Civil Action No.

9         v.                             :

10                                       :   1:05CV01924RCL

11    NATIONAL RAILROAD PASSENGER        :

12    CORPORATION (AMTRAK),              :

13              Defendant.               :

14    - - - - - - - - - - - - - - - x

15

16        Deposition of BERNARD LEE CAMPBELL

17

18                        Washington, D.C.

19                        Friday, February 9, 2007

20

21    Reported by:

22            Elizabeth L.Wasserman

ACE-FEDERAL REPORTERS, INC.

Nationwide Coverage

202-347-3700        800-336-6646

1    November 18th, three pages.                    The

2    first page is a letter from the EEOC to the Amtrak

3    EEO Compliance Manager.   The second page says

4    amendment to charge of discrimination.   The third

5    page is page 107 and contains parts 3 and 4 to the

6    second page.

7            MR. FISCHLER:   These are not consecutive

8    documents.

9            MR. GOLDSMITH:   No, they're not

10    consecutive in your numbering but they go together.

11    If you look at them, I think you'll infer the same

12    thing from that.   In fact, 106 and 107 are

13    consecutive.

14            MR. FISCHLER:   Right, right.   Okay.

15            BY MR. GOLDSMITH:

16        Q    All right.   Were you aware that Mr.

17    Stevens made an amendment to his EEO complaint with

18    the EEOC in November of 2004?

19        A    See, I didn't know he made the first

20    complaint.

21        Q    So you never knew that he--at no time

22    while he was still employed at Amtrak did you know

1    that he had made a complaint with the EEOC.  Is that

2    correct?

3        A    That is correct.

4        Q    And at no time did you know that he did an

5    amendment to his complaint with the EEOC.  Is that

6    also true?

7        A    I never knew he even made a complaint, so

8    I definitely didn't know he made an amendment to his

9    complaint.

10       Q    All right.  How did you find out that he

11   had made a complaint?  Was that here today, or did

12   you know it before today?

13       A    I never testified that I did know he made

14   a complaint to the EEOC.

15       Q    Well, you know now, right?

16       A    Yes, sir.

17       Q    All right, so you think you learned it

18   today?

19       A    I'm pretty sure.  I would have to say yes.

20   Yes.

21       Q    Now, have you had employees make

22   complaints to the EEOC in the past, when you've been

1    union affairs.

2        Q    Who pays his salary in his function as a

3    hearing officer?

4        A    Amtrak.

5        Q    Had he been a hearing officer on other

6    cases that derived from your employees?

7        A    Yes.

8        Q    Approximately how many?

9        A    A couple hundred.

10       Q    Have you ever disagreed with any rulings

11   he has issued?

12       A    All the time.

13       Q    When you received the e-mail from Ms.

14   Tierney, did that signify to you that you were

15   responsible for bringing charges against Mr. Stevens?

16       A    That is my job.

17       Q    Did you find that to be something that was

18   within your discretion or something that was

19   mandatory for you to do?

20       A    Mandatory.

21       Q    How did you know that?

22       A    Because that's what it is when you violate

1    a Rule G waiver.  It's mandatory.

2        Q    Any other reason why it's mandatory?

3        A    It's company policy.

4        Q    What's company policy?

5        A    That it's mandatory that we proceed to

6    bring a Rule G waiver up in a hearing.  And

7    termination, once you violate the Rule G, the only

8    solution is termination.

9        Q    Who makes the determination as to whether

10   someone has violated a Rule G waiver such that it

11   could become mandatory to bring charges?

12       A    Policy, company policy.

13       Q    But who decides when that policy needs to

14   be invoked?

15       A    The employee.

16       Q    Well, the employee doesn't specifically

17   say "I want to be fired."  The employee commits an

18   act and then management decides to fire him, right?

19       A    No.  The employee specifically says "I

20   want to be fired" by signing that Rule G waiver which

21   clearly states what's going to happen to you.

22       Q    If you commit another violation.