# IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ ) | |
| **David B. Stevens, et. al** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 1:05CV01924-RCL** |
| ) | |
| **National Railroad Passenger Corporation** ) | |
| **("Amtrak"),** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

### PLAINTIFF MAE WHITLEY'S STATEMENT OF MATERIAL FACTS IN DISPUTE FOR OPPOSING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

#### Whitley, A Foreman I, Applies For Promotion to Foreman II

1.     Whitley began her employment with National Railroad Passenger Corporation ("Amtrak") as a coach cleaner in 1977. See Dk[1] 16-1 ("Whitley Declaration") at ¶ 1.

2.     In 1985, Whitley was promoted to a Foreman I position supervising coach cleaners in Amtrak's Mechanical Department. Whitley has held a Foreman I title from the date of her promotion in 1985 until the present. Whitley Decl. at ¶ 1.

3.     Whitley has applied for a Foreman II position, supervising mechanical crafts. It is undisputed that a Foreman II must be able to supervise all the mechanical crafts, not just one. Deposition of Bernard Campbell ("Campbell Dep.") at 104-105.

4.      According to second line supervisor Bernard Campbell, Whitley is a hard worker and a good supervisor. Campbell Dep. 36:7 to 36:8; 37:2 to 37:6)

---

[1] "Dk" references are to official docket entry numbers; Those entries have not been reproduced for this submission. "PDE" refers to Plaintiff's deposition exhibits, which were consecutively numbered for reference by all witnesses.

Mechanical Department Personnel

5.      Since 2003, the Washington, D.C. Mechanical Department has been led by Michael Kapela, the Master Mechanic, Mid-Atlantic Division.  Deposition of Michael Kapela, 2/12/07 (Kapela Dep.") 6. Ron Truitt, the Superintendent, was Kapela's immediate subordinate.  Kapela Dep.  7. Bernard (BL) Campbell and Robert Frank were Assistant Superintendents reporting to Truitt.  Kapela Dep.  15. Kapela selected them for those positions.  Kapela Dep. 15. Gary Louers was a General Foreman (Kapela Dep.  67) reporting to Campbell and directly supervising Whitley.  Joseph Tana ("Tana") is a Foreman II, Tana Dep.  11, who chose AMTRAK counsel Fischler to represent him at his deposition (Deposition of Joseph Tana ("Tana Dep") 54-55, and who was a union shop steward.  Sarah Ray led the HR Department.  Lavar Freeman and Taylor Cannon were her subordinates.  Ray Dep.  14-15.

The Foreman II Position

6.      The Foreman II position supervises electricians, pipe fitters, machinists and Car Repairers Ray Dep.  118.

7.      Kapela admits that 50% of the job is "experience and knowledge in managing people." Kapela Dep.  93-94.

8.      It is undisputed that a Foreman II need not be able to do the craft workers' duties better than a craft worker. Incumbents only occasionally might "assist" the skilled craftspeople by picking up tools.  Louers Dep.  42-43.

Qualifications For The Foreman II Position; Certification; Probationary Period

9.      AMTRAK maintains in this case that it is necessary for a Foreman II to have "craft experience" one of these crafts, thereby conceding that any Foreman II will be selected without "mechanical experience" in three of the four crafts to be supervised.

9.   AMTRAK admits that an applicant could qualify for a Foreman II position through either mechanical experience or by participating in its now-defunct Foreman II training position.  Dk 43-5 (Ray Aff. Exh. A).

10.   PDE 1—which does not require "mechanical experience"-- is the job description for a Foreman II.  Ray Dep.  30-32.

11.   It is "accurate" except for the absence of reference to 238 certification. Campbell Dep. 108-109. PDE 21 is a "Special Notice" of Foreman II vacancy from 1999. Ray Dep.  158-161.

12.   Like the current official position description, it does not list "mechanical experience" as a mandatory prerequisite for selection.  Ray Dep.  162; PDE 21.

13.   Ray cannot explain this.  Ray Dep.  162.

14.   The Notice did require safety record, attendance, and other requirements. Exh. 21; Ray Dep.  162.

15.   The Mechanical Department informed Ray that air brake certification was a requirement for qualification for the position.  Ray Dep.  54.

16.   PDE 1 and the vacancy announcements so state.  See PDE 2, 29.

17.   Possessing the certification is a big hurdle that a candidate need not pass later if she is already certified.  Tana Dep.  40.

18.   However, AMTRAK nonetheless hires and promotes individuals to the Foreman II position even without completion of the relevant "238" certifications, with the understanding that if such selectees do not complete the training successfully within their 90 day probationary period, they cannot remain in the job.  Truitt Dep.  38-39.

19.   AMTRAK utilizes a ninety working day probationary period for Foremen II.  Louers Dep.  34-35. Tana Dep.  134-135.

20.     A Foreman II is subject to a ninety day probationary period when he or she enters into that job, whether an internal promotion or an outside hire.  Ray Dep.  23-24.

21.     It is expected that new foremen will continue to learn during the probationary period.  Louers Dep.  53.  Because of the difficulty in finding qualified applicants, AMTRAK sometimes hired individuals who lacked—unlike Whitley—the certifications necessary to perform as a Foreman II. Truitt Dep.  38:5 to 38:15.

22.     They would be permitted to attempt to obtain the certification within the ninety day trial period.  Truitt Dep.  39:5 to 39:19).

23.     Ray doesn't know if any certifications are necessary for an individual to perform as a Foreman II (they are).  Ray Dep.  22.

24.     Ray says that applicants must already possess all the qualifications before being selected.  Ray Dep.  24-35.

25.     However, the facts refute that contention summarily, as AMTRAK repeatedly hired candidates who lacked the certifications required by the Position Description (which Whitley possessed), on the theory that the selectees could obtain the certifications during their ninety working day probationary period. Truitt Dep.  39; PDE 30 (Wilson).

<u>The Mechanical Department "Always" Has Foreman II Vacancies; Pay Is Low;
Overtime Is To Be Avoided</u>

31.     The Mechanical Department "always" has Foreman II vacancies—including between 10/13/04 and 12/7/04.  Tana Dep.  105.

32.     It is difficult to get qualified applicants for Foreman II positions, largely because the pay is low.  Truitt Dep.  36:13- 36:1.

33.    Accordingly, in Kapela's experience, every qualified applicant who has ever applied has received an interview.  Kapela Dep.  53-54.

34.    Vacancies require the authorization of overtime, but "any use of overtime is undesirable" to Kapela. Kapela Dep.  90.

35.    Foremen II working overtime are paid time and a half, which is expensive.  Kapela Dep.  90.

36.    Overtime has an adverse impact on the company's budget.  Kapela Dep. 90-91. If a Foreman II position is vacant, that creates a "problem" for AMTRAK.  Ray Dep.  26.

