IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| David B. Stevens, et. al | ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 1:05CV01924-RCL |
| National Railroad Passenger Corporation ("Amtrak"), | ) ) ) | |
| Defendant. | ) ) ) | |

## SECOND (MAY 10, 2007) AFFIDAVIT OF MAE WHITLEY

1.      My name is Mae Whitley.  My nickname is Mary.  I am over 18 years of age and competent to testify in a court of law.  I began my employment with National Railroad Passenger Corporation ("Amtrak") as a coach cleaner in 1977.  In 1985, I applied for and was promoted to a Foreman I position.  The Foreman I position is a supervisory position located in Amtrak's Mechanical Department.  I have held a Foreman I title from the date of my promotion in 1985 until I retired from Amtrak in 2006.

2.      On March 7, 2003, I filed a complaint against Amtrak alleging sexual harassment, sex discrimination, and retaliation.  During the course of litigating that case, my then-attorney Gary Brown engaged in an extensive discovery process where several Amtrak employees, including Althera Stiggers, Frank Cover, Daryl Pesce, and Bernard Campbell were deposed.  I was present for most, if not all, of the depositions conducted in the case.

3.      Additionally, during the discovery process in that case, as in the
discovery process of this case, Amtrak provided me (through my respective attorneys)
several documents, all of which appear to be documents created in the ordinary course
of Amtrak business.

4.      Among those documents are the following:

5.      Jane Ladson's application for the foreman II position shows that she had
ten years' experience as a Car Repairer, and several years of experience as a Foreman 1.
Whitley Affidavit Exhibit 1.

6.      A letter dated May 10, 2001, in which Ladson wrote to Daryl Pesce,
expressing "displeasure" at how "Amtrak overlooked [her] long work history    " by
selecting individuals with "less experience and no mechanical background" for Foreman
II positions. She noted that "some of the people chosen only had a few weeks of training
in the mechanical department" and that she could "only assume that in order to advance
within Amtrak, it is more important who you know, rather than what you know."
Whitley Affidavit Exhibit 2.

7.      Pesce's response to Ladson on May 25, 2001 in which he wrote that she
had displayed a "weakness" in her mechanical knowledge, despite her ten years'
experience in a mechanical craft. Whitley Affidavit Exhibit 3.

8.      Upon information and belief, during or around 1999, a training program
was provided for foreman 1 s to become foreman 2 s. To the best of my knowledge,
only two individuals were promoted to foreman 2 positions from the training program,
namely Althea Stiggers and Wellington Gibson.

9.    Upon review of Stiggers' application for the training program, I am under the impression that Stiggers had no craft experience when she applied, in contrast to Ladson's ten years. Whitley Affidavit Exhibit 5.

10.    Upon review of Gibson's application for the training program, I am under the impression that Gibson had no craft experience. Whitley Affidavit Exhibit 6.

11.    Ladson was ultimately promoted, in March 2004. Whitley Affidavit Exhibit 4. Upon information and belief, it was following her pursuit of an EEO Complaint.

12.    According to his application, Burrows, an applicant for the Foreman II position who was selected, had no supervisory experience whatsoever, and no experience in three of the four crafts to be supervised. PDE 87.

13.    In January 2004, candidates Shifflet and Swain were promoted to Foreman II. A review of their application files indicates that neither had any supervisory experience. Whitley Affidavit Exhibit 7.

14.    Candidates White and Carter were also promoted to Foreman II on May 25, 2004. By reviewing their applications, I see that neither of them possessed any supervisory experience. Whitley Affidavit Exhibit 8.

15.    On March 30, 2004, Amtrak gave me a Notice to Impose Discipline for allegedly failing to tag some equipment for repair, even though my equipment was in perfect working order at all relevant times.

16.    At the time I instructed Campbell that I had done nothing to possibly warrant any discipline.

3

17.     Bernard Campbell threatened me by saying I had to waive my right to a hearing, or the discipline, which I would assuredly receive, would be worse than the result of the waiver.

18.     He also assured me that the discipline wouldn't "go anywhere" — implying that it would be placed in abeyance if I signed. Also, when General Foreman Gary Louers instructed me of the discipline, he did not say anything to me about any possible adverse effect on her promotion prospects.

19.     On May 28, 2004, I was interviewed by Bob Frank, Joseph Tana, and LeVar Freeman –who works in Human Resources.

20.     The interviews did not make reference to my "discipline" during the interview. Shortly after the interview, in July, Myra Simms told me that she had been asked if she would mind training me.

21.     On August 6, 2004, I received a rejection letter stating that "others more closely meet the needs of the department." However, on August 19, 2004, I spoke to Taylor Cannon, who said, for the first time, that "if he had known" about the discipline, I would not have been interviewed—and that I would have to wait until twelve months after the date of the discipline to be promoted.  I took notes of this conversation, which are attached as Whitley Affidavit Exhibit 9.

