UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---------------------------x
DAVID B. STEVENS et al.,      :
                              :
        Plaintiffs,           :
                              :
    v.          : No. 1:05: CV01924-RCL
                              :
NATIONAL RAILROAD             :
PASSENGER CORPORATION,        :
                              :
        Defendant.            :
---------------------------x

Washington, D.C.

Wednesday, March 14, 2007

Deposition of

JOSEPH TANA

a witness, called for examination by counsel for

Plaintiffs, pursuant to notice and agreement of

counsel, beginning at approximately 10:31 a.m., at

the law offices of Leizer Goldsmith, 5335 Wisconsin

Avenue, Washington, D.C., before M. Bryce Hixson of

Beta Court Reporting, notary public in and for the

District of Columbia, when were present on behalf

of the respective parties:

---

Page 11

1     Q     When he calls you to talk to you

2    about the mechanical aspect, is that -- is he

3    calling you because of your capacity as a

4    union representative or your capacity as a

5    Foreman II?

6     A     As -- well back then, it was a

7    Foreman III, but yes.

8     Q     As a Foreman?

9     A     Right, as a Foreman.

10     Q     What about with regard to the union

11    business, when have you had dealings with him

12    or what kinds of dealings have you had with

13    him?

14     A     More like I said I have had

15    dealings with him where there is like he'll

16    say, let me give you an example, "Can Foreman

17    mark off personal business?" and I'll say,

18    "Well, sure; why not?":  And he says, "I

19    don't see where a Foreman should be marking

20    off personal business?" and "Mike, you're

21    going through a divorce.  You have a problem

22    with one of your kids, you don't want to

Page 21

1  yes.

2      Q    What about Mr. Campbell?

3      A    Ninety-none percent of the time,

4  yes.

5      Q    Okay.  What have you heard Mr.

6  Campbell say that you didn't think was true?

7      A    God, that's hard to say, I mean, I

8  don't know.  I mean to pinpoint one thing

9  right now, it is hard to say.

10     Q    I am going to show you a document

11 that has been previously marked as Exhibit 50

12 -- Plaintiff's Exhibit 50 for these

13 depositions.

14               (Discussion off the record)

15          MR. FISCHLER:  Exhibit 50.

16          BY MR. GOLDSMITH:

17     Q    Exhibit 50 purports to be a note

18 from yourself to Mr. Campbell --

19     A    Right.

20     Q    From September 1, 2004.

21     A    Right.

22     Q    Do you recognize that?

Page 22

1      A    Yes, I do.

2      Q    Is that something you sent to Mr.

3  Campbell around September 1, 2004?

4      A    Yes.

5      Q    And it refers to an incident

6  involving shampoo machines, do you see that?

7      A    Right.

8      Q    And you wrote here, "It was brought

9  to my attention that Ms. Mae Whitley was

10 innocent of the charges.

11          And after our discussion, you have

12 agreed that Ms. Whitley should not have been

13 included with the others involved in this

14 incident."  Do you see that?

15     A    Yes.

16     Q    Were you telling the truth when you

17 said to Mr. Campbell that he had agreed that

18 Ms. Whitley should not have been included

19 with the others?

20     A    Yes.

21     Q    If Mr. Campbell were to say that

22 you were lying when you said that, would he

Page 23

1  be the one who is lying?

2      A    I don't understand where you are

3  coming from.

4      Q    Well, I am asking you, if your

5  letter, which purports to recount something

6  that you discussed with Mr. Campbell was

7  truthful.

8      A    Yes, it is truthful.

9      Q    So if Mr. Campbell were to say

10  that, where you said that he agreed with you

11  about Ms. Whitley; he would be lying,

12  wouldn't he?

13      A    Probably, yes.

14      Q    Are there any other lies you can

15  think of having heard from Mr. Campbell?

16      A    No.  And I am not saying that this

17  is an outright lie.  As a matter of fact, am

18  I allowed to get in the detail with this or

19  not?

20      Q    Well, I'll ask you some questions

21  about it, which should give you an

22  opportunity.

Page 35

1      Q    Remember I asked you a few moments

2  ago if you were familiar with Rodney Wilson.

3  Exhibit 30 is an employment --

4      A    This is --

5      Q    -- application from Mr. Wilson, do

6  you see that?

7      A    Right here.  Okay.

8      Q    Yeah, and there's multiple pages,

9  there is an application from him.  It appears

10  if you take a look at 1921, if you look at

11  the bottom right, you can see the numbers

12  there.  If you look at 1921 --

13      A    You're right.

14      Q    -- within Exhibit 30 that he was

15  offered a position on September 13, 2004.  Do

16  you see that?

17      A    Okay.

18      Q    Now, you've testified that -- that

19  you sat in on -- I believe you sat in on many

20  interviews for Foreman II, is that right?

21      A    Right.

22      Q    And you don't have any recollection

Page 36

1  of this gentleman, so I assume you didn't sit

2  in on an interview for him.  Is that right?

3      A    There were times where I have other

4  union business and I will have other people

5  that are qualified like the President of the

6  local sit in.

7      Q    Do you know if that happened in

8  this particular case.  Do you have any

9  recollection of that?

10     A    I have no recollection of this

11  person, if I sat in, somebody else sat in.

12  No, the name is not familiar to me.

13     Q    Take a look at page -- at page 1926

14  -- 1925 and 1926.

15     A    Okay.

16     Q    Tell me if -- which is the

17  employment application, employment history of

18  this Mr. Wilson and tell if it appears that

19  he is qualified to be a Foreman II?

20         MR. FISCHLER:  I'm going to object,

21  lack of foundation.  You can answer.

22         THE WITNESS:  I'm going to -- I'm

Page 37

1  not going to pay his judgment.  I am not

2  familiar with this person.

3         BY MR. GOLDSMITH:

4      Q    No, I'm asking based on his written

5  qualifications.  Is he qualified?

6      A    Anybody can write anything down.

7  It's when you start talking to him that you

8  find out what's truthful.

9      Q    Well, if somebody didn't have --

10  let me ask you this.  You've just showed me,

11  you've just flashed me your card that shows

12  certifications.

