# Transcript of the Testimony of **Garry Louers**

**Date:** February 6, 2007
**Volume:** 1

**Case:** Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Printed On: 5/4/2007



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 10

1   Q   What would you say -- well, let me ask you
2   this: As a general foreman, do you have occasion to
3   supervise people who hold the foreman 2 job?
4   A   Yes.
5   Q   You also supervise people at the foreman 1
6   job?
7   A   Yes.
8   Q   And tell me, if you could -- first of all,
9   do you actually have occasion to evaluate them, to
10  give them written evaluations?
11  A   Yes.
12  Q   What are the duties of a foreman 1?
13  A   Foreman 1, they normally oversee the coach
14  cleaning forces or the utility workers.
15  Q   That's the same thing; right?
16  A   No.
17  Q   Oh, I'm sorry. What do the utility
18  workers do?
19  A   Utility workers, they service the
20  equipment, dump trash, clean restrooms, clean locker
21  rooms.
22  Q   Coach cleaners mainly clean the actual

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 27

1  whether there was a need for additional foreman 2s
2  in your area or anybody else's area, for that
3  matter, as far as just deciding whether there is a
4  vacancy that needs to be filled?  Have you ever
5  asked anybody about that?
6      A    No.
7      Q    Do you know whose job it is to make those
8  kinds of staffing decisions for mechanical, let's
9  say how many foreman 2s are going to be needed in
10 the locomotive area or, for that matter, in your
11 area?
12     A    That would be some assistant
13 superintendent and up, their level.
14     Q    Who's got that job right now?
15     A    The assistant superintendent turnaround
16 service, B.L. Campbell.
17     Q    Are you familiar with a gentleman named
18 Larry Ice?
19     A    Yes.
20     Q    Who is he?
21     A    He is no longer with Amtrak, I believe.
22 He is -- he is an assistant superintendent -- he

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 30

1      Q    Did you ever observe any kind of change in
2  what the practice was with regard to promoting
3  people from within or has that been a constant thing
4  that you have observed over the years?
5      A    It's been constant.
6      Q    All right.  Now, with regard to selecting
7  candidates for vacant positions, whether they are
8  promoted from within or hired from the outside, are
9  you aware of any established procedures or practices
10 that the company uses in going through the process
11 of picking the individuals who will get the jobs?
12     A    No, not -- not directly.
13     Q    Do you know if they use interviews?
14     A    Yes.
15     Q    Is it a constant that in order to obtain a
16 position, you have to first be interviewed?
17     A    Yes.
18     Q    And on the occasions when you were
19 promoted, were you interviewed each time before you
20 were promoted even though you were already working
21 for the company?
22     A    Yes.

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 34

1   A   Not to my knowledge.
2   Q   Not frequently to your knowledge?
3   A   Right, not frequently.
4   Q   So more of a rarity than a frequent
5   occurrence?
6   A   I'm not -- I'm not sure.  I'm really not
7   sure.
8   Q   Have you ever observed that foreman 2 have
9   been selected for the job and they have come to work
10  and didn't have the background and experience that
11  they needed to actually start doing the job?  Have
12  you ever seen that happen?
13  A   Not that I could recall.
14  Q   Have you ever heard of that happening?
15  Did anyone ever tell you thus-and-so came to do this
16  job and turned out they didn't know how to do it?
17  A   Yes, I think I have heard chat about that.
18  Q   Now, the position -- I guess most
19  positions at Amtrak, there is a probationary period
20  at the beginning; correct?
21  A   Yes.
22  Q   And that's true for foreman 2, also?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 35

1   A   Yes.
2   Q   90 days?
3   A   Yes.
4   Q   Have you ever observed foremen 2 come in
5   and be gone within or right at the 90-day mark after
6   they started in -- after they entered on duty?
7   A   You mean taken off the job?
8   Q   Yes.
9   A   Yes.
10  Q   And do you remember specifically who the
11  employees were who that happened to?
12  A   Not specifically.
13  Q   Have you ever heard of a foreman 2 named
14  Mr. Grimes?
15  A   Yes, I heard that --
16  Q   Does Mr. Grimes still work there?
17  A   I'm not sure.  He may.
18  Q   Have you ever heard of one named Rodney
19  Wilson?
20  A   Rodney Wilson doesn't ring a bell.
21  Q   Have you ever heard of one named Akins?
22  A   Yes.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 38

