# Transcript of the Testimony of **Ronald M. Truitt**

**Date:** February 20, 2007
**Volume:** 1

**Case:** David B. Stevens, et al., v. National Railroad Passenger Corporation

Printed On: 5/4/2007



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

---

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 16

1    Q    Those are two different things, right?
2    A    Yes.  Labor Relations gets a copy.
3    Q    And you're saying that generally the
4  general foremen would send it to them?
5    A    The general foremen are the charging
6  officers.
7    Q    And the general foremen would act under
8  the supervision of the assistant superintendent,
9  right?
10   A    Yes.  Yes.
11   Q    So would it be fair to say that that could
12 almost be interchangeable, as to why might send a
13 copy to Labor Relations, between a general foremen
14 and an assistant superintendent?
15   A    Usually it was a set policy.  When charges
16 went against an employee, a copy went to the union, a
17 copy went to labor relations, a copy went into the
18 employees file.  Even if it was a warning, verbal
19 warning, a written warning, and then the first couple
20 steps of the way Labor Relations has it laid out as
21 far as discipline.
22   Q    Would there be anything that would prevent

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 17

1  a general foremen or an assistant superintendent from
2  not sending copies to any of those entities if they
3  had taken discipline?
4      A    Not that I'm aware of.
5      Q    So they could do that, theoretically.
6      A    Not that I'm aware of.
7      Q    Well, would it be impossible for them to
8  do that?
9      A    Can't answer that.  You're asking me to
10 give you an answer to a question that I can't answer.
11     Q    Why can't you answer?
12     A    You're making me guess that that's
13 possible.  I could guess and say yes; Yes.
14     Q    And by guess --?
15     A    That would be an assumption.  That's
16 exactly what it would be, an assumption they
17 wouldn't.
18     Q    I'm not asking you now about any
19 particular scenario; I'm just asking you whether from
20 your knowledge as superintendent, your involvement in
21 the system, whether there would be anything that
22 would preclude someone who wanted to from say giving

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 23

1  you this way:
2          What role did Mr. Kapela play in deciding
3  who would become a Foreman II?
4      A    I don't know that.  I can't answer.
5      Q    Why not?
6      A    Because I don't think he had a role.
7      Q    What about yourself.  Did you have a role?
8      A    No.  That was at the Assistant
9  Superintendent level.
10     Q    So that would have been -- I may not get
11 all the names; but Mr. Campbell, Mr. Ice, Mr. Frank -
12 - am I forgetting anybody who was an assistant
13 superintendent during your time?
14     A    That was it.
15     Q    So what was your understanding of that
16 process, what the role of the assistant
17 superintendents would be in selecting Foreman II?
18     A    I think the process was -- I believe, I
19 believe a general foreman did the interviews.  And
20 then the general foreman came back and sat down with
21 the assistant superintendents.
22     Q    I'm sorry, they did what the assistant

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 24

1  superintendents?
2      A      They sat down --
3      Q      Sat down with them?
4      A      With the assistant superintendents, yes.
5      Q      Do you think they all sat down together,
6  or that it might just be one or two assistants at any
7  given time?
8      A      I don't know.
9      Q      And then it was the case, wasn't it, that
10 paperwork would be generated, and you actually signed
11 off on those, right?
12     A      I actually put the paperwork together,
13 then I sent it to -- it was generated from my office
14 and then sent to Mr. Kapela for signature.  If he
15 wasn't available, I signed.
16     Q      So let's take a look at one or two of
17 these just to -- take a look at Exhibit 30.
18            (Document shown to witness.)
19            Exhibit 30 contains the personnel files of
20 Mr. Wilson.  And I believe there's a personnel action
21 in here.
22            Take a look at page 1928, if you look at

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

---

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 30

1  Because usually what it is, this is after a person's
2  been hired, and that's why -- this is once a person
3  gets hired.  My signature goes on here, and this goes
4  straight -- this does not go to the chief mechanical
5  office, this goes right to HR.
6      Q      Was that the norm for a document?  I'm
7  looking at a number --?
8      A      All this is is to get the payroll correct,
9  and this is all for payroll.  I had to look at that
10 form a little closer.
11     Q      All right.  Let me ask you, in the context
12 of the actual selection of someone to be a Foreman
13 II, would you ever see any paperwork identifying who
14 was selected to be a Foreman II?
15     A      No.
16     Q      Do you know why not?
17     A      From my office, that would be too many
18 employees.  I was averaging 55 vacancies a year.
19     Q      So there were so many vacancies that it
20 would -- fill it in.  So many vacancies, therefore?
21     A      If that was the case, there was constant
22 interviews just about every month of employees.

