# Transcript of the Testimony of **Michael Kapela**

**Date:** February 12, 2007
**Volume:**

**Case:** David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack')

Printed On: 5/4/2007



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com
Internet: www.acefederal.com

---

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack')

Page 6

1  A    I reside in Wilmington, Delaware.

2  Q    Are you employed by Amtrak?

3  A    Yes, I am.

4  Q    For approximately how long have you been

5  employed by Amtrak?

6  A    31 years.

7  Q    And where is your duty station?

8  A    Washington, D.C.

9  Q    For how long have you been working in

10 Washington, D.C.?

11 A    I've worked in Washington from 1997 until

12 2000, and then I went on staff and I've been in

13 Washington since 2003.

14 Q    What's your present job title?

15 A    Master mechanic, mid-Atlantic division.

16 Q    How long have you had that title?

17 A    Since 2003.

18 Q    As master mechanic, mid-Atlantic

19 division -- let me ask you this.  Who is your

20 immediate supervisor?

21 A    Deputy Chief Mechanical Officer MaryAnne

22 Bergeron.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 7

1    Q    Where is her duty station?

2    A    It's a he.  He is in Wilmington, Delaware.

3    Q    He, I'm sorry.  With regard to mechanical

4 operations in Washington, D.C., are you the -- would

5 it be fair to say that you're the leader of the

6 mechanical department?

7    A    For the mid-Atlantic division, yes.

8    Q    Approximately how many Amtrak employees

9 work underneath your chain of command?

10    A    700.

11    Q    And in 2004 approximately how many would

12 there have been?

13    A    700.

14    Q    Has that remained more or less constant

15 since 2004?

16    A    Yes.

17    Q    Are you familiar with a gentleman named

18 Ron Truitt?

19    A    Yes, he was my superintendent.

20    Q    Does Mr. Truitt still work for Amtrak?

21    A    Yes, he does.

22    Q    Is he still your superintendent?

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 15

1 getting ready to retire in the next five years.  I

2 can tell you the upper staff chose Mr. Olson.

3    Q    Okay.  And what about the assistant

4 superintendents?  Who are assistant superintendents

5 in Washington, D.C.?

6    A    Assistant superintendents, Bobby Frank,

7 Mike Bello, B.L. Campbell, Ed Kent for VRE and MARC,

8 and there's a gentleman named Listed Myers, but he's

9 in Philadelphia.

10    Q    Until recently, was Mr. Ice also one of

11 those assistant superintendents?

12    A    Yes, he retired, or he's on disability

13 actually.

14    Q    Did you have any role in installing any of

15 those assistant superintendents in their jobs?

16    A    Yes.

17    Q    What was your role?

18    A    I interviewed along with Mr. Truitt when

19 the newer -- in 2003 there was a brand-new

20 organization, so we chose -- we interviewed and

21 chose the assistant superintendents.

22    Q    All right.  Now, are there general foremen

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 17

1   Q    All right.  Now, what role -- strike that.

2        In the area of Foreman II, you testified

3   that the assistant superintendents and the general

4   foremen play a role in installing those individuals

5   in their jobs; right?

6   A    Uh-huh.

7   Q    You have to do it audibly so she can get

8   it.

9   A    Yes.

10  Q    And when they do that, how is it

11  determined as between the different assistant

12  superintendents who is going to be responsible for a

13  given selection for a Foreman II?

14  A    They interview the candidates, they look

15  at their qualifications, and then they come to a

16  decision, "they" meaning whoever else was on the

17  interview panel.

18  Q    Does the -- you mentioned an interview

19  panel.  What's an interview panel?

20  A    It would be either assistant

21  superintendent, general foreman, somebody from HR.

22  Q    You're saying those persons would be on an

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 18

1   interview panel?  Is that what you're saying?

2   A    Most of the time.

3   Q    And how is it determined who will be on an

4   interview panel?

5   A    The department head -- if the assistant

6   superintendent needs people, let's say they need

7   electricians, just take an example, and the people

8   that are apply -- the applicants show up at HR and

9   they are interviewed at HR with a representative

10  from the mechanical department.

11  Q    So who would be the person in the

12  mechanical department who would designate who the

13  representative of the mechanical --

14  A    Assistant superintendent.

15  Q    So if the assistant superintendent assigns

16  persons to be on an interview panel and then an

17  interview is conducted, who is going to make a final

18  decision as to who the individual will be who will

19  be selected for the position once the interviewing

20  is complete?

21  A    They will.

22  Q    "They" meaning --

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 21

1   would be selected; correct?

2       A    That's correct.

3       Q    And so some candidates might not be

4   selected even though they were qualified?

5       A    Correct.

6       Q    That can happen.  So what I'd like to do

7   with you for a moment right now is just to separate

8   those two aspects of it.  How is it determined which

9   individuals are sufficiently qualified that they

10  might deserve an interview in order to get a Foreman

11  II position?

12      A    HR gets the applications and they go

13  through the applications and pick out who has some

14  qualifications and who doesn't meet the requirements

15  of the job position whatsoever.

16      Q    All right.  And after that's done, I

17  believe it's your testimony that the assistant

18  superintendent would select persons to be on an

19  interview panel; is that correct?

20      A    That's correct.

21      Q    And then the interview panel would

22  interview the candidates, and then with consultation

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

---

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 22

1   with the assistant superintendent then make a

2   decision as to who would actually be selected for a

3   position; is that correct?

