1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF COLUMBIA

3

4     - - - - - - - - - - - - - - - -x

5     DAVID B. STEVENS, ET. AL,      :

6              Plaintiffs,       : Civil Action No.

7         v.                : 1:05CV01924-RCL

8     NATIONAL RAILROAD PASSENGER     :

9     CORPORATION ("AMTRAK")        :

10    - - - - - - - - - - - - - - - -x

11

12

13              DEPOSITION OF SARAH E. RAY

14

15

16                   Washington, DC

17                   Monday, January 8, 2007

18

19    REPORTED BY:

20         DAVID L. HOFFMAN

21

22

23

---

14

1     Carolina, South Carolina, Georgia and over to

2     Alabama.

3         Q     What other kinds of things are done in the

4     Mid-Atlantic Division office in addition to what you

5     just described?

6         A     We handle the files for employees.  We

7     handle approximately, I guess, 3000 personnel files.

8     Any information that needs to go into those files we

9     put them in there.  We do employee relations.  If any

10    employees have issues, they come to us.  We work with

11    Labor Relations, the Union on issues, FMLA.  We file

12    that paperwork.  We do data entry for every position

13    that we fill.  There's a job file folder and we have

14    to enter that information into the computer and

15    maintain that job file folder.

16        Q     How many people work in the regional

17    office?

18        A     In my office, two Human Resources

19    officers, which are the recruiting officers and I

20    have two HR specialists -- Human Resources

21    specialists.  One basically works at the front desk

22    and does a lot of data entry on the phones and the

23

15

1    other is data entry paperwork.  If I've got to order

2    the position, we've got to key that in, basically,

3    payroll to make sure people get paid right.  We've

4    got a lot of data entry because we have a lot of

5    employees.

6         Q    In 2003 to 2005, who were the HR officers?

7              (Pause.)

8         A    2003 to '05?  That should be Taylor Cannon

9    and LeVar Freeman.  I'm trying to think when Wardell

10   Thomas left, but LeVar replaced Wardell.  So I'm not

11   quite sure.  I want to say Wardell Thomas.

12        Q    How does Mr. Freeman spell his name?

13        A    F-R-E-E-M-A-N.

14             (Pause.)

15        Q    Do you receive performance evaluations on

16   your own performance?

17        A    On my performance?

18        Q    Yes.

19        A    Yes, sir.

20        Q    And do you prepare performance evaluations

21   for your subordinates?

22        A    Yes, sir.

23

18

1    turned over.  Did you prepared those to be turned

2    over as well?

3         A    Yes, personnel files kept in my office and

4    they would call my office and I would turn them over.

5    Yes.

6         Q    In the process of handling your duties

7    related to recruitment, have you had occasion to

8    recruit, to fill Foreman 2 positions?

9         A    Probably in the past I have, but I can't

10   actually say, unless I pull a job file folder.

11        Q    There were job file folders turned over in

12   this case relating to recruitment for Foreman 2

13   positions.  Can I presume from that, that you've been

14   involved in recruiting for Foreman 2 positions at

15   times in the past ?

16        A    For this probably, probably Wardell and

17   LeVar and maybe Taylor.  Although I probably had to

18   gather the information, the officers would have

19   handled the files.  In other words, been in the

20   recruitment process.  But I had to gather the

21   information.  So it's the job of the manager to

22   gather the information.

23

19

1    Q    Would it be your job to assign either

2  LeVar, Wardell or Taylor to handle the file in an

3  ongoing way with regard to recruitment for a Foreman

4  2 position?

5    A    The way we had it set up is certain

6  officers had certain departments.  So when Wardell

7  was there, he was helping with Mechanical.  Right not

8  Taylor handles all Mechanical.  But there are some

9  situations where we're all busy and if this comes up,

10  I may have to do it or LeVar or Taylor may have to do

11  it.  It just depends on what's going on.  But right

12  now, Taylor handles all Mechanical.  When Wardell was

13  there, I think he handled some Mechanical.  I think

14  we were busy and we had to throw LeVar into it.  At

15  any given time, any of us could handle it.

16    Q    Do you have an understanding of what it is

17  that an incumbent do in the Foreman 2 position?

18    A    I have a basic understanding.  I won't say

19  I have a full understanding.

20    Q    What's your basic understanding of that?

21    A    They're the ones that supervise the

22  skilled craft -- your pipe fitters, your

23

20

1  electricians, your machinists and your carman

2  positions to make sure they're doing their jobs to

3  get the train out.

4    Q    How did you develop the understanding you

5  have about what people do in the Foreman 2 position?

6    A    I've been around for 25 years, almost 25

7  years and I've handled Mechanical before in the past,

8  and I know the steps like Foreman 1, Foreman 3,

9  General Foreman and so forth.

10    Q    Who supervises Foreman 2?

11    A    General Foreman.

12    Q    Who assigns work to Foreman 2?

13    A    I would imagine the general foreman.  Let

14  me just say this.  I don't know.  I mean I would

15  imagine that's the progression.

16    Q    You would imagine that the progression is

17  the general foreman supervise Foreman 2?

18    A    Yes.

19    Q    Do the Foreman 2 supervise anybody else?

20    A    You say did the --

21    Q    Did the Foreman 2 have individuals whom

22  they supervised?

23

21

1     A     Utility workers, the labor.

2     Q     Anybody else?

3     A     I think now -- I want to say I don't know.

4     I think now they supervise coach cleaners.  They

5     could possibly supervise coach cleaners, too.

6     Q     What's a utility worker?

7     A     It's a laborer.

8     Q     During the period of 2003 to 2005, who did

9     Foreman 2 have responsibility for supervising?

10    A     I'm going to say I don't know just because

11    I can tell you that I  know they always supervised

12    the craft of carmen, electrician, pipe fitter,

13    machinist; but at some point in there it changed to

14    utility workers and I'm not sure of that timeframe.

15    Q     When it changed to utility workers, who

16    assumed the responsibility for supervising -- I mean

17    who did the Foreman 2 have to supervise?  First of

18    all, I'm sorry.

19    A     I don't understand.

20    Q     You testified earlier that the Foreman 2

21    supervised utility workers.  Do you remember that

22    testimony?

23

22

1     A     Yes, but they always supervised -- the

2     main supervisory is the four crafts, the skilled

3     crafts.

4     Q     Has that continued up to today as far as

5     you know?

6     A     Oh yes, some 25 years.

7     Q     Are there any legal or regulatory

8     requirements that you're aware of that is imposed on

9     Amtrak with regard to who's placed in Foreman 2

10    positions?

11    A     No.

12    Q     Are there any certifications that

13    individuals have to have in order to perform as

14    Foreman 2?

15    A     I'm going to say I don't recall.  I'm

16    going to say I don't know.

17    Q     Is there anything that would refresh your

18    recollection as to whether there's any certifications

19    that an individual needs in order to perform as a

20    Foreman 2?

21    A     Say that again.  Repeat it.

22    Q     Is there anything that would refresh your

23

23

```
1    recollection that would help you remember whether

2    there are any certifications that people need in

3    order to perform as Foreman 2 at Amtrak?

4         A    I can't remember what they are.

5         Q    Does that imply that you think there are

6    some and you just don't remember specifically what

7    they are?

8         A    Possibly.

9         Q    When an individual enters on duty as a

10   Foreman 2 at Amtrak, are they subject to a

11   probationary period?

12        A    Yes.

13        Q    Does that probationary period apply to

14   someone who is transferred or promoted to that

15   position from within Amtrak?

16        A    Yes.

17        Q    Does it also apply to someone who comes in

18   from the outside and gets the job?

19        A    Yes, in all crafts they have probationary

20   periods.

21        Q    Also for the Foreman 2 who supervises

22   craft?

23
```

24

```
1         A    Yes.

2         Q    What's the purpose of the probationary

3    period?

4         A    To make sure that they're fit for the

5    position and they meet all the qualifications.

6         Q    Do they need to meet all the

7    qualifications before they enter on duty?

8         A    We're discussing Foreman 2?

9         Q    Yes.

10        A    They should meet the basic requirements

11   for the position.

12        Q    Before the enter on duty?

13        A    When we post we say some mechanical

14   experience.

15        Q    When you post for it, you list various

16   criteria that applicants should have.  Isn't that

17   right?

18        A    Yes, sir.

19        Q    Are they required to have those

20   qualifications before they enter on duty?

21        A    Before?  Yes, in other words, the posted

22   requirements we would have an interview process.

23
```

25

1    We'd make a selection and then they would report for

2    work.  So the posted requirements they would have met

3    that.

4         Q     And so, presumably, they shouldn't need a

5    90-day period in order to make sure that they meet

6    the qualifications at that point, right, because

7    they've already met them?

8         A     I'm confused then.  All unions have a

9    probationary period that they have to meet, fulfill

10   the requirements of the job.  In other words, to make

11   sure that they're a good fit and they're a good

12   match.  Those are not my rules.  They're in all of

13   the union agreements.

14        Q     But the qualifications that you list on

15   your vacancy announcements.

16        A     Those are two separate issues.

17        Q     Okay.  As to the qualifications that you

18   list on the vacancy announcement, are the applicants

19   required to meet those qualifications in order to be

20   selected in the first place to go on the job?

21        A     Yes.

22        Q     So would it be fair to say that the

23

26

1    probationary period is there to make sure that they

2    can actually do the job once they get there?

3         A     Right.

4         Q     Does it create a problem for Amtrak if a

5    Foreman 2 position is vacant?

6         A     Yes.

7         Q     What kind of problem does it create?

8         A     Well, these are the positions that

9    supervise the people that make sure the work gets

10   done and that the train gets out.

11        Q     If a position is vacant, how are the

12   skilled craft people supervised if there's no Foreman

13   2 there to supervise them?

14        A     I want to say I don't know, but I would

15   get they would have a fill-in.  They may ask someone

16   to work overtime, another Foreman 2 to work overtime.

17        Q     Does the union contract provide for any

18   extra pay for Foreman 2 when they have to fill in?

19        A     Well, they're working overtime, so they're

20   probably going to get time and a half, but I'm not

21   exactly sure how much they would get.  That's a

22   guess.

23

27

 1    Q    There is some kind of pay differential

 2  though.

 3    A    I'm not sure.

 4    Q    Do you deny that there is some kind of pay

 5  differential?

 6        MR. FISCHLER:  I think she's answered that

 7  she's not sure.  She's not admitting or denying

 8  anything.  She's not sure what the answer is.

 9        BY MR. GOLDSMITH:

10    Q    You can answer the question.

11    A    Actually, I'm not sure.  I know they fill

12  in all the time when we have vacancies and if he's

13  worked a full shift already and he has to work

14  another shift, I would imagine they'd pay him time

15  and a half.  But I'm not sure exactly how it works.

