# Transcript of the Testimony of **Bernard L. Campbell**

**Date:** February 9, 2007
**Volume:** 1

**Case:** Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Printed On: 5/4/2007



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 11

1   Q    And you know her also?
2   A    Very familiar.
3   Q    Now, are you aware of the fact that Ms.
4   Whitley was attempting to get promoted at various
5   times during her employment at Amtrak?
6   A    Just about all of her employment there,
7   yes.
8   Q    When Ms. Whitley was trying to get
9   promoted, was she attempting to get promoted into
10  positions that were also within your chain of command
11  at Amtrak?
12  A    Yes.
13  Q    Now, over the past four or five years, has
14  Mr. Kapela been your second line supervisor at
15  Amtrak?
16  A    Yes.
17  Q    Now, with regard to Ms. Whitley's attempts
18  to get promoted, she attempted at times to get
19  promoted to a position of Foreman II, correct?
20  A    Correct.
21  Q    Now, over the past several years, when she
22  attempted to do that, who had the final authority for

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 12

1  determining whether she would be promoted to Foreman
2  II?
3      A    I would have to say HR.
4      Q    Is there a particular person at HR?
5      A    No.
6      Q    And who else would have had input into
7  whether Ms. Whitley would be promoted to Foreman II?
8      A    I don't know.
9      Q    Did you have any input into that?
10     A    Absolutely not, except for trying to help
11 her.
12     Q    What about your immediate supervisor, Mr.
13 Truitt?  Would he have had any input into whether Ms.
14 Whitley would be promoted?
15     A    You'd have to ask Mr. Truitt.
16     Q    Well, from your observation and your years
17 working at Amtrak, is it your impression that he
18 would have input into that or that he would not?
19          MR. FISCHLER:  I'm going to object to the
20 question, but you can answer.
21          THE WITNESS:  I don't know.  You'd have to
22 ask Mr. Truitt.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 13

1           BY MR. GOLDSMITH:
2       Q    What about Mr. Kapela?  Would he have had
3  input into whether or not Ms. Whitley would be
4  promoted?
5       A    I don't know.
6       Q    Did you ever have any occasion to discuss
7  Ms. Whitley's prospects for promotion to Foreman II
8  with Mr. Kapela?
9       A    Don't recall.
10      Q    Is there anything that would refresh your
11 recollection as to whether that happened or not?
12      A    I don't know how to answer that.
13      Q    Well, do you think that that's information
14 that you might have had at some point, that you have
15 subsequently forgotten, or do you think it's
16 information that you never had at all?
17      A    I don't know.
18      Q    Do you know if Amtrak maintains any
19 documents that might help you recall as to whether
20 you ever discussed Ms. Whitley's prospects for
21 promotion with Mr. Kapela?
22           MR. FISCHLER:  I'm going to object to the

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 14

1  question, but you can answer.
2        THE WITNESS:  Not that I know of.
3        BY MR. GOLDSMITH:
4    Q    What about with Mr. Truitt?  Did you ever
5  have occasion to discuss Ms. Whitley's prospects for
6  promotion with Mr. Truitt?
7    A    Yes.
8    Q    What do you remember about those
9  conversations?
10   A    I don't.  It was insignificant.
11   Q    Did you discuss it with Mr. Truitt on one
12 occasion or more than one occasion?
13   A    I really don't know.
14   Q    Do you recall when you discussed it with
15 Mr. Truitt?
16   A    No, sir.
17   Q    What do you recall being said between
18 yourself and Mr. Truitt?
19   A    Don't.
20   Q    Do you recall any results that emerged
21 from the conversation you had with Mr. Truitt?
22   A    No, sir.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 17

1        BY MR. GOLDSMITH:
2    Q    Was there ever a time when you didn't
3  think that Ms. Whitley was a good candidate for
4  promotion to Foreman II?
5    A    Yes.
6    Q    When was that?
7    A    I can't remember the times.
8    Q    Did you ever discuss Ms. Whitley's
9  candidacy for Foreman II with Robert Frank?
10   A    No.
11   Q    How about Larry Ice?
12   A    I don't like Larry Ice.
13   Q    Did you ever discuss Ms. Whitley's
14 candidacy with Mr. Ice?
15   A    Absolutely not.
16   Q    Did you ever obtain any information as to
17 what Mr. Kapela's views were of Ms. Whitley being
18 promoted to Foreman II?
19   A    No.
20        MR. FISCHLER:  Calls for speculation.  You
21 can answer.
22        THE WITNESS:  No.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 24

