IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

———————————————————— )
                                                    )
David B. Stevens, et. al,                           )
                                                    )
                                                    )
            Plaintiffs,                             )
                                                    )
    v.                                              ) Civil Action No. 1:05-CV-01924-RCL
                                                    )
National Railroad Passenger Corporation             )
("Amtrak"),                                         )
                                                    )
            Defendant.                              )
———————————————————— )

## PLAINTIFF DAVID STEVENS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff David B. Stevens ("Stevens") hereby opposes Defendant National

Railroad Passenger Corporation's ("Amtrak") Motion for Summary Judgment.

## I.    BACKGROUND

This is a case of retaliatory threat and termination.  Stevens was terminated after

making allegations of hostile environment, disability discrimination, and retaliation

against Amtrak.  Although Amtrak denies retaliatory intent and claims that Stevens was

terminated for cause, Stevens presents overwhelming evidence, both direct and

circumstantial, of Defendant's malign intent, such that a trial on the merits is needed.

## II.    STATEMENT OF FACTS[1]

Stevens began his employment with Amtrak on February 28, 1990, in the position

of Mechanical Cleaner at Amtrak's Ivy Center Station.  Bernard (BL) Campbell is an

Assistant Superintendent for Amtrak's Mechanical Department and was Stevens' third-

line supervisor. Stevens had been diagnosed as HIV-positive in 1988.   Campbell Dep.

---

[1] A more complete recitation of facts is included in Plaintiff's Statement of Material Facts.

136:6 to 137:7, 247:19 to 248:12.  but had kept his HIV-positive status a private matter

and divulges this information only on a "need-to-know" basis.

On or around February 26, 2004, a co-worker started spreading rumors among

other Amtrak employees that Stevens had AIDS.  Dk 15-3 ¶ 3.  On March 10, 2004,

Snider apologized to Stevens in a letter for spreading the rumor that he had AIDS but

left the letter in public display on Stevens' work cart.  Dk 15-3 ¶ 4; Dk 15-34. Soon after

Snider had spread the rumors about Stevens, his co-workers and supervisors began

shunning Stevens and supervisors started assigning him a much heavier workload than

the other cleaners, making Stevens more cars on each train than other cleaners.  Dk 15-3

¶ 5.

Stevens filed a complaint with Amtrak's internal Dispute Resolution

Organization during the last week of March 2004, alleging that due to the rumors that he

had AIDS, he was being subjected to a hostile work environment based on a perceived

or actual disability.  Dk 15-3¶ 6.

On or around April 9, 2004, Stevens was experiencing severe mental and

emotional stress due to the hostile environment and obtained a temporary leave of

absence.  Dk 15-3 ¶ 12; Dk 15-5.  On April 12, 2004, Stevens delivered a copy of his leave

letter to the Master Superintendent, Michael Kapela , who approved a temporary leave

of absence for Stevens.  Dk 15-3 ¶ 13 (11/30/2005 Stevens Decl. Exh. 10).

On April 19, 2004, however, Stevens learned from a co-worker that the April 9th

letter from LeHot had been forwarded to Savoy.  Stevens additionally learned that

Campbell and Lisa Coleman, who worked in Amtrak's Dispute Resolution office, had

also seen the letter without need.  Stevens was shocked and outraged that such a

sensitive document was being casually passed around.  Dk 15-3 ¶ 14; Dk 15-6

(11/30/2005 Stevens Decl. Exh. 3, fax coversheet).

> Stevens' Lawyer Protests Campbell's Improper Dissemination Of Stevens'
> Hostile Environment/Medical Leave Letter

On May 21, 2004, Richard McKewen, Stevens' attorney, wrote to Amtrak's Law

Department, protesting disability discrimination and a hostile work environment. PDE

52.  The letter also stated that Campbell had disseminated a copy of LeHot's letter to at

least six other people who had no legitimate reason for seeing the letter and that Stevens

was willing to pursue his charges before the EEOC and in court if necessary.  Dk 15-3

¶15; Dk 15-7 (Exh. 4 – May 21, 2004 letter from McKewen).

> McCallum Investigates Stevens' Claims'; McCallum's Protocols

EEO Officer Andrew McCallum testified that he handled the relevant "external"

complaints.  McCallum 18-19.  It was "automatically" become his responsibility to

investigate Stevens' issues as "thoroughly" as possible.  McCallum Dep. 15-16, 19.  In

investigating, McCallum would interview the relevant personnel other than the

charging party (Stevens).  McCallum Dep. Dep. 16, 21.

McCallum "has" to tell the interviewed employees the reason for the interview,

since otherwise they "could not possibly answer the questions."  McCallum Dep. 21-22.

On June 3, 2004, Amtrak counsel Melissa Rogers wrote to McKewen that Stevens' case

had been turned over to McCallum.  PDE 91; McCallum Dep. 30-31.  McCallum in fact

received the May 21 letter.  McCallum Dep. 37-38;  PDE 52.  He would have asked

Campbell questions about the letter. McCallum Dep. 38.  McCallum Dep. 39.  McCallum

would have discussed with Campbell the allegation that the letter had been improperly

shared.  McCallum Dep. 39-40.

<u>Contrary to Amtrak's Workplace Violence Policy, Campbell Threatens To "Destroy" Stevens If Stevens Ever "Puts [Campbell's] Name In Anything Else,"</u>

On May 30, 2004, after beginning his leave of absence, Stevens went to the Amtrak Ivy City facility to retrieve some medication he had left in his best friend, Darryl Hollis' car.  Hollis, who was also an Amtrak employee, had agreed to meet Stevens outside the building to return the medicine.  Another friend of Stevens', Terrell Williams ("Williams"), had driven him.  Stevens walked inside the building.  Dk 15-3¶16. Campbell saw him, so he quickly exited and got back into the car with Williams. Campbell, who was not wearing a hard hat or safety glasses either, followed him outside to the car and yelled at Stevens that he was not allowed on the premises. Campbell then told Stevens that he was not one to be "fucked" with.  Campbell said: "you see I like you but you are going to put my name in that fucking shit, but you are better off fucking with those white people than fucking with me."  Terrell Dec. ¶ 3. Campbell threatened Stevens: "I will destroy a mother fucker like you." It is undisputed that Campbell also stated: "if you ever put my name in anything else, you would wish you didn't."  Dk 15-3 ¶¶ 16-17; Campbell Dep. 146:21 to 147:12 (directly declining to deny having said it); Campbell Dep. 189-190 ("I think I testified that I told Mr. Stevens that I didn't want him putting my name in whatever he was doing").  Stevens could literally feel Campbell's spit, as he got right up next to Stevens and berated him.  Stevens Aff. ¶ 2.  Campbell testified that what Stevens was "doing"-- that he was making reference to that day-- was complaining of a "hostile work environment."  Campbell 189-190.  Campbell does not deny cursing during the tirade. Campbell 145:9 to 146:1.

Campbell testified that what prompted him to threaten Stevens not to  "include [Campbell's] name in anything he was doing," was "the conversation with

the DRO, claiming that I did something to David." Campbell Dep. 193:20 to 194:20

Despite the preceding admission, in the very same deposition, Campbell lied that he was

unaware of the contentions of the May 21 letter, PDE 52, which he admits caused him to

threaten Stevens on May 30, around May the time of May 21.  Campbell Dep. 126:22 to

127:3.

> **Stevens' Counsel Discusses Campbell's Retaliatory Threats With Amtrak Counsel Rogers, And Confirms The Conversation In A Writing That Is Provided To McCallum; McCallum Discusses Campbell's Threats Against Stevens With Campbell; Campbell Is Not Held Accountable For Threatening Stevens**

On June 21, 2004, Richard McKewen wrote a second letter to Amtrak counsel

Rogers on Stevens; behalf, stating that Stevens would like to return to work but in a

different department.   Dk 15-3¶ 20; Dk 15-8 (Exh. 5, June 21, 2004 letter from

McKewen).  The letter "memorialized" McKewen's conversation with Rogers, in which

he had informed her of the May 30 incident, in which, according to McKewen :

> Campbell approached the vehicle and began to verbally abuse Mr. Stevens.  Mr. Campbell's unprovoked and profanity-laced assault derogated and humiliated Mr. Stevens in front of his friend.  Coming so close on the heels of Mr. Stevens' complaints and my written communication with you, Mr. Campbell's actions can only be taken as evidence of retaliation, and as further evidence of Mr. Stevens' hostile work environment.  I trust that your EEO office will take this incident into consideration as it investigates Mr. Stevens' claims.

Dk 15-8 at 2. McCallum would have received Dk 15-8, because it was "procedure" that

he receive whatever complaints letters came in.  McCallum Dep. 32-33.

McCallum spoke to Campbell about Stevens' contention that Campbell had retaliated

against Stevens by threatening him, as set forth in the June 21 letter from Stevens'

counsel.  McCallum Dep. 47; Dk 15-8.

On June 23, 2004, Stevens finally filed a charge of discrimination with the EEOC. Dk 15-3 ¶ 22; Dk 15-9. On July 1, 2004, Campbell sent Stevens a letter stating that the documentation was not sufficient and that he must provide further documentation to support his leave of absence or he would be terminated.   Dk 15-3 ¶ 23; Dk 15-3 (Exh. 7). Stevens had never received this type of threatening letter although he had previously been on medical leave prior to protesting discrimination.  Stevens Aff. ¶ 4.

