```
             IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF COLUMBIA
                      :05CV01924-RCL


DAVID B. STEVENS, et al.,              )
                                       )
                    Plaintiff,         )
                                       )
         vs.                           )   D E P O S I T I O N
                                       )
NATIONAL RAILROAD PASSENGER            )
CORPORATION, ("Amtrak"),               )
                                       )
                    Defendant.         )
                                       )
------------------------------------
```

ANDREW MCCALLUM

```
TAKEN AT THE LAW OFFICES OF:
WILLIAM S. BRITT, ESQUIRE
106 West Fifth Street
Lumberton, NC 28358
```

04-17-07
09:40 O'CLOCK A.M.

Devanne Norris
Court Reporter

Chaplin & Associates

P. O. Box 407

27285-0407

Kernersville, NC

(336) 992-1954

Test                                                                        test

Page 7

1    I, as the attorney, taking the deposition am on

2    the telephone, and the other side of the

3    litigation attorney is present in the room.  So if

4    you could do that for me I'd appreciate it.

5        A.    Not a problem.

6        Q.    Thank you.  Mr. McCallum, is today a

7    good day in time for you to have your deposition

8    take as opposed to any other?

9        A.    Yes.  The sooner the better.

10       Q.    The sooner the better.  You're not under

11   any medications or anything like that that would

12   make it difficult for you to testify today are

13   you?

14       A.    No, I'm not.

15       Q.    All right.  Did you previously work for

16   Amtrak?

17       A.    Yes.

18       Q.    And between what dates did you work for

19   Amtrak?

20       A.    August 2000 to April 2006.

21       Q.    And what was your position there?

22       A.    EEO manager for northeast corridor.

23       Q.    And -- I'm sorry.  The northeast

24   corridor?

25       A.    Yes.  It was kind of a misnomer.  I

Page 11

1   Children's Hospital in Boston.   From there I went

2   to Digital Equipment Corporation, which was bought

3   out by Compaq.   I spent 21 years with that

4   organization.

5        Q.   And I'm sorry, when you worked at

6   Children's Hospital, did you say you worked in

7   Employee Relations as well as EEO?

8        A.   That's right.

9        Q.   Is that all one department there, or was

10  those two different jobs that you had at different

11  times?

12       A.   It was one department.

13       Q.   And what's your highest level of

14  education?

15       A.   I have a master's degree.

16       Q.   From where?

17       A.   Lesley College in Cambridge,

18  Massachusetts.

19       Q.   What's it in?

20       A.   Business.

21       Q.   How did you end up in the EEO compliance

22  field?

23            MR. FISCHLER:   Objection.

24  Relevance.

25       Q.   (Mr. Goldsmith)  You can answer.  Mr.

Test                                                                      test

Page 13

1        A.    Well, I had a background as a recruiting

2    station commander for the Army.  We dealt with

3    people, employee relation issues on a constant

4    basis.  So it wasn't like I was completely new to

5    it, but I was looking at it from a governmental

6    standpoint, not from a civilian standpoint; and

7    those are kind of two different things, if

8    you know what I mean.

9        Q.    All right.  What does the EEO compliance

10   manager do at Amtrak?

11       A.     EEO compliance manager at Amtrak is

12   responsible for external EEO charges,

13   investigating them, representing the company in

14   terms of dealing with the local agencies, the

15   federal government, the city agencies and state.

16       Q.    Okay.  You mentioned external charges.

17   You mean external charges of discrimination?

18       A.    The unit's specific goal was to handle

19   charges coming from outside of the company.  We

20   had another unit that handled charges inside the

21   company called Dispute Resolution Organization.

22       Q.    And was that Dispute Resolution

23   Organization, was that within the same -- to use a

24   military term, chain of command as the ---

25       A.    No.

Test                                                                                    test

Page 14

1      Q.    --- EEO compliance office or were they

2    completely separate?

3      A.    They were separate.

4      Q.    Did you -- and your job was always as a

5    compliance manager.  That didn't change during the

6    six years you were at Amtrak?

7      A.    No, it didn't.

8      Q.    Did you ever have an occasion to get

9    involved in investigating any internal charges of

10   discrimination?

11     A.    Yes, occasionally we would investigate

12   internal charges.

13     Q.    And how would it be determined whether

14   your unit would get involved in investigating the

15   internal charges?

16     A.    If an internal charge was changed to --

17   if a lawyer was involved, the law department was

18   involved, or if that internal charge turned into

19   an external charge we automatically took it over.

20     Q.    So you're saying if the Amtrak Law

21   Department was involved, you would take it over?

22     A.    No, if the external law department got

23   involved.  If the complainant says I've got a

24   lawyer now, ---

25     Q.    I see.

1      A.   --- it automatically came to my

2   department.

3      Q.   All right.  Now, did you have -- was

4   part of your responsibility -- I think you said

5   part of your responsibility would be to

6   investigate charges made to public agencies

7   against Amtrak, right?

8      A.   That's correct.

9      Q.   And you'd also investigate internal

10  charges if there was also a public charge going on

11  simultaneously, right?

12     A.   Well, they would not -- once the public

13  charge was announced, the internal charge was

14  cancelled out.  So they never went on

15  simultaneously.

16     Q.   Okay.  All right.  So when the charge --

17  sorry.

18          In your capacity, when you were

19  investigating charges, can you tell me generally

20  what your responsibilities were, what you would

21  do?

22     A.   Yes.  Normally, if I got a charge in

23  from EEOC, or from the state, or from the city, I

24  would review the charge and we would do as a

25  complete investigation as possible by going

Test                                                                                            test

Page 16

1    through the charge allegation by allegation and

2    investigating those allegations.

