## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

_____
                                        )
**David B. Stevens, et. al,**            )
                                        )
                                        )
           **Plaintiffs,**               )
                                        )
      **v.**                             ) **Civil Action No. 1:05CV01924-RCL**
                                        )
**National Railroad Passenger Corporation** )
**("Amtrak"),**                          )
                                        )
           **Defendant.**                )
_____)

### PLAINTIFF DAVID STEVENS' STATEMENT OF MATERIAL DISPUTED FACTS

1.      Stevens began his employment with Amtrak on February 28, 1990, in the position of mechanical cleaner at Amtrak's Ivy Center Station.

2.      Bernard (BL) Campbell is an Assistant Superintendent for Amtrak's Mechanical Department and was Stevens' third-line supervisor.

3.      Stevens had been diagnosed as HIV-positive in 1988 but had kept his HIV-positive status a private matter and divulges this information only on a "need-to-know" basis.

4.      However, Campbell has falsely testified that Stevens told him he was HIV positive.  Campbell Dep. 136:6 to 137:7, 247:19 to 248:12.

5.      Conveniently, Campbell states that he does not recall anyone else being present. Campbell Dep.  247:19 to 248:12

6.      Stevens in fact had not told anyone at Amtrak about his status before events described below.  Dk 15-3 (Affidavit of David B. Stevens, 11/30/2005) ¶ 1.

7.      Campbell also falsely testified that Stevens had claimed he was dating former Washington Redskins wide receiver Michael Westbrook.  139:2 to 139:4.

8.      In fact, Westbrook is Stevens' cousin.

9.      In 2003, Stevens entered a drug rehabilitation program and took approved leave from work.  Dk 15-3 ¶ 2.

Rumors Spread That Stevens Has AIDS

10.     On or around February 26, 2004, after Stevens returned to his duties, Shirley Snider ("Snider"), one of Plaintiff's co-workers, asked Stevens if he had been out sick because of AIDS.

11.     Although Stevens told Snider that he did not have AIDS, Snider started spreading rumors among other Amtrak employees that he did.  Dk 15-3 ¶ 3.

12.     The rumors regarding Stevens' condition spread throughout the facility and finally he confronted Snider about starting the rumors.  On March 10, 2004, Snider apologized to Stevens in a letter for spreading the rumor that he had AIDS but left the letter in public display on Stevens' work cart.  Dk 15-3 ¶ 4; Dk 15-4 (letter from Snider).

Co-Workers Shun Stevens And His Workload Is Increased

13.     Soon after Snider had spread the rumors about Stevens, his co-workers and supervisors began treating Stevens differently, including avoiding physical contact with him or simply acting strangely around him.  His co-workers would go out of their way to avoid being in the same area with him.   In addition, the two Amtrak employees who were responsible for making work assignments, Cindy Williams Hemphill ("Hemphill") and Donna Blake ("Blake"), began assigning him a much heavier workload than the other cleaners, making Stevens more cars on each train than other cleaners.  Dk 15-3 ¶ 5.

<u>Stevens Protests Hostile Environment To the Dispute Resolution Organization</u>

13.     Frustrated by this situation, Stevens filed a complaint with Amtrak's

internal Dispute Resolution Organization ("DRO") during the last week of March 2004,

alleging that due to the rumors that he had AIDS, he was being subjected to a hostile

work environment based on a perceived or actual disability.  Dk 15-3¶ 6.

14.     The DRO is a separate entity from Amtrak's EEO office, also referred to

as "Diversity".  McCallum 13-14.

15.     Subsequent to his complaint, Amtrak began to give Stevens even less

desirable and more difficult work assignments.  For example, on April 7, 2004, Stevens

was assigned to clean a train car missing a trash receptacle and in whcih the refuse had

accumulated in a pile several feet high.  The waste consisted of rotted food, spoiled milk,

and used tissue, among other things.  Due to concerns for his health, Stevens did not

want to clean the car without proper protective equipment.  He asked Donna Blake to

assign someone to assist him in cleaning the car and/or to call the main office to report

the missing trash receptacle, which had caused the health hazard.  Blake refused and

told Stevens to clean the car.  Dk 15-3 ¶ 6.

<u>Stevens Is Threatened With Suspension</u>

15.     After he finished cleaning the car, Stevens went to the lunchroom to take

a break.  After he left the lunchroom, Stevens went to see if there was another train to

clean.  Dk 15-3¶ 7.

16.     While he was waiting for the train to pull up, the general foreman, Joseph

Savoy ("Savoy"), asked what he was doing.  Stevens told Savoy he was waiting for the

last train to come in so he could clean it if necessary.  Savoy told Stevens not to wait for

the train and said that if he did not leave the area, he would write him up and Bernard

Campbell ("Campbell"), the Assistant Superintendent, would suspend him.  Dk 15-3¶ 8.

17.    Stevens had seen other cleaners and Amtrak employees wait in this area

without Savoy threatening them with suspension.  Dk 15-3 ¶ 9.

### Stevens Calls EAP And Protests Hostile Environment Directly To Campbell

18.    After this incident, Stevens felt the hostile environment had escalated to

an intolerable level.  On the same day that Savoy threatened him, Stevens called Maya

Theodore Dalton ("Dalton") in the Employee Assistance Program to discuss the hostile

work environment.  Dalton knew about the Snider incident and instructed Stevens to

call his mental health professional.  Dk 15-3 ¶ 10.

19.    In addition to Dalton, Stevens also called Campbell, to explain briefly

what had happened that day and to tell him that he had left work two hours early

because of the Savoy incident.  Campbell told Stevens not to worry and that he would

take care of it.   Dk 15-3 ¶ 11.

### Stevens Seeks Medical Leave, Citing The Hostile Environment

20.    On or around April 9, 2004, Eric LeHot ("LeHot"), Stevens' mental health

professional, faxed a letter to Amtrak's medical department stating that Stevens was

experiencing severe mental and emotional stress due to the hostile environment and

placed him on a temporary leave of absence.  Dk 15-3 ¶ 12; Dk 15-5 (11/30/2005 Stevens

Decl Exh. 2, April 9, 2004 letter from LeHot).

21.    On April 12, 2004, Stevens delivered a copy of LeHot's letter to the Master

Superintendent, Michael Kapela ("Kapela") who approved a temporary leave of absence

for Stevens.  Dk 15-3 ¶ 13 (11/30/2005 Stevens Decl. Exh. 10).

<u>Kapela Improperly Copies Campbell On Stevens' Hostile Environment/Medical
Leave Letter</u>

22.     On April 19, 2004, however, Stevens learned from Jeff Thomas, a
pipefitter at Amtrak, that a copy of the April 9th letter from LeHot had been forwarded
to Savoy.  Stevens additionally learned that Campbell and Lisa Coleman, who worked in
Amtrak's Dispute Resolution office, had also seen the letter.  There was no legitimate
business purpose for Savoy, Campbell, or Coleman to have seen the letter and Stevens
was shocked and outraged that such a sensitive document was being casually passed
around.  Dk 15-3 ¶ 14; Dk 15-6 (11/30/2005 Stevens Decl. Exh. 3, fax coversheet).

23.     In or around May 2004, Stevens sought advice from an attorney at The
Georgetown University Law Center's Institute for Public Representation regarding the
hostile environment at his workplace.  On May 10, 2004, the DRO administratively
closed out Stevens' case.  Amtrak Stevens 526-527.

<u>Stevens' Lawyer Protests Campbell's Improper Dissemination Of
Stevens' Hostile Environment/Medical Leave Letter</u>

24.     On May 21, 2004, Richard McKewen, a staff attorney there, wrote
to Amtrak's Law Department, stating that Stevens had been experiencing disability
discrimination and a hostile work environment and that he had complained to
Theodore-Dalton and Bernard Campbell. PDE 52.

