## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

———————————————————— )
                                          )
David B. Stevens, et. al                  )
                                          )
        Plaintiffs,                       )
                                          )
    v.                                    ) Civil Action No. 1:05CV01924-RCL
                                          )
National Railroad Passenger Corporation   )
("Amtrak"),                               )
                                          )
        Defendant.                        )
———————————————————— )

### PLAINTIFF MAE WHITLEY'S OPPOSITION TO DEFENDANT'S
### MOTION FOR SUMMARY JUDGMENT

Plaintiff Mae Whitley ("Whitley") hereby opposes Defendant National Railroad

Passenger Corporation's ("Amtrak") Motion for Summary Judgment.

### I.    BACKGROUND

This is a case of retaliatory and discriminatory failure to promote.  Whitley filed

a lawsuit against Amtrak in 2003, alleging sexual harassment and retaliation.  Thereafter,

she was been repeatedly denied a promotion into a Foreman II position.  Although

Amtrak denies retaliatory or discriminatory intent, and claims that Whitley was not

qualified for the position, Whitley can show that she is, in fact, qualified, and that

Amtrak's denials of unlawful conduct are pretextual, such that a trial is required.

### II.    STATEMENT OF KEY FACTS[1]

Whitley, A Foreman I, Applies For Promotion to Foreman II

Whitley began her employment with National Railroad Passenger Corporation

("Amtrak") as a coach cleaner in 1977.  See Dk[2] 16-1 ("Whitley Declaration") at ¶ 1.

---

[1] A more complete recitation of facts is included in Plaintiff's Statement of Material Facts.

Whitley has applied for a Foreman II position, Whitley is a hard worker and a good supervisor.  Deposition of Bernard Campbell 36:7 to 36:8; 37:2 to 37:6.

The Foreman II Position

The Foreman II position supervises electricians, pipe fitters, machinists and Car Repairers.  Deposition of Sarah Ray 118.  Kapela admits that 50% of the job is "experience and knowledge in managing people." Deposition of Michael Kapela 93-94.

Qualifications For The Foreman II Position; Certification; Probationary Period

PDE 1—which does not require "mechanical experience"-- is the job description for a Foreman II.  Ray Dep.  30-32.  It is mainly "accurate".  Campbell Dep. 108-109.

AMTRAK utilizes a ninety working day probationary period for Foremen II. Louers Dep.  34-35. Tana Dep.  134-135. A Foreman II is subject to a ninety-day probationary period when he or she enters into that job.  Ray Dep.  23-24.

Because of the difficulty in finding qualified applicants, AMTRAK sometimes hired individuals who lacked—unlike Whitley—the certifications necessary to perform as a Foreman II. Truitt Dep.  38:5 to 38:15.  They would be permitted to attempt to obtain the certification within the ninety-day trial period.  Truitt Dep.  39:5 to 39:19.

The Mechanical Department "Always" Has Foreman II Vacancies; Pay Is Low; Overtime Is To Be Avoided

The Mechanical Department "always" has Foreman II vacancies—including between 10/13/04 and 12/7/04.  Tana Dep.  105.  It is difficult to get qualified applicants for Foreman II positions, largely because the pay is low.  Truitt Dep.  36:13-36:1.

---

[2] "Dk" references are to official docket entry numbers; Those entries have not been reproduced for this submission.  "PDE" refers to Plaintiff's deposition exhibits, which were consecutively numbered for reference by all witnesses.

Vacancies require the authorization of overtime, but "any use of overtime is undesirable" to Kapela. Kapela Dep. 90. Foremen II working overtime are paid time and a half, which is expensive. Kapela Dep. 90.

<u>Ladson And Stiggers Apply For The Foreman II Training Position As Well</u>

In 1999, two applicants for the Foreman II training slot were Jane Ladson and Althera Stiggers. Ladson had many years of experience as a Foreman I, and ten years' experience as a Car Repairer. Whitley Affidavit Exhibit 1 (Ladson application). Stiggers had experience as a Foreman I, but none in a craft position—a resume similar to Whitley's. Stiggers was selected for the position—in Kapela's shop (PDE 71 at 83-84).

Ladson protested the selection of Stiggers. On May 10, 2001, Ladson wrote to Pesce and expressed dismay that others with "less experience and no mechanical background" had been selected for Foreman II. She noted that "some of the people chosen only had a few weeks of training in the mechanical department" and that she could "only assume that in order to advance within Amtrak, it is more important who you know, rather than what you know." AMTRAK received the letter on May 10, 2001. Pesce's response to Ladson on May 25, 2001 was instructive. He wrote that (despite her ten years' experience in a mechanical craft) she had displayed a "weakness" in her mechanical knowledge. Whitley Affidavit Exhibit 2.

Stiggers soon became a full-fledged Foreman II, then quickly a Foreman III. Stiggers Dep. 82-86. Ladson continued to have many more years of mechanical experience than Stiggers but could not get promoted. The only other individual to enter on duty in the training position before AMTRAK eliminated it was Wellington Gibson. Whitley believes that he—like Stiggers-- also had a resume that lacked time in a mechanical craft. Whitley Aff. ¶ 9. Ladson was finally promoted in March 2004, several

years later, after having initiated an EEO Complaint.  Whitley Aff. ¶ 11; Whitley Aff.

Exhibit 4 (Promotion Form).

> Whitley Sues Amtrak Regarding The Mechanical Department; The Managers Are
> Deposed Days Before Whitley Is Interviewed For Promotion

On March 7, 2003, Whitley filed a civil complaint against Amtrak alleging sexual

harassment, sex discrimination, and retaliation. Dk 16-1. [3] Whitley had also previously

made a harassment complaint against Kapela, PDE 74, 75.

> Kapela Is Asked At November 2003 Whitley Deposition About An
> Alleged Sexual Affair And Related Nepotistic Promotion Of Stiggers;
> Campbell Testifies; Ray Participates In Amtrak's Defense

On November 18, 2003, Attorney Fischler defended Kapela's deposition at

Whitley's then-counsel's office.  PDE 71 (Kapela Dep. 11/18/03) at 1, 45.  During that

deposition, Kapela admitted that Whitley accused him of harassment previously.  PDE

71 at 53-54.  He was asked point blank by Whitley's then-lawyer whether he engaged in

an affair with Stiggers. PDE 71 at 79-81, 93, and whether he was involved in selecting the

same Stiggers for the Foreman II training position.  PDE 71 at 73-75.  On November 19,

2003, Campbell was deposed as well.  He testified that Stiggers told him she had had an

affair with Wimbish, but that he didn't want "to be a judge or jury" and "didn't know if

Mike was doing anyone." Campbell Dep. (11/19/03) at 33-34.

Campbell says both that he has discussed that suit with Whitley, and that he

doesn't "really know" if he has.  Campbell Dep.  38:4 to 38:7.

Ray and Kapela have discussed Whitley's prior lawsuit and this one, including the

reasons for selecting certain candidates.  Ray Dep.  137, 149-152.  Ray supplied Kapela with

a lot of information at that time.  Ray Dep.  137.  Ray also does not deny possibly having

---

[3] In an opinion dated, June 9, 2004, this Court granted summary judgment dismissing all of
Whitley's claims.

discussed Whitley's lawsuit with Robert Frank and Campbell (assistant superintendents). Ray Dep. 145-146. Ray participated in answering Plaintiff's Interrogatories in Whitley's prior lawsuit (PDE 15). Ray Dep. 147-148.

Since filing her complaint in 2003, Whitley has applied for several Foreman II positions with Amtrak. Dk 16-1 ¶ 6. When Whitley applied for promotion, she was on every occasion treated as qualified by HR. Ray Dep. 227-230. It is undisputed that she was interviewed for the Foreman II proper position twice, first in December 2003 and again on March 28, 2004.

<u>Whitley Obtains Her Certification</u>

It is undisputed that by June 2004, Whitley had completed the classes that would unquestionably qualify her to work as a Foreman II.

<u>Role Of HR And The Interview Panel In The Process</u>

A Human Resources Specialist or Ray herself screens all applicants to ascertain if they are minimally qualified for the position in question and therefore eligible for interview. Ray Dep. 74-75; Kapela Dep. 51-52. It is supposedly forbidden to select an outside candidate without an interview. Ray Dep. 81-82. Assistant Superintendents (such as Frank and Campbell) decide who will represent Mechanical on a Foreman II interview panel. Kapela Dep. 17-18, 21. They discuss the issue among themselves. Kapela Dep. 34-35.

<u>It Is Disputed Whether The Interview Panel Could Reject Whitley On Its Own</u>

A panel demonstrably lacks authority to make the ultimate decision on a promotion. Ray Dep. 96; Truitt Dep. 30:11 to 30:15; Truitt Dep. 52:18 to 53:8. It completes no forms indicating its own will as to a selection. Ray Dep. 97-99. There is no official record of who was actually in the interview. The same panelists do not always

interview all the candidates for Foreman II who are applying during the same timeframe. Tana—who sat in many interviews—cannot say what AMTRAK does if there are different panelists interviewing competing candidates, and AMTRAK is trying to compare candidates. Tana Dep. 101. No witness ever testified or averred that AMTRAK actually compared Whitley to Jefferson, Eckstein or Grimes. See Tana Dep. 103-104.

### Amtrak HR Forms Fail To Reveal Who Selects Foremen II Or How

AMTRAK has no form indicating that a particular individual has been selected for Foreman II. Tana Dep., (Page 53:9 to 53:11). Nor does it have a document indicating that a particular individual was selected rather than someone else. Truitt Dep. 30:11-30:15.

