JRC      IN THE UNITED STATES DISTRICT COURT
              DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - -x
                                :
David B. Stevens, et al.        :
                                :
         Plaintiffs,            :
                                : Civil Action No.
                                : 1:05CV01924-RCL
     v.                         :
                                :
National Railroad Passenger     :
Corporation                     :
("Amtrak"),                     :
                                :
         Defendant.             :
- - - - - - - - - - - - - - - -x


                    Wednesday, January 10, 2007
                    Washington, DC


     The deposition of MARGARET TIERNEY was

called for examination by counsel for the Plaintiff

in the above-entitled motion, pursuant to notice,

in the offices of, 5335 Wisconsin Avenue, N.W.,

Suite 440, Washington, DC 20015, convened at 1:02
p.m. before Jacqueline Richards-Craig, a notary
public, when were present on behalf of the parties:

Page 2

```
 1   APPEARANCES:
 2      For the Plaintiffs:
           LEIZER Z. GOLDSMITH, Esq.
 3         Leizer Goldsmith
 4         5335 Wisconsin Avenue, N.W.
 5         Suite 440
 6         Washington, D.C. 20015
 7         (202) 895-1506
 8
 9
10
11
12
13      For the Defendant:
14         KEITH FISCHLER, ESQ.
15         KRUCHKO AND FRIES
16         1750 TYSONS BOULEVARD
17         SUITE 560
18         MCLEAN, VA 22192
19         (703) 734-0554
20
21
22
```

Page 3

```
           EXHIBITS
                                    MARKED

 No. 38                               39

 No. 39                               47

 No. 40                               47

 No. 41                               49

 No. 42                               57

 No. 43                               58

 No. 44                               61
```

Page 4

```
                 PROCEEDINGS
                    (1:02 p.m.)
 Whereupon,
         MARGARET ANN TIERNEY
 was called for examination by counsel for the
 Plaintiff and having first been duly sworn by the
 notary public, was examined and testified as
 follows:
         EXAMINATION BY COUNSEL FOR PLAINTIFF
     BY MR. GOLDSMITH:
     Q   Good afternoon, Ms. Tierney. Could you say
 your whole name for the record, please.
     A   Margaret Ann Tierney.
     Q   My name is Leizer Goldsmith. I am an
 attorney and I represent David Stevens as well as
 Mae Whitley in a law suit that they brought against
 Amtrak. Have you ever had your deposition taken
 before?
     A   Yes.
     Q   So you have some familiarity with this.
 I'm going to be asking you questions and Mr.
 Fischler may have objections from time to time. If
```

Page 5

```
 he does, let him express his objection, and then you
 can answer the question, afterwards, anyway, unless
 he tells you not to. Okay? Another good thing to
 remember is that the court reporter can't get two
 things at the same time. So, if I'm talking you've
 got to let me finish, and if you're talking I've got
 to let you finish, so that we can have a transcript
 that everyone can read afterwards. Is that Okay?
         Where do you reside?
     A   Baltimore, Maryland.
     Q   And, what year were you born in?
     A   '56.
     Q   Can you tell me if you're presently
 employed?
     A   Yes.
     Q   Do you work for Amtrak?
     A   Yes.
     Q   For how long have you worked for Amtrak?
     A   26 years.
     Q   What's your current position with Amtrak?
     A   HR. Human Resources Officer.
     Q   Is there any reason why - are you taking
```

Page 6

1 any medications or do you have any medical
2 conditions that would inhibit your ability to answer
3 questions truthfully today?
4   A   No.
5   Q   Where's is your office, your duty station
6 for Amtrak these days?
7   A   Washington Union Station.
8   Q   How long have you been working at
9 Washington Union Station?
10  A   I'd say 15 years.
11  Q   Who's your immediate supervisor?
12  A   Deborah Jowers.
13  Q   How does she spell that?
14  A   J-o-w-e-r-s.
15  Q   Do you know how she spells Deborah?
16  A   D-e-b-o-r-a-h.
17  Q   And for how long has she been your
18 supervisor?
19  A   For about two and a half years.
20  Q   Do you know what her title is?
21  A   Manager; Drug and Alcohol Programs.
22  Q   So would it be accurate to say that you

Page 7

1 work in the Drug and Alcohol Programs area? What's
2 it called - what's your - is it part of your
3 title?
4   A   No, HR Officer isn't a title. Human
5 Resources Officer is the title and the department is
6 Human Resources Drug and Alcohol Programs.
7   Q   Prior to Ms. Jowers, who was your
8 supervisor?
9   A   Bohdan Baczara.
10  Q   How is that spelled?
11  A   B-o-h-d-a-n. Baczara, B-a-z - B-a-c-z-a-
12 r-a.
13  Q   Okay. And, for how long was that
14 individual your supervisor?
15  A   Five or six years.
16  Q   Are you familiar with someone named Malva
17 Reed?
18  A   Yes.
19  Q   Who's Malva Reed?
20  A   Senior Director, Human Resources, Health
21 Services Drug and Alcohol Programs.
22  Q   Are you underneath her chain of command?

Page 8

1   A   Yes.
2   Q   Is she your second line supervisor?
3   A   Yes.
4   Q   Where is her duty station?
5   A   Washington Union Station.
6   Q   Is your department a national - do you
7 have responsibility for the administration of drug
8 and alcohol programs for Amtrak nationally?
9   A   Yes.
10  Q   What's the highest level of education that
11 you have?
12  A   I have high school, and a couple of courses
13 in college - college courses.
14  Q   Can you explain to me what the Human
15 Resources Drug and Alcohol Programs Office does?
16  A   It administers the Drug and Alcohol
17 Program.
18  Q   Can you flush that out a little bit for me,
19 as far as what you do day to day there?
20  A   It's - they have the random Drug and
21 Alcohol Program which is done nationally. They have
22 the "For Cause" Drug and Alcohol Program which is -

Page 9

1 consists of "road violations", "reasonable
2 suspicion" and "accident injury". We have the
3 "follow-up" program for anyone that had a "non-
4 negative" drug test result, and "return to duty"
5 program. And, then we have the FMCSA "random drug
6 and alcohol" program.
7   Q   And what do you spend most of your own time
8 doing, in that job?
9   A   Mostly, administering the program itself.
10 Overseeing our vendor -- vendors when they perform a
11 collection, any problems that have arisen.
12  Q   What else do you do?
13  A   That takes my whole day.
14  Q   That takes your whole day, everyday? It's
15 pretty much interfacing with the vendors and seeing
16 what the vendors are doing, on your behalf?
17  A   Well, yes because the testing - the
18 collections after the collection is performed, it
19 goes through our laboratory, through a medical
20 review officer, and then reported to the - what's
21 considered - called designated employee
22 representatives, that's reported to us.

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21

Page 10

1  Q  You mentioned the vendors. How many
2  different vendors are there performing on behalf of
3  Amtrak in the Drug and Alcohol area?
4  A  One.
5  Q  What's that company called?
6  A  E-M-S-I. Emergency Management Information
7  System.
8  Q  You said, E-M-S-I?
9  A  E-M.
10 Q  I-S or?
11 A  E-M - E-M-S-I. Emergency Management
12 Systems, Inc. I'm sorry. Emergency Management
13 Systems, Inc. I referred to it as the E-M-S-I.
14 Q  Okay. For how long has that been the only
15 vendor involved in the programs with you?
16 A  The contract with E-M-S-I - it's not very
17 old because - no, not very old.
18 Q  Was there a different contractor before
19 that?
20 A  Yes.
21 Q  Who was that?
22 A  It was ADP.

