# Transcript of the Testimony of **Bernard L. Campbell**

**Date:** February 9, 2007
**Volume:** 1

**Case:** Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Printed On: May 10, 2007



Ace-Federal Reporters, Inc.
Phone: 202-347-3700
Fax: 202-737-3638
Email: info@acefederal.com

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 34

1    enter on duty as a Foreman II?

2        A    I'm sure that the person would be notified

3    that they were accepted for the position, and some

4    type paperwork would come down to the clerks so we

5    would know who was coming.

6        Q    Do you know who has to sign off on the

7    paperwork placing the person in the job of Foreman

8    II?

9        A    HR.

10       Q    Anyone else?

11       A    Not that I know of.

12       Q    How long have you known Ms. Whitley?

13       A    I'd say about 27 years.

14       Q    Do you consider her a friend?

15       A    Yes.

16       Q    Do you consider her a very close friend?

17       A    Used to.

18       Q    What changed?

19       A    Mary.

20       Q    How so?

21       A    She wasn't the same person.

22       Q    What did you notice that made you draw the

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 124

1      Q      Now, Mr. Stevens was terminated by Amtrak,

2   correct?

3      A      Correct.

4      Q      And you proposed that Amtrak do that,

5   correct?

6      A      Absolutely wrong.

7      Q      Who did?

8      A      Mr. Stevens terminated hisself.

9      Q      How did he go about doing that?

10     A      He failed a drug test.  He gave an

11   adulterated sample, and it was his second time.

12     Q      Who initiated the action to have Mr.

13   Stevens removed?

14     A      Mr. Stevens initiated hisself.

15     Q      Okay.  Once Mr. Stevens had completed his

16   actions, what was the next thing that happened in the

17   process that led to him being removed?

18     A      The medical facility sent information to

19   Amtrak that Mr. Stevens had turned in an adulterated

20   sample.  He was given the opportunity to give another

21   sample.  He didn't do that.  He was told if he left,

22   he would be considered being positive.  Mr. Stevens

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 125

1    left.  The paperwork was sent to me, and the process

2    was started.

3        Q    What did you do to start the process?

4        A    I think I gave it to a General Foreman to

5    hold the case.

6        Q    So your name is on documents that charge

7    Mr. Stevens with misconduct, correct?

8        A    I'm not sure.

9        Q    Would it surprise you if that were the

10   case?

11       A    Yes.

12       Q    Do you know what role, if any, Mr. Kapela

13   played in documents being generated to initiate the

14   termination of Mr. Stevens?

15       A    Zero.

16           MR. GOLDSMITH:  Let's mark this, and the

17   number we're going to use is 52.

18                          (Plaintiff's Exhibit No. 52

19                          was marked for identifica-

20                          tion.)

21           BY MR. GOLDSMITH:

22       Q    I'm showing you what has been marked as

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 126

1    Exhibit 52 to your deposition.  It's a letter dated

2    May 21, 2004.  It says it's to the Law Department of

3    Amtrak, signed on the past page, which I guess is the

4    third page, by a Richard McEwen.  Do you know if

5    you've ever seen this before?

6            MR. FISCHLER:  In answering this, I don't

7    want you disclosing any conversation you've had with

8    Ms. Rogers or anybody from the Law Department.

9    That's privileged.

10           MR. GOLDSMITH:  And the question on the

11   table at this point doesn't require that.

12           MR. FISCHLER:  That's fine.

13           BY MR. GOLDSMITH:

14   Q      You can tell me if you recognize the

15   letter or not.

16   A      I've never seen this.

17   Q      Now what I would like you to do is read it

18   enough in your own mind to be able to answer the

19   question of whether you were familiar with anything

20   that's in here prior to today.

21   A      Okay.  What do you want to know?

22   Q      Were you familiar with any of the

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 127

1    contentions that are found in Exhibit 52 around the

2    time of May 21, 2004?

3         A     Not at that time, no.

4         Q     Did you later become familiar with some of

5    those contentions?

6         A     Only became familiar that Mr. Stevens had

7    related that he had a hostile work environment.  I

8    was sent a letter, not this one, saying that he had

9    alleged that he had a hostile work environment.  I

10   did fax that letter to the General Foreman in the

11   station, who has a closed office.

12            That gentleman was off one day when that

13   letter was in his office.  A foreman named B.K. White

14   was in the office, this Jeff Thomas was in there, saw

15   that letter.  At no time did that letter say anything

16   about Mr. Stevens having full-blown AIDS.  It only

17   talked about a hostile work environment, and it was

18   going to Joe Savoy to investigate what the

19   allegations were about.

20        Q     So do you believe that, if you take a look

21   at the second page of the exhibit--pardon me for a

22   moment.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 131

1    see Mr. Kapela or not.

2              BY MR. GOLDSMITH:

3        Q    Did Mr. Kapela ever tell you that Mr.

4    Stevens had come to see him?

5        A    No.

6        Q    Did you ever have any occasion to discuss

7    Mr. Stevens' concerns about the material that was

8    private to him being disclosed by Amtrak with Mr.

9    Stevens?

10       A    No.

11       Q    Did you ever have occasion to discuss that

12   with Mr. Kapela?

13       A    What?  Discuss what?  This letter, or--

14       Q    Mr. Stevens' concerns that there were

15   disclosures of private information made by Amtrak.

