Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 19

1          MR. FISCHLER:  I think it's 84.

2          MR. GOLDSMITH:  84.

3          (Plaintiff's Exhibit 84 identified.)

4          MR. GOLDSMITH:

5     Q    I'm showing you a document that has been

6  marked as Exhibit 84.  I'm wondering if you

7  recognize the form, just the form, not what's

8  included within it?

9     A    Uh-huh.  It's a return to work physical.

10    Q    And I see on here there's an area around

11 the middle of the page where it says "examination."

12    A    Uh-huh.

13    Q    It has lines for temperature and blood

14 pressure, et cetera?

15    A    Uh-huh.

16    Q    Is this the form where you would document

17 an individual's temperature, blood pressure,

18 et cetera, or would you put it on a different form

19 and have it transferred to this form?

20    A    It depends on who the MA is because the

21 medical assistant may write it on the flow sheet,

22  jot it down on a flow sheet and then write it neat

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 20

1    for the doctor on the form.

2         Q    What would you do personally if it was

3    you?

4         A    I do both.

5         Q    Sometimes you would put it on a flow

6    sheet?

7         A    Right.

8         Q    Does the flow sheet go in the patient's

9    medical file after you've done it?

10        A    Yeah.  It's the cover sheet.

11        Q    If you put it on the flow sheet, would

12   there end up being two different documents that

13   would have the person's vitals on it?

14        A    It's all together.  If they don't have a

15   chart -- they used to file by days or by companies.

16   It would be like his chart -- everything that he had

17   done on that visit would be stapled together, either

18   filed under that date or filed under Amtrak, the

19   company.

20        Q    So in this case, because this looks like a

21   document relating to an examination of Mr. Stevens,

22   once you looked at that chart that you just

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 21

1    described, would you see two different pieces of

2    paper that indicated what his vitals were on that

3    day, one like this that looks like the doctor

4    eventually does something with it and one like the

5    flowchart that you described?

6         A    Yes.

7         Q    And then sometimes you're saying that you

8    or another medical assistant might actually be the

9    one who actually puts the numbers right on this

10   evaluation that the doctors --

11        A    We do the numbers point-blank.  We do the

12   numbers -- the vitals is for the nurse to do.

13   Whether we take the shortcut and just write it on

14   the flow sheet first and when we get in the room

15   with the patient, we transfer it or write directly

16   on the form.

17        Q    The handwriting I would see on any of

18   these under examination would be the handwriting of

19   a medical assistant who works on it, not the

20   handwriting of a doctor?

21        A    It would be both.  The vitals would be

22   from the medical assistant, and the medical

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 22

1    information would be from the doctor.

2        Q    If there were a flow sheet that would be

3    in the file, and if there were an evaluation, that

4    would be the file?

5        A    Correct.

6        Q    If you were to have a return to work

7    physical, are there certain things that a doctor

8    would necessarily check for?

9        A    A return to work physical is basically for

10   patients that have been off of work due to another

11   doctor.  Maybe they were in a car accident or had a

12   baby or had surgery.  And their doctors release them

13   to go back to work, but their company will send them

14   to Concentra to make sure that they can work, do

15   their job, not just their doctor saying they can go

16   to work.

17            What we would need is first something from

18   his doctor or the patient's doctor stating they can

19   go back to the work, and our doctors do the

20   evaluation from that, if they can and have their

21   doctor's okay.

22       Q    Other than what you just told me about a

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 23

1    flow sheet and the doctor's evaluation form, if you

2    were talking about a return to work exam, are there

3    other records that would routinely be kept relating

4    to the patient's visit?

5        A    The flow sheet, the physical form -- if

6    these were Amtrak, he's a male, his ID and I think

7    that's it, probably some HIPAA forms and some

8    medical forms like that.

9        Q    So the physical form, is that what I've

10   referred to as Exhibit 84?

11       A    Yes.

12       Q    And the flow sheet you talked about.

13            MR. GOLDSMITH:  I'm going to show you a

14   document which we can mark as Exhibit 85.

15            (Plaintiff's Exhibit 85 identified.)

16            BY MR. GOLDSMITH:

17       Q    I'm showing you what's marked as

18   Exhibit 85.  Is this a med 1?

19       A    Yes.

20       Q    You said an ID.  That would be like a copy

21   of the person's driver's license if they have one?

