jrc

JRC

1

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - -x
                                                :

David B. Stevens, et al.      :

    Plaintiffs,          :

                             : Civil Action No.
                             : 1:05CV01924-RCL

    v.                    :

National Railroad Passenger  :
Corporation                :
("Amtrak"),              :

    Defendant.          :
- - - - - - - - - - - - - - - - -x

Wednesday, January 10, 2007
Washington, DC

The deposition of MARGARET TIERNEY was called for examination by counsel for the Plaintiff in the above-entitled motion, pursuant to notice, in the offices of, 5335 Wisconsin Avenue, N.W., Suite 440, Washington, DC 20015, convened at 1:02 p.m. before Jacqueline Richards-Craig, a notary public, when were present on behalf of the parties:



MILLER REPORTING CO., INC.
735 8th STREET, S.E.
WASHINGTON, D.C. 20003-2802
(202) 546-6666

jrc                                                                57

1    Q    So one time there was a question like
2    this, and it turned out that the department within
3    Amtrak had made some kind of mistake which was
4    leading to this question about the person leaving
5    in the middle of a testing situation?
6    A    No, no, no, no.
7    Q    You said that after you got the
8    authorization information and talked to the people
9    at the site, you would evaluate the situation.
10   What would you be -- What would be the purpose of
11   evaluating the situation, so that what could
12   happen?
13   A    Are you saying the employee left the site?
14   Q    Right.
15   A    Okay. I would look at the paperwork and
16   see why, why he was scheduled, was it approved?
17   Again, it could be a number of things, and plus
18   it's just being brought to my attention. I would
19   have to investigate what was, you know, going on.
20   Q    Would that include why the person left?
21   A    Yes.
22   Q    Could there ever be a situation were an

jrc

58

1 employee could leave a testing facility in the
2 middle of a process where that could be justified
3 or excused?
4     A    Yes.
5     Q    What would be some examples of that?
6     A    An employee's house was burning down.
7     Q    Anything else?
8     A    A medical emergency.
9     Q    Anything else?
10     [Laughter.]  (Notary signals for Ms.
11 Tierney to speak louder.)
12     A    I'm so, sorry, a medical emergency.  I
13 don't know why I'm talking so low. I'm sorry.
14     MR. FISCHLER: I always have to tell my
15 kids the opposite.
16     MS. TIERNEY: Really?
17     MR. FISCHLER: I've never seen anybody ask
18 people to use their outside voice, that's why I was
19 laughing.
20     MS. TIERNEY: I'm sorry -- Maybe, it's just
21 warm in here -- I'm just trying to relax.  I'm so
22 sorry Jacquie. I'm trying to think of real life

jrc                                                                    59

1   things that have happened, that I know. But then
2   again, these are things that the employee would
3   need to justify.
4          BY MR. GOLDSMITH:
5       Q   You said that these are things that have
6   happened.  Does that mean you've had instances of a
7   house burning down or a medical emergency while an
8   employee was being drug tested?
9       A   Yes.
10      Q   What did you do in the instance of the
11  house burning down?  The employee was released to
12  take care of the situation and it was documented
13  for the record and the employee brought in a notice
14  in the paper, the next day.
15      Q   So, there was no discipline for that?
16      A   No, but it needed to be documented,
17  because, you know, if something did come up, or a
18  question -- why wasn't the test completed, and so
19  forth.
20      Q   What about the medical emergency
21  situation, what happened that time?
22      A   I want to say that there was an emergency

jrc                                                                60

1   with their child, and the phone call was received
2   at the facility, but I can't remember whether there
3   was legitimate documentation.
4        Q    Something like the child was not at the
5   facility with the parent and something was going
6   wrong with the child, so they left the facility in
7   a hurry?
8        A    It was a rush to the hospital, yeah.
9        Q    Do you know if any medical information --
10  any medical explanation was ever given relating to
11  Mr. Stevens having left Concentra?
12       A    No.
13       Q    You don't know one way or the other?
14       A    No.
15       Q    When you -- after you do a memo like
16  Exhibit 38 in a "non negative" testing situation,
17  what's your next involvement, in that situation,
18  typically?
19       A    I'm really -- after this portion, I'm not
20  involved in it.
21       Q    I'm going to show you -- actually -- let's
22  take a five minute break.

```
23380                                                                    1
FIELD
```

     1              IN THE UNITED STATES DISTRICT COURT

     2                  FOR THE DISTRICT OF COLUMBIA         MAR 0 3 2007

     3

     4      - - - - - - - - - - - - - - - - x

     5      MAE L. WHITLEY,                  :

     6      DAVID B. STEVENS, et al.,        :

     7                  Plaintiffs,          :

     8                                       :  Civil Action No.

