```
 1              IN THE UNITED STATES DISTRICT COURT

 2                FOR THE DISTRICT OF COLUMBIA
                                              MAR 1 4 2007
 3

 4   DAVID B. STEVENS and        )
                                         ORIGINAL
 5   MAE WHITLEY,                )

 6          Plaintiffs,          )

 7      vs.                      )  Civil Action No.

 8   NATIONAL RAILROAD           )  1:05CV01924-RCL

 9   PASSENGER CORPORATION       )

10   ("AMTRAK"),                 )

11          Defendant.           )

12          *         *         *         *         *

13

14

15          The deposition of MAE (MARY) JONES WHITLEY

16   was taken on Tuesday, February 27, 2007, commencing

17   at 10:17 a.m., at the offices of National Railroad

18   Passenger Corporation, 60 Massachusetts Avenue,

19   N.E., Washington, D.C., before Victoria L. Wilson,

20   Notary Public.

21

22          *         *         *         *         *
```



EXHIBIT
NRPC

A

```
 1    issue in more detail.  So other than the discipline

 2    issue, anything else that Mr. Campbell did or

 3    Mr. Kapela did that I haven't asked you about?

 4          MR. GOLDSMITH:  Objection.  Objection to

 5    the form.

 6          THE WITNESS:  A lot -- hiring people that

 7    was less qualified than me.

 8          BY MR. FISCHLER:

 9    Q.    And that's what I want to get to next.

10          Tell me, what does a foreman 2 do?

11    A.    Okay.  Foreman 2 responsibility, they

12    supervise foreman 1s and the mechanica-craft

13    employees.

14    Q.    What are the mechanical-craft employees?

15    A.    Car repairman, electrician -- car

16    repairman, electrician --

17    Q.    Pipe fitters?

18    A.    Pipe fitters, yes.

19    Q.    Anybody else?

20    A.    That's it.

21    Q.    Okay.  Did you ever work as a car

22    repairman?
```

1    A.    Not directly, no.

2    Q.    What do you mean, "not directly"?  Did you

3    ever work indirectly as a car repairman?

4    A.    I work closely with them during the

5    inspection as the foreman 2 that I had to do on a

6    car, basically, cover the responsibility that a car

7    repairman would do if they inspecting the interior

8    of the car.

9    Q.    Okay.  So you said the inspection you did

10   as a foreman 2.

11   A.    The inspection as a foreman 1.  I'm sorry.

12   If I said foreman 2, I'm sorry, I meant foreman 1.

13   Q.    So the inspection that you did in

14   supervising the couch cleaners is comparable to what

15   you would have to do in supervising a car repairman?

16   A.    I -- I would give them orders if I needed

17   them to do something and stuff but what I was

18   talking about, if I can explain what I was saying,

19   you know, I worked closely with the foreman 2s, also

20   worked closely with all the craft that I just

21   mentioned.

22   Q.    Okay.

1      A.    Even my laborers worked with the pipe

2   fitters.  I have to give one of my employees to the

3   pipe fitter, help them work, so that mean I have

4   to -- to be involved in that.  You know, and there's

5   a lot of time that I have participated in that job.

6      Q.    Okay.  But did you ever hold the title "car

7   repairman"?

8      A.    No, I never held the title of a car

9   repairman.

10     Q.    Did you ever perform the duties of a car

11  repairman?

12     A.    Indirectly.

13     Q.    Did you ever --

14     A.    No.

15     Q.    Okay.  Did you ever hold the title of

16  electrician?

17     A.    No.

18     Q.    Did you ever perform the duties of an

19  electrician?

20     A.    No.

21     Q.    Did you ever hold the title of pipe fitter?

22     A.    No.

1      Q.    Did you ever perform the duties of a pipe

2  fitter?

3      A.    I have.

4      Q.    Tell me when.

5      A.    I have helped -- don't know the exact time.

6  In the period of my career with Amtrak, like I said,

7  my employees have to work with pipe fitters

8  sometimes.  It is times that we would be short of

9  pipe fitters or I might be short of my employees so

10  I have to assist.  That's the job of a foreman; you

11  have to assist sometimes.

12      Q.    Okay.  And in doing that, you performed the

13  duties of a pipe fitter?

14      A.    I have helped put water in there and drop

15  the little tablets in the toilets and that's the job

16  of a pipe fitter.

17      Q.    That's the job of a pipe fitter?

18      A.    Some parts of it, yes.

19      Q.    Are there other parts of a pipe fitter job?

20      A.    Yes.  I actually never had to work with the

21  part that they have to hook the hose up to to clean

22  the tanks out from, you know, urine and feces and

1   stuff like that, ah, ah, ah --

2       Q.   You can't explain it like that.   The court

3   reporter cannot write that down.