37.    Overtime then becomes necessary.  Ray Dep.  26.

38.    That may require payment of time and a half.  Ray Dep.  27.

<u>The Mechanical Department Determines Its Own Vacancies</u>

39.    The Mechanical Department decides for itself what positions it has vacant. Ray Dep.  33-34.

40.    Ray would discuss filling mechanical positions with Truitt.  Ray Dep.  36.

41.    She would also consult with Frank, Campbell, Kapela and Larry Ice about filling positions.  Ray Dep.  37-39.

42.     She doesn't deny discussing Foreman II positions with Kapela during 2003-2005.  Ray Dep.  39.

43.    However, she also testified that she could not remember if she had been involved in filling Foreman II positions without seeing documents.  Ray Dep.  18.

<u>Whitley And Robert Frank Interact Regarding Whitley's Sexual Harassment Complaint</u>

44.        On March 22, 1999, Whitley went into Bob Frank's office upset and crying, and told Frank that she was being sexually harassed by Frank Cover. Frank sent her home and Ms. Fyffe of EEO called Whitley at home.

45.        On April 9, 1999, an EEO meeting on Whitley's concerns was conducted with Frank, Wayne Brody, Kapela, Saunji Fyffe, Frank Covers , Daryl Pesce and Whitley in attendance. Whitley Aff. ¶ 31.

<u>Whitley Applies For The Foreman II Training Position</u>

46.     Whitley applied for a Foreman II training position in 1999 and thereafter, which she did not obtain.  Obtaining the position would result in six months of training after which the applicant would automatically be promoted to Foreman II.  PDE 71 at 84.

47.     When Whitley asked her about the training position, Ray told Whitley that the purpose of the position was primarily to improve the incumbent's supervisory skills, not primarily to improve her craft-related skills.  Whitley Aff. ¶ 33.

48.     The interview panel included Ray and Kapela.  PDE 35 (Kapela Dep. 11/18/03) at 63.

<u>Ladson And Stiggers Apply For The Foreman II Training Position As Well</u>

49.     Two other applicants for the same slot were Jane Ladson and Althera Stiggers.  Ladson had many years of experience as a Foreman I, and ten years' experience as a Car Repairer.  Whitley Affidavit Exhibit 1 (Ladson application).

50.     Stiggers had experience as a Foreman I, but none in a craft position—a resume similar to Whitley's.

51.     AMTRAK General Foreman and agent Tom Wimbish, who had a prior sexual affair with Stiggers,  Stiggers Dep. 182,  admitted that Kapela and Stiggers were

having a sexual affair at that very time.  Whitley Aff. ¶ 44, 45; Whitley Affidavit Exhibit

16.

52.    Stiggers was selected for the position—in Kapela's shop (PDE 71 at 83-

84)-- as witnessed by Sarah Ray.  Whitley Aff. ¶ 44, 45; Whitley Affidavit Exhibit 17(1999

Applicant flow log).

53.    Wimbish told Whitley in Campbell's presence that Whitley could not

expect to be promoted without sleeping with Kapela, too. Whitley Aff. ¶ 44.  ; Whitley

Affidavit Exhibit 16.

54.    In July 2000, Kapela and Whitley met and discussed Whitley's

employment. Whitley Aff. ¶ 46 ; Whitley filed an internal EEO complaint on the matter,

which also included her contention that Kapela, her supervisor at the time was

harassing her.  Whitley Aff. Exh. 16  hereto (Internal EEO Complaint 1999).

55.    Ladson protested the selection of Stiggers.  In her correspondence with

Daryl Pesce, she noted that she had sought promotion both to the training position and

to a full Foreman II but been denied, despite her ample qualifications.  Whitley Affidavit

Exhibit 18. (August 3, 200 letter).

56.    She noted her ten years of experience as a Carman, and that qualifications

should determine selections.  Id.

57.    Pesce responded on August 25.  He boldly stated that the best qualified

person (Stiggers) had been selected.  Id. (8-25-00 letter).

58.    On May 10, 2001, Ladson wrote to Pesce and expressed dismay that

others with "less experience and no mechanical background" had been selected for

Foreman II.  She noted that "some of the people chosen only had a few weeks of training

in the mechanical department" and that she could "only assume that in order to advance

within Amtrak, it is more important who you know, rather than what you know."
AMTRAK received the letter on May 10, 2001. Whitley Affidavit Exhibit 2.

59.     Pesce's response to Ladson on May 25, 2001 was instructive.  He wrote
that (despite her ten years' experience in a mechanical craft) she had displayed a
"weakness" in her mechanical knowledge.  Whitley Affidavit Exhibit 3.

60.     Stiggers soon became a full fledged Foreman II, then quickly a Foreman
III.  Stiggers Dep. 82-86.

61.     Ladson continued to have many more years of mechanical experience
than Stiggers but could not get promoted.

62.     The only other individual to enter on duty in the training position before
AMTRAK eliminated it was Wellington Gibson.  Whitley believes that he—like Stiggers-
- also had a resume that lacked time in a mechanical craft.  Whitley Aff. Second ¶ 8,10.

63.     Thus, AMTRAK demonstrated its lack of concern for superior pre-
existing mechanical knowledge in Foreman II selection.  Ladson was finally promoted in
March 2004, several years later, after having initiated an EEO Complaint.  Whitley Aff.
Second ¶ 11.  Whitley Affidavit Exhibit 4 (Promotion Form).

Whitley Sues Amtrak Regarding The Mechanical Department; The Managers Are
Deposed Days Before Whitley Is Interviewed For Promotion

64.     On March 7, 2003, Whitley filed a civil complaint against Amtrak alleging
sexual harassment, sex discrimination, and retaliation. Dk 16-1. [2]

65.     In that Complaint, Whitley alleged that her supervisor, Frank Cover
("Cover"), sexually harassed her and withheld training for a Foreman II position and
promotions because she would not submit to his sexual advances.  Dk 16-1 ¶¶ 8, 20.

---

[2] In an opinion dated, June 9, 2004, this Court granted summary judgment dismissing all of
Whitley's claims.

66.     Whitley also alleged that Amtrak retaliated against her by denying her the Foreman II training.  Dk 16-1 ¶¶ 23, 40.

67.     Whitley had also previously made a harassment complaint against Kapela, PDE 74, 75.

> Kapela Is Asked At November 2003 Whitley Deposition About An
> Alleged Sexual Affair And Related Nepotistic Promotion Of Stiggers;
> Campbell Testifies; Ray Participates In Amtrak's Defense

68.     On October 27, 2003, Whitley was deposed by Amtrak's counsel, Mr. Fischler.  She testified, among other things, to having been harassed by Kapela, to having protested the harassment by Cover to Robert Frank, who sent her home for the day.  Whitley Dep. 10/27/03 at 195.

69.     On November 18, 2003, Fischler defended Kapela's deposition at Whitley's then-counsel's office.  PDE 71 (Kapela Dep. 11/18/03) at 1, 45.

70.     During that deposition, Kapela admitted that he was accused of harassment by Whitley previously.  PDE 71 at 53-54.