22.     I then called Campbell to discuss the letter, who then asked Cannon to call his office.

23.     Cannon then issued me a formal letter stating that I was not selected due to the prior discipline. PDE 20. On August 26, 2004, I wrote to Cannon, expressing disappointment and inquiring as to "what deficiency I have that does not qualify me to become a Foreman II in the . . . Department?" PDE 89. However, Cannon never replied.

4

24.    Campbell had never given me the impression that the discipline would affect me in this way, and, in fact, he told me the opposite-- that it would not negatively affect me.

25.    Earlier in this litigation, I submitted an affidavit dated November 29, 2005, where I described a conversation that I had with Bernard Campbell in approximately August 2004.  I had made an audio tape of that conversation, which I believe my attorneys will be providing to this court as an exhibit to this affidavit. Whitley Affidavit Exhibit 10 (PDE 53).

26.    During my prior litigation with Amtrak, Amtrak provided me with a document reflecting its internal complaint procedure. Whitley Affidavit Exhibit 11.

27.    My EEO activity at Amtrak began on March 22, 1999 when I went into Bob Frank's office upset and crying, and told Frank that I was being sexually harassed by Frank Cover.  Frank Cover then sent me home and Ms. Fyffe of EEO called me at home.

31.    On April 9, 1999, I had a EEO meeting regarding my concerns with Frank Cover, Wayne Brody, Kapela, Saunji Fyffe, and Daryl Pesce.

32.    I ultimately litigated retaliation following my March 1999 EEO activity. One of the issues I raised in that litigation was availability of a Foreman II training position.

33.    When I asked her about the training position, Ray told me that the purpose of the position was primarily to improve the incumbent's supervisory skills, not primarily to improve craft-related skills.

34.    In the documents provided to my attorney by Amtrak, there were several interview sheets reflecting the contemporaneous notes taken by interviewers when interviewing candidates for Foreman II positions.

35.    However, there is no official record of who was actually in each interview. Additionally, interview sheets are maintained by some of the panelists, but not necessarily all. The sheets are lists of questions and are not signed by the panelists, so that it is difficult even to know whose sheet was whose. A perfect example is the set of interview sheets reflecting the interview of Thomas Carter. Whitley Affidavit Exhibit 12.

36.    When looking at the interview sheet for Grimes, it looks like he was interviewed solely by Michael Talley. Whitley Affidavit Exhibit 13.

37.    Candidate Eckstein may have been interviewed by Frank and Tana only. Tana Dep. 102; Whitley Affidavit Exhibit 14.

38.    I was recommended for the Foreman II position by my direct supervisor, Gary Louers. Whitley Affidavit Exhibit 15.

39.    I had engaged in a great deal of effort in order to obtain a Foreman II position, including taking mechanical training courses on my own.

40.    In 1999, when I was interviewed for Foreman II training, Campbell instructed me to take those courses in order to get promoted. I had every reason to anticipate that a promotion to Foreman II would be forthcoming.

41.    In 2004, no one told me that I was not qualified for a Foreman II position until I heard that in litigating this case.

42.    In fact, after one my first interview with him for Foreman II, interviewer Robert Frank told me that I had done well.

6

43.     Interviewer Al Aaronson complimented me after that interview as well.

44.     With regard to Althera Stiggers, in 1999 or 2000, I was informed by Tom Wimbish that Stiggers and Kapela were having an affair, which I reflected in the attached document "Amtrak Internal Employment Discrimination Complaint," which was drafted shortly after the events described in that document.  Whitley Affidavit Exhibit 16.

45.     Upon review of the documents provided to my counsel, I am reminded that Stiggers was then selected for the position to work for Kapela. Whitley Affidavit Exhibit 17.

46.     In July 2000, I met with Kapela to discuss employment.

47.     When reviewing the documents provided by Amtrak, I noticed an email exchange between Ladson and Pesce , in whichLadson protested the denial of her requests to become a Foreman II and Pesce responded. Whitley Affidavit Exhibit 18.

48.     In reviewing the documents provided by Amtrak, I also observe  that Freeman, who interviewed me, does not appear to have interviewed any of the individuals selected in December 2004, or even earlier in 2004, such as Guyton, Ladson, Grimes or Wilson,  Searles, or A. Talley.  I was actually surprised to see Freeman in the interview because I was not familiar with him.  During the interview in which he was present, I was informed that he was filling in for Sarah Ray.

49.     One evening in approximately December 2004, Gary Louers came into his General Foreman office, which I share.  Louers told me something like: "guess what happened today?" I answered: "what?" He said something like: "BL said: 'David Stevens tried to pay off the person who gave him the drug test.'" Gary then said something like: "because  he didn't pass the urine test," or "because his urine was dirty" or "or

7

"because his urine wasn't right," I'm not sure which. Gary further stated: "BL said: 'I got him now,'" and that Stevens was going to lose his job. I asked something that Gary responded to by saying that David was already on "Rule G." I told Gary something to the effect that I didn't believe David would do something like that. Not long after this, I learned that David was indeed fired.

I declare, under penalty of perjury, that the foregoing affidavit is true and correct.

Executed on May 10, 2007

Mae Whitley

S/10/07
(date)

8