13     A    Right.

14     Q    Is there anything in this -- on

15  these pages that indicates that this

16  gentleman had certifications to be a Foreman

17  II?

18     A    No.

19     Q    Is there anything on here

20  indicating that this gentleman has ever been

21  a supervisor?

22         MR. FISCHLER:  The document speaks

Page 38

1   for itself.

2          THE WITNESS:  It shows that he has

3   mechanical background in air conditioning; it

4   shows that he went to a junior college.

5          BY MR. GOLDSMITH:

6      Q    Why are you telling me that?

7      A    I am just looking at -- you were

8   asking me about qualifications.

9      Q    No, I am asking you right now if

10  there's anything that shows he has been a

11  supervisor.

12     A    That he has been a supervisor?

13         MR. FISCHLER:  I think there are a

14  couple of questions pending.

15         THE WITNESS:  He has military

16  background; it is on page 26.

17         BY MR. GOLDSMITH:

18     Q    25 to 26, I think?

19     A    Right.  The only thing that I see

20  here that might indicate that he had

21  supervisory is the military background.

22     Q    You are talking about where it says

Page 39

1   that that he was in the Navy?

2      A    Right.

3      Q    On 1926?

4      A    From -- yeah, the page 1926.

5      Q    And what is it on in that section

6   that suggests that he was a supervisor?

7      A    I said it suggests that he might

8   have had supervisory, being that he was in

9   the military.  I mean --

10     Q    Is that --

11     A    -- I don't see -- it depends what

12  his position was.

13     Q    All right, it doesn't tell you

14  though, right?

15     A    Not that I see, no.  I mean, I have

16  navy background so I know about the navy.  If

17  I was there, I probably would have explored,

18  you know, would he get in the navy if he was

19  like a Lead Petty Officer, or Watch

20  Supervisor, things of this nature but this

21  gentleman I don't remember.

22     Q    If Amtrak hires a Foreman II off

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 37

1    A    Yes.

2    Q    Did she do a good job of managing the

3    people who she was supervising?

4    A    Most of the time.

5    Q    Overall, did she do a good job of that?

6    A    Yes.

7    Q    Now, let me ask you about Mr. Kapela.

8    What's the essence of his duties at Amtrak, as you

9    understand them?

10    A    He's the Master Mechanic.  He's in charge

11    of all aspects of the mechanical operation.

12    Q    Did there come a time when you became

13    aware that Ms. Whitley was making any complaints

14    about Mr. Kapela?

15    A    Ms. Whitley always complained about

16    people.

17    Q    I'm asking about Mr. Kapela specifically.

18    A    Specifically?

19    Q    Yes.  Did you ever become aware of her

20    making any EEO complaints about Mr. Kapela?

21    A    I knew she had filed a lawsuit against Mr.

22    Kapela.

Page 40

1    the street who doesn't have an interview, in

2    your experience who would be the one who

3    would make the selection?

4    A    No, everybody goes through an

5    interviewing process.  I have never known

6    them to hire somebody off the street without

7    an interview.

8    Q    Who decides whether someone gets an

9    interview?

10    A    Who decides?  Human resources

11    usually and they'll discuss it also with I

12    would assume the Manager of the Assistant

13    Superintendent.

14    Q    And who decides who the

15    interviewers will be, who is going to conduct

16    the interview?

17    A    That depends on who is available on

18    the day in question.

19    Q    Who makes up -- who decides who to

20    send down there to do it?

21    A    Who decides?

22    Q    Yeah.

Page 41

1    A    It depends on what you are looking

2  at, what position, if it's a Foreman position

3  --

4    Q    Let's talk about Foreman II

5  position, yeah.

6    A    It would be the General Foreman or

7  the Assistant Superintendent.

8    Q    Are you familiar with Larry Ice?

9    A    Yes, I am.  He was Assistant

10 Superintendent in the locomotives.

11   Q    Do you ever remember discussing Ms.

12 Whitley's candidacy for Foreman II with Larry

13 Ice?

14   A    No.

15   Q    Is Mr. Frank a truthful person?

16   A    No.

17   Q    Why not?

18   A    Because he lies.

19   Q    What does he lie about?

20   A    Everything and anything.

21   Q    What do you remember him lying

22 about?

Page 48

1  if I am right, Bobby sat in twice.

2    Q    Is the only time you've ever

3  discussed Ms.  Whitley with Mr. Frank during

4  the interview?

5    A    Yeah, of course, Mr. Frank really

6  had no dealings with Mae.  It wasn't -- Mr.

7  Campbell -- she worked for Mr.  Campbell, Mr.

8  Campbell had dealings.

9    Q    And did Mr. Frank tell the truth to

10 you about the interview?

11   A    Yes, he felt that she was weak.

12 Like --

13   Q    And -- I'm sorry.

14   A    -- and like I said, Mae did, she

15 was weak but she doesn't do it on a daily

16 basis, mechanical, she's more involved with

17 the cleaning aspect of the train.  My

18 contention was and has always been, and I

19 told this to Mae, and I told it to everybody.

20    She was a Foreman I, she should

21 have been given the opportunity.  She has 91

22 days to qualify, to prove herself.

Page 49

1  Personally, I would have given her the shot.

2  Personally, I think Mr. Campbell would have

3  gave her the shot, but the two other

4  gentlemen in the interview felt that other

5  people were stronger on the mechanical end of

6  the interview.  I think Mae could have

7  handled it; that's my opinion.

8     Q    You just testified that Mr. Frank

9  lied to you about job related thing.  Tana,

10  do you remember that testimony?

11    A    Yes.

12    Q    Was that a commonplace occurrence?

13    A    With Mr. Frank?

14    Q    Yes.

15    A    I can only speak for myself.

16    Q    That means that the answer is yes.

17         MR. FISCHLER:  No, the answer --

18         THE WITNESS:  The answer is I can

19  only speak for myself.

20         BY MR. GOLDSMITH:

21    Q    Was it a commonplace occurrence for

22  you that he would lie to you about job

Page 50

1  related things?