1  Okay. Now, do you know if there was ever
2  a time when Ms. Whitley was interested in
3  participating in that program?
4      A   Yes.
5      Q   She was; right?
6      A   Yes.
7      Q   After the program was terminated, did she
8  continue to express interest in becoming a foreman
9  2?
10     A   Yes.
11     Q   Did she do anything that you know of to
12 advance her prospects of becoming a foreman 2?
13     A   Yes.
14     Q   What did she do?
15     A   She went to the get several
16 certifications, for one.
17     Q   Which certifications, do you know?
18     A   To work in turnaround service, you need
19 205 and 209 certifications and she may have gotten
20 more than that.
21     Q   Did she get the 238?
22     A   Well, 238 is the main title and 205 and

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 39

1  209 are subtitles of different certifications.
2      Q   Do you know if she got certifications to
3  work in areas other than turnaround service?
4      A   I think she did.
5      Q   Did you, yourself, play any role in her
6  obtaining the certifications? Let me ask you a
7  different question.
8          Did she ever come to you with any
9  questions or looking for assistance in her studies
10 in trying to prepare herself to get those
11 certifications?
12     A   Yes.
13     Q   Did you answer her questions and try to
14 assist her when you could?
15     A   Yes.
16     Q   Did Ms. Whitley during that time when she
17 was studying for those certifications appear to
18 believe that she would have prospects of being
19 promoted to foreman 2 if she completed the
20 certifications?
21     A   That's what I got from her demeanor, yes.
22     Q   Did you ever talk to -- I'm sorry.

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 42

1  chance to get promoted?
2     A    Not that I can recall.
3     Q    In your experience, does a foreman 2 need
4  to know how to do the work of the craft better than
5  the craft workers themselves, the same as the craft
6  workers themselves, enough to recognize a problem
7  but not as much as the craft workers themselves?
8     A    I would have to say right along on the
9  same level as the craft person.
10    Q    And why is that?
11    A    So we could -- so the job could properly
12 get done.
13    Q    When Ms. Whitley was in the process of
14 trying to get in the training program and then
15 process of taking the various courses that she took,
16 did she ever have any conversations with you about
17 what her aspirations were, why she wanted to do
18 that?
19    A    Yes, we spoke about advancement.
20    Q    And did you encourage her in making that
21 effort?
22    A    Yes.

Page 43

1     Q    Did you ever tell her that there was
2  anything else that she should be doing other than
3  what she did do in order to have the opportunity for
4  the advancement?
5     A    Not that I can remember.
6     Q    So was it your impression that she was
7  doing the right things in order to get that
8  opportunity?
9     A    Yes.
10    Q    Did anyone in management -- first of all,
11 do you know if Ms. Whitley ever was promoted to
12 foreman 2?
13    A    No.
14    Q    She wasn't; right?
15    A    Was not.
16    Q    Did anyone in management ever tell you why
17 she wasn't promoted to foreman 2?
18    A    No.
19    Q    Did anyone ever say anything from which
20 you were able to infer why she wasn't promoted to
21 foreman 2?
22    A    Yes.

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 47

1   Q   So you had had the impression at one
2   point -- let me ask it this way:  Did you have the
3   impression -- did your impression change at some
4   point as to Ms. Whitley being qualified for the job
5   of a foreman 2?
6   A   No.
7   Q   Did you always feel that she was
8   qualified?
9   A   Yes.
10  Q   So did your impression change as to what
11  others within Amtrak were using as the criteria for
12  determining whether Ms. Whitley was qualified for
13  foreman 2?
14  A   No, I've always thought she was capable of
15  performing the job.
16  Q   But in forming that opinion, you didn't
17  know that Mr. Cannon was going to say -- well,
18  strike that.
19      When he told you that mechanical
20  background would be an issue, did that inform your
21  understanding of why Ms. Whitley didn't get a job as
22  a foreman 2?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 48

1   A   Yes.
2   Q   Did you think that he might be, if he were
3   asked, he might have said that she was within the
4   category of people that didn't have the mechanical
5   background necessary to be a foreman 2?
6   A   No, it never -- conversation never got
7   that far where her name would even be mentioned.
8   Q   All right.  So let's take her name out of
9   it completely.  But when he told you this, he was
10  telling you something that you hadn't understood
11  previously; is that right?
12  A   Yes.
13  Q   And so you had been moving along as a
14  general foreman, someone who had responsibility for
15  supervising foremen 2 and, in fact, you had been
16  doing what you could to assist Ms. Whitley; you
17  believed that Ms. Whitley had become qualified to be
18  a foreman 2; right?
19  A   I believe she was capable of performing a
20  foreman 2's job, right.
21  Q   You gave her a recommendation -- a couple
22  recommendations; right?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 49