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 36

1  any given point?
2      A    Yes.
3      Q    And it tells you which rez centers it's
4  related to, and everybody that way knows how many
5  openings there are.  Is that fair to say?
6      A    Yes.
7      Q    You testified that there was a lot of --
8  I'll use the word churning -- that there were a lot
9  of people coming and going, new people being hired
10 and a need for people to be hired, when you were
11 superintendent.
12     A    Uh-huh.
13     Q    Would you say that it was easy or
14 difficult to fill Foreman II positions?
15     A    It was probably not hard, but not easy; it
16 was in between.
17          It was harder for me to hire an
18 electrician.  If you ask me, was it hard to hire an
19 electrician?  Absolutely correct.
20     Q    Very hard.
21     A    Very hard.
22     Q    Foreman II less so.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

---

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 38

1  mean?
2      A    Yes.
3      Q    Anything else?
4      A    That's about the main.
5      Q    Were there particular certificates that
6  Foremen II had to have in order to serve?
7      A    Yes.
8      Q    Was it easy to find people who had those?
9      A    If we hire from outside, they wouldn't
10 have them, of course; but if we hired them from the
11 inside, they may not have them, either.
12     Q    So you would hire people -- you would hire
13 people who didn't necessarily have them even though
14 they were required?
15     A    Yes.
16     Q    And whose decision was it to do that?
17     A    They wouldn't have them; that's an in-
18 house certification.  It's recommended by the federal
19 government, FRA requires on the 238, 109 and 107
20 certain programs, and certifications that an
21 employee, a QMP must have.  And anybody supervising,
22 since we're talking supervisors, must have.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 39

1  Q  So I believe it was your testimony that
2  some people would be hired to be Foreman II without
3  having those certifications. Is that correct?
4  A  Yes.
5  Q  And who made the decision that individuals
6  who lacked those certifications would be in any case
7  hired?
8  A  Whoever was doing the interview.
9  Q  So do you know if there was some kind of
10 general corporate decision to let that requirement
11 slide, or?
12 A  You wouldn't have that if you hiring from
13 outside. Nor would you have it from the inside if an
14 employee never had gone through the training. You
15 have 90 days to get that once you become a foreman,
16 to get those certifications.
17 Q  And they take tests in order to get them,
18 right?
19 A  That's correct.
20 Q  And the pass rate isn't very high on those
21 tests, isn't that true?
22 A  80 percent.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 52

1  A  Mr. Wilson, I think, was the one you used.
2  Q  So with Mr. Wilson, we looked at 1928,
3  1930, 1932.
4  A  If the general foreman selected Mr.
5  Wilson, for example, in his process, he usually told
6  HR that Mr. Wilson is selected as a foreman. And
7  then HR would say, Hey, we need the form filled out
8  for personnel reasons, payroll. And then that would
9  come to my level, and I'd fill that out -- it would
10 come to the assistant superintendent's level.
11 They're the ones that were to fill it out, with the
12 right coding, correct coding and then it would come
13 to me; and all I did on the bottom line is make sure
14 that 4274 is allocated for one Foreman II, and that's
15 what you've been allocated for, and the paper and the
16 numbers are correct, and I signed them off, and it
17 went back to HR and Payroll.
18 Q  All right. But at the point where the
19 person was selected, let's say you had three
20 candidates at one time, and one person was being
21 selected.
22 A  I can tell you about is the assistant

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 53

1  superintendents and general foremen there's a -- once
2  you filled it out, there is a form just to fill out
3  and say 'I selected Bob Jones.'
4      Q    There was such a form, or was not?
5      A    It was not a form.
6      Q    Was not, okay.
7      A    Was not a form.
8      Q    All right.  So --
9      A    You just looked at all three, say there
10 was three individuals, you looked at all three
11 interview, and the questions; and then what we do is
12 put their application along with the questions all
13 together for HR, and put the top one on the top,
14 would be the one that was selected.
15     Q    So in the case of a general foreman, who
16 would be the individual who'd be responsible for
17 communicating with HR to say "We've now selected Joe
18 Smith for a position"?
19     A    As far as the foreman goes?
20     Q    Yes.  Let's talk about general foreman
21 first.  Who would do that?
22     A    The assistant superintendents.