4       A    That's correct.  But HR also is part of

5   that decision-making too, I said.

6       Q    All right.  So an interview panel has some

7   involvement in a final selection; correct?

8       A    Yes.

9       Q    Assistant superintendent has some

10  involvement in a final selection; correct?

11      A    Yes.

12      Q    HR has some involvement in a final

13  selection; correct?

14      A    That's correct.

15      Q    What about you personally?  Do you have

16  any involvement in that?

17      A    No.

18      Q    What about the superintendent?  Would he

19  have any involvement in that?

20      A    Depends -- no, the superintendent doesn't

21  have anything like -- unless that superintendent was

22  involved in the interview process itself, there's no

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 23

1  need for the superintendent to get into any hourly

2  job progression, if that makes sense to you.

3      Q    Hourly job progression --

4      A    Hourly job is Foreman III to coach cleaner

5  and all crafts.

6      Q    What about informally?  Let me ask this

7  question with regard to both the superintendent and

8  yourself.  Did the assistant superintendents or

9  interview panelists ever informally speak with you

10  about a selection process that they may be involved

11  in for a Foreman II level position?

12      A    Sometimes.

13      Q    And what might be a purpose or a cause

14  that might prompt them to do that, to involve you in

15  that?

16      A    Just talk, just normal office

17  conversation.

18      Q    Would they ask you, hey, what do you think

19  of this person or what do you think of that person

20  as a potential supervisor?

21      A    They could.

22      Q    And would you respond to them if you knew

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 30

1      BY MR. GOLDSMITH:

2      Q    You don't have to tell me what the lawyers

3  said, but your understanding at some point came to

4  be that the case was over; is that right?

5      A    Yes.

6      Q    Did anyone -- let me ask that a different

7  way.

8      Did you ever come to have any

9  understanding as to whether Amtrak had won or lost

10  the case?

11      A    I don't think so.

12      Q    You testified a few minutes ago about the

13  process for selection of Foreman II.  I'm going to

14  ask you some more questions about that.  Who has the

15  final authority to decide who gets a Foreman II

16  position in Washington, D.C., the ultimate

17  authority?

18      A    That would be the assistant superintendent

19  of that department and HR.

20      Q    And is there any way that you can separate

21  out for me with regard -- now we're just talking

22  about the final selection of a person for the

Page 32

1  superintendent disagreed about that?  How would that
2  be resolved?
3      A    Well, for HR to have an issue with a
4  candidate, they would have to have -- let's say one
5  employee, one candidate missed more time than the
6  other, even though it had been in the past, okay.
7      Q    All right, all right.
8      A    That could be the decision breaker, all
9  right.  Let's say one employee had just a hair more
10  mechanical experience.  Like if it were you and I,
11  right, we both -- we both took the qualifying test,
12  so to speak, the 238 test, but you worked in a
13  garage and worked with tools, okay, forever how long
14  it's been.  I've never had that experience.  They're
15  going to take you.
16      Q    But what if -- let's try a different
17  scenario, though.  Let's say you had two people who
18  were identical, there was no difference in their
19  qualifications, and HR wanted one person and an
20  assistant superintendent wanted a different person.
21          How would that get resolved?
22      A    I don't know.  I've never run into that

Page 33

1  issue.
2      Q    Has there always been consensus on Foreman
3  II selections between HR people and the assistant
4  superintendents in your experience?
5      A    I would tell you that in my experience,
6  when I used to interview for foreman positions and
7  general foreman positions, there was always
8  something that made one candidate a little bit
9  better than the other.
10      Q    So you haven't seen any disagreements
11  ultimately between HR and the assistant
12  superintendents?
13      A    No.
14      Q    How is it determined which assistant
15  superintendent will be involved in a particular
16  selection process for a Foreman II?
17      A    If it's their department, number one, if
18  it's going to -- if that position is a vacancy.
19  Each assistant superintendent has an organizational
20  chart with a number of mechanics and foremen.  So if
21  they're -- at that vacancy in that specific
22  assistant superintendent's realm of responsibility,

1    then they're involved.

2        Q    What if -- once the individual is selected

3    for the position, are they necessarily going to go

4    work in the area where the opening appeared to be,

5    or do they have a chance to bid on other Foreman II

6    openings that might have also come up?

7        A    They could go anywhere, actually.

8        Q    So when you -- so does that result in a

9    situation, then, where frequently an assistant

10   superintendent has been involved in a selection

11   process for a Foreman II who actually comes in and

12   ends up working someplace completely different?

13       A    Happens every day.

14       Q    Do you or does the superintendent actually

15   delegate to a particular assistant superintendent

16   the responsibility for participating in a particular

17   selection process involving Foreman II?  How do they

18   know which assistant superintendent should be

19   involved?  Just because it's in their area?

20       A    They talk among themselves.  I don't get

21   involved with their day-to-day business that way,

22   because it's simple.  If they -- let's just say Mike

1    Bello has two vacancies at Foreman II and Mike Bello

2    is going to be out of the office for two days.  It

3    really affects all of them because their overtime

4    budgets are affected by it.  So they all work

5    together to get their vacancies filled.

6            Or I have a foreman vacancy over here, so

7    now I'm paying a foreman from here to go over there

8    and work overtime.  Sometimes I can't get that

9    position filled on overtime and it goes empty.  So,

10   you know, it's a position that they need to keep

11   their positions filled.