16    Q    Is there a position description that's

17  kept on file that describes the job of a Foreman 2?

18    A    Yes.

19    Q    Do you know who generated that, who

20  created it, drafted it?

21        (Pause.)

22    A    Not exactly.

23

28

 1    Q    Is that something that you played any role

 2  in the drafting?

 3    A    No, sir.

 4    Q    Did it exist before you became the Human

 5  Resources manager?

 6    A    Yes, it's always existed.

 7        MR. GOLDSMITH:  Bear with me just a

 8  moment.

 9        (Pause.)

10            (The document referred to

11            was marked for iden-

12            tification as Plaintiff's

13            Exhibit No. 1.)

14        (Handing document to witness.)

15        BY MR. GOLDSMITH:

16    Q    I'm showing you what's been marked as

17  Plaintiff's Exhibit 1 today.  It says on it "Job

18  Title, Foreman 2."  I'm wondering if this is the job

19  description or position description for Foreman 2

20  that you were referring to a moment ago?

21    A    Yes, it is a job description for Foreman

22  2.

23

29

1    Q    As far as you know, this description

2 remains current?

3    A    I don't know.

4    Q    Are you aware of any that has superseded

5 it?

6    A    I know that Corporate's been working on

7 redoing all of the job descriptions, so I couldn't

8 say whether this is the most recent one.

9    Q    In the event of an update, would you be

10 required to sign on to it?

11    A    No, sir.

12    Q    Would that be something that would come

13 out of Corporate?

14    A    Yes, sir.

15    Q    Would they notify you if there was an

16 update?

17        (Pause.)

18    A    Usually, we can request one when we need

19 one. I won't necessarily say that they send it out

20 to everybody once they've been done because we

21 usually work off the posted requirements, which gives

22 a brief job description to tell us what we're looking

23

30

1 for.

2    Q    Are you aware of any changes to this job

3 description having been completed by Corporate?

4    A    I couldn't say, sir. I don't have the

5 last one.

6    Q    You don't have the last one?

7    A    In other words, you're saying do I know of

8 any changes?

9    Q    Yes.

10    A    I wouldn't be able to remember.

11    Q    In any event, you testified that there was

12 a job description placed before you, before you

13 became Human Resources manager and hasn't changed

14 since then. Correct?

15    A    I didn't say it hasn't changed since then

16 because I know that they've been working on changing

17 the job descriptions. Every so often they do it.

18    Q    Do you have any awareness of any changes

19 that have been made to this job description since

20 1992?

21    A    I'm not sure.

22    Q    Who would know?

23

31

1    A    That would be a Corporate function.

2    Q    Who at Corporate?

3        (Pause.)

4    A    Georgette Fletcher is now charge of job

5    descriptions.

6    Q    I see at the bottom a Bates stamp number.

7    Do you see that?  It says 2031 and the subsequent

8    pages are the numbers after that.

9    A    At the bottom?  Yes, sir.

10    Q    Does that indicate to me it was your

11    office that produced this?

12    A    No, sir.

13    Q    Who did?

14    A    I have no idea.  My office doesn't produce

15    job descriptions at all.  I can't answer any

16    questions about --

17    Q    Do you maintain copies of job descriptions

18    on file?

19    A    Yes, if they send it to us.  Yes.

20    Q    So if you had been asked by counsel to

21    produce job descriptions, would you have been able to

22    go to the file and pull out the job descriptions and

23

32

1    send them on?

2    A    We're instructed to call Corporate to make

3    sure we have the latest job description.

4    Q    If you had been the one -- and you're

5    responsible for the call to Corporate.  Correct?

6    A    Yes, if he asked me to produce one, I

7    would have called Corporate.

8        MR. GOLDSMITH:  Let's mark this as Exhibit

9    2.

10            (The document referred to

11            was marked for iden-

12            tification as Plaintiff's

13            Exhibit No. 2.)

14        (Handing document to witness.)

15        BY MR. GOLDSMITH:

16    Q    Showing you what's been marked as Exhibit

17    2, can you tell me what this is?

18    A    This is a posting for a Foreman 2

19    position.

20    Q    Let me ask you this.  Who generates the

21    form?  Where does this form come from?

22    A    This example right here?

23

33

1    Q    Yes.  I see a heading up at the top.  It

2  obviously came from -- somebody printed it out from

3  the Internet it looks like.  Do you agree?

4    A    Yes, sir.  Actually, what happens is we

5  get a Form 2002 from the department and from that

6  form we have to key this into the system to generate

7  this job posting.

8    Q    So the actual posting that we see here,

9  which has Bates Whitley 121 at the bottom would have

10  been generated by your office?

11    A    You mean this example right here?  Yes, we

12  would put this in the system, but we got the

13  information from a Form 2002.

14    Q    I see.  So someone gives you some

15  information and you then convert that information

16  into this form that we see here in Whitley 121,

17  Exhibit 2?

18    A    Yes, sir.

19    Q    Who in your office performs that function?

20    A    It could be Taylor Cannon.  It could be

21  Glenda Jackson.  It could be LeVar Freeman.  It could

22  have been Wardell Thomas.  It just depends on who had

23

34

1  time to do it at that time.

2    Q    Is that something you would never do

3  personally?

4    A    Me?

5    Q    Right.

6    A    I laugh because I'm not good with

7  computers, okay.

8    Q    Just trying to find out.

9    A    No, I haven't done for a long, long time.

10    Q    Have you done it at all since you came

11  back after you were away from Amtrak?

12    A    I don't know.  I don't think I've ever

13  done it.  That's always been a function of the HR

14  specialist.  But if she's really tied up with a lot

15  of projects, then the HR officers can do it

16  themselves.

17    Q    Do you ever instruct the specialists as to

18  what to put on the form when talking about job

19  announcements, such as Exhibit 2?

20    A    As I told you, we get a Form 2002, which

21  has all this information.  It comes from the

22  department to tell us what position they have open,

23

35

1    what are the requirements and so forth.  Now HR

2    generates this number, the position number, but all

3    of this information is coming from the department to

4    tell us what position is available and what are the

5    requirements.

6        Q    Doesn't that make the case that you don't

7    need to say anything to the specialist in order for

8    them to complete the form and create the job

9    description, such as in Exhibit 2?

10       A    I guess every now and then I could talk to

11   the department and say  -- let's say if I notice

12   something's wrong, misspelled or they forgot

13   something.

14       Q    I'm sorry.  Did you finish your answer?

15       A    I mean I do go over the form and if they

16   miss something, let's say, I may call back -- not

17   thinking about this position, but the main thing that

18   is coming up.  Let's say relocation.  Do you want

19   relocation to apply?  I'm not talking about this

20   particular position.  It may not have said that.  Or

21   the department can call me back and say they wanted

22   to add -- they forgot to put something on the

23

30

1    for.

2        Q    Are you aware of any changes to this job

3    description having been completed by Corporate?

4        A    I couldn't say, sir.  I don't have the

5    last one.

6        Q    You don't have the last one?

7        A    In other words, you're saying do I know of

8    any changes?

9        Q    Yes.

10       A    I wouldn't be able to remember.

11       Q    In any event, you testified that there was

12   a job description placed before you, before you

13   became Human Resources manager and hasn't changed

14   since then.  Correct?

15       A    I didn't say it hasn't changed since then

16   because I know that they've been working on changing

17   the job descriptions.  Every so often they do it.

18       Q    Do you have any awareness of any changes

19   that have been made to this job description since

20   1992?

21       A    I'm not sure.

22       Q    Who would know?

23

31

```
1      A     That would be a Corporate function.

2      Q     Who at Corporate?

3            (Pause.)

4      A     Georgette Fletcher is now charge of job

5    descriptions.

6      Q     I see at the bottom a Bates stamp number.

7    Do you see that?  It says 2031 and the subsequent

8    pages are the numbers after that.

9      A     At the bottom?  Yes, sir.

10     Q     Does that indicate to me it was your

11   office that produced this?

12     A     No, sir.

13     Q     Who did?

14     A     I have no idea.  My office doesn't produce

15   job descriptions at all.  I can't answer any

16   questions about --

17     Q     Do you maintain copies of job descriptions

18   on file?

19     A     Yes, if they send it to us.  Yes.

20     Q     So if you had been asked by counsel to

21   produce job descriptions, would you have been able to

22   go to the file and pull out the job descriptions and

23
```

32

```
1    send them on?

2      A     We're instructed to call Corporate to make

3    sure we have the latest job description.

4      Q     If you had been the one -- and you're

5    responsible for the call to Corporate.  Correct?

6      A     Yes, if he asked me to produce one, I

7    would have called Corporate.

8            MR. GOLDSMITH:  Let's mark this as Exhibit

9    2.

10                   (The document referred to

11                    was marked for iden-

12                    tification as Plaintiff's

13                    Exhibit No. 2.)

14           (Handing document to witness.)

15           BY MR. GOLDSMITH:

16     Q     Showing you what's been marked as Exhibit

17   2, can you tell me what this is?

18     A     This is a posting for a Foreman 2

19   position.

20     Q     Let me ask you this.  Who generates the

21   form?  Where does this form come from?

22     A     This example right here?

23
```

33

1    Q    Yes.  I see a heading up at the top.  It

2  obviously came from -- somebody printed it out from

3  the Internet it looks like.  Do you agree?

4    A    Yes, sir.  Actually, what happens is we

5  get a Form 2002 from the department and from that

6  form we have to key this into the system to generate

7  this job posting.

8    Q    So the actual posting that we see here,

9  which has Bates Whitley 121 at the bottom would have

10  been generated by your office?

11    A    You mean this example right here?  Yes, we

12  would put this in the system, but we got the

13  information from a Form 2002.

14    Q    I see.  So someone gives you some

15  information and you then convert that information

16  into this form that we see here in Whitley 121,

17  Exhibit 2?

18    A    Yes, sir.

19    Q    Who in your office performs that function?

20    A    It could be Taylor Cannon.  It could be

21  Glenda Jackson.  It could be LeVar Freeman.  It could

22  have been Wardell Thomas.  It just depends on who had

23

34

1  time to do it at that time.

2    Q    Is that something you would never do

3  personally?

4    A    Me?

5    Q    Right.

6    A    I laugh because I'm not good with

7  computers, okay.

8    Q    Just trying to find out.

9    A    No, I haven't done for a long, long time.

10    Q    Have you done it at all since you came

11  back after you were away from Amtrak?

12    A    I don't know.  I don't think I've ever

13  done it.  That's always been a function of the HR

14  specialist.  But if she's really tied up with a lot

15  of projects, then the HR officers can do it

16  themselves.