1   Q    How is it determined whether an individual
2   will have an interview?
3   A    Usually by application for an interview.
4   Q    Do all applicants get an interview?
5   A    No.
6   Q    How is it determined which ones will get
7   an interview and which ones won't?
8   A    Well, I think they look at discipline,
9   they look at attendance, they look at the work
10  history, and they pick those that are in the top part
11  to give an interview.
12  Q    Who is the "they" that you were referring
13  to?
14  A    I would have to say HR.
15  Q    Do they ever consult with you in that
16  process?
17  A    No.
18  Q    Do you know why not?
19  A    It's not my job.
20  Q    Does Mr. Truitt ever play a role, before
21  he left did he ever play a role in determining who
22  would be on a panel?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 27

1   Q    Ever have any discussions with Taylor
2   Cannon about who would be on a panel to select for
3   Foreman II?
4   A    No.
5   Q    Are you familiar with the interview
6   process that's used for Foreman II positions?
7   A    Yes.
8   Q    Can you describe it to me?
9   A    There's a set of questions that normally
10  HR prepares.  They will submit those questions up to
11  the interviewers.  Every participant will be asked
12  the same questions, and everyone that's on a panel
13  will take their notes.  And after each individual
14  leaves, there is a discussion about how the interview
15  went.
16  Q    Is there anything wrong with a panelist
17  also discussing how the interview went with others,
18  other than those who are also on the panel?
19  A    I don't know who "others" are.
20  Q    Well, let's say there was a panel and, for
21  example, you weren't on the panel but one of the
22  panelists wanted to speak with you about the process

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 28

1 and about the interviews. Would that be okay? Is
2 that permitted, or is that forbidden?
3    A    I have never seen that happen. I can't
4 tell you if it's forbidden or--
5    Q    So your impression is, at a minimum, that
6 the general practice is that it's only discussed
7 among the panelists. Is that right?
8    A    That is my understanding.
9    Q    Is that way you have proceeded when you
10 have been on a panel, only to discuss it with the
11 other panelists?
12    A    That is correct.
13    Q    Is there a rule or a practice with regard
14 to whether or not an individual needs to have an
15 interview in order to be hired as a Foreman II?
16    A    Could you ask that again?
17    Q    Yes. Is it required that a person be
18 interviewed before he or she becomes a Foreman II?
19    A    To my knowledge, yes.
20    Q    Do you know why that is?
21    A    I think it's procedure.
22    Q    Do you know why that would be the

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 31

1    Q    What if the person was working in some
2 other area?
3    A    They would probably ask people from that
4 area.
5    Q    Do you supervise the General Foremen from
6 areas other than Turnaround Services?
7    A    No.
8    Q    Do you know if Amtrak has a practice of
9 informing applicants who are determined to be
10 unqualified when they apply for Foreman II?
11        MR. FISCHLER: I'm going to object to that
12 question, but you can answer it if you understand it.
13        THE WITNESS: Could you ask that again?
14        BY MR. GOLDSMITH:
15    Q    Do you know if Amtrak has a practice of
16 informing candidates if they're found not to be
17 qualified for Foreman II after they apply?
18    A    No, I don't.
19    Q    Who decides who is going to make the
20 selection when a Foreman II position is going to be
21 filled?
22    A    HR.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 36

1   A   I can't recall now.  I'm having a block
2   here.
3   Q   If you think of anything else as we're
4   here today, why don't you point that out to me?
5   Okay?
6   A   Surely.
7   Q   Was Ms. Whitley a hard worker?
8   A   Yes, sir.
9   Q   Now, there was a time when Amtrak had a
10  training program specifically designed to see that a
11  Foreman I could get promoted to Foreman II.  Do you
12  remember that?
13  A   Yes.
14  Q   Did you write a letter of recommendation
15  for Ms. Whitley to participate in that?
16  A   Probably did.
17  Q   What were the essence of Ms. Whitley's
18  duties as a Foreman I?
19  A   She was in charge of making sure the
20  trains were clean.
21  Q   Did she do a good job of making sure the
22  trains were clean?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 37