On July 20, McCallum sent a position statement to the EEOC on Amtrak letterhead.  PDE 57.  In the statement, McCallum asserted that BL Campbell had said that Stevens had told others about his medical condition.  PDE 57.  McCallum testified that Campbell told him that directly. McCallum Dep. 44-45.

Although McCallum testified that he would have told Campbell about the charge and the letters from Stevens' counsel (McCallum 21-22, 47-48), Campbell emphatically claims that no one at Amtrak ever informed him that Stevens complained that Campbell threatened to "destroy" Stevens. Campbell Dep. 204:11 to 204:16. In any case, Campbell would not have "cared" anyway if someone did.  Campbell Dep. 204:17 to 205:2.

Campbell further claims that the fact that Stevens *ever* filed a complaint with the EEOC "doesn't ring a bell."  Campbell Dep. 186:17 to 187:2. He claims not to have known about either Stevens' initial EEOC Complaint or the November 2004 amendment. Campbell 201-202.  Campbell says he learned of the EEOC complaints at his deposition.

On July 23, 2004, Campbell sent another letter (PDE 55) to Stevens stating that the medical documents he provided were still not sufficient and to respond by August 6 with additional documentation or be terminated.  Dk 15-3¶ 25; Dk 15-12.

On July 27, McKewen wrote (PDE 58) to Melissa Rogers of the Amtrak Law Department, contending that Stevens was being threatened with termination.  McKewen

characterized Amtrak as potentially placing Stevens in a hostile work environment if he returned to his previous post, stating that Stevens' claims arose from the latest threats of termination, which were retaliatory  PDE 58 at 2.  He also protested Campbell's "profanity-laced" threats of May 30, as previously reported to Rogers by phone and in the June 21 letter.  PDE 58 at 2.

The Law Department turned the July 21 letter over to its agent, McCallum, for investigation.  McCallum Dep. 47-48.  McCallum interviewed Campbell about PDE 58, and Campbell apparently told McCallum that his actions were "just following procedure," which was satisfactory to McCallum. Nonetheless, Campbell now claims that at no time prior to his 2007 deposition was he ever informed of Stevens' July 2004 concern about his letters. Campbell Page 188:11 to 188:15.

On August 11, 2004, Stevens had his attorney submit a detailed medical status report from Stevens' health care provider.  Dk 15-3 ¶ 26.  On August 20, 2004, Campbell sent another similar letter  Dk 15-3 ¶ 27; Dk 15-13; PDE 56.

On August 23, 2004, McKewen wrote the EEOC stating that Campbell's rejection of Stevens' documentation to be retaliation for Stevens' prior complaints and requested that Stevens' EEOC charge be amended to assert a claim for retaliation.  Dk 15-3 ¶ 29; Dk 15-14. McCallum received the charge and investigated it.  McCallum Dep. 55-56, 64.

While he was still on leave, on November 7, 2004, Stevens found a note on his door stating, "you will lose. you got aids." Stevens filed a police report on this incident and on November 17, 2004.  Dk 15-3¶ 31; Dk 15-3.

Stevens filed an amended EEOC charge on November 18, 2004.  PDE 59. McCallum received it on November 23, 2004.  PDE 59.  The Amended Charge alleged in

part that Campbell threatened to terminate Stevens in retaliation for Stevens' existing

charge.  It elaborated as follows:

> On May 29, 2004, the Respondent engaged in another retaliatory action against me. When I visited Ivy City, the location of Respondent's administrative buildings, to pick up some medications I had left with a friend, Bernard Campbell approached me and threatened me with violence because I included him in my initial EEOC charge.  He told me he would "destroy" me if I continue to pursue the complaint against him.

PDE 59 at 3. It further referenced the threat on the door. McCallum admits that he

interviewed Campbell about the amended charge. McCallum Dep. 55-56.  However,

Campbell says he was never informed about the threat on the door.  Campbell Dep. 241.

On November 18, Stevens' counsel wrote to Amtrak's Melissa Rogers in the Law

Department again.  McCallum had to admit having received the letter because his stamp

reflected receipt on November 29, 2004.  McCallum Dep.  64-67.  The letter attached the

Amended Charge. PDE 59; PDE 59 at 3.

On December 13, Stevens went to Concentra for a back to work physical and

drug screen.  He provided the urine sample to the attendant, Demetria Hudley.  Hudley

told Stevens that the sample was outside the acceptable temperature range. Stevens Aff.

¶ 9.  Apparently, the plastic cup contains a temperature strip on it, which Hudley was

trained read, but she says no temperature was registering.  Hudley Dep. 25, 65, 81-82.

Hudley saw no signs of any tampering.  Hudley Dep. 65:3 to 65:9.  Hudley collected the

sample at 2:04 PM.  Hudley Dep. 56-57; PDE 81.

Concentra follows the Department of Transportation (Urine Specimen Collection

Guidelines). PDE 78.  Under those Guidelines, Hudley should have immediately

transferred the urine to a second cup with its own temperature strip to see if a

temperature would register.  Hudley Dep. 28:16 to 28:22; 79-82; PDE 78 at 17 (Urine

Specimen Collection Guidelines), but she did not.  Hudley Dep. 82:13 to 82:19.  Hudley admits that the temperature strip frequently fails to register a temperature.  Indeed, it happens "every day." Hudley Dep. 28:16 to 28:22.

Hudley instructed Stevens that he would have to provide a second, monitored sample and agreed to do so, including signing the requisite form.  However, instead of administering the test "immediately", as required by the guidelines, PDE 78 at 17 ("Temperature"), Hudley took Stevens was to an examination room to wait for someone to collect another sample.  Hudley Dep. 45-46; Dk 15-3 ¶ 33.  Stevens never suggested to the staff that he was unable to provide a second sample (Stevens Aff. ¶ 11); to the contrary, Hudley elected not to have him give the second specimen, and instead to have him wait for the doctor.  Hudley Dep.  45: 22-46:9.

After waiting a long time with nothing happening, Stevens went into the hallway and got the attention of another staff member, Ebonie Beaty.  Beaty said she would check what was going on and the doctor would be with him shortly.  However, no doctor came, and no one came to take a second sample.

Due to the fact that he is HIV-positive and had suffered from serious illnesses including pneumonia in the past, Stevens became very frightened at the idea that something was wrong with his urine and thought he might have another serious illness. After he had waited at least 45 minutes alone in the room, having asked Beaty for assistance.  He then waited at least another another twenty minutes but still no one came to see him.  Dk 15-3 ¶ 33-37.

Stevens informed Concentra that he was HIV positive (Hudley Dep. 86), and had recently had contracted pneumonia.  Stevens Aff. ¶ 13. This did not prompt an offer to get the second urine sample collected.  Stevens Aff. ¶ 14. Stevens suggested that Beaty

call Jackie Cobb, the Mechanical Department administrative employee who executed the

Med-1 Form authorizing Stevens' visit to Concentra and whose number was sitting

invitingly on that form. Stevens Aff. ¶ 15. Beaty agreed to try that, and Stevens sat down

in the waiting room while Beaty placed a call and spoke on the phone.  Stevens Aff. ¶ 16;

Hudley Dep. 31. (Staff may have called Cobb).

Again, Stevens waited but nothing happened.  He approached Beaty again, and

Beaty told him she needed to contact Margaret Tierney (of Amtrak Medical) to find out

what to do.  PDE 39 (Tierney e-mail stating that she was contacted on the 13th).  Beaty

apparently called Tierney and left a voice mail.  Stevens waited some more.

Margaret Tierney is employed  by Amtrak's Medical Department.  She states that

sometimes "collectors" such as Concentra make mistakes. Tierney Dep. 72. For instance,

sometimes a collector arrives late to the site.  Tierney Dep. 28.  In such a case, there may

need to be a rescheduling.  Tierney Dep. 29.  Sometimes the collector loses the sample.

Tierney Dep.  31.  That is not held against the employee.

If she learns that an employee has left the site, she "would have to investigate

what was, you know, going on."  Tierney Dep. 58.  there are situations where "an

employee could leave a testing facility in the middle of a process where that could be

justified or excused. . . [including] "a medical emergency."  Tierney Dep. 57.  these are

things that the employee would need to justify Tierney Dep. 59. Such emergencies

would "need to be documented."  Tierney Dep. 60.

Tierney manages her own voice mail correspondence.  Sometimes, she does not

return phone messages until the next day.  Tierney Dep. 39.  Tierney claims her office

has four representatives, one is always on call 24/7, and the collectors are instructed that they can get a response from them as such.  Tierney Dep. 39-41.  She admits, however, that sometimes she gets a message to the effect that something occurred on the prior day.  Tierney Dep. 40.  When she learns of an unusual collection situation, she would talk to and send a memo to the employee's immediate supervisor.  Tierney Dep.  35-36.