3            Once we investigated the allegations, we

4    put together a position paper and try and meet the

5    deadline that was requested by a particular

6    agency.

7        Q.   What steps would you typically take in

8    investigating the charge item by item?

9        A.   Well, I would normally go to the

10   department and interview personnel within that

11   department: managers, employees, etcetera.  And I

12   would normally put together some type of an

13   interrogatory that I could make sure that I'm

14   asking the same questions of everyone.

15       Q.   All right.  How would you handle the

16   charging party?  You've already said that by the

17   time you get this, they have a lawyer of their

18   own.

19           How would you go about getting

20   information from the charging party?

21       A.   I did not deal with the charging party.

22   Once the charging party went outside to the EEOC

23   or to a local agency, I dealt strictly with that

24   agency.  And if the charging party had any

25   questions for me, they had to go through the

Test                                                                                    test

Page 17

```
 1    agency.  If I had any questions for the charging
 2    party, I went through the agency.
 3         Q.   All right.  Okay.  So did you ever have
 4    anything to do with attempting to resolve outside
 5    a public agency an EEO complaint?
 6         A.   I'm not sure I understand what you're
 7    saying.
 8         Q.   Well, it sounds like a big part of your
 9    job is to investigate and put together position
10    statements on behalf of Amtrak, right?
11         A.   That's right.
12         Q.   And I'm wondering whether there was any
13    part of your duty that also would have involved
14    negotiating or trying somehow to resolve the
15    charges.
16         A.   Yes.  That was also part of my duties.
17         Q.   How would you go about doing that?
18         A.   Well, normally that would be -- the
19    agency would make a determination whether they
20    wanted to negotiate the allegation or not.  If I
21    had gone through and determined from my
22    investigation that we had, in fact, discriminated
23    against an individual, then I would talk to my
24    department head, tell them that we're at fault,
25    and we would go and tell the agency: "We're at
```

Test                                                                          test

Page 18

1    fault.  How do we fix this?"

2           But if it was the agency that wanted to

3    negotiate, I would sit down and negotiate with

4    them and tell them what we would and would not do.

5           Q.   All right.  But you never dealt with the

6    lawyer of the charging party or the charging party

7    yourself, is that right?

8           A.   Very seldom did I deal with the lawyer

9    of the charging party.  Occasionally, I did have

10   to deal with them if they called me or wanted some

11   questions or wanted some information.  I

12   determined with my law department whether it was

13   prudent to give them that information or not.  And

14   so, occasionally, I did deal with the

15   complainant's lawyer, but I never dealt with the

16   complainant.

17          Q.   I believe you testified that the Dispute

18   Resolution Organization would handle internal

19   charges before any kind of charge was made with

20   the EEOC or similar agency, is that right?

21                    MR. FISCHLER:  Asked and answered.

22                    THE WITNESS:  No, that's not quite

23   right.

24          Q.   (Mr. Goldsmith)  Explain to me, if you

25   could.

Test                                                                      test

 1        A.    An internal charge -- if an employee

 2   decided that they wanted to complain to the

 3   internal organization, they could do that.  They

 4   could also, at the same time, complain to an

 5   external agency.  If the two charges came at the

 6   same time, the external agency charge topped the

 7   internal agency charge and that's the charge

 8   that we dealt with.  But we never dealt with the

 9   two charges at the same time.

10        Q.    Right.  But if it was specifically an

11   internal charge, that was something that would be

12   handled by the Dispute Resolution office as

13   opposed to your office?

14        A.    That's correct, unless there was a

15   lawyer involved.

16        Q.    Okay.  Now, if an employee were to make

17   a charge with the EEOC or another organization,

18   would those charges or whatever correspondence was

19   coming from the EEOC, would that be directed to

20   you automatically when you were the compliance

21   manager as it related to your region?

22        A.    Yes.

23        Q.    Would anyone need to tell you

24   specifically to investigate a particular charge in

25   an instance or would you just automatically know

1    that that was your responsibility?

2          A.   If a charge came into my office, it was

3    automatically my responsibility to take care of

4    that charge.

5          Q.   Did you ever have anyone else who you

6    could ask to assist you or you could assign any of

7    that work?

8          A.   I could ask any of my co-workers, my

9    peers, to assist me if I needed the assistance.

10         Q.   How many peers did you have?

11         A.   Four, I believe.

12         Q.   Were they all -- were there four peers

13   for the mid-Atlanta region or the region ---

14         A.   No, we were spread across the country.

15         Q.   Across the country?

16         A.   That's right.

17         Q.   And let's just say hypothetically if

18   someone came in and had a huge class action

19   complaint involving, you know, 500 workers or

20   something, that might be logical for you to get

21   the other people involved in helping you

22   investigate it.  Is that a logical conclusion for

23   me to draw?

24              MR. FISCHLER:  Objection to form.

25   Calls for speculation.  You can answer.

1              THE WITNESS:  If there were 100

2    people involved I think I would probably ask for

3    help.

4         Q.   (Mr. Goldsmith)  So if something was

5    more along the lines of an individual complaint,

6    would you normally ask for help or would you

7    normally just handle it yourself?

8         A.   We were pretty good at our jobs.  I

9    handled that myself.  We had multiple complaints.

10   I could be handling six or seven complaints at one

11   time.

12        Q.   Now, if you're investigating a charge,

13   you said you would speak to the personnel in the

14   area where the -- you were going to speak to the

15   relevance to the Amtrak employees about it, is

16   that fair to say?

17        A.   That's fair.

18        Q.   Except for the charging party, who you

19   wouldn't speak to, right?

20        A.   That's correct.

21        Q.   When you do that, when you're speaking

22   to the various individuals, do you tell them why

23   you're speaking to them?