25.     The letter also stated that Campbell had disseminated a copy of
LeHot's letter to at least six other people who had no legitimate reason for seeing the
letter and that Stevens was willing to pursue his discrimination and hostile environment
charges before the EEOC and in court if necessary.  Dk 15-3 ¶15; Dk 15-7 Exh. 4 – May
21, 2004 letter from McKewen.

<u>McCallum Investigates Stevens' Claims'; McCallum's Protocols</u>

26.     McCallum testified that if there was a prior internal complaint to the Dispute Resolution Organization, but a subsequent external charge was filed, he would take the whole case over, including the internal charge once the matter went "external". McCallum 18-19.

27.     Therefore, once the May 21 letter was received, handling of Stevens' charge would have been assigned to him as an "external" charge involving an outside attorney representing the employee.  McCallum Dep. 13-15.

28.     It was then "automatically" become his responsibility to investigate, as "thoroughly" as possible.  McCallum Dep. 15-16, 19.

29.     In investigating, McCallum would interview the relevant personnel other than the charging party (Stevens).  McCallum Dep. Dep. 16, 21.

30.      If he had questions for the charging party, he would go through the outside agency (EEOC).  McCallum Dep. 16-17.

31.     McCallum "has" to tell the interviewed employees the reason for the interview, since otherwise they "could not possibly answer the questions."  McCallum Dep. 21-22.

32.     The reason (an active internal or external EEO charge) would in any case be implicit to the employee, since McCallum is from the EEO office.  McCallum would handle an individual complaint such as Stevens' on his own.  McCallum Dep. 21.

33.     It was also part of his duties to try to resolve EEOC charges brought against the company.  McCallum Dep. 17.

34.      McCallum is no longer a full time employee of Amtrak, having left in April 2006.  McCallum Dep. 7 (though he has a contract with Amtrak to handle disciplinary hearings, McCallum Dep. 11).

35.     McCallum testified that he would have kept a record of the investigation regarding Stevens that would remain in Amtrak's custody.  McCallum Dep. 21-23.

36.     However, despite at least five requests for production of documents that would have covered it, which Amtrak purported to be responding to cooperatively by producing all non-privileged documents, Amtrak produced no documents authored by McCallum or in any way reflecting McCallum's investigation, nor any privilege log indicating that documents existed but were purported to be protected by privilege. McCallum Dep. 21-23; Stevens Aff. __ Exh. 27 (Defendant's Responses to Plaintiff's Requests For Production of Documents, See Responses to Requests Nos. 7, 8, 10, 11, 16).

37.     On June 3, 2004, Amtrak counsel Melissa Rogers wrote to McKewen that Stevens' case had been turned over to McCallum.  PDE 91; McCallum Dep. 30-31.

38.     McCallum in fact received the May 21 letter.  McCallum Dep. 37-38;  PDE 52.

39.     He would not have actually shown the letter to Campbell, but would have asked him questions about it instead.  McCallum Dep. 38.

40.     He would have asked Campbell if Campbell had given a copy of Stevens' letter to Lisa Coleman.  McCallum Dep. 39.

41.     McCallum would have discussed with Campbell the allegation that the letter had been improperly shared.  McCallum Dep. 39-40.

42.     Campbell does not deny that that the letter was shared with at least six unauthorized employees. Campbell Dep. 133:8 to 133:13.

43.     Campbell never discussed the issue with Stevens, but did discuss it with Kapela. Dep. 131:11 to 131:21.

44.     However, Kapela never called Campbell's conduct into question.

Campbell Dep. 133:14 to 133:20.

Amtrak's Workplace Violence Policy

45.     Amtrak's Workplace Violence Policy's very first sentences state: " Amtrak
has zero tolerance for threats and violence.  Amtrak is committed to providing its
employees a workplace free from acts of threats and violence and to effectively respond
in the event that workplace violence does occur."  The policy goes on to define
"workplace violence" to include, first and foremost, "[p]hysically or verbally threatening
another individual."  With regard to discipline, it states that: {a]ny person who exhibits
threatening behavior, threatens to commit and/or actually commits a violent act on
Company property may be removed from the worksite as quickly as safety permits, and
may be asked to remain away from the worksite. . . Violations of this policy may lead to
disciplinary actions up to and including termination of employment. . ." As to reporting
threats, the policy states that Amtrak employees "should notify a supervisor of any
threatens which they have witnessed, received, etc. " Stevens Aff. Second Exh. 1
(Amtrak Stevens 1070-1072).

Contrary to Amtrak's Workplace Violence Policy, Campbell Threatens To
"Destroy" Stevens If Stevens Ever "Puts [Campbell's] Name In Anything
Else,"

46.     On May 30, 2004, after beginning his leave of absence, Stevens went to the
Amtrak Ivy City facility to retrieve some medication he had left in his best friend, Darryl
Hollis' car.  Hollis, who was also an Amtrak employee, had agreed to meet Stevens
outside the building to return the medicine.  Another friend of Stevens', Terrell Williams
("Williams"), had driven him to pick up the medication.  After Hollis did not come

8

outside to meet Stevens as planned, Stevens walked about ten feet inside the building. Dk 15-3 ¶16.

47. Stevens had only been in the building for about a minute when Campbell saw him. Stevens knew that he should have been wearing a hard hat and safety glasses when inside the building, so he quickly exited and got back into the car with Williams. Campbell, who was not wearing a hard hat or safety glasses either, followed him outside to the car and yelled at Stevens that he was not allowed on the premises. Campbell then told Stevens that he was not one to be "fucked" with. Campbell said: "you see I like you but you are going to put my name in that fucking shit, but you are better off fucking with those white people than fucking with me." Dk 15-21 (Terrell Dec.) ¶ 3.

48. Campbell threatened Stevens: "I will destroy a mother fucker like you." It is undisputed that Campbell also stated: "if you ever put my name in anything else, you would wish you didn't." Dk 15-3 ¶¶ 16-17; Campbell Dep. 146:21 to 147:12 (directly declining to deny having said it); Campbell Dep. 189-190 ("I think I testified that I told Mr. Stevens that I didn't want him putting my name in whatever he was doing").

49. Stevens could literally feel Campbell's spit, as he got right up next to Stevens and berated him. Stevens Aff. Second ¶ 2.

50. Campbell testified that what Stevens was "doing"-- that he was making reference to that day-- was complaining of a "hostile work environment." Campbell 189-190.

51. Campbell does not deny cursing during the tirade. Campbell 145:9 to 146:1.

52.     Campbell testified that what prompted him to threaten Stevens not to "include [Campbell's] name in anything he was doing," was "the conversation with the DRO, claiming that I did something to David." Campbell Dep. 193:20 to 194:20.

53.     Despite the preceding admission, in the very same deposition, Campbell lied that he was unaware of the contentions of the May 21 letter, PDE 52, which he admits caused him to threaten Stevens on May 30, around May the time of May 21. Campbell Dep. 126:22 to 127:3.

54.     Stevens remained quiet during Campbell's tirade.  Dk 15-3¶ 18. Notably, he had never been told by anyone he was not allowed on the premises during his leave.  Dk 15-3¶ 19.