### AMTRAK Officials Contradict Each Other As To Selection And Non-Selection

Despite Campbell's false assertions to the contrary, Campbell Dep. 27-28, panelists discuss the selection with their supervisors. Ray Dep. 99. Kapela testified that HR, the Assistant Superintendent, and the interview panel decide together whom to select. Kapela Dep. 17-18, 21-22. In fact, they could also consult with him. Ray Dep. 91.

The final selection for the position is made by the Department, not the Panel. Ray Dep. 89. The Panel members may consult with the Assistant Superintendent "on up to Mike Kapela" about the selection. Ray Dep. 89-91. Commonly, they would. Ray Dep. 91.

### Selection Authority Resides Within Mechanical Management, But Amtrak Witnesses Falsely Deny It

There always must be departmental approval for a selection to occur. Ray Dep. 96-97; PDE 9.

Amtrak maintains no regular document that would provide no insight into who actually selected a candidate for Foreman II.  Kapela Dep.  45.  Campbell says that he plays no role whatsoever in such a selection.  Campbell Dep.  24:6 to 24:19; 31:19 to 31:22; Campbell Dep.  11:17 to 12:8.  However, Campbell's testimony that he played no role in the process of promoting or selecting individuals for Foreman II positions is untruthful, according to his former direct supervisor, Truitt Dep.  69:8 to 69:13.  Sometimes, the Assistant Superintendents discuss the selection process with Kapela himself.  Kapela Dep.  23.  They might ask him for input.  Kapela Dep.  23.

### Whitley Was Well Qualified For Foreman II

Fifty percent of being a Foreman II is "managing people."  Kapela Dep.  93-94.  Indeed, such experience is "very important" in a Foreman II, Truitt Dep.  36:13 to 36:16; 102:13 to 102:17, and past demonstration of leadership is also very important.  Truitt Dep.  103:7 to 103:20.

### Kapela And Campbell Testify That They Support Whitley's Promotion

Kapela now claims that Campbell allegedly told Kapela he wanted to "give" Whitley a "chance."  Kapela Dep.  71-72.  Kapela allegedly responded that they would do so.  Kapela Dep.  72.

### Foreman II And Whitley Supervisor Louers Recommends Whitley, Stating That She Is "Desperately Needed" As A Foreman II

Whitley's direct supervisor, Gary Louers, stated that Whitley's "backbone" and "safety record" were "***desperately needed***" in the "Foreman 2 ranks."  Emphasis added.  In Louers' view, Whitley did not need any special support or assistance to adapt to the Foreman II position.  Louers Dep.  62-64.  Louers testified that she possessed the

necessary of the craft knowledge to perform the supervisory duties.  Louers Dep.  54.

### Whitley Was At All Times Officially Treated As Qualified

During her interviews, nor at any other time prior to litigation, Whitley's

qualifications were not questioned. Dk 6-1 ¶ 14.   Ray admits, when pressed, that HR

**treated** Whitley as qualified.  Ray Dep.  227-230.  PDE 37 is another Human Resources

"Applicant Flow Log."

### Unqualified Applicants Shifflet, Swain, Burrows, Carter And White Are Selected

In April 2006, Henry Burrows was selected for a Foreman II position.  Exh. (A-Z

hereto).  Burrows presented the opposite profile from Stiggers.  He had no supervisory

experience whatsoever, and no experience in three of the four crafts to be supervised,

PDE 87, though he had a long history as a car repairman.    Whitley Aff. Second ¶  12.

PDE 87. According to both official documents and Kapela's (88-90) testimony, he was

not qualified.  In January 2004, unqualified candidates Shifflet and Swain were

promoted to Foreman II.  PDE 14 Exh. B.  None possessed any supervisory experience.

Whitley Affidavit Exhibit 7.  White and Carter were promoted to Foreman II on May 25,

2004.  Neither possessed any supervisory experience Exhs. Id.

### The Failure To Select Whitley Was Not Comparative To Other Candidates

Frank and Freeman never compared Whitley to other candidates.

### Whitley Is Denied Promotion While Amtrak, With At Least One Vacancy, Waits For Someone Else To Apply

As noted AMTRAK "always" has Foreman II vacancies.  Tana Dep.  105-107.

AMTRAK possesses no documentation as to who was selected "instead" of Whitley.

Tana Dep.  51-52.  AMTRAK has no selection forms.  Tana Dep.  52-53.  PDE 37

demonstrates that candidate Eckstein was selected but failed his physical in September

or October, that Grimes was the next candidate interviewed for the same vacancy, but that Grimes' interview was on December 7, 2004. PDE 36 at 1573. There were no eligible candidates available for selection during that time, other than Whitley. PDE 37; Tana Dep. 105. Although she *was the only qualified applicant of record for two or three months, Defendant declined to select her anyway*. Tana Dep. 105; PDE 37.

<u>Shampoo Wand Incident</u>

On March 30, 2004, Amtrak gave Whitley a Notice to Impose Discipline for allegedly failing to tag some equipment for repair. Whitley Aff. Second ¶ 15. In fact, Whitley's equipment was at all relevant times in perfect working order. Whitley Aff. Second ¶ 15. Whitley had done absolutely nothing to possibly warrant any discipline, and told Campbell so, Whitley Aff. Second ¶ 16, although Campbell denies she did so. Campbell Dep. 59-60. Campbell threatened Whitley that she must waive her right to a hearing, or the discipline she would receive pursuant to the hearing would be worse than the result of the waiver. Whitley Aff. Second ¶ 17. Campbell assured Whitley that the discipline wouldn't "go anywhere"—implying that it would be placed in abeyance—if she signed. Whitley Aff. Second ¶ 18. AMTRAK witness Tana could not deny that Campbell had expressed such intent. Tana Dep. 87-90. Neither Tana nor Whitley ever expected the reprimand to impede promotion. Tana Dep. 91-92. Whitley signed the waiver on April 6, 2004. Defendant's Deposition of Mae Whitley Exh. 8. Campbell now denies having promised not to have the reprimand placed in Whitley's file. Campbell Dep. 151.

<u>Whitley Is Not Selected And Two Vacancies Remain, After Her May 28 Interview And Before HR "Discovers" Her "Discipline"</u>

As of June 24, 2004, there were two Foreman II vacancies, but neither Whitley nor anyone else was selected for any.  PDE 4.  As of July 17, there were still two vacancies for Foreman II.  PDE 4.  On July 26, another vacancy announcement was generated, still indicating the existence of two vacancies.  PDE 2.

<u>Whitley's Application Is Rejected</u>

O May 28, 2004, Whitley was interviewed not only by Frank and Tana, but also by LeVar Freeman of the HR office.  Ray Dep.  19-21.  No mention was made of the discipline to Whitley at that time.  Whitley Aff.  Second ¶ 20 .  As of August 4, Tana "would not have been" telling Whitley that his May interview of her with Frank and Freeman was causing her not to be selected.  See Facts ¶244.

<u>Whitley Is Told, Instead, That The Shampoo Discipline Precludes Promotion</u>

On August 6, 2004, Whitley finally was informed as to the status of her application, in the form of a rejection letter stating that "others more closely meet the needs of the department."  PDE 18.  On August 19, 2004 Whitley spoke to Cannon Cannon informed Whitley for the first time that "if he had known" Whitley had been written up she would never have been interviewed, thus implying that Campbell had just informed HR about the reprimand.  He further stated that Whitley would have to wait until twelve months after the date of the discipline to be promoted.  Whitley Affidavit Second ¶ 21 (Whitley Addt'l Docs 48-49).  Whitley called Campbell, whose response was to ask Cannon to call Campbell's office.  Whitley Aff. Second ¶ 22; Whitley Affidavit Exhibit 9.  Cannon then issued Whitley a letter stating that she was not selected because of prior discipline.  PDE 20.

Tana raised the issue of the discipline with Campbell, knowing that Whitley was not guilty in the shampoo machine incident.  Tana Dep.  61.  Campbell admitted that

Whitley should not have been disciplined for the shampoo incident.  Tana Dep.  61-62;

PDE 50.  Campbell communicated to Tana such that Tana thought the discipline would

be "dismissed."  Tana Dep.  62-63.

<u>Campbell Admits To Amtrak Retaliation On Tape</u>

In approximately August 2004, Whitley asked Bernard Campbell why she didn't

get the Foreman II job. Dk 16-1 ¶ 25.  Whitley pointed out to Campbell that she believed

that the charges of misconduct relating to the shampoo machine were bogus and

unfounded and that had never been in trouble or counseled before.  Dk 16-1 ¶ 26.  He

answered her by referring to her prior lawsuit, reminding her that she had gone after

"those white motherfuckers," and asking her: "do you think those motherfuckers are

gonna forget?" Dk 16-1 ¶ 27.  For emphasis, he added: "do you think that?" Dk 16-1  ¶

28.  Whitley answered him that she was not surprised that upper management would

retaliate against her because she went after them. Dk 16-1 ¶ 29; Campbell Dep.  68:15 to

69:1)(declining to deny that she said that to him). Campbell's response was to the effect

that they were not retaliating, but rather were "just not moving" her.  Dk 16-1 ¶ 30.

Campbell then said that, to retaliate, they would have to do something like fire her.  Dk

16-1  ¶ 31.  Campbell said that: "It's a thing they say to you in court: no harm, no foul."

Dk 16-1  ¶ 32; Campbell Dep.  69:16 to 70:2) (declining opportunity to deny having said

it).  Exasperated, Whitley asked him if she would have to wait a "whole year" to get

promoted.  Dk 16-1 ¶ 33.  He responded: "Oh you might have to wait a whole year and a

half. Dk 16-1 ¶ 34; Campbell Dep.  70:3 to 70:20)(declining opportunity to deny having

said it).  He also asked her: "Why did you think you could do that?  Dk 16-1 ¶ 35.