Page 11

1  Q  Do you know what that stands for?
2  A  Oh gosh, you know what? I can't.
3  Q  You don't remember? Are you familiar with
4  a company called, Concentra?
5  A  Yes.
6  Q  Did Amtrak ever have a relationship with
7  Concentra?
8  A  We have medical facilities that have our
9  protocols to our - throughout Amtrak.
10 Q  And is Concentra - does Concentra run one
11 of those medical facilities?
12 A  Concentra is one of the medical facilities,
13 and I think Concentra's throughout our system.
14 Q  Are there other medical facilities within
15 your system?
16 A  Yes. There's a total of - I want to say
17 one hundred fifty.
18 Q  And, how many different companies run
19 those, as far as you know?
20 A  Well, there's different names for each
21 facility -- I mean they're throughout the system.
22 U.S. Health Works, have Concentra, Mercy Works.

Page 12

1  Q  Those are different companies from each
2  other, as far as you know?
3  A  They're all individual medical facilities.
4  Q  Approximately how many different companies
5  do you think - are run medical facilities that
6  administer your program?
7  A  Oh, I'd say approximately one hundred
8  fifty, I'd say.
9  Q  What services - let me ask you this, the
10 Concentra - Are you familiar with the Concentra
11 facility in Prince George's County?
12      MR. FISCHLER: What do you mean by
13 familiar?
14 A  Yeah.
15      MR. FISHCLER: You can answer.
16 A  I'm not sure I know what you mean,
17 familiar?
18 Q  Is there a Concentra facility, in Prince
19 George's County, that administers drug test on
20 behalf of Amtrak?
21 A  Do you  - I would know, probably more -
22 like a location, like - there's -- cause there's so

Page 13

1  many of them, not all of them are approved. Like
2  Lanham, Maryland, I know Baltimore, I know they have
3  one at - they have one in California.
4  Q  What tasks specifically does the Lanham,
5  Concentra do on behalf of Amtrak?
6  A  They have a set of protocols, and they
7  handle the drug and alcohol collections. I can't
8  answer for the medical side, but they have a set of
9  protocols that they follow.
10 Q  What do you mean the medical side?
11 A  There's - for physical examinations.
12 Q  Do they perform physical examinations that
13 are ordered by Amtrak?
14 A  Yes.
15 Q  On Amtrak employees?
16 A  Yes.
17 Q  Do they provide any other medical services
18 to Amtrak employee that are mandated by, or
19 contracted for, by Amtrak other than drug screening
20 and physical examination or --?
21 A  Not that I know of.
22      MR. FISHCLER: Let him finish the question

Page 14

1  before you answer.
2  A  I'm sorry.
3  Q  Now, you testified that you - that you
4  interfaced with - I don't think that was your word,
5  I think that was mine, but I think it's a fair
6  characterization that you interfaced with the -
7  with individuals from facilities that provide drug
8  testing services for Amtrak. Is that correct?
9  A  Yes.
10 Q  And, can you give me a little more detail
11 of what you do when you're interacting with them?
12 A  I'm not sure of what you mean - how do I
13 interact with them?
14 Q  What do you - do you speak with them?
15 A  At times.
16 Q  What do you speak with them about?
17 A  It depends on the case.
18 Q  In general, what are the kinds of things
19 that you speak with them about?
20 A  It would only be in reference to a drug and
21 alcohol collection.
22 Q  Do you ever speak to them about the

Page 15

1  protocols?
2  A  Yes.
3  Q  What kinds of things would you talk about
4  in relation to the protocols?
5  A  That the protocols are followed.
6  Q  And, what are some of the key protocols?
7  A  It would be how the - you know -- the
8  collection started, do they have our chain of
9  custody, our breath alcohol forms, did they follow
10 the collection procedures? And we have a check-off
11 list for the collectors. If there's any problems
12 with the collection they're to notify our office.
13 Q  What kinds of problems arise with regards
14 to collection?
15 A  A variety of things, it could be -- there
16 is a "refusal to test".
17 Q  What else?
18 A  Do you want me to list them all?
19 Q  Yes, please.
20    MR. FISCHLER: Whatever you can think of.
21 A  Whatever I can think of, Okay. I would say
22 then, mostly, is a "refusal to test." A shy

Page 16

1  bladder, a situation - a "shy lung", an alcohol
2  test, a "no show" of an employee that was scheduled,
3  and I guess anything that I would do ordinarily that
4  would show up - that they should call us.
5  Q  Without mentioning any names of any
6  particular employees, do you remember ever being
7  contacted about someone being a "no show" - Amtrak
8  processing a "no show" for a drug test?
9  A  Do I -- Can you say that again?
10 Q  Yes. Do you ever recall a situation where
11 there was an issue of someone being a "no show,"
12 Amtrak processing a "no show" for a drug test?
13 A  Yes.
14 Q  Tell me how you learned about that?
15 A  A telephone call.
16 Q  From one of the medical facilities that
17 handles the testing?
18 A  It could be from the facility -- from the
19 department head.
20 Q  So, you recall a situation where you've
21 learned about that from a facility and also a
22 situation where you learned about a "no show"

Page 17

1  situation from a department head at Amtrak. Is that
2  right?
3  A  Yes.
4  Q  And is that - is it the case that a
5  significant number of the issues that are brought to
6  your attention come from the - directly to you from
7  the facilities, without a manager first
8  communicating with you about Amtrak?
9  A  Yes.
10 Q  And are there also significant number that
11 come to you first, from a manager talking to you
12 about it?
13 A  No.
14 Q  Usually it comes from the facility?
15 A  Yes.
16 Q  And occasionally, it comes from a manager?
17 A  Yes.
18 Q  Now, if someone informs you either - let
19 me ask you this, if a facility informs you that an
20 employee has been a "no show" on a scheduled drug
21 test, what do you do?
22 A  It doesn't happen often, but if they're a

Page 18

1  "no show" that's - again it depends on the
2  situation, but it could actually be a "refusal to
3  test."
4      Q    Was there a difference between - under
5  your protocols, between a "no show" and a "refusal
6  to test" or are those the same thing?
7      A    It would be a "refusal" - the same thing.
8      Q    What about - have you ever had an instance
9  of a "shy bladder" problem?
10     A    Yes.
11     Q    What's a "shy bladder," problem?
12     A    The employee is unable to provide a
13 sufficient amount of urine for a collection.
14     Q    And have those been brought to your
15 attention by facility operators?
16     A    Yes.
17     Q    And, what do you do when you learn that
18 there has been a "shy bladder" problem from a
19 facility operator?
20     A    There's procedures that you follow, in that
21 the employee is provided fluids. It's not a refusal
22 not to drink the fluids through a three hour time

Page 19

1  period to help the employee be able to provide a
2  sample.
3      Q    You said something about not a refusal, but
4  I didn't understand what you said, just now.
5      A    Well, the fluids they're offered to drink
6  through the three hour time period, forty ounces of
7  fluid, and at times, some people refuse to drink -
8  may refuse to drink the water or do not want - need
9  to drink anything. That's not a refusal, you know,
10 interrupting you know, the process, if it takes
11 three hours, it takes three hours.
12     Q    What if - are you saying there are time
13 when people are having trouble providing a
14 significant - sufficient sample, and they also
15 don't want to drink fluids?
16     A    Hmmm.
17     Q    Yes?
18         MR. FISHCLER: You have to answer, "yes" or
19 "no."
20     A    Oh, I'm sorry. Yes.
21     Q    And, when that happens, you're saying that
22 it's not a refusal to test, for the individual to