16       A    I did, after that was--after I got the

17   letter from Pat Graham that I sent to Joe Savoy, at

18   that time I did have the opportunity to discuss Mr.

19   Stevens' letter.

20       Q    With Mr. Kapela?

21       A    Yes.

22       Q    Anyone else you discussed it with at that

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 132

1    time?

2        A      I remember discussing it with Mr. Kapela

3    because Ms. Pat Graham gave me the letter that I sent

4    to Joe.

5        Q      What was said between yourself and Mr.

6    Kapela?

7        A      I don't have a clue.

8        Q      Does that mean you can't remember?

9        A      Yes.

10       Q      Do you remember if Mr. Kapela had seen the

11   letter that you testified you had forwarded on?

12       A      Don't know.

13       Q      You don't remember that either?

14       A      You asked me if I remembered if Mr. Kapela

15   remembered.

16       Q      I'm sorry.  Mr. Kapela remembered what?

17       A      You asked me did I remember if Mr. Kapela

18   remembered.

19       Q      No.  My question is, do you remember if

20   Mr. Kapela had seen the same letter that you had

21   passed along, that had wound up with Mr. Thomas?

22       A      I don't know.  Pat Graham gave me the

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 133

1    letter.  I don't know if he saw it or not.  I would

2    assume he did, but I don't know.

3         Q      Why were you discussing it with Mr.

4    Kapela?

5         A      Because there was an allegation of a

6    hostile work environment that belonged to me, and I

7    report to Mr. Kapela.

8         Q      Would you take a look at the last page of

9    the exhibit, the very top of that page?  It says that

10   Mr. Stevens' April 9th letter had been shared with at

11   least six other unauthorized employees.  Do you know

12   if that's true or untrue?

13        A      I have no idea.

14        Q      Did Mr. Kapela ever call your conduct into

15   question with regard to the disclosure of Mr.

16   Stevens' information?

17        A      I never disclosed Mr. Stevens'

18   information, sir.

19        Q      So would the answer be no?

20        A      That's correct.

21        Q      Do you know, are you familiar with an

22   Amtrak Dispute Resolution Office?

Bernard L. Campbell - February 9, 2007

Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 136

1    he's asking.

2            BY MR. GOLDSMITH:

3        Q    Was it shortly before or was it many years

4    before, or both?

5        A    Both.

6        Q    Do you know if Mr. Stevens is HIV

7    positive?

8        A    Yes.

9        Q    How did you first learn that?

10       A    Mr. David Stevens made it known.

11       Q    Did he tell you personally, directly?

12       A    Yes.

13       Q    When did he do that?

14       A    I don't remember the date.

15       Q    Was anyone else present when he told you

16   that?

17       A    I don't remember.

18       Q    Do you remember where you were?

19       A    No.

20       Q    Do you remember the year?

21       A    A couple of years ago.

22       Q    Do you remember the decade?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 137

1        A        A couple of years ago.

2        Q        So you're not sure which decade it was in?

3        A        Well, if it was a couple of years ago, I

4    think that's pretty well in the right decade.

5        Q        You think it was in the 2000's, not in the

6    1990's?

7        A        I would say the 2000's.

8        Q        Did anyone else also give you the

9    information that Mr. Stevens was HIV positive at some

10   point?

11       A        It was just a pretty known fact on the

12   railroad.

13       Q        And was that before or after April of

14   2004?

15       A        I would say that was before.

16       Q        Do you know how much before?

17       A        Around the time that he alleged that he

18   was going with the Redskins football player.

19       Q        When was that?

20       A        It would have to be Westbrook, whenever

21   Westbrook was playing for the Redskins.

22       Q        He was the football player involved?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 145

1    said it to you, how do you think you said it?

2        A    Don't know.  However he said it, I

3    probably didn't like it.

4            MR. FISCHLER:  I don't think that's what

5    he asked.

6            MR. GOLDSMITH:  All right.  Let me ask the

7    question again.

8            BY MR. GOLDSMITH:

9        Q    I asked you whether you said, "You see, I

10   like you, but you're going to put my name in that

11   fucking shit," and you said, "I don't think I would

12   have said it that way," and then we talked about

13   something else.  How do you think you would have said

14   it?

15       A    "David, I don't know what you're trying to

16   do.  Don't put my name in your stuff.  I don't have

17   anything to do with it."  That would be more of what

18   I would say.

19       Q    Do you think you cursed at all in there?

20       A    Don't know.

21       Q    So it's possible you did, and possible you

22   didn't?

Bernard L. Campbell - February 9, 2007

Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 146

1     A     Don't know.

2     Q     All right.  And then did you also say to

3  him, "I will destroy a motherfucker like you"?

4     A     Absolutely not.

5     Q     Did you say anything like that?

6     A     I said absolutely not.

7     Q     Did you say anything that he might have

8  misheard or misinterpreted as "I will destroy a

9  motherfucker like you"?

10     A     I can't tell you what he might have

11  misinterpreted.

12     Q     So not that you know of?

13     A     I can't tell you what he might have

14  misinterpreted.

15     Q     Right, and did you say to him, "If you

16  ever put my name in anything else, you would wish you

17  didn't"?

18     A     Might have said something like, "David,

19  don't get me involved, you don't want me to testify

20  against you," something like that.