22       A    Right.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 25

1    it off to the lab.

2        Q    You said the first thing you mentioned was

3    emptying pockets.  Do they have to take off

4    overcoats?

5        A    Right, outerwear.

6        Q    What does the cup look like?

7        A    A plastic cup.  It has a temperature strip

8    on it.  That's how we can usually tell if it has a

9    temperature or not, and it has numbers on the side

10   that tell them how far to fill it up to.  They're

11   sterile cups.

12       Q    Is there tape over the toilet?

13       A    Not in our bathroom -- yeah, there's tape

14   on the sides.  There's tape on the sides.

15       Q    Have you ever been in a situation where

16   you've observed a patient tampering with their drug

17   test somehow in any way?

18       A    Yes.

19       Q    What have you personally observed being

20   done?

21       A    Usually it's the temperature.  It doesn't

22   have a temperature.  Sometimes we find transfer cups

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 26

1    that they brought in in the bathroom.  There's a lot

2    of ways.

3         Q    What else?

4         A    Usually they bring it in.  We find the

5    cups or it doesn't have a temperature.  They can't

6    keep it -- because we're such a busy clinic, in the

7    waiting room they can't get in and get it in the

8    cup, so it registers to body temperature in time.

9    They're usually waiting in the waiting room for like

10   45 minutes.  That's usually our first time as the

11   collector because it doesn't have a temperature.

12        Q    I'm sorry.  I'm not sure I understood what

13   you were explaining to me.  They wait in the waiting

14   room for 45 minutes and what happens?

15        A    The temperature of the urine they bring

16   in.  They usually bring in someone else's urine.

17   That's what would pass their drug screen.  If you

18   put it in the microwave and warm it up -- this is

19   what I've noticed -- you warm it up, if you get back

20   in time, we would never know.  But a lot of times

21   because we're so busy, they sit in the waiting room

22   for 45 minutes, the temperature drops.  By the time

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 27

1   we call them back to do their drug screen, it

2   doesn't have a temperature and that's usually how we

3   can tell.

4        Q    If they get in right away, they can get

5   away with it; is that right?

6        A    Yes.

7        Q    How long does it take for the temperature

8   drop to happen?

9        A    It depends on, I guess, where they hide

10  the specimen at.

11       Q    Where do they sometimes hide the specimen?

12       A    Inside their underpants, between their

13  legs, behind heating pads on their back.

14       Q    What have you actually observed as far

15  as -- not seeing the urine, but seeing someone had

16  done that?

17       A    They tie them up in condoms and they

18  usually don't have anywhere to put the condom.  They

19  can't flush the toilet.  We either see it in the

20  toilet, or they hide it behind the commode.

21       Q    You've found condoms behind the commode at

22  times?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 28

1       A    Yeah.

2       Q    You testified about people using heating

3   pads.  Have you seen the heating pads?

4       A    Yeah.

5       Q    How do you find the heating pads?

6       A    He just told me.  It was a patient.  He

7   just told me that that's how they did it.

8       Q    Have you actually seen it hidden in

9   underpants?

10       A    No.  We can't go in the bathroom with them

11   unless they give us an initial tampered specimen,

12   and then we can send someone in the bathroom to

13   chaperone them for that second specimen.  That first

14   time, our first clue is usually the temperature

15   strip.

16       Q    How often have you seen the temperature

17   strip not register a temperature?

18       A    It happens frequently.

19       Q    Does it happen every week?

20       A    Every day.

21       Q    Every day?

22       A    Yeah.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 35

1    supervisor can okay it with us or they can tell us

2    no, they have to stay.

3         Q    What does it cost the company to do that

4    second screening?

5         A    I think it's about $38, but I think with

6    big companies like Amtrak they send so many people

7    over, they have like discounted rates, I think.

8         Q    If the decision is to have them give a

9    second sample, you do that right away?

10        A    We do that once the patient says it's

11   ready because we really need that second one, and we

12   have to get a chaperone.

13        Q    Is it hard to get a chaperone?

14        A    Yeah.

15        Q    Why is it hard to get a chaperone?

16        A    Because it has to be the same sex.  Just

17   the amount of nurses we have are mainly females.