     9           v.                          :

    10                                       :  1:05CV01924RCL

    11      NATIONAL RAILROAD PASSENGER      :

    12      CORPORATION (AMTRAK),            :

    13                  Defendant.           :

    14      - - - - - - - - - - - - - - - - x

    15

    16           Deposition of BERNARD LEE CAMPBELL

    17

    18                                          Washington, D.C.

    19                                          Friday, February 9, 2007

    20

    21      Reported by:

    22           Elizabeth L. Wasserman

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage

EXHIBIT
NRPC
B

1   Q    Did you ever say anything to Mr. Stevens

2   about his having complained about that incident?

3   A    Yes.

4   Q    What did you say to him?

5   A    Mr. Stevens was off the property due to a

6   hostile work environment.  One day I saw Mr. Stevens

7   in the S&I facility.  He was dressed to kill, has

8   nice clothes.  He had no hard hat.  He had no safety

9   glasses.  He had no safety shoes on.

10       I saw Mr. Stevens in there.  I told Mr.

11  Stevens basically he shouldn't be in the building,

12  and he didn't need to get me involved with whatever

13  he was trying to do.  He needed to leave the property

14  and get off the property.

15  Q    And did you say this to him while he was

16  on the property?

17  A    Yes.  He had some friend with him in the

18  car, as I escorted him back to his car to leave, told

19  him I am not the one to play with.  He needed to get

20  off the property.

21  Q    But did you say this to him while you were

22  on the way back to the car with him?

```
 1      A    I talked to David from the time I met him
 2   there all the way back to his car.
 3      Q    Would the person who was in the car with
 4   him have heard any of the conversation?
 5      A    He might have heard the end of the
 6   conversation.
 7      Q    Did you know the person in the car?
 8      A    I had no idea who he was, or cared.
 9      Q    Did Mr. Stevens have any response to what
10   you said to him about not being on the property?
11      A    Not that I recall.  He looked kind of
12   dazed.
13      Q    Did he tell you why he was on the
14   property?
15      A    Made no difference.  If he was in my
16   facility, that's a hard hat, safety area, safety
17   shoes.  It makes no difference.  If you were in there
18   or anybody not dressed appropriately, I would ask you
19   to leave.
20      Q    Did he tell you why he was there?
21      A    I didn't really care, didn't want to hear
22   why he was in my building, inappropriately dressed.
```

1   Q    So you're saying you don't know whether he
2   said it or not because you weren't listening?
3   A    I wasn't listening.  It makes no
4   difference why he was in my building, dressed
5   inappropriately.
6   Q    Now, did you tell Mr. Stevens that you
7   weren't one to be fucked with?
8   A    No.
9   Q    Did you tell him, "You see, I like you,
10  but you're going to put my name in that fucking
11  shit"?
12  A    I don't think I would say it exactly like
13  that.  I do like David.  I still like David.  I still
14  don't want my name in anything that he's doing.  I
15  have nothing to do with what he's doing. I only run a
16  facility, and I treat everybody the same.
17  Q    What had he put your name in at that time?
18  A    He had said that I had sent some
19  information out about him.
20  Q    Anything else?
21  A    That's all that I know of.
22  Q    So if you didn't say it exactly like I

1  said it to you, how do you think you said it?

2      A   Don't know. However he said it, I
3  probably didn't like it.

4           MR. FISCHLER: I don't think that's what
5  he asked.

6           MR. GOLDSMITH: All right. Let me ask the
7  question again.

8           BY MR. GOLDSMITH:

9      Q   I asked you whether you said, "You see, I
10 like you, but you're going to put my name in that
11 fucking shit," and you said, "I don't think I would
12 have said it that way," and then we talked about
13 something else. How do you think you would have said
14 it?

15     A   "David, I don't know what you're trying to
16 do. Don't put my name in your stuff. I don't have
17 anything to do with it." That would be more of what
18 I would say.