4       A.   Okay.  I'm so sorry.

5            I never performed the duty actually when

6   they have to dump the hoppers.  They call it dump

7   the hoppers.

8       Q.   And that's the waste that's in the

9   bathroom?

10      A.   That's the waste in the bathroom.   I

11  observed it, but I never actually had to do it

12  myself.

13      Q.   The part that you have done is -- tell me

14  that again.  What part have you done?

15      A.   It is, like, help putting the water into

16  the tanks.  You have to put the water back into the

17  hopper.  We call it the hopper, which is from the

18  bathroom.  You stick the hose and you fill it back

19  up.  After they dump it, you have to rinse it out

20  two or three different times to clean it, so I --

21  sometimes I will have to help that if I didn't have

22  a person up top.  They call up top.  Down the bottom

1    is the person actually did the dumping.  Up top was

2    the person that rinsed out.  So a lot of times, like

3    I said, we were short, I would help.  I would do the

4    rinsing out, put the tablets in and stuff like that,

5    you know, putting them little safety stuff on,

6    gloves and all that, the whole works.

7        Q.   But you never did the bottom part?

8        A.   I actually never did it but I assist them

9    by watching them, making sure, you know, if they did

10   it properly.

11       Q.   So you have done a part of the pipe fitter?

12       A.   I did a part of the pipe fitter, yes.

13       Q.   Okay.  Let me show you what I am going to

14   mark as Exhibit 3.  Give me 1 second.

15            (Whitley Deposition Exhibit 3 was marked

16   for identification.)

17       A.   Thank you.  (Reviewing document.)

18            MR. GOLDSMITH:  I'm sorry, Keith.  Did you

19   ask her a question?

20            MR. FISCHLER:  No, I'm just asking her to

21   look at it.  There is no question pending.

22            THE WITNESS:  Okay.

1    A.    Just overall?

2    Q.    Overall.

3    A.    Yes.

4    Q.    Okay.  I hear some reservation.  Why is

5    there reservation?

6    A.    I'm saying yes because, like I said before

7    in one of my statements, that I knew I was qualified

8    to be a foreman 2, just being there that many years

9    and being a supervisor and working closely with

10   these people.  Only thing I was really concerned

11   about was being certified so I would be able to work

12   the job.

13   Q.    Okay.  And when were you certified?

14   A.    I was certified in -- I think I finished my

15   classes here, May -- wait the minute.  Let me look

16   up here.  I think it was -- I believe it was

17   10/22/2003.  I think that's -- wait a minute.  Wait

18   a minute.  Take that off.  I'm not sure.  I think it

19   was March of -- I want to say 2005 when I finished

20   my training.

21   Q.    Okay.  Is that reflected on this sheet?

22   You look like you are testifying from memory and I'm

23380
FIELD

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF COLUMBIA          MAR 0 3 2007

3

4      - - - - - - - - - - - - - - - x

5      MAE L. WHITLEY,                    :          ORIGINAL

6      DAVID B. STEVENS, et al.,          :

7               Plaintiffs,               :

8                                         :   Civil Action No.

9         v.                              :

10                                        :   1:05CV01924RCL

11     NATIONAL RAILROAD PASSENGER        :

12     CORPORATION (AMTRAK),              :

13               Defendant.               :

14     - - - - - - - - - - - - - - - x

15

16          Deposition of BERNARD LEE CAMPBELL

17

18                              Washington, D.C.

19                              Friday, February 9, 2007

20

21     Reported by:

22          Elizabeth L.Wasserman

EXHIBIT
NRPC
B

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage

23380
FIELD

47

```
 1         Q      All right.  Mr. Tana gave you Exhibit 50?

 2         A      Yes.

 3         Q      And do you agree with what it says in

 4    Exhibit 50?

 5         A      Absolutely not.

 6         Q      What don't you agree with about Exhibit

 7    50?

 8         A      I don't agree with anything of it.  I have

 9    said he showed me no new evidence.  It was just a

10    ploy of the union, trying to alleviate whatever had

11    happened to Ms. Whitley, and I didn't agree with it

12    at any point or at any time.

13         Q      After Mr. Tana gave you this, did you

14    respond to it?

15         A      No.

16         Q      Did you respond to him orally?

17         A      I told him to probably get out of my

18    office.  I'm not sure.

19         Q      Did you ever discuss the contents of

20    Exhibit 50 with Taylor Cannon?

21         A      No.

22         Q      Did you ever discuss it with anyone else
```

23380
FIELD

48

1    from HR?

2        A    No.

3        Q    With regard to the last paragraph here in

4    Exhibit 50, it says that Mr. Tana is formally

5    requesting that her waiver be removed from her

6    personnel file.  Do you agree that she had executed a

7    waiver?