71.     He was asked point blank by Whitley's then-lawyer whether he engaged in an affair with Stiggers. PDE 71 at 79-81, 93, and whether he was involved in selecting the same Stiggers for the Foreman II training position.  PDE 71 at 73-75.

72.     On November 19, 2003, Campbell was deposed as well.  He testified that Stiggers told him she had had an affair with Wimbish, but that he didn't want "to be a judge or jury" and "didn't know if Mike was doing anyone." Campbell Dep. 11/19/03 at 33-34.

73.     Kapela claims he has no understanding as to whether AMTRAK won or lost Whitley's prior suit.  Kapela Dep.  30.

74.     Campbell is aware of the suit.  Campbell Dep.  37:12 to 37:22).

75.     He says both that he has discussed that suit with Whitley, and that he doesn't "really know" if he has.  Campbell Dep.  38:4 to 38:7).

76.     Robert Frank's reputation for truthfulness is poor.  Tana Dep.  41.

77.     Frank's lying on work-related matters was a commonplace occurrence.  Tana Dep.  48-50.

78.     Tana asserted that he was going to "take the Fifth Amendment" rather than elaborate fully on Frank's lack of truthfulness.  Tana Dep. 45.

79.     Frank—one of two decision makers according to Amtrak's latest representations-- knew about Whitley's first federal lawsuit.  Tana Dep.  50-51.

80.     Frank was hostile toward Whitley during her interview.  Docket Entry 16-1 (Whitley Affidavit) ¶¶15-20.

81.     Ray and Kapela have discussed Whitley's prior lawsuit and this one, including the reasons for selecting certain candidates.  Ray Dep.  137, 149-152.

82.     Ray supplied Kapela with a lot of information at that time.  Ray Dep.  137.

83.     Ray also does not deny possibly having discussed Whitley's lawsuit with Robert Frank and Campbell (assistant superintendents).  Ray Dep.  145-146.

84.     Ray participated in answering Plaintiff's Interrogatories in Whitley's prior lawsuit (PDE 15).  Ray Dep.  147-148.

85.     Since filing her complaint in 2003, Whitley has applied for several Foreman II positions with Amtrak.  Dk 16-1 ¶ 6.

86.     When Whitley applied for promotion, she was on every occasion treated as qualified by HR.  Ray Dep.  227-230.

87.     She was interviewed for the training position by a panel that included Ray and Kapela.  PDE 35 (Kapela Dep. 11/18/03) at 63, and it is undisputed that she

was interviewed for the Foreman II proper position twice, first in December 2003 and again on March 28, 2004.

### Whitley Obtains Her Certification

88.    By June 2004, Whitley had completed the classes that would unquestionably qualify her to work as a Foreman II.  Dk 16-1 ¶ 10; Dk 16-1 Exh. 3 - copy of certification card.

89.    According to Amtrak's policies, the completion of this program qualified her to work as a Foreman II.  Dk 16-1 ¶ 7.

90.     Despite having completed the program, however, Whitley was not selected for a Foreman II position.  Both Bernard Campbell and Michael Kapela, Whitley's supervisors, knew that Whitley had taken the Foreman II classes.  Dk 16-1 ¶ 12.

91.    However, as far as Whitley ever knew, both declined to recommend her, in retaliation for her prior complaints and lawsuit.  Dk 16-1 ¶ 22.

### Role Of HR And The Interview Panel In The Process

92.    In order to compete for a position, an applicant must have at least submitted a resume, if not a formal application form.  Ray Dep.  74.

93.    A Human Resources Specialist or Ray herself screens all applicants to ascertain if they are minimally qualified for the position in question and therefore eligible for interview.  Ray Dep.  74-75; Kapela Dep.  51-52.

94.    HR would rely upon Mechanical supervisors to answer their questions in matching up a candidate against the qualifying criteria.  Ray Dep.  74-75.

### Amtrak interviews for mechanical positions

11

95.    It is supposedly forbidden to select an outside candidate without an interview. Ray Dep. 81-82.

96.    Mechanical sometimes selects individuals who were interviewed previously, as opposed to currently.  PDE 8.

97.    Assistant Superintendents (such as Frank and Campbell) decide who will represent Mechanical on a Foreman II interview panel.   Kapela Dep.  17-18, 21.

98.    They discuss the issue among themselves.  Kapela Dep.  34-35.

99.    Ray testified that Human Resources Representatives only sometimes sit on the panels.  Ray Dep.  85-86.

100.    When Tana—who asked Mr. Fischler to represent him at his deposition in this case-- sits on a panel, he supposedly representing the union, even though he is a manager.  Ray Dep at 86-87.

It Is Disputed Whether The Interview Panel Could Reject Whitley On Its Own

101.    A panel demonstrably lacks authority to make the ultimate decision on a promotion.  Ray Dep.  96; Truitt Dep.  30:11 to 30:15; Truitt Dep.  52:18 to 53:8; Kapela Dep.  39-40 (testifying that he doesn't know if his subordinates maintain documents reflecting the will of the interview panel).

102.     It completes no forms indicating its own will as to a selection.  Ray Dep. 97-99.

103.    Thus, the documentation generated reflecting selection of a Foreman II is a standard "Form 2000" (Amtrak/Whitley 1948), such as PDE 9.

104.    Review of a Form 2000 shows no opportunity to demonstrate whether an interview was offered or conducted, who may have conducted it, or what the interviewers may have concluded.  PDE 9.

105.     Indeed, the person who generates the Form 2000 may not have even interviewed the applicant in question. Ray Dep.  97.

106.     There is no official record of who was actually in the interview. Interview sheets are maintained by some of the panelists, but not necessarily all.  The sheets are lists of questions, and are not signed by the panelists so that it is difficult even to know whose sheet was whose.  Whitley Affidavit Exhibit 12.

107.     A panel is poorly equipped to render a comparative decision to select one candidate over another, since the same panelists do not always interview all the candidates for Foreman II who are applying during the same timeframe.  Tana—who sat in many interviews—cannot say what AMTRAK does if there are different panelists interviewing competing candidates, and AMTRAK is trying to compare candidates. Tana Dep.  101.

108.     Whitley's name appears on an applicant flow log maintained by Taylor Cannon in 2004. PDE  24; Ray Dep.  179-180.

109.     The log states that the candidates were interviewed by Frank and Freeman.  PDE 24.

110.      However, candidate Grimes was really interviewed solely by Michael Talley.  Whitley Affidavit Exhibit 13 (Amtrak Whitley 1573).

111.     Candidate Eckstein may have been interviewed by Frank and Tana only. Tana Dep.  102; Whitley Affidavit Exhibit 14 (Amtrak Whitley 1555).

112.     No witness ever testified or averred that AMTRAK actually compared Whitley to Jefferson, Eckstein or Grimes.  See Tana Dep.  103-104.