2     A    Yes.

3     Q    Do you know if Ms. Whitley back in

4  the 2003 and 2004 timeframe, if she had a

5  lawsuit going against Amtrak?

6     A    The only lawsuit that I know Ms.

7  Whitley had was for sexual harassment against

8  Mr. Cover.

9     Q    And did you ever discuss that case

10  with Ms.  Whitley?

11    A    No.

12    Q    Did you ever discuss the sexual

13  harassment that she said she experienced with

14  Ms. Whitley?

15    A    No, because when that went down, I

16  was not present.  I was in Florida at the

17  time all that took place.

18    Q    Have you ever discussed that with

19  anyone?

20    A    Sure, I mean, everybody there

21  discussed it.  I mean, they knew that it was

22  going down.

Page 51

1    Q    Did that include Mr. Frank?

2    A    Mr. Frank?

3    Q    Yeah.

4    A    Sure, he knew, he was the Assistant

5    Superintendent.

6    Q    What about Mr. Freeman, did he know

7    about it?

8    A    That I don't know; that I really

9    don't know.

10    Q    What did Mr. Frank do or say to

11    indicate to you that he knew about the

12    lawsuit about Mr. Cover?

13    A    Because Mr. Frank was in charge of

14    the shop and the individuals that were being

15    brought up in the case for Ms. Whitley were

16    from the shop.  So that was under his realm

17    of supervision.

18    Q    And do you recall anything that was

19    said between yourself and Mr. Frank, or that

20    you heard Mr. Frank say about that?

21    A    I will be honest with you, no.  And

22    that wouldn't make a bearing on Mr. Frank's

Page 52

1    decision, I know him that well.

2    Q    Let me ask you more specifically,

3    in the case of Ms. Whitley and her interview

4    that you've testified about, do you know if

5    Amtrak ever generated a document that anybody

6    signed indicating who was selected rather

7    than Ms.  Whitley?

8    A    No, I do -- I mean, as far as you

9    mean, they send you a letter or they call you

10    up and they offer you the job so --

11    Q    So --

12    A    I'm not even sure who was

13    interviewing Mae was.

14    Q    I guess, what I am trying to find

15    out is if it was your interview panel that

16    you were on that made a selection, is there

17    any document to indicate who you selected?

18    A    Who they selected, no, because they

19    give that afterwards.

20    Q    Would there be a document

21    afterwards indicating that someone was

22    selected in lieu of someone else?

Page 53

1    A    Just a letter that they would put

2  out or however they do it, I'm not even sure

3  of that.  I know that there is usually a

4  phone call and I'm sure there's got to be a

5  letter that goes out asking you to accept

6  that, you know, you have to sign formally.

7         Isn't there a letter in here that

8  they send out, a form letter.

9    Q    Well, have you ever seen a form

10  letter that -- where somebody signs and says

11  I on behalf of Amtrak now select X person --

12    A    No.

13    Q    -- for the job.

14    A    No.

15    Q    Have you ever enquired as to why

16  they don't have such a form?

17    A    No.

18    Q    You were on a break a few minutes

19  ago, when Mr.  Fischler asked for a break,

20  and you went out in the hallway and spoke

21  with Mr. Fischler, right?

22    A    Yes, sir.

Page 54

1    Q    Does Mr. Fischler represent you

2  here today?

3         MR. FISCHLER:  I represent Amtrak

4  and its employees.  My conversation with them

5  is privileged.

6         BY MR. GOLDSMITH:

7    Q    I am asking you, did you represent

8  -- does Mr.  Fischler represent you here

9  today?

10         MR. FISCHLER:  I am answering on

11  behalf of him; I represent him.

12         BY MR. GOLDSMITH:

13    Q    Is he your personal lawyer or not?

14    A    My personal lawyer?

15    Q    Yes.

16         MR. FISCHLER:  I represent the

17  company and all of its employees.  I'm going

18  to --

19         MR. GOLDSMITH:  Do you represent

20  Ms. Whitley?

21         MR. FISCHLER:  She's not an

22  employee now, is she?

Page 55

1   MR. GOLDSMITH:  Do you -- are you
2   telling me that any employee who would come
3   in here, you represent?
4   MR. FISCHLER:  If -- I don't know,
5   but in this case I do.
6   MR. GOLDSMITH:  I'm going to ask
7   him as to who his lawyer is.
8   THE WITNESS:  I'm assuming that
9   since I was told to come here with him, that
10  yes, he is representing me today.  I know
11  that he is here to give me legal advice, yes.
12  MR. GOLDSMITH:  Let's mark this as
13  the next Exhibit.  We've got a consecutive
14  numbering system going here, so it's not
15  number one.
16  MR. FISCHLER:  What is the number?
17  MR. GOLDSMITH:  Eighty something.
18  I'll make it 84.
19  MR. FISCHLER:  No.
20  MR. GOLDSMITH:  Higher than that?
21  MR. FISCHLER:  Yes, make it 87.
22  MR. GOLDSMITH:  All right.

Page 61

1   what went down.
2   Q    Okay.  And did her insight at the
3   time convince you that she wasn't guilty of
4   anything?
5   A    Right, but --
6   Q    And what did you do with that
7   information?
8   A    I went to Campbell; and I brought
9   it to Mr. Campbell.
10  Q    What happened when you went to
11  Campbell?
12  A    I -- to be truthful, I don't
13  remember.  I just remember him and I talked.
14  You know, I told basically what went down is
15  the information that Mae had given me about
16  the shampoo machines and other circumstances
17  that were involved, and he said he would take
18  it into consideration.
19  Q    Well, he said, unless you weren't
20  telling the truth here, he said that after
21  our -- after your discussion that he agreed
22  that Ms. Whitley should not have been

Page 62

1  included with the others involved in this

2  incident.  Isn't that what he told you?

3      A    Right.

4      Q    Do you know if there was a problem

5  with shampoo machines generally or if the

6  problem was limited to shampoo wands?

7      A    No, it was the whole machine.  To

8  my recollection, it was the whole machine was

9  broken.

10     Q    And your testimony is that you

11  can't recall what it is that convinced you

12  and apparently Mr. Campbell that Ms. Whitley

13  was innocent, is that right?