1   A    I gave her -- I think it was one, yes.
2   Q    But then at some point, somebody in the
3   person of Mr. Cannon, gave you some information that
4   helped you to understand that within management at
5   Amtrak, they were using some different criteria to
6   judge whether someone was qualified to be a foreman
7   2 than what you thought applied; is that fair to
8   say?
9   A    No, my understanding that that was a
10  personnel department's policy or whatever.  That's
11  strictly a personnel issue.
12  Q    What did Mr. Campbell think about that?
13  A    I don't -- I don't -- I can't speak for
14  him.  I don't know.
15  Q    Did you ever develop an impression as to
16  whether he agreed with Mr. Cannon that -- well,
17  strike that.
18       Did you ever develop an impression as to
19  whether Mr. Campbell agreed with you that
20  Ms. Whitley was qualified to be a foreman 2?
21  A    No, we never discussed it to any extent
22  that I recall.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 53

1   learning more skills quickly on the job; does that
2   happen, too?
3   A    If the person has come into a new
4   position, yes, it would fall under the 90-day
5   period, as well as the evaluations.
6   Q    And you would assume that they would be
7   continuing to learn during the 90 days, which would
8   help them in terms of how their evaluation would
9   look after the 90-day period; is that fair?
10  A    Yes.
11  Q    But when I asked you a moment ago, the
12  first thing you mentioned was that Ms. Whitley had
13  the drive to be able to do the job.  What did you
14  mean by that?
15  A    Meaning separating her from the other
16  three foreman 1s, she was the only one interested.
17  She was the only one that tried to do something
18  about it, her trying to advance.
19  Q    But how did you see her having the
20  knowledge of a particular skilled craft that she
21  would need in order to do the job as a foreman 2?
22  That's what I am trying to understand.  How was she

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 54

1  going to get that knowledge or did she already have
2  that knowledge?
3      A    She, if I remember correctly, kind of
4  worked along with -- got some tips from the other
5  crafts during this process.
6      Q    While she was taking trainings?
7      A    Right.
8      Q    When she took the trainings, the trainings
9  she was taking were all classes where she would have
10 been with people from the skilled crafts; correct?
11 That's who takes the trainings; true?
12     A    Well, there is an instructor in the class
13 and that's all he does, basically.
14     Q    And then the classmates would be people
15 from the skilled crafts trying to brush up on their
16 skills and keep them current and that sort of thing;
17 right?
18     A    Yes.  Yes, I -- there were craft personnel
19 in the class she went through, yes.  Yes.
20     Q    And so when you recommended Ms. Whitley
21 for the promotion to foreman 2, you believed that
22 she had the sufficient knowledge of the crafts that

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 61

1      A    Yes.
2      Q    Did you also have occasion to orally
3  recommend her to anyone for foreman 2?
4      A    No, I don't recall talking to anybody
5  specifically about her.  I just wrote the letter.
6          (Deposition Exhibit 47 identified.)
7          BY MR. GOLDSMITH:
8      Q    I'm showing you what's been marked as
9  Exhibit 47.  It also says Whitley 114 down in the
10 lower right, date March 1, 2004.  Is this the letter
11 of recommendation that you wrote for Ms. Whitley?
12     A    Yes.
13     Q    Do you recall if you gave it to
14 Mr. Campbell?
15     A    No, I don't recall.
16     Q    Do you recall who you gave it to?
17     A    Mary.
18     Q    Okay.  So your impression was that she
19 would share it with whoever she wanted to share it
20 with in order to get herself promoted?
21     A    Right.  Like I say -- I may have given it
22 to somebody.  I don't recall, you know, but I

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 62

1  definitely know I gave her one.
2      Q    I'm sure you did.
3      A    Yes.
4      Q    All right.  And did you write it around
5  March 1st, 2004?
6      A    Yes.
7      Q    And do you recall what prompted you to
8  write it?
9      A    I thought she would have been able to
10 handle the position of foreman 2.
11     Q    Did you volunteer to her that you wanted
12 to write her a letter or did she ask you to write
13 her a letter or did some other manager show an
14 interest in her and wanted to know what you thought
15 of her, what --
16     A    I don't recall.
17     Q    You don't remember?  It could be anything?
18     A    Yes.
19     Q    Now, you mentioned that you felt she was
20 capable of transforming into the foreman 2 ranks,
21 which you have testified about really already today.
22 Is there anything that you can tell me about that