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 54

1      Q    What about a Foreman II.  Who would tell
2  HR who was selected?
3      A    Usually if -- general foreman.
4      Q    Now let's concentrate on the Foreman II
5  aspect of this for a moment.  You said that your
6  understanding is that normally the general foreman
7  would be responsible for communicating with Human
8  Resources who was selected for a position, is that
9  right?
10     A    Yes.
11     Q    But that would be at the instruction and
12 direction of the assistant superintendent, right?
13     A    Yes.
14     Q    So would you expect that an assistant
15 superintendent might get involved in deciding who
16 would be selected for a Foreman II position?
17     A    Can't answer that.
18     Q    Well, they might be on the panel, true?
19     A    It's possible, yes.
20     Q    And even if they weren't on the panel,
21 there might be discussions.  There's nothing wrong
22 with that, right?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 55

1  A  No.
2  Q  So I guess what I'd like to understand is,
3  if we're talking about Foreman II selection, who's
4  likely to have been involved in the discussion of who
5  to select for a Foreman II position, in your
6  experience?
7  A  General foreman and the assistant
8  superintendent.
9  Q  And why would the assistant superintendent
10 get involved in that?
11 A  You asked if there would be a discussion.
12 Q  Right.
13 A  That's the discussion they'd probably
14 have.
15 Q  Why would that person in that position
16 need to be involved, assistant superintendent?
17 A  Just to let them know how many they chose.
18 I guess it could be, one of the conversations they
19 have is "Hey, I got three candidates.  Are they only
20 choosing two?"  Is one form or discussion they could
21 have had.  Or the assistant superintendents; you
22 know, "Hey, we've got two of them that, they're

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 56

1  pretty close, but we only have one position.  You
2  know, I'm having trouble which one to pick."
3  Q  So the assistant superintendent could play
4  a role in deciding who to pick, correct?
5  A  He could be the tie-breaker.  How about if
6  we use it that way?
7  Q  And in many instances, applicants for
8  Foreman II are persons who are already employed by
9  Amtrak, correct?
10 A  Yes.
11 Q  So would it be, in that instance it would
12 be expected that the assistant superintendent and the
13 general foreman might be familiar with the person
14 already; correct?
15 A  Yes.
16 Q  So they might have opinions about the
17 person, whether they wanted to promote them or not.
18 A  Been known in work habit.
19 Q  Right; they may think this person's a good
20 person to have promoted to Foreman II, they might
21 think another person is not a good person to have
22 promoted to Foreman II.  Correct?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 57

1    A    Yes.
2    Q    And they might discuss that, correct?
3    A    Yes.
4    Q    Now we've talked about the fact that there
5 were three assistant superintendents. Any reason why
6 it would be surprising that more than one of the
7 assistant superintendents might be involved in the
8 discussion of whether to promote someone to a Foreman
9 II?
10    A    Yes.
11    Q    That could happen too, correct?
12    A    Yes.
13    Q    And I fact, I have a mental picture in my
14 mind that some of these people may have offices that
15 may be right next to each other on a wing of the
16 building. Is that fair to say?
17    A    Oh, yes.
18    Q    So it's sort of, from a physical
19 standpoint, it's easy to have conversations about
20 that sort of thing?
21    A    Yes.
22    Q    Did you ever observe, in the course of

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 58

1 doing your work, that any of the assistant
2 superintendents among the three of them tended to
3 take any more interest than the others in the process
4 of deciding who to select for positions?
5    A    No.
6    Q    Would you have reason to doubt that that
7 could be the case?
8    A    No.
9    Q    So it might be, you just didn't observe
10 it. Is that fair to say?
11    A    True.
12    Q    I believe you testified that you do know
13 Ms. Whitley, correct?
14    A    Yes.
15    Q    You've known her for a long time, right?
16    A    Oh, yes.
17    Q    A very long time in this case, right?
18    A    Yes.
19    Q    Do you know her to be a truthful person?
20    A    Yes.
21    Q    What about Mr. Campbell? Is he a truthful
22 person?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 69