12       Q    So when the -- so let's say there's a car

13   repair position comes up and the assistant

14   superintendent who is involved, who supervises that

15   area, gets a panel together and so forth.  And then

16   they come back to that assistant superintendent and

17   say here's what's going on with these interviews,

18   here are the candidates we have.

19           Would it be common for the assistant

20   superintendent in charge of the car repair to then

21   go talk to the other assistant superintendents as

22   well and get their feedback and input on the

1  then they're involved.

2     Q    What if -- once the individual is selected

3  for the position, are they necessarily going to go

4  work in the area where the opening appeared to be,

5  or do they have a chance to bid on other Foreman II

6  openings that might have also come up?

7     A    They could go anywhere, actually.

8     Q    So when you -- so does that result in a

9  situation, then, where frequently an assistant

10  superintendent has been involved in a selection

11  process for a Foreman II who actually comes in and

12  ends up working someplace completely different?

13     A    Happens every day.

14     Q    Do you or does the superintendent actually

15  delegate to a particular assistant superintendent

16  the responsibility for participating in a particular

17  selection process involving Foreman II?  How do they

18  know which assistant superintendent should be

19  involved?  Just because it's in their area?

20     A    They talk among themselves.  I don't get

21  involved with their day-to-day business that way,

22  because it's simple.  If they -- let's just say Mike

1  Bello has two vacancies at Foreman II and Mike Bello

2  is going to be out of the office for two days.  It

3  really affects all of them because their overtime

4  budgets are affected by it.  So they all work

5  together to get their vacancies filled.

6        Or I have a foreman vacancy over here, so

7  now I'm paying a foreman from here to go over there

8  and work overtime.  Sometimes I can't get that

9  position filled on overtime and it goes empty.  So,

10  you know, it's a position that they need to keep

11  their positions filled.

12     Q    So when the -- so let's say there's a car

13  repair position comes up and the assistant

14  superintendent who is involved, who supervises that

15  area, gets a panel together and so forth.  And then

16  they come back to that assistant superintendent and

17  say here's what's going on with these interviews,

18  here are the candidates we have.

19        Would it be common for the assistant

20  superintendent in charge of the car repair to then

21  go talk to the other assistant superintendents as

22  well and get their feedback and input on the

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 36

1   situation, or would it just be one assistant

2   superintendent who would normally be involved in a

3   selection like that?

4        A    If we're hiring car repairmen or

5   electric -- any craft, actually, what happens is

6   that person, whoever it might be, might be an

7   assistant, might be a general foreman, they go down

8   and interview with HR.  They have six candidates.

9   Out of the six, let's say two are tied head-to-head

10  and there's something that's going to get -- make

11  one better than the other.  So usually HR and that

12  person that did the interview would talk, and then

13  that's how the candidates are brought to us.

14       Q    They're brought to you?  When you say

15  "that's how the candidates are brought to us" --

16       A    That's how the positions are filled.

17  That's a better way to put it.

18       Q    So you're saying it would not be common

19  for an assistant superintendent to talk to the other

20  assistants before they had the selection made?

21       A    I don't think so.  I mean, I don't know if

22  they talk to each other or not about that.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 37

1        Q    There's no reason why they couldn't;

2   right?

3        A    There is no reason they couldn't, that's

4   correct.

5        Q    From the way you're describing it to me,

6   it sounds as though if there are five or six

7   assistant superintendents, and there's as good a

8   chance as not that some of the other assistants are

9   also going to have to work -- or supervise the

10  Foreman II who is being selected, almost like it

11  would be common courtesy to go talk to them about a

12  possible selection, particularly if it's someone

13  they all knew.

14            Would that be fair to say?

15            MR. FISCHLER:  Are you asking him in his

16  experience if this happens or if it's possible?

17            MR. GOLDSMITH:  The question is --

18            THE WITNESS:  I honestly would tell you

19  that it could or could not happen.  I can't give you

20  an opinion on that.

21            BY MR. GOLDSMITH:

22       Q    Now, you gave some testimony about the

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 39

1  process of the panel is done, whether the panel,
2  either individual panelists or the panel as one,
3  writes down, here is who we recommend for the
4  position.  We have interviewed five people, whatever
5  it is, we recommend this person.  Have they ever
6  done that?
7      A    I do it every time.  I don't know that
8  they do it all the time.  I can just tell you when
9  I'm in an interview, I do it because of legality
10  issues.  Why did you pick this person?  Here is why.
11      Q    But within your chain of command, it's the
12  case, isn't it, that that's not always been done by
13  the others who you supervise when they conduct
14  panels; correct?
15      A    I don't know that.
16      Q    Do you know that it is always done?
17      A    I don't know whether it is or isn't always
18  done.
19      Q    All right.  You testified previously a
20  little bit about Mr. Ice.  Do you remember that?
21      A    You asked me if he was assistant
22  superintendent, yes.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 40

1      Q    Yes.  And you said he's not presently
2  working for Amtrak; correct?
3      A    Correct.
4      Q    Do you know where he resides?
5      A    Somewhere in Maryland.
6      Q    Do you know if he lives in the D.C.
7  metropolitan area, in Maryland or --
8      A    Have not heard from Mr. Ice since he left
9  the property.
10      Q    When did he leave the property?
11      A    I'm going to say June '06.  I could be
12  wrong.  I'm guessing.
13      Q    So about half a year ago now?
14      A    Yeah.
15      Q    Did Mr. Ice -- did he suffer some kind of
16  on-the-job injury or --
17      A    No.
18      Q    Okay.  Do you know approximately how old
19  Mr. Ice is?
20      A    50-something.
21      Q    Do you know if he's married?
22      A    Yes.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

Page 43

1    Q    And what's its function?  What's the

2  function of the form generally, first of all?