17    Q    Do you ever instruct the specialists as to

18  what to put on the form when talking about job

19  announcements, such as Exhibit 2?

20    A    As I told you, we get a Form 2002, which

21  has all this information.  It comes from the

22  department to tell us what position they have open,

23

36

1    position.

2        Q    So you would collect that information and

3    discuss it with the specialist?

4        A    Or whoever was entering the document.

5        Q    And made sure that they did enter it

6    correctly.

7        A    Yes, sir.

8        Q    In the case of Mechanical, between 2003

9    and 2005, who are the people who you would have

10    spoken to from that department about announcements,

11    job announcements such as Exhibit 2?

12        A    '03 and '05, Juan Truitt.  I'll give you

13    his name for one.  I remember talking to him.

14        Q    Anybody else?

15        A    I think he was the one in charge, the

16    superintendent from '03 to '05.

17        Q    Anyone else?

18        A    He's the main one I remember talking to.

19    I mean I talked to a lot of people in Mechanical

20    about this.

21        Q    Do you remember who any of the other

22    managers were in Mechanical at that time?

23

37

1        A    What do you mean "managers?"

2        Q    You said you spoke to a lot of managers

3    about job announcements in addition to Mr. Truitt,

4    but he was the one you specifically remembered.  I'm

5    asking you now who else was a manager there at the

6    time?

7        A    But usually I would talk to the

8    superintendent.  I mean, if you ask me who are the

9    managers -- Bobby Frank, Larry Ice, and B.L.

10    Campbell.  Those would be the assistant

11    superintendents.

12        Q    Did you ever speak to someone named Mr.

13    Klein about vacancy announcements?

14        A    No, sir.  I never spoke to Mr. Klein.

15        Q    Do you know Mr. Klein?

16        A    Yes, sir.

17        Q    Did you ever speak to Mr. Michael Kapela?

18        A    Yes, sir.

19        Q    About vacancy announcements?

20        A    I'm sure I've spoken to him about jobs in

21    the past.  I don't know specifically about postings.

22    You know, he may call and say, hey, I've got these

23

38

1   jobs I need up right away.  Make sure you get them up

2   right away.  I've talked to him before about setting

3   up interviews, stuff like that.  I talk to him about

4   a lot of things.

5       Q     Does that include jobs and interviews for

6   Foreman 2 positions?

7       A     I want to say I'm sure in the past I spoke

8   to him about different positions.  Certainly, the

9   general foreman and the superintendents, things like

10  that.

11          MR. FISCHLER:  But he's asking you a

12  specific question.

13          THE WITNESS:  For Foreman 2, I'm going to

14  say I don't know.  I don't recall.  I don't remember.

15          BY MR. GOLDSMITH:

16      Q     Do you deny speaking to Mr. Kapela about

17  Foreman 2 positions?

18      A     I may have.  I'm sure I've talked to him.

19  You're talking about this specific posting here?

20      Q     No, I'm not talking about that specific

21  posting.

22      A     Okay, all right.

23

39

1       Q     Let's make sure we're on the same page

2   here.

3       A     All right.  I thought you were talking

4   about this specific posting.

5       Q     I'm not asking you to recall a specific

6   posting.  I'm asking you generally.

7       A     I'm sure I talked to him in the past about

8   Foreman 2 positions at some point in time.  It's been

9   around 25 years.

10      Q     Between 2003 and 2005, would you have had

11  occasion to talk to him about it?

12      A     I don't know exactly when.  I can't put a

13  timeframe on it.

14      Q     Would you deny having done that?

15      A     What do you mean?

16      Q     Would you deny having spoken to Mr. Kapela

17  about Foreman 2 positions?

18      A     I won't deny anything.

19      Q     Let me finish the question.  Would you

20  deny having spoken to Mr. Kapela about Foreman 2

21  vacancies between 2003 and 2005?

22      A     I won't deny it.

23

54

1    A    Under No. 3, where it says, "Work

2  experience preferred?"

3    Q    Actually, the next line down.  I skipped

4  one.

5    A    No. 4?

6    Q    Right.

7    A    "Other Requirements?"

8    Q    Right.

9    A    Yes.

10    Q    Both the mechanical experience and the air

11  brakes certification are requirements that you were

12  informed of by the Mechanical Department.  Right?

13    A    Yes.

14    Q    That's their job to know that.  Correct?

15    A    Yes, they'll have to get those

16  certifications.

17    Q    The applicants will have to get the

18  certifications and the Mechanical Department is

19  telling you that they're required to have the

20  certifications.  Correct?

21    A    Yes, they must have the certifications.

22  Yes.

23


55

1        (Pause.)

2    Q    With regard to the Foreman 2 positions,

3  such as those that are reflected on Exhibits 2 and 3,

4  does Amtrak accept outside, non-Amtrak applicants for

5  those positions typically?

6    A    Yes.

7    Q    They also promote from within sometimes to

8  that position?

9    A    We try to promote from within.

10    Q    Is there a preference of some sort to do

11  that?

12    A    We would like to, yes.  If we have

13  qualified people, we definitely try to promote from

14  within.

15    Q    What steps do you take to attempt to

16  promote from within?

17    A    Well, we post the position.  We look at

18  the applicants.  If we have qualified applicants,

19  they're what we're looking for and the department

20  makes a selection.

21    Q    How are outside candidates informed of

22  openings, particularly, in the Mechanical Department?

23

68

1                          was marked for iden-

2                          tification as Plaintiff's

3                          Exhibit No. 6.)

4              (Handing document to witness.)

5              BY MR. GOLDSMITH:

6       Q     Exhibit 6 has Amtrak with the Bates 1392

7    to 3, a two-page exhibit.  What is Exhibit 6?

8       A     This is information that we put into the

9    computer on the job holders.  Everybody who applied

10   for this particular position and who was awarded the

11   position.

12      Q     So you collected information as to who was

13   selected for Foreman 2 between a particular date and

14   another date and you listed them all.  Is that right?

15             MR. FISCHLER:  When you say, "listed them

16   all," I'm not clear what you mean.  You can answer

17   if you understand, but I'm confused.

18             (Pause.)

19             BY MR. GOLDSMITH:

20      Q     Do you understand the question?

21      A     I thought he was--

22             MR. GOLDSMITH:  Unless he tells you not to

23

69

1    answer, you can answer.  Even after he talks, you

2    need to answer.

3             THE WITNESS:  Can you repeat the question?

4             BY MR. GOLDSMITH:

5       Q     I'll just repeat it.  Is it correct to say

6    that your office collected information about all the

7    people who'd been selected for Foreman 2 within a

8    particular timeframe and included them on this one

9    document?

10      A     Yes.

11      Q     I just want to ask you a couple of quick

12   questions about the information on here.  There are

13   different columns.

14      A     Yes.

15      Q     It says what looks like an abbreviation

16   for "assigned station" over near the right.  Do you

17   see that?  I may be misunderstanding it, but it's the

18   sixth from the right column.  Do you see that column?

19      A     Assigned status.

20      Q     Assigned status.  Okay, what does that

21   mean?

22      A     I don't remember.

23

70

1    Q    The next one says what I guess would be

2    "assigned" something else.  Do you know what that is?

3    A    Reason.

4    Q    What does that mean?

5    A    That should be like a 43 probably means

6    that they got the position.  They were awarded the

7    position.

8    Q    Do you think a 42 means that, too?

9    A    I'm not sure.

10   Q    Do you see any 42s on the chart?

11   A    Maybe that's a 42.

12   Q    It's hard to read.

13   A    I thought that was a 3.

14   Q    When you answered me about the 43, did you

15   just mean --

16   A    Okay, that column should be for who got

17   the position.

18   Q    If I see a number in there, a 42 or 43 or

19   something like that, as opposed to a 00, is that

20   indicating to me that they got the position?

21   A    Yes.

22   Q    The 00, is that indicating to me that they

23

71

1    didn't get the position?

2    A    Yes.

3    Q    Then there's a hire something date.  Do

4    you see that?

5    A    Yes.

6    Q    What does that date mean?

7    A    The date they went into the position.

8    Q    Is that the date they entered on duty?

9    A    Yes.

10   Q    Going back to the left again, there's an

11   INT line.  What does that mean, that column?

12   A    Wait a second.

13   Q    Do you see in between "Assignment Reason

14   and sex," it says "INT."  Would you like me to point

15   it out to you?

16        MR. FISCHLER:  I don't see "sex."

17        MR. GOLDSMITH:  Okay.

18        BY MR. GOLDSMITH:

19   Q    Do you see there it says, "Assignment

20   Reason, next to and over to the right?  That's what

21   I'm asking you about.  What does that appear to say

22   to you.  I realize it's hard to read and I apologize.

23

72

1       A     Which one are you asking again?

2       Q     The one to the immediate right of

3   "Assignment Reason."  They look like Ys and Ns in

4   there, which might be designating yeses and noes in

5   that column.  I'm wondering what that might mean.

6       A     I don't remember.

7       Q     Do you think the INT might be a reference

8   to interview?

9       A     No.

10      Q     Is there something else you think it might

11  be referring to?

12      A     I don't know.  I'll have to think about

13  that one.

14          (Pause.)

15      Q     I'm going to show you what I'm going to

16  have marked as Exhibit 7.

17                  (The document referred to

18                  was marked for iden-

19                  tification as Plaintiff's

20                  Exhibit No. 7.)

21          (Handing document to witness.)

22          BY MR. GOLDSMITH:

23


73

1       Q     Exhibit 7 has a Bates 1536 at the bottom

2   and it says "Closed Union Vacancies."  What is

3   Exhibit 7?

4       A     This is the same thing as the last report.

5       Q     It's shorter though?

6       A     Yes.

7       Q     A shorter report?  Is it a shorter report?

8       A     This is an applicant for the position of

9   Foreman 2 and the candidates that applied or were

10  considered.

11      Q     Is it correct -- I'm just trying to

12  understand the difference in this document and

13  Exhibit 6.  One difference that I note, tell me if

14  I'm correct, is that there is only one vacancy number

15  associated with Exhibit 7, but there are various

16  different vacancy numbers that appear on Exhibit 6.

17  Is that correct?

18      A     That's true.

19      Q     So it would appear that Exhibit 7 -- well,

20  let me ask you a different question.  What does

21  "Closed Union Vacancies" mean?

22      A     It means that this report, this position

23

74

1    has been closed because we have filled it.

2        Q    All right.  And I see over there on the

3    right-hand side I see that INT column again.  Any

4    idea what that means?

5        A    We're speaking to the one way over to the

6    right again?

7        Q    Yes, like the fourth from the right

8    column.