1   A   Yes.
2   Q   Did she do a good job of managing the
3   people who she was supervising?
4   A   Most of the time.
5   Q   Overall, did she do a good job of that?
6   A   Yes.
7   Q   Now, let me ask you about Mr. Kapela.
8   What's the essence of his duties at Amtrak, as you
9   understand them?
10  A   He's the Master Mechanic.  He's in charge
11  of all aspects of the mechanical operation.
12  Q   Did there come a time when you became
13  aware that Ms. Whitley was making any complaints
14  about Mr. Kapela?
15  A   Ms. Whitley always complained about
16  people.
17  Q   I'm asking about Mr. Kapela specifically.
18  A   Specifically?
19  Q   Yes.  Did you ever become aware of her
20  making any EEO complaints about Mr. Kapela?
21  A   I knew she had filed a lawsuit against Mr.
22  Kapela.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 38

1  Q   And do you know approximately when you
2  became aware of that?
3  A   No.
4  Q   Did you ever have occasion to discuss Ms.
5  Whitley's lawsuit against Mr. Kapela with Ms.
6  Whitley?
7  A   Don't really know.
8  Q   What do you mean by that?
9  A   I don't know if I really discussed it, and
10 if I did, when did I, what did we say.  I'm sure Ms.
11 Whitley was probably talking about it numerous
12 amounts of times to everybody.
13 Q   Including you?
14 A   Including me.
15 Q   Do you think she talked about it with Mr.
16 Kapela, too?
17 A   You'd have to ask Mr. Kapela.
18 Q   Did you ever observe her talking about it
19 with Mr. Kapela?
20 A   No.
21 Q   Ever observe her talking about it with Mr.
22 Truitt?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 40

1  in a sexual harassment case that she brought?
2  A   Yes.
3  Q   But you don't know who she said was
4  harassing her at the time?
5  A   Not exactly, no.
6  Q   Did you tell the truth in your deposition
7  in that case?
8  A   I always tell the truth.
9  Q   Is that a yes?
10 A   That would be a yes.  I always tell the
11 truth.
12 Q   During the time that she was working for
13 you, was there ever an occasion when you had to
14 impose or when you chose to impose discipline on Ms.
15 Whitley?
16 A   If it was, it was informal discipline.
17 I've never imposed formal discipline on Ms. Whitley.
18 Q   Did you ever authorize anybody below you
19 on the organizational chart to impose a formal
20 discipline on Ms. Whitley?
21 A   No.
22 Q   Are you aware of anyone ever imposing a

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 41

1  formal discipline on Ms. Whitley?
2     A    No.
3     Q    You told me before that you're familiar
4  with Mr. Louers.  He works for you?
5     A    Gary Louers, that is correct.
6     Q    Do you know if he ever imposed a formal
7  discipline on Ms. Whitley?
8     A    I know of no formal discipline ever being
9  imposed on Ms. Whitley.
10    Q    What's the difference between a formal
11 discipline and an informal discipline?
12    A    Well, Amtrak has a disciplinary procedure,
13 and a verbal warning and a written warning are called
14 informal discipline.  Once you go to formal
15 discipline, issue an intent to impose, they can
16 either make a deal with the union and management, or
17 if they choose not to accept what management puts out
18 in the intent, they have a right to go to an official
19 hearing which is a courtroom environment with a
20 hearing officer, a charging officer, union
21 representation, and all the facts put on the table,
22 and a hearing officer makes the determination.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 42

1     Q    Did you ever propose that any formal
2  discipline be imposed against Ms. Whitley?
3     A    No.
4     Q    Did Mr. Louers ever propose that any
5  formal discipline be imposed against Ms. Whitley?
6     A    No.
7     Q    If the Human Resources Office were to
8  develop the impression that your chain of command had
9  imposed a formal discipline on Ms. Whitley, how would
10 they have gotten that information?
11    A    You have to ask them.
12    Q    Would that be a mistake on their part?
13    A    I have never given her formal discipline.
14 You'd have to ask HR about what HR does.  I can talk
15 for me.
16    Q    And when you say you're talking for you,
17 you're talking for yourself and your subordinate
18 managers, right?
19    A    To the best of my knowledge.
20    Q    Let's take a look at Plaintiff's Exhibit
21 20, which was previously introduced in another
22 deposition.  Do you recognize that document?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 43