After continuing to wait for an "immediate" re-test and a physical examination for which he came to Concentra, and upon reflecting upon his urine supposedly being "out of range," Stevens became extremely upset and worried that he might be ill and needed to go to George Washington University Medical Center, where he was a regular patient on account of his serious medical conditions.   Stevens knew that Concentra—a walk-in clinic-- was not equipped to treat someone with serious health conditions like himself.  Dk 15-3 ¶¶ 34-36.

Instead of just collecting Stevens' second urine sample and getting it over with, Beaty said that Concentra needed to call Amtrak to see if he could leave the facility without providing a second sample. Beaty called Margaret Tierney of Amtrak's medical department to ask for instructions on how to handle the situation.

As noted above, Tierney testified that there was supposed to be 24/7 coverage at the Medical Department to deal with this kind of situation. She further testified that had she been available to pick up the phone, she would have spoken to Stevens about the situation right then and there, to "try to get an understanding of some of the details of what happened in the event."  Tierney Dep. 46.

Stevens was present when Beaty made the call to Tierney, and heard Beaty leave a message on Tierney's voice mail stating that David Stevens' urine sample was not at

the right temperature and to please call Concentra back to inform them of the

procedures they should follow.  Dk 15-3¶ 37; Dk 15-3 Exh. 14 – December 13, 2004

memorandum from Concentra; Beaty Dep. 77.

PDE 39 is an email demonstrating that Tierney definitely was contacted on the

13th in the "afternoon."  Stevens had given Beaty his phone cell phone number, but

despite Tierney's attempt to represent her unit as utilizing a rapid response and

speaking to employees in a drug testing incident, Tierney never called him that

afternoon or at any time thereafter, leaving it to Concentra to inform Stevens that he

need not bother to return.

Finally, Stevens told Beaty he was going to the emergency room, gave Beaty his

cell phone number, and went straight to George Washington Medical Center.

At no time did Stevens ever refuse to give a second specimen.  Hudley Dep. 79.

Beaty does not believe Stevens did anything dishonest.  Beaty Dep. 71. Stevens did not

object to providing a second sample, or a supervised second sample under direct

observation.  Beaty Dep. 72-73.

Stevens called Concentra from Darryl Hollis' car, where he was a passenger on

the way to the hospital.  Stevens Aff. ¶ 18.  Beaty called him back after he was already at

the hospital. Stevens Aff. ¶ 19 . Stevens informed Beaty that he was diagnosed with

bronchitis. Beaty Dep. 85-86;  Dk 15-3 ¶ 39; Dk 15-18. Beaty told Stevens she had spoken

to Tierney, who said he did not have to return to Concentra.  Stevens Aff. ¶  21 .

Concentra, through Beaty, specifically instructed Stevens not to return to

Concentra, even though the Guidelines state that Concentra should have instructed

Stevens to return as soon as it was prepared to administer the test.  PDE 78 (Guidelines

at 19, stating that: "when the collector learns that a directly observed collection should

have been conducted, but was not, the collector must notify the employer to direct the employee to return for an immediate recollection under direct observation"). Beaty admits that she would have told Stevens it was Amtrak's responsibility to determine what would happen if he left.   Beaty Dep. 78-79.

The fact of Concentra's failure to permit Stevens to provide a second, supervised sample is undisputed in this case.  Concentra's records reflect that Stevens arrived at Concentra on December 13 at 1:43 and left at 5:13.  Hudley Dep. 46-47; PDE 80. He was never permitted to provide the observed second specimen, and he never saw a doctor. Stevens Aff. ¶ 22. Concentra's medical file on Stevens, produced pursuant to a subpoena, ultimately confirms that Stevens was never seen by a doctor and never completed his physical.  Stevens Aff. ¶ 23.

Hudley testified that Stevens was required to endure long waits because Concentra was "really, really busy."  Hudley Dep. 54.  It is undisputed that Stevens never saw a doctor at Concentra on December 13.

Hudley testified that Concentra would have informed Stevens that it was having difficulty finding a male chaperone had that been the case, Hudley Dep. 36:6 to 36:12, and it is undisputed that Stevens was never told that.  Stevens Aff. ¶ 24.  Beaty admitted does not recall advising Stevens as to how long he would have to wait Beaty Dep. 74.

Beaty admits she cannot testify that Stevens was in fact offered the opportunity to go into a room and "produce the second sample."  Beaty Dep. 96-97.  She does not know why he would not have been given the opportunity. Beaty Dep.  97. Beaty would not deny that Stevens waited because Amtrak wanted him to.  Beaty Dep. 93.

Whatever 24/7 response was supposed to be in place at Amtrak Medical did not function to Stevens' benefit on December 13, since Stevens got no direct instructions on

how to proceed from Amtrak while he was still waiting at Concentra.  Tierney denies

speaking to anyone in Amtrak management about Stevens' situation.  Tierney Dep.  33.

Astoundingly, Tierney claims she doesn't know "one way or the other," if a

medical explanation was ever given relating to Mr. Stevens having left Concentra on

December 13, Tierney Dep. 60, or if there were any extenuating circumstances

surrounding the December 13 events at Concentra, Tierney Dep. 44, she admits she

never spoke to Stevens.  Tierney Dep. 66-67, and can't remember if she even tried.

However, she admits that no one from Concentra ever told her that Stevens told them he

would not provide a second specimen.  Tierney Dep. 45.

On the other hand, Tierney says she is "sure" of the false fact that Stevens was

offered the opportunity to give his second sample immediately. Tierney Dep.  69 (See

Hudley Dep. 64-65). Challenged at her deposition on this point, Tierney had to admit

that PDE 44 did not inform her as to "whether it was immediately after the first sample

that he said he couldn't stay any longer."  Tierney Dep. 69-70. Tierney never asked Beaty

if the re-test took place "immediately".  Beaty Dep. 95.

Tierney states that how long it would take Concentra to get someone to

supervise Stevens "never came up because the employee left the site." Tierney Dep. 71.

She does not know how long Stevens waited before leaving.  Tierney Dep. 70-72. Tierney

claims no one told her that Stevens went to the emergency room and was diagnosed

with bronchitis,  Tierney Dep. 72, and that no one told her the undisputed fact that

Stevens provided Amtrak the documentation from his December 13 visit to the

emergency room.  Tierney Dep. 72.

Tierney testified that she "definitely" would have looked into Stevens' assertion that he left Concentra on account of an emergency and that his actions might have been justifiable under Amtrak policy:

> Q    If you had been told that Mr. Stevens had to go to the emergency room and he was diagnosed with bronchitis would you have looked further into his situation before identifying him or agreeing that he had refused to test?
>
> A    I would have the opportunity to explain that he had an emergency, first how important it was to complete the collection, but if he had an emergency, and could justify it, you know, I definitely would have looked into it.

Tierney Dep. 74.

One evening in approximately December 2005, Gary Louers came into his General Foreman office, which Mary Whitley shared.  Louers told Whitley something like: "guess what happened today?"She answered: "what?" He said something like: "BL said: 'David Stevens tried to pay off the person who gave him the drug test.'" Louers then said something like: "because he didn't pass the urine test," or "because his urine was dirty" or "or "because his urine wasn't right," I'm not sure which.  Louers further stated: "BL said: 'I got him now,'" and that Stevens was going to lose his job.  Whitley asked something that Louers responded to by saying that Stevens was already on "Rule G." Not long after this, Whiltey learned that Stevens was indeed fired. Whitley Aff. ¶ 49.

Amtrak instituted procedures to terminate Stevens' employment on December 14, 2004.  Dk 15-3¶ 40.  It was the very next day after the event.

Tierney claims she is "not involved" in discipline after she prepares a memo such as PDE 38. In fact, Tierney was responsible for coordinating the disciplinary hearing, However, despite Stevens' specific objection that she needed to be there, Amtrak went

forward with the hearing without requiring her to testify.  She then refused and failed to

appear at the disciplinary hearing, where she could have been cross examined over

Stevens' strenuous objection.    Tierney Dep. 60-61.

Campbell denies proposing that Amtrak terminate Stevens.  Campbell 124:1 to

124:14.  In fact, he sent out a Notice of Formal Investigation (PDE 65) which states:  "The

purpose of this investigation is to develop the facts and determine your responsibility, if

any, in connection with the following charge. . ," However, Campbell admitted that it

was "absolutely correct" that he assigned General Foreman Michael Talley ("Talley") to

handle the so-called "investigation" for the sole purpose of finding Stevens "guilty".

Campbell Dep. 209:13 to 210:4.  Neither Campbell nor Talley ever attempted to speak to

Stevens about what had occurred.  Campbell Dep. 210:5 to 210:10.  Campbell Dep. 210:19

to 211:1.  Campbell admits he failed to speak to Stevens' union representative about the

charges.  Campbell Dep. 210-211.  Campbell just undertook to make sure Talley "made

sure he had his ducks in a row." Campbell Dep. 211:18 to 212:2.  It was an easy case.

Campbell Dep. 211:18 to 212:2.  Campbell feigned ignorance as to how Talley could have

known Stevens went to the emergency room saying "I don't know how Mr. Talley

would know that. Campbell Dep.  214:21 to 215:3.  Nothing can refresh his recollection

as to whether Talley told him Stevens had bronchitis.  Campbell Dep. 215.