24        A.   I have to.

25        Q.   And so -- why do you have to?

Test                                                                                    test

Page 22

1        A.   Well, I don't see how they could

2    possibly answer my questions if I can't tell them

3    what the issue is.

4        Q.   All right.  So you make it a practice of

5    telling them what's going on and then asking them

6    questions relevant to what's going on, correct?

7        A.   We don't go -- I don't go into detail.

8    I give them whatever information they need to

9    answer the questions that I want answered.  They

10   don't necessarily have to know the entire case;

11   they don't necessarily have to know what all the

12   charges are.  But if there is something in a

13   particular area that they worked in and there was

14   a question that I had specifically for them, I'd

15   tell them why I was asking that question, not

16   necessarily going deep into the case.

17       Q.   Do you keep a record of having spoken to

18   these witnesses or individuals?

19       A.   Yes.  Normally, I would keep my written

20   questions and put them in the packet.

21       Q.   And when you left Amtrak in 2006, did

22   you take any of those things with you?

23       A.   No.

24       Q.   And were those records that would have

25   been maintained by the EEO compliance office?

test                                                                                    test

Test                                                                          test

Page 23

1          A.   They should still be maintained by my

2     predecessor.

3          Q.   Anyone who would proceed you as well,

4     right?

5          A.   Pardon?

6          Q.   Anyone who's taken your place since you

7     left, correct?

8          A.   That's correct.  That's what I meant to

9     say.  I'm sorry.

10               MR. FISCHLER:  I was signaling to

11    him say successor not predecessor.

12               THE WITNESS:  Yeah.  That's what I

13    meant to say.

14          Q.   (Mr. Goldsmith)  I just needed to make

15    the record clear.  I understood what you meant.

16          A.   Okay.

17          Q.   Did you know David Stevens and the

18    gentleman -- the two people who brought this case?

19          A.   Vaguely familiar.

20          Q.   And do you know if you've ever met him?

21          A.   I've never met him.

22          Q.   Was it -- let's take a look at Exhibit

23    66.  Let me know when you've got that in front of

24    you.

25               MR. FISCHLER:  Exhibit 66?

test                                                                          test

Page 13

1      A.   Well, I had a background as a recruiting

2    station commander for the Army.  We dealt with

3    people, employee relation issues on a constant

4    basis.  So it wasn't like I was completely new to

5    it, but I was looking at it from a governmental

6    standpoint, not from a civilian standpoint; and

7    those are kind of two different things, if

8    you know what I mean.

9      Q.   All right.  What does the EEO compliance

10   manager do at Amtrak?

11     A.    EEO compliance manager at Amtrak is

12   responsible for external EEO charges,

13   investigating them, representing the company in

14   terms of dealing with the local agencies, the

15   federal government, the city agencies and state.

16     Q.   Okay.  You mentioned external charges.

17   You mean external charges of discrimination?

18     A.   The unit's specific goal was to handle

19   charges coming from outside of the company.  We

20   had another unit that handled charges inside the

21   company called Dispute Resolution Organization.

22     Q.   And was that Dispute Resolution

23   Organization, was that within the same -- to use a

24   military term, chain of command as the ---

25     A.   No.

Test                                                                           test

Page 14

1      Q.    --- EEO compliance office or were they

2   completely separate?

3      A.    They were separate.

4      Q.    Did you -- and your job was always as a

5   compliance manager.  That didn't change during the

6   six years you were at Amtrak?

7      A.    No, it didn't.

8      Q.    Did you ever have an occasion to get

9   involved in investigating any internal charges of

10  discrimination?

11     A.    Yes, occasionally we would investigate

12  internal charges.

13     Q.    And how would it be determined whether

14  your unit would get involved in investigating the

15  internal charges?

16     A.    If an internal charge was changed to --

17  if a lawyer was involved, the law department was

18  involved, or if that internal charge turned into

19  an external charge we automatically took it over.

20     Q.    So you're saying if the Amtrak Law

21  Department was involved, you would take it over?

22     A.    No, if the external law department got

23  involved.  If the complainant says I've got a

24  lawyer now, ---

25     Q.    I see.

Page 15

1        A.    --- it automatically came to my

2    department.

3        Q.   All right.  Now, did you have -- was

4    part of your responsibility -- I think you said

5    part of your responsibility would be to

6    investigate charges made to public agencies

7    against Amtrak, right?

8        A.   That's correct.

9        Q.   And you'd also investigate internal

10   charges if there was also a public charge going on

11   simultaneously, right?

12       A.   Well, they would not -- once the public

13   charge was announced, the internal charge was

14   cancelled out.  So they never went on

15   simultaneously.

16       Q.   Okay.  All right.  So when the charge --

17   sorry.

18            In your capacity, when you were

19   investigating charges, can you tell me generally

20   what your responsibilities were, what you would

21   do?

22       A.   Yes.  Normally, if I got a charge in

23   from EEOC, or from the state, or from the city, I

24   would review the charge and we would do as a

25   complete investigation as possible by going

Test                                                                        test

Page 16

1    through the charge allegation by allegation and

2    investigating those allegations.

3            Once we investigated the allegations, we

4    put together a position paper and try and meet the

5    deadline that was requested by a particular

6    agency.

7        Q.   What steps would you typically take in

8    investigating the charge item by item?

9        A.   Well, I would normally go to the

10   department and interview personnel within that

11   department: managers, employees, etcetera.  And I

12   would normally put together some type of an

13   interrogatory that I could make sure that I'm

14   asking the same questions of everyone.

15       Q.   All right.  How would you handle the

16   charging party?  You've already said that by the

17   time you get this, they have a lawyer of their

18   own.