55.     Williams signed a sworn statement corroborating Stevens' version of events.  Dk 15-21.

56.     That  some version of the event happened is undisputed.

**Stevens' Counsel Discusses Campbell's Retaliatory Threats With Amtrak Counsel Rogers, And Confirms The Conversation In A Writing That Is Provided To McCallum; McCallum Discusses Campbell's Threats Against Stevens With Campbell; Campbell Is Not Held Accountable For Threatening Stevens**

57.     On June 21, 2004, Richard McKewen wrote a second letter to Amtrak counsel Rogers on Stevens' behalf, stating that Stevens would like to return to work but was seeking a transfer to a different department, in light of the harassment by his co-workers and supervisors and unauthorized disclosure of his medical records, and also recounting Campbell's verbal abuse and threats toward Stevens on May 30.   Dk 15-3 ¶ 20; Dk 15-8 (Exh. 5, June 21, 2004 letter from McKewen).

58.     The letter "memorialized" McKewen's conversation with Rogers, in which he had informed her of the May 30 incident, in which, according to McKewen :

> Campbell approached the vehicle and began to verbally abuse Mr. Stevens. Mr. Campbell's unprovoked and profanity-laced assault derogated and humiliated Mr. Stevens in front of his friend. Coming so close on the heels of Mr. Stevens' complaints and my written communication with you, Mr. Campbell's actions can only be taken as evidence of retaliation, and as further evidence of Mr. Stevens' hostile work environment. I trust that your EEO office will take this incident into consideration as it investigates Mr. Stevens' claims.

Dk 15-8 at 2.

59.     McCallum would have received Dk 15-8, because it was "procedure" that he receive whatever complaints letters came in. McCallum Dep. 32-33.

60.     McCallum says he spoke to Campbell about Stevens' contention that Campbell had retaliated against Stevens by threatening him, as set forth in the June 21 letter from Stevens' counsel. McCallum Dep. 47; Dk 15-8.

61.     However, despite the workplace violence policy, Stevens' second-line supervisor, Kapela, testified that he was unaware of the May 30, 2004 incident at Ivy City in which Campbell threatened to destroy Stevens. It is undisputed that no disciplinary action was ever taken against Campbell for threatening Stevens.

<u>Stevens Seeks Reasonable Accommodation</u>

62.     On June 21, 2004, Stevens submitted a formal request for an accommodation for his disability through a transfer to a different department. Dk 15-3 ¶ 21.

<u>Stevens Files An Equal Employment Opportunity Commission Charge</u>

63.     Having received no satisfactory remedy from Amtrak for what had happened and instead having been met with continuing retaliation, on June 23, 2004, Stevens finally filed a charge of discrimination with the EEOC. Dk 15-3 ¶ 22; Dk 15-9

(Exh. 6– EEOC charge). McCallum, the Company's EEO officer responsible for investigating charges then received it.  McCallum Dep. 14-15.

64.    Soon after, Campbell continued and escalated his campaign of retaliation against Stevens for his complaints of discrimination and hostile environment.   Thus, on July 1, 2004, Campbell sent Stevens a letter stating that the documentation was not sufficient and that he must provide further documentation to support his leave of absence or he would be terminated.   Dk 15-3 ¶ 23; Dk 15-10 (Letter, Exh. 7).

65.    Stevens had never received this type of threatening letter although he had previously been on medical leave prior to protesting discrimination.  Stevens Aff. 3.

66.    Attempting to comply with Campbell's request, on July 8, 2004, Stevens had his mental health care provider complete and return Amtrak's medical status report form.  Dk 15-3 ¶ 24; Dk 15-11 (Exh. 8).

  McCallum Quotes Campbell In Amtrak EEOC Position Statement;
  Campbell Denies Ever Knowing There Was A Complaint About His May
  30 Conduct Or That Stevens Filed An EEOC Charge Or Amended Charge

67.    On July 20, McCallum sent a position statement to the EEOC on Amtrak letterhead.  PDE 57.

68.    In the statement, McCallum asserted that BL Campbell had said that Stevens had told others about his medical condition.  PDE 57.

69.    McCallum testified that Campbell told him that directly before he wrote it in the position statement. McCallum Dep. 44-45.

70.    Although McCallum testified that he would have told Campbell about the charge and the letters from Stevens' counsel (McCallum 21-22, 47-48), Campbell emphatically claims that no one at Amtrak ever informed him that Stevens complained that Campbell threatened to "destroy" Stevens. Campbell Dep. 204:11 to 204:16.

71.     In any case, Campbell would not have "cared" anyway if someone did. Campbell Dep. 204:17 to 205:2.

72.     Campbell further claims that the fact that Stevens *ever* filed a complaint with the EEOC "doesn't ring a bell."  Campbell Dep. 186:17 to 187:2.

73.     He claims not to have known about either Stevens' initial EEOC Complaint or the November 2004 amendment.  Campbell 201-202.

74.     Campbell says he learned of the EEOC complaints at his deposition, in 2004.

Campbell Continues To Threaten Termination, Absent Additional
Medical Documentation

75.     On July 23, 2004, Campbell sent another letter (PDE 55) to Stevens stating that the medical documents he provided were still not sufficient and to respond by August 6, 2004, with additional medical documentation or he would be terminated.  Dk 15-3¶ 25; Dk 15-12 (Exh. 9).

Stevens' Counsel Again Explicitly Protests Retaliation By Campbell To
Amtrak Counsel; McCallum Questions Campbell About The Issues

76.     On July 27, McKewen wrote (PDE 58) to Melissa Rogers of the Amtrak Law Department, contending that he was being threatened with termination in the form of two letters (PDE 54, 55) he had received from Campbell regarding returning to work.

77.     McKewen characterized Amtrak as potentially placing Stevens in a hostile work environment if he returned to his previous post.  It stated that: "Mr. Stevens' claims arise, in substantial part, from the actions of Mr. Campbell.  These latest threats of termination from Mr. Campbell can therefore only be taken as evidence of retaliation."  PDE 58 at 2.

78.    The letter also explicitly incorporated by reference the protest of Campbell's "profanity-laced" threats of May 30, as previously reported to Rogers by phone and in the June 21 letter.  PDE 58 at 2.

79.    The Law Department turned the July 21 letter over to its agent, McCallum, for investigation.  McCallum Dep. 47-48.

80.    McCallum interviewed Campbell about PDE 58, and Campbell apparently told McCallum that his actions were "just following procedure," which was satisfactory to McCallum. Nonetheless, Campbell now claims that at no time prior to his 2007 deposition was he ever informed of Stevens' July 2004 concern about his letters that suggested Stevens could be fired. Campbell Page 188:11 to 188:15.

81.    In response, on August 11, 2004, Stevens had his attorney submit a detailed medical status report from Stevens' health care provider.  Dk 15-3 ¶ 26.

82.    On August 20, 2004, Campbell sent yet another letter stating that the medical documentation was still insufficient and that if Stevens did not provide further documentation, he would be terminated.  Dk 15-3 ¶ 27; Dk 15-13 (Exh. 10); PDE 56).

83.    Stevens had submitted similar medical documentation in the past and no one had ever questioned the sufficiency of the documentation.  Dk 15-3 ¶ 28.

<u>Stevens Amends His EEOC Charge; Amtrak Is Notified And McCallum Investigates</u>

84.    On August 23, 2004, McKewen sent a letter to the EEOC stating that Stevens considered Campbell's rejection of his medical documentation to be retaliation for Stevens' prior complaints and requested that Stevens' EEOC charge be amended to assert a claim for retaliation.  Dk 15-3 ¶ 29; Dk 15-14 (Exh. 11). McCallum received the charge and investigated it.  McCallum Dep. 55-56, 64.

<u>Campbell Admits That Amtrak Mechanical Is Retaliating Against Whitley</u>

85.     In approximately August 2004, Stevens' co-Plaintiff in this case, Mae Whitley, asked Bernard Campbell why she didn't receive a promotion. Dk 16-1 (Whitley Decl.) ¶ 25.