Whitley captured the exchange on tape.  Whitley Aff. ¶ 25 (Exh. 10).[4]

Campbell Withdraws Shampoo Discipline; Whitley Receives A Third
False Letter On Her Promotion

On September 1, 2004, after a conversation with Tana, Campbell withdrew the

disciplinary action due to evidence that Whitley was innocent of the alleged misconduct.

Dk 16-1 ¶ 36; PDE 50; Tana Dep. 22. On September 2, 2004, Cannon sent Whitley yet a

third false letter.  This one echoed the first, but not the second rejection letter.  PDE 17.

Thus, it stated that once again the reason for rejection was that "other candidates. . .

more closely met the needs," and were selected.

Selection Of The Less Qualified Outside Candidate Wilson, Without An
Interview

Amtrak professes to prefer promoting from within.  Ray Dep.  55; Truitt Dep.

95:14 to 96:2.  It is undisputed that an AMTRAK veteran has an easier transition to

Foreman II work than a newcomer from the outside.  Louers Dep.  66.  Fixing planes or

ships is different from fixing trains.  Louers Dep.  67-68.  Kapela concedes that successful

outside candidate Rodney Wilson—who was offered employment on September 13,

2004 (PDE 30)-- should not have been selected, Kapela Dep.  88-89, since there is no

evidence that Wilson had any supervisory experience.  Kapela Dep.  87-89; Exh. 30 at

1925-26; Tana Dep.  35-39; Campbell Dep.  87.  Wilson had never even worked on a train,

Ray Dep. 194-195, much less obtained certification in train car repair like Whitley.  Ray

Dep. 195; PDE 30 at 1925-26; Tana Dep.  35-38; Kapela Dep.  86-87; Ray Dep.  195.

---

[4]     The recording has been provided to the Court.  Whitley apologizes for the poor sound
quality.

AMTRAK practice is that everyone must have an interview to be selected for Foreman II.  Tana Dep.  39-40; Louers Dep.  30.  Truitt Dep. 96:3-96:20, 97:5-98:7; Campbell Dep.  28:17-28:19.  However, PDE 30 reveals that Wilson was never interviewed.  Tana Dep.  35-36; PDE 30; Ray Dep.  195-198, 206-209; Kapela Dep.  86.  No witness has claimed that Wilson is as well qualified as Whitley. Campbell Dep. 251. Louers, her supervisor, flatly contradicted it.  Louers Dep.  96-99; PDE 30.

<u>Whitley's Comparative Qualifications</u>

Freeman told Tana that Freeman felt that there were stronger candidates than Whitley in the mechanical area.   Tana Dep.  97-99.  It is a mystery whom he was referring to—if Freeman really said that-- since there was a dearth of candidates.  Tana thinks Whitley was compared to the other candidates interviewed on May 28, 2004. Tana Dep.  101.  However, the Applicant Flow Log (PDE 24) fails to reflect any other interviews occurring that day or until the next month.

<u>Even After Reversing The Shampoo Discipline, AMTRAK Prefers A Vacancy And Payment Of Overtime To Promoting Whitley</u>

Candidates Charles Eckstein and Thomas Jefferson were interviewed on September 8, 2004.  Jefferson withdrew, and Eckstein never entered on duty.  PDE 37. Grimes was selected on December 13, 2004, with a start date of January 19, 2005. Plaintiff's Exh. 7; Ray Dep.  68-73.  Jefferson, Eckstein and Whitley were the only other candidates listed by AMTRAK for that same vacancy.  PDE 7.  Thus, the position was held vacant, with no applicants other than Whitley, for at least 2 months in fall of 2004.

### III.     ARGUMENT :      <u>THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED</u>

#### A.     <u>APPLICABLE PRINCIPLES FOR SUMMARY JUDGMENT</u>

The standards for considering defendant's motion are well known:

> Under Rule 56(c) of the [F.R.C.P.], summary judgment is to be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  The district judge, in ruling on a summary judgment motion, must assume the truth of the nonmovant's evidence, and draw all justifiable inferences in that party's favor.  <u>Bayer v. United States Dep't of the Treasury</u>, 294 U.S. App. D.C. 44, 956 F.2d 330, 333 (1992), citing <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

"The judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 249 (1986).   The court must view the evidence in the light most favorable to the nonmoving party and must not assess witness credibility.  <u>See</u> <u>Aka v. Washington Hosp. Ctr</u>., 332 U.S. App. D.C. 256, 156 F.3d 1284, 1288, 1298 (D.C. Cir. 1998;) (en banc); <u>Mackey v. United States</u>, 8 F.3d 826, 829 (D.C. Cir. 1993).  "Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those positions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Furthermore, "the record must show the movant's right to [summary judgment] with such clarity as to leave no room for controversy," and must demonstrate that the opposing party "would not be entitled to [prevail] under any discernible circumstances." <u>McKinney v. Dole</u>, 765 F. 2d 1134, 1135 (D.C. Cir. 1985,), <u>citing</u> <u>Williams v. W.M.A.T.A.</u>, 721 F.2d at 1415.  The burden of making such a showing is on the party moving for summary judgment.  <u>McKinney v. Dole</u>, 765 F.2d at 1134-35 (D.C. Cir. 1985,).

**B.**    **DEFENDANT IS NOT ENTITLED TO SUMMARY JUDGMENT HERE,
SINCE WHITLEY HAS PRESENTED SUFFICIENT EVIDENCE OF RETALIATORY
MOTIVE AND PRETEXT**

1.    **THE APPLICABLE STATUTORY LANGUAGE**

The District of Columbia Human Rights Act, D.C. Code § 2-1402.61, prohibits

employers from undertaking adverse employment actions "on account of" an

employee's activities protected by that Act.  It states:

D.C. Code § 2-1402.61, on "coercion or retaliation," states as follows:

(a) It shall be an unlawful discriminatory practice to coerce, threaten,
retaliate against, or interfere with any person in the exercise or enjoyment
of, or on account of having exercised or enjoyed, or on account of having
aided or encouraged any other person in the exercise or enjoyment of any
right granted or protected under this chapter.

2.    **PROOF OF A PRIMA FACIE CASE OF RETALIATION**

The plaintiff has the burden of proving by the preponderance of the evidence a

prima facie case of discrimination."  <u>Texas Department of Community Affairs v.</u>

<u>Burdine</u>, 450 U.S. 248, 252-253 (1981).  The burden "is not onerous."  The elements of the

prima facie case are:  involvement in protected activity, adverse employment action  by

the employer, and that there was a nexus between the two. <u>Cones v. Shalala</u>, 199 F.3d

512 (D.C. Cir. 2000), citing <u>McDonnell-Douglas Corp. v. Green</u>, 411 U.S. 792 (1973);

<u>Carter-Obayuwana v. Howard University</u>, 764 A.2d 779 (D.C. 2001); <u>Arthur Young &</u>

<u>Co. v. Sutherland</u>, 631 A.2d 354, 368 (D.C. 1993).

3.    **THE PRIMA FACIE REQUIREMENTS ARE EASILY SATISFIED**

As shown in the facts, ¶64, on March 7, 2003, Whitley engaged in ample

protected activities that were well known to Defendant's relevant actors at the necessary

times.  Thus, Whitley filed a civil complaint against Amtrak alleging sexual harassment,

sex discrimination, and retaliation.  She alleged therein that her supervisor, Frank Cover,

sexually harassed her and withheld training for a Foreman II position and promotions because she would not submit to his sexual advances.  Whitley also alleged in that suit that Amtrak retaliated against her by denying her the Foreman II training.  The suit alleged misconduct by Kapela—against whom Whitley had previously made out an EEO Complaint-- as well as well as Cover.

Defendant's Initial Disclosures and Interrogatory Responses in this case indicated that Kapela, Campbell and Sarah Ray were the three people with knowledge of why Whitley was not promoted.  Dk 40-2.  As shown in Facts, pp. 9-10, all three admit to being fully aware of Whitley's suit.

Kapela was deposed in Whitley's prior suit on November 19, 2003, less than one month before Whitley's first Foreman II interview.  Campbell is aware of Whitley's suit as well, having been deposed in November 2003 as well.  See Facts ¶69, 72.  As shown in the Facts, ¶75,  Campbell admits that he has discussed that suit with Whitley, though he alternatively claims he doesn't "really know" if he has.  Ray admits that she has discussed Whitley's suit with Kapela and supplied Kapela with information for that case.  See Facts ¶81.

Ray testified that she may have discussed Whitley's lawsuit with Robert Frank and Campbell (assistant superintendents) as well.  See Facts ¶ 83. Frank was a management official whom Whitley informed about the harassment and discrimination she was facing. Frank was also hostile toward Whitley when she was being interviewed, particularly in May 2004.  See Facts ¶80.

Defendant's denial of promotion to Whitley indisputably satisfies the requirement that Plaintiff suffer an adverse employment action.

In its earlier summary judgment motion, Defendant conceded that the prima facie case was satisfied.  It now maintains (Dk 43-1 at 15-16), however, that Whitley cannot show a causal connection.  However, Defendant provides no reasoning that would apply the applicable law to the facts.

Where there is close temporal proximity between the discrimination complaint and the adverse action, the facts are sufficient to establish the requisite causal connection.  Cones v. Shalala, 199 F.3d 512, 521 (D.C. Cir. 2000).  Here, Whitley was repeatedly denied promotion in late 2003 and throughout 2004, beginning just days after Campbell and Kapela were deposed.