Page 20

1  refuse the fluids?
2      A    Yes.
3      Q    So, what do you do if the person refuses
4  the fluids and still doesn't produce a sample?
5      A    If the employee can't provide sample, it
6  goes to a next step and the employee's referred to a
7  medical physician for an evaluation, to find out if
8  the employee has a medical condition that warrants
9  not being able to provide a sample.
10     Q    Do you remember any particular instances
11 where you've been alerted by managers initially, as
12 opposed to being alerted by drug test facility
13 personnel, that there's been a problem with the drug
14 test?
15     A    No, I don't recall.
16     Q    So your testimony is that you think that
17 happens sometimes, but you can't recall any
18 particular instance?
19     A    That - Can you say that again?
20     Q    Your testimony is that you - that it
21 happens sometimes that -?
22     A    What is your question? What was your

Page 21

1  question again?
2      Q    I'm trying to repeat the question again for
3  you. If you listen to it, you might be able to
4  answer it.
5      A    I'm sorry.
6      Q    My understanding of you testimony is that
7  you recall, generally that there are instances in
8  which there are problems that arise with drug tests
9  that are communicated to you, initially by Amtrak
10 staff rather than by medical facility staff, but you
11 can't recall any specific times when that times when
12 that happens. Is that correct?
13     A    That's correct.
14     Q    Have you ever had an instance that you
15 learned of where an Amtrak employee was suspected of
16 tampering with their urine?
17     A    Yes.
18     Q    How often does that come up?
19     A    Not often - I don't --
20     Q    Does it come up every year?
21     A    Yes.
22     Q    And, what do you do when that comes up?

Page 22

1  A  Well, again there is a standard collection
2  procedure, when that occurs.
3  Q  Can you explain that to me?
4  A  Well, if the employee provides his sample
5  - if the employee provides his sample, that the
6  collector either color - doesn't -- temperature is
7  out of range, if it smells of bleach, they would
8  have the employee provide another sample under
9  direct observation, and the collector would be of
10 the same gender and watch the fluids leave the
11 employee's body. Both specimen are processed and
12 sent through the lab and then marked.
13 Q  So, both the specimen that they provided -
14 that the employee provided the first time, and the
15 specimen that they provided the second time get
16 processed?
17 A  Yes, sir.
18 Q  And, why do both get processed?
19 A  Because the initial - the initial specimen
20 was possibly adulterated, or tampered with.
21 Q  And, how do you ascertain whether the
22 initial specimen was adulterated or tampered with?

Page 23

1  A  Well, it goes through our laboratory, and
2  there's testing done at the laboratory.
3  Q  Has there ever been a time when an employee
4  was suspected of tampering with their urine but the
5  samples come back from the lab, and there's a
6  conclusion that there was no tampering? Has that
7  ever happened?
8  A  Not that I recall.
9  Q  Okay. I believe you were introduced a few
10 moments ago to David Stevens?
11 A  Yes.
12 Q  And, have you ever met him before?
13 A  No.
14 Q  Are you familiar with Mr. Stevens' name?
15    MR. FISCHLER: Outside of any conversation
16 with me.
17 A  When you say familiar, I have so many names
18 - I mean I wouldn't -- I couldn't recall on when,
19 I'd have to refer to the case - I have so many
20 cases that I deal with daily. Does that answer your
21 question?
22 Q  Do you know whether you've ever dealt with

Page 24

1  a scenario involving Mr. Stevens' drug test?
2  A  Yes.
3  Q  And, how do you know that?
4  A  From when I was called to deposition - for
5  the deposition there's a record made.
6  Q  So, without telling me anything that you've
7  discussed with Mr. Fischler, you're saying that you
8  know that you've dealt with a scenario involving Mr.
9  Stevens because you've reviewed and prepared for the
10 deposition and had your memory refreshed, is that
11 what you're saying?
12 A  No. I just, you know, looked at the case
13 when the name came up, just to know where it was and
14 my, you know, in our system.
15 Q  When the name came up in preparation for
16 this - where preparation may be troubling you -
17 I'm not trying to trick you. In relation to the
18 fact that you had to testify in this proceeding that
19 you're here for today, someone said - or the name
20 David Stevens came to your attention you went and
21 looked at it, and had your memory refreshed about
22 having dealt with him. Is that right?

Page 25

1  A  Well, yes, yes.
2  Q  And when you did that, and you looked at -
3  well let me ask you this, did you have a file that
4  you had maintained about Mr. Stevens?
5  A  Yes.
6  Q  And did you review that file?
7  A  Not thoroughly.
8  Q  Did you review it, cursorely?
9  A  Yes.
10 Q  Okay, and when you looked at the file did
11 that actually refresh your recollection about Mr.
12 Stevens' situation or does it just confirm that you
13 have a record of having dealt with Mr. Stevens?
14 A  Yes.
15 Q  It was an either or question.
16 A  How - What did you say?
17 Q  As you sit here now today, putting aside
18 what might have remembered a week or a month, or a
19 year ago, do you remember anything about Mr.
20 Stevens, case or do you only know that you have
21 records about Mr. Stevens' case.
22 A  I only remembered that I had a record when

Page 26

1    I pulled the case.
2    Q   And so it didn't - when you pulled the
3    case it didn't spark something in your mind, that
4    said, oh, I remember this. Nothing like that
5    happened?
6    A   Not really.
7    Q   Approximately how many of these kinds of
8    drug test problem cases do you deal with in a year?
9    A   Maybe, six.
10   Q   And by six, you mean six in what category,
11   my question was kind of vague. You told me - other
12   than -- Let me rephrase the question, you've told me
13   -- if I remember your testimony correctly, both that
14   you deal with about six cases of problematic drug
15   tests in a year and also that, that takes up all of
16   your time. So, I'm trying to make sure that I
17   understand your testimony and that I don't get
18   confused. Can you help me out with that?
19   A   They're not all problems, but they're still
20   - how do I say, -- a "non negative" case that
21   there's processes that I have to take care of. And,
22   the same way that the negative testing that goes on,

Page 27

1    there's a process and paperwork that's received,
2    there's reports that are prepared for the documents
3    that you receive in each category for violations,
4    reasons of suspicions, accidents.
5    Q   So do you monitor the programs as they're
6    administered in the medical facilities overall,
7    generally, and in addition to dealing with specific
8    cases that may come up involving specific employee?
9    A   Yes.
10   Q   And when you gave me the number - the
11   estimate of six in a year, those were the numbers -
12   your estimate of the number of times when there is
13   either a positive drug test or a quasi positive drug
14   test, is that fair to say?
15   A   Well, there's more than six "non negatives"
16   through the year. You said like -- problem?
17   Q   Alright, let's take the word problem out.
18   How many "non negatives" - that seems to be your
19   terminology - would you deal with in the course of
20   a year?
21   A   Thirty or Forty.
22   Q   And then you say that also that issues

Page 28

1    sometimes come up relating to negative tests, right?
2    A   Yes.
3    Q   What would be an example of an issue that
4    comes up or that could come up even when there's
5    been a negative test?
6    A   The collector's late arrival to the site to
7    handle a test, not that it would cause a test to be
8    done but, you know, operations. There're just
9    things that could go on.
10   Q   You're saying late arrival by the employee?
11   A   No, late arrival by the collector to the
12   site.
13   Q   So, that means there may need to be
14   rescheduling, or there may be a question about why
15   the collector wasn't there?
16   A   Yes.
17   Q   Okay. So, turning your attention to the
18   "non negative" cases. How would you characterize
19   what's gone wrong in the majority of the "non
20   negatives," can you categorize those for me?
21   A   Ummm.
22   Q   Maybe, I'll rephrase for you.