21     Q     All right, but I just want to know.  If

22  the answer is no, then that's fine, but I want to

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 186

1    Look like they did a little over and above, if you

2    ask me.

3         Q     So are you concerned about the fact that

4    somebody at Amtrak is sending out letters with your

5    name that you haven't authorized, or not?

6         A     No, I'm not.  Not this particular type

7    letter.  It's a form letter.

8         Q     If it's a form letter, then it's okay?

9         A     No.  This particular letter, I wouldn't

10   have a problem with this particular letter.

11              MR. GOLDSMITH:  I'm going to show you what

12   is going to be Exhibit 57.

13                        (Plaintiff's Exhibit No. 57

14                         was marked for identifica-

15                         tion.)

16              BY MR. GOLDSMITH:

17        Q     Exhibit 57 has Bates numbers

18   Amtrak/Stevens 113 through 117 in the lower right,

19   and it appears to be a letter from Amtrack's EEO

20   Compliance Office to the Equal Employment Opportunity

21   Commission.  Did you come to be aware at some point

22   that Mr. Stevens had filed a complaint with the Equal

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 187

1    Employment Opportunity Commission?

2        A    Doesn't ring a bell.

3        Q    All right.  Do you recognize Exhibit 57?

4    Are you familiar with it?

5        A    Some of the inserts have been almost

6    identical to some of the paperwork that you have had

7    me read.

8        Q    Have you ever seen Exhibit 57 itself

9    before?

10       A    No.

11            MR. GOLDSMITH:  I'm showing you what has

12    been marked as Exhibit 58.

13            MR. FISCHLER:  Which one is 58?   That's

14    the letter from McEwen?

15            MR. GOLDSMITH:  Yes.

16                            (Plaintiff's Exhibit No. 58

17                            was marked for identifica-

18                            tion.)

19            BY MR. GOLDSMITH:

20       Q    Exhibit 58 is a two-page letter from

21    Richard McEwen to Melissa Rogers.  Have you ever seen

22    this before?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 207

1    Prince George's County?

2        A    That is correct.

3        Q    How did you learn about that?

4        A    E-mail.

5        Q    Who did you get the e-mail from?

6        A    I think Lateria, Margaret Ann Lateria.

7        Q    Would that be Margaret Tierney?

8        A    Yes.  You must know her.

9        Q    Where does she work?

10       A    Somewhere for Amtrak.  Philadelphia, I

11   think.

12       Q    And what was the essence of the e-mail?

13       A    It basically said that Mr. David Stevens

14   had reported for a return-to-duty physical.  He gave

15   an adulterated sample.  He was told that he had to

16   give another sample under observation.  He said he

17   was worried about his health.  He left.

18           He was told that if he didn't give that

19   sample, that he would be probably terminated, I

20   believe.  That's the policy.  No, excuse me, he would

21   be considered as a positive result or being a Rule G

22   violator.  His second hit would put him into the

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 223

1    a Rule G waiver.  It's mandatory.

2        Q    Any other reason why it's mandatory?

3        A    It's company policy.

4        Q    What's company policy?

5        A    That it's mandatory that we proceed to

6    bring a Rule G waiver up in a hearing.  And

7    termination, once you violate the Rule G, the only

8    solution is termination.

9        Q    Who makes the determination as to whether

10   someone has violated a Rule G waiver such that it

11   could become mandatory to bring charges?

12       A    Policy, company policy.

13       Q    But who decides when that policy needs to

14   be invoked?

15       A    The employee.

16       Q    Well, the employee doesn't specifically

17   say "I want to be fired."  The employee commits an

18   act and then management decides to fire him, right?

19       A    No.  The employee specifically says "I

20   want to be fired" by signing that Rule G waiver which

21   clearly states what's going to happen to you.

22       Q    If you commit another violation.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 224

1      A      That is correct.

2      Q      Right, so in Mr. Stevens' case he signed a

3    Rule G waiver.

4      A      Correct.

5      Q      And then some other facts occurred.

6      A      I don't know what those are.

7      Q      Well, stick with me.  Some other facts

8    occurred.

9      A      All right.

10     Q      And they result in Ms. Tierney sending you

11   an e-mail, right?  You get an e-mail telling you

12   about what happened.

13     A      I had an e-mail telling me that Mr.

14   Stevens turned in an adulterated sample that did not

15   meet the temperature specifications.  He was asked to

16   give another sample under supervision.  He didn't do

17   that.  He was also told if he left, he would be

18   considered as being positive.  His second positive,

19   Mr. Stevens is aware that it would be termination.

20   He left the facility.

21     Q      And so when you read that e-mail, you

22   decided to assign Mr. Talley to move toward a hearing

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 225

1    in terms of terminating Mr. Stevens.  Is that

2    correct?

3        A      That is correct.

4        Q      If Mr. Stevens had been--well, let's just

5    make this hypothetical--when an employee presents for

6    a drug test under Amtrak's policies, how long are

7    they required to wait for the testing facility to

8    give them a test?

9        A      I think there is a four-hour rule.  After

10   four hours, if they can't participate in urinating in

11   the bottle, then they have a physical exam to see why

12   they can't urinate.  They are given every opportunity

13   to drink water, soda, whatever they need.

14       Q      What if they can urinate but the testing

15   facility isn't prepared to test them?

16       A      I don't know about that.  You have to ask

17   the testing facility.