18   And the only people that we can get to chaperone

19   male drug screens are either the doctors or the

20   X-ray techs, and they're usually doing X-rays and

21   treating patients.  So we have to catch the patient

22   when he's ready, grab a doctor and get him in there

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 36

1    to see him.

2        Q    The observer who's watching the person

3    give the urine can be anyone of the same sex; right?

4        A    Right, as long as it's the same sex and an

5    employee, one of us.

6        Q    Is the fact that sometimes it's hard to

7    get a male chaperone for a retest, is that something

8    that you would tell the patient if the patient is

9    waiting for a retest?

10        A    Yeah, we probably could.  We probably

11    would let him know -- yeah, we would, that we're

12    waiting on the doctor to come chaperone.

13        Q    Do you have any recollection of collecting

14    a urine sample from Mr. Stevens in December of '04?

15        A    I'm not 100 percent sure.  I think I do.

16    Just from the outline of it being an Amtrak and

17    Ebonie being a part of it, I remember going through

18    this before.

19        Q    Why don't you tell me what you remember

20    about that.

21        A    I think he was there for a return to work

22    physical and a drug screen.  I did his drug screen,

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 46

1    happened with Mr. Stevens is it that you had to make

2    a decision as to whether to give a second urine

3    sample track or the physical track?

4         A    Right.

5         Q    And you selected which?

6         A    I sent him on the physical track so he

7    could complete his physical.  Hopefully by the time

8    he finished that, he'll be ready to give his second

9    specimen.

10        Q    I'm going to show you what was previously

11   marked in this case as Exhibit 80.  Can you identify

12   for me what Exhibit 80 is?

13        A    The status report.

14        Q    How is this document generated?

15        A    Through the system.

16        Q    Through the computers?

17        A    Right.

18        Q    And you testified before about the time in

19   and time out.  Do you remember that?

20        A    Right.

21        Q    Here it looks like he arrived at 1:43 and

22   left at 5:13; is that correct?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 47

1        A      Right.

2        Q      That would have been December 13th of 2004

3    was the date in question?

4        A      Uh-huh.

5        Q      Can you say yes or no?

6        A      Yes.

7        Q      So that would be the same date that

8    appears on Exhibit 85, the med 1 form that I showed

9    you; is that right?

10       A      Right, yes.

11       Q      Under the visit it says return to duty.

12   Then it says "return to work" and "nonreg collect

13   UDS."  Do you see that?

14       A      Yes.

15       Q      What does that information mean to you?

16       A      That's what he was supposed to be having

17   done, a return to work physical and a nonregulated

18   drug screen.

19       Q      Does this tell you those things were

20   completed or they were scheduled?

21       A      That's what was completed.  That's what he

22   was billed for.  That's what Amtrak was billed for.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 54

1    there would be that second specimen because he can't

2    leave until he gives it to us.  He's disqualified if

3    he leaves.

4              BY MR. GOLDSMITH:

5        Q    Can you think of any other reason why he

6    would have been there that long?

7        A    We were busy, really busy.  We are busy.

8    We are busy.

9        Q    Is there anything that might have been

10   said between yourself or Ms. Beaty and anyone at

11   Amtrak that might have resulted in him being there

12   that long?

13       A    He had to provide a second specimen.  He

14   had to provide a second specimen.

15       Q    But if he was there for 3-1/2 hours, there

16   should have been enough time for him to provide it;

17   right?

18       A    Right.

19       Q    Is there something that might have been

20   said between yourself and Ms. Beaty -- strike that.

21             Now, the flow sheet that you testified

22   about, that should have been part of his chart;

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 56

1     Q    What do you think would be a more reliable

2    indicator of how long Mr. Stevens was there that

3    day, your recollection today or Exhibit 80?

4          MR. FISCHLER:  Objection to form of the

5    question; calls for speculation.  You can answer.

6          THE WITNESS:  I'm not sure.

7          BY MR. GOLDSMITH:

8     Q    I'd like you to take a look at Exhibit 81.

9    Do you recognize what Exhibit 81 is?

10    A    Yes.

11    Q    What is it?

12    A    The chain of custody for Amtrak drug

13    screen.

14    Q    Does this pertain to Mr. Stevens?

15    A    Yes.

16    Q    And the collection of his urine on

17    December 13, 2004?

18    A    Yes.

19    Q    Did you sign that you received the initial

20    collection?