19     Q   Do you think you cursed at all in there?

20     A   Don't know.

21     Q   So it's possible you did, and possible you
22 didn't?

1    A    Don't know.

2    Q    All right. And then did you also say to
3  him, "I will destroy a motherfucker like you"?

4    A    Absolutely not.

5    Q    Did you say anything like that?

6    A    I said absolutely not.

7    Q    Did you say anything that he might have
8  misheard or misinterpreted as "I will destroy a
9  motherfucker like you"?

10   A    I can't tell you what he might have
11 misinterpreted.

12   Q    So not that you know of?

13   A    I can't tell you what he might have
14 misinterpreted.

15   Q    Right, and did you say to him, "If you
16 ever put my name in anything else, you would wish you
17 didn't"?

18   A    Might have said something like, "David,
19 don't get me involved, you don't want me to testify
20 against you," something like that.

21   Q    All right, but I just want to know. If
22 the answer is no, then that's fine, but I want to

23380
FIELD

201

1    November 18th, three pages.  The
2    first page is a letter from the EEOC to the Amtrak
3    EEO Compliance Manager.  The second page says
4    amendment to charge of discrimination.  The third
5    page is page 107 and contains parts 3 and 4 to the
6    second page.
7        MR. FISCHLER:  These are not consecutive
8    documents.
9        MR. GOLDSMITH:  No, they're not
10   consecutive in your numbering but they go together.
11   If you look at them, I think you'll infer the same
12   thing from that.  In fact, 106 and 107 are
13   consecutive.
14       MR. FISCHLER:  Right, right.  Okay.
15       BY MR. GOLDSMITH:
16   Q    All right.  Were you aware that Mr.
17   Stevens made an amendment to his EEO complaint with
18   the EEOC in November of 2004?
19   A    See, I didn't know he made the first
20   complaint.
21   Q    So you never knew that he--at no time
22   while he was still employed at Amtrak did you know

```
 1   that he had made a complaint with the EEOC.  Is that
 2   correct?
 3       A    That is correct.
 4       Q    And at no time did you know that he did an
 5   amendment to his complaint with the EEOC.  Is that
 6   also true?
 7       A    I never knew he even made a complaint, so
 8   I definitely didn't know he made an amendment to his
 9   complaint.
10       Q    All right.  How did you find out that he
11   had made a complaint?  Was that here today, or did
12   you know it before today?
13       A    I never testified that I did know he made
14   a complaint to the EEOC.
15       Q    Well, you know now, right?
16       A    Yes, sir.
17       Q    All right, so you think you learned it
18   today?
19       A    I'm pretty sure.  I would have to say yes.
20   Yes.
21       Q    Now, have you had employees make
22   complaints to the EEOC in the past, when you've been
```

```
 1   union affairs.
 2       Q     Who pays his salary in his function as a
 3   hearing officer?
 4       A     Amtrak.
 5       Q     Had he been a hearing officer on other
 6   cases that derived from your employees?
 7       A     Yes.
 8       Q     Approximately how many?
 9       A     A couple hundred.
10       Q     Have you ever disagreed with any rulings
11   he has issued?
12       A     All the time.
13       Q     When you received the e-mail from Ms.
14   Tierney, did that signify to you that you were
15   responsible for bringing charges against Mr. Stevens?
16       A     That is my job.
17       Q     Did you find that to be something that was
18   within your discretion or something that was
19   mandatory for you to do?
20       A     Mandatory.
21       Q     How did you know that?
22       A     Because that's what it is when you violate
```

```
 1   a Rule G waiver.  It's mandatory.

 2         Q     Any other reason why it's mandatory?

 3         A     It's company policy.

 4         Q     What's company policy?

 5         A     That it's mandatory that we proceed to

 6   bring a Rule G waiver up in a hearing.  And

 7   termination, once you violate the Rule G, the only

 8   solution is termination.

 9         Q     Who makes the determination as to whether

10   someone has violated a Rule G waiver such that it

11   could become mandatory to bring charges?

12         A     Policy, company policy.

13         Q     But who decides when that policy needs to

14   be invoked?

15         A     The employee.

16         Q     Well, the employee doesn't specifically

17   say "I want to be fired."  The employee commits an

18   act and then management decides to fire him, right?

19         A     No.  The employee specifically says "I

20   want to be fired" by signing that Rule G waiver which

21   clearly states what's going to happen to you.

22         Q     If you commit another violation.
```