8        A    Yes.

9        Q    And do you know if that waiver had been in

10   her personnel file?

11       A    Yes.

12       Q    It was?

13       A    All waivers would go in a personnel file.

14       Q    Do you know if it ever was removed from

15   her personnel file?

16       A    No.

17       Q    Did you ever discuss the issue of removing

18   the waiver from her file or taking the waiver off her

19   record with Ms. Whitley?

20       A    Don't recall.

21       Q    Do you deny having done that?

22       A    I don't recall.

1    Q    So it's possible you did, and also

2    possible you did not?

3    A    You could say that.

4    Q    And do you deny that Ms. Whitley would

5    have developed the impression that that waiver wasn't

6    being counted against her anymore?

7    A    I can't tell you what Ms. Whitley thought.

8    You have to ask Ms. Whitley.

9    Q    So you don't know?

10    A    That's what I'm testifying to.

11    Q    What about the HR office?  Did they know

12    if that waiver was continuing to be counted against

13    Ms. Whitley?

14    A    I don't have a clue what HR knew.

15    Q    Do you know how HR would have first become

16    aware of the existence of the waiver?

17    A    No, I don't.

18    Q    Is that a process that you would have had

19    anything to do with?

20    A    I don't know what you mean.

21    Q    The process by which they would have

22    become aware of the fact that Ms. Whitley executed a

1    waiver relating to discipline that you proposed

2    against her.

3        A    I know of no process that I would have put

4    in place.

5        Q    No process for them to become aware of it,

6    is that what you mean?

7        A    No.  I know of no process--what you asked

8    me, was there a process?--no process that I know of

9    that took place by me to make them aware of a waiver

10   in Ms. Whitley's file.

11       Q    And the same would be true as to them

12   becoming aware of any removal of a waiver.  Is that

13   true?

14       A    That's true.

15       Q    Was it your impression that the waiver

16   executed by Ms. Whitley would affect her chances of

17   being promoted to Foreman II?

18       A    I had no inkling about that at the time of

19   the waiver.  The waiver was for employees not doing

20   their job that they were told to do, and it was not

21   picked on Ms. Whitley.  It was picked on all Foreman

22   I's that worked in the S&I, sir.  They all failed to

23380
FIELD

1      A      Yes. sir.

2      Q      Now, at some point in discussing her

3   prospects for being promoted to Foreman II, you said

4   something to her to the effect that you asked her,

5   "Do you think those motherfuckers are going to

6   forget?"  Is that right?

7      A      I don't know what she's talking about now.

8   That's not me.

9      Q      So no, you didn't say that?

10      A      I absolutely did not say that.

11      Q      And did you ever tell her, in response to

12   her saying that she was being retaliated against,

13   that Amtrak wasn't retaliating against her, they were

14   just not moving her?  Did you ever say that?

15      A      No.

16      Q      Did you ever say to Ms. Whitley that she

17   wasn't being retaliated against because it was a

18   situation of no harm, no foul?

19      A      Don't recall saying that.

20      Q      Do you deny saying that?

21      A      Don't recall saying that.

22      Q      So you might have said it, and you also

23380
FIELD

70

1      might not have said it?

2          A      Don't recall saying it.

3          Q      And is it true that she asked you at one

4      point if she would have to wait a whole year to get

5      promoted?

6          A      No recollection of that.

7          Q      Do you deny that she said that to you?

8          A      I have no recollection of her saying that

9      to me.

10         Q      So she might have said it, she also might

11     not have said it?

12         A      You'd have to ask Ms. Whitley.  I have no

13     knowledge.

14         Q      And did you say to her, "Oh, you might

15     have to wait a whole year and a half"?

16         A      I have no knowledge of this conversation,

17     sir.

18         Q      Do you deny having said that to her?

19         A      I have no knowledge of it.  When was this

20     supposed to happen?

21         Q      So you could have said that to her at some

22     point, and you also may not have said it.  Is that

ACE-FEDERAL REPORTERS, INC.
Nationwide Coverage

23380
FIELD

71

1    your testimony?

2                        MR. FISCHLER:  That's not his testimony.

3                        THE WITNESS:  I have no knowledge of any

4    conversation that you are talking about.

5                        BY MR. GOLDSMITH:

6            Q        Have you ever referred to Mr. Kapela as a

7    "motherfucker"?

8            A        No.

9            Q        How about Mr. Truitt?

10           A        Yes.

11           Q        Is that something you've said frequently

12   about Mr. Truitt, or--

13           A        That's not what you asked me, and the

14   answer is no.

15           Q        But you've said it at some point?

16           A        I've said it to Mr. Truitt before.  A

17   boss, sometimes you get in an argument.