<u>Amtrak HR Forms Fail To Reveal Who Selects Foremen II Or How</u>

113.    Interviewers normally complete the form that contains the interview questions for each interview they conduct.  Ray Dep.  88.

114.    Those notes are then placed in Amtrak's "job file" folder for that position. Ray Dep.  88.

115.    The only documentation maintained reflecting whether HR treated a candidate as qualified or not, is that which shows whether or not the applicant was interviewed.  Ray Dep.  76.

116.    That documentation is the "interview sheet."  Ray Dep.  76.

117.    AMTRAK has no form indicating that a particular individual has been selected for Foreman II.  Tana Dep., (Page 53:9 to 53:11).

118.    Nor does it have a document indicating that a particular individual was selected rather than someone else. Truitt Dep.  30:11-30:15.

<u>AMTRAK Officials Contradict Each Other As To Selection And Non-Selection</u>

119.    Despite Campbell's false assertions to the contrary, Campbell Dep. 27-28, panelists discuss the selection with their supervisors. Ray Dep. 99.

120.    Kapela testified that HR, the Assistant Superintendent, and the interview panel decide together whom to select. Kapela Dep. 17-18, 21-22. In fact, they could also consult with him. Ray Dep. 91.

121.    The final selection for the position is made by the Department, not the Panel. Ray Dep. 89.

122.    The Panel members may consult with the Assistant Superintendent "on up to Mike Kapela" about the selection. Ray Dep. 89-91.

123.    Commonly, they would. Ray Dep. 91.

124.    However, according to Ray, the "people on the Panel" also "might" decide without consulting anyone else. Ray Dep. 90-91.

<u>Selection Authority Resides Within Mechanical Management, But Amtrak Witnesses Falsely Deny It</u>

125.    Kapela testified that in every case, there is always consensus between HR and the Assistant Superintendent on whom to select for Foreman II. Kapela Dep. 32-33.

126.    There always must be departmental approval for a selection to occur. Ray Dep. 96-97; PDE 9. I

127.    It is HR's role at AMTRAK "to follow the request of the department that's making the request." Ray Dep. 107-108.

128.    "The authority lies within management." Tana Dep. 108.

129.    Nor could it be any other way. Indeed, even Ray, who has vast HR experience, is not knowledgeable as to what Foremen II actually do. Ray Dep. 109.

130.    Logically, Human Resources' approval on the AMTRAK Form 2000 reflects nothing more than HR's lack of a reason to disagree with the Mechanical Department's decision as to whom to select.  Ray Dep.  99-100; PDE 9.

131.    The approving assistant superintendent need not have personally participated in the interview process. Ray Dep.  95-96.

132.    In deciding whom to select, Assistant Superintendents could discuss their personal knowledge of the candidates amongst themselves.  Truitt Dep.  52:18 to 53:8).

133.    Sometimes, a particular Assistant Superintendent might take a particular interest in a particular candidate.  Truitt Dep.  55:2 to 58:11).

134.    Approval signatures on a Form 2000 such as PDE 9 can provide no insight into who actually selected a candidate for Foreman II.  Kapela Dep.  43-46.

135.    Amtrak maintains no regular document that would.  Kapela Dep.  45.

136.    Kapela does not know if a particular Assisstant Superintendent may be more active in the selection and promotion process than others.  Kapela Dep.  48-49.

137.    Ray could not claim that an Assistant Superintendent lacks authority to decline to accept a recommendation from the interview panel.  Ray Dep.  94.

138.    And indeed, HR's Taylor Cannon could only obtain his alleged knowledge that as to Whitley "Other candidates whose background and experience more closely meet the needs of the department have been selected," from the Mechanical Department.  Truitt Dep.  100:14 to 101:7)

139.    Campbell says Human Resources determines who will make a Foreman II selection, and that Human Resources makes the actual selection as well.  Contrary to Ray, Kapela, Truitt and Louers, Campbell says that he plays no role whatsoever in such a selection. Campbell Dep.  24:6 to 24:19; 31:19 to 31:22; Campbell Dep.  11:17 to 12:8.

140.     However, Campbell's testimony that he played no role in the process of promoting or selecting individuals for Foreman II positions is untruthful, according to his former direct supervisor, Truitt Dep. 69:8 to 69:13, who reported directly to Kapela during the relevant period and supervised Campbell directly.

141.     He testified that it was normally the Assistant Superintendents who would determine who would become a Foreman II. Truitt Dep. 23:2 to 23:9); Truitt Dep. 23:15 to 24:8.

142.     Campbell's immediate subordinate, General Foreman Gary Louers, concurred with Truitt that staffing decisions with regard to Foremen II are made by Assistant Superintendents such as Campbell. Louers Dep. 27. Campbell would not deny that Kapela has a role to play. Campbell Dep. 13:2 to 13:5 (testifying that he "doesn't know").

143.     Kapela differs, stating that the Assistant Superintendent and HR have the final authority in selections. Kapela Dep. 30.

144.     He says it would not be unusual for the Assistant Superintendents to discuss whom to select from among themselves. Kapela Dep. 36-37; 45-46.

145.     Sometimes, these participants also discuss the selection process with Kapela himself. Kapela Dep. 23.

146.     They might ask him for input. Kapela Dep. 23.

<u>Whitley Was Well Qualified For Foreman II</u>

147.     Fifty percent of being a Foreman II is "managing people." Kapela Dep. 93-94.

148.    Therefore, it would be very hard for a person with no supervisory experience to succeed in the job, and much easier for someone who did.  Kapela Dep. 94.

149.    With regard to this half of the job, Whitley was well qualified for promotion.  Thus, she possessed years of railroading experience and vast supervisory experience that was comparable to Stiggers', something that was important because some people do not have a talent for supervising.  Louers Dep.  68.

150.    Indeed, such experience is "very important" in a Foreman II, Truitt Dep. 36:13 to 36:16; 102:13 to 102:17, and past demonstration of leadership is also very important.  Truitt Dep.  103:7 to 103:20.

Campbell Supports Kapela

151.    Campbell preferred to go over his supervisor Truitt's head when he had issues on the job.  Truitt Dep.  88:19 to 89:4.

152.    Truitt protested this to Kapela, but Truitt cannot recall any response from Kapela. Truitt Dep. 89:11 to 89:21.

153.    Indeed, it was typical of Campbell to be in conflict with others, with the notable exception of Kapela.  Truitt Dep.  92:6 to 92:20; Truitt Dep.  99.

Kapela And Campbell Testify That They Support Whitley's Promotion

154.    Kapela now claims that Campbell allegedly told Kapela he wanted to "give" Whitley a "chance."  Kapela Dep.  71-72.

155.    Kapela allegedly responded that they would do so.  Kapela Dep.  72.

156.    However, Campbell either does not recall discussing a promotion for Whitley with Kapela, Campbell Dep.  13:2 to 13:5; 13:13 to 14:2, or denies having done it. Campbell Dep.  17:16 to 17:22.