14     A    No, it's too --

15     Q    You just can't remember now?

16     A    No.  I just don't remember.  I

17  remember Mae coming to me; Mae gave me some

18  insight into it, I went and discussed it with

19  Campbell.  He said he would take into

20  consideration; basically that he felt, you

21  know, that I have opened -- say, opened his

22  eyes up, and I thought that was going to be

Page 63

1  dismissed, but I guess it wasn't.  I think

2  this was like saying everybody fell for it.

3  I think it's a year; isn't that what the

4  waiver said, six months to a year?  Is this

5  -- is number 49 a waiver?

6      Q    Number 49 is a waiver, yes.

7          MR. FISCHLER:  Forty-nine.  I don't

8  have 49.

9          MR. GOLDSMITH:  I have two of them

10  here.

11         MR. FISCHLER:  Well --

12         BY MR. GOLDSMITH:

13     Q    Forty-nine is a waiver.  Do you

14  recall Ms.  Whitley executing a waiver on

15  this issue?

16     A    Yes, everybody did.

17     Q    Did you ever have occasion to

18  discuss the -- this -- anything about this

19  shampoo incident, your discussions with Ms.

20  Whitley about it or your discussions with Mr.

21  Campbell about it or anything about it with

22  anyone else?

Page 64

1    A    Probably Gary Loures and I had --
2  wasn't Gary involved?  I'm pretty sure Gary
3  Loures was involved.  He was the general
4  foreman.
5    Q    Would he ever have discussed that
6  with anyone from personnel?
7    A    No, there is no need to discuss
8  with personnel.  To me --
9    MR. FISCHLER:  There's no question
10 pending.
11    BY MR. GOLDSMITH:
12    Q    Why is there no need to discuss it
13 with anyone in personnel?
14    A    Why?  I mean, to me this is
15 trivial.
16    Q    Why is it trivial?
17    A    Why is it trivial?  Because to me,
18 it's trivial.  Things break down, I mean, it
19 happens to everybody.
20    Q    So why did you tell me that you
21 thought it was trivial?  Because --
22    A    Because it's a shampoo machine.

Page 67

1  your backing of her?
2    A    I mean I asked them what the status
3  was because they hadn't notified anybody at
4  that time, and Mae asked me could I please
5  find out what was going on.  And I send this
6  letter to Sarah Ray, e-mail.
7    Q    At the time -- it looks here like
8  you made a contact about a month before
9  August 4th with personnel, right, on this
10 issue?
11    A    Right.  It's not uncommon for
12 personnel to be slow.
13    Q    So at that time, did you -- in
14 July, did anyone tell you that Ms. Whitley
15 wouldn't be promoted because she had been
16 previously disciplined?
17    A    No.
18    Q    Did anyone tell you that in August?
19    A    No.
20    Q    Did they tell you in July that
21 there were others who were better qualified
22 than Ms. Whitley, so she wouldn't be

Page 68

1  promoted?

2      A    In July?

3      Q    Yeah.

4      A    I don't remember.

5      Q    Well, if they told you that, do you

6  think you would've asked them what the reason

7  -- you know why she hadn't heard anything?

8      A    You're losing me.

9      Q    Well, it appears to me that they

10  didn't tell you anything in July because

11  that's what I'm inferring from your e-mail is

12  you didn't know whether she was being

13  selected or not, is that right?

14      A    Right.

15      Q    And in August that still applied

16  and that's why you send this e-mail, is that

17  right?

18      A    Right, because Mae and I talked and

19  she told me she still hadn't heard anything.

20  I think there was more than one foreman.  I

21  think there was like two or three that were

22  being selected, if I'm -- if I remember

Page 69

1  right, and not all the selections had been

2  made.  And Mae asked me, could I please find

3  out, you know, what the status was.  And I

4  send this to Sarah Ray, and I send it to

5  Sarah Ray because she's the head of human

6  resources.

7      Q    As of August 4th, do you think you

8  were telling Ms. Whitley that she definitely

9  wasn't going to be selected?

10      A    No.

11      Q    Do you think you would've been

12  telling her as of August 4th that she

13  shouldn't except to be selected because of

14  the evaluations of Mr. Frank and Mr. Freeman?

15      A    No.

16      Q    All right.  I'm going to show you

17  Exhibit 37.

18      A    Do you want this back?

19      Q    Just put in that pile of exhibits.

20      A    Thirty-seven?

21      Q    Yes, please.  Exhibit 37 --

22      A    Hold on a minute.

1    Q    So --

2    A    -- just when you're employed.

3    Q    So do you think he would be given a

4 physical before his start date or after his

5 start date?

6    A    He should be given a physical prior

7 to -- I mean, that only makes sense.

8    Q    All right.  Now, it says here that

9 his start date was going to be 10/13/04, but

10 he failed the physical.  So would you surmise

11 from that that he didn't start on 10/13/04?

12        MR. FISCHLER:  I'm going to object

13 to the extent this calls for speculation.  He

14 has no personal knowledge of it.

15        BY MR. GOLDSMITH:

16    Q    You can answer.

17    A    I mean I have no knowledge; I

18 wouldn't know.  I'm not involved in that

19 aspect of hiring.

20        MR. FISCHLER:  Do you see that?

21        BY MR. GOLDSMITH:

22    Q    Did you ever observe that Mr.

1 Eckstein entered on duty as a Foreman II?

2    A    No.

3    Q    And that's something you would've

4 observed if it had happened, right?

5    A    Right.

6    Q    And -- all right, and it --

7    A    Well, that depends where they put

8 him.

9    Q    Well, wherever they would've put

10 him, you would've been responsible for him as

11 the union rep, right?

12    A    As the union chairman, yes.

13    Q    So you would've been aware of it,

14 right?

15    A    Yes.

16    Q    And you don't have any recollection

17 of that happening, right?

18    A    Yes.

19    Q    Now, it says here Mr. Grimes, he

20 had a start date of 01/19/05, do you see

21 that?