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 63

1  that you haven't already told me as to how and why
2  you believe that?
3      A    No.
4      Q    In the second paragraph, you start with --
5  it says, "With transitional support and training
6  through the mechanical department and her own
7  diligent attitude to advance within the
8  organization, I believe along with her safety
9  background and the backbone she has, which is most
10 desperately needed in the foreman 2 ranks, she would
11 have no problem fulfilling the needs in this
12 department as a foreman 2."  Do you know what you
13 had in mind as far as transitional support and
14 training?
15     A    Meaning her transition from foreman 1 into
16 the foreman 2 ranks.
17     Q    Is there any specific support -- things
18 that she would need support on that are part of the
19 job of being a foreman 2 that you might have had in
20 mind at that time?
21     A    No, nothing specifically, just the overall
22 picture.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 64

1  Q  Just the fact that it is a new job and you
2  have to adjust to a new job because it is new
3  duties, not any particular specific skill or
4  knowledge that you felt she didn't have?
5  A  No, everything -- every aspect of the
6  foreman 2's job, that's where I believe I was coming
7  from, and that would have been for anybody.
8  Q  What did you mean when you said that
9  her -- basically, that -- I'll paraphrase -- you
10 tell me if I have got it wrong -- but someone like
11 her was desperately needed in the foreman 2 ranks,
12 what did you mean by that?
13 A  For one, she doesn't take any crap off of
14 anybody.
15 Q  Why is that important?
16 A  Because we need supervisors that's going
17 to be strong-minded and capable of getting the
18 job -- the job done, making sure the employees are
19 working safe and she had that ability.
20 Q  Are you saying -- you mentioned she has a
21 diligent attitude to advance.  Do you have any
22 recollection of any managers above your rank at

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 65

1  Amtrak coming back to you after you wrote this
2  letter and asking you any questions about it?
3  A  No.
4  Q  It didn't happen?
5  A  No.
6  Q  What was particularly good about her
7  safety background?
8  A  Well, she was in the safety department at
9  one point of her career for an extended period.
10 Q  Had she shown great interest in safety,
11 also, in working for you as a foreman 1?
12 A  Yes.
13 Q  And did she show great diligence in doing
14 her job as a foreman 1, as well as showing diligence
15 about trying to advance?
16 A  Yes.
17 Q  I have heard the phrase, as I have gotten
18 involved in this case involving Amtrak, I have heard
19 the phrase "railroading" and "railroading
20 experience."  How important is railroading
21 experience to being a foreman 2?
22 A  I hear the phrase, too, but railroading,

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 66

1  basically, is getting the job done in a pinch.
2      Q    How much of an advantage, if at all, would
3  it be for someone who had already worked for the
4  railroad for many years in attempting to transition
5  into being a foreman 2 as opposed to someone coming
6  from a different line of work where they didn't work
7  in railroads?
8      A    It would be smoother for the employee
9  already working for Amtrak.
10     Q    Can you give me an example of -- do you
11 remember any particular instances where someone came
12 in from the outside and had a significant adjustment
13 to make that you don't think they would have had to
14 make if they had already worked for a railroad?
15     A    No.
16     Q    But it is your general impression that
17 that's the case; is that what you are saying?
18     A    It is easier for the employee that's
19 already on board.
20     Q    I mean in your area, as far as fixing cars
21 goes, how similar is the work of someone who, let's
22 say, fixes airplanes?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 67

1      A    I don't know.
2      Q    It is not obvious to you one way or the
3  other that it is very similar or very different, you
4  just would need to know more about airplanes in
5  order to do that?
6      A    No.
7      Q    You don't know?
8      A    No.  No.
9      Q    What about would the same be true if I
10 asked you about someone who was fixing ships?  Is
11 that any clearer to you how analogous that is or is
12 not to fixing rail cars?
13     A    I couldn't say.  I don't -- I never worked
14 on airplanes or ships so I don't know.
15     Q    We know at a minimum -- I'm sorry.
16     A    Having mechanical background.  I don't
17 know.
18     Q    We know at a minimum that the experience
19 of fixing airplanes or ships doesn't teach one the
20 particulars of what you would have to do in an
21 Amtrak car; true?
22     A    Yes.  On the outside looking in, I would