1  Mr. Kapela?
2      A    No.
3      Q    If Mr. Campbell were to say that he played
4  no role whatsoever in the promotion to Foreman II
5  process, would that be an untruthful statement by
6  him?
7      A    Restate that question, would you please.
8      Q    Yes.  If Mr. Campbell were to testify that
9  he played absolutely no role in the process of
10 promoting or selecting individuals for Foreman II
11 positions, would that be an untruthful statement by
12 him?
13     A    Yes.
14     Q    You testified that -- well, let me ask
15 this a different way.
16          Was it common for you to have insufficient
17 individuals available to, as Foreman II to avoid
18 having to assign overtime?
19     A    You'll have to rephrase that.
20     Q    Sure, there were a lot of negatives in
21 there.
22          You needed a certain amount of coverage of

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 88

1      A    There was a few of them right before then.
2      Q    So were there several times that you and
3  Mr. Campbell disagreed about something and Mr. Kapela
4  ended up siding with Mr. Campbell on the issue?
5      A    Mr. Kapela didn't always side on
6  Campbell's decision, either.  He decided my side,
7  too, a lot.  So I think he was the referee.
8      Q    Why did you leave the position?
9      A    They hired somebody in my position.
10     Q    Did Mr. Campbell play any role in you
11 leaving the position?
12     A    I can't answer that.
13     Q    Why can't you answer it.
14     A    Because all I can tell you is on the 4
15 o'clock, on a Wednesday afternoon, the chief
16 mechanical officer called me in Mr. Kapela's office
17 and said they had replaced me.  I had done nothing
18 wrong, but they were replacing me.
19     Q    Did you ever observe -- let me ask you
20 this:  When Mr. Campbell went to Mr. Kapela about
21 you, did you feel that the issues that he was raising
22 were things he could have raised directly with you

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 89

1  and resolved it man to man?
2      A    Management to management.
3      Q    Management to management.
4      A    Yes.
5      Q    And did you ever tell Mr. Kapela that you
6  felt that Mr. Campbell was trying to make an end run
7  around yourself?
8      A    I never looked at it that way; I always
9  looked at it -- I never -- I didn't feel for my job,
10 ever.
11     Q    What did you tell Mr. Kapela was your
12 general view of how Mr. Campbell was handling the
13 conflict?
14     A    I just felt that Mr. Campbell -- I told
15 Mr. Kapela an incident that had come, that Mr.
16 Campbell should have brought that back to my
17 attention and not to his attention; should have been
18 stopped at my level, not to his level.
19     Q    What did Mr. Kapela say?
20     A    Trying to remember.  I can't recall
21 exactly what he said.
22     Q    Did you have conflicts similar to what you

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 92

1  assistant superintendents?
2      A    Certainly.
3      Q    Both of them, or one more than the other?
4      A    Both of them.  Mr. Ice went out sick, so
5  he wasn't there that much.
6      Q    Did you observe Mr. Campbell to have major
7  conflict with any of the general foremen?
8      A    Yes.
9      Q    Any in particular that you remember?
10     A    I'm trying to remember -- there's been a
11 few general foremen.  He spoke -- most of the
12 general foremen, he spoke like to them just like he
13 did anybody else.
14     Q    Sounds like the main exception to that was
15 Mr. Kapela; is that fair to say?
16     A    Excuse me?
17     Q    It sounds like the main exception to Mr.
18 Campbell being in conflict with everyone was Mr.
19 Kapela, from what you've told me.  Is that correct?
20     A    Yes.
21     Q    Did you ever observe that Mr. Campbell
22 tried to use his authority to grant or deny positions

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 93

1  to lower level employees, based on his own personal
2  preferences?
3      A    No.
4      Q    Do you know that he didn't do that, or you
5  just don't know?
6      A    I don't know.
7      Q    Would it surprise you if he ever did that?
8      A    No.
9      Q    In your experience, you testified a little
10 bit about the disciplinary process at Amtrak earlier.
11 Is it the case that sometimes investigation hearings
12 are conducted in discipline cases at Amtrak?
13     A    Yes.
14     Q    What's the purpose of an investigation
15 hearing, as far as you know?
16     A    You'll have to clarify that a little bit
17 better, because there's investigations as far as,
18 when an employee comes to trial for missing time --
19 if we use missing time.  First off he gets a verbal
20 then he gets a written warning, then step one he gets
21 days in the street.  Now he can go to trial.  What we
22 mean by that is, there is -- the trial comes in front