3    A    It is a tracking document actually that

4  tells if an employee has had some type of HR action.

5  So this one -- let's see, I know this guy resigned

6  and went somewhere else, I believe.  But it's just

7  used for employees to go -- we fill them out and

8  send them to HR to keep the SAP system correct.

9    Q    All right.  And in this particular case,

10 this document which says 1948 down in the lower

11 right, it says that it's a new hire; is that right?

12   A    Yes.

13   Q    So would it be fair to say that this is

14 the document that tracks the hiring of Mr. Aikens;

15 is that right?

16   A    Yes.

17   Q    All right.  Now, down at the bottom there

18 are approval signature lines.

19   A    Uh-huh.

20   Q    And it says that Larry Ice is there

21 approving, although his signature doesn't actually

22 appear, and then it says Ron Truitt, and his

Page 44

1  signature does appear, then it has human resources,

2  Taylor Cannon, and someone who entered the data;

3  correct?

4    A    Yes.

5    Q    What is -- let's assume for a moment that

6  Mr. Ice approved the action, even though the

7  signature isn't there.  What is his name down at the

8  bottom there signifying?  What does it mean that his

9  name is there?  What's that showing?

10   A    Actually, that's just showing that this

11 person has been hired as a new-hire foreman, and

12 4274, that's one of Larry's red centers or was one

13 of the locomotive red centers at the time, I

14 believe, and that person would be filling a job in

15 his area of responsibility.

16   Q    So does it tell me that Mr. Ice approves

17 of the fact that this person is being hired and

18 placed in that job?

19   A    Yes.

20   Q    Does it also tell me that Mr. Truitt

21 approves?

22   A    Yes.

Page 45

1    Q    And Mr. Cannon approves as well?

2    A    Yep.

3    Q    Does this document tell me anything about

4  who actually selected Mr. Aikens to fill the job

5  that these individuals have now approved of his

6  filling?

7    A    No.

8    Q    Is there another type of Amtrak form that

9  would give me that information on a particular hire?

10   A    Only the -- the only thing you might find

11  is the documents that were taken during the

12  interview processes.

13   Q    All right.  Now, in this particular case,

14  as you said, Mr. Aikens's form says his job

15  assignment is to one of Mr. Ice's red centers;

16  correct?

17   A    Yes.

18   Q    And as we've said, Mr. Ice's approval is

19  down below.  Can I infer from what I see on this

20  document that Mr. Ice would have been the assistant

21  superintendent who would have played a role in

22  putting together the interview panel and having the

Page 46

1  final selection made of Mr. Aikens?

2    A    No, you couldn't.  It would be -- this is

3  the way it would be.  We generate requests to HR for

4  the filling of our vacancies.  So HR puts them, A,

5  on the Web site and sometimes advertise in the

6  paper.  They bring the candidates.  So they are --

7  they will call and say we need somebody to interview

8  for foreman on this date at this time, and then

9  whoever, whether it's a general foreman, which it

10  usually is, or assistant superintendent, they go

11  down and interview.

12   Q    But I believe your earlier testimony --

13  and tell me if I'm wrong, but I believe your earlier

14  testimony is that there is a degree of

15  responsibility for this process that rests with the

16  assistant superintendents; isn't that true?

17   A    Correct, to fill their vacancies.

18   Q    So what I'm trying to understand right now

19  is as between the various different assistant

20  superintendents, how would I go about ascertaining

21  which assistant superintendent played a role in a

22  given selection process?

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 45

1    Q    And Mr. Cannon approves as well?

2    A    Yep.

3    Q    Does this document tell me anything about

4  who actually selected Mr. Aikens to fill the job

5  that these individuals have now approved of his

6  filling?

7    A    No.

8    Q    Is there another type of Amtrak form that

9  would give me that information on a particular hire?

10    A    Only the -- the only thing you might find

11  is the documents that were taken during the

12  interview processes.

13    Q    All right.  Now, in this particular case,

14  as you said, Mr. Aikens's form says his job

15  assignment is to one of Mr. Ice's red centers;

16  correct?

17    A    Yes.

18    Q    And as we've said, Mr. Ice's approval is

19  down below.  Can I infer from what I see on this

20  document that Mr. Ice would have been the assistant

21  superintendent who would have played a role in

22  putting together the interview panel and having the

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 48

1  interviews.

2    Q    When you say "a record of the interview,"

3  you mean to include not just the actual interview of

4  the candidates, but the way that the interviews got

5  set up, the --

6    A    That should be -- that's an HR process.

7    Q    Okay.  And including -- and is it your

8  testimony that it's an HR process -- that part of

9  what you're including within that HR process is the

10  assistant superintendents conferring and figuring

11  out who is going to go assist HR?

12    A    Yes.

13    Q    So in your experience since 2003, have

14  there been -- have any of the assistant

15  superintendents taken a larger role in the process

16  of getting positions filled with Foreman II than any

17  of the other assistant superintendents?

18    A    Not that I'm aware of.

19    Q    As far as you can tell, it's not obvious

20  that Mr. Ice did more of that or that Mr. Frank did

21  more of that or Mr. Campbell did more of that?