9        A    No, I don't.

10           (Pause.)

11       Q    When individuals are applying for a

12   Foreman 2 position, do they have to complete an

13   application form?

14       A    Yes, or submit a resume.  A resume could

15   be submitted online.

16       Q    If someone initially submits a resume, do

17   they also eventually have to complete a form?

18       A    We would like them to.

19       Q    Once an individual applies for a Foreman 2

20   position, is there an initial screening that goes on

21   to determine whether they're qualified for the job or

22   not?

23

75

1        A    Yes.

2        Q    Who performs the initial screening?

3        A    The recruiter assigned to that function.

4        Q    That would be one of your specialists or

5    yourself?

6        A    The HR officer or myself.

7        Q    In the period of 2003 to 2005, who were

8    the people that could have screened applicants for

9    Foreman 2 in Washington, D.C.?

10       A    LeVar Freeman, Wardell Thomas or Taylor

11   Cannon.

12       Q    Could it have been you as well?

13       A    It could have been me.

14       Q    One of those four people?

15       A    Yes.

16       Q    Would there sometimes be more than one

17   person involved in screening an applicant?

18           (Pause.)

19       A    Yes.

20       Q    Do you have a written guide that you use

21   in order to screen them?

22       A    No.

23

76

1    Q    What criteria are used to screen them?

2    A    Form 2002.

3    Q    Would you or one of the HR officers who

4    was doing the screening for a Foreman 2 position

5    sometimes have questions about matching up an

6    applicant's qualifications to what's on the 2002?

7    A    Yes.

8    Q    Would you sometimes ask someone in the

9    Mechanical Department to assist you in interpreting

10    either what's on the 2002 or what the applicant is

11    saying in your applicant?

12    A    Yes.

13    Q    Is that a common practice or is it unusual

14    to do that that way?

15    A    No, it's not unusual.

16    (Pause.)

17    Q    I showed you a moment ago Plaintiff's

18    Exhibit 5. I believe you testified that this

19    reflected the initial screening. It says, "Applicant

20    Flow Log." Is that true?

21    A    What do you mean "initial screening?"

22    Q    You testified a moment ago that your

23

80

1    A    Yes.

2    Q    I see columns that say, "Q and UQ" on this

3    form. Does that mean qualified or unqualified?

4    A    Right.

5    Q    And I see that -- well, let me just ask

6    you. Are you familiar with Ms. Whitley?

7    A    Do I know her? Yes.

8    Q    Have you known her for many  years?

9    A    Yes.

10    Q    This particular initial screening sheet

11    you completed personally. Correct?

12    A    Yes, that's my handwriting.

13    Q    Why is it not checked under either Q or UQ

14    for Ms. Whitley here were it is for the other

15    applicants?

16    A    I don't know.

17    Q    Let me ask you this. Does anyone ever

18    apply for a Foreman 2 position who's unqualified?

19    Does that happen sometimes?

20    A    Yes.

21    Q    What happens in that situation as far as

22    what steps your office takes?

23

81

1    A    What do you mean?

2    Q    What do you do next if you get an

3  application and it becomes clear that the person's

4  unqualified?

5    A    You mean as far as documentation?

6    Q    Do you document it somehow?  Do you notify

7  the person, the applicant, those kinds of things?

8    A    We don't always notify them.  We would

9  document it or it could be in the folder and it could

10  be a group that says, "not qualified."

11    Q    Do you sometimes inform them?

12    A    If we have the time.

13    Q    When you inform them, it is orally or in

14  writing or both sometimes?

15    A    We're supposed to do it in writing.  We

16  have done it orally sometimes.

17    Q    Some of each?

18    A    Yes.

19    Q    Let's talk now about an applicant who is

20  qualified.  In the event of such an application, is

21  the applicant always interviewed?

22    A    Say that again.

23

82

1    Q    If someone is qualified when they apply

2  for a Foreman 2, are they necessarily going to be

3  interviewed?

4    A    Not always, no.

5    Q    How do you determine whether or not to

6  interview someone?

7    A    As an example, if have a lot of qualified

8  applicants, the rule is we can just interview five

9  people we would like.  If the department doesn't have

10  the time to interview all of the qualified

11  candidates, then we could interview the top five.

12    Q    Would you ever interview someone who was

13  lower on the list than the top five and not interview

14  the people who are in the top five?

15    A    We always try to interview the best

16  qualified.  When we're looking at the top five, we're

17  going to exclude people who are qualified.

18    Q    Is anyone ever selected to be a Foreman 2

19  without having been interviewed?

20    A    What do you mean?

21    Q    Has anyone ever been selected to be a

22  Foreman 2, when they weren't one of the people who

23

85

1    them.

2        Q      Are those asked of all interviewees for

3    Foreman 2 positions?

4        A      The same questions are asked of all the

5    applicants.

6        Q      Has that been the case over time going

7    back to 2003?

8        A      Yes, all questions are consistent through

9    all applicants.

10       Q      Was it true going back to when you first

11   returned to Amtrak?

12       A      Yes, sir.

13       Q      How much advance time is necessary in

14   order to set up an interview with an applicant for

15   Foreman 2?

16              (Pause.)

17       A      That varies.  It just depends on a lot of

18   things.

19       Q      Who normally serves on the interview

20   panels for Foreman 2?

21       A      It could be an HR rep and a department

22   person.  It could be two department reps.  Depending

23

86

1    on the position, it could be a union representative.

2        Q      There's a gentleman named Mr. Tana.  Are

3    you familiar with him?

4        A      Yes, sir.

5        Q      What's his job?

6        A      He's a union rep for ARSA.

7        Q      How long -- let me ask you this.  Is that

8    a collateral duty for him or is he a full-time union

9    rep as far as you know?

10       A      Full-time?

11       Q      Does he do that all the time?

12       A      Full-time duty to interviewing the panel?

13       Q      No, I'm asking you -- you said he was a

14   union rep.  Does he also work on the trains?

15       A      Yes, he's a foreman, too, plus, he handles

16   the union duties.

17       Q      When he sits on a panel for selection to

18   Foreman 2, who is he representing?

19       A      He's representing the applicants and the

20   union to make sure that the process is fair.

21       Q      Let me ask you this.  Other than Mr. Tana,

22   would it be common for a Foreman 2 to sit on an

23

87

1     interview panel for selection for new Foreman 2s?

2         A     Repeat that because you lost me.

3         Q     Other than Mr. Tana, who is a special

4     case, would it be common for an incumbent Foreman 2,

5     to sit on an interview panel to interview people to

6     become Foreman 2 or would the panel be composed of

7     people who are more highly ranked?

8         A     Let me see if I can explain this.  A lot

9     of the position we require we let the union rep sit

10    in on the interview process.  So it's not uncommon

11    for no matter what position they're in, if they're

12    the union rep for that position, they can sit.  We

13    have been letting them in the interview process to

14    make sure it's a fair process.

15        Q     Are there any other Foreman 2 who sit on

16    the interview panel?

17        A     Let me think who was there before.

18        Q     I'm not talking about the union now.

19    Forget about the union.  I'm asking you, other than a

20    union rep, would a Foreman 2 sit on a panel to

21    interview for the selection of new Foreman 2?

22        A     Not normally if they're not the union rep.

23

88

1         Q     So Mr. Tana's there because he's the union

2     rep and if he weren't the union rep he would be

3     sitting on panels.

4         A     No.

5         Q     When Mr. Tana sits on the interview panel

6     -- strike that.  When individual sit on the interview

7     panel, they complete, they fill in the form that has

8     the questions listed.  Isn't that usually the case?

9         A     Yes.

10        Q     When they do that, one of the things on

11    the form is it lists various categories of knowledge

12    or competency and invites the interviewers to check

13    how strong the candidates are in a given area.  Are

14    you familiar with that?

15        A     I would have to see the interview sheet.

16    They're different.

17        Q     Is it your understanding that the

18    interviewers are expected to take notes during the

19    interview?  Who are those notes provided after they

20    take them?

21        A     They go in the job file folder.

22        Q     When the notes go in the job file folder,

23

89

1    who sees them next?

2        A    The go in the job file folder after the

3    file is closed.

4        Q    So who sees the interview notes after

5    they've been taken by the interviewers?

6        A    No one at that point unless the file is

7    requested.

8        Q    Who might have occasion to request the

9    file?

10       A    In a case like this.

11       Q    What about just in the normal course of

12   making a selection for a Foreman 2?  Who decides

13   who's going to be selected among the multiple

14   candidates who are interviewed for a Foreman 2

15   position?

16       A    The panel usually talks, but the final

17   choice is held by the Department.

18       Q    Who was the head of the department between

19   2003 and 2005?

20       A    I didn't say head of the department.

21       Q    I'm asking you who was the head of the

22   department between 2003 and 2005?

23

90

1        MR. FISCHLER:  If you know.

2        THE WITNESS:  I would say I'm not sure.

3        BY MR. GOLDSMITH:

4        Q    Who is head of the department today?

5        A    When you speak of "head," do you mean head

6    of the whole Mechanical or head in Washington, D.C.

7    at that terminal?  That's another reason I was --

8        Q    Why don't you tell me both.  As of today,

9    who's the head in Washington, D.C.?

10       A    Mike Kapela and Vinc Nesci.

11       Q    Where is his duty station?

12       A    Wilmington, Delaware.

13       Q    Does he supervise Mr. Kapela?

14       A    Yes.

15       Q    Before the decision is made, once there's

16   been a panel, who needs to be consulted in order for

17   a decision to be made who to select for a Foreman 2

18   position?

19       A    Pardon me?

20       Q    Who has to be consulted before a position

21   can be filled for a Foreman 2 position?

22       A    They could make a decision that day after

23

91

1    the panel is over.  Or they could go back and contact

2    us later and let us know who's selected.

3        Q    Who's the "they?"

4        A    The people that were on the panel.

5        Q    So it's the people who were on the panel.

6    You said they can make a decision.  What other

7    choices do they have?

8        A    They may go back and think about it.  If

9    it's a hard choice, they may want to go back and I

10    don't know.

11        Q    Would the people on the panel be expected

12    to consult with anyone else?

13        A    They could.

14        Q    Is that common, uncommon?

15        A    It's common with all departments.

16        Q    Who might they consult with?

17        A    Are you speaking of Foreman 2

18    specifically?

19        Q    Yes.

20        A    Then they could consult with on up -- the

21    general foreman, the assistant superintendent, and up

22    to Mike Kapela -- the chain of command.

23

94

1    transferring someone in the organization, say,

2    promoting someone from a carman to a Foreman 2, then

3    that would be the transfer.  It could be a salary

4    change.  If we put somebody out on medical leave,

5    termination, retirement, resignation -- things like

6    that.