1    MR. FISCHLER: Give me one second.
2    BY MR. GOLDSMITH:
3    Q    Once you've had a chance to read it, tell
4 me if you recognize it.
5    A    Yes, I do.
6    Q    And when did you first see this document?
7    A    I don't remember.
8    Q    Did you see it in preparation for this
9 case or around the time of August 2004?
10   A    I think Joey Tana had talked about this.
11 I'm not sure. I remember seeing it.
12   Q    Now, it says that, "Your record
13 indicates"--this is to Ms. Whitley--"that discipline
14 was assessed on April 6, 2004." Was that correct,
15 when Mr. Cannon wrote that?
16   A    I would have to ask Mr. Cannon.
17   Q    Well, did your line of command, your chain
18 of command, assess any discipline against Ms. Whitley
19 on April 6, 2004?
20   A    I told you I recall giving Ms. Whitley a
21 letter for failing to perform her job, which was an
22 informal letter. I think she got a written warning.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 44

1    Q    So the answer--
2    A    Although I'm not sure. She might have
3 took a waiver. I'm not sure of that. There was a
4 problem with Foreman I's not doing their job. Not
5 only did Ms. Whitley get a letter, Ms. Moncree got a
6 letter, Ms. Johnson got a letter, because they let
7 $2,000 worth of equipment go broke, and they were in
8 an enhancement program, and they were supposed to
9 shampoo at least one train a day. It did not get
10 done, and then they received something for that.
11   Q    So why did you tell me that you didn't
12 propose any discipline against Ms. Whitley?
13   A    I'm telling you what I'm remembering. If
14 I didn't remember it perfectly, then I'm sorry, but
15 I'm only trying to tell you what I know. And if I
16 did, then--
17   Q    So are you telling me now that you did
18 propose discipline against her on this equipment that
19 you're referring to?
20   A    I'm saying that I did give Ms. Whitley
21 something. I thought it was a written warning. If
22 you have that in your files and let me see it, maybe

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 45

1  you could spring my memory a little bit and I might
2  be able to help you a little bit better.
3      Q    You mentioned something about Mr. Tana.
4  Who is Mr. Tana?
5      A    He's a General Chairman.
6      Q    For the union?
7      A    That's correct, JCC.
8      Q    And he also works for Amtrak, correct?
9      A    That is correct.
10     Q    What does Mr. Tana have to do with the
11 situation we've just been discussing?
12     A    He would be Ms. Whitley's union rep.
13     Q    And what did you--I think you may have
14 said that Mr. Tana may have shown you Exhibit 20?
15     A    He might have.  His name just popped into
16 my head.
17     Q    What do you think you discussed about this
18 situation, if anything, with Mr. Tana?
19     A    I have not one vague clue about what we
20 might have discussed.
21     Q    Do you know whether Ms. Whitley was
22 personally responsible for the problem with the

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 45

1  you could spring my memory a little bit and I might
2  be able to help you a little bit better.
3      Q    You mentioned something about Mr. Tana.
4  Who is Mr. Tana?
5      A    He's a General Chairman.
6      Q    For the union?
7      A    That's correct, JCC.
8      Q    And he also works for Amtrak, correct?
9      A    That is correct.
10     Q    What does Mr. Tana have to do with the
11 situation we've just been discussing?
12     A    He would be Ms. Whitley's union rep.
13     Q    And what did you--I think you may have
14 said that Mr. Tana may have shown you Exhibit 20?
15     A    He might have.  His name just popped into
16 my head.
17     Q    What do you think you discussed about this
18 situation, if anything, with Mr. Tana?
19     A    I have not one vague clue about what we
20 might have discussed.
21     Q    Do you know whether Ms. Whitley was
22 personally responsible for the problem with the

202-347-3700    Ace-Federal Reporters, Inc.    800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 47