Asked whether he "heard" that there were extenuating circumstances causing

Stevens not to have provided a second sample, Campbell retorted with the non-sequitur

that it was not his "decision".  Reminded that that was not the question, Campbell

insisted: "I wouldn't even look for that."  Campbell Dep. at 213: 1-12).

On January 18, 2005 and January 31, 2005, Amtrak held a hearing as part of its

procedures necessary to terminate Stevens' employment, in which Talley prosecuted

Stevens.   Campbell was listed as the Charging Officer bringing the action against Stevens.  See Dk 15-19 at 7.

Defendant's position is that Bernard Campbell was "ultimately responsible for terminating plaintiff."  Dk 44-2 at 7., and indeed, Campbell executed a Personnel Action Request terminating Stevens for "dishonesty".  PDE 64; Amtrak Stevens 402.

However, brazenly, Campbell lied under oath about that elementary fact at his deposition. Campbell Dep. 229:11 to 229:16 (claiming he had "nothing to do with" authorizing the termination).  Campbell lamely attempted to deny that he brought the charges against Stevens, insisting instead that Stevens brought them"against himself." Campbell Dep. 223: 9 to 21.

Campbell claims that Talley did not tell him that Stevens went directly to the emergency room from Concentra.  Campbell Dep. at 214-215.  Campbell claims that the first time he learned Stevens was diagnosed with bronchitis at the emergency room was over two years later at his deposition in this case.  Id. at 215. Campbell admits that he was not interested in information regarding extenuating circumstances before issuing disciplinary charges against Stevens.  Campbell Dep. at 212-213.  Campbell claims no one ever told him how long Stevens had to wait for a second test to be administered.  Id. at 216.  Stevens claims he did not request a copy of the transcript, Id. at 217, and  never read the transcript.  Id. at 217.  Although Talley was his charging officer, he does not recall discussing what happened at the hearing with Talley.  Id. at 217.  He denies discussing what happened at the hearing with Kapela.  Id. at 217.

Campbell contends that AMTRAK recognizes no exception the to rule that one who leaves a drug testing situation is treated as refusing to test for medical emergencies.

Id. at 219-220. However, AMTRAK's medical officer, Margaret Tierney, testified to the contrary. Tierney Dep. 58-59.

Campbell admitted that he did not know how long an employee was required to wait for a drug test. Id. at 225. He said that would be up to the testing facility. Id. at 225. However, it is undisputed that Campbell never attempted to directly communicate with the testing facility. Beaty Dep. 70; Campbell Dep. 34 (testifying that he is not familiar with any of the Concentra employees).

Campbell claims that Stevens failed "to cooperate with the medical personnel administering the test." Campbell Dep. 227: 9-17. Campbell now admits, however, that his statement in the affidavit he submitted in support of the Motion to Dismiss, that Stevens declined to retake the test or cooperate with m he medical personnel administering the test, Mr. Stevens left the facility, was based solely on a review of the (misleading) records. Id. at 226-227.

At his deposition—a time when he would have been expected to be on his best behavior— Campbell three times mis-characterized Stevens' drug test facts in a manner that was both false and disparaging toward Stevens. Thus, Campbell testified repeatedly that Stevens provided an "adulterated sample." Campbell, Dep. 124:1 to 125:2; 207:12 to 208:2; 224:13-15). He did so even though all documents generated by Concentra and the testimony of Hudley and Beaty were to the contrary—indicating that there were no signs of tampering but that the first urine sample was simply out of range, including PDE 81, which offered a box to check specifically for "adulterated" if those were the perceived facts. Hudley Dep. 85; Beaty Dep. 50-51; 95-96. Even worse, Campbell inserted the "adulterated" concept into the bloodstream of Stevens' employment records. See PDE 64; Amtrak Stevens 402.

18

Campbell also testified falsely that he received an e-mail stating that Stevens had "turned in an adulterated sample." No such e-mail has been produced, and the references to adulteration in the record all began with Campbell. PDE 39; Campbell Dep. 224.

No Concentra personnel agreed with Campbell. Hudley Dep. 85:6-9. PDE 42, 43, and 44 were created by Concentra personnel reflecting the events of December 13. None of those say the sample was cold, much less "adulterated." Nothing in the documents indicates to Beaty that Stevens adulterated the sample. Beaty Dep. 95-96.

Campbell not only denied knowing that Stevens had gone to the emergency room on December 13, 2004, but also denied that Talley—the charging officer who presented Campbell's case at the "investigation" hearing-- could have known that. Campbell Dep. 214:21 to 215:3. Campbell also denied that Talley told him Stevens had been diagnosed with bronchitis at the emergency room. Campbell Dep. 215: 6-10. Campbell expressed doubt that Talley would have known if Concentra was prepared to give Stevens a second test. Campbell Dep. 215: 18- 216: 4. He also testified that Talley never told him how long Stevens had to wait to give his second sample. Campbell,Dep. 216; 5-15.

Campbell, who was ultimately responsible for the termination, knew there was a transcript prepared of the investigation hearing, but never bothered to read it. Campbell Dep. 216: 16- 217: 3. Nor did he request a copy of it. Campbell Dep. 217: 6-8. Yet, he asserts that the case was "clear cut" and that Stevens "knew what the consequences would be" when he "walked out of that facility." Campbell Dep. 218: 4-15.

Campbell never discussed the Stevens issue with a single other witness. Campbell Dep. 209-210. Campbell looked at the case as a "simple" one. Campbell Dep.

19

211-212.  Campbell claims to be unaware that Stevens was diagnosed with bronchitis on

December 13.  Campbell Dep.  215.  Nor did Talley tell him how long Stevens had to

wait at Concentra for his second urine test.  Campbell Dep.  216.

Campbell claims AMTRAK has no exceptions to the policy that if an employee

walks out of a testing situation, it is a positive test.  Campbell Dep. 218; 21-219: 9.

Specifically, Campbell claims there is no exception for a medical emergency.  Campbell

Dep. 220; 2-9).  Tierney testified to the contrary, however, as shown above. Tierney Dep.

58-60.

Campbell was shown PDE 59, Stevens' Amended Complaint to the EEOC.

Asked if he would have had concern had someone told him that Stevens had made such

a complaint about him, Campbell said he would neither have been "concerned", nor

"cared," and would have taken no action.  Campbell Dep. 200-205

Campbell falsely claims that Stevens told him Stevens was HIV positive.

Campbell Dep. 247:19 to 248:12.  In fact, Stevens did no such thing.  Stevens Aff. ¶ 26.

Defendant endorses (Dk 44-2 at 7) Campbell's lie that Campbell did not know

that Stevens had filed an EEOC charge "until the day of Campbell's deposition" in 2007.

Indeed , Campbell repeated that claim in his testimony at least four times. Campbell

Dep. 186:17 to 187:2, 201:21 to 202:3, 202:10 to 202:20, 238:20 to 239:3.  Campbell himself

highlighted the point, claiming—probably sarcastically-- to have provided that

testimony "17 times".  Campbell Dep. 238:20 to 239:3.  There is no doubt that Campbell

knows what an EEOC complaint is.  Campbell Dep. 202:21 to 203:3.

In fact, Campbell knew all about Campbell's EEOC charge.  McCallum Dep. 15-16, 19.

21-22, 37-38, 39. 44-45, 47-48, 55-56, 64

Campbell admitted that he is unaware of any untruthful statements by Stevens.

Campbell Dep. 233:3 to 233:16.

V.    ARGUMENT: THE MOTION FOR SUMMARY JUDGMENT
MUST BE DENIED

A.    APPLICABLE PRINCIPLES FOR SUMMARY JUDGMENT

The standards for considering defendant's motion are well known:

Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted
only "if the pleadings, depositions, answers to interrogatories, and
admissions on file together with the affidavits, if any, show that there is
no genuine issue as to any material fact and that the moving party is
entitled to judgment as a matter of law.  The district judge, in ruling on a
summary judgment motion, must assume the truth of the nonmovant's
evidence, and draw all justifiable inferences in that party's favor.  Bayer v.
United States Dep't of the Treasury, 294 U.S. App. D.C. 44, 956 F.2d 330,
333 (1992), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249
(1986).

"The judge's function is not himself to weigh the evidence and determine the

truth of the matter but to determine whether there is a genuine issue for trial."

Anderson v. Liberty Lobby, 477 U.S. 242, 249 (1986).   The court must view the evidence

in the light most favorable to the nonmoving party and must not assess witness

credibility.  See Aka v. Washington Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284,

1288, 1298 (D.C. Cir. 1998;) (en banc); Mackey v. United States, 8 F.3d 826, 829 (D.C. Cir.

1993).  "Of course, a party seeking summary judgment always bears the initial

responsibility of informing the district court of the basis for its motion, and identifying

those positions of the 'pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' which it believes demonstrate the

absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323

(1986).

Furthermore, "the record must show the movant's right to [summary judgment] with such clarity as to leave no room for controversy," and must demonstrate that the opposing party "would not be entitled to [prevail] under any discernible circumstances." McKinney v. Dole, 765 F. 2d 1134, 1135 (D.C. Cir. 1985,), citing Williams v. W.M.A.T.A., 721 F.2d at 1415.  The burden of making such a showing is on the party moving for summary judgment.  McKinney v. Dole, 765 F.2d at 1134-35.