19           How would you go about getting

20   information from the charging party?

21       A.   I did not deal with the charging party.

22   Once the charging party went outside to the EEOC

23   or to a local agency, I dealt strictly with that

24   agency.  And if the charging party had any

25   questions for me, they had to go through the

Test                                                                    test

Page 17

1    agency.  If I had any questions for the charging

2    party, I went through the agency.

3         Q.   All right.  Okay.  So did you ever have

4    anything to do with attempting to resolve outside

5    a public agency an EEO complaint?

6         A.   I'm not sure I understand what you're

7    saying.

8         Q.   Well, it sounds like a big part of your

9    job is to investigate and put together position

10   statements on behalf of Amtrak, right?

11        A.   That's right.

12        Q.   And I'm wondering whether there was any

13   part of your duty that also would have involved

14   negotiating or trying somehow to resolve the

15   charges.

16        A.   Yes.  That was also part of my duties.

17        Q.   How would you go about doing that?

18        A.   Well, normally that would be -- the

19   agency would make a determination whether they

20   wanted to negotiate the allegation or not.  If I

21   had gone through and determined from my

22   investigation that we had, in fact, discriminated

23   against an individual, then I would talk to my

24   department head, tell them that we're at fault,

25   and we would go and tell the agency: "We're at

Test                                                                              test

Page 18

1   fault.  How do we fix this?"

2         But if it was the agency that wanted to

3   negotiate, I would sit down and negotiate with

4   them and tell them what we would and would not do.

5         Q.   All right.  But you never dealt with the

6   lawyer of the charging party or the charging party

7   yourself, is that right?

8         A.   Very seldom did I deal with the lawyer

9   of the charging party.  Occasionally, I did have

10  to deal with them if they called me or wanted some

11  questions or wanted some information.  I

12  determined with my law department whether it was

13  prudent to give them that information or not.  And

14  so, occasionally, I did deal with the

15  complainant's lawyer, but I never dealt with the

16  complainant.

17        Q.   I believe you testified that the Dispute

18  Resolution Organization would handle internal

19  charges before any kind of charge was made with

20  the EEOC or similar agency, is that right?

21              MR. FISCHLER:  Asked and answered.

22              THE WITNESS:  No, that's not quite

23  right.

24        Q.   (Mr. Goldsmith)  Explain to me, if you

25  could.

 1      A.    An internal charge -- if an employee

 2  decided that they wanted to complain to the

 3  internal organization, they could do that.  They

 4  could also, at the same time, complain to an

 5  external agency.  If the two charges came at the

 6  same time, the external agency charge topped the

 7  internal agency charge and that's the charge

 8  that we dealt with.  But we never dealt with the

 9  two charges at the same time.

10      Q.    Right.  But if it was specifically an

11  internal charge, that was something that would be

12  handled by the Dispute Resolution office as

13  opposed to your office?

14      A.    That's correct, unless there was a

15  lawyer involved.

16      Q.    Okay.  Now, if an employee were to make

17  a charge with the EEOC or another organization,

18  would those charges or whatever correspondence was

19  coming from the EEOC, would that be directed to

20  you automatically when you were the compliance

21  manager as it related to your region?

22      A.    Yes.

23      Q.    Would anyone need to tell you

24  specifically to investigate a particular charge in

25  an instance or would you just automatically know

1    that that was your responsibility?

2        A.    If a charge came into my office, it was

3    automatically my responsibility to take care of

4    that charge.

5        Q.    Did you ever have anyone else who you

6    could ask to assist you or you could assign any of

7    that work?

8        A.    I could ask any of my co-workers, my

9    peers, to assist me if I needed the assistance.

10       Q.    How many peers did you have?

11       A.    Four, I believe.

12       Q.    Were they all -- were there four peers

13   for the mid-Atlanta region or the region ---

14       A.    No, we were spread across the country.

15       Q.    Across the country?

16       A.    That's right.

17       Q.    And let's just say hypothetically if

18   someone came in and had a huge class action

19   complaint involving, you know, 500 workers or

20   something, that might be logical for you to get

21   the other people involved in helping you

22   investigate it.  Is that a logical conclusion for

23   me to draw?

24            MR. FISCHLER:  Objection to form.

25   Calls for speculation.  You can answer.

1          THE WITNESS:  If there were 100

2    people involved I think I would probably ask for

3    help.

4        Q.   (Mr. Goldsmith)  So if something was

5    more along the lines of an individual complaint,

6    would you normally ask for help or would you

7    normally just handle it yourself?

8        A.   We were pretty good at our jobs.  I

9    handled that myself.  We had multiple complaints.

10   I could be handling six or seven complaints at one

11   time.

12       Q.   Now, if you're investigating a charge,

13   you said you would speak to the personnel in the

14   area where the -- you were going to speak to the

15   relevance to the Amtrak employees about it, is

16   that fair to say?

17       A.   That's fair.

18       Q.   Except for the charging party, who you

19   wouldn't speak to, right?

20       A.   That's correct.

21       Q.   When you do that, when you're speaking

22   to the various individuals, do you tell them why

23   you're speaking to them?

24       A.   I have to.

25       Q.   And so -- why do you have to?

Test                                                                                                                test

Page 22

1        A.   Well, I don't see how they could

2    possibly answer my questions if I can't tell them

3    what the issue is.

4        Q.   All right.  So you make it a practice of

5    telling them what's going on and then asking them

6    questions relevant to what's going on, correct?

7        A.   We don't go -- I don't go into detail.

8    I give them whatever information they need to

9    answer the questions that I want answered.  They

10   don't necessarily have to know the entire case;

11   they don't necessarily have to know what all the

12   charges are.  But if there is something in a

13   particular area that they worked in and there was

14   a question that I had specifically for them, I'd

15   tell them why I was asking that question, not

16   necessarily going deep into the case.