86.     Whitley pointed out to Campbell that Whitley had never been in trouble or counseled. Dk 16-1 (Whitley Decl.) ¶ 26.

87.     He answered her by referring to her prior lawsuit, reminding her that she had gone after "those white motherfuckers," and asking her: "do you think those motherfuckers are gonna forget?" Dk 16-1 (Whitley Decl.) ¶ 27.

88.      For emphasis, he added: "do you think that?" Dk 16-1 (Whitley Decl.) ¶ 28.

89.     Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them.  Dk 16-1 (Whitley Decl.) ¶ 29.

90.     Campbell's response was to the effect that they were not retaliating, but rather were "just not moving" her.  Dk 16-1 (Whitley Decl.) ¶ 30.

91.     Campbell then said that, to retaliate, they would have to do something like fire Whitley.  Dk 16-1 (Whitley Decl.) ¶ 31.

92.      Campbell said that: "It's a thing they say to you in court: no harm, no foul."  Dk 16-1 (Whitley Decl.) ¶ 32.

93.     Exasperated, Whitley asked him if she would have to wait a whole year to get promoted.  Dk 16-1 (Whitley Decl.) ¶33.

94.     He responded: "Oh you might have to wait a whole year and a half.  Dk 16-1 (Whitley Decl.) ¶ 34.

95.    He also asked her: "Why did you think you could do that? Dk 16-1 (Whitley Decl.) ¶ 35.

### McCallum Receives Entry of Appearance By Stevens' New Counsel

96.    On or around September 13, 2004, Stevens sought to return to work. He became sick soon after, however, and his return was delayed. Dk 15-3 ¶ 30.

97.    On October 25, 2004, McCallum received an entry of appearance before the EEOC by Patrick Wojahn of Whitman-Walker Clinic, on behalf of Stevens. Stevens Aff. Second Exh. 2 (Amtrak/Stevens 97).

### Stevens Receives Threat Note On His Door

98.    While he was still on leave, on November 7, 2004, Stevens found a note on his door stating, "you will lose. you got aids."

99.    Stevens filed a police report on this incident and on November 17, 2004. Dk 15-3 ¶ 31; Dk 15-15 (Exh. 12 – police report).

100.    On November 10, 2004, Stevens sent an amended EEOC charge to include retaliatory harassment by Campbell based on Campbell's threats to terminate him if he did not provide additional medical documentation. Dk 15-3 ¶ 32; Dk 15-16 (Exh. 13).

### Stevens Amends His Charge In November; Campbell Is Interviewed Regarding The November Amended Charge

101.    Stevens' Amended EEOC charge was filed by November 18, 2004. PDE 59. McCallum received it on November 23, 2004. PDE 59. The Amended Charge alleged in part that Campbell threatened to terminate Stevens in retaliation for Stevens' existing charge. It elaborated as follows:

> On May 29, 2004, the Respondent engaged in another retaliatory action against me. When I visited Ivy City, the location of Respondent's administrative buildings, to pick up some medications I had left with a friend, Bernard Campbell approached me and threatened me with

>violence because I included him in my initial EEOC charge.  He told me
>he would "destroy" me if I continue to pursue the complaint against him.

PDE 59 at 3.

102.     The Amended Charge also alleged that someone placed a note on his

door stating, "you will lose. you got aids."

103.     McCallum was also sent a courtesy copy by the Acting Director of the

EEOC Washington Field Office, attaching the Amended Charge.  Stevens Aff. Exh. 3

(Amtrak Stevens 101-102).

104.     McCallum admits that he interviewed Campbell about the amended

charge. McCallum Dep. 55-56.  However, Campbell says he was never informed about

the "you will lose, you got AIDS" note.  Campbell Dep. 241.

### Stevens' Counsel Writes To Rogers Again; McCallum Receives The Letter

105.     On November 18, Stevens' counsel wrote to Amtrak's Melissa Rogers in

the Law Department again.  McCallum had to admit having received the letter because

his stamp reflected receipt on November 29, 2004.  McCallum Dep.  64-67.

106.     The letter attached a copy the November 18 Amended Charge of

Discrimination incorporating the May 30 events. PDE 59; PDE 59 at 3.

### McCallum Fails To Attempt To Resolve Stevens' Complaint

107.     McCallum never made any attempts to resolve Stevens' Complaint.

McCallum Dep. 49.

### Stevens Appears At Concentra For A Return To Work Physical

108.     In December 2004, Stevens was ready to return to work after his extended

medical leave and scheduled a "return-to-work" physical.  On December 12, Stevens

was sick, as his breathing was off and he was running a fever. Stevens Aff. Second ¶ 5.

109.     On December 13, 2004, Stevens' friend Darryl Hollis was driving Stevens to Concentra in Prince George's County, to undergo the physical examination, which was to include a drug test. Stevens Aff. ¶6. The two got lost, so they called Jackie Cobb, an administrative employee in the Mechanical Office whose job was to monitor and coordinate the Stevens' physical with Concentra. Stevens Aff. ¶ 7. Cobb provided directions, and at 1:43 PM (PDE 80), Stevens reported to Concentra.  Before he could go inside, he was greeted by Amtrak Foreman II supervisor Craig Watson.  Watson said: "hey David, I got tired of waiting on y'all, it's time for me to go home," implying that he had been waiting at Concentra for Stevens to show up.  Stevens Aff. ¶ 8.

### Stevens Provides Urine Sample, Is Informed That The Temperature Is "Out Of Range," And Told To Wait

110.     Stevens put on a hospital gown, entered the special sealed room designed to prevent alteration, urinated and provided the urine sample to the attendant, Demetria Hudley.  Hudley immediately told Stevens that the sample was outside the acceptable temperature range. Stevens Aff. ¶ 9.  Apparently, the plastic cup contains a temperature strip on it, which Hudley was trained read, but she says no temperature was registering. Hudley Dep. 25, 65, 81-82.  No one else ever attempted to read the temperature from the strip.  Stevens Aff. ¶ 10.

111.     Hudley saw no signs of any tampering by Stevens.  Hudley Dep. 65:3 to 65:9.

112.     Hudley collected the sample at 2:04 PM.  Hudley Dep. 56-57; PDE 81.

113.     Concentra follows the Department of Transportation (Urine Specimen Collection Guidelines). PDE 78.

114.     Under those Guidelines, Hudley should have immediately transferred the urine to a second cup with its own temperature strip to see if a temperature would register.  Hudley Dep. 28:16 to 28:22; 79-82; PDE 78 at 17 (Urine Specimen Collection Guidelines), but she did not.

115.     Hudley Dep. 82:13 to 82:19.  Hudley admits that the temperature strip frequently fails to register a temperature.

116.     Indeed, it happens "every day." Hudley Dep. 28:16 to 28:22.

117.     Hudley instructed Stevens that he would have to provide a second, monitored sample and agreed to do so, including signing the requisite form.  However, instead of administering the test "immediately", as required by the guidelines, PDE 78 at 17 ("Temperature"), Hudley took Stevens was to an examination room to wait for someone to collect another sample.  Hudley Dep. 45-46; Dk 15-3 ¶ 33.

118.     Stevens never suggested to the staff that he was unable to provide a second sample (Stevens Aff. ¶ 11); to the contrary, Hudley elected not to have him give the second specimen, and instead to have him wait for the doctor.  Hudley Dep.  45: 22-46:9.

   Stevens Waits At Concentra After Being Informed That His Urine Is Out
   of Range, While Amtrak Mechanical And Medical Are Called About The
   Situation At His Initiation

119.     After waiting a long time with nothing happening, Stevens went into the hallway and got the attention of another staff member, Ebonie Beaty.  Beaty said she would check what was going on and the doctor would be with him shortly.  However, no doctor came, and no one came to take a second sample. (Stevens Aff. ¶ 12).