Defendant seems to contend that Frank and Freeman alone prevented Whitley's promotion, and that there is "no evidence" Frank knew of the suit, thereby disproving any connection.  However, as an initial matter, the Declarations of Frank and Freeman should be stricken from the record. As shown in Plaintiff's Motion to Strike, Defendant egregiously violated Fed. R. Civ. P. 26(a) in failing to identify an intent to rely upon either individual as a witness, much less as the key witnesses, until after the close of discovery.

Moreover, that Frank and Freeman decided is itself a fact that is hotly disputed by Defendant's own Responses and Disclosures, which never named them, by its key witness Campbell, who attributed decisional authority to HR, by HR Supervisor Ray, who attributed authority to the "Mechanical Department" generally—thereby implying Kapela, Kapela, who did not name Frank or Freeman, and Truitt, who agreed that authority was vested in the Department.  Even assuming, *arguendo*, that the facts could permit such an interpretation, Frank's knowledge of Whitley's EEO activity was in any case extensive and sufficiently illustrates the requisite connection.

Frank knew about Whitley's first federal lawsuit.  See Facts ¶79.  Accordingly, rather than stating that he was unaware of the suit, he avers only that he didn't "consider" it.  Defendant's brief then coyly asserts that "there is no evidence" that Frank was aware of the suit.  Had Plaintiff been permitted to depose Frank, he obviously would have to have admitted that he was so aware.

Defendant's attempt to switch responsibility from Campbell, Kapela and Ray (see Defendant's Interrogatory Responses and Initial Disclosures), its alleged decision makers throughout the discovery period, to Frank and the obscure Freeman after it ended, is unavailing based on readily available facts. It is undisputed that Campbell and Kapela were deposed in Whitley's case in November 2003, and that Ray was aware of the suit as the defendant's HR point person.  Indeed, as shown, Facts ¶263, Campbell told Whitley she was being retaliated against as a result of that earlier case.  As we show below, even if Frank played a role, he too was implicated as a wrongdoer in Whitley's first case, and Kapela and Truitt testified that they delegated complete responsibility for the selection of all Foremen II to Frank and Campbell, whom it made partners in a collaborative selection process in which neither was superior to the other. Facts ¶125-128.  However, Campbell contradicts this testimony, denying that either he or Frank had authority to select or promote Foremen, and stating that only HR could do that.  Assuming the truth of Kapela and Truitt's testimony that Frank and Campbell were authorized to select Foremen II, Campbell bears at least equal responsibility with Frank for the failure to promote Whitley.  Thus, Kapela testified that he told Campbell he wanted to promote Whitley, a proposition with which Campbell agreed. Facts, ¶154-155.  Kapela and Campbell had a special relationship in which Campbell would do Kapela's bidding. Facts ¶151-153. According to Truitt and the laws of common sense, Campbell

would have been expected at least to share his knowledge about Whitley with his partner Frank. As Defendant "always" had openings, he could have promoted Whitley at any time, and if Frank disagreed, the matter could have been brought to Truitt or Kapela. There is no evidence of any such thing ever happening.

The evidence is that Whitley informed Campbell repeatedly about her interest in promotion, as well as the progress of her efforts, such as her involvement in the 238 certification courses and when she was informed serially of alleged reasons for her rejection. See Facts, ¶88-90, 167-168, 250. Kapela admitted that Campbell would have had a particular interest in Whitley's advancement because it was his job to mentor Campbell. Facts¶160. Whether or not he participated directly in rejecting Whitley, Campbell admitted to her in August 2004 that he—her Assistant Superintendent-- knew the reason for the denial and that it was her lawsuit against AMTRAK which management would not "forget". As shown in the Facts, ¶267, it is undisputed that Campbell told Whitley at that time that she "might have to wait a year and a half" to be promoted.

It is simply incredible to think that knowing that Kapela wanted her promoted and that he did, too, Campbell lacked the power to effectuate such promotion and the villain Frank would not let him. Moreover, figuring out what Defendant really was doing is made all the more difficult by the fact that Campbell contradicts his boss directly in claiming that he never spoke to either Kapela about Whitley. See Facts p. 15.

As shown in the Facts, ¶88-90, 167-168, 250, Whitley consulted with Campbell about her promotion repeatedly and he told her he was involved. They discussed her obtaining training and certification, which she did. And when Whitley was informed by Taylor Cannon first that better candidates were being selected, then that she was being

denied because of discipline, and then back again to better candidates, Whitley discussed those things with Campbell. Facts, ¶250.

Pursuant to the collaborative process allegedly envisioned by their common supervisory chain, Frank did not possess sole authority to decide who would serve on the interview panel, much less who would be selected.  Facts, ¶97-98, 101.  Moreover, as shown in Truitt's testimony, it was Campbell's responsibility to share his information about Whitley with Frank.  Facts, ¶97-98.  When Campbell told Whitley that he was looking into her rejection in September 2004, AMTRAK had openings, and he possessed no less authority than Frank to decide whether she would get one. Facts, ¶97-98. However, remarkably, Campbell states that he never discussed Whitley with Frank. Facts, ¶119, 140. By failing to do anything to exert his co-extensive authority on Whitley's behalf, Campbell became directly culpable for the failure to promote Whitley, at least co-extensively with Frank, such that the relationship between Campbell's knowledge of Whitley's lawsuit and that failure creates the requisite causal connection.

Although Campbell claims that he did not discuss Whitley's promotion with Frank, viewing inferences in Plantiff's favor, as the Court must, Whitley has shown that Campbell possessed the authority to render him knowledgeable about the reason for Whitley's rejection, that he was interested in the subject and she kept him apprised, and that he then told Whitley what the answer was to her question about her status—that they were "just not moving her" and would not be any time soon on account of her suit. In this context, Campbell's statement that he did not discuss the issue with Frank should not be credited, particularly in view of his similar denial of recall as to discussing the same issue with Kapela, Campbell Dep. at 13, and Campbell's general lack of candor.

Defendant's contention that Frank and Freeman were the sole decision makers is weak indeed. At the time of its earlier Motion for Summary Judgment, Defendant conceded the causal connection prong, and did not name Frank and Freeman as the decision makers. Dk 7. That itself raises serious questions about the veracity of the current representation. The attribution of responsibility to those two individuals came only after the close of discovery, in concert with Defendant's refusal to make them available for deposition. Furthermore, as shown in the Facts, ¶191, 194, 234, although both men have now averred that they were part of a group that decided not to promote Whitley, neither accepted primary responsibility and neither has stated who else was involved. Contrary to Defendant's representations, as shown in the facts, ¶ 39-43, 94-96, 98, 101, 121-146, there is ample evidence—including testimony from Freeman's boss Ray-- that HR employees do not decide for the Mechanical Department whom to select. Moreover, Defendant's pattern of not selecting Whitley includes her first interview in late 2003. It is undisputed that Freeman did not interview Whitley on that occasion, and he has not claimed involvement in denying her promotion prior to his May 28, 2004 interview of her.

The claim that Frank did not know about Whitley's suit is a false briefing contention, as Defendant carefully calibrated Frank's affidavit such that it includes no denial of knowledge of protected activity generally, but rather, a suggestion of it that counsel could expand upon in his brief. In fact, as shown, ¶ 79, Tana testified that Frank *did* know about the suit. Moreover, Whitley testified in her first case deposition that she protested sexual harassment to Frank, Whitley 2003 Deposition at 47, 53, rendering it highly likely that Defendant's attorneys would have interviewed him about the case. Moreover, Frank as Whitley's supervisor had sent her home when she was very upset

about sexual harassment. Facts ¶ 44. She discussed that harassment with both Campbell and Frank in 1999. Whitley 2003 Deposition at 98-100. Frank and Kapela then attended a meeting with the "in-house EEO," Whitley 2003 Deposition at 107-108.

These facts definitively show that Defendant's decision-making process was in no way segregated from knowledge and involvement in Whitley's first lawsuit. Accordingly, the requisite causal connection has been demonstrated.

**4.   THERE IS AMPLE EVIDENCE OF PRETEXT FOR WHITLEY TO PREVAIL UNDER THE BURDEN-SHIFTING TESTS**

**a.   Proving Retaliatory Intent By Showing Pretext**

To proceed by showing pretext, the plaintiff must show either "that the asserted reasons were insufficient to explain the employer's decision or were not applied in a nondiscriminatory fashion, or by proving that a discriminatory reason more likely motivated the employer." Burdine, supra, 450 U.S. at 256; McDonnell-Douglas, supra, 411 U.S. at 804-05.  "The reasonableness of the employer's reasons may of course be probative of whether they are pretexts.  In general, the more idiosyncratic or questionable the employer's reasons, the easier it will be to expose it as a pretext, if indeed it is one." Loeb v. Textron, Inc., 600 F.2d 1003, 1012 n. 6 (1st Cir. 1979).

Retaliation is as susceptible to proof by circumstantial evidence as any other factual issue. U.S. Postal Service Board of Governors v. Aikens, 460 U.S. 711 (1983). "Since direct evidence of discriminatory treatment is rarely present [in an employment discrimination case], plaintiff ordinarily must rely on 'circumstantial' rather than direct evidence to infer such motivation." Jones v. Trailways Corp., 477 F.Supp. 642, 646 (D.D.C. 1979). See Also Aka, 156 F.3d at 1288-89. Employer confessions or admissions, otherwise known as "direct evidence," are not required. Reeves v. Sanderson Plumbing,

530 U.S. 133 (2000). In <u>Reeves</u>, Justice O'Connor wrote for the Court that this holding

was consistent with the general principle of law that a jury may consider a party's

dishonesty as evidence of guilt. The unanimous opinion made it clear that the fact

finder may find for the employee based on inferences alone, except in the rare instance

of a case where the employer's asserted rationale is disproved, but there exists

independent evidence that discrimination did not really motivate the adverse action.