Page 29

1    A   Okay.
2    Q   You testified earlier about several
3    different kinds of things that could lead to what
4    we're now talking about as a "non negative" test. I
5    guess I'm asking you, what's the most common of
6    those issues that can arise, that are put in the
7    category of a "non negative" test?
8    A   I'm not sure what you mean.
9    Q   Is the most common thing to find a sample
10   that's been tampered with, or is it finding someone
11   who refuses to attend, or what do you see the most
12   of in that category?
13   A   Again, refuse?
14   Q   Well, let me ask you this, do you keep
15   records of the cases that come before you?
16   A   Hmmm, hmmm.
17   Q   Can you say "yes" or "no"?
18   A   Yes.
19   Q   And when you do, do you have any codes that
20   you use to associate with different kinds of issues
21   that can arise that are within the category of "non
22   negative" tests?

Page 30

1  A  Yes.
2  Q  How many different codes are there?
3  A  There's "refusal" and it's the drug itself.
4  Q  Meaning, like a positive test for a
5  particular drug?
6  A  Yes.
7  Q  Anything else?
8  A  I want to say - all I can say is the
9  "refusal," the different drugs, an invalid sample,
10 it could be lost - a sample can be lost.
11 Q  What do you do if there's a lost sample?
12 A  It depends on the situation, the type of
13 testing event.
14 Q  As in whether the individual is there at a
15 random basis or in a return to duty basis, or an
16 injury or accident basis, is that right?
17 A  Yes.
18 Q  And how do those different situations come
19 to bare on what you do if there's a lost sample?
20 A  In each situation, for a "return to duty"
21 actually you would need another collection
22 performed.  If it was to determine, because, you

Page 31

1  know "return to duty" is normally when you want to
2  get somebody back to work and they want to get paid.
3  And, for a random, it's, you know, "lost test."
4  Q  Meaning it's forgotten?
5  A  Yeah.  I mean  Yes. Yes.  We find out it
6  was lost.
7  Q  And currently, when you say lost, I assume
8  that means lost by the collector, not by the
9  employee.
10 A  Yes.
11 Q  Okay.  Do you have - can you share with
12 me, having had an opportunity, at least to some
13 degree, to look at the file on Mr. Stevens, what
14 kind of an event happened relating to Mr. Stevens?
15 A  If I can remember correctly, it was
16 interfering with the testing process by leaving the
17 site.
18 Q  And, do you know how you brought - how you
19 were made aware of that?
20 A  Collectors would contact our office.
21 Q  Is that what happened specifically in this
22 case, or what happens generally?

Page 32

1  A  That's what happens, generally.
2  Q  And, do you know what you did when - do
3  you know what you were told, in this particular case
4  about Mr. Stevens, initially?
5  A  I can't remember exactly. No.
6  Q  And do you remember who you spoke to about
7  Mr. Stevens, initially about the situation?
8  A  A collector.
9  Q  Do you know what facility - it was at?
10 A  I think it's Concentra.
11 Q  Do you know which one?
12 A  I think it was Lanham.
13 Q  Now in the process of learning that there
14 was an issue involving Mr. Stevens, did you speak to
15 anyone in Amtrak management about Mr. Stevens?
16 A  Can you say that again?
17 Q  Yes.  Did you have occasion to discuss a
18 drug testing event or a "non negative" event with
19 anyone in Amtrak management regarding Mr. Stevens?
20 A  No.
21 Q  At no time, or - let me ask you this, when
22 - Did you ever have any such discussion with anyone

Page 33

1  at Amtrak management about Mr. Stevens?
2  A  No, it would only be the report results.
3  Q  What about report results?
4  A  I don't know - what do you mean, what
5  about?
6  Q  Let's go back, what's a report result?
7  A  A result is reported to supervision.
8  Q  So, in this case if Mr. Stevens was an
9  employee of Amtrak, did his supervisory chain?
10 A  Pardon?
11 His supervisors -- would Mr. Stevens'
12 supervisors be notified that there was an issue?
13 A  Yes.
14 Q  Who would do that?
15 A  Myself.
16 Q  Would you do that orally or in writing?
17 A  I do it orally and I'd do it in writing.
18 Q  Do you know what you - do you know who you
19 talked to in this instance, Mr. Stevens' instance.
20 A  I don't recall.  Oh, I'm sorry, I don't
21 recall.
22 Q  Is there anything that you know of that

Page 34

1  would refresh your recollection as to who you spoke
2  to in Amtrak management, about Mr. Stevens?
3      A   Can you say that again?
4      Q   Yes. Is there any person or thing that you
5  think could refresh your recollection as to who you
6  might have spoken to in Amtrak management about Mr.
7  Stevens?
8      A   No.
9      Q   Okay. Now the results, you said were also
10 reported in writing. Is that right?
11     A   Yes.
12     Q   In what form is that, a sheet with numbers
13 on it or is it a memo that you write or a letter,
14 what does that look like?
15     A   It's a memo form.
16     Q   That comes from you?
17     A   Yes. I'm sorry, yes.
18     Q   Who would that typically be sent to?
19     A   The immediate supervisor.
20     Q   Is that the same person you would have
21 talked to about the issue?
22     A   Yes.

Page 35

1      Q   What happens first, the memo or the phone
2  conversation, or the verbal conversation?
3      A   The verbal conversation.
4      Q   I assume that you don't remember what you
5  said to anybody in this particular case, is that
6  right?
7      A   No.
8          Okay, so, can you tell me generally what kinds
9  of things you would say to a manager when there was
10 a "non negative test" situation?
11     A   It would be I have the result for the
12 testing event and it is a "non negative," and a - a
13 "non negative", I'm sorry, and that's brief.
14     Q   Is there some - do you ask the supervisor
15 to take some kind of action or do you tell them why
16 you're informing them?
17     A   The memo would outline that.
18     Q   So, in the phone call do you tell them that
19 there's going to be a memo?
20     A   Yes. I follow up with a confirmation memo.
21     Q   Do they sometimes have questions,
22 supervisors when they hear this?

Page 36

1      A   No.
2      Q   Why is it that you're supposed to talk with
3  them verbally before you send them a memo?
4      A   For confident - for confidentiality, on
5  where to forward the memo.
6      Q   Any other reason?
7      A   No.
8      Q   Does it ever occur that you're contacted
9  about a particular drug test, administration of a
10 drug test, while the test -- testing process, excuse
11 me, is actually ongoing at the provider's facility?
12     A   Yes.
13     Q   Is that a common thing?
14     A   Yes.
15     Q   Are the providers instructed to contact you
16 if they have any questions about the implementation
17 of the program as they're doing it?
18     A   Yes.
19     Q   Do you know if there were any such contacts
20 made to you during the event of Mr. Stevens' test
21 that lead to this "non negative" characterization of
22 the test?

Page 37

1      A   I don't remember.
2      Q   If you are - what happens if someone calls
3  you from a facility and you're not available to talk
4  on the phone at the time when they call?
5      A   If a message is left, I will return the
6  phone call. Does that answer?
7      Q   Yes. Do you have any particular protocol
8  that you follow as to how promptly you return calls,
9  or does it vary depending on what you're doing?
10     A   Yes. All four of us on the staff are
11 designated employer representatives.
12     Q   Employer representatives?
13     A   Employer representatives, yes.
14     Q   Which means that any of you can answer
15 questions?
16     A   Yes, sir.
17     Q   If a message is left for you is it
18 forwarded to one of the other people or is it your
19 responsibility to return the call that's left for
20 you, if you're not available at the time the call
21 comes in?
22

Page 38

1   A   If their supervisor knows another phone
2   number, he will call, or he will call the designated
3   employer representative.
4   Q   Do you have a voicemail system?
5   A   Yes.
6   Q   How long have you had the voicemail system?
7   A   Since we start -
8   Q   For many years?
9   A   Yes, sir.
10  Q   Longer ago than three or four years?
11  A   Yes, sir.
12  Q   Is there an option in the voicemail system
13  where an individual can leave a message in your
14  particular box?
15  A   Yes.
16  Q   Does that frequently happen?
17  A   Yes.
18  Q   People leave messages in your box. And, if
19  the message is in your box, who checks the messages
20  in your box?
21  A   I do.
22  Q   So, are there occasions sometimes, when