18       Q      I'm sorry.  Was it your testimony that you

19   don't recall whether or not you ever talked to Ms.

20   Tierney about what she knew about what happened on

21   the day of Mr. Stevens' test?

22              MR. FISCHLER:  Asked and answered.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 226

1          THE WITNESS:  That is correct.

2          BY MR. GOLDSMITH:

3     Q    You don't remember?

4     A    That is correct.

5          MR. GOLDSMITH:  I'm going to show you what

6     we're going to mark as 61.

7                    (Plaintiff's Exhibit No. 61

8                     was marked for identifica-

9                     tion.)

10         BY MR. GOLDSMITH:

11    Q    Showing you what has been marked as

12    Exhibit 61, a two-page document, says it's a

13    declaration of Bernard Campbell dated October 20,

14    2005, did you sign this on the second page?

15    A    That's my signature.

16    Q    And do you remember preparing and signing

17    this affidavit, declaration?

18    A    No.

19    Q    All right, but you don't deny that you

20    did?

21    A    That's my signature.

22    Q    So you don't deny that you did?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 227

1      A      That's my signature.

2      Q      All right.  To be real clear, do you deny

3   signing this declaration or not?

4      A      I don't deny it.  That's my signature.

5      Q      Thank you.  And you swore to this or you

6   declared this under penalty of perjury, correct?

7      A      I guess I did.  I'm not sure.  I don't

8   remember signing it, but that's my signature.

9      Q      All right.  It says here under paragraph

10   6, you said, "Rather than retake the test or

11   cooperate with the medical personnel administering

12   the test, Mr. Stevens left the facility."  You see

13   that?

14      A      Yes.

15      Q      Is that based on personal knowledge or on

16   review of records?

17      A      Basically, it would be of records.

18      Q      Which records did you review?

19      A      Probably the one that Margaret Tierney

20   sent me.

21      Q      Anything else?

22      A      No.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 233

1      A     No.  I didn't be a detective and try to

2   find out.

3      Q     And whether by trying to find out or by

4   just falling into it, you didn't become aware of any

5   specific information that Mr. Stevens ever expressed

6   that turned out to be untrue.  Is that right?

7      A     I never tried to find out.

8      Q     That's a different question.  So, you

9   know, we want to try to wrap this up.  My question

10  is, did you ever find out, whether you were trying or

11  not, that anything he said was untruthful?

12     A     I can only tell you I never tried to find

13  that out.

14     Q     Did any such information ever fall into

15  your lap without you trying?

16     A     No.

17     Q     Do you know whether Mr. Stevens ever said

18  anything untruthful about any parties he went to?

19     A     No.

20     Q     Do you know if he ever said anything

21  untruthful about a lavish lifestyle?

22     A     No.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 238

1              MR. FISCHLER:  Okay, but it's got nothing

2      to do with this deposition.  He can't do anything

3      with it.  That's fine.

4              MR. GOLDSMITH:  I mean, I've got no other

5      questions for him.  He has never seen it before.

6              MR. FISCHLER:  Okay.

7              MR. GOLDSMITH:  Let me show you No. 67.

8                        (Plaintiff's Exhibit No. 67

9                        was marked for identifica-

10                       tion.)

11             MR. FISCHLER:  Same objection.  These

12     documents aren't authenticated.

13             BY MR. GOLDSMITH:

14     Q     Showing you what has been marked as

15     Exhibit 67, it says Amtrak/Stevens down in the lower

16     right, 222.  It says it's a Notice of Charge of

17     Discrimination from U.S. Equal Employment Opportunity

18     Commission.  Have you ever seen this before?

19     A     No, sir.

20     Q     And I believe it was your testimony that

21     you didn't know that Mr. Stevens ever made a charge

22     of discrimination with the Equal Employment

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 239

1    Opportunity Commission until today.  Is that right?

2         A    That's about number 17, sir.  No, I

3    haven't.

4         Q    Now, did you play any role in responding

5    to requests for production of documents in this case

6    here?

7         A    To whom?

8         Q    The case that I brought.  Were you asked

9    by counsel to get any documents that needed to be

10   turned over to me?

11        A    None that I know of.

12             MR. GOLDSMITH:  Let's mark this.

13                       (Plaintiff's Exhibit No. 68

14                        was marked for identifica-

15                        tion.)

16             MR. FISCHLER:  I'm going to object.  This

17   document is incomplete.  I can't imagine the

18   relevance of a cover sheet.

19             BY MR. GOLDSMITH:

20        Q    Showing you what has been marked as

21   Exhibit 68, it says Amtrak 234 down at the bottom, it

22   says it's a facsimile cover sheet for a two-page fax

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 189

1       Q      He said that directly to your face?

2       A      I don't think he used the words directly

3  in my face as hostile work environment.  He said he

4  didn't like the people that he worked with, they

5  didn't treat him fair.  I saw nothing to substantiate

6  that.

7       Q      Now, you knew that in May of 2004 that Mr.

8  Stevens had sent a letter of complaint about the

9  exposure of his medical information.  You knew about

10  that, correct?

11      A      Are you talking about the letter that I

12  faxed?

13      Q      Yes.

14      A      There was nothing on that letter about his

15  medical information, sir.

16      Q      You knew that Mr. Stevens was upset about

17  the fact that that letter had been circulated more

18  broadly that he wanted it to, correct?