21    A    Yes.

22    Q    Was that at 2:04 p.m.?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 57

1      A    Yes.

2      Q    At that time you indicated that he was to

3    give a second specimen and be observed?

4      A    Right.

5           MR. GOLDSMITH:  I'm going to show you what

6    I'm going to mark as 86.

7           (Plaintiff's Exhibit 86 identified.)

8           BY MR. GOLDSMITH:

9      Q    Showing you what's been marked as Exhibit

10   86, it looks like a cover sheet of a fax from

11   Margaret Tierney at Concentra to you?

12     A    Yes.

13     Q    Up at the top it says "second fax."

14     A    Right.

15     Q    Is that your handwriting?

16     A    Yes.

17     Q    It looks like the fax was four pages; am I

18   right?

19     A    Yes.

20     Q    It looks like you crossed out -- did you

21   cross out the other number?

22     A    Yes.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 65

1    physical until he was ready to go again and do his

2    drug screen when he was finished.

3         Q    Why didn't you check inadequate specimen

4    volume on Exhibit 42?

5         A    Because he had enough.  He had enough for

6    me to collect and send to the lab.  It just didn't

7    have a temperature.  I didn't check signs of

8    tampering because I didn't see that he tampered with

9    it.  It just didn't have a temperature.

10        Q    I'm going to turn your attention to -- by

11   the way, Exhibit 42, is that one of the things you

12   would have faxed to Amtrak, too?

13        A    Yes.

14        Q    Turn your attention to Exhibit 43.  Do you

15   see Exhibit 43?

16        A    Yes.

17        Q    Do you recognize that?

18        A    Yes.

19        Q    It appears to me Exhibit 43 is a document

20   I already showed you with some extra handwriting on

21   it.  Do you think that's right?

22        A    Yes.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 71

1    about him not being able to stay.  The doctors were

2    going so slow.  He was in that room for a while.  I

3    just don't know why he left or when he left.

4        Q    Is there any reason why, once you and

5    Ms. Beaty had the information that he needed to go,

6    why you couldn't have taken a second urine sample

7    from him?

8        A    No.  We could have taken -- as long as he

9    was ready -- that's the only thing.  Once he

10   performed that second specimen, he could have left.

11   The only thing we can hold him for is that specimen.

12   Once we collect that specimen, he can come back a

13   week later and do the physical, the physical part of

14   it, but just per Amtrak, we couldn't let him leave

15   without that second specimen.

16       Q    And you think you might have been having

17   trouble getting a male chaperone?

18       A    I don't even -- I just remember him being

19   in the room, and I do remember him saying he had to

20   go.

21       Q    And you've said frequently you have

22   trouble getting a male chaperone?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 72

1        A    Yes.

2        Q    And he might not have known that that was

3    the problem; right?

4        A    I don't know.

5        Q    You didn't talk to him anymore at a

6    certain point; right?  You handed him off to

7    Ms. Beaty?

8        A    Right.  I think I went and saw him in the

9    room, too, and he said something about he had a

10   doctor's appointment.  All we needed was that second

11   specimen and he could have left.

12       Q    Are you positive that he saw the doctor

13   that day?

14       A    No.

15            MR. FISCHLER:  Do you need a break at some

16   point?

17            THE WITNESS:  I'm good.  I don't remember.

18   I just remember his door being open.  I don't even

19   remember him being in our gowns.  I remember him

20   with his clothes on, I think.  I just remember him

21   with the door open waiting on a bed.  We were so

22   busy.  He said he had to go, and we do have a lot of

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 79

1    her.  Once he left, I'm sure -- once we realized he

2    was gone.

3        Q    What about before he left while he was

4    waiting?

5        A    No.  We couldn't have informed her.

6        Q    Do you think if Mr. Stevens had actually

7    refused to give a second sample, do you think

8    someone would have noted that?

9            MR. FISCHLER:  Objection; calls for

10   speculation.

11           THE WITNESS:  They should have.

12           BY MR. GOLDSMITH:

13       Q    And you don't remember that happening

14   specifically?

15       A    No.

16           MR. GOLDSMITH:  Maybe this would be a good

17   time to take a break.

18           (Recess.)