18           Q        Have you ever said that about Mr. Truitt

19   behind his back?

20           A        I don't know.  I can't recall.  Normally

21   I'm the type of guy that says things to you one-on-

22   one, in your face.

23380
FIELD

1            MR. FISCHLER:  Okay.

2            MR. GOLDSMITH:  So I'll let you have this

3     now, so there won't be any question about that.

4            MR. FISCHLER:  Well, are you making the CD

5     an exhibit?

6            MR. GOLDSMITH:  Really what I'm doing is

7     making the contents of this CD, which is a minute and

8     33 seconds, an exhibit.

9            MR. FISCHLER:  Well, why don't you just

10    play it, she transcribes it--

11           MR. GOLDSMITH:  I don't think it's going

12    to work.  Play along with me, and if you want to have

13    a standing objection and then deal with it

14    afterwards, that's fine, but play along with me and

15    see.  I think you'll be okay with it.

16           MR. FISCHLER:  Okay.

17           MR. GOLDSMITH:  If you're not, that's

18    cool, too.  But what I want to do is, I want you to

19    know exactly what I'm playing back and what's being

20    discussed.  And that's going to be Exhibit 53 that

21    we're up to.  Is that right?

22           MR. FISCHLER:  Right.  I mean, I'm not

23380
FIELD

1    thing, and you can always go back and listen to it

2    and do whatever else you're going to do with it.

3             MR. FISCHLER:  Okay.

4             MR. GOLDSMITH:  All right, so I've

5    introduced Exhibit 53 into the record.

6             BY MR. GOLDSMITH:

7        Q    Mr. Campbell, I'm going to play some of

8    these--in fact, I'll play this entire tape excerpt

9    for you, but I'm going to ask you a few specific

10   questions about it.  And the first question I'm going

11   to ask is simply whether you can recognize your own

12   voice in the recording as I play it for you, and then

13   I'm going to stop once you're confident that you can

14   answer the question one way or the other.  Okay?

15       A    Sure.

16       Q    So this is not going to be the complete

17   tape.  It's just going to be enough for you to hear

18   your voice or not.

19             (CD played.)

20             MR. FISCHLER:  I'm going to object.  It's

21   completely unintelligible to me.  You can ask

22   whatever questions, but I don't see where we're going

1   with this.

2           BY MR. GOLDSMITH:

3       Q   Did you hear your voice on the tape?

4       A   I don't know if I heard anything.  It was

5   a lot of mumbo jumbo.

6       Q   Did you hear any voices in the tape?

7       A   Nothing that was distinguishable.

8       Q   All right.  I'm going to play it back in

9   smaller bits.

10          (CD played.)

11          BY MR. GOLDSMITH:

12      Q   Did you hear anything that was said there?

13      A   Nothing that I can understand what was

14  said.

15      Q   Okay, and did you hear a male voice and a

16  female voice in there?

17      A   Sounds like I heard about three or four

18  voices.

19      Q   Just in that little bit?

20      A   Sounds like I heard about three or four

21  voices.

22      Q   All right.  Keep listening.

1          (CD played.)

2          BY MR. GOLDSMITH:

3      Q    Did you recognize that voice right there?

4      A    I don't know--no.

5          (CD played.)

6          BY MR. GOLDSMITH:

7      Q    Do you recognize Ms. Whitley's voice

8  anywhere?

9      A    Man, your whole tape is unlistenable.

10      Q    So you didn't recognize Ms. Whitley's

11  voice anywhere on the tape?

12      A    No.

13          MR. FISCHLER:  I couldn't swear those were

14  human voices.  I can't understand a word that's being

15  said, if those are words.

16          MR. GOLDSMITH:  All right.  Let me just

17  ask the witness, though, if that would be okay.

18          BY MR. GOLDSMITH:

19      Q    Were you able to recognize Ms. Whitley's

20  voice?

21      A    The entire tape was unintelligible.

22      Q    All right.  Let me give you some

1    answer a blanket question like that.

2            MR. GOLDSMITH:  All right.  Well, why

3    don't I take you through some of this and see what

4    you think about it?

5            (CD played.)

6            BY MR. GOLDSMITH:

7        Q    Did Ms. Whitley say to you, "Bernard, I

8    want to ask you one question"?

9        A    I don't know.

10        Q    That's because you can't understand what

11    it says on the tape.  Is that right?

12        A    I haven't understood anything on the tape

13    yet, sir.

14        Q    So you don't know whether she said that or

15    not?

16        A    I don't know.

17            MR. FISCHLER:  Is there any representation

18    as to when this--we don't even know who the parties

19    to the conversation are, but when this conversation

20    took place?