157.    Campbell told Kapela that Whitley passed the 238 certification test. Kapela Dep. 94-95.

158.    However, neither Campbell nor Kapela ever told Truitt that he wanted to promote Whitley to Foreman II. Truitt Dep. 104:11 to 105:4.

159.    Both Kapela and Campbell thereby concede that Whitley was qualified for the position, that Campbell had a role to play in the decision, and that Campbell and Kapela were both interested in the outcome. Campbell Dep. 52:12 to 52:14; Kapela Dep. 71-72.

160.    Kapela testified affirmatively in response to being asked if the issue of Whitley's promotion would have "flowed through" Campbell rather than a different assistant superintendent (such as Frank), because it was part of Campbell's job as Whitley's supervisor to mentor Whitley. Kapela Dep. 76.

<u>Foreman II And Whitley Supervisor Louers Recommends Whitley, Stating That She Is "Desperately Needed" As A Foreman II</u>

161.    Whitley's direct supervisor, Gary Louers, a General Foreman whose duties featured supervising Foreman II incumbents (Deposition of Gary Louers ("Louers Dep.") 10, more than agreed that Whitley was qualified and capable of performing as a Foreman II, Louers Dep. 47-48, and therefore recommended her for the promotion on October 29, 2003, and again on March 1, 2004. Louers Dep. 48-49, 61-62; PDE 47.

162.    Louers was effusive. He stated that Whitley's "backbone" and "safety record" were "***desperately needed***" in the "Foreman 2 ranks." Emphasis added.

163.    In Louers' view, Whitley did not need any special support or assistance to adapt to the Foreman II position. Louers Dep. 62-64.

164.    Louers testified that she possessed the necessary of the craft knowledge to perform the supervisory duties.  Louers Dep.  54.

165.    Indeed, Whitley had the necessary certifications for Foreman II.  Louers Dep.  38.

166.    After he wrote the recommendation, Louers did not receive any feedback about it from his superiors such as Campbell or Frank.  Louers Dep.  63-65, 69-70; Campbell Dep.  17:8 to 17:15.

<u>Whitley Was At All Times Officially Treated As Qualified</u>

167.    In 1999, Whitley was interviewed for the Foreman II training program. Campbell subsequently instructed her to take mechanical training courses on her own if she wanted to be promoted, which she did.  Whitley Aff. Second ¶ 40.

168.    Whitley had reasonably expected that she would be promoted if she obtained those certifications.  Louers Dep. 39; Whitley Aff  Second ¶ 40.

169.    During her interviews, nor at any other time prior to litigation, Whitley's qualifications were not questioned. Dk 6-1 ¶ 14.

170.    Ray avers—even though it is undisputed that her office treated Whitley as qualified-- that it is elementary that Whitley is not qualified for a Foreman II position because of a lack of mechanical experience.   Ray Aff.  (Dk 43-5 Exh. B); Ray Dep.  118-119.

171.    Ray admitted that HR sometimes informs candidates who have applied—orally and/or in writing-- but who are unqualified.  Ray Dep.  81-82.

172.    It is undisputed that Whitley was never so informed. Ray concedes, however, that HR never informed Whitley in writing or otherwise that she was not qualified for promotion.  Ray Dep. 118-119; Whitley Aff Second ¶ 41.

173.     Further undermining her credibility, Ray maintains nonetheless that her assertion (Dk 43-5 Exh. B; PDE 14) that Whitley is unqualified, is correct (Ray Dep. 143-144).

174.     Ray admits, when pressed, that HR *treated* Whitley as qualified.  Ray Dep. 227-230.

175.     PDE 37 is another Human Resources "Applicant Flow Log."  It demonstrates that Whitley was in a pool for consideration with Grimes and two others who were interviewed in September and December 2004.  Thus, Whitley was treated as eligible and qualified for promotion throughout the fall of 2004.

<u>Unqualified Applicant Henry Burrows Is Selected</u>

176.     In April 2006, Henry Burrows was selected for a Foreman II position. Exh. (A-Z hereto).

177.     Burrows presented the opposite profile from Stiggers.  He had no supervisory experience whatsoever, and no experience in three of the four crafts to be supervised, PDE 87, though he had a long history as a car repairman.     Whitley Aff. Second ¶ 12.

178.     According to both official documents and Kapela's (88-90) testimony, he was not qualified.

<u>Ray's April 2004 Initial Screening Sheet Does Not Screen Whitley Out</u>

179.     Ray completed an initial screening sheet" on April 18, 2004.  PDE 8.

180.     Five candidates were identified there with a check mark reflecting that they were qualified.  As to the sixth, Whitley, Ray oddly checked neither "qualified" not "unqualified".  PDE 8.

181.     Ray says she doesn't know why.  Ray Dep. 80.

182.    Ray had already known Whitley for many years.  Ray Dep.  80.

183.    She had rated her qualified five years earlier for Foreman II training, her office had done so a few months earlier and set up her December 2003 interview for Foreman II. Dk 16

184.    PDE 8 confirms that Whitley was interviewed.

Whitley Was Informed That She Performed Well In Interview

185.    After her first interview in December 2003, interviewer Robert Frank told Whitley that she had done well.  Whitley Aff. Second 42.

186.    Interviewer Aaronson did as well.  Whitley Aff. Second 43.

187.    Foreman II Tana, who interviewed Whitley on the second occasion, in May 2004, testified that he wanted to see Whitley promoted.  Tana Dep. 94 .

188.    She was interviewed a second time on May 28, 2004.

Unqualified Applicants Shifflet and Swain Are Promoted

189.    In January 2004, unqualified candidates Shifflet and Swain were promoted to Foreman II.  PDE 14 Exh. B.

190.    None possessed any supervisory experience. Whitley Affidavit Exhibit 7. So, according to both official documents and Kapela's (88-90) testimony, they could not have been qualified.

Unqualified Applicants White and Carter Are Promoted

191.    White and Carter were promoted to Foreman II on May 25, 2004.  Neither possessed any supervisory experience Whitley Affidavit Exhibit 8 , so, according to both official documents and Kapela's (88-90) testimony, they could not have been qualified.

The Failure To Select Whitley Was Not Comparative To Other Candidates

191.     Frank and Freeman never compared Whitley to other candidates.  There is no evidence that Freeman interviewed *any* others selected by Defendant in 2004 as reflected by Ray PDE B (Dk 43-5 Exh. B) and the other documents produced by Defendant, in which his name does not appear.   Whitley Aff. Second ¶ 48.

192.     Nor does he appear to have interviewed any of the candidates selected earlier in 2004 such as Guyton, Whitley Aff. Second ¶ 48., successful candidates Ladson, Grimes or Wilson, or candidates such as Searles, or A. Talley.

193.     In fact, Whitley was not even familiar with Freeman when he appeared at her interview, where she was told he was filling in for Ray. Whitley Aff. Second ¶ 48.

194.     There is no evidence that Freeman maintained any sort of ongoing role in selections of Foremen II after the May 28, 2004 interview of Whitley.