22    A    Yes.

Page 74

1    Q   Do you have any personal knowledge

2 of having interviewed anyone else for a

3 Foreman II position yourself between 10/13 --

4 I'm sorry, between 09/08/04, the date of the

5 Eckstein interview, and 12/07/04, the date of

6 the Grimes interview?

7    A   As far as --

8    Q   Did you interview anyone else who

9 is not indicated on this applicant flow log?

10    A   To my recollection, no.  That

11 doesn't mean -- no, I won't go --

12    Q   Do you have any recollection --

13 returning your attention back to Exhibit 88?

14    A   Eighty-eight.

15    Q   Of -- which should be in the pile

16 -- it's right there.

17    A   Oh, here.  I'm sorry, go ahead.

18    Q   Do you have any recollection of

19 anything that you and Ms. Whitley were saying

20 to each other about her status as far as

21 being promoted to a Foreman II around the

22 time of that e-mail?

Page 75

1    A   No, I probably told her -- really,

2 I can't remember what our conversation was.

3    Q   Did there ever come a time when you

4 developed information to the effect that

5 management was saying they weren't promoting

6 Ms. Whitley because of prior discipline?

7    A   No, I never remember anybody saying

8 that.

9    Q   Would it surprise you if they did?

10    A   Would it?

11    Q   You know --

12    A   Mae really didn't have that much

13 discipline.

14    Q   So her disciplinary record was good

15 as far as you know?

16    A   As, my knowledge of Mae's

17 discipline was this letter here, and I know

18 she was counseled a few times on her

19 attendance?

20    Q   When you say "This letter here," do

21 you mean Exhibit 15?

22    A   I'm referring to -- right.

Page 76

1     Q     The issues reflected in 48, 49 and

2  50?

3     A     Right, about the shampooing

4  machine.

5     Q     Did Ms. Whitley ever tell you that

6  she was told that she wasn't going to get

7  promoted because of discipline?

8     A     That I don't remember either.  I

9  remember Mae saying she wasn't getting

10  promoted, but I don't remember her saying it

11  was due to a discipline.

12     Q     Take a look at Exhibit 20, if you

13  could.

14     A     Twenty?  Okay.

15     Q     Do you recognize Exhibit 20, which

16  is an August 19, 2004,letter for Mr. Cannon

17  to Ms. Whitley?

18     A     No.

19     Q     Take a moment to read it.

20     A     No, I never saw this letter until

21  today.

22     Q     All right.  Does it refresh your

Page 78

1  speculation.

2        THE WITNESS:  If I'm telling you

3  that I had no knowledge of the discipline,

4  this letter stating discipline, I would have

5  no need to go to Campbell because I had no

6  knowledge of it.

7        BY MR. GOLDSMITH:

8     Q     So that's your testimony is that --

9     A     I --

10     Q     -- you don't remember contacting

11  Mr. Campbell --

12     A     No, I don't.

13     Q     -- because you don't remember

14  knowing about it at all, is that right?

15     A     I don't remember ever hearing that

16  Mae was disqualified because of discipline.

17     Q     All right.  And does it surprise

18  you to see this letter from Mr. Cannon,

19  Exhibit 20?

20     A     Nothing surprises me.

21     Q     Do you think that Ms. Whitley

22  deserved to be disqualified because of

Page 79

1   discipline?

2        MR. FISCHLER:  Objection, lack of

3   foundation.

4        THE WITNESS:  That's not -- do you

5   want my personal opinion?

6        MR. GOLDSMITH:  Yes.

7        MR. FISCHLER:  Objection, lack of

8   relevance.  Go ahead.

9        THE WITNESS:  I'm waiting for you.

10       MR. GOLDSMITH:  Yeah, no, I'm

11  waiting for the answer.  He's put his

12  objection on the record.

13       MR. FISCHLER:  You can answer.

14       BY MR. GOLDSMITH:

15    Q    Now, you can answer.

16    A    Personally the -- like I've already

17  stated the -- to me the shampoo machine is

18  trivial.  That because the shampoo machine

19  was broken down, she didn't address it, no,

20  that should not hold anybody back from being

21  considered a supervisor.

22    Q    Take a look at Exhibit 18 if you

Page 82

1    Q    And that was a decision that was

2   made by Mr. Frank and Mr. Freeman, in your

3   mind?

4    A    Yes.  And as far as the lack of

5   mechanical background, like I stated, I

6   agreed with them on that, but like I said,

7   she was a foreman already.  I felt she

8   should've been given a chance.

9        Like I said, there's a 91-day

10  qualification period.  If a person doesn't --

11  they have used it before, or if a foreman

12  doesn't cut it, they take him off the job

13  before they get to 91 days.  If that happens

14  she could still fall back on her Foreman I's

15  position.  She would not have lost her

16  seniority.

17       MR. FISCHLER:  There's no question

18  pending.

19       BY MR. GOLDSMITH:

20    Q    Did you finish your answer?

21    A    Yes.

22    Q    Did Mr. Frank ever tell you

Page 83

1    specifically that he disagreed with your

2    opinion about that that you just expressed?

3        A    No.

4        Q    Did Mr. Freeman ever tell you that

5    he disagreed with that?

6        A    No.

7        Q    Did anyone in management at Amtrak

8    ever tell you, they disagreed with that?

9        A    That they disagreed with -- let's

10   have a little more clarification.

11       Q    Well, you expressed the view that

12   Ms. Whitley's mechanical qualifications might

13   not have been so great.

14       A    Well, that's right.  Right.

15       Q    But that you thought that she

16   should get a chance and that she would have

17   90 days to prove herself?

18       A    Right.

19       Q    Okay.  Did Mr. Frank ever disagree

20   with that?

21       A    Did they ever -- they never agreed

22   or disagreed; they just heard what I had to

Page 84

1    say as a union rep.

2        Q    Did Mr. Freeman ever tell you that

3    he disagreed with that?

4        A    No, he did not?

5        Q    Did anyone from personnel ever tell

6    you they disagreed with that?

7        A    No.

8        Q    Did Mr. Campbell ever say he

9    disagreed with that?