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 68

1  have to say it is different.
2      Q    Let me ask you this, also:  In terms of
3  becoming a foreman 2, how important is it that a
4  person who is going to assume that job already have
5  experience working as a supervisor, supervising
6  other people, wherever, in whatever kind of work?
7  Is that important?
8      A    Yes, it is important having the experience
9  to supervise people.
10     Q    Why?
11     A    If you didn't have the experience, it
12 would be that much more difficult to accomplish that
13 task.
14     Q    Have you ever run across anyone in working
15 in a skilled craft who was fantastic at fixing
16 things but wouldn't necessarily have a great
17 aptitude for directing other people or managing them
18 or dealing with their problems?
19     A    Yes.
20     Q    Is that a fairly common -- are there a lot
21 of people like that in the world in your experience?
22     A    I ran across a few, yes.

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 69

1      Q    So those are really -- when we are talking
2  about the foreman 2, you need to understand the
3  physical work but you also need to understand how to
4  manage the people; right?
5      A    Yes.
6      Q    And did you feel that Ms. Whitley had both
7  those attributes?
8      A    Yes.
9      Q    Did you ever have an opportunity to
10 discuss the possibility of Ms. Whitley becoming a
11 foreman 2 with Mr. Kapela?
12     A    No.
13     Q    Did you have much opportunity to interact
14 with Mr. Kapela in your job on a day-to-day basis?
15     A    I have opportunities, yes.
16     Q    Have you ever discussed anything about
17 Ms. Whitley with him?
18     A    No.
19     Q    Have you ever heard Mr. Truitt say
20 anything on the subject of promoting Ms. Whitley?
21     A    No.
22     Q    What about Mr. Ice?

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 70

1   A   No.
2   Q   What about Mr. Frank?
3   A   No.
4   Q   There was an incident involving tagging a
5   shampoo wand. Do you know what I am talking about?
6   A   Yes.
7   Q   What was that all about? Tell me what
8   happened, if you could.
9   A   Basically, something -- an inspection was
10  made and it was found that something was wrong with
11  the shampoo machine on the platform and none of the
12  supervisors on neither shift corrected the problem
13  or made sure that there was a working wand or
14  shampooer down on the floor.
15  Q   And who noticed the problem?
16  A   I believe -- I would -- I think it was
17  Mr. Campbell.
18  Q   And what happened when he noticed it?
19  A   He didn't like it and all the supervisors
20  on all three shifts were written up.
21  Q   Was Ms. Whitley one of the people who was
22  written up?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 73

1   A   Right.
2   Q   Do you know if all of the supervisors who
3   were written up got the same penalty or punishment
4   for this as each other? Was it all the same?
5   A   I'm not sure. Somebody may have been on
6   vacation or just happened to luck out on that. I
7   don't know. I don't recall wherever anybody
8   received any less discipline or not or more.
9   Q   Was that the first time that anyone
10  brought to your attention that there was a shampoo
11  wand in disrepair or had that happened before?
12  A   No, that's not the first time, no.
13  Q   Was it the first time that supervisors
14  were disciplined for it?
15  A   I'm not -- I'm not sure of that.
16  Q   So it might be the first time and it might
17  not be? It could go either way?
18  A   Could go either way.
19  Q   It is not something that necessarily every
20  time it happens automatically everybody would be
21  disciplined for it; is that fair to say?
22  A   It would all depend upon the -- it would

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 74

1   all depend on the -- of the evidence.
2       Q    But it wasn't -- I mean did you, yourself,
3   know that there was a wand that was not tagged for
4   repair when it should have been?
5       A    No, I didn't.
6       Q    If you had discovered it yourself as
7   opposed to Mr. Campbell's having discovered it,
8   would you have disciplined all the supervisors or
9   would you have just fixed the wand?
10      A    I couldn't say what I would have done.
11      Q    You are not certain?
12      A    No, I'm not certain.
13      Q    Do you remember anything about what
14  Mr. Campbell told you, what he said to you when he
15  discovered the wand?
16      A    No.
17      Q    Did any other managers above your rank
18  have anything to do with that whole incident, as far
19  as you know, involving the wand and disciplining
20  Ms. Whitley?
21      A    As far as I know, no.
22      Q    Do you recall what the punishment was for