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 95

1  what the purpose is is necessarily to fire a person
2  whose termination has been proposed or suggested, or
3  whether the purpose is to find out the truth about
4  what happened.
5      A    It's both.
6      Q    Well, if the truth were that an employee
7  who had been charged with misconduct was not guilty
8  of misconduct, you would expect then that the
9  employee would not be fired, right?
10     A    Right, that's correct.
11     Q    And if they were guilty, then maybe they
12 would.
13     A    Right.
14     Q    Okay.  We talked some about the promotion
15 process, and I want to ask you:  Do you know whether
16 Amtrak had any kind of a policy or practice favoring
17 promotions from within rather than from the outside?
18     A    Well if I used the term favor, and there's
19 a past practice.
20     Q    What was the practice, as best you can
21 describe it?
22     A    Past practice where they hired within or

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 96

1  promoted within. As long as they had the adequate
2  candidates.
3      Q    Would it surprise you if a Foreman II from
4  outside Amtrak was selected without having gone
5  through and interview?
6      A    No.
7      Q    That wouldn't surprise you?
8      A    Yes, it would -- excuse me, yes.
9      Q    It would surprise you --
10     A    Yes, but he wouldn't --
11     Q    -- because the process is they're supposed
12 to have an interview, right?
13     A    They have to have a --
14     Q    Why do they have to have an interview.
15     A    They go through HR.
16     Q    Why do they have to have an interview?
17     A    That's been the process.
18     Q    It's always been that way, as far as you
19 know, right?
20     A    Yes. Yes.
21          There are steps that HR takes; there's
22 background checks, everything else on that -- if

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 97

1  we're talking outside candidate. So HR would bring
2  them in, they'd do background checks on that person
3  first before they would even be considered to be in
4  the interview process.
5      Q    Going back to your earlier testimony about
6  the selection process, I believe you testified that
7  you wouldn't see a person's application for Foreman
8  II; that that would be settled at the assistant
9  superintendent's level. Is that right?
10     A    General foreman, assistant super.
11     Q    So your testimony then would be that you
12 wouldn't have an opportunity to stop it if somebody
13 tried to sneak someone through without interviewing
14 them, is that right?
15     A    I wouldn't stand for that. If I was aware
16 of it, I wouldn't stand for it.
17     Q    But it could have happened without you
18 being aware of it, true? Because you wouldn't have
19 looked at the file.
20     A    True.
21     Q    I'm not trying to tell you it did happen
22 or it didn't, but I'm just saying that theoretically

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 98

1  if someone tried to do that, you wouldn't necessarily
2  know that it had been done, because you don't look at
3  the person's application.
4      A    Yes, that's correct.
5      Q    But it would be the job of the assistant
6  superintendent and/or general foreman to do that?
7      A    Yes.
8      Q    Did you ever observe -- are you familiar
9  with -- I'm sorry, I asked you that already.  Did you
10 ever observe any interactions between B.L. Campbell
11 and anybody in Personnel?
12     A    You mean HR.
13     Q    Yes, HR.
14     A    Please rephrase that question.
15     Q    Did you ever have occasion to be present
16 when Mr. Campbell was talking with anyone from HR, to
17 be on the phone when he was talking to someone from
18 HR?
19     A    I think he was present more with the
20 hearing officer -- I'd walk in on the Human
21 Resources; not HR, but Labor Relations, I had been in
22 the room with Labor Relations when there's been a

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 99

1  decision coming down to overturn things, and
2  sometimes he would call me in the office.
3      Q    Do you have any reason to think that Mr.
4  Campbell would be any less opinionated in his
5  dealings with Sarah Ray or Taylor than he was in his
6  dealings with you?
7      A    I can't honestly answer that.
8      Q    Why can't you answer it?
9      A    It being an opinion, I wouldn't know if it
10 would be true or not.
11     Q    Right.  But from your observation of his
12 personality, it sounds like other than -- tell me if
13 I'm wrong.  It sounds like, from what you've said,
14 other than Mr. Kapela, everybody else received a
15 pretty sharp treatment from -- that's not the right
16 word.  ?
17     A    Uncensored.
18     Q    Uncensored treatment from Mr. Campbell.
19 Is that right?
20     A    Yes.
21     Q    So I guess I'm trying to figure out
22 whether you think the Personnel people, the HR people