22    A    Right.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

Page 49

1    Q    Mr. Bello -- no?

2    A    No.  That's just something that I don't

3   concern myself with.

4    Q    So it's possible that some of them did

5   more of that than others, but you don't know because

6   it's not your -- it's not something you involve

7   yourself with; is that correct?

8         MR. FISCHLER:  Asked and answered.

9         THE WITNESS:  That's correct.

10        BY MR. GOLDSMITH:

11   Q    Do you think that Mr. Truitt would be

12  likely to have an understanding of that?

13        MR. FISCHLER:  Objection; calls for

14  speculation.

15        You can answer if you possibly know.

16        THE WITNESS:  He may.

17        BY MR. GOLDSMITH:

18   Q    Do you think he'd be more -- well, strike

19  that.

20        Is that something that you would want

21  Mr. Truitt to have an understanding of?

22   A    What?

Page 51

1    A    Both, yes.

2    Q    Both.  You interviewed yourself to become

3   a Foreman II?

4    A    I was interviewed as -- for a Foreman II's

5   position, but I have interviewed people for Foreman

6   II positions.

7    Q    Did you serve as a Foreman II?

8    A    Yes.

9    Q    For approximately how long?

10   A    Whew, man, let's see, '82 to '89.

11   Q    All right.  Now, in order to be scheduled

12  for an interview for Foreman II, would a candidate

13  have to actually be qualified for the position?

14   A    Well, now, say -- here's what happens.

15  They fill out an Amtrak job application and send it

16  in to HR.  HR reviews the applications and then they

17  set up the interviews.

18   Q    And I believe your testimony earlier was

19  that HR screens the applicants for qualifications in

20  some way.  Didn't you testify to that?

21   A    Yeah, exactly.

22   Q    So what does HR screen Foreman II

Page 52

1 applicants for?

2    A    Let's say they go back over their -- if

3 it's an internal candidate, first thing they will do

4 is look at their attendance.  If their attendance is

5 poor, they don't get an interview.

6    Q    Do they also screen to see whether the

7 person is qualified for -- to do the duties of the

8 position?

9    A    Yes.

10    Q    So would it be their job to screen out

11 people who are not qualified to do the duties of the

12 position?

13    A    Yes.

14    Q    And I believe you testified that HR sets

15 up the interviews; correct?

16    A    Correct.

17    Q    But that they can do that in consultation

18 with the department?

19    A    For scheduling, yes.

20    Q    Well, what about as to who they are going

21 to interview?

22    A    Not as much.  Mostly for scheduling

Page 53

1 purposes, then you get the pile of candidates when

2 you get down there, or they will e-mail you the list

3 of names of qualified candidates.

4    Q    Now, are you in the department able to

5 find out who has applied before the interviews are

6 actually set up?

7    A    Through HR, yes.

8    Q    And are you able to inform personnel if

9 there's -- or HR if there's an individual who you

10 particularly want to interview?

11    A    No.

12    Q    Why not?

13    A    It's not ethical.

14    Q    Not ethical to say I want to interview

15 this particular person, can you make sure that you

16 set up an interview for him?

17    A    Can't do it.

18    Q    Why is it unethical?

19    A    Because.  I mean, listen, everybody gets a

20 chance to apply for a position, right.  If there's a

21 person that I think is pretty good for a position,

22 right, and they're in there, they will prove

Page 54

1  theirself in the interview process.

2      Q    But what if the person doesn't get an

3  interview?

4      A    Then he's not qualified.

5      Q    What if the person is qualified but

6  doesn't get an interview?

7      A    If the person applying for a position

8  is -- for mechanical and has mechanical background,

9  has worked with tools, they're qualified.

10     Q    Have there ever been instances where

11 there's been a sufficient number of applicants for a

12 position, though, that HR doesn't have all of the

13 qualified applicants interview?

14     A    Not that I'm aware of.

15     Q    So in your experience, anyone who is

16 qualified has gotten an interview?

17     A    Yes.

18     Q    So putting aside whether it's unethical to

19 suggest that a particular person be interviewed,

20 it's never necessary because if they're qualified,

21 they're going to get an interview anyway; correct?

22     A    I cannot tell HR to interview someone

Page 62

1      You can answer if you can.

2      THE WITNESS:  I don't recall.

3      BY MR. GOLDSMITH:

4      Q    Do you know whether Ms. Whitley met the

5  basic qualifications to serve as a Foreman II?

6      A    No, I don't.

7      Q    You don't know?

8      A    I do not know.

9      Q    Do you know which of the particular

10 qualifications to be a Foreman II -- strike that.

11     Are you familiar with Gary Louers?

12     A    Yes.

13     Q    Who is he?

14     A    General foreman, second trick SNI.

15     Q    Do you know if Mr. Louers ever recommended

16 Ms. Whitley to serve as a Foreman II?

17     A    No, I do not.

18     MR. GOLDSMITH:  Let's take a five-minute

19 break if that would be okay.

20     (Recess.)

21     BY MR. GOLDSMITH:

22     Q    I'm going to show you what's been marked

Page 64

1   A    No.

2   Q    You don't know one way or the other?

3   A    No.

4   Q    Do you know whether Ms. Whitley was ever

5   selected for a Foreman II position?

6   A    No.

7   Q    You don't know whether she was or not?

8   A    (Inaudible response.)

9        MR. FISCHLER:  You can't just shake your

10  head because the reporter can't write that down.