7        Q    Down at the bottom there's a box with a

8    set of approval signatures.  Do you see that?

9        A    Yes.

10        Q    What's that all about?

11        A    In this particular instance, the person in

12    the Mechanical Department approving this person for a

13    new hire.

14        Q    In this case, the supervisor's name on

15    here is Larry Ice.  Correct?

16        A    Yes.

17        Q    Are you familiar with Mr. Ice?

18        A    Yes.

19        Q    Would Mr. Ice be expected to have seen the

20    interview notes in order to sign his name on this?  I

21    don't see his signature, but there's a box with his

22    name written on it.

23

95

1    A    Not necessarily.  If he wasn't in the

2    interview process, and they made a decision that day.

3    Q    When does Mr. Ice have the authority to

4    not accept the recommendation of the interview panel?

5         (Pause.)

6    A    I don't know.

7    Q    Would Mr. Ice necessarily know what the

8    recommendation of the interview panel was?

9    A    If they made a decision right then and

10   they didn't discuss it with him, then --

11   Q    Then he what?

12   A    I guess I have to say I don't know.

13   Q    Is there any document that Mr. Ice would

14   be expected to have in front of him showing him

15   anything about what the interview panel recommended,

16   other than the notes?

17   A    Other than the --

18   Q    Interview notes.

19   A    Okay, you're taking it again that was he

20   in the interview process or not.

21   Q    Would he have to have been in the

22   interview process in order to be the approving

23

96

1    supervisor?

2    A    No.

3    Q    Let's not talk specifically about Mr.

4    Akins in Document 1948.  Let's just talk generally

5    for a moment.  When the interview panel finishes its

6    work, does it fill out any kind of or send any kind

7    of written notice as to who it recommends be

8    selected?

9    A    That would be this form.  Let's say they

10   had the interview process.  They talked after the

11   process.  Then they would go back to their department

12   and say this is who we selected.  Then they would cut

13   this Form 2000.

14   Q    It says here that Mr. Truitt also has to

15   approve.  Correct?  Or has approved in this

16   particular case, going back to Exhibit 9.

17   A    Right.  He could have been in the

18   interview process, but I don't know.  He may have

19   been in this particular interview process.

20   Q    When the interview -- well, let me

21   rephrase.  I think you told me.  Tell me if I got it

22   right.  When the interview is complete, there are

23

97

1    notes because they're required to complete the notes
2    from the questions that were previously prepared.
3    Correct?
4        A    Right.
5        Q    The next document that's generated in the
6    process of selecting someone for a Foreman 2 position
7    is one of these, this form you probably have --
8        A    Form 2000.  Right.
9        Q    And the people who approve of the Form
10   2000 would be people who might have been involved in
11   the interview process, also may not have been
12   involved in the interview process.  Is that also
13   correct?
14       A    That's true.  Because as you see, Ron
15   Truitt signed.  We have what we call "statistical
16   clerks."  We'll give the information to them and
17   they'll send it up to Ron Truitt, who wasn't in the
18   interview process, but he's the Mechanical
19   superintendent.
20       Q    So there is no form that is signed.
21   There's no standard document for the interview panel
22   to itself reflect its will at the end of its
23

98

1    interviews.  Is that correct?
2        A    No.
3        Q    There is no such thing.  Right?
4        A    No.  In other words, do they fill out
5    something saying this is the person who is going to
6    be selected?  No.
7        Q    There's no such document.  Correct?
8        A    They go back to the department.  They tell
9    us who they're going to select and they send a Form
10   2000 in and we fill out those other forms that we
11   talked about here.  That's the only way it's
12   reflected, the initial screening sheet, the applicant
13   flow -- we fill out one of those and we put it in the
14   computer and it's reflected there.
15       Q    So the decision of who to select comes out
16   of the department without any document that
17   specifically says what the interview panel thought.
18   Correct?
19       A    Right.  In other words, we talk about it.
20   The department gives its final okay on who they want,
21   then by so doing this form here.  Attached to this
22   could come a letter or selection form or something
23

99

1    like that.

2        Q    Or there may not.  Is that also true?

3        A    Yes.

4        Q    And the panelists, as far as what Amtrak's

5    policies and practices are, are free to consult with

6    the managers and others within the department before

7    any kind of recommendation is written or any kind of

8    selection is made on the Form 2000.  Correct?

9        A    They can, yes.

10       Q    On this particular 2000, going back to

11   Exhibit 9, page 1948, it says "Human Resources

12   approval" and there's a signature by Taylor Cannon.

13   Is that right?

14       A    Uh-huh.

15       Q    There's another signature below that.

16   Whose is that?

17       A    Glenda Jackson.

18       Q    What's her job?

19       A    She's HR specialist.  She would key this

20   information into the system.

21       Q    What does Mr. Cannon's signature there

22   mean?  Why is it there?

23

100

1        A    It means that it's probably -- sometimes I

2    sign.  Sometimes he signs.  He's the Mechanical

3    Department.  He would have known about this action.

4        Q    Does it mean, when he says "approval,"

5    that he doesn't know of any reason not to sign on

6    what the department is saying what it wants to do?

7        A    Right.

8        (Pause.)

9        Q    If you can just return your attention to

10   Exhibit 5 for a moment, which is the applicant flow

11   log.  Do you see where it says "Washington, D.C." and

12   then sort of next to that an above there's a 2 in

13   parentheses?

14       A    Yes.

15       Q    What does that 2 mean?

16       A    That means that there were two positions.

17       Q    Two vacancies at the time?

18       A    Yes.

19       Q    Could you return your attention now to

20   Exhibit 6.  Do you see there's a column that says

21   something like "CERT TYPE" to the left beside the

22   single digit 1.  I'm sorry.  Next to the single digit

23

107

1       A    I don't know.

2       Q    It was your job to supervise him though,

3   right?

4       A    Yes, sir.

5       Q    Would you expect him to handle it the same

6   as you or differently than you would?

7       A    I would have expected him to call and ask.

8       Q    If he called -- you mean call Mechanical?

9       A    Yes.

10      Q    If he called and asked, what sort of

11  answer do you think he would get about whether

12  certifications were needed in order to be a Foreman

13  2?

14           MR. FISCHLER:  Objection.  That calls for

15  speculation.

16           THE WITNESS:  I don't know.

17           BY MR. GOLDSMITH:

18      Q    As far as you know, the Mechanical

19  Department might have intended it to be the way it

20  reads here.  You just would have wanted to call and

21  make sure.

22      A    Verification.

23


108

1       Q    Yes?

2       A    Yes, verification.

3       Q    And your answers to those questions are

4   not altered at all by the fact that it says, "must

5   have certification."  That doesn't change your

6   answers.  Right?

7       A    Like I said, I would question it.

8       Q    Was there anything you would have done

9   besides question it?

10           MR. FISCHLER:  Also calls for speculation.

11  You can answer.

12           THE WITNESS:  Would I have done anything

13  besides question it?  That would be what you would

14  do.

15           BY MR. GOLDSMITH:

16      Q    And then follow whatever Mechanical said

17  they wanted to do once you questioned it?

18      A    Right.

19      Q    Is that generally the role of Human

20  Resources at Amtrak in recruitment and selection, to

21  follow the request of the department that's making

22  the request?

23

109

1      A     Yes.  And if we have questions, to call

2      them and speak with them about it.

3             (Pause.)

4      Q     Have you ever watched a Foreman 2 do his

5      or her work?  Have you ever had occasion to be at a

6      facility watching them supervise mechanics and

7      electricians and carmen?

8      A     You mean to actually be with them?  I mean

9      I've seen them out there, but I don't know what

10     they're doing.

11     Q     You testified that you have some

12     familiarity with Ms. Whitley.  Correct?

13     A     Yes, I know Ms. Whitley.

14     Q     Is she a truthful person as far as you

15     know?

16     A     I couldn't answer that.

17     Q     Are you aware of anything untruthful she's

18     said?

19     A     I'd have to answer that no because I'm not

20     around Ms. Whitley to --

21            (Pause.)

22     Q     Did you finish your answer?

23

118

1      qualifications for Foreman 2 with anyone else besides

2      Ms. Whitley?

3      A     I'm sure with the HR staff.  We would have

4      discussed the candidates.

5      Q     Would that include Mr. Cannon?

6      A     Yes.  It could have been Cannon, LeVar or

7      Thomas.

8      Q     What do recall being said about Ms.

9      Whitley in those conversations?

10     A     I don't recall.

11     Q     Is there anything that would refresh your

12     recollection?

13     A     No, I can't recall about any of them, any

14     of the candidates.  It was a long time ago.

15     Q     Did you ever develop a point of view as to

16     whether Ms. Whitley was or wasn't qualified to be a

17     Foreman 2?

18     A     In all the years that I've worked for

19     Amtrak to promote to a Foreman 2, you must have been

20     in the craft of electrician, pipe fitter, machinist

21     or carmen and I think Mae will attest to that.  You

22     promote from those into Foreman 2 from the skilled

23

119

1    crafts.  Ms. Whitley was a Foreman 1, which

2    supervised coach cleaners, so they could not promote.

3    She did not come from a skilled craft to go into a

4    Foreman 2 position.  They then -- because they

5    complained that they didn't have a career path, we

6    had a training program set up so that they would have

7    a career path to promote to Foreman 2, but that

8    program is no longer in existence.  We did send

9    approximately three candidates, maybe, to that

10   training class to promote from where Ms. Whitley was,

11   Foreman 1, into that craft.

12       Q     When Ms. Whitley told you about the

13   courses she was taking, did you tell her she wasn't

14   qualified?

15       A     No, we didn't even discuss that.  We

16   discussed -- she just told me she was taking some

17   courses.  I can't remember.

18       Q     Did your office ever generate any

19   information delivered to Ms. Whitley to tell her she

20   wasn't qualified to be a Foreman 2?

21       A     Well, I don't know.  I'm sure, if she

22   didn't meet the qualifications back then of carmen,

23

120

1    pipe fitter, electrician -- those crafts -- we

2    wouldn't have interviewed her.

3        Q     Did you ever participate in making any

4    decisions about whether or not to interview Ms.

5    Whitley?

6        A     Me, personally?

7        Q     Yes.

8        A     It would be whoever the recruiter was at

9    the time of the position.  That would have been the

10   person that would make the decision on who they would

11   interview.

12       Q     Do you know whether you were personally in

13   on any such discussions?

14       A     I can't recall.

15       Q     Is there anything that would refresh your

16   recollection?

17       A     No.

18       Q     Do you know whether Ms. Whitley was ever

19   interviewed?