1  Q    All right.  Mr. Tana gave you Exhibit 50?
2  A    Yes.
3  Q    And do you agree with what it says in
4  Exhibit 50?
5  A    Absolutely not.
6  Q    What don't you agree with about Exhibit
7  50?
8  A    I don't agree with anything of it.  I have
9  said he showed me no new evidence.  It was just a
10 ploy of the union, trying to alleviate whatever had
11 happened to Ms. Whitley, and I didn't agree with it
12 at any point or at any time.
13 Q    After Mr. Tana gave you this, did you
14 respond to it?
15 A    No.
16 Q    Did you respond to him orally?
17 A    I told him to probably get out of my
18 office.  I'm not sure.
19 Q    Did you ever discuss the contents of
20 Exhibit 50 with Taylor Cannon?
21 A    No.
22 Q    Did you ever discuss it with anyone else

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 48

1  from HR?
2  A    No.
3  Q    With regard to the last paragraph here in
4  Exhibit 50, it says that Mr. Tana is formally
5  requesting that her waiver be removed from her
6  personnel file.  Do you agree that she had executed a
7  waiver?
8  A    Yes.
9  Q    And do you know if that waiver had been in
10 her personnel file?
11 A    Yes.
12 Q    It was?
13 A    All waivers would go in a personnel file.
14 Q    Do you know if it ever was removed from
15 her personnel file?
16 A    No.
17 Q    Did you ever discuss the issue of removing
18 the waiver from her file or taking the waiver off her
19 record with Ms. Whitley?
20 A    Don't recall.
21 Q    Do you deny having done that?
22 A    I don't recall.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 49

1   Q   So it's possible you did, and also
2   possible you did not?
3   A   You could say that.
4   Q   And do you deny that Ms. Whitley would
5   have developed the impression that that waiver wasn't
6   being counted against her anymore?
7   A   I can't tell you what Ms. Whitley thought.
8   You have to ask Ms. Whitley.
9   Q   So you don't know?
10  A   That's what I'm testifying to.
11  Q   What about the HR office?  Did they know
12  if that waiver was continuing to be counted against
13  Ms. Whitley?
14  A   I don't have a clue what HR knew.
15  Q   Do you know how HR would have first become
16  aware of the existence of the waiver?
17  A   No, I don't.
18  Q   Is that a process that you would have had
19  anything to do with?
20  A   I don't know what you mean.
21  Q   The process by which they would have
22  become aware of the fact that Ms. Whitley executed a

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 50

1   waiver relating to discipline that you proposed
2   against her.
3   A   I know of no process that I would have put
4   in place.
5   Q   No process for them to become aware of it,
6   is that what you mean?
7   A   No.  I know of no process--what you asked
8   me, was there a process?--no process that I know of
9   that took place by me to make them aware of a waiver
10  in Ms. Whitley's file.
11  Q   And the same would be true as to them
12  becoming aware of any removal of a waiver.  Is that
13  true?
14  A   That's true.
15  Q   Was it your impression that the waiver
16  executed by Ms. Whitley would affect her chances of
17  being promoted to Foreman II?
18  A   I had no inkling about that at the time of
19  the waiver.  The waiver was for employees not doing
20  their job that they were told to do, and it was not
21  picked on Ms. Whitley.  It was picked on all Foreman
22  I's that worked in the S&I, sir.  They all failed to

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 51

1  do their job.
2    Q    Did you ever develop an impression as to
3  whether Ms. Whitley's chances of being promoted to
4  Foreman II would be impacted by her having executed
5  that waiver?
6    A    I had nothing to do with an impression of
7  what that waiver would do.  That waiver was done
8  because an employee failed to do their job.  What
9  effects it had was not on anything that I would even
10 care about at the time that that was happening.
11   Q    Did Ms. Whitley ever tell you that she had
12 developed an impression that the waiver was impacting
13 her promotion prospects?
14        MR. FISCHLER:  I'm going to object on
15 relevance grounds, but you can answer.
16        THE WITNESS:  Not that I recall.
17        BY MR. GOLDSMITH:
18   Q    Is there anything that would refresh your
19 memory as to whether that ever happened?
20   A    If I think of it, I'll let you know.
21   Q    Do you know whether Ms. Whitley was ever
22 promoted to Foreman II?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 52