### B.    DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT WITH RESPECT TO STEVENS' CLAIM REGARDING CAMPBELL'S ACTIONABLE THREAT TO "DESTROY" STEVENS

D.C. Code § 2-1402.61, on "coercion or retaliation," states as follows:

(a) It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.

As we noted in opposing the Motion to Dismiss or in the Alternative for Summary Judgment:

The D.C. Court of Appeals has held explicitly that threatening an employee's employment status in retaliation for his protected activity violates the Human Rights Act. Arthur Young & Co. v. Sutherland, 631 A.2d 354 (D.C. 1993), citing Atlantic Richfield Co. v. District of Columbia Com. on Human Rights, 515 A.2d 1095, 1001 (D.C. 1986) (threatening employee that "she would never work in the District of Columbia again if she pressed her discrimination claim" amounted to unlawful retaliation under section 1-2525 (a)).  In this respect, the Human Rights Act clearly differs from Title VII of the Civil Rights Act of 1964, under which retaliatory threats are not independently actionable.

Here, Stevens can place this case squarely before the jury to weigh credibility and resolve fact disputes simply by presenting the evidence, as described above, that Defendant's agent, Bernard Campbell, repeatedly threatened him for his having named Campbell in successive anti-discrimination contacts.  Thus, Campbell, within a week

after McKewen sent the May, 2004 letter on Stevens' behalf alleging hostile environment and unauthorized disclosure of his medical records,  verbally attacked Stevens in a parking lot, threatening that he would "destroy [Stevens'] ass" and: ". . . you are going to put my name in that fucking shit, No I will destroy a mother fucker like [Stevens]," and that "if [Stevens] ever put [Campbell's] name in anything else, [he] would wish [he] didn't."  Dk 15-21 (Exh. 18 - Statement of Terrell Williams).

Based on the above, a material issue of fact clearly exists as to whether Defendant has violated the Human Rights Act by making actionable retaliatory threats. Accordingly, summary judgment must be denied.

After the full briefing on Defendant's first dispositive motion, this Honorable Court denied Defendant's Motion, both with regard to the Rule 12 and Rule 56 aspects. Since that time, this claim has become stronger for Plaintiff.  Thus, Defendant's brief (Dk 43-1 at 6) reflects its admission that Stevens engaged in protected activity during May 2004 through internal discrimination complaints.  Defendant fails even to **attempt** to produce any evidence that Campbell did not threaten Stevens on May 30 as alleged, in either its Statement of Material Facts (Dk 43-2), Statement of Facts, Argument, or even inferentially through any documents.

On the other hand, Stevens has presented reliable evidence that within a week after McKewen sent the May, 2004 letter on Stevens' behalf alleging hostile environment and unauthorized disclosure of his medical records by Campbell, Campbell threatened him in a company parking lot, threatening that he would "destroy [Stevens'] ass" and: ". . . you are going to put my name in that fucking shit, No I will destroy a mother fucker like [Stevens]," and that "if [Stevens] ever put [Campbell's] name in anything else, [he] would wish [he] didn't." Dk 15-21 (Exh. 18, Statement of Terrell Williams).

Based on the above, a material issue of fact still clearly exists as to whether Defendant has violated the Human Rights Act by making actionable retaliatory threats. Accordingly, summary judgment must be denied.

### C.     DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT ON THE RETALIATORY TERMINATION CLAIM, SINCE STEVENS HAS PRESENTED SUFFICIENT DIRECT EVIDENCE OF RETALIATORY ANIMUS

The District of Columbia Human Rights Act, D.C. Code § 2-1402.61, prohibits employers from undertaking adverse employment actions "on account of" an employee's activities protected by that Act. In Atlantic Richfield Co. v. District of Columbia Com. on Human Rights, 515 A.2d 1095, 1101 (D.C. 1986), the D.C. Court of Appeals interpreted the Human Rights Act as permitting a finding based on an employer's threat that the employee "would never work in the District of Columbia again if she pressed her discrimination claim with the Office of Human Rights." The plaintiff left the employment thereafter upon being constructively discharged. 515 A.2d at 1097.

This case follows the pattern of Atlantic Richfield. Similarly to the cited case, here, while Stevens was on leave but visiting an Amtrak facility, Stevens was threatened by Campbell that he would be "destroyed" if he ever protested against Campbell again. Nonetheless, as shown, Stevens continued protesting repeatedly through his attorney, escalated the protest by going to the EEOC and then filed an Amended Charge, all of which Campbell was aware of, through McCallum.  He was then fired at the very first opportunity presented to Campbell to do so— Stevens' return to work physical which of course occurred before Stevens worked another minute for Amtrak.  Under the Atlantic Richfield theory alone, therefore, summary judgment must be denied.

### D. STEVENS PRESENTS SUFFICIENT INFERENTIAL EVIDENCE OF RETALIATION, THUS DEFEATING THE INSTANT MOTION

1.     **Applicable Principles For Proving Retaliation By Indirect Evidence**

Discrimination and retaliation are as susceptible to proof by circumstantial evidence as any other factual issue.  U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983).  "Since direct evidence of discriminatory treatment is rarely present [in an employment discrimination case], plaintiff ordinarily must rely on 'circumstantial' rather than direct evidence to infer such motivation."  Jones v. Trailways Corp., 477 F.Supp. 642, 646 (D.D.C. 1979).  See Also Aka, 156 F.3d at 1288-89.

Discrimination or retaliation can always be proved by circumstantial evidence alone; employer confessions or admissions, otherwise known as "direct evidence," are not required.  Reeves v. Sanderson Plumbing, 530 U.S. 133 (2000).  The plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination."  Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 (1981).  The burden "is not onerous."  Id.

2.     **Applicable Principles For Proving A Prima Facie Case Of Retaliation Under An Indirect Evidence Theory**

As adapted from the McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973), line of cases, the elements of the plaintiff's prima facie case of retaliation as follows:  the plaintiff must establish that he engaged in protected activity, that the employer took an adverse employment action against him, and that there was a nexus between the adverse action and the exercise of his rights."  Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000); Carter-Obayuwana v. Howard University, 764 A.2d 779 (D.C. 2001), citing McKenna v. Weinberger, 234 App. D.C. 297, 729 F.2d 783, 790 (D.C. Cir. 1984); Arthur Young & Co., 631 A.2d at 367.   The first two prongs are undisputed in this case.  In any

case there can be no doubt but that sending letters of protest alleging discrimination and retaliation are statutorily protected activities.  See Paquin vs. Federal National Mortgage Association, 119 F. 3d 23, 31 (D.C. 1997) (holding that a letter asserting plaintiff's termination was based on discrimination is a statutorily protected activity). A plaintiff need not prove that his protected activity was the sole factor motivating the employer's challenged decision in order to establish the "causal link" element of a prima facie case. Long v. Eastfield College, 88 F.3d 300  (5th Cir. 1996), citing De Anda v. St. Joseph Hosp., 671 F.2d 850, 857 n.12 (5th Cir. 1982). Where other evidence—such as a statement of retaliatory intent-- links the adverse action to the protected activity, the degree of proximity in time need not be as close to show the connection. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1119 (8th Cir. 2006).

Where there is close temporal proximity between the discrimination complaint and the adverse action, that timing alone can be are sufficient to establish the requisite causal connection.  Cones, 199 F.3d at 521; Barbour v. Merrill, 759 F. 2d 80, 86 (D.C. Cir. 1985); Gleklen v. Democratic Congressional Campaign Comm., Inc., 199 F.3d 1365, 1368 (D.C. Cir. 2000) (gap of a few weeks between protected activity and adverse action sufficient to establish causal connection); Cones v. Shalala, 199 F.3d 512 (D.C. Cir. 2000) (gap of several weeks elapsed between plaintiff's discrimination complaints and refusal to consider the plaintiff for a position was sufficient to infer causal connection).  Such timing, though not even needed because of the additional evidence referenced above, is present in this case.

In ascertaining how close the temporal proximity really is in a given case, the United States Court of Appeals for the Fourth Circuit has wisely held that a court should consider not just the amount of calendar time that has passed between the protected

activity and adverse action, but also whether the Defendant has declined to avail itself of early opportunities to retaliate or, in the opposite context, retaliated as promptly and severely as it could. Thus, in the recent case of Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004), that Court held that the passage of "nine-to ten months" between the plaintiff's discrimination complaint and the decision not to select him was sufficient to establish the requisite causal connection, because, in that case the adverse action at issue was a failure to select, and the retaliating official had no sooner opportunity to retaliate against the Plaintiff, who was not his employee. 380 F.3d at 215.

Where a plaintiff engages in multiple protected acts, it would be inappropriate for a court to find, as Defendant urges here, that proximity in time should be measured only from the time of the first (oldest) action--even if Defendant has not acted in a manner that would show a break in the chain of causality between the first and subsequent complaints. Such a presumption would assume, nonsensically, that an employee's first protected act could prompt retaliation, but that a sustained pattern of protest could not. See Morey v. Somers Cent. Sch. Dist., 2007 U.S. Dist. Lexis 20265 (S.D.N.Y. March 21, 2007)(where plaintiff first complained in May and continued doing so for three months thereafter, a September adverse action came a "matter of days (or at most a month)" after the applicable protected activity); Escobar v. Swift & Co., 99 Fair Empl. Prac. Cas. (F.E.P.)(BNA) 821; 2007 U.S. Dist. Lexis 25 (D. Minn. 2007)(declining to ignore plaintiff's later complaints as possibly causing adverse action).