17       Q.   Do you keep a record of having spoken to

18   these witnesses or individuals?

19       A.   Yes.  Normally, I would keep my written

20   questions and put them in the packet.

21       Q.   And when you left Amtrak in 2006, did

22   you take any of those things with you?

23       A.   No.

24       Q.   And were those records that would have

25   been maintained by the EEO compliance office?

Test                                                                          test

Page 23

```
 1        A.   They should still be maintained by my

 2   predecessor.

 3        Q.   Anyone who would proceed you as well,

 4   right?

 5        A.   Pardon?

 6        Q.   Anyone who's taken your place since you

 7   left, correct?

 8        A.   That's correct.  That's what I meant to

 9   say.  I'm sorry.

10             MR. FISCHLER:  I was signaling to

11   him say successor not predecessor.

12             THE WITNESS:  Yeah.  That's what I

13   meant to say.

14        Q.  (Mr. Goldsmith)  I just needed to make

15   the record clear.  I understood what you meant.

16        A.   Okay.

17        Q.   Did you know David Stevens and the

18   gentleman -- the two people who brought this case?

19        A.   Vaguely familiar.

20        Q.   And do you know if you've ever met him?

21        A.   I've never met him.

22        Q.   Was it -- let's take a look at Exhibit

23   66.  Let me know when you've got that in front of

24   you.

25             MR. FISCHLER:  Exhibit 66?
```

Test                                                                          test

Page 30

1          Do you think this refers to allegations

2    that you, in fact, investigated?

3        A.    Probably does.  And I'm saying probably

4    because she's talking about the Dispute Resolution

5    Office doing an investigation into it.

6        Q.    And it was your understanding that they

7    had started looking into Mr. Steven's intentions

8    before you took it over?

9        A.    That was my understanding that there had

10   been a complaint that went to the DRO before it

11   came to me.  And once he went outside, it of

12   course came to me, because that's our procedure.

13       Q.    This is a letter that was sent by

14   Melissa Rogers.

15          Did you ever consult with her about Mr.

16   Stevens?

17       A.    I'm sure I did because she was on the

18   ADA Board.

19          MR. FISCHLER:  And I'm going to

20   object to any questions about the conversations.

21   Those would be privileged.

22       Q.    (Mr. Goldsmith)  All right.  Now, the

23   letter, Exhibit 91, was sent to Richard McKewen

24   who was representing Mr. Stevens.

25          Did you ever speak to him at any time?

1      A.   I never spoke to him.

2      Q.   All right.  Now, it says that -- it says

3   in the first -- second paragraph that you would be

4   sending a letter to Mr. Stevens indicating that

5   the investigation has been transferred over to

6   you.

7           Did you ever send him such a letter?

8      A.   I don't know if I did or not.  If it

9   said this, I'm sure she asked me to do it and I

10  did it.

11     Q.   Let's take a look at Exhibit 52.

12           MR. FISCHLER:  I'm taking back the

13  documents just so I can take a look at them and

14  I'll hand him Exhibit 52.

15           MR. GOLDSMITH:  All right.  Very

16  good.

17           MR. FISCHLER:  I just wanted the

18  record to be clear and I don't want to mumble

19  under my breath, ---

20           MR. GOLDSMITH:  Thank you.

21           MR. FISCHLER:  --- which is

22  probably what I would do if you were in the room,

23  but now I want to ---

24           MR. GOLDSMITH:  It's different.

25           MR. FISCHLER:  --- choreograph

1   everything clearly.  Let's hold off for one

2   second.

3   (Off-record discussion)

4              MR. FISCHLER:  He's now reviewing

5   Exhibit 52.

6   (Witness examined document)

7              THE WITNESS:  Okay.  I've scanned

8   this.  Questions?

9      Q.   (Mr. Goldsmith)  First of all, have you

10  seen this before?

11     A.   I don't remember seeing this before.

12     Q.   It's a letter from lawyers representing

13  Mr. Stevens to Amtrak Legal.  Does it appear to be

14  about some of the same material -- sort of the

15  same subject that you were investigating?

16     A.   It appears to.

17     Q.   Would you have anticipated that this

18  would have been -- a copy of this would have been

19  routed to you under the circumstances when you

20  were investigating the charge?

21     A.   It would be my guess that if it came

22  into the shop, I would have gotten a copy of it.

23  Let me see something here.

24             MR. FISCHLER:  So the record is

25  clear, the witness is looking at the prior

 1  exhibits.

 2             THE WITNESS:  I'm trying to see

 3  what the date is down here: 4-23-04, it looks

 4  like.  And -- yes, I should have gotten a copy of

 5  this one here.  That would by my guess.  But I

 6  can't specifically say I got it, but it would be

 7  the procedure to make sure I got a copy of

 8  everything that comes in.

 9     Q.   (Mr. Goldsmith)  All right.  Take a look

10  at the -- if you take a look at the last paragraph

11  on the second page, it says that -- it talks about

12  the involvement of Campbell in the transmission of

13  these documents.

14             Do you see that, the very last

15  paragraph?

16     A.   "Kim had, in fact, provided her with a

17  copy of the letter as well."  Yes.  I see what

18  you're looking at.

19     Q.   Was he one of the people you spoke to in

20  investigating the contentions of Mr. Stevens'?

21     A.   With Ms. Coleman -- Mr. Campbell?

22     Q.   Campbell.

23     A.   Yes, I did talk to Mr. Campbell.

24     Q.   What about Ms. Coleman, did you talk to

25  her, too?