120.     Due to the fact that he is HIV-positive and had suffered from serious illnesses including pneumonia in the past, Stevens became very frightened at the idea

that something was wrong with his urine and thought he might have another serious

illness. After he had waited at least 45 minutes alone in the room, having asked Beaty for

assistance.  He then waited at least another another twenty minutes but still no one came

to see him.  Dk 15-3 ¶ 33-37.

121.    Stevens informed Concentra that he was HIV positive (Hudley Dep. 86),

and had recently had contracted pneumonia.  Stevens Aff. ¶13.

122.    This did not prompt an offer to get the second urine sample collected.

Stevens Aff. ¶ 14.

123.    Stevens suggested that Beaty call Jackie Cobb, the Mechanical

Department administrative employee who executed the Med-1 Form authorizing

Stevens' visit to Concentra and whose number was sitting invitingly on that form.

Stevens Aff. ¶ 15.

124.    Beaty agreed to try that, and Stevens sat down in the waiting room while

Beaty placed a call and spoke on the phone.  Stevens Aff. ¶16; Hudley Dep. 31. (Staff

may have called Cobb).

125.    Again, Stevens waited but nothing happened.  He approached Beaty

again, and Beaty told him she needed to contact Margaret Tierney (of Amtrak Medical)

to find out what to do.  PDE 39 (Tierney e-mail stating that she was contacted on the

13th).

126.    Beaty apparently called Tierney and left a voice mail.  Stevens waited

some more.

<u>Amtrak Medical Department's Alleged Protocols</u>

127.    Margaret Tierney is employed  by Amtrak's Medical Department.  She

states that sometimes "collectors" such as Concentra make mistakes. Tierney Dep. 70.

128.    For instance, sometimes a collector arrives late to the site.  Tierney Dep. 28.

129.    In such a case, there may need to be a rescheduling.  Tierney Dep. 28.

130.    Sometimes the collector loses the sample.  Tierney Dep.  31.

131.    That is not held against the employee.  Tierney Dep.  31-32.

132.    If she learns that an employee has left the site, she "would have to investigate what was, you know, going on."  Tierney Dep. 58.

133.    There are situations where "an employee coud leave a testing facility in the middle of a process where that could be justified or excused. . . [including] "a medical emergency."  Tierney Dep. 56.

134.    These are things that the employee would need to justify Tierney Dep. 58.

135.    Such emergencies would "need to be documented."  Tierney Dep.  58.

136.    Tierney manages her own voice mail correspondence.  Sometimes, she does not return phone messages until the next day.  Tierney Dep. 38-39.

137.    Tierney claims her office has four representatives, one is always on call 24/7, and the collectors are instructed that they can get a response from them as such.  Tierney Dep. 39-40.

138.    She admits, however, that sometimes she gets a message to the effect that something occurred on the prior day.  Tierney Dep. 40-41.

139.     When she learns of an unusual collection situation, she would talk to and send a memo to the employee's immediate supervisor.  Tierney Dep.  34-35.

<u>Stevens Continues To Wait; Margaret Tierney Is Called But Neither She Nor Anyone Else Provides Any Guidance; The Second Sample Is Still Not Collected</u>

140.    After continuing to wait for an "immediate" re-test and a physical examination for which he came to Concentra, and upon reflecting upon his urine supposedly being "out of range," Stevens became extremely upset and worried that he might be ill and needed to go to George Washington University Medical Center, where he was a regular patient on account of his serious medical conditions.  Stevens Aff.  ¶17.

141.    Stevens knew that Concentra—a walk-in clinic-- was not equipped to treat someone with serious health conditions like himself.  Dk 15-3 ¶¶ 34-36.

142.    Instead of just collecting Stevens' second urine sample and getting it over with, Beaty said that Concentra needed to call Amtrak to see if he could leave the facility without providing a second sample. Beaty called Margaret Tierney of Amtrak's medical department to ask for instructions on how to handle the situation.

143.    As noted above, Tierney testified that there was supposed to be 24/7 coverage at the Medical Department to deal with this kind of situation. She further testified that had she been available to pick up the phone, she would have spoken to Stevens about the situation right then and there, to "try to get an understanding of some of the details of what happened in the event."  Tierney Dep. 46.

144.    Stevens was present when Beaty made the call to Tierney, and heard Beaty leave a message on Tierney's voice mail stating that David Stevens' urine sample was not at the right temperature and to please call Concentra back to inform them of the procedures they should follow.  Dk 15-3¶ 37; Dk 15-3 Exh. 14 – December 13, 2004 memorandum from Concentra; Beaty Dep. 77.

145.    PDE 39 is an email demonstrating that Tierney definitely was contacted on the 13th in the "afternoon."  Stevens had given Beaty his phone cell phone number, but despite Tierney's attempt to represent her unit as utilizing a rapid response and

speaking to employees in a drug testing incident, Tierney never called him that

afternoon or at any time thereafter, leaving it to Concentra to inform Stevens that he

need not bother to return.

### Stevens Finally Goes To The Emergency Room

146.    Finally, Stevens told Beaty he was going to the emergency room, gave

Beaty his cell phone number, and went straight to George Washington Medical Center.

Stevens Aff. ¶17.

### Stevens Did Not Refuse To Provide A Directly Observed Sample, And Acted Honestly

147.    At no time did Stevens ever refuse to give a second specimen.

Hudley Dep. 79.  Beaty does not believe Stevens did anything dishonest.  Beaty Dep. 71.

148.    Stevens did not object to providing a second sample, or a supervised

second sample under direct observation.  Beaty Dep. 72-73.

### Beaty Instructs Stevens Not To Return To Concentra

149.    Stevens called Concentra from Darryl Hollis' car, where he was a

passenger on the way to the hospital.  Stevens Aff. ¶  18.

150.    Beaty called him back after he was already at the hospital. Stevens Aff.  ¶

19.

151.    Stevens informed Beaty that he was diagnosed with bronchitis at the

hospital. Beaty Dep. 85-86; Dk 15-3 ¶ 39; Dk 15-18 Exh. 15 – Emergency Room record.

152.    Concentra, through Beaty, specifically instructed Stevens not to return to

Concentra, even though the Guidelines state that Concentra should have instructed

Stevens to return as soon as it was prepared to administer the test.  PDE 78 (Guidelines

at 19, stating that: "when the collector learns that a directly observed collection should

have been conducted, but was not, the collector must notify the employer to direct the employee to return for an immediate recollection under direct observation").

153.    Beaty admits that she would have told Stevens it was Amtrak's responsibility to determine what would happen if he left.  Beaty Dep. 78-79.

154.    While being driven to George Washington University Hospital in Washington, D.C., Stevens called Beaty several times to see if she had heard back from Amtrak. Stevens Aff. ¶ 20.

155.    They eventually spoke, and Beaty told Stevens she had spoken to Tierney, who said he did not have to return to Concentra.  Stevens Aff.  ¶ 21.

<u>No Explanation Is Produced As To Why Stevens Was Not Permitted To Provide The Second, Supervised Urine Sample</u>

156.    The fact of Concentra's failure to permit Stevens to provide a second, supervised sample is undisputed in this case.  However, the reason for that failure is in dispute.  Concentra's records reflect that Stevens arrived at Concentra on December 13 at 1:43 and left at 5:13.

157.    Hudley Dep. 46-47; PDE 80. He was never permitted to provide the observed second specimen, and he never saw a doctor.  Stevens Aff. ¶ 22.