<u>Reeves</u> was consistent with the Supreme Court's earlier holding in <u>Hicks v. St. Mary's</u>

<u>Honor Center</u>, 509 U.S. 502, 511 (1993), that in Title VII- type cases, "the fact-finder's

disbelief of the reasons put forward by defendant (particularly if disbelief is

accompanied by a suspicion of mendacity) may, together with the elements of a prima

facie case, suffice to show intentional discrimination."

     The United States Court of Appeals for the D.C. Circuit has recently attempted to

clarify what is required of a plaintiff at this stage, holding that:

> Assuming then that the employer has met its burden of producing a
> nondiscriminatory reason for its actions, the focus of proceedings at trial
> (and at summary judgment) will be on whether the jury could infer
> discrimination from the combination of (1) the plaintiff's prima facie case;
> (2) any evidence the plaintiff presents to attack the employer's proffered
> explanation for its actions; and (3) any further evidence of discrimination
> that may be available to plaintiff (such as independent evidence of
> discriminatory statements or attitudes on the part of the employer) or any
> contrary evidence that may be available to the employer (such as
> evidence of a strong track record in equal opportunity employment).

<u>Aka</u>., 156 F.3d at 1289.

     Inferring knowledge of past events-- even notwithstanding a witness' denial of

such knowledge-- is consistent with the basic principle that: a trial court has the

prerogative to disbelieve even uncontraverted testimony when the inherent

improbability of the testimony itself furnishes a basis for discrediting the evidence.

Sabbagha v. Celebrezze, 345 F.2d 509, 511-12 (4th Cir. 1965); Albright v. United States, 732 F.2d 181, 188 (D.C. Cir. 1984), citing Wynne v. Boone, 191 F.2d 220, 222 (D.C. Cir. 1951). Evidence of discrimination by the employer is admissible regarding an employer's motive in taking adverse action against an employee. Hairston v. WMATA, 1997 U.S. Dist. Lexis 5188 (D.D.C. 1997)(Hogan, J.); Morris v. Washington Metro. Area Transit Authority, 702 F.2d 1037, 1045 (D.C. Cir. 1983).

> **b.**    **Evidence of Pretext Is Ample In This Case**

As shown, Defendant maintains that Whitley was not selected because Bernard Frank and a gentleman named Lavar Freeman thought others were better qualified. As we show below, that alleged reason is false and fails to justify Defendant's actions.

> **i.**    **Campbell's Admission That Whitley Would Not Be Promoted Because Of Her Prior Lawsuit Demonstrates Pretext**

In this case, Defendant's motivation and intent to retaliate is well demonstrated by Campbell's explanation of Defendant's retaliatory actions to Whitley. Thus, as shown in the facts, ¶259-268, Campbell described Defendant's retaliatory mindset to her openly in August 2004, during the same time period in which Campbell was attempting to oust Whitley's co-Plaintiff David Stevens. Campbell told Whitley that she had not been promoted because she that she had "gone after" "those white motherfuckers," by filing her EEO lawsuit. Campbell asked Whitley rhetorically: "do you think those motherfuckers are gonna forget?" For emphasis, he added: "do you think that?" Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them.

Campbell's response to Whitley's expression of lack of surprise that she was being retaliated against, was most revealing. He said Amtrak was "***not retaliating,*** " but

*rather was "just not moving* [promoting]" her. (Emphasis added.)  Campbell then said

that, in order to meet the legal definition of retaliation, Amtrak would have to do

something like fire Whitley.  Campbell summed it up: "It's a thing they say to you in

court: no harm, no foul." When Whitley exclaimed: "I might have to wait a whole year?"

Campbell responded that she might have to wait a "year and a half."

Campbell's August discussion with Whitley operates as an admission of a party

opponent, that Amtrak was "not moving" Whitley up to Foreman II because Amtrak's

management would not "forget" her very recent lawsuit against them.  Similarly

damning is Campbell's statement that Whitley might have to wait a year and a half for

promotion, not just a year.  The one year period was the length of time Whitley thought

was being applied to her based on the shampoo incident discipline, but Campbell's

statement signaled that the shampoo incident was not really the problem—the length of

the wait might be more than just a year—Whitley's prior lawsuit *was*.

This evidence alone requires trial in this case. See <u>Wright,</u> 187 F.3d at 1305 ("it

would be inappropriate to grant summary judgment to Defendant where Plaintiff has

provided ***direct evidence of discriminatory motive***, because the issue turns largely on

whose witnesses are believed: "Such a credibility determination can be made only after

trial. . ."); <u>Dunbar,</u> 285 F.Supp.2d at 1197.

Bob Frank, Bernard Campbell and Michael Kapela had authority and input

regarding the selection process.  All three knew that Whitley had engaged in protected

activity against Amtrak. Indeed, Campbell and Kapela were deposed in November 2003

in that litigation, and Frank was the recipient of Whitley's internal complaint regarding

Cover. Frank also displayed his displeasure toward Whitley for this in 2004, by refusing

to speak to her and by badgering her during her interview with redundant questions.

As shown in the Facts, ¶ 261, in approximately August 2004, Whitley asked Bernard Campbell why she didn't get the job. Whitley pointed out to Campbell that Whitley had never been in trouble or counseled.  He answered her by referring to her prior lawsuit, reminding her that she had gone after "those white motherfuckers," and asking her: "do you think those motherfuckers are gonna forget?"  For emphasis, he added: "do you think that?" Whitley answered him that she was not surprised that upper management would retaliate against her because she went after them. Campbell's response was to the effect that they were not retaliating, but rather were "just not moving" her.   Campbell then said that, to retaliate, they would have to do something like fire Whitley. Campbell said that: "It's a thing they say to you in court: no harm, no foul." Exasperated, Whitley asked him if she would have to wait a whole year to get promoted.  He responded: "Oh you might have to wait a whole year and a half. He also asked her:  "Why did you think you could do that?

Defendant professes a policy that prohibits promotion within one year after discipline.  In August 2004, at the time of her encounter with Campbell, Whitley had just learned that the one year rule on discipline was being invoked against her as an excuse for not promoting her.  Hence, her question to Campbell about waiting a "whole year". The jury could easily infer that Campbell's response—"you might wait a year and a half''—was telling, in that signified Campbell's recognition that it was not the disciplinary penalty of one year even, that was holding Whitley's promotion back, but rather that she might have to wait longer than that—a random length of time longer than just one year—since the real reason for the non promotion was that the "motherfuckers" weren't "forgetting" that she sued them.

Campbell was perfectly positioned to know what was really happening.  Indeed, his immediate supervisor Truitt had entrusted the selection of foremen II to him and the other assistant superintendents (Frank and Ice).  Moreover, Campbell had a special relationship with Kapela, his second line supervisor, Facts, ¶151-153, whom the jury should infer to have been one of the "motherfuckers" to whom Campbell referred.

Despite the existence of audio tape to the contrary, Campbell denied that parts of the conversation with Whitley occurred, while conceding that he couldn't deny the other parts.  In any event, a jury could easily infer that a supervisor with key decision making authority who admitted contemporaneously that Whitley was qualified and deserved a chance at promotion, admitted directly to her that she was not being "moved" because the "motherfuckers" just would not "forget" her lawsuit. This conversation renders Defendant's other explanations pretextual.

> **ii.        Selection Of At Least Five Candidates Kapela Found Or Would Find Unqualified Because They Were Without Supervisory Experience Shows Pretext**

As shown, Facts 176-178,189-191,278-289, candidates Carter, Burrows, Wilson, Shifflet, Swain and White were all selected for Foreman II despite being unqualified in Kapela's view on account of lack no supervisory experience.  Kapela might have discussed or been asked for input on these selections.  See Facts¶126, 145-146.  If not, Campbell and/or Frank would have made the selections, Facts ¶141, though Campbell has testified that only HR makes selections.  Facts ¶139.  Both men were well aware of Whitley's suit, and Campbell had just been deposed. Their elevation to Foreman II instead of the admittedly qualified Whitley demonstrates pretext.

> **iii.      <u>Campbell's Overtly False Testimony—Particularly In Denying That He Or Kapela Plays A Role In Selection-- Shows Pretext</u>**

Campbell did not want to take the fall for the retaliatory failure to promote Whitley, but nor did he want to attribute the decision to his boss, Kapela, to whom he is always deferential. Thus, he came up with what he must have thought was the perfect alibi. He testified that neither he nor Kapela plays any role whatsoever in the selection of Foremen II, and that HR makes selection decisions unilaterally. See Facts ¶139 .The difficulty for Campbell and his credibility is that Ray, Kapela, Truitt and Louers all contradicted that account. See Facts ¶119-146. Truitt went so far as to describe it as untruthful. See Facts ¶140.

Campbell provided other blatantly false testimony. Thus, he now denies having promised not to have the reprimand placed in Whitley's file, despite the fact that it was not "discovered" by HR until August, four months after issuance. See Facts ¶212, 249.

Campbell swore emphatically at deposition that he had never disciplined Whitley. The transcript shows that Campbell insisted on that answer emphatically until reminded of the specific incident, when he recanted. See Facts ¶216 . His vociferousness in defense of incorrect testimony reflects the mentality of "flight from the scene of the crime."

### iv.  Defendant's Failure To Identify Anyone As Accountable For The Decision Not To Promote Whitley Shows Pretext

Defendant cannot seriously justify its failure to promote Whitley, as it cannot say who decided not to do so. Defendant's brief states that her "interview performance was consistently evaluated as poor, on the mechanical questions asked in the interview," citing Declarations of Freeman and Frank.