Page 39

1   you're not able to check the messages for an hour?
2   Yes?
3   A   Yes.
4   Q   Does it sometimes happen when you can't
5   check them until the next day?
6   A   Yes.
7   Q   What do you do when you get a message in
8   your box that there's been - that your guidance is
9   being sought on a drug testing event that's going on
10  at one of the facilities that Amtrak contracts with?
11  A   What is the guidance?
12  Q   What do you do at that point, if someone is
13  asking you for guidance, but you're not there so
14  they have to leave a message?
15  A   Well, the protocol is that there's other
16  staff members and the designated employer
17  representative is available twenty/four/seven, for
18  guidance. I'm sorry, for guidance.
19  Q   So, you have like a schedule that's between
20  the four of you?
21  A   Yes, sir.
22  Q   So, someone is always there, and the

Page 40

1   providers are they informed of that?
2   A   Yes, sir.
3   Q   So, does it ever happened that for what
4   ever reason you, not withstanding, that system you
5   get a message from the prior day or from a few hours
6   ago that there was something going on at one of the
7   facilities?
8   A   Yes.
9   Q   What do you do in that situation?
10  A   I - it depends on what the situation is,
11  I'll act on it and contact the facility and contact
12  the supervisor or employee.
13  Q   Has anything come to your attention in your
14  review of Mr. Stevens' situation that suggests to
15  you that that there was any kind of an issue with a
16  telephone call or and or voicemail message to you
17  relating to him on the day that his "non negative"
18  test situation arose?
19  A   Not that I remember.
20  Q   If someone were to say that such a thing
21  happened, to you have any particular reason to deny
22  it?

Page 41

1   A   No.
2       MR. GOLDSMITH: In our fancy numbering
3   system we're on 38, am I right? Okay, we're going
4   to mark this as deposition Exhibit 38. Without
5   referring to any particular, person's name.
6           [Whereupon, Exhibit 38 was
7   marked for
8           identification.]
9       MR. GOLDSMITH: Did I give you one?
10      MR. FISCHLER: Yes.
11      BY MR. GOLDSMITH:
12  Q   I'm showing you what's been marked as
13  Exhibit 38, and it says at the top "Confidential"
14  and it purports to be a memo from yourself to
15  Bernard Campbell relating to a drug test result for
16  David Stevens. Do you recognize this?
17  A   Yes.
18  Q   Is this a memo that you generated?
19  A   Yes.
20  Q   Is that your signature on it.
21  A   Yes.
22  Q   It says that - in the second paragraph,

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21

Page 42

1  "Mr. Stevens provided a specimen that was cold." Do
2  you see that?
3    A  Yes, sir.
4    Q  Do you know how you would have developed
5  that information?
6    A  The facility performing the collection -
7  from the facility that performed the collection.
8    Q  Is there anyone else who could have given
9  you that information?
10   A  No.
11   Q  It says, "The testing technician explained
12 to the employee that he would have to provide
13 another specimen under direct observation which
14 would be supervised by someone of the same gender,
15 after he completed his physical examination." Do
16 you see that?
17   A  Yes, sir.
18   Q  Does that sound like a correct following of
19 the protocol in the event of someone giving a cold
20 specimen?
21   A  Yes.
22   Q  And then it says that, "Mr. Stevens left

Page 43

1  the premises without providing a second urine
2  specimen." Do you see that?
3    A  Yes.
4    Q  Does review of this and/or anything else
5  that's come to your attention either in this
6  deposition or before, refresh your recollection at
7  all, as to any of the circumstances or details of
8  what might have happened with Mr. Stevens, in
9  addition to anything that you see here in this
10 document?
11   A  No.
12   Q  Do you know if there were any extenuating
13 circumstances that existed on that day for Mr.
14 Stevens?
15   A  No.
16   Q  Do you if the testing facility people told
17 you if there were or weren't any extenuating
18 circumstances?
19   A  No.
20   Q  Do you know whether or not Mr. Stevens
21 agreed to provide a second urine specimen?
22   A  Yes.

Page 44

1    Q  What do you know about that?
2    A  That he left the premises, and did not
3  provide a second.
4    Q  Did anyone ever indicate to you whether Mr.
5  Stevens did or didn't represent to the testing
6  facility that he was prepared to give a second
7  specimen?
8    A  Pardon me?
9    Q  Did anyone ever -- from the testing
10 facility, from Concentra ever inform you as to
11 whether Mr. Stevens did or did not tell them that he
12 was prepared to give a second specimen?
13   A  That he was not?
14   Q  Did anyone from the facility ever tell you
15 that Mr. Stevens told them, that he would or would
16 not give another specimen?
17   A  No.
18   Q  Do you think that you saw any documents
19 relating to Mr. Stevens' visit to Concentra on the
20 day in question which is December 13, 2004?
21   A  No.
22   Q  You don't think you did?

Page 45

1    A  No.
2    Q  Is that - would that be because that's
3  commonly what happens, you don't actually see any
4  papers?
5    A  The only thing I would see would be the -
6  it's the authorization that when the person goes in
7  for the treatment it's called a "Med-1," and then,
8  of course, the statement from the collector on what
9  took place.
10   Q  When would you see a statement from the
11 collector?
12   A  As soon as possible -- the day of the
13 collection, or the day after.
14   Q  When the collector, in this case, Concentra
15 informs you - and by the way, are you certain that
16 in this particular case you were informed first by
17 Concentra and not by a supervisor of Mr. Stevens?
18   A  Yes.
19   Q  Why are you certain of that, in this case?
20   A  I don't know. I'm never - I'm very rarely
21 contacted by a supervisor, concerning a problem.
22   Q  So, assuming that you were contacted

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21

Page 46

1  initially by Concentra - and again, there's a
2  summary here in the second paragraph, that you wrote
3  about what happened. Would you have - are there
4  questions that you would have asked the Concentra
5  personnel about the scenario before you wrote this
6  memo?
7    A  Yes.
8    Q  What questions would you have asked?
9    A  If the employee was still there, or hasn't
10 left, so I could, you know, talk with the employee,
11 her processes that she followed.
12   Q  Would you try to get an understanding of
13 some of the details of what happened in the event?
14   A  Yes.
15   Q  But, you don't remember any of the
16 specifics of those things in the particular case, is
17 that right, or do you?
18   A  I really - I don't.
19   Q  When you write this memo - now let me ask
20 you a general question first, because I assume that,
21 from what you told me that the memo we see here
22 before us Exhibit 38, is similar to other memos you

Page 47

1  would have done in other cases. Correct?
2    A  Yes.
3    Q  Do you attempt to accurately repeat for the
4  individual, to the employee's supervisors what
5  you've learned about what happened at the testing
6  facility?
7    A  Yes.
8    Q  Why is it important to be accurate about
9  that?
10   A  It's just has always been our practice, if
11 there is not a result reported that, you know, just
12 a short summary of what took place, and then also
13 from the collector.
14   Q  What do you mean also from the collector?
15   A  It's just a statement of events that took
16 place during the collection process.
17   Q  Now, it says here in the third paragraph,
18 according to the testing technician's statement,
19 "the employee's actions of not proving a subsequent
20 sample constitutes a refusal to test." Do you see
21 that?
22   A  Yes.