19      A      I don't know that letter was circulated

20  more broadly than he wanted it to.  What does that

21  mean?

22      Q      Did you tell Mr. Stevens that you didn't

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 190

1    want to see your name in any paperwork of his?

2        A    No.  I think I testified that I told Mr.

3    Stevens that I didn't want him putting my name in

4    whatever he was doing.

5        Q    All right, and what was it that he was

6    doing that it was including your name, that you

7    didn't want him to continue doing?

8        A    I don't know what he was doing, but

9    whatever it was, I didn't want to be involved.

10       Q    How did you know he was doing anything?

11       A    Because he had already complained of a

12   hostile work environment.

13       Q    So as we sit here today, do you know

14   whether Mr. Stevens' letter that was sent on his

15   behalf, Exhibit 52 here today, do you know whether,

16   when you told Mr. Stevens that you didn't want him

17   putting your name in anything he was doing, whether

18   you were referring to anything that had been

19   mentioned in Exhibit 52?

20       A    I think I told you the first time I saw

21   Exhibit 52 was today, sir.

22       Q    Right, but putting aside when you saw

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 193

1    but is that in front of him?  I just wanted it in

2    front of him.

3              MR. GOLDSMITH:  I don't think the question

4    was specific to Exhibit 52, though, so it's just

5    going to send him more off track.

6              MR. FISCHLER:  Maybe he doesn't need it,

7    but I'm having trouble following what the questions

8    are.

9              MR. GOLDSMITH:  Did you understand the

10   question?

11             THE WITNESS:  No, sir.

12             MR. GOLDSMITH:  You can read the question

13   back.

14             THE WITNESS:  Which question?

15             MR. GOLDSMITH:  No, she'll read it back.

16             (The previous question was read as

17   requested.)

18             THE WITNESS:  No.

19             BY MR. GOLDSMITH:

20        Q    What did inform your statement that you

21   didn't want Mr. Stevens to include your name in

22   anything he was doing?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 194

1       A       I think it's from the conversation with

2   the DRO, claiming that I did something to David.

3       Q       Is it a conversation that you had with Ms.

4   Coleman?

5       A       I would probably say yes.

6       Q       And was it a conversation that you had

7   with Ms. Coleman in the same general time frame of

8   Exhibit 52, namely something that would have happened

9   in the weeks preceding May 21, 2004?

10      A       Again, you're mighty vague.  I don't know

11  how to answer that unless you give me something to

12  answer.

13      Q       Why don't you tell me what the content of

14  the conversation was that you're referring to?

15      A       Best I can remember, it was that David had

16  complained that I did something to him.

17      Q       You don't remember what he complained you

18  did?

19      A       Basically, I had passed out some

20  information about his medical condition.

21      Q       And that's something different from the

22  complaint that he had that's reflect back in Exhibit

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 200

1    knowledge that Mr. Stevens thought that he had been

2    exposed to a hostile work environment?

3        A    Only from the letter that I sent to Joe

4    Savoy.

5        Q    Now, it says here that Mr. Stevens is

6    asserting through his counsel that he has tried to

7    resolve the matter amicably.  You see that?

8        A    Yes.

9        Q    Did you try to resolve the matter

10   amicably, too?

11       A    I didn't know there was a matter to

12   resolve.

13       Q    Nobody told you?

14       A    That's what I testified to, sir.

15            MR. GOLDSMITH:  All right.  Let's take a

16   look at Exhibit 59.  Exhibit 59 has three pages to

17   it.

18                          (Plaintiff's Exhibit No. 59

19                          was marked for identifica-

20                          tion.)

21            MR. FISCHLER:  This is the EEOC letter?

22            MR. GOLDSMITH:  Fifty-nine starts with

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 201

1    November 18th, three pages.                      The

2    first page is a letter from the EEOC to the Amtrak

3    EEO Compliance Manager.  The second page says

4    amendment to charge of discrimination.  The third

5    page is page 107 and contains parts 3 and 4 to the

6    second page.

7             MR. FISCHLER:  These are not consecutive

8    documents.

9             MR. GOLDSMITH:  No, they're not

10   consecutive in your numbering but they go together.

11   If you look at them, I think you'll infer the same

12   thing from that.  In fact, 106 and 107 are

13   consecutive.

14             MR. FISCHLER:  Right, right.  Okay.

15             BY MR. GOLDSMITH:

16       Q    All right.  Were you aware that Mr.

17   Stevens made an amendment to his EEO complaint with

18   the EEOC in November of 2004?

19       A    See, I didn't know he made the first

20   complaint.

21       Q    So you never knew that he--at no time

22   while he was still employed at Amtrak did you know

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 202

1    that he had made a complaint with the EEOC.  Is that

2    correct?

3         A    That is correct.

4         Q    And at no time did you know that he did an

5    amendment to his complaint with the EEOC.  Is that

6    also true?

7         A    I never knew he even made a complaint, so

8    I definitely didn't know he made an amendment to his

9    complaint.

10        Q    All right.  How did you find out that he

11   had made a complaint?  Was that here today, or did

12   you know it before today?

13        A    I never testified that I did know he made

14   a complaint to the EEOC.

15        Q    Well, you know now, right?

16        A    Yes, sir.

17        Q    All right, so you think you learned it

18   today?