19           BY MR. GOLDSMITH:

20       Q    I'm going to have you take a look at

21   Exhibit 78.  I'm showing you what's been marked as

22   Exhibit 78.  Do you recognize this?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 80

1        A      Yes.

2        Q      What is it?

3        A      The drug screen regulation.

4        Q      Is this what you were trained in --

5        A      Yeah.

6        Q      -- that you testified about earlier?

7        A      Yes.

8        Q      Is this what you followed at Concentra for

9    drug tests?

10       A      Yes.

11       Q      Section 6, which begins on page 7 and goes

12   through page 13, describes collection procedures.

13   Could you just read that to yourself and tell me if

14   there's anything in here that you don't follow for

15   any reason.

16              MR. FISCHLER:  She currently doesn't work

17   there.

18              MR. GOLDSMITH:  When you were working at

19   Concentra.

20              MR. FISCHLER:  I just wanted to clear that

21   up.

22              THE WITNESS:  That's how we do it.

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

1          BY MR. GOLDSMITH:

2      Q    I'm going to turn your attention to

3   section 8 on page 14 through the very top of 16 and

4   ask you the same question.  Is there anything that

5   you don't follow in there?

6      A    Yes.

7      Q    That's what you follow; right?  There's

8   nothing there that you don't follow --

9      A    No.

10     Q    -- didn't follow at Concentra?

11     A    No.

12     Q    I'm going to ask you with regard to -- on

13   page 17 there's part of section 10 about

14   temperature, and then it talks about specimen volume

15   and adulteration for about a page total.  Can you

16   look at that and tell me if there's anything there

17   that you don't follow?

18     A    Yes.

19     Q    That's what you follow on those things?

20     A    Yes.

21     Q    Do you know if you poured the urine from

22   Mr. Stevens's test into a second cup with a

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 82

1    temperature strip?

2         A    Yeah, I did.

3         Q    How do you know that?

4         A    I'm speculating.

5         Q    You're not sure?

6         A    I'm not sure.  I don't remember -- the

7    reason why I say I did is because the second one was

8    the follow-on and we can't send the second one

9    without the first one.

10        Q    You're talking about the vials where you

11   divide it into two?

12        A    Yeah.

13        Q    I think I'm asking you a different

14   question.  How many temperature strips did you use

15   to check the temperature of Mr. Stevens's urine?

16        A    One.

17        Q    Under section 12, which is on page 19 to

18   20, can you tell me if that's what you were supposed

19   to follow at Concentra, too?

20        A    Yes.

21        Q    Do you know if Mr. Stevens came to

22   Concentra that day with somebody else?

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 85

1    they didn't say we'd be worried about it or talking

2    to him.  They took my statement.

3        Q    When you say the "supervisors," you mean

4    from Amtrak?

5        A    No, Lisa Shave.

6        Q    From what you've seen and remembered

7    today, would you be able to say whether Mr. Stevens

8    gave an adulterated sample?

9        A    No.

10       Q    Would you have ever told anyone that

11   Mr. Stevens did something dishonest?

12       A    No.

13       Q    Did you ever take any actions that were

14   designed to make Concentra look like it did a better

15   job of handling Mr. Stevens on the 13th than it

16   actually did?

17       A    No.

18       Q    Did you think any of your colleagues were

19   doing any of that?

20       A    I don't know.  We weren't -- we were the

21   medical assistants.  They weren't really handling it

22   with us.  They were just taking our statements and

Demetria Hudley - March 2, 2007
David B. Stevens, et al. v. National Railroad Passenger Corporation

Page 86

1    handling it.  When it went this far -- that's why I

2    wasn't sure who it was when it actually went this

3    far.  I thought it was over on the telephone.  If it

4    was going on since then, they never said anything to

5    me.

6         Q    Do you have any reason to doubt that

7    Mr. Stevens told you that day that he had recently

8    been sick?

9         A    No.

10        Q    Do you remember specifically him saying

11   that?

12        A    Yes.

13        Q    Do you remember anything specifically he

14   said about his sickness or medical condition?

15        A    Yes.

16        Q    What do you remember?

17        A    I'm not sure if it's him, but I think -- I

18   don't know if it was him or not, but that he had

19   HIV.  I'm not sure, and I think -- I don't even

20   think he said it to me.  I think he said it to

21   Ebonie.  He just kept telling me -- he may have said

22   it to me.  I'm not sure, but I remember that being