21            MR. GOLDSMITH:  Well, the tape reveals who

22    the parties to the conversation are, but you guys say

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

COPY

```
--------------------------x
DAVID B. STEVENS et al.,      :
                             :              MAR 2 9 2007
         Plaintiffs,          :
                             :
    v.                        : No. 1:05: CV01924-RCL
                             :
NATIONAL RAILROAD             :
PASSENGER CORPORATION,        :
                             :
         Defendant.           :
--------------------------x
```

Washington, D.C.

Wednesday, March 14, 2007

Deposition of

JOSEPH TANA

a witness, called for examination by counsel for
Plaintiffs, pursuant to notice and agreement of
counsel, beginning at approximately 10:31 a.m., at
the law offices of Leizer Goldsmith, 5335 Wisconsin
Avenue, Washington, D.C., before M. Bryce Hixson of
Beta Court Reporting, notary public in and for the
District of Columbia, when were present on behalf
of the respective parties:

**EXHIBIT**
NRPC

C
_____

90

1    to do when they hold stuff in advance is get

2    a person's attention; "Hey, you're messing

3    up.  We think you have potential.  Don't do

4    it again."

5        Q    Do you think Mr. Campbell might

6    have told Ms.  Whitley that he was going to

7    keep her discipline in advance?

8            MR. FISCHLER:  Same objection.

9            THE WITNESS:  I have no knowledge.

10           BY MR. GOLDSMITH:

11       Q    So you don't know?

12       A    No.

13       Q    It's possible he did, and it's

14   possible he did not?

15       A    I have no knowledge.

16       Q    Do you know whether Mr. Campbell --

17   did -- do you recall any conversations about

18   that -- imposition of that discipline by Mr.

19   Campbell on Ms. Whitley that you may have had

20   with Ms. Whitley?

21       A    No, I mean, we -- I remember

22   talking to Mae about the discipline and

91

1    everything.

2        Q    Do you remember her talking to you

3    about what Mr. Campbell said would happen if

4    she didn't sign a waiver?

5        A    He was going to take it to a formal

6    investigation. I mean, that's the next step.

7    If you don't take a waiver, it goes to formal

8    investigation.

9        Q    And do you remember him, what he

10   said the outcome of that would be?

11       A    Probably that they would get time

12   on the street -- everybody involved; or

13   discipline held on advance.

14       Q    Do you think that he -- do you

15   recall what Ms. Whitley's feelings might

16   have been about that?

17       A    If I remember right, everybody

18   concerned just took the waiver to get it over

19   and done with like, "Let's get it done. This

20   is BS, let's just get it done."

21       Q    Do you think Ms. Whitley would have

22   thought at the time when she took the waiver

AMTRAK

August 19, 2004

MS MAE L WHITLEY
823 GLEN ALLEN DRIVE
BALTIMORE MD  21229

RE: Your application for the FOREMAN II position
Vacancy No. 50172367

Dear MS WHITLEY:

Thank you for applying for the position of FOREMAN.

It is Amtrak's policy that applications cannot be considered for
individuals who have had discipline assessed within one year.
Since your record indicates that discipline was assessed on
April 6, 2004, we cannot consider your application further at
this time.

We appreciate your interest in furthering your career with
Amtrak and encourage you to apply for future vacancies, once you
have had a clean record for a minimum of one year.

Sincerely,

Taylor Cannon
Human Resources Department

Whitley 0134

Plaintiff Exhibit. 20



EXHIBIT
NRPC

D



### AMTRAK

**Job Description**

| Search Jobs | Online Help | Referral Program | My Account | Ho |

New Search

*Job Reference #50172367*
**Amtrak - Washington-DC - Foreman II (1) (Eff. 07/27/04)**

POSITIONS:     Foreman II (2) (Eff. 07/27/04)
DEPARTMENT: Mechanical
LOCATION:     Washington, DC
RATE OF PAY: $22.10 Per Hour
POSITION NO.: 50172367

(INTERNAL AND EXTERNAL APPLICANTS)

DUTIES: Supervisor will be responsible for assuring that their employees are performing service and inspection activities in accordance with FRA, FDA & EPA standards.

(1)     Position will supervise daily turns and displacements from Union Station to the locomotive shop for both diesel and electric locomotives. Supervises crews dispatching and working and dispatching locomotives. Must have CFR 238-206 certifications. Will work 12am-8am shift.
(2)     Position will work in Motor Pit supervising turns and displacements from the annex to the station for both electric and diesel locomotives. Supervises crews dispatching and working and dispatching locomotives. Must have CFR 238-206 certifications.

EDUCATION: Must have a High School Diploma

WORK EXPERIENCE: Must have some mechanical experience.

WORK EXPERINECE PREFERRED: Must have demonstrated locomotive experience. Must be technically sound with all Amtrak's rolling stock, MDOT-VRE commuters and private cars.