195.     Nor is there any evidence that Frank conducted an actual comparison of any kind.

196.     Indeed, he never discussed who was or was not being selected with fellow panelist Tana, Tana Dep.  40, although Amtrak's documentation states that Tana participated in the interviews of the other candidates on the Applicant Flow Logs.  PDE 5, 24, 37.

Whitley Is Denied Promotion While Amtrak, With At Least One Vacancy, Waits For Someone Else To Apply

197.     As noted AMTRAK "always" has Foreman II vacancies.  Tana Dep.  105-107.

198.     AMTRAK possesses no documentation as to who was selected "instead" of Whitley.  Tana Dep.  51-52.

199.     AMTRAK has no selection forms.  Tana Dep.  52-53.

200.    The failure to promote Whitley was not because of an unflattering comparison with another candidate.  Tana Dep.  105-107.

201.    Thus, PDE 37 demonstrates that candidate Eckstein was selected but failed his physical in September or October, that Grimes was the next candidate interviewed for the same vacancy, but that Grimes' interview was not conducted until December 7, 2004.  PDE 36 at 1573.

202.    There were no eligible candidates available for selection during that time, other than Whitley. PDE 37; Tana Dep.  105.

203.    Although she **was the only qualified applicant of record for two or three months for a vacant position, Defendant declined to select her anyway**. Tana Dep. 105; PDE 37.

Shampoo Wand Incident

204.    On March 30, 2004, Amtrak gave Whitley a Notice to Impose Discipline for allegedly failing to tag some equipment for repair.  Whitley Decl. ¶ 3.

205.    In fact, Whitley's equipment was at all relevant times in perfect working order.   Whitley Aff. Second ¶15.

206.    Whitley had done absolutely nothing to possibly warrant any discipline, and told Campbell so, Whitley Aff. Second ¶ 16, although Campbell denies she did so. Campbell Dep. 59-60.

207.    Campbell threatened Whitley that she must waive her right to a hearing, or the discipline she would receive pursuant to the hearing would be worse than the result of the waiver.  Whitley Aff. Second ¶ 17.

208.     Campbell assured Whitley that the discipline wouldn't "go anywhere"— implying that it would be placed in abeyance—if she signed.  Whitley Aff 5-7-07 ¶18.

209.    AMTRAK witness Tana could not deny that Campbell had expressed such intent.  Tana Dep.  87-90.

210.    Neither Tana nor Whitley ever expected the reprimand to impede promotion.  Tana Dep.  91-92.

211.    Whitley signed the waiver on April 6, 2004. Defendant's Deposition of Mae Whitley Exh. 8.

212.    Campbell now denies having promised not to have the reprimand placed in Whitley's file.  Campbell Dep. 151.

213.    It could be that the shampoo wand incident reflected the first time anyone was punished for that reason.  Louers Dep.  73.

214.    Direct supervisor Louers could not say that he would have disciplined Whitley for the shampoo machine problem had it been up to him, and would be surprised if that incident would preclude Whitley's being promoted.  Louers Dep.  74-75.

215.     In carrying out his instructions to inform Whitley of discipline for the shampoo incident, he did not say anything to her about any possible adverse effect on her promotion prospects. Whitley Aff. Second ¶ 18; Louers Dep.  78-80.

216.    Campbell swore emphatically at deposition that he had never disciplined Whitley. Campbell Dep. 40-42.

217.    Reminded of the incident, he recanted.  Campbell Dep. 43-45.

<u>Discipline In Abeyance Generally</u>

218.     AMTRAK managers sometimes hold discipline in abeyance.[3] Tana Dep. 87-88; PDE 90.

219.     Amtrak maintains that disciplinary action may preclude promotion. It would be possible to not forward discipline to Human Resources after generating it. Truitt Dep.  16:22 to 17:4.

220.     HR officers are trained to check the file for discipline, and to send out a letter to a job applicant if there has been discipline within the last year, informing the applicant that she is therefore ineligible for promotion.  PDE 20; Ray Dep.  132-134, 155.

<u>Campbell Threatens Stevens In Retaliation For Stevens' Protected Activity</u>

221.     On May 30, 2004, Campbell, yelled at Whitley's co-Plaintiff David Stevens, who had just protested alleged discrimination by Campbell and filed a charge with the D.C. Office of Human Rights. Campbell shouted that was not one to be "fucked" with.  Dk 15-3 ("Stevens Decl.") ¶ 17.

222.     Campbell said: "you see I like you but you are going to put my name in that fucking shit, but you are better off fucking with those white people than fucking with me."  Declaration of Terrell Williams ("Williams Decl.")(Dk. 15-21) ¶ 3.

223.     Campbell threatened Stevens: "I will destroy a mother fucker like you," and: "if you ever put my name in anything else, you would wish you didn't."  Stevens Decl. ¶¶ 16-17.

224.     Terrell Williams corroborated Stevens' version of events.  Dk 15-21.

<u>Amtrak Countenances Retaliation</u>

---

[3]     The Court reporter consistently mis-transcribed the word "abeyance" so that the transcript reads "advance" when it should say "abeyance".

26

225.    There is no evidence that AMTRAK has ever done anything to remediate the retaliation Campbell admitted to in August 2004, and which was reported to it in Stevens' affidavit of November 2005 if not sooner.  Dk 16-1.

226.    In the same vein, although he was Campbell's direct supervisor, internal EEO investigator McCallum never questioned Truitt about allegations that Campbell threatened David Stevens.  Truitt Dep.  117:21 to 118:5.

227.    Nor did anyone ever question Truitt about an internal complaint by Stevens.  Truitt Dep.  119:19 to 120:1.

228.    Truitt would "not be surprised" if Campbell used his authority to grant or deny positions to lower level employees, based on his own personal preferences. Truitt Dep.  92:22 to 93:2

<u>Whitley Is Not Selected And Two Vacancies Remain, After Her May 28 Interview And Before HR "Discovers" Her "Discipline"</u>

229.    As of June 24, 2004, there were two Foreman II vacancies, but neither Whitley nor anyone else was selected for any.  PDE 4.

230.    The Applicant Flow Logs reveal that Lenford Chapman was the only candidate interviewed in that period (mid-June) but he was not selected.  PDE 24.

231.    No other candidates had pending applications during that period. PDE 24, 37. On July 4, 2004, Tana inquired of Ray about the status of Whitley's application. PDE 88.

232.    As of July 17, there were still two vacancies for Foreman II.  PDE 4.  These would lead to overtime payments.  Campbell Dep. 98-99.

233.     On July 26, another vacancy announcement was generated, still indicating the existence of two vacancies.  PDE 2.

<u>Whitley's Application Is Rejected</u>

234.     Throughout April to August 2004, Whitley continued to pursue her promotion.  Thus, on May 28, 2004, Whitley was interviewed not only by Frank and Tana, but also by LeVar Freeman of the HR office.  Ray Dep.  19-21.