10       A    No.  Mister -- like I said Mr.

11   Campbell went out of his way to help Mae.

12       Q    Did Mr. Kapela ever say that he

13   disagreed with that?

14       A    I never heard anything from Mr.

15   Kapela either way about any of this.

16       MR. FISCHLER:  Are you done with

17   Exhibit 18?

18       MR. GOLDSMITH:  That's -- yeah, I'm

19   done.  And like I held it in my hand, so I

20   wouldn't steal it from you.

21       MR. FISCHLER:  That's fine.  I just

22   -- that's why I'm asking because otherwise, I

Page 85

1  will lose it and we will no longer --

2          MR. GOLDSMITH:  Let me show you

3  Exhibit 89.

4              (Deposition Exhibit No. 89 was

5              marked for identification.)

6          BY MR. GOLDSMITH:

7      Q    And Exhibit 89 is a letter from Ms.

8  Whitley to Mr. Cannon on August 20 or 26,

9  '04.

10     A    26th.

11     Q    26, 04.  Have you seen this before?

12     A    No.

13         MR. FISCHLER:  I'm going to state

14 an objection.  He said that he never saw the

15 letter about discipline, he didn't know about

16 discipline affecting her promotion.  There's

17 no way he would've known about this before

18 today.  So I think there's lack of foundation

19 and he's not qualified to testify about it.

20         BY MR. GOLDSMITH:

21     Q    Do you think Ms. Whitley would've

22 talked to you about the contents of this

Page 87

1  indicates that it relates to Mr. Stevens, who

2  is one of the plaintiffs in this case, and

3  that -- there is a charging officer, B.L.

4  Campbell.  And then down at the bottom it

5  says that Mr. Stevens is being given a

6  formal reprimand held in advance for three

7  months, will be expunged if no further

8  absenteeism takes place.  Do you see those

9  things?

10     A    Uh-huh.

11     Q    Yes?

12         MR. FISCHLER:  You can't answer

13 that way.  The court reporter can't write it

14 down.  You have to answer yes or no.

15         THE WITNESS:  Yes.

16         BY MR. GOLDSMITH:

17     Q    Are you familiar with a procedure

18 by which Amtrak holds discipline in advance

19 sometimes?

20     A    Yes.

21     Q    And are you familiar with a

22 procedure by which Amtrak expunges discipline

Page 88

1  sometimes?

2      A    Yes.

3      Q    Are those common things for them to

4  do?

5      A    To expunge they review it.

6      Q    And as to holding in advance, is

7  that also common?

8      A    Yes, it is.

9      Q    With regard to the discipline

10 reflected in Exhibits 48 and 49 that you

11 looked at previously regarding the shampoo

12 machines and the waiver, do you recall

13 anything about any conversations between

14 yourself and Mr. Campbell about what he was

15 going to do with that discipline?

16     A    No.

17     Q    Do you -- would you deny that Mr.

18 Campbell said that he was going to keep it in

19 his desk drawer in his office?

20         MR. FISCHLER:  I object to that.

21 Testimony is he doesn't remember it.

22         THE WITNESS:  I don't remember.

Page 89

1         BY MR. GOLDSMITH:

2      Q    So you wouldn't have any basis for

3  denying that he might have said that?

4      A    No.

5      Q    Would it surprise you if Mr.

6  Campbell might have said something like that?

7         MR. FISCHLER:  Same objection.

8         THE WITNESS:  I mean, I don't know.

9  I mean, I have no knowledge of it.

10        BY MR. GOLDSMITH:

11     Q    Does that happen sometimes?

12     A    To my knowledge, no.

13     Q    What does it mean to keep a

14 discipline in advance then?

15     A    What it means is that if you don't

16 get any trouble during those three months,

17 you won't serve the discipline that was

18 assessed, but if you get brought up on

19 another charge regardless of what it is,

20 you're going to serve the time that was held

21 in advance.

22         In other words, what they're trying

Page 90

1  to do when they hold stuff in advance is get

2  a person's attention; "Hey, you're messing

3  up.  We think you have potential.  Don't do

4  it again."

5       Q    Do you think Mr. Campbell might

6  have told Ms.  Whitley that he was going to

7  keep her discipline in advance?

8           MR. FISCHLER:  Same objection.

9           THE WITNESS:  I have no knowledge.

10          BY MR. GOLDSMITH:

11      Q    So you don't know?

12      A    No.

13      Q    It's possible he did, and it's

14  possible he did not?

15      A    I have no knowledge.

16      Q    Do you know whether Mr. Campbell --

17  did -- do you recall any conversations about

18  that -- imposition of that discipline by Mr.

19  Campbell on Ms. Whitley that you may have had

20  with Ms. Whitley?

21      A    No, I mean, we -- I remember

22  talking to Mae about the discipline and

Page 91

1  everything.

2       Q    Do you remember her talking to you

3  about what Mr.  Campbell said would happen if

4  she didn't sign a waiver?

5       A    He was going to take it to a formal

6  investigation.  I mean, that's the next step.

7  If you don't take a waiver, it goes to formal

8  investigation.

9       Q    And do you remember him, what he

10  said the outcome of that would be?

11      A    Probably that they would get time

12  on the street -- everybody involved; or

13  discipline held on advance.

14      Q    Do you think that he -- do you

15  recall what Ms.  Whitley's feelings might

16  have been about that?

17      A    If I remember right, everybody

18  concerned just took the waiver to get it over

19  and done with like, "Let's get it done.  This

20  is BS, let's just get it done."

21      Q    Do you think Ms. Whitley would have

22  thought at the time when she took the waiver

Page 92

1  that she wasn't going to be able to be

2  promoted because of that?

3      A    No, because I know she didn't think

4  that.  I didn't even think that.  I've

5  already stated to you I thought that the

6  charges with the shampoo machine, that that

7  was a trivial incident.

8          MR. FISCHLER:  And I didn't get a

9  chance.  I'm going to object to the form to

10  the extent you're asking; what he thought Ms.

11  Whitley thought.  There is no way he would

12  possibly know what Ms. Whitley thought.

13          BY MR. GOLDSMITH:

14      Q    Did you know what Ms. Whitley

15  thought because she told you what she

16  thought?