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

---

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 75

1   Ms. Whitley from that?
2       A    No, I don't remember.
3       Q    Did anyone ever tell you that Ms. Whitley
4   would be ineligible for promotion because of the
5   shampoo wand incident?
6       A    No one told me that, no.
7       Q    Would it surprise you if someone told you
8   that?
9       A    Yes.
10      Q    Why would it surprise you?
11      A    No particular reason, it just would
12  surprise me.  A lot would all depend on the severity
13  of whatever discipline was given.
14      Q    Bear with me one minute.  I'm sorry.
15           (Pause.)
16           MR. GOLDSMITH:  Why don't we take a
17  five-minute break and we can all stretch our legs
18  and I can find the document I need.
19           MR. McCOY:  Sure.
20           (Recess.)
21           (Deposition Exhibit 48 identified.)
22           BY MR. GOLDSMITH:

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 78

1   oh, yes it does.  It says, "formal reprimand," down
2   here.  Okay.
3       A    Yes.
4       Q    Now, do you recall the circumstances under
5   which -- do you recall a meeting at your office
6   regarding this, the resolution of this charge
7   against Ms. Whitley?
8       A    That would have been the intent.
9       Q    With the intent, number 48?
10      A    Yes.
11      Q    Tell me about that.  What happened there?
12      A    Well, it discussed the charges, discussed
13  the specifications, and then I would have offered
14  the waiver, and then the employee would have
15  discussed with their union representation whether to
16  take it or not or go to a formal hearing.
17      Q    Was Mr. Campbell present there then, too?
18      A    No.
19      Q    Do you remember being present for any
20  conversations between Ms. Campbell and Ms. Whitley
21  about these charges or the waiver or the proposed
22  reprimand?

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 79

1       A    I don't recall any.
2       Q    Is it possible that you were present but
3   you are just not remembering it?
4       A    It would be unlikely.
5       Q    All right.  So during the meeting, was
6   anything said about Ms. Whitley's prospects for
7   promotion being related to this proposed waiver?
8       A    No, that wasn't -- no.
9       Q    Did you understand that it had anything to
10  do with her prospects for promotion?
11      A    No.
12      Q    All right.  Have you ever had occasion to
13  propose a formal reprimand against a supervisor for
14  this same conduct or conduct that you would consider
15  to be real similar in the past?
16      A    Have I?
17      Q    Yes.
18      A    Yes.  Yes.  Yes.
19      Q    What would be some conduct that's been
20  similar that you have given a reprimand for or
21  proposed a reprimand for?
22      A    I can't think of one right off -- right

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 80

1   offhand.
2       Q   Is there anything you can think of that
3   might refresh your recollection about that?
4       A   No.
5       Q   Do you remember what happened to the other
6   supervisors who were supposedly also viewed as
7   potentially responsible for the wand being in
8   disrepair in April of 2004?
9       A   I don't remember exactly how -- if Mary
10  got this discipline, most likely they got the same.
11      Q   But you don't remember specifically?
12      A   No, I don't remember specifically.
13      Q   And you don't remember -- do you know if
14  there was ever a formal hearing or anything for an
15  employee who didn't sign a waiver in this incident?
16      A   No, I don't recall that.  If that
17  happened, they weren't on my shift.
18      Q   Do you remember any other waivers related
19  to this incident?
20      A   If Mary got -- was offered a waiver, I'm
21  sure the rest of the foremen were, too.
22      Q   Do you think they would have accepted it

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 96

1   or do you think they treated her unfairly?
2       A   I couldn't say.
3       Q   Does fixing HVAC equipment equate to
4   fixing train cars in your mind?  Is that the same
5   kind of work?
6       A   Heating and air-conditioning units?
7       Q   Uh-huh.
8       A   Yeah, electrician technician.
9       Q   It is related?
10      A   Yes.
11      Q   I'm going to mark this next exhibit
12  here -- oh.  I'm sorry.  It is already marked.  It
13  is number 30.  If you could, take a look in the book
14  at number 30.  Exhibit 30 is an employment
15  application of a gentleman named Rodney Wilson.  I
16  think I asked you about him and you said you didn't
17  know who he was?
18      A   I don't remember him, no.
19      Q   But I would like to ask you a couple of
20  questions based on your experience as a foreman 2,
21  foreman 3, general foreman.  If you take a look at
22  the lower right-hand corner, you can see there is a