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 100

1  would have been in the Kapela category of people who
2  he seemed to be more deferential toward, or the
3  everyone else category.
4      A    With Sarah Ray he, just because knowing
5  Sarah Ray as long as we have, I think he wouldn't
6  pull it all out, but he'd pull part of it out, yes.
7      Q    Part of the -- part of the --
8      A    Uncensored.
9      Q    And so the same would likely be true with
10 someone like Taylor Cannon, who was a subordinate of
11 Sarah Ray, if I understand it correctly.
12     A    Taylor hadn't been around Washington that
13 long; but - yes.
14     Q    Let me have you take a look at Exhibit 17.
15 Exhibit 17 is a rejection letter for a Foreman II
16 promotion to Ms. Whitley signed by Taylor Cannon, and
17 it says "Other candidates whose background and
18 experience more closely meet the needs of the
19 department have been selected."
20          Can you tell me, based on your experience
21 as superintendent, how would Mr. Cannon have
22 developed that information?  How would he know that

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 101

1  to be the case?
2      A    Can't answer that.  I don't know where he
3  got his information at.
4      Q    Would he have gotten information at least
5  from somewhere in the Mechanical Department in order
6  to determine that?
7      A    Sure.  Yes.
8      Q    And since it's a Foreman II position, it
9  would have been either at the general foreman or
10 assistant superintendent level, that he probably
11 would have gotten it, correct?
12     A    Or her file.
13     Q    Or her file.  Meaning -- okay.
14     A    Personnel file.
15          That's usually what we do when a candidate
16 puts a position; you pull the personnel file, to see
17 what's in the personnel file.  And usually what rules
18 somebody out right away in any position of promotion
19 is absenteeism.
20     Q    Uh-huh.
21     A    With high absenteeism, they're usually
22 pulled from the interview process.

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 102

1  Q    Well, in the instance of -- let's take a
2  look at -- in the instance of someone who has been
3  interviewed, then the selection information would
4  have to have come from the mechanical department
5  somewhere, over to Human Resources.  Right?
6  A    Repeat that, please.
7  Q    Sure.  If Ms. Whitley had been
8  interviewed, then it wouldn't just be from the file
9  that Mr. Cannon would know whether or not she was
10 selected; it would have to be information that she
11 got from Mechanical.
12 A    It would be both.  It would be both.
13 Q    How important is supervisory experience to
14 functioning as a Foreman II?
15 A    How important is it?
16 Q    Yes.
17 A    Very.
18 Q    Would someone who had supervisory
19 experience have an edge on someone who -- in that
20 area, over someone who didn't have supervisory
21 experience?
22 A    Yes and no.  B) is of course when you have

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

---

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 103

1  a mechanic that knows the equipment, may be a male or
2  female.  If they know the equipment and know the
3  operation, they may not have the supervision
4  experience, but they know the knowledge of the
5  equipment plays a bigger role than on the supervision
6  part of it.
7  Q    But supervision in itself is also
8  important to handling of people, correct?
9  A    Leadership is what the key word that we
10 look for; leadership, not supervision sometimes, but
11 the leadership.
12 Q    And if someone's demonstrated that in the
13 past, would that help them in their application?
14 A    Yes.
15 Q    And if someone didn't have that on their
16 resume, would that be a negative draw on their
17 application?
18 A    I wouldn't use a phrase 'negative'.
19 Q    Just the absence of a positive, correct?
20 A    Correct.
21 Q    What about railroading experience?  How
22 much does it help someone if they've worked for

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 104

1  Amtrak or in railroads before when they want to be a
2  Foreman II?
3       A    It helps.
4       Q    Why does it help?
5       A    Knowing knowledge of the, some of the
6  equipment.
7       Q    That was what you were talking about a
8  moment ago when you talked about knowledge of the
9  equipment?
10      A    Yes.
11      Q    Did Mr. Campbell ever indicate to you that
12 he wanted to give Ms. Whitley a shot as a Foreman II?
13      A    No.
14      Q    Did he ever indicate to you that he did
15 not want to promote her to Foreman II?
16      A    No.
17      Q    Did Mr. Kapela ever indicate to you that
18 he wanted to give Ms. Whitley a shot as a Foreman II?
19      A    No.
20      Q    Did he ever indicate to you that Mr.
21 Campbell said that Mr. Campbell wanted to give her a
22 shot as a Foreman II?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 105