11       THE WITNESS:  No.

12       BY MR. GOLDSMITH:

13  Q    Do you know if Ms. Whitley has ever served

14  for Amtrak in a Foreman II position?

15  A    No, I do not.

16  Q    Take a look, if you would, at Exhibit 31.

17  Exhibit 31 purports to show 2004 selections for

18  Foreman II.  It's a document that was provided to me

19  by Amtrak in discovery in this case.

20       Have you seen this before?

21  A    No, I have not.

22  Q    That was no?

---

Page 67

1   who were selected, and it appears that some of them

2   were selected during 2004; correct?

3   A    Yes.

4   Q    Are you able to, from looking at this

5   document, tell me who Mr. Cannon might have been

6   referring to as having been selected in lieu of

7   Ms. Whitley being selected on Exhibit 17?

8   A    It appears that a Thomas Carter was

9   selected because of the position number reflected in

10  Exhibit 17 and Exhibit 31.

11       MR. FISCHLER:  I have a question.  Is it

12  your representation that this document was produced

13  with the numbers on it like this?

14       MR. GOLDSMITH:  Yes.  Well, if you look at

15  the -- yeah, it sure was.

16       MR. FISCHLER:  Okay.  That's not -- I

17  don't recall and I wanted to check.  Okay.

18       MR. GOLDSMITH:  FYI, it was produced both

19  ways, both without and with, which is why you've

20  seen it without.

21       MR. FISCHLER:  Okay, okay.  That's fine.

22       MR. GOLDSMITH:  But I didn't write those

Page 69

1  5000601, and a gentleman named Michael Atkins was

2  put in the position of 50006103.

3      Q    Do you think that might have been Aikens?

4      A    Aikens, yes.

5      Q    Did you play any role in the selection of

6  Mr. Carter?

7      A    No.

8      Q    Did you play any role in the selection of

9  Mr. Aikens?

10     A    No.

11     Q    Continuing to look at Exhibit 31, I also

12  see Mr. Wilson was selected.  Did you play any role

13  in his selection?

14     A    No.

15     Q    What about Mr. Grimes?

16     A    No.

17     Q    What about Leslie White?

18     A    No.

19     Q    Do you know whether Bernard Campbell

20  played any role in the selection of Ms. White?

21     A    I do not.

22     Q    Do you know if he played any role in the

Page 70

1  selection of Mr. Carter?

2      A    Do not.

3      Q    Mr. Aikens?

4      A    Nope.

5      Q    Wilson?

6      A    No.

7      Q    Grimes?

8      A    No.

9      Q    Do you know whether any particular

10  assistant superintendent played a role in any of

11  those selections?

12     A    No.

13     Q    Are you familiar with a gentleman named

14  Joey Tanna?

15     A    Yes.

16     Q    Who is he?

17     A    He is a Foreman II at Washington, and he's

18  also a union representative for the foreman's union.

19     Q    Have you ever had occasion to discuss

20  Ms. Whitley's candidacy for Foreman II with him?

21     A    Not that I recall.

22     Q    Do you think you have but you can't recall

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 71

1 the details anymore, or do you think you probably
2 haven't?
3     A    I don't recall one way or the other.
4     Q    What about Mr. Campbell?  Have you
5 discussed Ms. Whitley's application for Foreman II
6 with Mr. Campbell?
7     A    I do recall that, and the only reason I do
8 recall it is because Mr. Campbell and I had a
9 conversation, probably about a week ago, when this
10 case became evident, and --
11    Q    Can I just interrupt you for a moment?
12 Are you going to tell me about a conversation that
13 happened about a week ago or one that happened in
14 advance of Ms. Whitley being selected?
15        MR. FISCHLER:  The answer was yes, there
16 was a conversation.  Why don't you ask a more
17 specific question?
18        BY MR. GOLDSMITH:
19    Q    When did the conversation occur?
20    A    When Ms. Whitley applied for the position.
21    Q    Was there one conversation or more than
22 one conversation?

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

---

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 72

1     A    One.
2     Q    Okay.  What do you remember about that
3 conversation?
4     A    Mr. Campbell approached me and said he'd
5 like to give Ms. Whitley a chance -- a shot at a
6 Foreman II's job.
7     Q    What happened?
8     A    I said that's fine, we can give her a
9 shot.
10    Q    What else was said?
11    A    That's it.
12    Q    Can you place that anymore specifically in
13 time other than -- well, strike that.
14        Can you place that in time at all?
15    A    Not really.
16    Q    Did you ever discuss that conversation you
17 had with Mr. Campbell with anyone else besides
18 Mr. Campbell?
19    A    Not that I recall.
20    Q    You started to tell me about a
21 conversation you had a week ago.  Without telling me
22 anything that might have been said in the presence

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 76

1  superintendents other than Mr. Campbell?  Did you
2  ever discuss Ms. Whitley's candidacy for Foreman II
3  with any of them?
4      A    I don't think so.  Ms. Whitley worked for
5  Mr. Campbell at the time.
6      Q    Does that -- does the fact that she worked
7  for Mr. Campbell make it seem more likely in your
8  mind that the issue would have flowed through
9  Mr. Campbell rather than a different assistant
10 superintendent?
11     A    I know that Mr. Campbell had worked with
12 Ms. Whitley and that Mr. Campbell was -- what would
13 the word be?  Part of his job is to mentor and
14 improve people, and that's what he was doing with
15 Ms. Whitley.
16     Q    How was he going about mentoring and
17 improving Ms. Whitley at the time?
18     A    As he does with all of his supervisory
19 staff, he gets them to follow the policies and
20 procedures.  He does a good job at it.
21     Q    Do you know whether Ms. Whitley ever took
22 training courses to get 238 certification?