20       A     From reviewing the records, yes.

21       Q     Yes, she was?

22       A     Yes.

23

132

```
 1   courses that Ms. Whitley told you she was taking as

 2   far as their content?

 3       A    I don't remember which ones she told me

 4   she was taking.  I just remember --

 5       Q    Do you know whether Ms. Whitley has ever

 6   been disciplined in the Mechanical Department for any

 7   reason?

 8       A    Yes.

 9       Q    What do you know about that?

10       A    Reviewing the files, she received a

11   discipline.  I recall Taylor writing her a letter.

12       Q    When did you review the files?

13       A    When -- gosh, the last lawsuit.  I can't

14   remember.

15       Q    In the last lawsuit of Ms. Whitley's?

16       A    I think it was.  I'm not sure.

17       Q    Do you know what she was disciplined for?

18       A    No, I don't.

19       Q    Do you know if the discipline was ever

20   rescinded?

21       A    No, I don't.

22       Q    Do you know who in management decided to

23
```

133

```
 1   impose discipline on her?

 2       A    No, I don't.

 3       Q    Do you know whether that had an impact on

 4   Ms. Whitley being selected for any Foreman 2

 5   positions?

 6       A    I know she was sent a letter by Taylor

 7   Cannon that she would not be considered for one of

 8   the interview processes.

 9       Q    Because of discipline?

10       A    Yes.  I know that he sent her a letter.

11       Q    Did her status ever change in that regard?

12       A    I don't know.

13       Q    Did you discuss with Taylor his sending

14   Ms. Whitley that letter before he sent it?

15       A    No, I didn't.

16       Q    Did you discuss the contents of that

17   letter at any time prior to your reviewing it for

18   litigation purposes?

19       A    Say that again.

20       Q    Did you discuss the contents of Taylor's

21   letter to Mae Whitley at any time prior to when you

22   told me you did it because it was part of a

23
```

134

1    litigation situation?

2            MR. FISCHLER:  Do you understand the

3    question?

4            BY MR. GOLDSMITH:

5        Q    You testified a moment ago that you saw

6    Taylor's letter when you were reviewing the file for

7    litigation.  Correct?

8        A    Right.

9        Q    Did you ever discuss Taylor's letter or

10   what was written in Taylor's letter at any time

11   before that?

12       A    I don't recall.

13       Q    Is there anything that would refresh your

14   recollection?

15       A    All I would say is that HR officers are

16   taught to check the discipline and if they have

17   discipline within a year, then they would send that

18   letter out.  That looks like what happened.

19       Q    But you never personally discussed it with

20   anyone until you reviewed it for purposes of

21   litigation?

22       A    I don't recall.

23

136

1    Tana about Ms. Whitley?

2        A    Mr. Tana?  If he was in on an interview

3    process about it -- I don't recall.

4        Q    Again, it's possible that you did, but you

5    don't have any recollection.  Right?

6        A    It's possible.

7        Q    Did you ever talk to Mr. Tana about the

8    discipline of Ms. Whitley?

9        A    No, I didn't.

10       Q    Do you know whether anyone else in your

11   office did?

12       A    I'm not sure.

13       Q    Have you heard of an employee receiving

14   two rejection letters for the same job announcement,

15   job posting?

16       A    Yes, by mistake.  It could have been a

17   mistake.

18       Q    Any other reasons why that might happen?

19       A    For the same job posting?

20       Q    Yes.

21       A    You should only get one letter for the

22   same job posting.  It was probably just an error.

23

1    Q    Have you ever discussed Ms. Whitley with

2    Mr. Kapela?

3    A    Yes.

4    Q    What discussions have you had?

5    A    In working on the last case, I had to call

6    his department for a lot of information.

7    Q    What was said between yourself and Mr.

8    Kapela?

9    A    I don't recall our conversation, but I had

10   to get a lot of information from him to supply in

11   that last case.

12   Q    Would it be fair to say you were talking

13   about the last case.  That's what you've been

14   discussing?

15   A    Yes.

16        (Pause.)

17   Q    When you say you had to get a lot of

18   information, are you talking about documents or were

19   you interviewing him?  What do you mean by "getting a

20   lot of information?"

21   A    Just information that the Law Department

22   asked for.

23

1    A    Yes.

2    Q    Have you ever discussed Ms. Whitley's

3    candidacy for Foreman 2 with Ron Truitt?

4    A    Yes, it would have been with working on

5    this case.

6    Q    What about when she was applying?

7    A    When she was applying, I didn't handle the

8    position when she was applying.

9    Q    So did you discuss it with Ron Truitt when

10   she was applying?

11   A    I didn't handle the position.

12   Q    So is that a yes or no?

13   A    No.

14   Q    Did you discuss Ms. Whitley's application

15   for Foreman 2 with Ron Frank at the time that she was

16   applying?

17   A    I don't recall any conversations with him

18   about it.

19   Q    What about her lawsuits?

20   A    I may have talked to any of the assistant

21   superintendents, anybody who had anything to do with

22   the case during my information that I had to provide

23

1    to the Law Department.  I could have, but I don't

2    recall.

3        Q    You said something a few minutes ago about

4    an earlier case.  Do you remember that?

5        A    Yes.

6        Q    How many lawsuits has Ms. Whitley had

7    against Amtrak that you know of?

8        A    I don't recall.  Well, I don't know.

9    Let's put it that way.

10       Q    When you were collecting information --

11   let me ask you this.  Prior to the timeframe in which

12   you were putting together the chart in Exhibit 14-B,

13   what you were just showing me, had you put together

14   information previous to that relating to Ms. Whitley

15   and a lawsuit?

16       A    I don't recall.  I think that maybe there

17   was an EEO lawsuit.

18       Q    So you don't recall is the answer to the

19   last question.  Right?

20       A    Yes.

21            (Pause.)

22       Q    Take a look at what we'll mark as Exhibit

23

1    No. 15.

2                      (The document referred to

3                      was marked for iden-

4                      tification as Plaintiff's

5                      Exhibit No. 15.)

6            (Handing document to witness.)

7            BY MR. GOLDSMITH:

8        Q    I'm showing you what's been marked as

9    Exhibit 15 to your deposition.  This is the first

10   page.  Defendant National Railroad Passenger

11   Corporation responses to Plaintiff's First Set of

12   Interrogatories.  It's an excerpt.  It's not

13   complete.  It pertains to Case 103CV0636 in the U.S.

14   District Court of the District of Columbia.  Turning

15   your attention to the second page, the answer to

16   Interrogatory No. 1, the answer indicates that you

17   were consulted or otherwise participated in preparing

18   the responses to the interrogatories.  Do you see

19   that at the bottom of page 2?

20       A    Yes, I do.

21       Q    Is that accurate as far as you know?

22       A    I guess if it says -- is this the same

23

148

1   case?

2           MR. FISCHLER:  It's a different case.

3           BY MR. GOLDSMITH:

4    Q     This one has a case number of 103CV00636.

5    The other one is 105CV01924.  Is it fair to say you

6    assisted in providing documents in the case reflected

7    in Exhibit 15?

8    A     Right then.

9    Q     And you also assisted in responding to the

10   case reflected in the prior Exhibit No. 14.  Correct?

11   A     Yes.

12   Q     You testified that you spoke to Mr. Kapela

13   about providing information in response to Ms.

14   Whitley's case.  Which case or cases were you

15   referring to?

16   A     Whatever the timeframe.  If he was in the

17   position when she filed the case.

18   Q     If I'm not mistaken, Mr. Kapela -- if you

19   take a look at Exhibit 15, you'll see at the top it

20   says Case No. 103, which is an indication that the

21   case was filed in 2003.  Was Mr. Kapela in his job by

22   2003?

23

149

1    A     I'm sorry.

2    Q     Do you need to hear it again?

3    A     Yes, I'm sorry.

4    Q     Was Mr. Kapela in his position by 2003?

5    A     I would imagine.  I don't know the exact

6    date he went in his position.

7    Q     It appears from page 2 in the

8    interrogatory answers --

9    A     I don't see a date on this, though.  When

10   did it happen?  Would there be a date?  I don't see a

11   date, so I can't say.  But I would imagine, from this

12   document with his name being in it, that he was in

13   the position but it doesn't show me a date for the

14   document.

15   Q     The case was filed in 2003 because it says

16   so in the case caption.

17   A     Okay.

18   Q     And the response here to Interrogatory No.

19   1 indicates that Mr. Kapela was the master mechanic

20   at the time that these were being responded to, which

21   would be sometime after this case was filed.

22   A     Then I would have had to call his office

23

150

1    to get the information for this case, too.

2    Q    You would have had to speak to him and

3    whoever was involved in the case, with regard to the

4    2003 case, as well as the 2005 case reflected in

5    Exhibit 14.  Correct?

6    A    Yes, I would have spoken to his office.

7    Q    I believe what you said was you would have

8    spoken to Mr. Kapela as well as anyone else in the

9    office you needed to speak to.  Correct?

10   A    Yes, whoever worked on the case.

11   Q    Remaining with Exhibit 15, the third page

12   of the exhibit, at the bottom it says page 13 of the

13   responses.  Do you see that?

14   A    Yes.

15   Q    Strike that.  I don't need to ask you

16   anything about that.

17       (Pause.)

18       MR. GOLDSMITH:  Mark this as No. 16.

19                    (The document referred to

20                    was marked for iden-

21                    tification as Plaintiff's

22                    Exhibit No. 16.)

23

151

1        (Handing document to witness.)

2        BY MR. GOLDSMITH:

3    Q    I'm showing you what's been marked as

4    Exhibit 16, which says, "The Court Complaint."  It

5    says it's the Mae Whitley v. Amtrak Case and it has

6    the 2003 filing date on the top.  Do you see that?

7    A    I do.

8        MR. FISCHLER:  This is the complaint for

9    the 2003 case.

10       BY MR. GOLDSMITH:

11   Q    Have you ever seen this document before?

12       (Pause.)

13   A    I don't recall seeing this.

14   Q    Are you familiar with any of Ms. Whitley's

15   contentions that are reflected in Exhibit 16?  Did

16   you know about them?

17   A    No, they probably would have went to the

18   department.  It was not an HR issue.  In other words,

19   the recruitment process -- this might have gone

20   through EEO probably.  I mean at any given time EEO

21   could have called with some information on it, but I

22   just don't recall.

23

152

1    Q    Do you recall being familiar with any of

2  the contentions that Ms. Whitley has in here?

3    A    I heard someone mention it to me, but I

4  didn't have anything to do --

5    Q    You did assist in responding to

6  interrogatories about it, though.  That's what we

7  were just talking about.  Right?