1    A    She was not.
2    Q    Did you ever develop an impression as to
3  why she wasn't promoted to Foreman II?
4    A    No, I didn't have an impression.
5    Q    Do you have any idea in your mind as to
6  why she wasn't promoted to Foreman II, as we sit here
7  today?
8    A    Seems whether she did bad in her HR
9  interview.
10   Q    Any other reason?
11   A    None that I know of.
12   Q    Was Ms. Whitley qualified to be promoted
13 to Foreman II?
14   A    I don't know.
15   Q    What would you have to do in order to
16 ascertain that?
17   A    Probably sit in on her interview.
18   Q    If HR had told you that they had selected
19 Ms. Whitley to be a Foreman II, would you have
20 protested that?
21   A    No, sir.
22   Q    Would it have shocked you if that had

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 54

1  A    No.
2  Q    Did you know, around September 2, 2004,
3  that Ms. Whitley's application was unsuccessful
4  because other candidates had been selected?  Were you
5  aware of that?
6  A    No.
7  Q    Do you know whether other candidates for
8  Foreman II were selected around September 2, 2004?
9  A    No, I don't.
10 Q    Did you ask Mr. Cannon to issue this
11 letter?
12 A    No way.
13 Q    Did you have any discussion with Mr.
14 Cannon about him issuing this letter?
15 A    No.
16 Q    Did he inform you that he was going to
17 issue this letter?
18 A    Not that I recall.
19 Q    Did he copy you on the letter?
20 A    No.
21 Q    Did Ms. Whitley ever tell you she had
22 received this letter?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 59

1  A    Four.
2  Q    Were they all inoperative?
3  A    No wands, no machines.
4  Q    And did you ever discuss with any of the
5  Foremen I why the machines were inoperative?
6  A    No.
7  Q    So you never discussed it with Ms.
8  Whitley, in particular?
9  A    No.
10 Q    Do you know if Ms. Whitley was present on
11 the job on the day that you discovered the machines
12 were inoperative?
13 A    Made no difference.
14 Q    Do you know if she was there or not?
15 A    No.
16 Q    Why did it make no difference?
17 A    I know four machines and five or six wands
18 didn't break in one day or two days.  There had to be
19 neglect from following instructions of shampooing
20 trains.
21 Q    When was the last time you had observed
22 that the machines and the wands were in working

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 60

1  order?
2    A    When I paid $10,000 for them.
3    Q    How long before the time that you noticed
4  they were inoperative was that?
5    A    I would say a couple of months.
6    Q    What did you do when you first discovered
7  that the machines were inoperative?
8    A    Don't know.
9    Q    Were all the supervisors charged with the
10 same thing?
11   A    All the Foreman I's.
12   Q    Did any of them have any more
13 responsibility for maintaining that equipment than
14 any of the others?
15   A    Not as far as I was concerned.
16   Q    Did any of them claim that somebody else
17 was more responsible for it than they were?
18   A    Not as far as I was concerned.
19   Q    Now I'm asking you about what they said.
20 Did any of them say that any one was more responsible
21 than another?
22   A    As far as I'm concerned, no.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 69

1    A    Yes. sir.
2    Q    Now, at some point in discussing her
3  prospects for being promoted to Foreman II, you said
4  something to her to the effect that you asked her,
5  "Do you think those motherfuckers are going to
6  forget?"  Is that right?
7    A    I don't know what she's talking about now.
8  That's not me.
9    Q    So no, you didn't say that?
10   A    I absolutely did not say that.
11   Q    And did you ever tell her, in response to
12 her saying that she was being retaliated against,
13 that Amtrak wasn't retaliating against her, they were
14 just not moving her?  Did you ever say that?
15   A    No.
16   Q    Did you ever say to Ms. Whitley that she
17 wasn't being retaliated against because it was a
18 situation of no harm, no foul?
19   A    Don't recall saying that.
20   Q    Do you deny saying that?
21   A    Don't recall saying that.
22   Q    So you might have said it, and you also

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 70

1  might not have said it?
2      A    Don't recall saying it.
3      Q    And is it true that she asked you at one
4  point if she would have to wait a whole year to get
5  promoted?
6      A    No recollection of that.
7      Q    Do you deny that she said that to you?
8      A    I have no recollection of her saying that
9  to me.
10     Q    So she might have said it, she also might
11 not have said it?
12     A    You'd have to ask Ms. Whitley.  I have no
13 knowledge.
14     Q    And did you say to her, "Oh, you might
15 have to wait a whole year and a half"?
16     A    I have no knowledge of this conversation,
17 sir.
18     Q    Do you deny having said that to her?
19     A    I have no knowledge of it.  When was this
20 supposed to happen?
21     Q    So you could have said that to her at some
22 point, and you also may not have said it.  Is that