Similarly, a defendant is not entitled to an inference of broken causality—as Defendant urges here-- based on any strange fiction that it could not have been motivated to retaliate against the Plaintiff on the date when it expressed its desire and proposed to fire him, but could have so motivated on the later date when it actually

carried out the firing.  Morey v. Somers Cent. Sch. Dist., 2007 U.S. Dist. Lexis 20265 (S.D.N.Y. March 21, 2007)(dating the adverse action to the time of the initial attempt to bring charges).

The ultimate question in the instant motion is whether there is evidence from which a jury could possibly infer retaliation, and summary judgment must be denied if it could so infer from all the facts and circumstances viewed *collectively*.  "A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario." Andrews v. City of Philadelphia, 895 F.2d 1469, 1484 (3d Cir. 1990). "Events obscure, ambiguous, or even meaningless when viewed in isolation may, like the component parts of an equation, become clear, definitive, and informative when considered in relation to other action. Conduct, like language, takes its meaning from the circumstances in which it occurs."  Carter-Obayuwana v. Howard Univ., 764 A.2d 779, 794 (D.C. 2001).

### 3.  Stevens Has Presented Sufficient Evidence To Demonstrate The Requisite Causality To Satisfy The Prima Facie Requirements

The evidence supporting causality is in this case is overwhelming.  First, as shown in the Facts ¶ 46-56, Campbell told Stevens that he would "destroy" him if he persisted in his protected complaints, then moved to fire Stevens at the very first opportunity with which he was presented, the day after the Concentra events.  Facts ¶ 195.

Moreover, the record reflects that Stevens engaged in a series of protected acts including his internal EEO and DRO complaints alleging discrimination based on his HIV status and quickly adding retaliation, and that those Complaints were consistently

communicated to Campbell, who met them with retaliation..  Thus, as shown in the
Facts  ¶ 13, Stevens filed a complaint with Amtrak's internal Dispute Resolution
Organization during the last week of March 2004, alleging that due to the rumors that he
had AIDS, he was being subjected to a hostile work environment based on a perceived
or actual disability.  Dk 15-3 ¶ 6. On April 7, 2004, he was unfairly threatened that
Campbell might suspend him.  On April 9, Stevens' mental health professional faxed a
letter to Amtrak's medical department stating that Stevens was experiencing severe
mental and emotional stress due to the hostile environment and placed him on a
temporary leave of absence. On April 12, 2004, Stevens delivered a copy of his mental
health professional's letter to Kapela;  On May 21, 2004, Stevens' counsel McKewen
wrote to Amtrak's Law Department, stating that Stevens had been experiencing
disability discrimination and a hostile work environment and that he had complained to
Theodore-Dalton and Bernard Campbell. PDE 52.  The letter also truthfully accused
Campbell of disseminating a copy of LeHot's letter to at least six other people who had
no legitimate reason for seeing the letter and warned of possible legal action.  At that
point, McCallum became the point man for Amtrak.  Facts ¶ 25-30 . It was then
McCallum's duty "automatically" to investigate, as "thoroughly" as possible, including
interviewing Campbell.

As noted, on May 30, 2004, probably within days after McCallum admits he
would have discussed the May 21 letter with Campbell, Campbell threatened to destroy
Stevens if he ever complained again, thereby demonstrating Campbell's awareness of
Stevens' complaints.  Stevens continued nonetheless.

McKewen discussed the situation with Amtrak's in-house counsel, then wrote to
her again on June 21, asserting that Stevens was being retaliated against and expressing

"trust" that Amtrak EEO would consider the incident.  Facts ¶ 58. McCallum received

the letter and discussed it with Campbell. Facts ¶ 59. On June 23, Stevens finally filed

with the EEOC. Facts ¶ 63.  Even so, thereafter he continued to protest Campbell's letters

demanding more medical information not previously required of Stevens when he was

on extended medical leaves of absence.  See Facts ¶ 76-77, Defendant's refusal to

accommodate him, and the May 30 incident itself.  On July 1, Campbell sent Stevens a

threatening letter demanding additional medical documentation (Facts ¶ 64), to which

McKewen soon replied on July 27 (Facts ¶ 76-77) with a letter that McCallum discussed

with Campbell-- PDE 58-- contending that threats of termination in the letters were

retaliatory.  Campbell sent another threatening letter on August 20 (Facts ¶ 82), and on

August 23, 2004 (Facts ¶ 84), McKewen sent a letter to the EEOC stating that Stevens

considered Campbell's rejection of his medical documentation to be retaliation for

Stevens' prior complaints and requested that Stevens' EEOC charge be amended to

assert a claim for retaliation. On October 25, 2004, McCallum received an entry of

appearance before the EEOC by Patrick Wojahn of Whitman-Walker Clinic, on behalf of

Stevens. Facts ¶  97. On November 10, 2004 and November 18, Stevens amended his

EEOC charge to include retaliatory harassment by Campbell based on Campbell's

threats to terminate him if he did not provide additional medical documentation, and a

discussion of the Ivy City incident in which Campbell threatened to "destroy" Stevens.

Facts ¶ 100-101. McCallum received it and interviewed Campbell about it. McCallum

admits he never made any attempts to resolve Stevens' Complaint. Facts ¶ 104. It is

undisputed that Campbell initiated termination proceedings against Stevens on

December 14, 2004.  Shortly thereafter, Louers told Whitley that Campbell had said

Stevens was trying to bribe Concentra employees and failed a drug test, and that

Campbell had: "got him now" and would be firing Stevens. Facts ¶ 194.

    Campbell's severe attitude of hostility toward Stevens was also reflected in

numerous things he has said. Thus, Campbell outrageously stated that Stevens

attempted to bribe Concentra, See Facts ¶194, an alleged fact which the Concentra

employees with whom Stevens dealt—Hudley and Beaty-- have denied. Similarly,

Campbell falsely testified, See Facts ¶232-238, repeatedly at his deposition—a time when

he would have been expected to be on his best behavior— that Stevens had submitted an

"adulterated" sample, even though all documents generated by Concentra and the

testimony of Hudley and Beaty were to the contrary—that there were no signs of

tampering but that the first urine sample was simply out of range. Even worse,

Campbell inserted the "adulterated" concept into the bloodstream of Stevens'

employment records, as it showed up in the "individual Detail Discipline Form (Amtrak

Stevens 1185) and the Human Resource File Attachment (Amtrak Stevens 1372). Facts ¶

234. Campbell also executed a Personnel Action Request, which is in Stevens' official

personnel folder, terminating Stevens for "dishonesty". PDE 64; Amtrak Stevens 402.

    Moreover, Defendant's motivation and intent to retaliate is further demonstrated

by its treatment of Stevens' co-Plaintiff, Mae Whitley. Thus, as shown, See Facts ¶ 85-

95, Campbell expressed Defendant's retaliatory mindset to Whitley openly in August

2004, during the exact same time period in which Campbell was attempting to oust

Stevens. Campbell manipulated the promotion process then told Whitley that she had

not been promoted because she had "gone after" "those white motherfuckers," by filing

an EEO lawsuit. Campbell asked Whitley rhetorically: "do you think those

motherfuckers are gonna forget?" For emphasis, he added: "do you think that?" Whitley

answered him that she was not surprised that upper management would retaliate against her because she went after them.

Campbell's response to Whitley's expression of lack of surprise that she was being retaliated against was extremely telling.  He said Amtrak was "***not retaliating,***" ***but rather was "just not moving*** [promoting]" her. (Emphasis added.)  Campbell then said that, in order to meet the legal definition of retaliation, Amtrak would have to do something like fire Whitley. Campbell summed it up: "It's a thing they say to you in court: no harm, no foul."

The willfulness of Amtrak's retaliation was illustrated clearly by Campbell's conversation with Whitley.  His remarks to Whitley confirmed Amtrak management's motivation and intent to punish those who would raise EEO contentions against it. Under the circumstances, there can be no doubt that Stevens has presented much, much more than is necessary to preclude summary judgment.

Furthermore, the very next day after the Concentra events, even while Stevens was again in the emergency room on account of bronchitis, Campbell was initiating termination proceedings against him with, admittedly, no interest in investigation and the unabashed desire to end Stevens' employment. See Facts ¶205-214.  Campbell admits that he wanted to Talley to exploit the investigation process to fire Stevens, and that he did zero investigation of the circumstances of Stevens' Concentra visit before making up his mind in that regard.   Based on all this, the causal connection is easily shown, regardless of the exact time measurement utiltized by the Court.