1        Q.    So maybe somewhere in the range of ten,

2    a few less, a few more, something like that?

3                    MR. FISCHLER:  Objection.  Calls

4    for speculation.  You can answer if you can.

5                    THE WITNESS:  Well, I'd be

6    guessing.  I have no idea.

7        Q.   (Mr. Goldsmith)  Well, more than five?

8        A.    My guess is there would probably be more

9    than five.

10       Q.    Now, in the cases that you were

11   investigating involving -- where you had to speak

12   to Mr. Campbell, was he always truthful with you?

13       A.    As far as I knew he was.  It was not

14   real smart not to be truthful with us because we

15   had the full backing of the law department and of

16   the CEO of the company.  So the EEO Department was

17   -- and the law department was a department that

18   you didn't play with.

19       Q.    Turning your attention to Exhibit 52.

20   You said that you didn't remember receiving this,

21   but you think it would have been routed to you, is

22   that right?

23       A.    Yes.  I think that would have been part

24   of the procedure.  They normally try to keep us as

25   well up on these things as possible, make sure we

1   have all the information we should have.

2        Q.    If this had been routed to you when you

3   were investigating Mr. Stevens' contention, would

4   you have shown this to Mr. Campbell in the process

5   of investigating?

6        A.    Would I have done what?

7        Q.    Would you have shown Exhibit 52 to Mr.

8   Campbell?

9                  MR. FISCHLER:  Calls for

10  speculation.

11                 THE WITNESS:  No, I would not.

12       Q.   (Mr. Goldsmith)  Why not?

13       A.    There's no need to show it to him.  I

14  can ask him questions.  I don't have to show him

15  the document.

16       Q.    All right.  Do you think you would have

17  asked him question -- had you had the document, do

18  you think you would have asked him questions ---

19       A.    Certainly.

20       Q.    --- you would have generated by reading

21  the document?

22       A.    That's right.

23       Q.    Bear with me just a moment.  I'm sorry.

24                 It says here in that last paragraph on

25  page two, that Stevens is alleging that Coleman

1    told Stevens that Campbell had given Coleman a

2    copy of his letter.

3              Do you see that in the last paragraph?

4       A.    Yes.

5       Q.    Did you think you would have asked Mr.

6    Campbell about that?

7       A.    Yes, I would have.  And, in fact, if he

8    did do it, that would have been the appropriate

9    thing to do, especially if he didn't know where it

10   was supposed to go.  That's what the DRO's job

11   was.

12             MR. FISCHLER:  There's no question

13   pending so wait.

14             THE WITNESS:  Okay.

15      Q.    (Mr. Goldsmith)  You don't have to speak

16   if there's not a question pending, but if you have

17   more to say to complete your answer you should say

18   it.  So do you have anything else to say?

19      A.    No, I don't.

20      Q.    Now, it says on the third page, Mr.

21   Stevens is saying that his medical information was

22   shared with at least six other unauthorized

23   employees.  Do you see that?

24      A.    Yes, I see it.

25      Q.    You would have asked Mr. Campbell about

Page 40

1    that?

2          A.    I'm sure I would have.

3          Q.    All right.  When you were investigating

4    the contentions that we've been talking about that

5    were brought by Mr. Stevens, was it your

6    understanding that that was part of the

7    investigation of an external charge, is that why

8    you got it?

9          A.    That's why I got it.  It was an external

10   charge.

11         Q.    Let's take a look at Exhibit 67.

12                    MR. FISCHLER:  67?

13                    MR. GOLDSMITH:  Please.

14                    MR. FISCHLER:  It's a one page,

15   Notice of Charge of Discrimination?

16                    MR. GOLDSMITH:  Yes.

17                    MR. FISCHLER:  The witness is

18   looking at it.

19         Q.    (Mr. Goldsmith)  Okay.  My question is

20   whether you would have received this, Mr.

21   McCallum?

22         A.    Pardon?

23         Q.    My question is whether you would have

24   received this?

25         A.    That comes in as part of the original

Page 44

```
 1        A.    I can't think of any, really, unless Ms.

 2   Rogers was not in the office for some reason or

 3   she was out for medical reasons.

 4        Q.    Give me just a moment again.  Let's take

 5   a look at Exhibit 57 if you could.

 6                  MR. FISCHLER:  Do you have 57?

 7                  THE WITNESS:  No.

 8                  MR. FISCHLER:  Okay.  Is 57 a

 9   letter to Janice Campbell?

10                  MR. GOLDSMITH:  Yes.  July 20th,

11   2004.

12                  MR. FISCHLER:  Handing the witness

13   57.

14                  THE WITNESS:  This is from me.

15        Q.    (Mr. Goldsmith)  57 appears to be a

16   letter that you wrote and signed, is that correct?

17        A.    It's got my signature on it.

18        Q.    And would you have needed someone else's

19   specific permission to send this to the EEOC or is

20   that just part of your job to write that?

21        A.    Part of my job.

22        Q.    Bear with me one moment.  Take a look at

23   the second page; the next to the last paragraph,

24   the last sentence of that paragraph, ---

25        A.    Uh-huh. (Yes)
```