158.    Concentra's medical file on Stevens, produced pursuant to a subpoena, ultimately confirms that Stevens was never seen by a doctor and never completed his physical.  Stevens Aff. ¶23; Stevens Aff.  Exh. 3 (Concentra Medical Records File); Hudley Dep.19-23; PDE 84 (Evaluation Sheet For Stevens' 1-27-04, demonstrating the absence of a similar document for 12/13/04).

159.    Hudley testified that Stevens was required to endure long waits because Concentra was "really, really busy."  Hudley Dep. 54.

160.       She initially testified that Stevens did see the doctor, Hudley Dep. 43:1 to 43:3. Indeed, PDE 80 (Concentra Non-Injury Status Report) was completed by staff so as to leave the impression that he did.

161.       However, Concentra could not produce copies of its standard records that would have confirmed that. Stevens Aff. Exh. 3.

162.       In fact, Stevens never saw a doctor at Concentra on December 13. Stevens Aff. ¶ 22.

163.       Hudley could not explain the fact that PDE 80 was the only document pertaining to Stevens' visit of December 13, 2004 in Concentra's files. Concentra either created no other documents, lost the documents or failed to produce them despite a valid subpoena that it purported to be abiding. See Dk 38 (Plaintiff's Opposition To Motion To Quash).

164.       Another possible explanation is that Concentra may have been having trouble finding a male chaperone. Hudley testified that it was difficult to find a male chaperone.. Hudley Dep. 35-36, 71-72.

165.       However, Hudley testified that, had such been the case, Concentra would have informed Stevens that it was having difficulty finding a male chaperone, Hudley Dep. 36:6 to 36:12, and it is undisputed that Stevens was never told that. Stevens Aff. ¶ 24.

166.       Moreover, Beaty said it was easy to get a male, and that one of the doctors or physician's assistants could do the job. She is not sure how many male physician's assistants would have been on duty. Beaty Dep. 75-76.

167.       However, she does not deny that she did not attempt to find a male to supervise Stevens' re-test. Beaty Dep. 75.

168.    Beaty testified that here were no male medical assistants on staff at the time, and two male physician's assistants, but those may not have been on duty at the time.  Beaty Dep. 76-77. If they were not on duty, that doctor would have had to supervise himself.  Beaty Dep. 76.

169.    Beaty admitted to not recalling ever advising Stevens as to how long he would have to wait for the re-test.  Beaty Dep. 74.

170.    Beaty admits she cannot testify that Stevens was in fact offered the opportunity to go into a room and "produce the second sample."  Beaty Dep. 96-97.

171.    She does not know why he would not have been given the opportunity. Beaty Dep.  97.

172.    Beaty would not deny that Stevens waited at Concentra because Amtrak wanted him to.  Beaty Dep. 93.

<u>Tierney And Amtrak Medical Fail To Counsel Stevens As To What To Do Upon Beaty's Call Of December 13</u>

173.    Tierney does not deny having been contacted while Stevens was at Concentra.  Tierney Dep. 36.

174.    However, she is unable to remember if she got a message or voice mail about Stevens.  Tierney Dep. 39-40.

175.    She testified that she is unsure as to how she was initially notified about the Stevens situation on December 13, 2004.  Tierney Dep.  31.

176.    In any case, it appears that whatever 24/7 response was supposed to be in place did not function to Stevens' benefit on December 13, since Stevens got no direct instructions on how to proceed from Amtrak while he was still waiting at Concentra.  Stevens Aff. ¶25.

177.    Tierney denies speaking to anyone in Amtrak management about Stevens' situation.  Tierney Dep.  32.

178.    She is unable to recall to whom she spoke about this case and nothing would refresh her recollection.  Tierney Dep.  34.

Tierney Testifies That She Remained Permanently Ignorant Of The December 13 Facts; Though Beaty Says She Told Tierney That Stevens Went To The Emergency Room

179.    Astoundingly, Tierney claims she doesn't know "one way or the other," if a medical explanation was ever given relating to Mr. Stevens having left Concentra on December 13, Tierney Dep. 60, or if there were any extenuating circumstances surrounding the December 13 events at Concentra, Tierney Dep. 42-44, she admits she never spoke to Stevens,  Tierney Dep. 66-67, and can't remember if she even tried.

180.     However, she admits that no one from Concentra ever told her that Stevens told them he would not provide a second specimen.  Tierney Dep. 43-45.

181.    On the other hand, Tierney says she is "sure" of the false fact that Stevens was offered the opportunity to give his second sample immediately. Tierney Dep.  69 (See Hudley Dep. 64-65).

182.    Challenged at her deposition on this point, Tierney had to admit that PDE 44 did not inform her as to "whether it was immediately after the first sample that he said he couldn't stay any longer."  Tierney Dep. 67-70.

183.    Beaty does not deny that Tierney never asked her if the re-test took place "immediately after the first sample was out of range."  Beaty Dep. 95.

184.    Tierney claims she would have discussed whether Concentra had "someone of the same sex present when Mr. Stevens first sample came in,"  Tierney Dep. 71, but she cannot recall the discussion.  Tierney Dep. 68-70.

27

185.    How long it would take Concentra to get someone to supervise Stevens "never came up because the employee left the site." Tierney Dep. 70.

186.    She does not know how long Stevens waited before leaving.  Tierney Dep. 69-71.

187.    She says the collectors never told her that Mr. Stevens was not offered the opportunity to give the second sample immediately.  Tierney Dep. 68-69.

188.    Tierney claims she heard something about a doctor's appointment, but says no one told her that Stevens went to the emergency room and was diagnosed with bronchitis.  Tierney Dep. 72.

189.    No one told her the undisputed fact that Stevens provided Amtrak the documentation from his December 13 visit to the emergency room.  Tierney Dep. 72.

190.    She could not recall having seen the emergency room documents, PDE 45, that were produced by Amtrak in discovery in this case.

191.    However, Tierney's testimony conflicts with Beaty's.  Beaty testified that although she could not recall the conversation with Tierney, she would have told Tierney on December 13 that Stevens "had to go to the hospital or something."  Beaty Dep. 62-63, 73.

192.    Beaty said she would have told the truth had Tierney asked any questions about Stevens. Beaty Dep. 71.

Tierney Admits That Under Established Amtrak Policies Stevens' Explanation For Leaving Concentra Upon Being Denied Any Opportunity To Provide The Observed Second Sample Should Have Been Seriously Considered As Justifying His Actions And Negating Any Violation

193.     Tierney testified that she "definitely" would have looked into Stevens'

assertion that he left Concentra on account of an emergency and that his actions might

have been justifiable under Amtrak policy:

> Q     If you had been told that Mr. Stevens had to go to the emergency
> room and he was diagnosed with bronchitis would you have looked
> further into his situation before identifying him or agreeing that he had
> refused to test?
>
> A     I would have the opportunity to explain that he had an
> emergency, first how important it was to complete the collection, but if he
> had an emergency, and could justify it, you know, I definitely would
> have looked into it.

Tierney Dep. 74.

### Campbell Tells Louers He's Got Stevens And That Stevens Attempted To Bribe Concentra

194.     One evening in approximately December 2005, Gary Louers came into his

General Foreman office, which Mary Whitley shared.  Louers told Whitley something

like: "guess what happened today?" She answered: "what?" He said something like: "BL

said: 'David Stevens tried to pay off the person who gave him the drug test.'" Louers

then said something like: "because he didn't pass the urine test," or "because his urine

was dirty" or "or "because his urine wasn't right," I'm not sure which.  Louers further

stated: "BL said: 'I got him now,'" and that Stevens was going to lose his job.  Whitley

asked something that Louers responded to by saying that Stevens was already on "Rule

G." Not long after this, Whiltey learned that Stevens was indeed fired. Whitley Aff. ¶ 49.