The closest Defendant's briefing contention gets to identifying who made the decision is reference to the identical statements that: "I interviewed the applicants for

these positions and was one of the decision makers who determined which candidates should be offered the positions," offered by Frank and Freeman.  Dk 43-5.  Defendant offers these affidavits after having declined to name either Frank or Freeman in his initial disclosures or interrogatory responses as even having knowledge relating to the case until after the close of discovery. Dk 42- 2, 4, 5.  The statements also come after neither Kapela nor Campbell specifically identified Frank as the decision maker in their depositions. Campbell Dep. 17:8 to 17:15); Kapela Dep. 78-79 (not recalling if he ever discussed Whitley's promotion with Frank), yet Defendant has also refused to make Frank or Freeman available for deposition.  Dk  40 (Motion to Permit Additional Depositions).  The affidavits should accordingly be stricken.  See Pl's Motion to Strike.

Furthermore, the affidavit statements of Frank and Freeman are demonstrably not truthful.  Freeman did not "interview the applicants."  As shown in the Facts, ¶109-112,191-192, out of eighteen candidates reflected in HR's job file for Foreman II for the winter 2003/2004 timeframe, *none* were interviewed by Freeman and Frank interviewed approximately half of them.  Defendant's list and the applicant flow logs (PDE 24, 37) reflect consideration of five candidates during the fall 2004 time frame: Whitley, Eckstein, Jefferson, Aikens  and Grimes.  Shortly thereafter, Wilson was hired.  Of those six, the only evidence of record is that Freeman interviewed only one applicant—Whitley-- not "the applicants."  Indeed, as shown in the Facts, ¶ 191-194, Freeman was not even assigned to work the Mechanical Department's recruitment by his HR department.  Frank interviewed Eckstein and Jefferson in addition to Whitley, but did not interview Grimes or Wilson.  This is consistent with the general fact that the interview panel is not the same for all applicants.  Tana Dep. at 99-100.

Defendant previously sought summary judgment without identifying who rejected Whitley.  Dk 7-2.  Despite months of discovery devoted to the subject of who made the decision and how, Defendant is still hiding the ball, blatantly conveying the impression that retaliation was at work.  Summary judgment must be denied.

> **v.     Defendant's Failure To Promote Whitley Despite "Desperately Needing" Her, And Allegedly Overwhelming Support Of Her Promotion By Messrs. Kapela, Campbell And Louers, Shows Pretext**

As shown, Facts ¶ 121, 129, Freeman's boss, Ray, has admitted that the authority for promotions resides in the Mechanical Department, not with her subordinate Freeman—who doesn't even "handle" Mechanical.  It is undisputed that Kapela is the Master Mechanic for Washington, D.C., the second-line supervisor of Campbell, the Assistant Superintendent who was very familiar with Whitley's work and could have remained her second line supervisor had she been promoted, and the third line supervisor of Louers, who was Whitley's direct supervisor and could have continued to supervise her had she been promoted to Foreman II.  All three testified that they supported Whitley's application for promotion, and all three professed not to know why their alleged wish had not come true.  Facts ¶154-160.  Indeed, Louers viewed Mechanical as "*desperately needing*" Whitley's leadership (emphasis added).  Facts ¶162.  Frank has provided an affidavit without Plaintiff obtaining an opportunity to cross-examine, which states that Whitley's interview was deficient. However, Tana, who was at the interview with Frank, testified, as shown, that Frank said in his presence that the interview was not the issue. Facts ¶ 238.

Considering that AMTRAK "always" had Foreman II openings, and specifically had them during the relevant time, it strains credulity that Louers, Campbell and Kapela

could have all supported the "desperately needed" Whitley's promotion, but it could not be effected anyway because—although they don't know it to be the case-- the stealthy Frank and powerful Freeman nixed it (even though they refuse even in the unsworn context to assume full responsibility for the decision).

> **vi.    Defendant's False Denigration Of Whitley's Credentials And Self-Contradictory Assertion that She Was "Not Qualified" For the Foreman II Position Evidences Pretext**

Evidence indicating that an employer misjudged an employee's performance or qualifications is relevant to the question of whether its stated reason is a pretext masking prohibited discrimination. Fischbach v. District of Columbia Dep't of Corrections, 318 U.S. App. D.C. 186 (D.C. Cir. 1996), citing Parker v. HUD, 282 U.S. App. D.C. 17, 891 F.2d 316, 322 (D.C. Cir. 1989)(noting that if the employer made an error too obvious to be unintentional, perhaps it had an unlawful motive for doing so). In order for an employer's proffered non-discriminatory basis for its employment action to be considered honestly held, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. Aka v. Wash. Hosp. Ctr., 156 F.3d at 1295; Ferguson v. Small, 225 F. Supp. 2d 31, 39 (D.D.C. 2002).

In this case, Defendant contends (Dk 43-1 FN 2) that Whitley was not qualified to serve as a Foreman II, and that summary judgment is therefore appropriate.  Defendant has submitted and re-submitted a false affidavit from its HR Manager, Sarah Ray, so stating.  Docket Entries No. 7-3, 43-5; Statement of Material Facts (Dk 43-2) ¶ 20.

> **(A)    Whitley Satisfies The Position Description Requirements**

According to Amtrak's own policies, it cannot be disputed that Whitley was indeed qualified.  Thus, as shown in the Facts ¶10-12, it is undisputed that the Position

Description for a Foreman II describes the "work experience requirement" as requiring three years of satisfactory work performance, familiarity with passenger equipment/locomotives, required tools and various machinery." PDE 1.

As shown in the facts, Facts ¶ 10-11, explicitly given the opportunity, Defendant's witnesses declined to disclaim that Exhibit 1 is the relevant job description, nor have any of those witnesses said that Whitley did not meet the work experience requirement.  Instead, Kapela, Campbell and Louers all agree that Whitley is qualified, and Ray admits that she treated Whitley as if she were qualified.  The only manager disagreeing is the stealth "decision maker," Frank, who avers without cross examination that he "believes" Whitley is not qualified based on her lack of experience with the mechanical crafts and her poor performance during the interview." Dk  43 ¶ 15.

Defendant's misleading briefing assertion (Dk 43-1) that the "position description" is a different document-- Exhibit A to Ray's Affidavit—is easily rebutted by a casual glance at that document which is in fact a vacancy announcement, and which Ray never claimed was the position description, Id, and as shown in the facts, ¶10-11, concurs that Exhibit 1 is the position description.

For Defendant, at best, Frank's statement *creates* a *disputed* factual issue.  In no way can it negate the admissions of all the other principals who would have participated in the process and exercised authority over it, and those thereby stand *undisputed*.

### (B)    Defendant's Twice Interviewing Whitley Shows She Was Qualified

Defendant's witnesses have conceded that to be interviewed, a candidate must first be recognized as qualified by HR.  Facts ¶ 114-115 . It is undisputed that Whitley was interviewed twice.  Whitley, therefore, has shown that Defendant's assertion that

she was not qualified for the Foreman II position because she lacked the required

training is obviously false and a pretext for unlawful retaliation.

### (C) Kapela's Admission Regarding The Importance Of Supervisory Experience Illustrates Whitley's Satisfactory Qualifications

Defendant's attempt to ignore the record with regard to Whitley's many strong

qualifications for Foreman II shows Whitley's qualifications, and thus, pretext.  PDE 1,

the Position Description, states that a candidate for Foreman II must "have

demonstrated the ability to lead, instruct, motivate and assist assigned work force in

performing. . . in a safe, efficient and cost-effective manner."  As shown, Facts ¶ 4,

Campbell admits that Whitley was a good supervisor.  It is undisputed that she

possessed these skills.  As noted, Defendant declines. Thus, as shown Facts ¶ 147,

Kapela has admitted that fifty percent of the job of a Foreman II is managing.  It is

undisputed that Whitley is a highly successful supervisor under Campbell's chain of

command.  Moreover, a review of the selectees' applications shows that none of them

had experience in more than one of the four skilled crafts.

### (D) The Existence And Application Of The Ninety Day Probationary Period Aids Whitley's Qualifications, Rendering Non-Promotion Pretextual

As shown, Facts ¶ 18, AMTRAK permits new Foremen II to learn skills and

improve their knowledge during a ninety-day probationary period, after which they are

fired if they cannot do the job.  Foreman II Supervisor Louers, who was intimately

familiar with Whitley's background as her supervisor, testified that she needed no such

help because she could already do the job.  The fact that Defendant could have fired

Whitley in the first ninety days if she could not perform the duties, should have

encouraged it to promote her in the face of expensive vacancies.

**(E)     Selectees Had No Experience In Most Of The Crafts**

Defendant selected numerous candidates for Foreman II.  It is undisputed that the essence of the job is supervision, not handling tools directly.  See Facts ¶ 3, 6, 8.  It is also undisputed that a Foreman II must be able to supervise all the crafts, not just one. Campbell Dep. at 104-105.  Defendant maintains that expert knowledge of the crafts is the true litmus test, however, under that standard very few of its selectees pass muster.

Thus, Defendant gave a job to Rodney Wilson, although his application indicates that he has never worked on trains, has no air brake certification, has no experience with locomotives, no experience with the WMSS system and has never supervised anyone. Kapela even admitted that he should not have been hired! Facts ¶ 281. Whitley obviously had far more exposure to train repair than Wilson.  Similarly, selectee Robert Grimes had no experience whatsoever in fixing trains and no relevant certifications, Whitley Affidavit Exhibit 13, and applicant Burrows was strictly a car repairman with no background in the other three crafts.  PDE 87.  Defendant's selection of candidates who lacked knowledge of multiple crafts belies its contention that Whitley needed such knowledge.