Page 48

1    Q  And that would be the case, regardless of
2  the technician's statement, wouldn't it, if an
3  employee refuses to give a second sample, that's
4  tantamount to a refusal to test, right?
5    A  Yes.
6    Q  In the next paragraph it says, among other
7  things, "your department is responsible for taking
8  disciplinary action." Why does your memo say that?
9    A  It's the department's responsibility.
10   Q  If the responsibility - why is it your
11 responsibility, to tell them that, that's their
12 responsibility?
13   A  That's just the way it's set up.
14   Q  The way the letter's set up - the memo's
15 set up?
16   A  Hmm, hmm.
17   Q  Yes?
18   A  Yes.
19   Q  But, they'd be expected to know that
20 anyway, wouldn't they?
21   A  Yes.
22   Q  Is it your intent in - and by the way that

Page 49

1  language is language that you wrote in the memo,
2  right? It's not boiler plate that you took from
3  somebody else's document, right?
4    A  I'm sorry what?
5    Q  The fourth paragraph about taking
6  disciplinary action.
7    A  That's a standard.
8    Q  But, it's not there because someone else
9  told you to put it there that way, you wrote the
10 memo, right?
11   A  That part of the memo was standard.
12   Q  So any employee - for instance if any of
13 your three colleagues in your office had done it,
14 they'd have that same language in there?
15   A  Yes. [Sigh.]
16      MR. FISCHLER: It's hard.
17   Q  Does your office have any authority within
18 Amtrak to compel any particular management or
19 supervisors to take any particular disciplinary
20 action against an employee in the event of a "non
21 negative" drug test?
22   A  No.

Page 50

1  Q  That's something that ultimately is at the
2  discretion of the managers, right?
3  A  Yes.
4     MR. GOLDSMITH: Let's mark this as Exhibit
5  39.
6     [Whereupon, Exhibit 39 was
7     marked for identification.]
8     MR. GOLDSMITH: Alright, I'm showing you
9  what's been marked as Exhibit 39. Let's go ahead
10 and mark this as Exhibit 40 while we're at.
11    [Whereupon, Exhibit 40 was
12    marked for identification.]
13 Q  Exhibit 39, could you tell me what that is?
14 A  Pardon me?
15 Q  Could you tell me what Exhibit 39 is?
16 A  It's an email.
17 Q  An email from who to who?
18 A  To, Bernard Campbell.
19 Q  From?
20 A  Myself.
21 Q  Yourself. It says in the second paragraph
22 of the email, "I am preparing the memo concerning

Page 51

1  the employee's refusal to test, who should I fax the
2  confirmation memo? Do you see that? What's the
3  confirmation memo?
4  A  The attached, Exhibit -- Exhibit 38.
5  Q  Your memo, Exhibit 38? Okay.
6     MR. GOLDSMITH: Turning your attention to
7  Exhibit 40.
8  Q  Who's Mr. Martinos?
9  A  I don't recall.
10 Q  Is Exhibit 40 an email that you sent, to a
11 Mr. Martinos?
12 A  Oh wait.
13 Q  Oh, I'm sorry, I thought it was passed to
14 you already. I'm not trying to make it any harder
15 than it already is.
16 A  I'm sorry, Oh, I'm sorry. No, that's our
17 Health Services, HR Specialist. I knew he sounded
18 familiar.
19 Q  Is there anything about the text of your
20 email in Exhibit 40 that would help you to remember
21 why you were asking the question, or did Health
22 Services receive medical approval to release this

Page 52

1  person to return to duty?
2  A  Any employee that's out on medical leave,
3  Health Services is, you know, part of our group. We
4  want to ensure that if medical was needed if there's
5  a situation, to make sure that it is cleared.
6  Q  If a medical is needed? Does that mean an
7  examination?
8  A  Yes, and whether sufficient medical for the
9  leave has been received.
10 Q  So, whether the leave which would have been
11 the leave before the person would be released to
12 return to duty was sufficiently documented?
13 A  Yes.
14 Q  Why would you be asking about whether the
15 prior leave had been sufficiently documented at the
16 point where you were talking about returning the
17 person to duty?
18 A  We always check with the department to
19 ensure that medical documentation has been received
20 for their record, so the employee's current and his
21 medical file is current.
22    MR. GOLDSMITH: Mark this as Exhibit 41.

Page 53

1     [Whereupon, Exhibit 41 was
2     marked for identification.]
3     MR. GOLDSMITH: Okay. Exhibit 41 is a Bates
4  stamped 1104 and then 1127 and then 1128.
5     MR. FISCHLER: Are there pages that are
6  missing?
7     MR. GOLDSMITH: Yeah, just those pages were
8  called out. The - within the document, you've got
9  the cover page and then you've got page 16 and 17.
10 So, 1-15, if there's anything after 17, they weren't
11 included.
12 Q  What is this?
13 A  You're asking me?
14 Q  Yes.
15 A  Oh. This looks like a copy - a partial
16 copy of the policy - drug and alcohol policy.
17 Q  Of Amtrak?
18 A  Yes, sir, Amtrak.
19 Q  So this would be part of whatever policies
20 that would have applied to Mr. Stevens in his
21 situation. Is that correct?
22 A  Yes, sir.

Page 54

1  Q  Have you ever encountered a situation where
2  an employee has been in the process of
3  administration of a urine test at one of your
4  contractor's facilities. And, a question has arisen
5  about that person leaving the facility and coming
6  back later to be tested. Has that issue ever come
7  up?
8  A  Yes.
9  Q  What have you done in such a situation?
10  A  Well, it's not permitted. It's
11  interference -- not completing the collection
12  process.
13  Q  So what have you done?
14  A  It would be a refusal to test.
15  Q  So, what would you done?
16  A  It would have to be called - contacted the
17  collection site to see why it happened. Was the
18  employee validly scheduled for the physical, or the
19  reason for being at the facility?
20  Q  So you would contact the facility and ask
21  them for the details of what happened, and then -
22  well, let's just - I mean if you remember, in the

Page 55

1  specific instance when you say that happened, does
2  it happen more than once. Would that issue come up?
3  Or questions about returning to a facility?
4  A  No. I mean - Well, yes.
5  Q  You think it's come up more than once?
6  Beyond contacting - You're saying that what you
7  would do, I think, in any case, I think, is you
8  would contact the facility and ask them what was
9  happening, right?
10  A  Yes.
11  Q  Are there other things that you would
12  definitely do in that situation?
13  A  Yes. I mean was there an authorization,
14  you know, for the test.
15  Q  You'd ask the facility that?
16  A  I would ask for the paperwork.
17  Q  You would ask the facility for the
18  paperwork showing authorization by Amtrak to have
19  the person tested?
20  Q  Okay, what else would you do?
21  A  Or seen. After I received that, I would
22  then evaluate the situation, of what took place.

Page 56

1  Q  What would you be evaluating for?
2  A  At times, I could be called before anything
3  even started, and it was just an error on the
4  department, themselves.
5  Q  So one time there was a question like this,
6  and it turned out that the department within Amtrak
7  had made some kind of mistake which was leading to
8  this question about the person leaving in the middle
9  of a testing situation?
10  A  No, no, no, no.
11  Q  You said that after you got the
12  authorization information and talked to the people
13  at the site, you would evaluate the situation. What
14  would you be -- What would be the purpose of
15  evaluating the situation, so that what could happen?
16  A  Are you saying the employee left the site?
17  Q  Right.
18  A  Okay. I would look at the paperwork and
19  see why, why he was scheduled, was it approved?
20  Again, it could be a number of things, and plus it's
21  just being brought to my attention. I would have to
22  investigate what was, you know, going on.