19        A    I'm pretty sure.  I would have to say yes.

20   Yes.

21        Q    Now, have you had employees make

22   complaints to the EEOC in the past, when you've been

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 203

1   working at Amtrak?

2       A    I don't know.  I've had--yes, I know of

3   one that I went to mediation on.

4       Q    When there's been a complaint in the past,

5   has someone from the Dispute Resolution Office talked

6   to you about that?

7       A    Yes.

8       Q    And in this case I believe your testimony

9   is that someone from the Dispute Resolution talked to

10  you but they didn't tell you that there was a

11  complaint made with the EEOC.  Is that correct?

12      A    That is correct.

13      Q    Is there anybody else at Amtrak who you

14  would have expected would have told you that a

15  complaint had been made with the EEOC, other than the

16  Dispute Resolution Office?

17      A    I didn't expect them to do it.

18      Q    Right, but now that you know that there

19  was a complaint, would you have thought that somebody

20  would have told you about it?

21      A    It doesn't make any difference to me.  I

22  just do my job, and that's somebody else's job.  If

Bernard L. Campbell - February 9, 2007

Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 204

1    they call me, I'll give them answers like I'm giving

2    you.

3        Q    All right.  Now, looking at the third page

4    of the exhibit, page 107, it says under Roman numeral

5    III, Mr. Stevens is alleging that--and you heard this

6    earlier today--that you told him you would destroy

7    him if he continued to pursue a complaint against

8    you.  Do you see that, the end of the Roman numeral

9    III?

10       A    Yes, I do.

11       Q    But nobody at Amtrak told you that Mr.

12   Stevens had made that complaint?

13       A    I think I've testified to that about 15

14   times, sir.

15       Q    So you're pretty certain about it?

16       A    Yes, sir.

17       Q    If someone at Amtrak had told you about

18   the complaint in paragraph III, would it have caused

19   you to take any action?

20       A    I wouldn't--

21            MR. FISCHLER:  Objection.  Calls for

22   speculation.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 205

1              THE WITNESS:  I wouldn't have cared.  I

2      still had my job to do.

3              BY MR. GOLDSMITH:

4         Q    So is the answer no, or--

5         A    I wouldn't have had concern.  I still had

6      my job to do.

7         Q    Putting aside the doing of your job, I'm

8      just trying to understand whether you're saying that

9      you would take no action in that situation or you

10     would take some kind of action.

11        A    I would take no action.  It wouldn't

12     benefit me at all.

13             MR. GOLDSMITH:  Let's take a look at what

14     I'm going to have marked as Exhibit 60.

15                         (Plaintiff's Exhibit No. 60

16                         was marked for identifica-

17                         tion.)

18             BY MR. GOLDSMITH:

19        Q    Let me show you what has been marked as

20     Exhibit 60.  It's a letter to Mr. Stevens dated April

21     7, 2004, from Ms. Atkinson at the DRO office.  Do you

22     know Ms. Atkinson?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 209

1      Q      What does it mean to hold the case?

2      A      To hold the case.  To go down there and

3      put in evidence that was received and hold the case.

4              Q.              Did you have any additional

5      sources of information, other than the e-mail that

6      you got from Ms. Tierney, about what had happened?

7      A      We eventually got the person that was at

8      the clinic that serviced Mr. Stevens to testify, I

9      believe.  I've never talked to that person.  That was

10     handled by the charging officer.

11     Q      Anything else?

12     A      I don't know what you're looking for.

13     Q      Was there anything else that you--any

14     other information, any other source of information

15     that you developed, other than the charging officer

16     talking to someone from the clinic and the e-mail

17     from Ms. Tierney?

18     A      That should have been a sufficient amount

19     of evidence.

20     Q      Sufficient to do what?

21     A      To find him guilty of violating Amtrak

22     drug and alcohol policy for a Rule G waiver that he

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 210

1    was signatory to.

2         Q    Was that the objective of what you were

3    trying to do?

4         A    Absolutely correct.

5         Q    Did you ever ask Mr. Talley to speak to

6    anybody else about Mr. Stevens' situation?

7         A    I don't know who anybody else is, but no.

8         Q    Did you ever try to speak to anybody else,

9    anybody, about Mr. Stevens' situation yourself?

10        A    No.

11        Q    After you got the e-mail from Ms. Tierney,

12   did you ever speak to Ms. Tierney about the contents

13   of the e-mail?

14        A    Not sure.  We do a lot of those.

15        Q    Do you recall anything that you may have

16   said to Ms. Tierney or that she may have said to you

17   about the contents of the e-mail?

18        A    No, sir.

19        Q    Did you ever speak to Mr. Stevens' union

20   representative about the charges against Mr. Stevens?

21        A    It is possible.

22        Q    Do you remember if you ever did that?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 211

1       A     No, I don't.

2       Q     Do you remember anything the union

3  representative might have said to you?

4       A     I don't remember if we really talked.

5       Q     So no?

6       A     No, I said I don't remember if we really

7  talked.

8       Q     Do you remember anything that might have

9  been said?

10      A     No.  I don't remember if we really talked.

11  I said it was possible for me to talk to him.

12      Q     Did Mr. Talley ever report to you about

13  his conversations or conversation with the person

14  from the clinic?

15      A     I'm sure that we talked.

16      Q     Do you remember anything you said?

17      A     No, not at this time.

18      Q     Putting aside what he actually said, do

19  you remember what the upshot of any of the

20  conversations were?