OTHER REQUIREMENTS: Must hold air brake certification.

COMMUNICATION AND INTERPERSONAL SKILLS: Good communication and interpersonal skills.

SUPERVISORY RESPONISBILITIES: Directly 30 or more union employees.

|  |  |
|---|---|
| Salary Range: | Annually |
| Last Date to Apply: | 2004-08-03 |
| Years of Experience: | 1 - 5 |
| Specialty: | Mechanical |
| Employment Type: | Direct Hire, Full Time |
| Travel Requirements: | None |
| Relocation Benefits may Apply: | No |
| Classification: | Agreement |

( refer )  ( apply )

Whitley 0121



EXHIBIT
NRPC

E



*Plaintiff's Exhibit 2*

10/24/03  FRI 07:23 FAX 215 349 1088     HUMAN RESOURCE                    @010

00325484

### AMTRAK
## Job Requisition and Qualification Profile

| | Vacancy No.: | | Date: 9 / 30 / 2003 |
|---|---|---|---|
| Department: **Mechanical** | Immediate Supervisor: **Larry Ice** | | |
| Job Title: **Foreman II** | Contact: **Ronald Truitt** | | Tel No.: **202 906 1300** |
| Job Code: **AB101**  Band/Zone: | No. of Positions: **1** | Date Required: **9 / 30 / 2003** | Min. Salary: **$22.10/hr** |
| Cost Center: **4275**  Site Code: **75003** | Function: **1821** | Job Location: **WAS** | Work Order No. |

| | ☐ Partially Excepted | ☐ Fully Excepted | ☐ Non-Agreement | ☒ Agreement | ☐ Intern |
|---|---|---|---|---|---|

| Hours of Service | ☐ Not Applicable (0) | ☐ Engineer (1) | ☐ Trainman (2) | ☐ Train Dispatchers/Director (3) |
|---|---|---|---|---|
| Job Category | ☐ Block Operator (4) | ☐ Signalman (5) | ☐ Cab Signal/ATS Electrician (6) | ☐ Locomotive Mover/Helper (7) |
| Department Underqualified: | ☐ Female | ☐ Minority | ☒ None | CDL: ☐ Yes  ☒ No  P Higgs |
| | ☐ New Position | ☐ Replaced Org. Unit No.: | ☒ Replaced Employee No.: **1**  P Higgs | |

| Check if Appropriate: | External Candidates Considered? | ☒ Yes | ☐ No | |
|---|---|---|---|---|
| | Relocation Benefits? | ☐ Yes | ☒ No | If Yes, Tier |
| | Position Subject to Reassignment? | ☐ Yes | ☒ No | |
| | Reimbursable? | ☐ Yes | ☒ No | If Yes,  % |

1. Summary of Duties: Applicant must be 206 qualified and have knowledge of Diesel & Electric Locomotive operations, must also be familiar with CFR 49, sections 229 & 238. Applicant will be responsible for completing and filing of daily inspection maps. Must be responsible to make work schedules, work orders, record defects and repairs into Work Management System.

2. Education (must have): Must have high school diploma.

   Education (preferred):

3. Work Experience (must have): Must have demonstrated mechanical experience.     *must have some mech exp*

   Work Experience (preferred): Prefer applicant to be technically sound with all Amtrak's rolling stock, AEM-7, HHP, G.E. and Yard Engines.

4. Other Requirements: Must hold Air Brake certification.

5. Communication and Interpersonal Skills: Good communication and interpersonal skills.

6. Supervisory Responsibilities (number of people, direct and/or indirect): Directly supervise 39 union employees

7. Travel:  ☐ Yes     %   ☐ No

8. Comments:

| Signature: | Date: | Signature: | Date: |
|---|---|---|---|
| Departmental Approval | / / | Human Resources Approval | / / |
| Date Filled:  / / | Person(s) Hired: | Posting No: | Advertisement No: |
| | | | Source of Hire: |
| Date Offer Letter Sent:  / / | Date Acceptance Received:  / / | | Effective Date:  / / |
| Human Resource Representative: | | | Total Days Required to Fill Position: |
| Comments: | | | |

Instructions: Complete form, print and obtain approvals. Original to Human Resources. Retain copy for Department and others as needed.
NRFC 2002 (10/02) Word Template
Amtrak is a registered service mark of the National Railroad Passenger Corporation.

Amtrak/Whitley
01384

EXHIBIT
NRPC

F

@007                                    AMTRAK     10/22/03  WED 13:17 FAX 2029063897

Plaintiff's Exhibit 3

SSS2728: FOREMAN II 4275

## Staff Summary Sheet - SSS2728

| | |
|---|---|
| **Requester:** RONALD TRUITT | **Executive Officer:** WILLIAM CROSBIE |
| **Title:** SUPERINTENDENT | **Department Head:** JONATHAN H. KLEIN |
| **Extension:** 8-777-1307 | **Director/Manager:** MICHAEL KAPELA |

**Purpose:** To request approval of 2002 Form for Foreman II position, which is vacant due to the promotion of existing foreman.