235.     No mention was made of the discipline to Whitley at that time.  Whitley Second Affidavit ¶ 20.

236.     Tana told his fellow interviewers, Frank and Freeman, that Whitley deserved the promotion.  Tana Dep.  82-84.

237.     Neither man told Tana that he disagreed with that. Tana Dep.  85.

238.     Frank told Tana that Whitley was weak in the mechanical area, but did not criticize her interview performance.  Tana Dep.  97.

239.      Campbell never criticized her interview performance either, telling Tana he had no knowledge of her interview.  Tana Dep.  97.

240.     In July Whitley's colleague Myra Simms told Whitley that she had been asked to train Whitley as a Foreman II.  Whitley Aff. Second ¶ 20.

241.     Tana sent Ray an e-mail on August 4, 2004, inquiring about the status of Whitley's application for promotion.  PDE 88.

242.     There was no response to Tana that would have indicated that Whitley would not be promoted because of prior discipline.  Tana Dep.  67.

243.     Nor did anyone tell Tana at that time that Whitley was not being selected because others were better qualified.  Tana Dep.  68-69.

244.      As of August 4, Tana also "would not have been" telling Whitley that his May interview of her with Frank and Freeman was causing her not to be selected.  Tana Dep.  69.

<u>Whitley Is Informed That Others Were Selected, Though None Were</u>

245.    On August 6, 2004, Whitley finally was informed as to the status of her application, in the form of a rejection letter stating that "others more closely meet the needs of the department."  PDE 18.

246.    When HR sends out letters stating that another candidate has been selected, such as PDE 18, that should mean that another candidate or candidates really has been selected.  Ray Dep. 120; PDE 12.

247.    However, PDE 18 was false.  Defendant had interviewed only one other candidate at that time, Lenford Chapman, on June 18, 2004.  PDE 24.

248.    Chapman had not and indeed never was selected.  Id.  In fact, at that time, the last persons selected were unqualified applicants White and Carter, who were selected on May 25, before Whitley's May 28 interview with Tana, Frank and Freeman.  Ray Aff. B (Docket 43-5 (Exh. B).

249.    On August 11, Whitley's co-worker Myra Sims told Whitley she was asked whether she thought Whitley had cheated in passing her certification test.  Whitley 132; DF 777.

<u>Whitley Is Told, Instead, That The Shampoo Discipline Precludes Promotion</u>

**249.**    On August 19, 2004 Whitley spoke to Cannon about her non-selection.  Cannon informed Whitley for the first time that "if he had known" Whitley had been written up she would never have been interviewed, thus implying that Campbell had just informed HR about the reprimand.  He further stated that Whitley would have to wait until twelve months after the date of the discipline to be promoted.  Whitley Aff. 2 Exh. 21 (Whitley Addt'l Docs 48-49).

**250.**     Whitley called Campbell, whose response was not to confirm that Whitley was barred from promotion due to discipline, but rather to ask Cannon to call Campbell's office.  Whitley Aff. Second 22; Whitley Aff. Exh. 9. Whitley Addt'l Docs 48-49.

251.     In fact, even now Campbell claims not to know that the reprimand would cause ineligibility for promotion.  Campbell Dep. 50-51.  Cannon then issued Whitley a letter stating that she was not selected because of prior discipline.  PDE 20.

252.     Tana raised the issue of the discipline with Campbell, knowing that Whitley was not guilty in the shampoo machine incident.  Tana Dep.  61.

253.     Campbell did not reject Tana's approach, but rather said he would take Tana's explanation to him that Whitley was innocent "into consideration."  Tana Dep. 61.

254.     Indeed, Campbell admitted that Whitley should not have been disciplined for the shampoo incident.  Tana Dep.  61-62; PDE 50.

255.     Campbell told Tana that Tana's presentation on Whitley's innocence "opened his eyes," and Campbell communicated to Tana such that Tana thought the discipline would be "dismissed."  Tana Dep.  62-63.

256.     There was no need for Tana to also discuss the shampoo machine incident with HR because it was "trivial".  Tana Dep.  63-64.

257.     Tana's understanding as a Foreman II and union representative is that Whitley's disciplinary record did not really preclude promotion.  Tana Dep.  75-76; Tana Dep Exhs; 15, 48, 49, 50.

258.     Tana did not think Whitley should have been disqualified from promotion because of the shampoo-related discipline.  PDE 20; Tana Dep.  78-79.

<u>Whitley Writes To Cannon About Non-Selection</u>

259.    On August 26, 2004, Whitley wrote to Cannon, expressing disappointment and inquiring as to "what deficiency I have that does not qualify me to become a Foreman II in the . . . Department?"  Whitley Aff. Second ¶ 23; PDE 89. Cannon never replied.  Whitley Aff. Second ¶ 23.

<u>Campbell Admits To Amtrak Retaliation On Tape</u>

259.    In approximately August 2004, Whitley asked Bernard Campbell why she didn't get the Foreman II job. Dk 16-1 ¶ 25.

260.    Whitley pointed out to Campbell that she believed that the charges of misconduct relating to the shampoo machine were bogus and unfounded and that had never been in trouble or counseled before.  Dk 16-1 ¶ 26.

261.    He answered her by referring to her prior lawsuit, reminding her that she had gone after "those white motherfuckers," and asking her: "do you think those motherfuckers are gonna forget?" Dk 16-1 ¶ 27.

262.    For emphasis, he added: "do you think that?" Dk 16-1  ¶ 28.

263.    Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them. Dk 16-1 ¶ 29; Campbell Dep.  68:15 to 69:1)(declining to deny that she said that to him).

264.    Campbell's response was to the effect that they were not retaliating, but rather were "just not moving" her.  Dk 16-1 ¶ 30.

265.    Campbell then said that, to retaliate, they would have to do something like fire her.  Dk 16-1  ¶ 31.

266.    Campbell said that: "It's a thing they say to you in court: no harm, no foul." Dk 16-1 ¶ 32; Campbell Dep. 69:16 to 70:2) (declining opportunity to deny having said it).

267.    Exasperated, Whitley asked him if she would have to wait a "whole year" to get promoted. Dk 16-1 ¶ 33. He responded: "Oh you might have to wait a whole year and a half. Dk 16-1 ¶ 34; Campbell Dep. 70:3 to 70:20)(declining opportunity to deny having said it).

268.    He also asked her: "Why did you think you could do that? Dk 16-1 ¶ 35. Whitley captured the exchange on tape. Whitley Aff. 25 (Exh. 10).[4]

Campbell Withdraws Shampoo Discipline, But Now Falsely Denies Doing So

269.    On September 1, 2004, after a conversation with Tana, Campbell withdrew the disciplinary action due to evidence that Whitley was innocent of the alleged misconduct. Dk 16-1 ¶ 36; PDE 50; Tana Dep. 22.