17      A    I don't remember.  I know that --

18      Q    Well, how did you figure out what

19  she --

20      A    I know there were --

21      Q    How did you learn what she thought?

22      A    I know there was --

Page 97

1      Q    But that wasn't why she wasn't

2  promoted, as far as you knew?

3      A    To my knowledge, no.

4      Q    Did Mr. Campbell ever told you that

5  it was his understanding that Ms. Whitley had

6  interviewed poorly?

7      A    No.  He had no knowledge of her

8  interview.

9      Q    He didn't say he had heard it from

10  somewhere?

11      A    No.

12      Q    Did Mr. Frank ever say that he

13  thought she had interviewed poorly?

14      A    No, just that she was weak in the

15  mechanical aspect of it.

16      Q    What about Mr. Freeman?  Did he say

17  that she had interviewed poorly?

18      A    Yes.

19      Q    What did he say about it?

20      A    Just that she interviewed poorly,

21  and I can't speak for him.  But he was basing

22  it on the mechanical aspect too.

1    Q    So it wasn't so much the way that
2  she talked during the interview as what her
3  skills were -- it was -- as reflected in her
4  work history, is that right?
5    A    No.  It was the interview.  He has
6  no knowledge of her work history.
7    Q    So -- all right, so his -- the
8  impression that he gave you was that he
9  thought that her performance in the interview
10 wasn't good?
11   A    Right, that it was weak
12 mechanically.
13   Q    Right.  But she wasn't performing
14 any mechanical tasks during the interview,
15 right?
16   A    No.
17   Q    So I'm just trying to parse out
18 whether he was talking about what he saw as
19 her experience or lack of experience in --
20 and the process of being interviewed.  Which
21 was more about as far as you could tell from
22 what he said to you?

1    A    All I know is that his job is to
2  interview people.  He does it day in and day
3  out.  I don't.  I sit in only on the
4  supervisor's interviews, like I said.  He
5  based it probably on past experience, on the
6  amount of interviewing that he does.
7         He interviews not only foremen.  He
8  interviews electricians, car men, machinists,
9  all the craftsmen on the railroad.  So based
10 on the mechanical questions, he felt that
11 there were stronger candidates mechanically.
12   Q    Do you remember who those
13 candidates were?
14   A    No.  I remember --
15   Q    Was it -- I'm sorry, go ahead.
16   A    I remember you jogged my
17 information -- my memory with Burrows when
18 you showed me that -- what do you call it,
19 deposition exhibit.
20   Q    Was it the interview panel's job,
21 as you understood it, to compare one
22 candidate to another?

Page 100

1     A     You compare their mechanical

2 abilities.  Yes.

3     Q     Well, is the interview panel the

4 same for each applicant?

5     A     No.

6     Q     Then how would the interview

7 panelists even know who the other candidates

8 were, and what their qualifications were?

9     A     When you say applicant --

10     Q     Uh-huh.

11     A     -- are you referring to the

12 interview process for that time period as far

13 as if they're hiring three foremen and

14 they're interviewing six people, for them

15 three positions?  Yes, they try and keep that

16 panel the same the whole time.  If somebody

17 gets sick or something like that, if somebody

18 is out of town, then they will replace the

19 person.

20          But 99 percent of the time, the

21 people that are interviewing for -- if they

22 need three foremen in October, they try to

Page 101

1 keep that panel, interviewing everybody the

2 same.  But there has been times where there

3 might be one or two differences in the panel.

4     Q     But let me ask you this.  What does

5 Amtrak do if they -- if it turns out that

6 there are differences in the panel, as far as

7 making a relative choice between one

8 candidate and another?

9          MR. FISCHLER:  I'm going to object

10 on lack of foundation.

11          BY MR. GOLDSMITH:

12     Q     How does that get done?

13     A     I really don't know.

14     Q     So do you actually know if --

15 whether Ms. Whitley was ever compared to

16 other candidates?

17     A     I can say that she was compared to

18 the people that we interviewed that day.

19 Yes.

20     Q     Take a look at Exhibit 37 again.

21 Exhibit 37 indicates that.

22          MR. FISCHLER:  Give me one second

Page 102

1  please.

2         MR. GOLDSMITH:  Sure.

3         MR. FISCHLER:  Okay.

4         BY MR. GOLDSMITH:

5     Q    It indicates -- again, you

6  testified that you interviewed Mr. Jefferson,

7  Mr. Eckstein and Mr. Grimes.  Do you see

8  that?

9     A    Right.

10    Q    And it says here, "Ms. Whitley was

11 not interviewed."

12    A    Right.

13    Q    And it also says that -- I'm sorry.

14 And the two names here are for Mr. Frank and

15 yourself, as interviewers.

16        Do you see that?

17    A    Yes.

18    Q    So do you think there was anyone

19 else in those interviews?

20    A    Like I told you, at times, no,

21 there weren't.

22    Q    Okay.  So could the people who were

Page 103

1  interviewed here, have been compared to the

2  people who were interviewed a few months

3  earlier, when they had a different panel?

4     A    I don't know.  I didn't -- I can't

5  speak for what Bobby Frank did with

6  personnel.

7     Q    Well, on these -- in this process

8  here where it says, "Ms. Whitley wasn't

9  interviewed," do you know whether she got

10 consideration for these positions or not?

11    A    No.

12    Q    Now, it's possible that they might

13 have relied on an older interview, right?

14    A    Anything is possible.  I mean --

15    Q    And it's also therefore possible

16 that they didn't rely on an older interview,

17 right?

18    A    Like I said, anything is possible.

19    Q    And do you recall discussing any of

20 these three candidates who were selected, Mr.

21 Jefferson, Eckstein and Grimes with Mr.

22 Frank?

Page 104

1  A    I'm sure we discussed it because we

2  interviewed them.

3  Q    Okay.  And when you had the

4  discussions, did you include Ms. Whitley in a

5  comparative discussion as to whether she

6  should be selected?