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

9c2ce784-ba10-42e9-b372-618b82489eb9

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 97

1  bunch of page numbers on these.  If you take a look
2  at page 1926, 1926 shows you the experience that
3  Mr. Wilson presented on his application.  It says
4  that he was an assistant chief engineer at a place
5  called PM Realty Group, then he worked at Harrison
6  House -- before that he worked at Harrison House of
7  Georgetown and before that he fixed all major air
8  equipment, air-conditioning equipment, chillers,
9  et cetera, generators.  Can you, from looking at
10  this, and from the prior page, was Mr. Wilson better
11  qualified to be a foreman 2 than Ms. Whitley?
12      A    Just that he has mechanical background
13  experience.
14      Q    Does it show anywhere that he supervised
15  anybody?
16      A    The assistant chief engineer, I don't know
17  what the duties entail.  Yes, maybe number -- number
18  1, maybe number 1.
19      Q    Maybe number 1 shows some supervisory
20  experience?
21      A    Yes.
22      Q    It may and it may not, right, because it

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 98

1  doesn't actually say he supervised anyone, it just
2  says he has a title of assistant chief engineer;
3  correct?
4      A    Yeah.  Maybe, maybe not.
5      Q    Maybe, maybe not he was a supervisor.
6  Uh-huh.
7           Does his application show that
8  Mr. Harrison ever worked on trains?
9      A    No.
10      Q    Does it show that he has air brake
11  certification?
12      A    No.
13      Q    Does it show that he knows anything about
14  locomotives?
15      A    No.
16      Q    Does it show that he knows anything about
17  how to operate the Amtrak -- I believe the acronym
18  is SMS system?
19      A    No.
20      Q    WMSS?
21      A    Right.  No.
22      Q    And it is not clear from this that he ever

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 98

1  doesn't actually say he supervised anyone, it just
2  says he has a title of assistant chief engineer;
3  correct?
4      A    Yeah.  Maybe, maybe not.
5      Q    Maybe, maybe not he was a supervisor.
6  Uh-huh.
7           Does his application show that
8  Mr. Harrison ever worked on trains?
9      A    No.
10     Q    Does it show that he has air brake
11 certification?
12     A    No.
13     Q    Does it show that he knows anything about
14 locomotives?
15     A    No.
16     Q    Does it show that he knows anything about
17 how to operate the Amtrak -- I believe the acronym
18 is SMS system?
19     A    No.
20     Q    WMSS?
21     A    Right.  No.
22     Q    And it is not clear from this that he ever

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 99

1  supervised anyone; right?  He might have but it is
2  not clear?
3      A    Not clear.
4      Q    So from looking at his application, does
5  it appear that he was as well qualified to be a
6  foreman 2 as Ms. Whitley in your mind?
7      A    No.
8      Q    Did you ever hear any information to the
9  effect that Mr. Campbell wanted to fire Ms. Whitley,
10 that he wanted her job, or something like that?
11     A    Not that I could recall, no.
12     Q    Have you ever been married to someone who
13 was working at Amtrak?
14     A    Yes.
15     Q    Was there ever any sort of a proceeding or
16 hearing involving a problem where some people were
17 insulting your wife?
18     A    Yes.
19     Q    Was Ms. Whitley a witness to that or was
20 she a witness in the proceeding for some reason?
21     A    Oh, yes.  Yes.
22     Q    Were you also a witness in it --

Garry Louers - February 6, 2007
Daivd B. Stevens et al., v. National Railroad Passenger Corporation

Page 99

1   supervised anyone; right?  He might have but it is
2   not clear?
3       A   Not clear.
4       Q   So from looking at his application, does
5   it appear that he was as well qualified to be a
6   foreman 2 as Ms. Whitley in your mind?
7       A   No.
8       Q   Did you ever hear any information to the
9   effect that Mr. Campbell wanted to fire Ms. Whitley,
10  that he wanted her job, or something like that?
11      A   Not that I could recall, no.
12      Q   Have you ever been married to someone who
13  was working at Amtrak?
14      A   Yes.
15      Q   Was there ever any sort of a proceeding or
16  hearing involving a problem where some people were
17  insulting your wife?
18      A   Yes.
19      Q   Was Ms. Whitley a witness to that or was
20  she a witness in the proceeding for some reason?
21      A   Oh, yes.  Yes.
22      Q   Were you also a witness in it --