1       A    Nope.
2       Q    Did you ever hear the inverse of any of
3  those?
4       A    Nope.
5       Q    Do you know anything about whether Ms.
6  Whitley does or does not have any kind of
7  disciplinary record?
8       A    Do I know if she does or doesn't?  No.
9       Q    Did Mr. Campbell ever discuss any sort of
10 disciplinary issues about Ms. Whitley with you?
11      A    No.
12      Q    Did Mr. Kapela ever do that?
13      A    No.
14      Q    Did Mr. Campbell ever indicate anything to
15 you about Ms. Whitley's attendance?
16      A    No.
17      Q    Did Mr. Kapela?
18      A    No.
19      Q    Have you ever had occasion to be involved
20 in a disciplinary investigation hearing like the ones
21 we were talking about a few moments ago, with the
22 third party hearing officer and so on?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 117

1  that it has to be --.
2           BY MR. GOLDSMITH:
3      Q    Are you familiar with somebody named Andy
4  McCallum?
5      A    Yes.
6      Q    Who is Andy McCallum?
7      A    I'm trying to think what his title is;
8  bear with me for a minute.  He's a -- I believe he
9  was an attorney for Amtrak.
10     Q    And have you ever spoken to him about any
11 particular complaints that have been made about the
12 Mechanical Department?
13     A    I've been involved with Andy with some.
14     Q    Were any of those complaints against Mr.
15 Campbell?
16     A    I don't know if they were directly at Mr.
17 Campbell, but yes.
18     Q    They at least involved Mr. Campbell in
19 some way?
20     A    Yes.
21     Q    Were you ever asked by Mr. McCallum about
22 any incident in which Mr. Campbell was alleged to

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 118

1  have threatened somebody?
2      A    Did I ask?  No.
3      Q    But did Mr. McCallum ever ask you about
4  that?
5      A    No.
6      Q    Did someone else ever ask you about Mr.
7  Campbell threatening anybody?
8      A    Yes.
9      Q    Who asked you about that?
10     A    It wasn't asked, it was stated.
11     Q    Who stated it.
12     A    I believe the employees were high speed
13 rail employees.
14     Q    They came to you and said --?
15     A    They didn't come -- they didn't approach
16 me; it was brought up to their assistant
17 superintendent at the time that Mr. Campbell was
18 abrupt with them.
19     Q    That he threatened somebody?
20     A    I don't know if the word is threat; I
21 would say abrupt.
22     Q    What do you remember speaking to Mr.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
570068b6-8a68-48d2-9d42-60f63b522fc7

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 119

1  McCallum or anybody from DRO or Diversity, about Mr.
2  Campbell?
3    A    Trying to remember.  At this time I can't
4  remember.
5    Q    You just know that his name has come up
6  and they've come to you and asked you things.
7    A    Yes.
8    Q    I think you testified earlier, on multiple
9  occasions.
10   A    Yes.
11   Q    I believe you testified that you don't
12 know Mr. Stevens.  Are you familiar with his name,
13 prior to this --
14   A    Prior to today?
15   Q    -- this case and today?
16   A    I want to say No.  I mean, there's -- I
17 know some Stevens.  I don't know if it's that
18 gentleman.
19   Q    Do you have any reason to -- is it
20 possible that someone may have questioned you about
21 an internal complaint that Mr. Stevens may have made
22 about Mr. Campbell?

Ronald M. Truitt - February 20, 2007
David B. Stevens, et al., v. National Railroad Passenger Corporation

Page 120

1    A    No.
2    Q    You don't think that happened?  Or you
3  don't know.
4    A    I don't recall; I don't recall.
5    Q    So you wouldn't deny that it could have
6  happened; you just don't remember it if it did.
7    A    Yes.
8    Q    I think I'm just about done.  Give me a
9  minute.
10        (Recess.)
11        BY MR. GOLDSMITH:
12   Q    Mr. Truitt, do you know if -- would you
13 know if Ms. Whitley ever came to you to talk about
14 some aspect of her aspirations to be promoted to
15 Foreman II?
16   A    I think I do recall that, yes.
17   Q    And do you recall -- ?
18   A    I can tell you what I told her.
19   Q    Yes, what did you tell her?
20   A    I told her she needed to get some
21 training.
22   Q    Do you know if she got the training?