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 78

1  other than what you've already told me?
2      A    No.
3      Q    Do you think you've had discussions about
4  Ms. Whitley with Mr. Campbell other than what you've
5  already told me before that you're just not able to
6  remember?
7          MR. FISCHLER:  About any other topic?
8          MR. GOLDSMITH:  Yes, any other discussion
9  about Ms. Whitley.
10         THE WITNESS:  No.
11         MR. GOLDSMITH:  I'm sorry, I forgot my own
12 question.
13     (The reporter read the record as requested.)
14         BY MR. GOLDSMITH:
15     Q    So let me just make sure that it's clear.
16 Are you saying that you didn't have any other
17 conversations with Mr. Campbell about Ms. Whitley or
18 that you don't remember whether you have?
19     A    I don't remember.
20     Q    Have you ever had any discussions about
21 Ms. Whitley with Robert Frank?
22     A    Don't remember.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 79

1    Q    He was an assistant superintendent; right?

2    A    Still is.

3    Q    Still is.  Did you ever have any

4  conversations with anyone in personnel about

5  Mr. Campbell's interest in giving Ms. Whitley a shot

6  as a Foreman II?

7    A    No.

8    Q    You mentioned that attendance can be a

9  relevant issue with regard to a person being -- an

10  in-house candidate being selected for a Foreman II

11  job.  Do you remember that testimony?

12    A    Yes.

13    Q    Do you know anything about Ms. Whitley's

14  attendance record?

15    A    No.

16    Q    Do you think you've ever known anything

17  about Ms. Whitley's attendance record?

18    A    No.

19    Q    Have you ever discussed Ms. Whitley with

20  Larry Ice?

21    A    Couldn't tell you.  Don't remember.

22    Q    I had you look a moment ago at Exhibit 24.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

---

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 85

1    Q    On the very first page of it, page 1917,

2  there has what appears to me to be, like, a file tab

3  number with a nine-digit number below that with

4  Mr. Wilson's name.  Do you see that?

5    A    Yes.

6    Q    Does that give you any -- and you can also

7  see from the lower right, where it says "Amtrak

8  Whitley 1917," that these are documents that were

9  produced to me by Amtrak.  Do you have any

10  understanding of where these documents would have

11  come from or how these documents were maintained by

12  Amtrak?

13    A    These documents should have been

14  maintained at human resources.  I mean, except

15  for -- even the 2003 is only -- I mean, I'm sorry,

16  the 2000, where it's the Amtrak Whitley 1928, that's

17  merely a piece of paper that we generate the 2000,

18  and that turns on their benefits back through HR.

19    Q    All right.  Turning your attention to

20  1926, let me ask you first of all, did you play any

21  role in the selection of Mr. Wilson?

22    A    No.

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 86

1    Q    Do you have any personal knowledge as to

2  who did?

3    A    No.

4    Q    Is there anything that you've seen in

5  looking at Exhibit 30 that would help us to

6  understand who did play a role in his selection?

7    A    No.

8    Q    Could 1928 or 1932 assist us in any way in

9  understanding that?

10   A    No.

11   Q    All right.  Returning your attention to

12 1926, 1926 appears to be the employment history that

13 Mr. Wilson provided to Amtrak on his employment

14 application.  Does that appear to be correct?

15   A    Yes.

16   Q    Does 1926 indicate to you that -- well,

17 first of all, let me ask you, is there anything in

18 this Exhibit 30 that indicates to you that

19 Mr. Wilson was interviewed?

20   A    No.

21   Q    With regard to 1926, is there anything in

22 here indicating that Mr. Wilson has ever worked on

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 87

1  trains?

2    A    No.

3    Q    Does he have any 238 certification?

4    A    No.

5    Q    Is there anything in here that tells you

6  that Mr. Wilson has any experience with -- as a

7  supervisor?

8        (Witness reviewed the document.)

9    A    If you look at the 1926, I think he's

10 saying that he was assistant chief engineer at PM

11 Health Group, and he was a director of maintenance

12 before that at the Harrison House of Georgetown.

13   Q    So is there any information associated

14 with -- well, first of all, do you think it says PM

15 Health Group or PM Realty Group?

16   A    Could say PM Realty Group.

17   Q    All right.  With respect to either that PM

18 Realty or the Harrison House, is there any

19 information there that would tell you for certain

20 that he supervises anyone?

21   A    No.

22   Q    Is there anything anywhere else in his

CONTAINS CONFIDENTIAL MATERIAL
202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
00cdc945-a513-404d-ad52-c7d96c698a93

Page 88

1   application or anywhere else in Exhibit 30 that

2   would tell you whether he ever supervised anyone?

3       A    Not that I can see.

4       Q    Was Mr. Wilson, based on Exhibit 30, well

5   qualified to become a Foreman II in Washington for

6   Amtrak?

7            MR. FISCHLER:  I'm going to object to the

8   form of the question, lack of foundation.

9            You can answer if you can.

10           THE WITNESS:  I wouldn't be able to answer

11  because I didn't interview the gentleman.