8    A    Possibly, yes.

9    Q    That's what we were talking about with

10  regard to --

11    A    Is this the same case?

12    Q    Exhibit 15, yes, it's the same case.  If

13  you'd look at the case numbers, it's the same case.

14    A    Okay.  Looking at this, I didn't remember

15  some of this stuff in here, but I probably -- I may

16  not have been sent this part of it, but was sent this

17  to answer the questions.  I mean usually they just

18  send me questions I have to answer.  Now what her

19  alleged information may have been --

20         (Pause.)

21         MR. GOLDSMITH:  Let's mark this as Exhibit

22  17.

23

155

1              was marked for iden-

2              tification as Plaintiff's

3              Exhibit No. 20.)

4         (Handing document to witness.)

5         BY MR. GOLDSMITH:

6    Q    No. 20 is dated August 19, 2004.  It's

7  another rejection letter to Ms. Whitley from Foreman

8  2.  Does this also look like an authentic letter from

9  your office?

10    A    Yes.

11         (Pause.)

12    Q    Let's take a look at this one.  Well,

13  let's do these first.

14         MR. GOLDSMITH:  This is 21.

15              (The document referred to

16              was marked for iden-

17              tification as Plaintiff's

18              Exhibit No. 21.)

19         (Handing document to witness.)

20         BY MR. GOLDSMITH:

21    Q    No. 21 says it's about a Foreman 2 vacancy

22  from May 10th of

23

162

1   requirements noticed on Exhibit 2 -- high school

2   diploma and mechanical experience.  Correct?

3       A    We would look at the education and the

4   work experience.

5       Q    You said those were the only mandatory

6   requirements.  Correct?

7       A    Well, that's what we screen applicants on

8   and there are other requirements in communication.

9       Q    But when you put out the special notice in

10  1999 for the same job, Foreman 2, you didn't indicate

11  must have some mechanical experience, did you?

12      A    No, we didn't.

13      Q    Why was that?

14      A    I'm not sure, but we posted it this way

15  before, but we screen by the requirements of the

16  position.

17      Q    You did indicate in 1999 that an applicant

18  would have to have knowledge of safety rules.

19  Correct?

20          MR. FISCHLER:  The document says what the

21  document says.

22          BY MR. GOLDSMITH:

23


179

1       Q    You hesitated a little though when I asked

2   you about his truthfulness.  Can you tell me why?

3       A    I don't know.

4       Q    Do you know Gary Louers?

5       A    Yes.

6       Q    Who is he?

7       A    I think he's a general foreman.

8       Q    Is he a truthful person as far as you

9   know?

10      A    I don't know.

11      Q    Have you had a lot of interaction with

12  him?

13      A    Not really.

14          (Pause.)

15          MR. GOLDSMITH:  Sorry for the delay.

16          (Pause.)

17                (The document referred to

18                 was marked for iden-

19                 tification as Plaintiff's

20                 Exhibit No. 24.)

21          (Handing document to witness.)

22          BY MR. GOLDSMITH:

23

180

1    Q    I'm showing you what's been marked as

2    Exhibit 24, a three-page document, starting with

3    Amtrak Whitley, 804.  Can you tell me what's in here?

4    A    It's an applicant flow log for a Foreman 2

5    position in Washington, D.C. and it lists Applicant

6    Mae Whitley, Linford Chapman, Michael Akins, whether

7    they were selected or not.

8    Q    That's on page 806.  Right?

9    A    Yes.

10    Q    Whose handwriting is on 806?

11    A    Taylor Cannon.

12    MR. GOLDSMITH:  Take a look at what we're

13    going to mark as Exhibit 25.

14                   (The document referred to

15                   was marked for iden-

16                   tification as Plaintiff's

17                   Exhibit No. 25.)

18    (Handing document to witness.)

19    BY MR. GOLDSMITH:

20    Q    Exhibit 25 starts with page 757 and goes

21    through 762.  Is this part of a job file?

22    (Pause.)

23

194

1    MR. FISCHLER:  She can't tell you what you

2    should infer.  That's an unfair question.

3    BY MR. GOLDSMITH:

4    Q    Do you believe that Mr. Cannon did the

5    screening?

6    MR. FISCHLER:  Asked and answered.

7    THE WITNESS:  I don't know.

8    BY MR. GOLDSMITH:

9    Q    Looking at 1923, Mr. Cannon gave Mr.

10    Wilson his acknowledgement form for all the benefits,

11    the union book and all that.  Correct, and he signed

12    for that?

13    A    Any  of us could have signed it.  Well,

14    I've signed out many people he's brought in.

15    Q    So you're saying, even though your writing

16    isn't in here at all, it could have been you who did

17    the screen.  Is that right?

18    A    I don't know who did it.

19    Q    You're one of the potential people who

20    might have done it.  Correct?

21    A    Anybody in my office.

22    Q    Looking at page 1926, is there any

23

195

1  indication that Mr. Wilson has ever worked on a

2  train?

3          MR. FISCHLER:  He just asked you looking

4  at that page.

5          THE WITNESS:  26?  I don't see it.

6          BY MR. GOLDSMITH:

7      Q    Is there any indication that Mr. Wilson

8  has any of the certifications that were reflected on

9  Ms. Whitley's certification card?

10     A    No.

11     Q    Is there any indication in Mr. Wilson's

12 file that Mr. Wilson was selected for an interview?

13     A    Any indication in this?

14     Q    Is there any indication in Exhibit 30 that

15 he was selected for an interview?

16     A    There's no indication in this that he was

17 selected for an interview, but we can infer because

18 he was hired.

19     Q    Do you know personally whether he was

20 selected for an interview?

21     A    No, but he had to have been interviewed to

22 be hired.

23

196

1      Q    Do you have any documents that you're

2  aware of that you could point me to that would show

3  when he was interviewed?

4      A    No, not here.  I don't know if it was

5  produced.

6      Q    You explained before that it wasn't

7  surprising to you that there was not a file for the

8  No. 317538, but we've agreed there was a file for the

9  other number, which was the 23 number, I believe.  If

10 somebody's got it in front of them, they can save us

11 time.

12         MR. FISCHLER:  I don't know what you're

13 asking.

14         THE WITNESS:  He's talking about that 67

15 number, but I can't even say that because it had two

16 numbers on there and I don't know which one it went

17 up under.  Remember it had two.  I can't say which

18 file would have been produced, which number it would

19 have been up under.

20         BY MR. GOLDSMITH:

21     Q    50172367 was the other number.  Right?

22     A    That was one of them.

23

197

1       MR. FISCHLER:  5012367.

2       MR. GOLDSMITH:  72367.

3       MR. FISCHLER:  That's also from 2003 and

4   well before this lawsuit.

5       MR. GOLDSMITH:  Let the witness testify.

6       MR. FISCHLER:  I'm stating an objection to

7   it.

8       MR. GOLDSMITH:  State an objection.

9       BY MR. GOLDSMITH:

10   Q    We've got vacancy numbers, two position

11   numbers that have been associated with this.  The

12   only one that there seems to be a job file, as far as

13   we know so far -- if there were an interview there

14   would be something in a job file, if not, in a

15   personnel file reflecting that there was an

16   interview.  Correct?

17   A    If there's an interview, it should be in

18   the job file folder.

19   Q    But it happens that sometimes there's also

20   interview information that seeps over into the

21   personnel files.  Right?

22   A    Yes, but it shouldn't be there.

23


198

1   Q    But it should definitely be in the job

2   file?

3   A    It should be.  Right.

4   Q    And a folder was produced with regard to

5   50172367.  Do you know whether within that file there

6   was any interview information related to Mr. Wilson?

7       MR. FISCHLER:  I'm going to object.

8   Exhibit 5 talks about selections in 2004.  Exhibit 29

9   talks about selections in October of 2003.  I don't

10   know that this wasn't a subsequent -- you may have

11   two different files that you're referring to.

12       THE WITNESS:  Someone could have left that

13   position and it's now open again.

14       MR. GOLDSMITH:  Let's do it this way.

15       BY MR. GOLDSMITH:

16   Q    You assisted your counsel in producing

17   documents in this case.  Correct?

18   A    Yes.

19   Q    In order to ascertain what happened with

20   regard to Mr. Wilson being interviewed, I would need

21   to look at the job file.  Correct?

22   A    Yes.

23

199

1   Q    There are two numbers associated with his

2   application as far as we know.  Correct?

3   A    On his application he had 50172367.

4   Q    If I were to have you to review 50172367,

5   could you tell me whether he was interviewed or not?

6   A    If I saw the listing.  I would have to

7   look.

8   Q    What do you mean by "listing?"

9   A    Like that right there.

10  Q    You're saying if you look at Exhibit 6?

11  A    And if that was the right number he was up

12  under.  As I explained earlier, he could have written

13  this down, but really considered at a later date.  He

14  may have applied for that.

15  Q    What year was Mr. Wilson selected?

16       MR. FISCHLER:  The best way to check is

17  your affidavit.

18       MR. GOLDSMITH:  Let me make it even easier

19  for you.

20       BY MR. GOLDSMITH:

21  Q    Let's look at the personnel action request

22  for hiring Mr. Wilson.

23

200

1   A    I need to look at the chart.  The date he

2   was hired, is that what you're looking for?

3   A    You're now looking at Exhibit B to Exhibit

4   14.

5   A    It says he was hired 10/13/04.

6   Q    So he was hired within 2004, which means

7   his name should appear on Exhibit 6 as having been

8   hired during 2004, Mr. Wilson.  Correct?

9   A    I don't know what number he would be up

10  under.  The position says one thing and his

11  application says another, that they assigned that

12  number to him.  We would have to go back and trail

13  it, the information.

14  Q    But if he were interviewed, it should be

15  in a job file with a number that shows up in his file

16  and there are two such potential numbers in his file.

17  Right?  His personnel file, correct?

18  A    Yes, if he was interviewed, it should be

19  somewhere in the job file folder, which one I don't

20  know.

21  Q    So one of the job file folders, one such

22  job file folder was produced.  One such job file

23

206

1    Q    If you have something else to add, go

2  ahead.

3    A    Notice the vacancy number here.

4         MR. FISCHLER:  From this angle, I can't

5  see the vacancy number.

6         THE WITNESS:  It's not the same as the

7  vacancy we're talking about.  That tells you that the

8  number's changed.

9         MR. FISCHLER:  Again, the number is at

10 issue.

11        MR. GOLDSMITH:  I'd prefer that you didn't

12 testify.

13        MR. FISCHLER:  I'm not testifying.  I'm

14 objecting to the relevance.

15        BY MR. GOLDSMITH:

16   Q    You've reviewed the entire job file and

17 you find nothing that said Mr. Wilson came under that

18 vacancy number?