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 87

1  N.E."  Are there others at your level under whose
2  command this position could be?
3      A    Yes.
4      Q    Who else could it have been under?
5      A    There are three Assistant Terminal
6  Superintendents, one for the Locomotive, one for the
7  PM Car Shop, and I have Turnaround Services.
8      Q    Who's for the Locomotive?
9      A    Now it's Bello, Mike Bello.
10     Q    How long has he been there?
11     A    About five months.
12     Q    Who was there before him?
13     A    I'd have to say Ron Truitt.
14     Q    Who was there before him?
15     A    I'd have to say Mike Bello.
16     Q    So it went Bello-Truitt-Bello?
17     A    Yes.
18     Q    How long was Bello in there the first
19 time?
20     A    Probably a year, year and a half.
21     Q    How long was Truitt in there, about?
22     A    About two years.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 98

1   A   Vaguely.
2   Q   What is Exhibit 1?
3   A   Basically, standards for qualifications,
4   job requirements.
5   Q   For the Foreman II position?
6   A   That is correct.
7   Q   Take a look at Exhibit 4, if you could.
8   Take a look in the first column of Exhibit 4.  Well,
9   first of all, it's a June 24, 2004 document.  It says
10  "RES Center 4275."  Refresh my memory about which
11  area that is?
12  A   I'm pretty sure that would be a Locomotive
13  position.
14  Q   What does this document appear to be?
15  A   It's requesting a foreman's position, I
16  would have to say.  Requesting a Foreman II position,
17  RES Center 4275, budgeted for four, currently field
18  two, interviewed two, and one position was awarded.
19  Attached an organization chart highlighting the
20  vacant position.  And it was signed by Vince Nesse.
21  Q   What was Vince Nesse's job in 2004?
22  A   He was the Chief Mechanical Officer, CMO.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

---

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 99

1   Q   Does this chart, can I read this chart to
2   inform me that there remained a vacancy in the
3   Locomotive Foreman II area at the time of the
4   document?
5   A.  It would seem to me that there were
6   four positions.  Two were filled.  Two people
7   interviewed.  They filled one.  So I'm only guessing
8   that one job would still be vacant.
9   Q   Who would do the duties of the vacant
10  position while it was vacant?
11  A   The foremen that are on the job.  They
12  would fill it in overtime.
13  Q   Take a look at Exhibit 5, if you could.
14  Exhibit 5 says it's an applicant flow log.  Have you
15  seen these before, applicant flow logs?
16  A   No.
17  Q   It says on the fourth line down,
18  "Interviewed by Joseph Tana, Robert Frank," and there
19  are a couple of start dates on here also that say May
20  25, 2004.  Do you see that?
21  A   Yes.
22  Q   Are you able to read this and tell me

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 104

1   Q   Are you familiar with this kind of
2   printout?
3   A   Vaguely.
4   Q   Did Ms. Whitley possess, at the time of
5   this printout, according to the printout, all the
6   certifications that she would have needed to be a
7   Foreman II working for you?
8   A   She had 238, Periodic Maintenance--yes.
9   Q   Did she have the certifications that she
10  would have needed to work in the Locomotive area?
11  A   She could have worked there.
12  Q   What about in the third area?
13  A   PM Line?  No.
14  Q   What would she have needed for PM Line
15  that she didn't have?
16  A   She would need--I don't know the exact
17  name of that inspection, but there is an inspection
18  for PM Line I don't see here.  If it was here, I
19  would notice it.  It's not in my area, but there is a
20  PM Inspection 238.  More for me, what my section,
21  what's needed.
22  Q   Looking at Exhibit 12, it's a letter to a