Although Defendant (Dk 25-8) did not dispute the presence of the causal connection in its first Motion for Summary Judgment, and despite the mountain of evidence set forth above, Defendant self-servingly asserts that Stevens has produced

"absolutely no evidence" of causality, but rather mere "serving allegations and assertions of wrongdoing, which are insufficient to defeat a proper motion for summary judgment."  Defendant then pegs Stevens' protected activity solely to July 2004[2] — contending that was the he most recent conceivable date upon which any protected activity occurred, and dates its motivation for terminating Stevens to February 2005, fully two months after it gave notice of intent to terminate him.  Having provided a completely fabricated summary of the relevant facts, Defendant proceeds to argue that: "A period of seven months is flatly insufficient to establish a causal link.  Even a three or four month span has been held too remote to establish a causal link, and that "[m]oreover, Bernard Campbell, who was ultimately responsible for terminating plaintiff, testified in his deposition that he did not know that Stevens had filed an EEOC charge until the day of Campbell's deposition.  (Deposition of Bernard Campbell at 201-202, lines 16-22 and 1-9, respectively."

Defendant presents a weak legal argument dressed up as a discussion of the facts.  The facts are undisputed that Stevens repeatedly engaged in protected activity that continued until no more than three weeks before Campbell initiated his firing, that Stevens was on extended medical leave until the day before firing was initiated, that Campbell was sending Stevens letters threatening to fire him during that leave, and that Campbell fabricated a reason for firing him on the very first day that Stevens was attempting to get off leave and back to work.  Further facts show that Campbell threatened to fire Stevens, expressed animosity toward Stevens and glee at Campbell's perceived creation of an opening for Campbell to fire him.  As noted above, the law is

---

[2]    A word search of Defendant's brief fails to reveal what event Defendant is referring to in July 2004.

clear that Defendant simply is not entitled to any of the upside down legal rulings it

implicitly and explicitly requests from the Court and must have in order to negate

causality, namely that:

> letters of protest are not protected activity; (2) express statements of
> retaliatory intent are irrelevant to ascertaining causal connection; (3)
> proximity in time must be extremely close regardless of the other
> evidence supporting the connection; (4) the length of time between the
> activity and the adverse action is measured by counting the time from the
> first protected act, ignoring any subsequent act, to the last act that
> consummates the adverse action, rather than the point at which the
> adverse decision is taken; (5) the time is counted in this way regardless of
> any evidence that the Defendant had a lack of available opportunities to
> undertake an adverse action during the interval between that first
> protected act and that last moment when the adverse action is
> consummated; (6) Campbell's bare assertion that he did not know about
> the EEOC complaint negates all other evidence that he was acutely aware
> of Stevens' protected activities, including his own statements to that
> effect; and finally, (7) the facts and circumstances should not be viewed
> collectively, but rather atomized in the most extreme possible way so as
> to negate any reasonable inference of causality that might be reached by
> considering their totality.

Since Defendant is not entitled to any—much less all—of these improper legal

presumptions, Defendant's argument against the causal connection that it previously

conceded-- before Plaintiff took the discovery that provides much of Plaintiff's evidence

in this case-- is meritless.

## 4. Defendant's Alleged Legitimate, Non-Discriminatory Reason

Defendant (Dk 44-1), contends that Amtrak terminated Stevens for "no other

reason" besides leaving Concentra before providing a second urine sample.

## 5. Applicable Principles For Demonstrating Pretext

To proceed by showing pretext, the plaintiff must show either "that the asserted

reasons were insufficient to explain the employer's decision or were not applied in a

nondiscriminatory fashion, or by proving that a discriminatory reason more likely

motivated the employer." Burdine, supra, 450 U.S. at 256; McDonnell-Douglas, supra, 411 U.S. at 804-05.

The United States Court of Appeals for the D.C. Circuit has recently attempted to clarify what is required of a plaintiff at this stage, holding that:

> Assuming then that the employer has met its burden of producing a nondiscriminatory reason for its actions, the focus of proceedings at trial (and at summary judgment) will be on whether the jury could infer discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer) or any contrary evidence that may be available to the employer (such as evidence of a strong track record in equal opportunity employment).

Aka., 156 F.3d at 1289.

Once the Plaintiff has shown a causal connection, even absent direct evidence of retaliatory animus, there must be a trial if there is evidence of pretext. One form of evidence from which a jury may be able to infer discriminatory intent is "evidence the plaintiff presents to attack the employer's proffered explanation for its actions." McGill v. MuNoz, 2000 U.S. App. Lexis 2418 (D.C. Cir. 2000), citing Aka, 156 F.3d at 1288, 1298 (noting that the "sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case").

**6.      Ample Evidence of Pretext Requires Trial In This Case**

a.      Campbell's Testimony—"15 Times" Over-- and Defendant's Assertion That Campbell Was Unaware of Stevens' EEOC Complaint Against Him Until The Date of His Deposition Is Disproved By The Testimony of Mr. McCallum, Who Is Employed As A Contractor By AMTRAK, And Who Admits That He Kept Campbell Apprised At All Times

Pretext can be shown when the alleged discriminator falsely denies knowledge of the Complainant's prior EEO activity, such as occurred here. Thus, an attempt to

cover up knowledge of protected activity, when it appears that such knowledge really was in the responsible official's possession at the time of the adverse action (as has occurred in the instant case), is obviously powerful evidence of pretext. Macey v. World Airways, Inc., 14 Fair Empl. Prac. Cas. (BNA) 1426; 1977 U.S. Dist. LEXIS 17148 (N.D. Cal. 1977) ("Resort to a pretextual explanation is, like flight from the scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence of illegal conduct." Sheridan v. E.I. Dupont De Nemours & Co., 100 F.3d 1061 (3rd Cir. 1996)(en banc), quoting  Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d Cir. 1995).

Defendant (Dk 43-1 at 8), contends that Campbell did not even know about the EEOC Complaint.  Indeed, Campbell flippantly boasted that he so testified "about 15 times." 204:11 to 204:16.  While that is, unsurprisingly, yet another exaggeration by Campbell, he did so testify repeatedly.  However, as shown repeatedly, including in Facts ¶ 261, former Amtrak EEO Officer and current contractor McCallum—whose only motive to lie would have been to Stevens' *detriment*-- directly contradicted Campbell. Nor was Campbell's incorrect testimony a mere mistake.  McCallum testified that it was his job to discuss the issues raised with Campbell.  He referred directly to what Campbell told him in the company's Position Statement to the EEOC.  Facts ¶ 67-74. Furthermore, even if Campbell had not known about the EEOC complaint, he admits to having known about Stevens' internal complaints against him and to referencing those complaints in his May 30 tirade.  Since internal complaints of discrimination are also protected activity, there can be no doubt that Campbell's denials of knowledge are nothing more than the proverbial "flight from the scene of a crime."

Campbell's repeated false testimony with regard to his knowledge of Stevens' protected activity is so brazen as to reflect a profound disrespect for this Honorable Court. Campbell's lying on this subject renders all his other testimony suspect as well.

> b. The Temporal Proximity Between Stevens' Protected Activities and Amtrak's Retaliatory Actions, Shows Pretext

Proximate timing between the adverse action and the retaliation is also probative evidence of pretext, and can indeed provide a basis for denial of summary judgment in the presence of other suspicious circumstances (if not by itself). Cones v. Shalala, 199 F.3d at 521; Ferguson v. Small, 225 F. Supp. 2d 31, 41 (D.D.C. 2002). In this case, as shown in the Facts, ¶ 24-84, 101-106, 195-206, Campbell had a practice of almost immediately retaliating against Stevens each time he complained. Thus, Campbell threatened to "destroy" Stevens on May 30, approximately one week after McKewen's May 21 letter on Stevens' behalf, complaining of hostile environment, which he was informed of. Then, within just one week of McKewen's June 21, 2004 letter to Amtrak *specifically accusing Campbell* of retaliating against Stevens and contributing to the hostile work environment, Campbell threatened to terminate Stevens—relying at that time on the pretext of insufficient medical documentation. After he learned of Stevens' amended EEOC charge against him in late November, Campbell seized upon his very first available opportunity after Stevens' extended medical leave—Stevens' pre-return to work physical a couple of weeks later—as an excuse to fire Stevens. Campbell's actions in this regard telegraphed the fact that he was looking for a reason to fire Stevens and just waiting for his opportunity to do so. See Womack v. Munson, 619 F.2d 1292, 1298 (8th Cir. 1990) (timing of discharge supports inference termination was because of complaint); Price v. Thompson, 380 F.3d 209, 213 (4th Cir. 2004) (retaliation at the first

available opportunity is probative of retaliatory motive).  All this evidence of temporal

proximity illustrates Amtrak's retaliatory motive and necessitates a trial.

     c.  <u>Campbell Falsely Denied Having Authorized The Termination</u>

     Defendant's position is that Bernard Campbell was "ultimately responsible for

terminating plaintiff."  Dk 43-1 at 7. However, brazenly, Campbell lied under oath about

that elementary fact at his deposition. See Facts ¶ 216 (claiming he had "nothing to do

with" authorizing the termination).  Campbell lamely attempted to deny that he brought

the charges against Stevens, insisting instead that Stevens brought them"against

himself." Facts ¶ 217.

     d.  <u>Campbell's Threat To Destroy Stevens Shows Pretext</u>

     As discussed at length above, Campbell directly threatened to "destroy" Stevens

if he did not cease EEO protests.  Stevens did not cease protesting, and Campbell indeed

fired him.  This evidence clearly rebuts the assertion that events at Concentra were the

sole reason for the firing.