Test                                                                    test

Page 45

```
 1        Q.   --- says, "Mr. B.L. Campbell, Assistant
 2   Superintendent, noted that Mr. Stevens had told
 3   other people about his medical condition."
 4             Do you see that?
 5        A.   Yes.
 6        Q.   Is that what Mr. Campbell told you?
 7        A.   If it's in here, that's what he told me.
 8        Q.   Is -- take a look at Exhibit -- I'm
 9   sorry.  Let's just stay with this one for just a
10   moment, 57.  I just have a question generally
11   about 57.  There are some -- strike that.
12             Let's go to 54.  54, 55 and 56,
13   actually, are similar.  I just want to ask you
14   something about those.
15                  MR. FISCHLER:  54, 55 and 56?
16                  MR. GOLDSMITH:  Right.
17                  MR. FISCHLER:  Okay.  I've given
18   the witness all three of those exhibits.
19        Q.   (Mr. Goldsmith)  These three exhibits
20   are informing Mr. Stevens that he needs to provide
21   verification of his ability to work.  I'm just
22   wondering if you were familiar with these when you
23   were investigating Mr. Stevens' contention.
24        A.   I'm sure that I was, because I ask for
25   all documentation pertaining to any issues when I
```

Test                                                                        test

Page 46

 1   start an investigation.  And this is the procedure

 2   that is used when people are not at work or when

 3   they're missing work because of a medical

 4   condition.  This is Amtrak's procedure to send out

 5   these letters by senior managers.

 6        Q.   So would you have discussed these

 7   letters with Bernard Campbell?

 8        A.   There's no need for me to discuss these

 9   letters if he's doing what he's supposed to do.  I

10   just needed copies of them to make sure that he

11   was doing the appropriate things that he should

12   have been doing.

13        Q.   Did you tell Mr. Campbell that Mr.

14   Stevens was concerned that he wasn't being treated

15   fairly with regard to his need for absences and a

16   hostile work environment?

17        A.   I don't know if I discussed that with

18   Mr. Campbell, because normally I would discuss

19   medical issues with the medical department.

20        Q.   All right.  Let's take a look at Exhibit

21   58.

22                MR. FISCHLER:  You can hand those

23   back to me.

24                THE WITNESS:  Which exhibit?

25                MR. FISCHLER:  I'm going to give

Test                                                                                        test

Page 47

1    you 58.  I'm handing the witness Exhibit 58.

2                  MR. GOLDSMITH:  Thank you.

3        Q.   (Mr. Goldsmith)  Exhibit 58 is another

4    letter from Mr. McKewen to Ms. Rogers.  Do you

5    remember receiving this?

6        A.   No, I don't.

7        Q.   Do you think you would have received

8    this?

9        A.   I think I should have received it.  I

10   don't know if I did.

11       Q.   The second page, in the first paragraph,

12   it says, "As explained in my letter to you dated

13   May and June 21st, 2004, Mr. Stevens' claims

14   arise, in substantial part, from the actions of

15   Mr. Campbell.  These latest threats of termination

16   from Mr. Campbell can therefore only be taken as

17   evidence or retaliation."

18               Do you see that?

19       A.   I see it.

20       Q.   Did you speak to Mr. Campbell about Mr.

21   Stevens' concern that he was being retaliated

22   against by Mr. Campbell?

23       A.   I'm sure that I did.  If I had this

24   document, I would have spoken to him about that.

25       Q.   How did he respond to questions about

Test                                                                    test

Page 48

1  that?

2      A.    I don't know how he would have

3  responded, but I'm guessing that -- and this is

4  strictly a guess -- that the three previous

5  documents are what the complainant was talking

6  about when he said he's being threatened with

7  termination, and that is just following procedure.

8  So if I had spoken to Mr. Campbell about that,

9  that would have been his answer to me.  Because,

10 you know, any other answer would have got him in

11 trouble with me and the department.

12     Q.    Did he give you any answers that got him

13 in trouble with you?

14     A.    No, he didn't.

15     Q.    Are you familiar with a gentleman named

16 Michael Talley?

17     A.    Pardon?

18     Q.    Are you familiar with a gentleman named

19 Michael Talley?

20     A.    I know Michael Talley, yes.

21     Q.    Did you ever have any communication with

22 Michael Talley about Mr. Stevens?

23     A.    I don't know.  But if he was part of

24 that chain of command, I'm sure I did.  And I

25 believe he was part of that chain of command.

Test                                                                          test

Page 49

```
 1      Q.   If you recall, I asked you earlier about

 2   attempts to resolve complaints.

 3           Do you recall making any attempt to

 4   resolve Mr. Stevens' complaints yourself?

 5      A.   No, I don't recall making any attempts

 6   to resolve his complaint other than doing the

 7   appropriate documentation back to the EEOC and

 8   dealing with the EEOC on it.

 9      Q.   Did you do something with the EEOC other

10   than send them a response letter that I just

11   showed you?  I forget the exhibit number, but did

12   you do anything else with the EEOC?

13      A.   Well, let me -- I don't believe so.  The

14   EEOC normally will be the entity that decides

15   whether they want to try and negotiate.  If Amtrak

16   feels that it hasn't done anything wrong and we've

17   given them the response that we think is

18   appropriate, they will initiate a negotiation, not

19   us.

20      Q.   Did you -- in investigating Mr. Stevens'

21   contentions, did you decide in your view Amtrak

22   had done something wrong towards Mr. Stevens?

23      A.   I believe my position paper gives you my

24   position.

25      Q.   Okay.  Well, do you recall concluding
```

Page 55

1    Stevens made about it, though, as well, right?

2         A.    Help me out.

3         Q.    I'm sorry. But you remember that Mr.

4    Stevens had said that this happened, right?

5         A.    I don't remember seeing anything about

6    the note in the original charge.

7         Q.    I'm not asking about the original

8    charge.  I'm just asking that Mr. Stevens said

9    that it happened.

10        A.    This would have been the only time I

11   would have seen it.

12        Q.    What do you mean this would have been

13   the only time, when the amended charge came?

14        A.    Yes.  I don't remember seeing it in the

15   original charge, unless it's in there and I missed

16   it.

17        Q.    So when you saw it in the amended charge

18   -- you now remember that you saw it in the amended

19   charge that you got it November 2004, right?