### Proceedings Are Initiated Against Stevens; Melissa Rogers Is Notified

195.     Despite the fact that Stevens offered to return to provide a second sample

and was suffering from an illness the day of the test, Amtrak instituted procedures to

terminate Stevens' employment on December 14, 2004.  Dk 15-3 ¶ 40.

196.     It was the very next day after the event; a day upon which Stevens was again at the emergency room trying to recover from bronchitis.  Dk 15-18 (emergency room records).

197.     On December 14, Andrea Butler, from the Mechanical office informed Campbell that she had faxed Tierney a series of four documents (Stevens Aff. 25 (Amtrak Stevens 849-852)): a memo post-dated to December 15, in which Tierney purports to instruct Campbell to initiate discipline; Stevens' waiver of a right to hearing from a February 2003 disciplinary proposal; the unusual collection form; the Hudley/Beaty memo of 12/13/04.

198.     On December 15, Tierney faxed Stevens' agreement to be retested signed at Concentra on December 13, to attorney Melissa Rogers (Amtrak Stevens. 299-300).

199.     In the legal department—the same Rogers who had been sent at least four letters, who had discussed Stevens' discrimination contentions with Stevens' counsel McEwen over the prior several months, and who had just within the last three weeks received the Amended Charge of discrimination filed at EEOC asserting that Campbell had threatened to destroy Stevens if he continued protesting discrimination or retaliation.

<u>Tierney Claims She Has No Role In Disciplinary Proceedings</u>

200.     Tierney claims she is "not involved" in discipline after she prepares a memo such as PDE 38.

201.     In fact, Tierney was responsible for coordinating the disciplinary hearing, Stevens Aff. Exh. 4, and placed herself on a hearing witness list as a "mandatory witness," Stevens Aff. Exh. 5.

202.    However, despite Stevens' specific objection that she needed to be there, Amtrak went forward with the hearing without requiring her to testify. She then refused and failed to appear at the disciplinary hearing, where she could have been cross examined over Stevens' strenuous objection.    Tierney Dep. 60-61.

> With No Prior Investigation Whatsoever, Amtrak Immediately Seizes
> Upon The December 13 Events To Fire Stevens

203.    By the next very next morning after the Concentra events, December 14, Amtrak had decided to fire Stevens. Thus, for that purpose, Mechanical Department administrator Andrea Butler faxed out a series of documents including Concentra's chain of custody form as completed on the 13th, Concentra's Unusual Collection Form, Stevens' waiver document from earlier in 2004 and the memo by Hudley and Beaty regarding the day's events. Stevens Aff. Exh. 6 (Exh. F. To Investigatory Hearing).

> Campbell "Absolutely" Assigned Talley Not To Develop The Facts And
> Determine Responsibility, But Rather Solely To Find Stevens "Guilty"

204.    Campbell denies proposing that Amtrak terminate Stevens. Campbell 124:1 to 124:14.

205.     In fact, he sent out a Notice of Formal Investigation (PDE 65) which states: "The purpose of this investigation is to develop the facts and determine your responsibility, if any, in connection with the following charge. . ," However, Campbell admitted that it was "absolutely correct" that he assigned General Foreman Michael Talley ("Talley") to handle the so-called "investigation" for the sole purpose of finding Stevens "guilty". Campbell Dep. 209:13 to 210:4.

206.    Neither Campbell nor Talley ever attempted to speak to Stevens about what had occurred. Campbell Dep. 210:5 to 210:10. Campbell Dep. 210:19 to 211:1.

207.    Campbell admits he failed to speak to Stevens' union representative about the charges.  Campbell Dep. 210-211.

208.    Campbell just undertook to make sure Talley "made sure he had his ducks in a row." Campbell Dep. 211:18 to 212:2.

209.    It was an easy case. Campbell Dep. 211:18 to 212:2.

210.    Campbell feigned ignorance as to how Talley could have known Stevens went to the emergency room saying "I don't know how Mr. Talley would know that. Campbell Dep.  214:21 to 215:3.

211.    Nothing can refresh his recollection as to whether Talley told him Stevens had bronchitis.  Campbell Dep. 215.

<u>Campbell Ignores The Facts Of What Actually Happened At Concentra</u>

212.    Asked whether he "heard" that there were extenuating circumstances causing Stevens not to have provided a second sample, Campbell retorted with the non-sequitur  that it was not his "decision".  When the questioner emphasized that that was not the question, Campbell insisted: "I wouldn't even look for that."  Campbell Dep. 213: 1-12.

213.    Upon finally answering the question, Campbell stated that Tierney never told him that.  Campbell Dep. 213: 13-17.

<u>Amtrak Conducts A Disciplinary Hearing At Which Stevens Is Prevented</u>
<u>From Cross Examining Tierney</u>

214.    On January 18, 2005 and January 31, 2005, Amtrak held a hearing as part of its procedures necessary to terminate Stevens' employment, in which Talley prosecuted Stevens.   Campbell was listed as the Charging Officer bringing the action against Stevens.  See Dk 15-19 (Exh. 16 -Hearing Transcript) at 7.

<u>Campbell Falsely Denies Responsibility For The Termination Decision,
Though AMTRAK's Position Is That Campbell Was "Ultimately
Responsible"</u>

215.    Defendant's position is that Bernard Campbell was "ultimately

responsible for terminating plaintiff."  Dk 44-1 at 7, and indeed, Campbell executed a

Personnel Action Request, which is in Stevens' official personnel folder, terminating

Stevens for "dishonesty".  PDE 64 (Amtrak Stevens 402).

216.    However, brazenly, Campbell lied under oath about that elementary fact

at his deposition. Campbell Dep. 229:11 to 229:16 (claiming he had "nothing to do with"

authorizing the termination).

217.    Campbell lamely attempted to deny that he brought the charges against

Stevens, insisting instead that Stevens brought them "against himself." Campbell Dep.

223: 9 to 21.

<u>Decisionmaker Campbell Claims Intentional Ignorance Of The Key Facts Of
Stevens' Conduct And Declines To Read The Hearing Transcript Before Firing
Stevens</u>

218.    Campbell claims that Talley did not tell him that Stevens went directly to

the emergency room from Concentra.  Campbell Dep. at 214-215.

219.    Campbell claims that the first time he learned Stevens was diagnosed

with bronchitis at the emergency room was over two years later at his deposition in this

case.  Id. at 215.

220.    Campbell admits that he was not interested in information regarding

extenuating circumstances before issuing disciplinary charges against Stevens.

Campbell Dep. at 212-213.

221.    Campbell claims no one ever told him how long Stevens had to wait for a second test to be administered.  Id. at 216.

222.    Stevens claims he did not request a copy of the transcript, Id. at 217, and never read the transcript.  Id. at 217.

223.    Although Talley was his charging officer, he does not recall discussing what happened at the hearing with Talley.  Id. at 217.

224.    He denies discussing what happened at the hearing with Kapela.  Id. at 217.

<u>Campbell Falsely Testifies That AMTRAK Does Not Recognize Exceptions To The Rule Requiring That A Drug Test Be Completed</u>

225.    Campbell contends that AMTRAK recognizes no exception the to rule that one who leaves a drug testing situation is treated as refusing to test for medical emergencies.  Id. at 219-220.

226.    However, AMTRAK's medical officer, Margaret Tierney, testified to the contrary.  Tierney Dep.  56-59.

<u>Campbell Slanders Stevens By Falsely Stating That Stevens Refused To Submit A Second Sample And Declined To Cooperate With Concentra</u>

227.    Campbell admitted that he did not know how long an employee was required to wait for a drug test.  Id. at 225.

228.    He said that would be up to the testing facility.  Id. at 225.

229.    However, it is undisputed that Campbell never attempted to directly communicate with the testing facility.  Beaty Dep. 70; Campbell Dep. 34 (testifying that he is not familiar with any of the Concentra employees).