**(F).     Selection Of Rodney Wilson Demonstrates Pretext**

Frank averred that Whitley was "not qualified" in his view because of her performance in her interview.  However, Frank's reputation for veracity is poor, and Tana testified specifically, see Facts ¶76, that Frank attributed his opposition to Whitley not to interview performance but rather to mechanical experience.  Defendant can hardly claim that Whitley is unqualified on account of her interview performance, but not even require outside candidate Wilson to undergo an interview, as it did.

### (G).    AMTRAK'S Contention That Whitley Is Not Qualified, Despite Possessing 238 Certification, While Others Who Lack The Certification Are Viewed As Qualified, Shows Pretext

Whitley took all the required classes by June 2004 while working full-time as a Foreman I and received her certification card showing the courses taken and the dates she passed certification.  PDE 22.  PDE 2 is a job announcement generated by AMTRAK stating that a Foreman II applicant as of July 2004, "[m]ust have CFR 238-206 certifications," and "Must hold air brake certification."  It includes three statements that the applicant "must" have certifications, including air brake certification.  Whitley had the certifications, while successful candidates Grimes and Wilson did not.  The contention that they were qualified while she was not is severely tested by these facts.

### vii.    Contention That Whitley Was Not Selected Because *Others* Were Comparatively *Better Qualified* Shows Pretext

Defendant (Dk 43-1 at 12) contends that "Whitley cannot compare her qualifications to the successful candidates."  However, this falls on Defendant's failure to provide any evidence that it is in fact a motivating reason.  Defendant (Dk 43-1 at 16) asserts that the decision not to promote Whitley was made solely by Frank and Freeman, even though the closest things to supporting evidence are their identical statements that they "participated".  However, even assuming, *arguendo*, that they decided, there is no evidence whatsoever that either of them, or anyone else at AMTRAK, ever compared Whitley's qualifications to those of successful candidates.  In fact, the opposite is true.

Thus, Wilson was never interviewed and there is no evidence he was ever compared by AMTAK to anyone else.  Grimes was interviewed by neither Frank nor Freeman, so they could not have compared Whitley to him either. Indeed, the claim that

Freeman used Whitley's interview to compare her to anyone is completely negated by the fact that no documentation indicates that he interviewed a single other candidate.

As shown in the facts, ¶ 245, 249, 273, pretext is further demonstrated by the fact that Ray's subordinate Taylor Cannon three times informed Whitley in August and September 2004, that she was not selected. On the first and third of those occasions, he attributed it to the selection of others allegedly better qualified. Those letters were untruthful. A review of Defendant's documentation reveals that at the time of the first letter (PDE 18), August 6 2004, Defendant had openings for Foremen II but had rejected—not selected-- the only other candidate it had interviewed, Lenford Chapman. See PDE 2 (seeking candidates for Foreman II on 7/27/04); PDE 4 (indicating the existence of two vacancies on 7/17/04); PDE 24 (applicant flow log). As shown, Defendant did not select another candidate until August 19, when it offered a position to the just-interviewed Grimes. PDE 37. Thus, the first rejection could not have been caused by the selection of other, "better qualified candidates." See Facts ¶ 245.

On September 2, 2004, Cannon-- after the intervening letter informed Whitley that she supposedly was not being promoted because of discipline, instead of "better candidates"—wrote his second letter that used the assertion that Whitley was rejected because of the alleged selection of "better qualified candidates." However, although Defendant had hired Aikens during the intervening month, Cannon's use of the plural was untruthful because Aikens was the only candidate hired. Moreover, based on the applicant flow log and Defendant's October 13 hiring of Wilson, it is clear that Defendant was still rejecting Whitley in a context in which it was seeking Foremen II to fill vacancies and avoid expensive overtime, but had no other candidates to fill them. Defendant's subsequent rush to hire the less-qualified Wilson without even the

supposedly mandatory interview later demonstrated how badly AMTRAK wanted the position filled, its dearth of other candidates, and its determination to retaliate.

Between the hiring of Wilson in October without an interview and Grimes' hire in December, Defendant still had at least one Foreman II vacancy that it was trying to fill.  PDE 37.  It again had no other candidates available, but again refused to promote Whitley.  See Facts ¶ 197, 200, 202, 203.  Defendant's actions during this period demonstrated once again that Defendant's desperate desire to thwart Whitley despite her qualifications and preparation for the job.  Defendant's actions—contrary as they were to Defendant's own business interests-- were obviously retaliatory.

### viii.    The Contention That Whitley Was Not Selected Because Frank And Freeman Were Not Impressed With Her Interview Answers Is Pretextual

An employer's asserted strong reliance on subjective feelings about the candidates may mask discrimination. Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1298 (D.C. Cir. 1998).  Here, Defendant claims to have relied on the reactions of interviewers Frank and Freeman.  However, as shown, Defendant never even mentioned either of these persons as even having knowledge related to the case until after the close of discovery. Further, neither Frank nor Freeman actually takes responsibility for the decision, each preferring in his affidavit that he was just one of the decision makers. Defendant gave Whitley no response to her interview for a full three months even as it had vacancies. See Facts ¶ 203. Frank and Freeman did not interview all the other candidates who did emerge during that time frame. See Facts ¶ 201. Freeman's sole role in the interview was solely to "fill in for Sarah Ray."  See Facts ¶ 193.  According to Tana, Whitley did not fail in her interview and he did not tell her she was being rejected as a result. See Facts ¶ 244. Moreover, as noted, there are no reliable documents supporting the contention that

Frank's and Freeman's reactions to the interview caused the rejection. See Facts ¶ 244, 291. In this context, this alleged reason is obviously pretextual.

### ix.     The Reprimand Did Not Prevent Whitley's Promotion

Defendant Dk 43-1 at 9-11 asserts that Whitley was disqualified for consideration for promotion because she received discipline in April 2004. Defendant nowhere contends that the alleged sole decision makers, Frank and Freeman, were ever aware of such discipline, however, much less relied upon it. Nor does Defendant say who decided to apply the alleged disciplinary rule against Whitley. As we show below, there are myriad critical disputes of fact regarding the discipline issue requiring trial.

As shown in the facts, ¶ 254, Campbell has admitted that Whitley should not have been disciplined for the shampoo incident. PDE 50. He coerced Whitley into signing a waiver of her right to a hearing on Campbell's false allegation, despite the fact that the charge that her equipment was in disrepair was a complete fabrication. As shown, Facts, ¶ 207-208, Campbell shrewdly applied both the carrot and the stick: he promised Whitley that the reprimand she would receive if she signed would not be made part of her official record (and therefore not adversely impact her attempt at promotion), while threatening credibly that the discipline she would receive pursuant to the internal AMTRAK hearing controlled entirely by management would be worse if she refused to go along. Relying on Campbell's promise, neither Tana nor Whitley nor Louers ever expected the discipline to impede promotion. Facts ¶ 214, 251, 257.

Campbell apparently held the discipline in abeyance for approximately four months. Thus, as shown, Facts ¶ 220, HR officers are trained to check the file for discipline, and to send out a letter to a job applicant if there has been discipline within the last year, informing the applicant that she is therefore ineligible for promotion. PDE. 20;

Ray Dep. 132-134, 155.  However, although Whitley was interviewed on May 28, nearly two months after issuance of the reprimand, it was only when Whitley and Tana pressured HR for an explanation as to why she had not been promoted—in July 2004 when there were vacancies and few if any qualified candidates—Taylor Cannon suddenly discovered the reprimand, told Whitley it precluded her promotion for one year and corresponded with her that that was now the reason  for rejection of her promotion.  Facts ¶249.  When Tana and Whitley communicated with Campbell about this, he feigned ignorance of the disciplinary rule and how Cannon could have found out about the deferred reprimand, and said he would take care of it. Facts ¶ 250 . Campbell told Tana that Tana's presentation on Whitley's innocence "opened his eyes," and Campbell communicated to Tana such that Tana thought the discipline was "dismissed."  Facts ¶ 255.  Campbell did not reply to Tana's September 1, 2004 letter confirming the revocation.

However, the very next day, on September 2, 2004, although Ray admits that under AMTRAK procedures an applicant should receive only one rejection letter for a particular job posting, Cannon sent Whitley her third rejection letter, returning to the reason Cannon had asserted before the discipline dust-up:  that "other candidates. . . more closely met the needs," and notably omitting any mention of discipline. Facts ¶ 273-274 .

Campbell now self-servingly denies having rescinded the discipline he earlier self-servingly denied having issued, though he admits receiving Tana's confirming letter.  Facts ¶ 217, 251, 255.

It is undisputed that despite the revisited excuse that others were better, as shown, ¶302, Defendant had not selected others who were better qualified, as only one selection had been made, and Defendant continued to have openings.

Defendant fails to contend that Whitley was not promoted because of the discipline—as opposed to contending simply that she was "ineligible" because of it. In view of Campbell's admission to Tana that the discipline would be revoked and the circumstantial evidence surrounding Cannon's behavior that confirms that it was, the shampoo incident—which Defendant does not in any case characterize as the actual reason for the failure to promote—is an irrelevance here.

At least three Foreman II selections occurred after the disciplinary action was withdrawn by Campbell. Dk 43-5 Exhibit B. However, at least one of the applicants, Wilson, had not yet applied as of September 2. As shown elsewhere, he was not qualified due to lack of supervisory experience and was never interviewed. Based on all the above, it is apparent that the alleged "discipline" is both irrelevant and pretextual.