Page 57

1  Q  Would that include why the person left?
2  A  Yes.
3  Q  Could there ever be a situation were an
4  employee could leave a testing facility in the
5  middle of a process where that could be justified or
6  excused?
7  A  Yes.
8  Q  What would be some examples of that?
9  A  An employee's house was burning down.
10  Q  Anything else?
11  A  A medical emergency.
12  Q  Anything else?
13  [Laughter.] (Notary signals for Ms.
14  Tierney to speak louder.)
15  A  I'm so, sorry, a medical emergency. I
16  don't know why I'm talking so low. I'm sorry.
17  MR. FISCHLER: I always have to tell my kids
18  the opposite.
19  MS. TIERNEY: Really?
20  MR. FISCHLER: I've never seen anybody ask
21  people to use their outside voice, that's why I was
22  laughing.

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21

Page 58

1  MS. TIERNEY: I'm sorry - Maybe, it's just
2  warm in here - I'm just trying to relax. I'm so
3  sorry Jacquie. I'm trying to think of real life
4  things that have happened, that I know. But then
5  again, these are things that the employee would need
6  to justify.
7      BY MR. GOLDSMITH:
8  Q   You said that these are things that have
9  happened. Does that mean you've had instances of a
10 house burning down or a medical emergency while an
11 employee was being drug tested?
12 A   Yes.
13 Q   What did you do in the instance of the
14 house burning down? The employee was released to
15 take care of the situation and it was documented for
16 the record and the employee brought in a notice in
17 the paper, the next day.
18 Q   So, there was no discipline for that?
19 A   No, but it needed to be documented,
20 because, you know, if something did come up, or a
21 question -- why wasn't the test completed, and so
22 forth.

Page 59

1  Q   What about the medical emergency situation,
2  what happened that time?
3  A   I want to say that there was an emergency
4  with their child, and the phone call was received at
5  the facility, but I can't remember whether there was
6  legitimate documentation.
7  Q   Something like the child was not at the
8  facility with the parent and something was going
9  wrong with the child, so they left the facility in a
10 hurry?
11 A   It was a rush to the hospital, yeah.
12 Q   Do you know if any medical information -
13 any medical explanation was ever given relating to
14 Mr. Stevens having left Concentra?
15 A   No.
16 Q   You don't know one way or the other?
17 A   No.
18 Q   When you - after you do a memo like
19 Exhibit 38 in a "non negative" testing situation,
20 what's your next involvement, in that situation,
21 typically?
22 A   I'm really - after this portion, I'm not

Page 60

1  involved in it.
2  Q   I'm going to show you - actually -- let's
3  take a five minute break.
4      [Off the record.]
5      BY MR. GOLDSMITH:
6  Q   Ms. Tierney, what is supposed happen if an
7  employee at a drug test - a urine test situation
8  provides a sample that were the temperature tape
9  can't read the temperature?
10 A   The collector would advise the employee
11 that a retest was necessary - they would advise the
12 employee a retest is necessary, and it would be
13 under direct observation. And of the same gender,
14 and hopefully, that it would move forward, and that
15 the employee would provide the second sample.
16     MR. GOLDSMITH: I'm sorry, let's get this
17 straight here. Okay, let's do this. Let's mark
18 this here - do we have 41 - 42? Mark this as
19 Exhibit 42.
20     [Whereupon, Exhibit 42 was
21     marked for identification.]
22     BY MR. GOLDSMITH:

Page 61

1  I'm showing that it's been marked as Exhibit 42.
2  Q   It says that it's an "unusual collection
3  form," and it's Bates stamped number 289. Have you
4  ever seen this before?
5  A   Something like this.
6  Q   Do you think you've seen it - you've seen
7  the form, or do you think you've seen the form as
8  completed for David Stevens?
9  A   I've seen the form.
10 Q   You don't remember seeing it with respect
11 to Mr. Stevens in particular?
12 A   I'm sure I have.
13 Q   You don't remember it, though?
14 A   I know, I do -- I remember seeing this.
15 Q   Did you see it in December of 2004 or did
16 you see it within the last month?
17 A   Oh, I would say, in '04 and recently.
18 Q   So, you think you saw it around the time of
19 the events that are described here, "specimen
20 temperature out of range?"
21 A   I would think so.
22     MR. GOLDSMITH: Let's mark this one as

Page 62

1  Exhibit 43.
2       [Whereupon, Exhibit 43 was
3       marked for identification.]
4     BY MR. GOLDSMITH:
5     Q  Before I ask you about Exhibit 43, let me
6  just ask you another question about 42.
7     A  I see.
8     Q  How do you think you received it in 2004?
9     A  Usually, via fax.
10    Q  From the facility?
11    A  Yes, sir.
12    Q  There's a fax tagged on here there's one
13 that says December 15, '04 at the bottom, do you see
14 that?
15    A  Yes, I do.
16    Q  Is there anyway of telling whether that was
17 fax to you, from that tag?
18    A  I really can't tell.
19    Q  Alright, turning your attention to Number
20 43. Do you recognize this?
21    A  Yes.
22    Q  What is Exhibit 43?

Page 63

1     A  Employee - I mean -- what's this form?
2     Q  Yes, let's talk about just the form first.
3     A  Okay. It's the "Chain of Custody" form.
4     Q  And, it appears to be a form that's
5  actually generated by Amtrak. Is that right, as far
6  as the blank form goes?
7     A  The blank form itself?
8     Q  Yes.
9     A  It's not - the laboratory would print
10 these off for us.
11    Q  Okay, they printed it off for you, but it's
12 got a mark at the top that suggests that it's an
13 official document for Amtrak. Is that right?
14    A  Yes, sir.
15    Q  They would print it off of there printer
16 and fill it out, or fill it out and take it off and
17 print it or whatever the case may be, at the
18 facility. Is that right?
19    A  No. It's a part form, you know, it has
20 sections that has to be torn off. It's not printed
21 off.
22    Q  So, you fill it out like with a carbon on

Page 64

1  it, like in the old days, or something?
2     A  Yes, sir.
3     Q  Alright, and this particular completed form
4  which has a Bates stamp 299 on it, have you seen
5  that before?
6     A  Date stamp? I'm sorry.
7     Q  I said Bates stamp 299, down in the lower
8  right hand corner, it's just an identifying number
9  so that we can keep track of it later. Have you
10 seen this particular document as completed?
11    A  I believe so.
12    Q  Did you see it in December of 2004 or only
13 within the last month or two?
14    A  No. I believe I saw it in '04.
15    Q  Do you think this might have been faxed
16 over to you from Concentra, as well?
17    A  Yes, sir.
18        MR. GOLDSMITH: Now, let's mark this as, 44.
19        [Whereupon, Exhibit 44 was
20        marked for identification.]
21    BY MR. GOLDSMITH:
22    Q  I'm showing you what has been marked as

Page 65

1  Exhibit 44. Do you recognize - Have you seen this
2  before?
3     A  Yes.
4     Q  And, what is this?
5     A  A statement from a collector.
6     Q  And, did you see this in December of 2004?
7     A  Yes.
8     Q  And, how do you remember that?
9     A  In order to make the determination in my
10 memo.
11    Q  So, you believe you saw this before you
12 made the determination in your memo?
13    A  I would have to.
14    Q  Now, did you ever speak to Mr. Stevens
15 before you made the determination in your memo?
16    A  No.
17    Q  Did you ever attempt to speak to Mr.
18 Stevens before you did that?
19    A  I can't remember.
20    Q  Is there anything that would refresh your
21 re-collection as to whether you attempted that?
22    A  I usually don't speak to the employees.