21      A     No, because it was such a simple case.  I

22  just made sure he had his ducks in a row when he went

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 212

1    down, with the adequate information to prove the

2    case.

3        Q     So when he went down to prove the case,

4    you didn't go with him, right?

5        A     That's correct.

6        Q     So you didn't testify at all in the case?

7        A     That's correct.

8        Q     And did he give you a report back after he

9    went to the hearing?

10       A     There's no such thing as a report back.

11       Q     Did he tell you anything about what

12   happened at the hearing?

13       A     He said he won the case.

14       Q     Did he tell you that the day of the

15   hearing?

16       A     I'm pretty sure.

17       Q     Did he tell you how he knew that?

18       A     Because it's elementary.  If you're dirty,

19   you're dirty; if you're not, you're not.  If you

20   don't test and you walk out the facility, you're

21   positive.

22       Q     Did there ever come a time when you

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 213

1   developed any information to suggest that there were

2   any extenuating circumstances or any explanations

3   that had been given by Mr. Stevens as to why he

4   hadn't completed the second test?

5           MR. FISCHLER:  Objection.  Lack of

6   foundation.  You can answer.

7           THE WITNESS:  It's not my decision.

8           BY MR. GOLDSMITH:

9   Q    I'm not asking you about a decision.  I'm

10  just asking you whether you developed any information

11  about that, whether you learned anything about that.

12  A    I wouldn't even look for that.

13  Q    So you never heard of anything like that

14  before?

15  A    Not that I know of.

16  Q    Ms. Tierney never told you anything like

17  that?

18  A    I think I testified to that.

19  Q    So the answer is no?

20  A    Yes.

21  Q    Yes, that the answer is no?

22  A    Yes.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 214

1       Q      Correct?

2       A      Correct.

3       Q      And Mr. Talley never told you anything

4    like that?

5       A      Anything like what?

6       Q      He didn't tell you that Mr. Stevens had

7    tried to explain that there had been extenuating

8    circumstances in the situation that caused the result

9    that occurred?

10            MR. FISCHLER:   Objection.   Lack of

11   foundation.   Go ahead.

12            THE WITNESS:   Alls I can tell you is that

13   every person that usually comes up like that have

14   extenuating circumstances.   If they were legitimate,

15   they will listen to them in the hearing.   I wasn't at

16   the hearing, so I don't know what they might have

17   been.

18            BY MR. GOLDSMITH:

19      Q      Mr. Talley didn't tell you?

20      A      No.

21      Q      Did Mr. Talley tell you that Mr. Stevens

22   had gone to the emergency room immediately when he

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 215

1   left the facility?

2       A     I don't know how Mr. Talley would know

3   that.

4       Q     I'm just asking if he told you that.

5       A     No.

6       Q     Did Mr. Talley tell you that Mr. Stevens

7   was diagnosed with bronchitis when he went to the

8   emergency room that day?

9       A     I don't remember that.  Bronchitis?  I

10  don't know.  I don't remember that.

11      Q     Is there anything that would refresh your

12  recollection as to whether Mr. Talley told you that?

13      A     No, I don't think so.

14      Q     Did you ever hear that from Mr. Stevens'

15  union representative?

16      A     The first time I heard bronchitis that

17  rings a bell is when you just told me.

18      Q     Did Mr. Talley tell you whether Concentra

19  was prepared to have Mr. Stevens give a second sample

20  after his first sample was not in the right

21  temperature range?

22      A     I don't know how Mr. Talley would know

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 216

1    that.

2        Q     So he didn't tell you that one way or the

3    other?  Didn't talk to you about that?

4        A     No.

5        Q     Did Mr. Talley say anything to you about

6    how long Mr. Stevens had to wait at the Concentra

7    facility for his second test to be administered?

8        A     No.

9        Q     Did anyone else ever tell you anything

10   about that?

11       A     About what?

12       Q     How long Mr. Stevens had to wait at the

13   Concentra facility for his second test to be

14   administered.

15       A     No.

16       Q     Do you know if there was a transcript made

17   of the hearing that was conducted that Mr. Talley

18   attended on your behalf?

19       A     I would say yes.  And he didn't attend on

20   my behalf.  He attended, that's his job.

21       Q     Well, it's his job because you assigned it

22   to him, right?

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 217

1       A    Yes.

2       Q    Did you ever read that transcript?

3       A    No.

4       Q    Did you receive a copy of the transcript?

5       A    No.

6       Q    Did you ever request a copy of the

7   transcript?

8       A    No.

9       Q    Did you ever discuss what happened at that

10  hearing with Mr. Kapela?

11      A    No.

12      Q    Did you ever discuss it with anybody?

13      A    Not that I can recall.  I don't know what

14  happened in the hearing.

15      Q    So you don't remember discussing it with

16  Mr. Talley, who was there, correct?

17      A    I might have talked to Talley.  He's my

18  charging officer.  I don't remember discussing it

19  with anybody.  Mr. Talley is my charging officer.  He

20  will report back to me.

21      Q    So you're saying he would have reported to

22  you something about it as a matter of course, but you

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 218

1   can't remember any conversations about it anymore

2   with him?

3       A    No, that's not what I told you,

4       Q    All right.  Then explain it to me, if you

5   could.