**Discussion:** This will help ensure that the reliability standards and the capturing of defects, repairs and costs are recorded into the Work Management System, which will ultimately improve accountability and the budgeting process.

**Alternatives:** Failure to fill this position will lead to unbudgeted overtime; have a negative impact on the turn around servicing of equipment, to safety and the Work Management System.

**Funding:** This is an approved position on the FY04 Organizational Chart for Washington Mechanical. Not filling this position will lead to unbudgeted overtime.

**Recommendations:** Approve this request.

### Routing Flow

| # | Parallel | Approver | Concur | Non-Concur |
|---|---|---|---|---|
| 02 | | Sr. VP - Operations | X | |
| | | Chief Engineer | | |
| | | Chief Financial Officer | | |
| 01 | | Chief Mechanical Officer | X | |
| | | Chief System Safety and Security | | |
| | | General Counsel & Corp. Sec. | | |
| | | Inspector General | | |
| | | VP - Business Diversity | | |
| | | VP - Government Affairs & Policy | | |
| 03 | | VP - Human Resources | X | |
| | | VP - Labor Relations | | |
| | | VP Marketing and Sales | | |
| | | VP - Planning & Bus. Dev. | | |
| | | VP - Procurement & Mat. Mgmt. | | |
| | | VP - Transportation | | |

### President and CEO Response

| Final Approver | Action Required |
|---|---|
| President and CEO | Awaiting full approval |

Amtrak/Whitley
01385

10/24/03  FRI 07:23 FAX 215 349 1088    HUMAN RESOURCE    @012



Amtrak/Whitley
01386

@008    AMTRAK    10/22/03 WED 13:17 FAX 2029083897

Job Reference # 50172367

**Amtrak - Washington-DC - FOREMAN II (eff. 10/24/2003)**

Position: Forman II
Location: Washington, DC
Dept: Mechanical
Rate of Pay: 22.10 per hour
Position #: 50172367

Duties: Must be qualified to make-work schedules, work orders,
record defects and repairs within the Work Management System. All
work must be reported on the daily schedule and closed at the end
of the shift. Must be 205, 206, 209, 210 and 212 certified. Must
be familiar with Amtrak, MDOT and VRE rolling stock. Supervisor
will be responsible for assuring that their employees are
performing inspections, servicing and repairs in accordance with
FRA, FDA, EPA and Amtrak.

Education: Must have high school diploma or equivalent.

Work experience: Must have some mechanical experience. Must be
205, 206, 207, 209, 210 and 212 certified. Prefer demonstrated
mechanical experience, technically sound with all Amtrak's rolling
stock, MDOT-VRE commuter and private cars. Must hold air brake
certification.

Communication & Interpersonal skills: Must have good communication
and interpersonal skills.

Supervisory responsibilities: Directly supervise 27 craft
employees.

Job Notes

Last Day to Apply: 10/31/2003
Job Category: Mechanical
Years of Experience: 1- 5
Travel Requirements: None
Relocation Benefits may Apply: No

AMTRAK is an equal opportunity employer committed to employing a diverse workforce.
Internal AMTRAK employees must complete a job opportunities application to apply for
positions.
© Copyright 2001 TeamRewards.com. All Rights Reserved.

EXHIBIT
NRPC

G

http://www.teamrewards.net/task/job_posting.jsp?ts_am3q25ml2k13=2005

10/24/2003

Amtrak/Whitley
00835

*Plaintiffs' Exhibit 29*

10/24/03  FRI 07:20 FAX 215 349 1088    HUMAN RESOURCE    ☑001
10/16/03  THU 12:29 FAX 2029081519    IVY CITY ENT FAC WASH DC    ☑012

**✈AMTRAK**    **Job Requisition and Qualification Profile**

**50172367**

| | | | | |
|---|---|---|---|---|
| | | Vacancy No.: | | Date: 9 / 30 / 2003 |

**Department: Mechanical** — Immediate Supervisor: **Robert Frank**

Job Title: **Foreman II** — Contact: **Ronald Truitt** — Tel No. **202 906 1300**

Job Code: **AB101** — Band/Zone: — No. of Positions: 1 — Date Required: **9 / 30 / 2003** — Min. Salary: **$22.10/hr**

Cost Center: **4263** — Site Code: **75003** — Function:**1829** — Job Location:**WAS** — Work Order No.