270.    Campbell admits receiving Tana's confirming letter, and doesn't deny discussing removal of the waiver, Campbell Dep. 47:19 to 51:1, but now disagrees with the letter confirming his agreement to withdraw. Campbell Dep. 49-50.

271.    Campbell's denial of telling Tana the discipline was reversed is a lie. Tana Dep. 21-23.

272.    Campbell did not respond to it at the time. Campbell Dep. 50.

Whitley Receives A Third False Letter On Her Promotion

273.    On September 2, 2004, Cannon sent Whitley yet a third false letter. This one echoed the first, but not the second rejection letter. PDE 17.

---

[4]    The recording has been provided to the Court. Whitley apologizes for the poor sound quality.

274.    Thus, it stated that once again the reason for rejection was that "other candidates. . . more closely met the needs," and were selected. It did not say anymore that discipline was precluding promotion.  PDE 17.

275.    However, Sarah Ray's chart, Docket 43-5 Exhibit B and Defendant's Applicant Flow Log, PDE 24, demonstrated that although candidate Aikens had applied (PDE 27) on August 11, 2004, been interviewed that same day(PDE 24), and offered employment on August 19, Defendant *still* had selected only one candidate—not multiple candidates as claimed by Cannon--since before Whitley's May 28, 2004 interview.

276.    Adding to the surprising sequence of false letters is the fact that, normally, an applicant should only get one rejection letter for a particular job posting.  Ray Dep. 136.

Whitley And Campbell Discuss The Cannon Situation

277.    Whitley subsequently discussed the Cannon letters with Campbell.  Whitley Aff. ¶ 22; Campbell Dep.  54 (declining to deny Whitley's having told him about PDE 17).

Selection Of The Less Qualified Outside Candidate Wilson, Without An Interview

278.    Amtrak professes to prefer promoting from within.  Ray Dep.  55; Truitt Dep.  95:14 to 96:2.

279.     It is undisputed that an AMTRAK veteran has an easier transition to Foreman II work than a newcomer from the outside.  Louers Dep.  66.

280.    Fixing planes or ships is different from fixing trains.  Louers Dep.  67-68.

281.    Kapela concedes that successful outside candidate Rodney Wilson—who was offered employment on September 13, 2004 (PDE 30)-- should not have been

selected, Kapela Dep. 88-89, since there is no evidence that Wilson had any supervisory experience. Kapela Dep. 87-89; Exh. 30 at 1925-26; Tana Dep. 35-39; Campbell Dep. 87.

282.    Wilson had never even worked on a train, Ray Dep. 194-195, much less obtained certification in train car repair like Whitley. Ray Dep. 195; PDE 30 at 1925-26; Tana Dep. 35-38; Kapela Dep. 86-87; Ray Dep. 195.

283.    Unlike Whitley, Wilson also had no experience with the applicable WMSS computer system. Louers Dep. 98-99; PDE 30.

284.    AMTRAK practice is that everyone must have an interview to be selected for Foreman II. Tana Dep. 39-40; Louers Dep. 30. Truitt Dep. 96:3-96:20, 97:5-98:7; Campbell Dep. 28:17-28:19.

285.    However, PDE 30 reveals that Wilson was never interviewed. Tana Dep. 35-36; PDE 30; Ray Dep. 195-198, 206-209; Kapela Dep. 86.

286.    If there were an interview, it would have been reflected in the job file folder, but there is no interview apparent there. Ray Dep. 197-200.

287.    AMTRAK has stipulated that there are no documents reflecting Wilson's interview and selection. Ray Dep. 208-209, 210-214 (first "stipulating" that AMTRAK would produce any such documents if they existed, and that "we'll produce it if we have it, if we have not already produced it," then not producing "it").

288.    Kapela denies involvement in Wilson's selection. Kapela Dep. 85.

289.    No witness has claimed that Wilson is as well qualified as Whitley. Campbell Dep. 251. Louers, her supervisor, flatly contradicted it. Louers Dep. 96-99; PDE 30.

290.    Ultimately, Louers is not sure that Whitley has been treated fairly with regard to promotion to Foreman II. Whitley Dep. 95-96.

<u>Whitley's Comparative Qualifications</u>

291.     Tana always thought Whitley should be promoted.  Tana Dep.  95-96.
Frank did not tell Tana that Whitley had interviewed poorly; but rather repeated the
mantra that she was weak in the mechanical aspect.  Tana Dep.  97.

292.     Campbell told Tana he had no knowledge of Whitley's interview.  Tana
Dep.  97.

293.      Freeman had no knowledge of Whitley's work history.  Tana Dep.  97-98.

294.     Freeman told Tana that Freeman felt that there were stronger candidates
than Whitley in the mechanical area.   Tana Dep.  97-99.

295.     It is a mystery who he was referring to—if Freeman really said that--
since there was a dearth of candidates.  Tana thinks Whitley was compared to the other
candidates interviewed on May 28, 2004.  Tana Dep.  101.

296.      However, the Applicant Flow Log (PDE 24) fails to reflect any other
interviews occurring that day or until the next month.

<u>Even After Reversing The Shampoo Discipline, AMTRAK Prefers A Vacancy</u>
<u>And Payment Of Overtime To Promoting Whitley</u>

297.     Candidates Charles Eckstein and Thomas Jefferson were interviewed on
September 8, 2004.  Jefferson withdrew, and Eckstein never entered on duty.  PDE 37;
Tana Dep.  72-73.

298.     Between September 8, 2004 and December 7, 2004, Tana does not recall
having interviewed any candidates for Foreman II, and PDE 37 corroborates his
recollection that there were none.  Tana Dep.  74.

299.      Contrary to PDE 37, candidate Grimes' file reveals that he was
interviewed by General Foreman Michael Talley, not as the document states, Frank and

Tana.  By contrast, Frank interviewed candidate Eckstein.  Whitley Affidavit Exhibit 14

(Amtrak/Whitley 1555 and 1557).

300.    Grimes was selected on December 13, 2004, with a start date of January

19, 2005.  Plaintiff's Exh. 7; Ray Dep.  68-73.

301.    Jefferson, Eckstein and Whitley were the only other candidates listed by

AMTRAK for that same vacancy.  PDE 7.

302.    Thus, the position was held vacant, with no applicants other than

Whitley, for at least 2 months in the fall of 2004.

Kapela Testifies Untruthfully At Deposition As To His Knowledge Of The
Process Of Rejecting Whitley

303.    Kapela self-contradictorily claims not know if Whitley does or does not

meet the basic qualifications for a Foreman II position.  Kapela Dep.  62.

304.    Kapela testified that he did not know whether or not Whitley was

selected for Foreman II.  Kapela Dep.  64, or if she has ever served AMTRAK in that

position.

305.    Kapela says he does not know whether or not Campbell played any role

in the selections of any of the Foremen II.  Kapela Dep.  69-70.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC

/s/

_____
Leizer Z. Goldsmith   D.C. Bar No. 419544
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Attorney For Plaintiffs Whitley & Stevens

Dated: May 10, 2007