7  A    If -- I wouldn't even know that she

8  had put in -- I mean, but then it says "No

9  interview."  That means she might have had a

10  prior interview.  I don't know.  It means she

11  might have withdrew her request for an

12  interview; I don't know.  I mean, all I can

13  tell you is these three people were

14  interviewed.

15  Q    Is it possible that you were

16  considering Ms.  Whitley in comparison to

17  those people, or is it impossible that that

18  was being considered?

19  A    I have -- I don't remember.

20  Q    Is there anything you can think of

21  that would refresh your recollection about

22  that?

Page 105

1  A    No, nothing whatsoever.

2  Q    I'm going to show you -- they're

3  with me.  One minute.  I'll show you another

4  document.  Keeping your attention on Exhibit

5  37 --

6  A    Uh-huh.

7  Q    -- does the fact that Mr. Grimes

8  was selected after an interview on 12/7/04

9  indicate to you that there was a vacancy

10  between 10/13/04 when Mr. Eckstein was

11  supposed to start and 12/7/04 when Mr. Grimes

12  was interviewed?

13  A    I don't know.

14  Q    Do you have any reason to think

15  there wasn't?

16  A    We always have vacancies.  We have

17  vacancies today.

18  Q    So if Ms. Whitley wasn't promoted

19  around that time, it wouldn't have been

20  because of a comparison to someone else,

21  would it?

22  A    Not to my knowledge.

Page 106

1    Q    Would have been because somebody

2  decided they just didn't want to promote Ms.

3  Whitley, right?

4    A    I have no knowledge of that; if

5  they want to promote her or not.

6    Q    Well, they didn't promote her.

7  Right?

8    A    Right.

9    Q    And you have no knowledge to

10  suggest that there wasn't a vacancy between

11  October 13th and December 7th, right?

12    A    No, I don't remember.

13    Q    You don't deny that there was no

14  vacancy then, do you?

15    A    I don't remember.

16        MR. FISCHLER:  Objection to the

17  question.

18        BY MR. GOLDSMITH:

19    Q    Can you think of any document that

20  would refresh your recollection?

21    A    We would have to see what vacancies

22  they had listed at that time.

Page 107

1    Q    And this doesn't give you any --

2  enough information about that; Exhibit 37?

3    A    No, that gives me no information at

4  all.  All this says is, "We need a foreman."

5  So if we need a foreman, it makes sense that

6  there were vacancies.  You want an interview

7  on this, you need vacancies.  The one thing

8  Amtrak is not doing is increasing the

9  workforce.

10    Q    But they were interviewing as of

11  that September 8th, when they interviewed Mr.

12  Eckstein and Mr. Jefferson, right?

13    A    Right.

14    Q    And they were interviewing as of

15  December 7th when they interviewed Mr.

16  Grimes, right?

17    A    I would say yes.

18    Q    If someone were to testify that the

19  decision as to who to promote to Foreman II

20  is made solely by personnel or Human

21  Resources, would that be correct?

22    A    But -- no, that would be the

Page 108

1  manager that was sitting in, and Human

2  Resources at least -- like I said, and that's

3  my opinion of how it would go down.

4      Q    So you're not sure who actually has

5  the authority to make a selection to Foreman

6  II at Amtrak, is that right?

7      A    A Foreman II?

8      Q    Yeah.

9      A    The authority lies within

10 management.  I stated that before.  I'm in

11 there to make sure that things are asked

12 fairly, that everybody is asked the same

13 questions that, you know, and then they will

14 ask me my opinion how I feel.

15     Q    When you say the authority for a

16 Foreman II selection resides within

17 management that ultimately falls to Mr.

18 Kapela, right?

19     A    No.

20     Q    Well, who does it fall to

21 ultimately then?

22     A    I stated before that it goes to the

Page 109

1  person that's doing the interviewing; the

2  general or the assistant superintendent.  I

3  stated Mr. Kapela's attitude is, "You guys

4  select whoever you want."  He went with the

5  selection.

6      Q    So Mr. Kapela, had he so chosen,

7  could have made decisions about this, but he

8  decided to give that responsibility --

9          MR. FISCHLER:  Wait --

10         MR. GOLDSMITH:  -- to people who

11 are beneath him on the chain of command.  Is

12 that right?

13         MR. FISCHLER:  I'm going object

14 that.  There is no way that he could tell

15 what Mr. Kapela could have done if he had

16 wanted to do this.  This is absolute

17 speculation, and it's a totally inappropriate

18 question.

19         MR. GOLDSMITH:  You can answer.

20         THE WITNESS:  Mr. Kapela -- I have

21 never known Mr. Kapela, in the four years

22 that I've known him since I've been back, to

Page 134

1  significance does a roster date have in their

2  employment at Amtrak?

3      A    The roster date determines what

4  jobs you get based on -- you bid based on

5  seniority.

6      Q    So you can't bid during your 90-day

7  probation, is that right?

8      A    Yes, you can.

9      Q    You can?

10      A    Yes.

11      Q    So --

12      A    Anybody can bid.

13      Q    I guess what I am trying to

14  understand is why wouldn't the roster date be

15  the day they actually started instead of when

16  they finish the probation.  What is that?

17      A    Based on a Union agreement, the

18  company requested a probationary time.  In

19  the beginning it was 30 days, it went to 60

20  days, it's now at 90 days.  And on the 91st

21  day you get a seniority roster.

22      Q    So technically they can bid during

Page 135

1  the probationary time, but once they have

2  passed the probationary time forever more

3  their roster date is the 91st day, after 90

4  business days.  Is that what you are telling

5  me in part?

6      A    Well, let me put it to you this

7  way.  My seniority date is March 13, 1979.

8  If I'd been on the job it's awarded to me

9  based on my seniority date and that date --

10  if somebody with 1982 was to bid the job they

11  would not get it.  Now there is only one

12  thing that could overrule your seniority

13  date, and that's the certifications of the

14  federal government jobs are put up, and they

15  are awarded to the senior qualified

16  applicant.

17      Q    So in the case of a foreman 2,

18  would that mean having the certifications

19  that are reflected in the card that you

20  showed me earlier today?

21      A    Yes, my card gives only five other

22  people on the property that have all the