12           BY MR. GOLDSMITH:

13      Q    Well, based on what you see in the

14  paperwork -- let me ask you this.  Would Mr. Wilson,

15  based on Exhibit 30, be qualified to receive an

16  interview from Amtrak for Foreman II?

17      A    If he's saying he was assistant chief

18  engineer, director of maintenance and a mechanical

19  engineer in the U.S. Navy, I would say I would give

20  him an interview.

21      Q    And are you certain about that?

22      A    Yes.

Page 89

1       Q    If --

2       A    I said I would give him an interview.

3       Q    I understand, I understand.  With regard

4   to selecting him for a position, would he need to

5   have supervised anyone in that experience in order

6   to get a position?

7       A    Yes.

8       Q    And would he need to get 238 certification

9   in order to get a position?

10      A    Say -- ask me that again.

11      Q    Would he need 238 certification in order

12  to be a Foreman II?

13      A    He would have to acquire a 238.

14      Q    And if he didn't acquire a 238 during his

15  probationary period, he'd have to be fired; correct?

16      A    Yes.

17      Q    And the probationary period is 90 days at

18  Amtrak; is that right?

19      A    Correct.

20      Q    Have there ever been times when you've

21  been -- strike that.

22           You gave some testimony earlier about use

Page 90

1  of overtime and that it's part of your duties to

2  keep things on budget.  Would that be fair to say?

3      A    Yes.

4      Q    And that you monitor what happens with

5  regard to use of overtime.  Is that fair to say?

6      A    Yes.

7      Q    Have there ever been times when you've had

8  to use a lot of overtime hours with regard to

9  Foreman II?

10     A    Yes.

11     Q    And is that an undesirable situation, from

12 your point of view?

13     A    Any use of overtime is undesirable.

14     Q    And that's because -- well, strike that.

15          With regard to the Foreman II, are they

16 paid time-and-a-half for overtime that they work?

17     A    Yes.

18     Q    So it's expensive to use overtime, for one

19 thing; correct?

20     A    Yes.

21     Q    Are there other reasons why using a lot of

22 overtime is undesirable?

Page 91

1      A    The biggest impact is on the budget.

2      Q    Do you have any particular recollection of

3  having to use a lot of -- strike that.

4          Approximately how many Foreman IIs would

5  normally be working in the mechanical department

6  since you've headed it up, from 2003 to the present?

7  Just a rough number.

8      A    Rough number, 65.

9      Q    So at any given time can you describe for

10 me what the point would be when you would need to

11 use overtime in terms of the -- to make up for not

12 being completely staffed up on the number of Foremen

13 II?

14     A    If there were special train issues where

15 we were doing an extra train for some group:  ball

16 team, Congress, something like that.  During our

17 high-speed rail incident when high-speed trains were

18 grounded for a while, we used overtime in all

19 crafts, including Foreman II, to produce the extra

20 trains in the conventional set to take the place of

21 the high-speed sets.

22     Q    If you only had -- let's say you only had

1    is some amount of give in the exact number of

2    Foremen II you might be employing with regard to its

3    impact on overtime.  Is that fair to say?

4        A    Yes.

5        Q    But that there is a point at which you

6    could be understaffed to the point that it required

7    overtime in order to do the job; is that correct?

8        A    Yes.

9        Q    Do you know whether Ms. Whitley was ever

10   denied promotion to Foreman II because you were

11   purposefully not filling craft positions in order to

12   impact the budget?

13       A    No.

14       Q    You don't know if that happened or it

15   didn't happen?

16       A    It didn't happen.

17       Q    Ms. Whitley served Amtrak as a Foreman I;

18   is that correct?

19       A    Yes.

20       Q    In the Foreman II position, what, if any,

21   importance does experience and knowledge in managing

22   people play?

1        A    About 50 percent.

2        Q    Of the overall needs of the job?

3        A    Of the overall job responsibility.

4        Q    So if an individual has no experience

5    doing that, that would be -- that would make it hard

6    for them to perform as a Foreman II.  Is that fair

7    to say?

8        A    Yes.

9        Q    And if a person had a lot of successful

10   experience doing that, that would make it easier for

11   them to perform as a Foreman II?

12       A    Yes.

13       Q    Ms. Whitley as a Foreman I, approximately

14   how many people at a time would she have supervised,

15   do you know?

16       A    I'm guessing 10 to 15, maybe some more.

17       Q    Now, I believe you gave some testimony

18   about Ms. Whitley's having taken some training

19   courses.  Did you testify a little about that

20   before?

21       A    No, you asked me if she had taken --

22       Q    Do you know anything about that?

February 12, 2007
David B. Stevens et al. v. National Railroad Passenger Corporation ("Amtrack")

Page 95

1      A    No.

2      Q    Did you ever hear anything to that effect,

3  that she had taken any -- let's talk about 238

4  courses for the time being.

5      A    Mr. Campbell told me she had taken 238.

6      Q    Did you ever hear any sort of a rumor that

7  she had cheated on a test?

8      A    No.

9           MR. FISCHLER:  Objection; calls for

10  hearsay.

11          THE WITNESS:  No.

12          BY MR. GOLDSMITH:

13     Q    Is Ms. Whitley a truthful person, as far

14  as you know?

15     A    I don't know that.

16     Q    Is Mr. Campbell a truthful person, as far

17  as you know?

18     A    Yes.

19     Q    What about Mr. Ice?

20     A    Yes.

21     Q    Mr. Truitt?

22     A    Yes.