19        MR. FISCHLER:  One, she hasn't reviewed

20 the whole job file.

21        MR. GOLDSMITH:  Please review the whole

22 job file and tell me if Mr. Wilson is reflected in

23

207

1  there at all.

2         (Pause.)

3         THE WITNESS:  That's the point I was

4  trying to make.

5         MR. FISCHLER:  There's an important

6  document she needs to identify you.

7         THE WITNESS:  Taylor made a note.  "Please

8  note that the recruitment activities for posting

9  5072367 will be identified in SAP 360217."  The new

10 hire, Robert Grimes, has the number 360217 on the

11 administration side.  The 50172367 was assigned to

12 another Foreman 2.  This is a problem we have all the

13 time.  We go back to assign a number and that number

14 has been taken.

15        BY MR. GOLDSMITH:

16   Q    So the 72367 was assigned to another

17 Foreman 2.  Correct?

18   A    Yes.

19   Q    Let's continue looking through that

20 particular job file.

21        MR. FISCHLER:  Through this file?

22        MR. GOLDSMITH:  Until the point at which

23

208

1  you want to tell me that you agree that Mr. Wilson

2  isn't discussed in that job file, then we can move on

3  to other job files if need be.

4        (Pause.)

5        THE WITNESS:  Okay, the answer is no.  I

6  didn't see --

7        BY MR. GOLDSMITH:

8    Q    -- Wilson?

9    A    Rodney Wilson in this job file folder I

10 just reviewed.

11   Q    There's no evidence in the folder for

12 72367 that Mr. Wilson was interviewed or selected or

13 anything else.  Correct?

14   A    I never said he was interviewed for that

15 particular position.

16   Q    The folder didn't say that?

17   A    The folder didn't say it nor did I.

18   Q    And neither the folder nor you says that

19 the folder shows him being selected for that

20 particular position.  Correct?

21   A    Which one?

22   Q    72367, which you just looked at.

23

209

1    A    It didn't say in here that he was selected

2  for that position.

3    Q    Very good.  You indicated that there was a

4  note from Mr. Cannon that talked about Mr. Grimes and

5  said something about a vacancy number or job number

6  360217.  Do you remember that testimony?

7    A    Yes.

8    Q    Would you expect that there would be

9  something, that there would be a job file at 360217

10 that would reflect Mr. Wilson?

11   A    Not necessarily.  We would have to find

12 out what number, as shows on his 2000 Form he was

13 assigned a vacancy number.

14   Q    And that was the number that I read to

15 you.

16   A    It could have been picked up under another

17 number.

18   Q    I read that number to you a few moments

19 ago.  I'll read it again, 87203.  I'm sorry.  That's

20 not it -- 317538.  Correct?

21   A    Just show it to me.

22   Q    Here's the personnel action request.

23

210

1    Again, this is page 1932 of Exhibit 30, 317538.

2        A    That's the number, the position number we

3    gave him.

4        Q    If there's a job file that reflects Mr.

5    Wilson's interview and selection, it would be under

6    317538 since we know it's not under 72367.  Correct?

7        A    Yes, but it could also be up under a

8    number posting number.  As I said, if there were more

9    than one position -- let's say there were four and he

10   was under -- as I said earlier, we post jobs -- let's

11   say it was four positions when Mr. Wilson came in.

12   We would post it under one original number, but then

13   we would have to make up three, go in the computer

14   and get three numbers for the three other candidates

15   whom we selected.  So it would be up under another

16   number.  The second point I want to make is it could

17   be another file folder on 501267 if somebody left the

18   position.  As you see, Mr. Wilson only stayed a short

19   period, so now his number is going to become vacant

20   again.  So these numbers get used over and over

21   again.

22       Q    Do you believe that there was a job file

23

211

1    created and maintained by your office that reflected

2    Mr. Wilson's selection and interview?

3        A    He should be in a job file folder, which

4    one I don't know under what number.

5        Q    Do you need to review all of the job file

6    folders that I got in order to reach a conclusion as

7    to whether there is any such folder?

8        A    I would.  I'd have to review the document

9    that was submitted to see if his name is under

10   another number.

11       Q    Let's do that right now.

12           MR. FISCHLER:  Let's go off the record for

13   a moment.

14           MR. GOLDSMITH:  Let's stay on the record.

15   We are going to go over them.

16           MR. FISCHLER:  I think there's a way to

17   short circuit this.  Why don't we stipulate that we

18   will go through the documents and look and if there's

19   something that hasn't been produced, we'll produce

20   it.  And if it has been produced, then it's in there

21   rather than go through it all.

22           MR. GOLDSMITH:  Let me ask her some

23

212

1    questions along the lines of that and see if we can

2    do it that way.

3            MR. FISCHLER:  That's fine.  I just think

4    of going through 4000 pages of documents is not a

5    good use of anybody's time.

6            MR. GOLDSMITH:  Let's do this.  Let's go

7    off the record for a moment.

8            (Discussion off the record.)

9            MR. GOLDSMITH:  Let's get on the record.

10           BY MR. GOLDSMITH:

11       Q    Ms. Ray, while we were off the record,

12   Amtrak counsel and I had a discussion in your

13   presence here about these job files and I'm going to

14   ask you some questions now in an effort to see if we

15   can get a shortcut on this process.

16       A    Okay.

17       Q    With regard to the selection of Mr.

18   Wilson, my understanding is that you're unable at

19   this time to point to anything that's been turned

20   over to me that you know about, at least from memory

21   without reviewing everything, that would show that,

22   that would reflect his interview and selection.  Is

23

213

1    that correct?

2            MR. FISCHLER:  I'm just going to object.

3    The testimony speaks for itself.  You can answer the

4    question.

5            THE WITNESS:  Yes, without me reviewing

6    all of the documents, I did not see any information

7    on Rodney Wilson.

8            BY MR. GOLDSMITH:

9        Q    If you were able to point me right now as

10   we sit here to what the documents would be, you would

11   have done that.  Correct?

12       A    If I saw the documents, I would have

13   pointed out the information if I saw it.

14       Q    Or if you had come in today with

15   independent recollection that there was a file about

16   it, you would have searched for it right now and

17   pointed me to it.  Right?

18       A    Yes.

19       Q    You've identified a position number,

20   317538.  My understanding is that that's a position

21   number that was assigned to Mr. Wilson at the time of

22   his selection.  Is that right?

23

214

1    A    Yes.

2    Q    You and your counsel, Amtrak counsel, are

3    going to produce the file for 317538 if, in fact,

4    such a file exist.  Correct?

5         MR. FISCHLER:  That's not really a

6    question for her.  That's a question for me and yes.

7         BY MR. GOLDSMITH:

8    Q    I can't ask you that you go and search to

9    see if you have a 317538 file.

10   A    Yes.  But as I stated earlier, it may not

11   be under that number either.

12        MR. FISCHLER:  Whatever number it's under,

13   we'll produce it if we have it, if we have not

14   already produced it.

15        MR. GOLDSMITH:  All right.

16        BY MR. GOLDSMITH:

17   Q    In the event that you produce a file

18   numbered 317538 or any other file relating to the

19   selection in the Fall of 2004 of Mr. Wilson, you'll

20   come back and answer questions about that file.

21   Correct?

22        MR. FISCHLER:  She can't answer that

23

227

1    reflected here in the interview chart as having been

2    interviewed?

3    A    From this document it appears that way.

4    Q    If the document is accurate, then it would

5    tell us everyone who was interviewed under that

6    process?

7    A    People do make mistakes and we do forget.

8    I don't want to say.

9    Q    But assuming there wasn't a mistake.

10   A    Yes.

11   Q    Is there any way of telling from this

12   Exhibit 37 when Mr. Eckstein failed his physical?

13   A    No.

14        (Pause.)

15   Q    Let's go back to Exhibit 24.  With regard

16   to Exhibit 24 on page 806, Ms. Whitley's name appears

17   at the top of the flow log name list.  Do you see

18   that?

19   A    Yes.

20   Q    It says she was interviewed 3/28/04.  Do

21   you see that?

22   A    Yes.

23

228

1    Q    Does that mean she was treated as being

2  qualified at that time?

3    A    They interviewed her.  This looks like a

4  pre-VS interview date.

5    Q    I'm just asking about 3/28/04.  Does that

6  indicate they were treating her -- that your office

7  was treating her as qualified?

8    A    I would say you need to ask Taylor Cannon.

9  He probably handled this.

10    Q    You don't deny that this indicates on her

11  because there was an interview that she was treated

12  as qualified at that time.  Correct?

13        MR. FISCHLER:  That's not what the

14  testimony is.

15        BY MR. GOLDSMITH:

16    Q    Would you like for me to rephrase the

17  question?

18    A    Well, I probably should let Taylor Cannon

19  because I'm looking at the dates.  I'm sure that went

20  back to previous files and I'm confused.

21    Q    I don't want to confuse you.  I just want

22  to ask you a really straightforward question.

23

229

1    A    Go ahead.

2    Q    Taylor Cannon works for you.  Correct?

3    A    Yes.

4    Q    He filled out this form.  Correct?  Page

5  806, right?

6    A    Yes.

7    Q    This is a routine form, an applicant flow

8  log that your office completes all the time.  Right?

9    A    Okay.

10    Q    You testified earlier that in order to be

11  interviewed a person had to be screened and shown to

12  be qualified to get an interview.  Correct?

13    A    Uh-huh.

14    Q    Without asking you whether it was a

15  mistake or not, I'm simply asking you whether this

16  form being completed this way indicates that your

17  office treated Ms. Whitley as being qualified at the

18  time that she got an interview on March 28, 2004.  Is

19  that fair?

20    A    I recall that the Mechanical Department

21  decided to interview all of the Foreman 1s for

22  positions.  So that probably was about the time that

23

230

1    that happened.

2        Q    Did that show that she was being treated

3    by your office as qualified?

4        A    She had an interview.

5        Q    Did that show she was being treated at the

6    time as qualified, whether mistakenly or not?

7        A    I'm being honest.  I'm just trying to --

8    not me, the Mechanical Department decided at some

9    point during this process to interview all of the

10   Foreman 1s, which we did.

11       Q    I'm not asking you about anyone else.  Let

12   me ask you the question one more time.

13       A    You're asking me --

14       Q    Was she treated by your office when she

15   was interviewed on March 28, 2004 as being qualified?

16       A    At that point, I guess, yes.

17            (Pause.)

18       Q    You say that around March of '04 that all

19   the Foreman 1s were interviewed for Foreman 2s.

20       A    I don't know if this was March of '04.

21       Q    When do you think that happened?

22       A    I have no idea.  I know that they

23