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 105

1   Mr. Leonard Chapman.  Forgive me if he was in the
2   list that I already asked you about.  Are you
3   familiar with Mr. Chapman?
4   A   Let me get there.  Yes, I am.  The
5   gentleman passed, but I am familiar with him.
6   Q   Was he an incumbent employee of Amtrak as
7   of 2004?
8   A   Yes.
9   Q   What position do you think he was holding?
10  A   Car Repairman.
11  Q   Do you know if he was seeking to be
12  promoted to Foreman II in your area?
13  A   No.
14  Q   You don't know, or he was not?
15  A   Alls I know is, when you go after foreman,
16  you're just going after a foreman's position, not for
17  a particular area.
18  Q   So is it your understanding that when
19  Personnel selects someone for a Foreman II position,
20  they're looking to see the person's qualifications
21  with regard to performing in any of the three areas
22  or all of the three areas?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 108

1  Q  You said earlier that you gave a
2  deposition, correct?
3  A  Yes.
4  Q  In another case, and it was a case of Ms.
5  Whitley's, correct?
6  A  Yes.
7  Q  Do you remember who took your deposition?
8  A  Not really.
9  Q  Do you remember if it was a man or a
10 woman?
11 A  Man with a ponytail.
12 Q  If I told you that his name was Gary
13 Brown, would that surprise you?
14 A  No.
15 Q  Take a look at Exhibit 21, if you could.
16 A  Okay.
17 Q  Exhibit 21 purports to be a notice from
18 Human Resources from 1999 about vacancies for Foreman
19 II.
20 A  Okay.
21 Q  Take a look at the text here and tell me
22 if you think that it does an adequate job of

202-347-3700  Ace-Federal Reporters, Inc.  800-336-6646

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 109

1  describing what you need to know and be able to do in
2  order to be a Foreman II.
3       MR. FISCHLER:  The document speaks for
4  itself.  You can answer.
5       THE WITNESS:  I would say for 1999 this
6  speaks for what you needed to know in 1999.
7       BY MR. GOLDSMITH:
8  Q  Has that changed since 1999?
9  A  Yes.
10 Q  When did it change?
11 A  About 2002, 2001, somewhere around that,
12 when the FRA made it mandatory for 238
13 certifications.
14 Q  So if this had been published say last
15 year and it had added information about the
16 requirement of 238 certificates, then it probably
17 would have been accurate?
18 A  I would say yes.
19 Q  You testified, I showed you--why don't I
20 just do this now?  Take a look, if you would--let me
21 just ask you a question.  You testified about a
22 couple of positions in which, for which Mr. Ice and

202-347-3700  Ace-Federal Reporters, Inc.  800-336-6646

ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 151

1  Q    Did you ever tell her that you would take
2  any actions that were related to her signing the
3  waiver, if she signed the waiver?
4       MR. FISCHLER:  Objection.  Vague.  You can
5  answer if you understand the question.
6       THE WITNESS:  I don't know what you're
7  asking.
8       BY MR. GOLDSMITH:
9  Q    Did Ms. Whitley ever ask you, did Ms.
10 Whitley ever raise the subject of that waiver with
11 you in the period after she had already executed it?
12 Did you ever have any discussions with her about it?
13 A    I can't recall.
14 Q    Is there anything that would refresh your
15 recollection as to whether you ever discussed that
16 with her?
17 A    I don't know.
18 Q    Did you ever tell Ms. Whitley that
19 although she was signing the waiver, you weren't
20 going to send the signed waiver to Personnel?
21 A    No way possible.
22 Q    Why is it not possible?

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 251

1  was asked.
2  Q    Is it your testimony that Mr. Wilson
3  appeared to be better qualified than Ms. Whitley was?
4  A    I didn't say that.
5  Q    I'm asking you now.
6  A    I don't know if he was.  I never met Mr.
7  Wilson.  I only went by the qualifications that were
8  on there.  I think the question was who would be
9  better qualified.
10      MR. FISCHLER:  He's asking a different
11 question now.
12      THE WITNESS:  I can't compare him with
13 Mary.  I don't know Mr. Wilson.
14      BY MR. GOLDSMITH:
15 Q    Well, what about just based on his paper
16 qualifications?  Is he better qualified than Mary?
17 A    I would say he had more mechanical
18 qualifications than Mary.
19 Q    All right.  Is he better qualified than
20 Mary?
21 A    I would say he had more mechanical
22 qualifications than Mary.

202-347-3700   Ace-Federal Reporters, Inc.   800-336-6646
ef1ec9d5-6b37-4eec-82bc-b9d99d971af3