     **e.**  <u>Campbell's Statements That He "Got" Stevens And That Stevens
Attempted To Bribe Concentra Employees Shows Pretext</u>

     As discussed above in the Facts, ¶ 194, General Foreman Gary Louers admitted

that Campbell stated to him that: "David Stevens tried to pay off the person who gave

him the drug test" because he failed his drug test. Campbell followed that with: 'I got

him now.'"

     The fact that Campbell would spread a malicious lie that Stevens attempted to

bribe Concentra—which has not been corroborated whatsoever, demonstrates yet again

that Campbell bore an abiding grudge against Stevens, which was obviously caused by

his refusal to back down from his EEO complaints.  The statement: "I got him now," is

the very essence of pretext, since it can only imply that Campbell was seeking out a way to "get" Stevens, and that he was glad to have now succeeded.

        f.     <u>Campbell's Severe Distortions Of December 13 Show Pretext</u>

            i.    "Adulterated Sample"

Campbell made additional malicious statements against Stevens that undercut his denial of a retaliatory motive. For instance, as shown, he testified falsely three times that Stevens had "adulterated" his urine sample. Facts ¶ 232. He also entered the concept into Stevens' official personnel folder, including on the personnel action commemorating the firing. Facts ¶ 234. Campbell did this despite the fact that Concentra's original document reflecting the events of December 13, PDE 81, contains a box available for checking the option "adulterated", which was left unchecked on the form, and the fact that Hudley and Beaty disavow that any tampering or adulterating occurred. Facts ¶ 233, 237, 238.

            ii.    "Refusal To Cooperate"

Campbell testified that Stevens failed "to cooperate with the medical personnel administering the test." Facts ¶ 230. However, the real record is that Stevens was entirely cooperative at Concentra at all times, and wanted to complete the second urine test despite being forced to wait a long time. In fact, it is undisputed that Stevens was extremely patient in providing Defendant with a urine sample and then, upon being asked for a second sample, waiting for an extended period for a second sample to be collected. Stevens only left Concentra's facility when he felt his health was at risk and Concentra could not instruct him when it would be able to collect the sample.

            iii.    "Dishonesty"

Campbell fired Stevens for "dishonesty". Facts ¶ 215. There is no evidence that Stevens acted dishonestly in any way. Facts ¶ 215.

g.  Campbell's Admitted Predisposition To Fire Stevens —
    Reflected In Both Words And Deeds-- Shows Pretext

Campbell brashly affirms that it is "absolutely correct" that the he assigned Tally for the sole purpose of finding Stevens "guilty". Facts 205. Apparently, he forgot to read his own "Notice of Formal Investigation," which promised an effort to develop the facts and determine if Stevens bore "any" responsibility for the events. Facts ¶ 205.

This predisposition was reflected in more than just that one deposition statement. Indeed, Campbell admits that neither he nor his agent Talley ever attempted to speak to Stevens about what had occurred, Facts ¶ 206, and that he failed to speak to Stevens' union representative. Facts ¶ 207. Rather, he just made sure Talley "made sure he had his ducks in a row." Facts ¶ 208.

Campbell claimed to avoid learning the true facts of the situation, as well as the Amtrak policies that would apply. Thus, he when asked if he had "heard" that there were extenuating circumstances causing Stevens not to have provided a second sample, he volunteered disinterest in the subject, stating: "I wouldn't even look for that." Facts ¶ 212. He claimed no one ever told him how long Stevens had to wait for a second test to be administered. Facts ¶ 221. He denied that Talley ever told him that Stevens went directly to the emergency room from Concentra. Facts ¶ 218. He further denied having known that Stevens was diagnosed with bronchitis before firing him, even though Stevens' emergency room records were in Talley's possession at the investigative hearing before the firing was completed. Facts ¶ 219. He asserted that he did not request a copy of the hearing transcript, much less read it. Facts ¶ 222.

Asked about Amtrak's policies on leaving a drug testing situation during an emergency, Campbell asserted that there could be no such exception—a direct conflict with Amtrak Medical's drug testing representative, Tierney, who said the opposite. Facts ¶ 225, 226.

Absent a retaliatory motive, a rational employer would be expected to attempt to discern the true facts of the situation before resorting to the industrial death penalty against an employee, but Campbell had such a motive, which caused him to seize the perceived opportunity to rid itself of an EEO protester. Whether he was indeed as ignorant as his testimony suggests, or if his claims are lies designed to deflect responsibility by use of a calculated persona, the impact is the same: profound evidence of an ulterior motive requiring trial.

h.    Campbell's Pre-Concentra Search For An Excuse To Fire Stevens Shows Pretext

Campbell's threats to fire Stevens for insufficient medical documentation carry the whiff of pretext. Thus, as shown, before his lawyers' letters and EEOC charge, Stevens had submitted documentation in the past to justify a leave of absence from work with no complaint from Campbell. Facts ¶ 64-65. After those protests, however, the same documentation was no longer acceptable to Campbell. Furthermore, when Campbell improperly requested the additional documentation in 2004, Stevens willingly complied but Campbell again found the documentation provided to comply, which was provided by Stevens' attorney and mental health care provider, Facts ¶ 75, insufficient. This further indicates that Campbell's actions were unfounded and merely a vehicle to retaliate against Stevens for daring to name him in his complaints.

i.    Had Campbell Studied The Record, He Would Not Have Fired Stevens—Absent Retaliatory Motive- Because Stevens' Actions At Concentra Were Reasonable Under The Circumstances

Amtrak's records on David Stevens contain Concentra's computerized record from December 13.  PDE 80 (Amtrak Stevens 003). That document indicates that Stevens was at Concentra for 3.5 hours on December 13.  As noted above, the record also contains Stevens' emergency room record from December 13, indicating the diagnosis of bronchitis.  Defendant is well aware of Stevens' HIV condition and the fact that he was trying to return from an extended medical leave.

At Concentra on December 13, it cannot be denied that the staff failed to follow Department of Transportation Guidelines by failing to re-test the urine for temperature with a different strip, Facts ¶ 114, and failing to immediately collect a second sample. See Facts ¶ 117.

Perhaps even more critical is the fact that—assuming its acts were not purposeful and inspired by Campbell-- Concentra was completely negligent in not only failing to permit Stevens to provide a second, observed sample, but in not even being able to tell him how long it might be before that sample could be collected.  As Hudley said, he was there a long time, nearly all of that time after they had told a man with serious immune system problems who had recently had  pneumonia that there was a problem with his urine.  Stevens was at all times polite, and, through Concentra staff, tried to contact Amtrak authorities to address the situation.  However, despite an alleged 24/7 team designated for this very purpose, Facts ¶ 127-138, Amtrak answered only with voice mail and no immediate call back.  The expectation that Stevens would wait for an infinite period for a re-test that should  have occurred "immediately" under the circumstances, rather than go to a facility that was actually familiar with him and his condition, and might actually provide some treatment, is simply not reasonable. In view

of this context, Amtrak, at a minimum, could have been expected to inquire into

Stevens' situation and given those facts fair consideration.

As shown in the Facts, ¶193, Tierney admitted that she would have "looked into

it" and given Stevens a chance to "explain", had she known that he went directly to the

emergency room and was diagnosed with bronchitis.  However, like Campbell she

claims ignorance of the facts.  Facts ¶ 186-193.  How she could have not known those

facts is a mystery—a mystery that suggests pretext.

> j.    Tierney's Calculated Evasion Of The Investigation Hearing Shows Pretext

The appearance of pretext just noted in Tierney's alleged ignorance of the facts of

the Stevens situation is severely exacerbated by the plain fact that her efforts to avoid

knowing are documented.  Thus, as shown, it was Tierney's job to coordinate the

investigative hearing.  She was listed as a mandatory witness.  Despite Stevens'

vociferous objection, it is undisputed she refused and failed to appear at the disciplinary

hearing, where she could have been educated as to the facts she allegedly did not know,

and  cross examined about application of Amtrak policies to those facts.  Tierney's

failure to testify is just too neatly coordinated with her claimed lack of knowledge.  That

failure further demonstrates pretext.

> k.    Failure to Discipline Campbell Shows Pretext

McCallum, Defendant's EEO officer, admits to knowledge of Campbell's

actionable May 30 threat to destroy Stevens.   Facts ¶¶ 59-61.  If Amtrak's Workplace

Violence Policy is worth the paper it is printed on, Campbell should have been

disciplined for his actions.  However, there is absolutely no evidence that anything was

ever done.  Thus, in sum, Amtrak ratified and practically endorsed Campbell's

treatment of Stevens. Trial is needed in this case.

## VII.    <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's Motion for Summary Judgment is utterly baseless, and should be denied by this Court.  Stevens was terminated in retaliation for his complaints of hostile environment and disability discrimination.  He respectfully requests that this Court set an early trial date.

Respectfully submitted,

THE GOLDSMITH LAW FIRM


/s/

_____
Leizer Z. Goldsmith
D.C. Bar No. 419544
1900 L Street, N.W., Suite 614
Washington, D.C. 20036
Telephone: (202) 775-0040
Facsimile: (202) 318-0798
Attorney For Plaintiff