20        A.    I do not remember whether I saw it in

21   the original charge or not.  It's in this charge

22   here, the November 2004 -- what is it? --

23   amendment.  And if it's in here, I investigated

24   it.

25        Q.    Right.  And I'm just asking you now if

1    you remember back to November 2004, when you got

2    the amended charge, that you did get the charge

3    and you investigated these things?

4           MR. FISCHLER:  Asked and answered.

5           THE WITNESS:  The best I can say is

6    that I should have gotten this charge.  If I got

7    this charge, it was investigated.  That was my

8    job.

9       Q.  (Mr. Goldsmith)  The investigation would

10   have included interviewing Mr. Campbell, correct?

11      A.   The investigation would have included

12   interviewing Mr. Campbell.

13      Q.   There's another -- I'm sorry.

14           All right.  There's another document,

15   which is dated October 14th, 2004, on

16   Whitman-Walker Clinic letterhead.

17           MR. GOLDSMITH:  Let's mark that as

18   Exhibit 29?

19           MR. FISCHLER:  October -- what's

20   the date?

21           MR. GOLDSMITH:  October 14th, 2004.

22           MR. FISCHLER:  Hold on one minute.

23   And this is 92?

24           (DEPOSITION EXHIBIT

25           NUMBER 92 WAS MARKED

Page 64

1       Q.    (Mr. Goldsmith)  Did you know that Mr.

2   Stevens had submitted a request for an

3   accommodation of his disability?

4       A.    No, I didn't know that.

5       Q.    But you did know that Mr. Stevens

6   amended his charge of discrimination with the

7   EEOC, right?

8       A.    That's correct.

9                 MR. GOLDSMITH:  All right.  Were

10  you able to find Exhibit 73?

11                MR. FISCHLER:  I don't see it.

12  What's the date of the letter again?  It's from

13  Whitman-Walker?

14                MR. GOLDSMITH:  November 4th, 2004.

15                MR. FISCHLER:  I don't see it in

16  this packet.  November 4th.  Let me double-check.

17  The last exhibit number I've got, unless it got

18  confused in something else, is 70.

19                MR. GOLDSMITH:  It's possible.  The

20  only thing -- yes, look for it among the ones that

21  are unnumbered and if you don't see it, then it's

22  possible ---

23                MR. FISCHLER:  I don't see it.  I

24  saw Whitman-Walker October 14th, which is the one

25  that we've done.  That's the only other

Page 65

1    Whitman-Walker.  Let me just make sure it's not

2    attached to this.  No, I don't see it in here.

3                MR. GOLDSMITH:  All right.  Hang on

4    a minute.

5        Q.   (Mr. Goldsmith)  Bear with me just a

6    moment.  Let's talk about Exhibit 69.

7                MR. FISCHLER:  Okay.  I'm handing

8    him Exhibit 69.

9        Q.   (Mr. Goldsmith)  All right.  Very good.

10               69, a letter to Ms. Rogers from

11   Whitman-Walker that was sent by your office.  Do

12   you have any reason to doubt that you got it?

13       A.   I may not have gotten this.  There

14   wouldn't have been any reason to give me this

15   letter.

16       Q.   Why would your stamp be on it, then?

17       A.   My stamp is on it?  Okay.  I got it then

18   if my stamp is on it.

19       Q.   Correspondence between -- strike that.

20               Would this have been sent to you by Ms.

21   Rogers' office?

22       A.   Yes.

23       Q.   Did you take any action as a result of

24   receiving 69?

25       A.   Anything that happens outside of the

Page 66

1   confines of our property, we're not responsible

2   for.  So people breaking into his apartment, he

3   talks to the local police about that.

4        Q.   So the answer is no?

5        A.   No.  On the first paragraph, anyway.

6   Let me read the second paragraph.

7   (Witness examined document)

8            On the second paragraph, I may very well

9   have spoken to the department about it.  But if

10  anything happens off of our property, I'm not

11  responsible for investigating that and we usually

12  don't.  That's the police's privy to do that.

13       Q.   Take a look at -- one moment.

14       A.   Looks like the police looked into this

15  at the bottom there.

16            MR. FISCHLER:  I'm sorry?

17            THE WITNESS:  Looks like the police

18  looked into that.

19            MR. FISCHLER:  Just so the record

20  is clear, he's saying that looking at the bottom

21  of the exhibit, it looks like the police looked

22  into it.  And he's referencing an enclosure police

23  report regarding incident of November 9th, just

24  so that's clear for the record.

25       Q.   (Mr. Goldsmith)  Do you have any reason

Test                                                                        test

Page 67

1   to doubt that Ms. Rogers would have forwarded

2   other letters that were sent by Mr. Stevens'

3   lawyer about his contentions to you like she did

4   that last one?

5       A.    No, I have no reason to doubt that Ms.

6   Rogers would send that.  She normally would send

7   me what's appropriate to be sent during a charge.

8       Q.    Take a look at the -- strike that.

9             Take a look at -- there's a Notice of

10  Right to Sue from April 7th, 2005, that was sent

11  to Mr. Stevens.  It's copied to Amtrak and has

12  your stamp on it.

13            Do you have any reason to doubt

14  receiving that?

15      A.    No.

16                MR. FISCHLER:  Do you want me to

17  show him a copy of that?

18                MR. GOLDSMITH:  Sure, if you want.

19  We can mark it if you want.  Received on April

20  12th, 2005.  We can mark it as 94 if you prefer.

21                MR. FISCHLER:  Yes.  Why don't we

22  mark that.  Why don't you hand it to the court

23  reporter so she can have it marked and we'll make

24  it part of ----

25                (DEPOSITION EXHIBIT