230.    Campbell claims that Stevens failed "to cooperate with the medical personnel administering the test."  Campbell Dep. 227: 9-17.

231.    Campbell now admits, however, that his statement in the affidavit he submitted in support of the Motion to Dismiss, that Stevens declined to retake the test or cooperate with m he medical personnel administering the test, Mr. Stevens left the facility, was based solely on a review of the (misleading) records.  Id. at 226-227.

Campbell Spreads The False Word That Stevens Provided An "Adulterated Sample"

232.    At his deposition—a time when he would have been expected to be on his best behavior— Campbell three times mis-characterized Stevens' drug test facts in a manner that was both false and disparaging toward Stevens.  Thus, Campbell testified repeatedly that Stevens provided an "adulterated sample." Campbell, Dep. 124:1 to 125:2; 207:12 to 208:2; 224:13-15).

233.    He did so even though all documents generated by Concentra and the testimony of Hudley and Beaty were to the contrary—indicating that there were no signs of tampering but that the first urine sample was simply out of range, including PDE 81, which offered a box to check specifically for "adulterated" if those were the perceived facts.  Hudley Dep. 85; Beaty Dep. 50-51; 95-96.

234.     Even worse, Campbell inserted the "adulterated" concept into the bloodstream of Stevens' employment records, as it showed up in the "individual Detail Discipline Form, Stevens Aff. Exh. 7 (Amtrak Stevens 1185),  and the Human Resource File Attachment, Stevens Aff. Exh. 8 (Amtrak Stevens 1372).

235.     Campbell also executed a Personnel Action Request, which is in Stevens' official personnel folder, terminating Stevens for "dishonesty".  PDE 64; Amtrak Stevens 402.

236.    Campbell also testified falsely that he received an e-mail stating that Stevens had "turned in an adulterated sample."  No such e-mail has been produced, and the references to adulteration in the record all began with Campbell. PDE 39; Campbell Dep. 224.

237.    No Concentra personnel agreed with Campbell.  Deposition of Demetria Hudley ("Hudley Dep") at 85: 6-9 ("6   Q   From what you've seen and remembered today, would you be able to say whether Mr. Stevens gave an adulterated sample?  A No).

238.    PDE 42, 43, and 44 were created by Concentra personnel reflecting the events of December 13.  None of those say the sample was cold, much less "adulterated."  Nothing in the documents indicates to Beaty that Stevens adulterated the sample.  Beaty Dep. 95-96.

<u>Campbell Fabricates A Rule Requiring Stevens To Wait Four Hours For A Drug Test</u>

239.    Campbell testified that there is a "four hour rule" under which Stevens would have had to wait for a test.  However, there is no such applicable rule.  Campbell Dep. 225. He admits he "doesn't know about that; you have to ask the testing facility," when asked what Stevens was supposed to do when the facility was not prepared to test him.  Campbell Dep. 225.

<u>Campbell Denies That Talley Could Have Known That Stevens Had Bronchitis While He Waited At Concentra To Be Re-Tested, And That Stevens Would Have Known How Long Concentra Made Stevens Wait To Provide A Second Urine Sample</u>

240.    Campbell not only denied knowing that Stevens had gone to the emergency room on December 13, 2004, but also denied that Talley—the charging officer

who presented Campbell's case at the "investigation" hearing-- could have known that. Campbell Dep. 214:21 to 215:3.

241.    Campbell also denied that Talley told him Stevens had been diagnosed with bronchitis at the emergency room.  Campbell Dep. 215: 6-10.

242.    Campbell expressed doubt that Talley would have known if Concentra was prepared to give Stevens a second test.  Campbell Dep. 215: 18- 216: 4.

243.    He also testified that Talley never told him how long Stevens had to wait to give his second sample. Campbell Dep. 216; 5-15.

> Campbell Did Not Bother To Request Or Read The Transcript Of The Investigation Hearing Before Firing Stevens, And Claims Complete Ignorance Of The Facts; Campbell Claims He Never Discussed Stevens' Case With Any Witness And Never Asked Talley To Do So; Campbell Viewed It As A "Simple" Case

244.    Campbell, who was ultimately responsible for the termination, knew there was a transcript prepared of the investigation hearing, but never bothered to read it.  Campbell Dep. 216: 16- 217: 3.

245.    Nor did he request a copy of it.  Campbell Dep. 217: 6-8.

246.    Yet, he asserts that the case was "clear cut" and that Stevens "knew what the consequences would be" when he "walked out of that facility." Campbell Dep.  218: 4-15.

247.    Campbell never discussed the Stevens issue with a single other witness, and never asked Talley to do so either.  Campbell Dep. 209-210.

248.    Campbell looked at the case as a "simple" one.  Campbell Dep. 211-212.

249.    Campbell claims to be unaware that Stevens was diagnosed with bronchitis on December 13.  Campbell Dep.  215.

250.    Nor did Talley tell him how long Stevens had to wait at Concentra for his second urine test.  Campbell Dep.  216.

Campbell  Denies Falsely That AMTRAK Policy Would Permit Not Firing
Stevens On Account Of An Emergency Situation

251.    Campbell claims AMTRAK has no exceptions to the policy that if an employee walks out of a testing situation, it is a positive test.  Campbell Dep. 218; 21-219: 9.

252.    Specifically, Campbell claims there is no exception for a medical emergency.  Campbell Dep. 220; 2-9).

253.    Tierney testified to the contrary, however, as shown above. Tierney Dep. 57-60.

Campbell Does Not Care If An EEOC Charge Is Filed Against Amtrak As
A Result Of His Own Conduct

254.    Campbell was shown PDE 59, Stevens' Amended Complaint to the EEOC.  Asked if he would have had concern had someone told him that Stevens had made such a complaint about him, Campbell said he would neither have been "concerned", nor "cared," and would have taken no action.  Campbell Dep. 200-205

Campbell Falsely Claims That Stevens Told Campbell He Was HIV
Positive

255.    Campbell falsely claims that Stevens told him Stevens was HIV positive. Campbell Dep. 247:19 to 248:12.

256.    In fact, Stevens did no such thing.  Stevens Aff. ¶ 26.

Campbell Falsely Denies Knowledge Of Stevens' Protected Activity

257.     Defendant endorses Dk 44-1 at 7 Campbell's lie that Campbell did not know that Stevens had filed an EEOC charge "until the day of Campbell's deposition" in 2007.

258.     Indeed, Campbell repeated that claim in his testimony at least four times. Campbell Dep. 186:17 to 187:2, 201:21 to 202:3, 202:10 to 202:20, 238:20 to 239:3.

259.     Campbell himself highlighted the point, claiming—probably sarcastically-- to have provided that testimony "17 times".  Campbell Dep. 238:20 to 239:3.

260.     There is no doubt that Campbell knows what an EEOC complaint is. Campbell Dep. 202:21 to 203:3.

261.     In fact, Campbell knew all about Campbell's EEOC charge.  McCallum Dep. 15-16, 19, 21-22, 37-38, 39. 44-45, 47-48, 55-56, 64

<u>Campbell Admits That Stevens (Unlike Himself) Is Truthful</u>

262.     Campbell admitted that he is unaware of any untruthful statements by Stevens.  Campbell Dep. 233:3 to 233:16.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC


_____

Leizer Z. Goldsmith
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-6235
Attorney For Plaintiffs Whitley & Stevens