      **x.**        **<u>Temporal Proximity Shows Pretext Here</u>**

Defendant identified three individuals as having knowledge of Whitley's non-promotion in its Initial Disclosures and Interrogatory Responses: Ray, Campbell and Kapela. Ray assisted in answering Interrogatories in Whitley's prior case, while the other two were deposed on November 18 and 19, 2003, less than a month before Whitley's interview with Frank, Aaronson and Ice for Foreman II and less than two months before the selections of unqualified candidates instead of Whitley. Whitley's first case then remained active during the relevant time period of this case. Both Campbell and Kapela were asked about Kapela's personal involvement in discriminatory actions against Whitley in those depositions, including whether Kapela had previously promoted a

girlfriend ahead of Whitley and the vastly better qualified Ladson. As Tana testified,

Frank knew about Whitley's suit as well. See Facts ¶ 79. Under the circumstances the

requisite temporal proximity has indisputably been demonstrated.

xi.    **Denial That Frank Knew About Whitley's Suit Shows Pretext**

Defendant's briefing position is that Frank did not know about Whitley's prior

lawsuit. Dk 43-1 at 16. In fact, Tana testified that he did. See Facts ¶ 79. Moreover, that

false assertion is set forth without any record reference because Frank—even in a self-

serving affidavit, refused to provide such testimony. Dk 43-5. Instead, he averred to the

entirely distinct proposition, that he "did not consider" the lawsuit. Dk 43-5 ¶ 18.

Defendant's own Motion, however, attaches this Honorable Court's decision granting

summary judgment to AMTRAK in the prior case Dk 43-3 at 16, and points out that

Frank was involved in responding to Whitley's internal EEO complaint. Accordingly,

Defendant's contentions regarding Frank's lack of knowledge are unavailing and indeed

pretextual. See Macey v. World Airways, Inc., 14 Fair Empl. Prac. Cas. (BNA) 1426; 1977

U.S. Dist. LEXIS 17148 (N.D. Cal. 1977) ("The lack of credible justification for the

discharge, coupled with Kelly's initial effort to conceal the fact that at the time he knew

of plaintiff's FEPC complaint, compel the conclusion that the discharge was at least

partially in retaliation and a further manifestation of the discriminatory treatment of

plaintiff by World employees"); Sheridan v. E.I. Dupont De Nemours & Co., 100 F.3d

1061 (3rd Cir. 1996)(en banc)( "Resort to a pretextual explanation is, like flight from the

scene of a crime, evidence indicating consciousness of guilt, which is, of course, evidence

of illegal conduct"), quoting  Binder v. Long Island Lighting Co., 57 F.3d 193, 200 (2d Cir.

1995).

xii.    **Whitley Was Not Ineligible Prior To Obtaining Her Certification**

Defendant (Dk 43-1 at 8-9) claims that Whitley was not eligible for promotion prior to obtaining her certification.  However, Defendant (Id. at 18-19) just a few pages later admits that "new hires could obtain the necessary certification during their 91-day period."  Defendant does not claim that Whitley would not be technically entitled to the same rights as any other "new hire." Accordingly, this argument is pretextual.

Furthermore, Defendant's evidence demonstrates that it hired or promoted many individuals to Foreman II during the relevant period who lacked the certifications. Indeed, as shown in the facts and admitted by the managers, among myriad available examples, it is undisputed that selectees Grimes and Wilson lacked certification but were selected anyway—Wilson without so much as an interview.

Defendant's witnesses have repeatedly stated that they do not follow the Position Description requirement of 238 certification, preferring to permit candidates to obtain the certifications during the 90-day probationary period if necessary.   See Facts ¶ 18. Moreover, Louers testified that Whitley did not need that period to improve her skills or obtain certification because she already knew the job and had the certification. Accordingly, the correct way to view the certifications is that, as Truitt testified, they were extremely important to Defendant, and obtaining them greatly strengthened a candidate, but they could still be attained during probation for a candidate who was selected without them. See Facts ¶ 21-22.

Defendant (Dk 43-3 at 85-88) pretends that Whitley's deposition testimony in which she discussed the certifications reflected an "admission" that Whitley was not qualified before she obtained the certifications when in fact she stated that she *was*

qualified.  Moreover, Defendant interviewed Whitley in December 2003, before she received her certifications, and Defendant admits that the offer of an interview constitutes admission that the candidate is qualified.  See Facts ¶ 93. Based on all this, the reliance on the lack of certification before Whitley finished obtaining it is yet another pretext.

5.      **DEFENDANT'S CONTENTION THAT IT WOULD HAVE FIRED WHITLEY FOR TAPING FURTHER DEMONSTRATES RETALIATORY MOTIVE**

Defendant (Dk 43-1 at 20) maintains that Whitley admitted she would have been fired for taping conversations.  It then contends that she should be precluded from recovery, and that under McKennon v. Nashville Banner Publ. Co., 513 U.S. 352 (1995), she is precluded from damages accrued after Amtrak discovered her taping in June 2005.  Amtrak's admission that it would have fired Whitley further demonstrates its retaliatory intent, and the argument that she should be precluded from damages after June 5, 2005 is without merit.

Where an employer seeks to rely upon after-acquired evidence of wrongdoing, it must first establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge. McKennon v. Nashville Banner Publ. Co., 513 U.S. 352, 362-363 (U.S. 1995) After-acquired evidence does not bar recovery because "the employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason." Id. at 360.  Hunter v. Ark Restaurants Corp., 3 F. Supp. 2d 9, 15 (D.D.C. 1998)(Harris, J.), citing McKennon, supra, 513 U.S. 352.  The employer has the burden of showing that it would have discharged the employee because of the misconduct, not simply that it could have done so. Frazier

<u>Indus. Co. v. NLRB</u>, 341 U.S. App. D.C. 393 (D.C. Cir. 2000), citing cases.

Here, Defendant discriminated and retaliated against Whitley by repeatedly denying her promotion in favor of unqualified candidates. As shown, it lied and prevaricated over and over again about the issue. In a response conceived in an effort to obtain evidence to support her claims, Whitley successfully taped Campbell admitting to the retaliation on Amtrak's part, as discussed at length above. In addition to its legal obligations, Amtrak has undertaken policies against discrimination and retaliation, including provision of an internal complaint procedure. Whitley Affidavit Exhibit 11. Had Defendant discovered Whitley taping its Assistant Superintendent stating management's policy of EEO retaliation against Whitley and fired her, Whitley would have had the right to protest through Defendant's system that such a discharge was improper and Defendant would purportedly investigate and respond fairly to such a charge. Accordingly, Defendant has not shown that it would have fired Whitley for discovering her taping of its agents' admissions of discrimination, and cannot invoke McKennon to buttress its position.

Finally, Defendant's assertion that it would have fired Whitley regardless of its legal and internal policy obligations, evidences its hell-bent intent to retaliate against her, particularly considering that Amtrak has not disciplined Campbell or anyone he refers to for retaliation, preferring instead to doggedly defend Whitley's suit.

Indeed, Amtrak openly signals its retaliatory motive and intent by failing to discipline Campbell for threatening to terminate Stevens on May 30, 2004, in response to *his* complaint of discrimination, then firing Stevens when he did not desist in his protected activity. Indeed, the tone and manner of Campbell's tirade in which he followed Stevens and yelled at him that Campbell was not one to be "fucked" with, and

that Campbell  ". . . "will destroy a mother fucker like [Stevens]," and: "if you ever put

my name in anything else, you would wish you didn't," is highly probative proof that

Amtrak reacts EEO protests and lawsuits such as Whitley'S as an affront to which the

response is retaliation. Defendant's retaliatory animus precludes summary judgment.

### C.     WHITLEY WAS DENIED PROMOTION BASED ON SEX

To set forth a prima facie case of sex discrimination, Whitley must show:

(i) that [s]he belongs to a racial minority; (ii) that [s]he applied and was
qualified for a job for which the employer was seeking applicants; (iii)
that, despite [her] qualifications, [s]he was rejected; and (iv) that, after
[her] rejection, *the position remained open and the employer continued
to seek applicants from persons of complainant's qualifications*."

(emphasis added.)  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817,

1824, 36 L. Ed. 2d 668 (1973); EEOC v. Catholic University of America, 317 U.S. App.

D.C. 343; 83 F.3d 455, 475 (D.C. Cir. 1996). If Defendant presents a legitimate, non-

discriminatory reason, Plaintiff must prove pretext or otherwise demonstrate unlawful

motivation under the standards set forth above, with respect to retaliation.

Whitley was interviewed, Facts ¶ 3, 33, 161-175, 291-296, but was not promoted,

and nine selectees for the Foreman II positions were men, of whom at least 4 (Shifflet,

Burrows, Carter, Wilson) were unqualified according to Kapela's own testimony.  See

Facts ¶177, 178, 189-191, 289;  PDE 14 Exh. B.  It is undisputed Defendant kept accepting

applications as it was rejecting Whitley, and indeed made additional selections. Facts ¶

¶177, 178, 189-191, 289. Whitley incorporates by reference her argument regarding

pretext as set forth under retaliation.  Trial is necessary on sex discrimination.

### VII.     CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment should be denied

in its entirety.

Respectfully submitted,

THE GOLDSMITH LAW FIRM, LLC


/s/
_____
Leizer Z. Goldsmith   D.C. Bar No. 419544
5335 Wisconsin Avenue NW Suite 440
Washington, D.C. 20015
Telephone: (202) 895-1506
Facsimile: (202) 318-0798
Attorney For Plaintiffs Whitley & Stevens



Dated: May 10, 2007