Page 66

1  Q  So, does that mean that's it's unlikely
2  that you did in this case.
3  A  Yes.
4  Q  With regard to Exhibit 44, does looking at
5  Exhibit 44 - Does looking at Exhibit 44 refresh
6  your recollection, at all, about who you might have
7  spoken to at Concentra?
8  A  It was a collector - it was the collector,
9  that definitely, that I spoke with.
10  Q  So, did you think it was one of the people
11  who signed Exhibit 44, Ms. Hudley or Ms. Batey?
12  A  Yes.
13  Q  Do you know which one?
14  A  I would think that I had spoken to both of
15  them.
16  Q  Is that - because you specifically
17  remember it, or is there some kind of protocol or
18  practice that you would follow, that would lead you
19  to think you would've done that?
20  A  Well, the practice is if we could talk to
21  the employee at the site it would be good, and we'd
22  always try to talk to whoever was involved the

Page 67

1  collection, is very important.
2  Q  Alright, so, does the text of Exhibit 44
3  refresh your recollection, at all, as to what you
4  were told by the collector had happened involving
5  Mr. Stevens on December 13?
6  A  Yes.
7  Q  Does the text of Exhibit 44 appear to be
8  the same information that you were given verbally by
9  the collector or collectors?
10  A  Yes.
11  Q  Did the collectors ever tell you that Mr.
12  Stevens was not offered the opportunity to give the
13  second sample immediately?
14  A  He wasn't offered?
15  Q  Right.
16  A  No.
17  Q  They never said that to you?
18  A  That he wasn't offered?
19  Q  The opportunity to give his second sample
20  immediately.
21  A  Not that I recall. No.
22  Q  Do you know if Mr. Stevens was offered the

Page 68

1  opportunity to give his second sample immediately?
2  A  I'm sure he was. Yes.
3  Q  Why are you sure of that?
4  A  Because of the process providing the cold
5  sample, he was asked -- and the document stating
6  that a second collection was needed.
7  Q  I believe you just shuffled to page 42, a
8  document - Exhibit 42. Is that right?
9  A  Yes.
10  Q  And Exhibit 42, says on it "the same gender
11  collector will immediately collect a second urine
12  sample under direct observation." Correct?
13  A  Yes.
14  Q  Exhibit 44 doesn't say that he was actually
15  offered that opportunity. Does it?
16  MR. FISCHLER: The document speaks for
17  itself. You can answer.
18  A  We were informed that he was unable to stay
19  at the center, so it tells me he couldn't stay any
20  longer to provide the second sample, which is
21  interference.
22  Q  Does it tell you whether it was immediately

Page 69

1  after the first sample that he said he couldn't stay
2  any longer?
3  A  No.
4  Q  So, it would be the case then that they
5  never told you how long he had to wait in order to
6  give the second sample, correct?
7  A  No.
8  Q  No, they never told you or no, the
9  statement's incorrect? Let me rephrase the
10  question. Did the collectors, at Concentra, on
11  December 13 ever tell you how long they needed Mr.
12  Stevens to stay at Concetra in order to enable him
13  to give the second specimen?
14  A  I mean, the employee would know how long he
15  would need to stay to provide a specimen.
16  Q  I'm not asking you that question, Maam.
17  I'm asking you did they ever tell you - Let's back
18  up a step, in order to give the second specimen Mr.
19  - you testified earlier Mr. Stevens would have had
20  to have provided that specimen while supervised by
21  someone of the same sex, correct?
22  A  Yes.

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21

Page 70

1   Q   Did anyone at Concentra ever tell you if
2   they had someone of the same sex present when Mr.
3   Stevens first sample came in?
4   A   That would have been discussed.
5   Q   Do you remember them ever telling you that?
6   A   No.
7   Q   Do you remember them ever telling you how
8   long it was going to take them to get someone of the
9   same sex there, so that he could give his sample?
10  A   It never came up, because the employee left
11  the site.
12  Q   Do you know how long the employee waited
13  before he left the site?
14  A   No, I don't.
15  Q   Did anyone from Concentra ever tell you
16  where Mr. Stevens went when he left the site?
17  A   No. I know that there was like a doctor's
18  appointment, but again, documentation needs to be
19  provided.
20  Q   Well, did anyone ever tell you that Mr.
21  Stevens went to the emergency room immediately?
22  A   No.

Page 71

1   Q   Did anyone ever tell you that when he got
2   there he was diagnosed with bronchitis?
3   A   No.
4   Q   Did anyone ever tell you that Mr. Stevens
5   provided Amtrak at some later point the
6   documentation from his visit to the emergency room
7   on December 13?
8   A   No.
9   Q   Having been asked a series of questions
10  today about Mr. Stevens' visit to Concentra on
11  December 13, do you now have any independent
12  recollection of what was said to you by the
13  collectors there, or is the only ability that you
14  have, have to specify as to the details - testify
15  as to the details coming from refreshing your
16  recollection of the documents?
17  A   Any testing event that I have of
18  conversation with the collector, I can't remember
19  exactly, but it's the standard collection protocol
20  that should be followed.
21      MR. FISCHLER: That's not the question.
22  A   Oh. I'm sorry.

Page 72

1   BY MR. GOLDSMITH:
2   Q   Are you able to recall any of these facts
3   independently, without reference to documents or is
4   it only when I'm showing you documents that you're
5   able to remember what was said between yourself and
6   the collectors at Concentra?
7   A   It's the documents. Yes.
8   Q   Has there ever been an occasion where
9   you've identified any failures or shortcomings in
10  the processes of any of your contractors with regard
11  to their carrying out their duties in drug testing
12  your employees?
13  A   Can you say that again?
14  Q   Yes. Have you ever identified that any of
15  them weren't carrying out their duties properly -
16  the contractors?
17  A   There have been times.
18  Q   If you had been told that Mr. Stevens had
19  to go to the emergency room and he was diagnosed
20  with bronchitis would you have looked further into
21  his situation before identifying him or agreeing
22  that he had refused to test?

Page 73

1   A   I would have the opportunity to explain
2   that he had an emergency, first how important it was
3   to complete the collection, but if he had an
4   emergency, and could justify it, you know, I
5   definitely would have looked into it.
6       MR. GOLDSMITH: Let me show you something
7   else.
8       Mark this as, next in sequence -- what do we
9   have 45?
10      [Whereupon, Exhibit 45 was
11      marked for identification.]
12  BY MR. GOLDSMITH:
13  Q   I'm showing you what has been marked as
14  Exhibit 45. It incorporates pages - Amtrak,
15  Stevens documents 860, 859, 861, 862, do you see
16  that, a four page document?
17  A   Yes, sir.
18  Q   Have you ever seen any of these documents
19  before?
20  A   No, sir, not that I recall.
21  Q   Do you see - Let me show you something
22  else.

Page 74

1  MR. GOLDSMITH: Alright, that's all of the
2  questions I have. Thank you for coming.
3  MR. FISCHLER: I want to ask a quick
4  question or two.
5  BY MR. FISCHLER:
6  Q   Let me refer you to Exhibit, I believe it's
7  38. This is your memo. Do you have it?
8  A   Yes.
9  Q   In the second paragraph, in the second
10 sentence, "this is to advise you that according to
11 the statement provided by the testing technician,
12 Mr. Stevens provided a specimen that was cold." Do
13 you see where I am?
14 A   Yes, sir.
15 Q   How did you know that about that fact?
16 A   The collector -- from the collector.
17 Q   Okay. Let me refer you to Exhibit 44.
18 Second paragraph, about the middle, "he was then
19 processed for this physical, it should be noted that
20 his temperature at that time was 97.8 "F", which I
21 assume is Fahrenheit. How did you know, that fact?
22 A   I guess from the nurse - I guess from the

Page 75

1  doctor and the nurse - the collector who performed
2  the physical.
3  Q   Okay, that's all I have. Thank you.
4  MR. GOLDSMITH: That's all I have Ms.
5  Tierney. Thank you so much for coming in today,
6  it's nice to meet you.
7  [Whereupon, at 2:54 p.m., the deposition in
8  the above-referenced matter was concluded.)
9  (Signature not waived)

c9daf0ca-2cf4-4a00-b163-de9e0fa86a21