6       A    I told you I think Mr. Talley reported

7   that he won the case because it was so elementary

8   that it was easy.  After Concentra talks and the MRO

9   talks, it's pretty well a clear-cut case.  If you

10  walked out, you signed a Rule G waiver that says that

11  you will be subject to a test for the next ten years,

12  if you come up positive or fail to give a sample, you

13  are terminated.  He signed that Rule G waiver.  He

14  knew what the consequences were if he walked out of

15  that facility.

16      Q    So what did Mr. Talley tell you about the

17  hearing?

18      A    He won.

19      Q    Anything else?

20      A    That's all I can remember.

21      Q    You testified that it's elementary, that

22  if an employee walks out of a testing situation, that

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 219

1    that's treated as a positive test.  Is that right?

2        A    That is absolutely correct.

3        Q    Do you know whether there are any

4    exceptions to that rule?

5        A    No, none written.

6        Q    Do you know whether Amtrak recognizes any

7    exceptions to that rule?

8        A    I know of none that they accept to that

9    rule.

10       Q    Do you know whether Amtrak recognizes an

11   exception for a medical emergency to that rule?

12       A    I wouldn't get into medical emergencies.

13   I don't deal with those.

14       Q    I'm just asking you whether if someone

15   left a testing facility for a medical emergency,

16   whether that's treated the same as if they left for

17   some other reason?

18       A    I've already testified that if you leave

19   when you are back there and they have told you what's

20   the thing and you have signed a Rule G waiver, it's

21   considered as positive.  A positive, and you've

22   already signed a Rule G waiver, you will be

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 220

1    terminated.

2        Q    And there is no exception, as far as you

3    know, for a medical emergency?

4        A    As far as I know, there are no written

5    exceptions.

6        Q    Well, is there an unwritten exception for

7    a medical emergency?

8        A    Not that I know of, and I'm not making

9    any.

10       Q    Do you know if Amtrak would recognize an

11   exception to that rule in the instance of someone

12   having a house burn down?

13           MR. FISCHLER:  Asked and answered.

14           THE WITNESS:  No.

15           BY MR. GOLDSMITH:

16       Q    You don't know?

17       A    You'd have to ask Amtrak.

18       Q    Well, what if I did?

19       A    They might give you an answer.

20       Q    But Mr. Talley came back and he told you

21   he had won the case because it was so elementary?

22       A    That's correct.  I've testified to that.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 241

1      Q      You see at the bottom of 60 that it says

2    Amtrak/Stevens 235?

3      A      Yes.

4      Q      Do you know where the letter that you

5    forwarded that was attached to Exhibit 68 is now?

6      A      No.

7           MR. GOLDSMITH:  Let me show you what's

8    going to be marked as 69.

9                         (Plaintiff's Exhibit No. 69

10                        was marked for  identifica-

11                        tion.)

12           BY MR. GOLDSMITH:

13      Q      Exhibit 69 is a letter from Whitman-Walker

14    Clinic on behalf of Mr. Stevens, written to the Law

15    Department at Amtrak, a two-page document.  Have you

16    ever seen this before?

17      A      No.

18      Q      Did anyone inform you, around November 18,

19    2004, that Mr. Stevens was concerned that someone had

20    come to his apartment building and scrawled on his

21    door, "You will lose, you have AIDS"?

22      A      No.

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 186

1    Look like they did a little over and above, if you

2    ask me.

3        Q    So are you concerned about the fact that

4    somebody at Amtrak is sending out letters with your

5    name that you haven't authorized, or not?

6        A    No, I'm not.  Not this particular type

7    letter.  It's a form letter.

8        Q    If it's a form letter, then it's okay?

9        A    No.  This particular letter, I wouldn't

10   have a problem with this particular letter.

11           MR. GOLDSMITH:  I'm going to show you what

12   is going to be Exhibit 57.

13                        (Plaintiff's Exhibit No. 57

14                        was marked for identifica-

15                        tion.)

16           BY MR. GOLDSMITH:

17       Q    Exhibit 57 has Bates numbers

18   Amtrak/Stevens 113 through 117 in the lower right,

19   and it appears to be a letter from Amtrack's EEO

20   Compliance Office to the Equal Employment Opportunity

21   Commission.  Did you come to be aware at some point

22   that Mr. Stevens had filed a complaint with the Equal

Bernard L. Campbell - February 9, 2007
Mae L. Whitley & David B. Stevens, et al., v. National Railroad Passenger Corporation (Amtrak)

Page 187

1    Employment Opportunity Commission?

2        A    Doesn't ring a bell.

3        Q    All right.  Do you recognize Exhibit 57?

4    Are you familiar with it?

5        A    Some of the inserts have been almost

6    identical to some of the paperwork that you have had

7    me read.

8        Q    Have you ever seen Exhibit 57 itself

9    before?

10       A    No.

11           MR. GOLDSMITH:  I'm showing you what has

12   been marked as Exhibit 58.

13           MR. FISCHLER:  Which one is 58?   That's

14   the letter from McEwen?

15           MR. GOLDSMITH:  Yes.

16                       (Plaintiff's Exhibit No. 58

17                       was marked for identifica-

18                       tion.)

19           BY MR. GOLDSMITH:

20       Q    Exhibit 58 is a two-page letter from

21   Richard McEwen to Melissa Rogers.  Have you ever seen

22   this before?