☐ Partially Exempted    ☐ Fully Exempted    ☐ Non-Agreement    ☒ Agreement    ☐ Intern

Hours of Service    ☒ Not Applicable (0)    ☐ Engineer (1)    ☐ Trainman (2)    ☐ Train Dispatchers/Director (3)

Job Category    ☐ Block Operator (4)    ☐ Signalman (5)    ☐ Cab Signal/ATS Electrician (6)    ☐ Locomotive Mover/Helper (7)

Department Underutilized:    ☐ Female    ☐ Minority    ☒ None    CDL: ☐ Yes ☒ No

☒ New Position    ☐ Replaced Org. Unit No.:    Replaced Employee No.:

Check if Appropriate:
- External Candidates Considered?    ☒ Yes    ☐ No
- Relocation Benefits?    ☐ Yes    ☒ No    If Yes, Tier
- Position Subject to Reassignment?    ☐ Yes    ☒ No
- Reimbursable?    ☐ Yes    ☒ No    If Yes,    %

1. Summary of Duties: **Must be qualified to make work schedules, work orders, record defects and repairs within the Work Management System. All work must be reported on the daily schedule and closed at the end of the shift. MUST BE 205, 206, 207, 209, 210, & 211 CERTIFIED. Must be familiar with Amtrak, MDOT and VRE rolling stock. Supervisor will be responsible for assuring that their employees are performing inspections, servicing and repairs in accordance with FRA, FDA, EPA and Amtrak.**

2. Education (must have): **Must have high school diploma.**

Education (preferred): Some

3. Work Experience (must have): **Must have demonstrated mechanical experience** & be 205, 206, 207, 210 & 212 certified

Work Experience (preferred): **Must be technically sound with all Amtrak's rolling stock, MDOT-VRE commuter and private cars.**

4. Other Requirements: **Must hold Air Brake certification.**

5. Communication and Interpersonal Skills: **Good communication and interpersonal skills.**

6. Supervisory Responsibilities (number of people, direct and/or indirect) **Directly supervise 27 craft employees.**

7. Travel:    ☐ Yes    %    ☐ No

8. Comments:

| | | | |
|---|---|---|---|
| Signature: Departmental Approval | Date: / / | Signature: Human Resources Approval | Date: / / |
| | Posting No. | | Advertisement No: |
| Date Filled: / / | Person(s) Hired: | | Source of Hire: |
| Date Offer Letter Sent: / / | Date Acceptance Received: / / | | Effective Date: / / |
| Human Resources Representative: | | | Total Days Required to Fill Position: |
| Comments: | | | |

Instructions: Complete form, print and obtain approvals. Original to Human Resources. Retain copy for Department and others as needed.
NRPC 2002 (10/02) Word Template

Amtrak is a registered service mark of the National Railroad Passenger Corporation.

Amtrak/Whitley
00836

# Staff Summary Sheet - SSS2725

| Requester: RONALD TRUITT | Executive Officer: WILLIAM CROSBIE |
|---|---|
| Title: SUPERINTENDENT | Department Head: JONATHAN H. KLEIN |
| Extension: 8-777-1307 | Director/Manager: MICHAEL KAPELA |

**Purpose:** To request approval of 2002 Form for Foreman II position. This position is to provide relief for the Car Shop ARASA forces and is included in the approved head counts on the Mechanical Organizational Charts.

**Discussion:** This will help ensure that the reliability standards and the capturing of defects, repairs and costs are recorded into the Work Management System, which will ultimately improve accountability and the budgeting process.

**Alternatives:** Failure to fill this position will lead to unbudgeted overtime; have a negative impact on the defect maintenance of equipment, to safety and the Work Management System.

**Funding:** This is an approved position on the FY04 Organizational Chart for Washington Mechanical. Not filling this position will lead to unbudgeted overtime.

**Recommendations:** Approve this request.

## Routing Flow

| # | Parallel | Approver | Concur | Non-Concur |
|---|---|---|---|---|
| 02 | | Sr. VP - Operations | X | |
| | | Chief Engineer | | |
| | | Chief Financial Officer | | |
| 01 | | Chief Mechanical Officer | X | |
| | | Chief System Safety and Security | | |
| | | General Counsel & Corp. Sec. | | |
| | | Inspector General | | |
| | | VP - Business Diversity | | |
| | | VP - Government Affairs & Policy | | |
| 03 | | VP - Human Resources | X | |
| | | VP - Labor Relations | | |
| | | VP Marketing and Sales | | |
| | | VP - Planning & Bus. Dev. | | |
| | | VP - Procurement & Mat. Mgmt. | | |
| | | VP - Transportation | | |

## President and CEO Response

| Final Approver | Action Required |
|---|---|
| President and CEO | Awaiting full approval |

10/23/03

Amtrak/Whitley
00837

