UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| DAVID B. STEVENS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| MAE WHITLEY, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1924 (RCL) |
| | ) | |
| NATIONAL RAILROAD PASSENGER | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

This matter returns to the Court on the defendant's Motions [43, 44] for Summary Judgment. The plaintiffs have made three claims against National Railroad Passenger Corporation ("Amtrak") in their second amended complaint. Plaintiff David Stevens makes a claim of unlawful retaliation in violation of the District of Columbia Human Rights Act, D.C. Code Ann. § 2-1402.61 (2006). (Pls.' 2d Amend. Compl. 7-8.) Plaintiff Mae Whitley makes claims of unlawful retaliation and gender discrimination, both in violation of the DCHRA. (*Id.*) On October 21, 2005, Amtrak filed a Motion to Dismiss plaintiff Mae Whitley's claims, or in the alternative, for Summary Judgment [7, 9] pursuant to Rule 12(b)(6) and Rule 56(c) of the Federal Rules of Civil Procedure. Amtrak also filed a Motion to Dismiss plaintiff David Stevens' claims, or in the alternative, for Summary Judgment [8] pursuant to Rule 12(b)(6) and Rule 56(c) of the Federal Rules of Civil Procedure. On June 2, 2006, this Court denied defendant Amtrak's

1

motions [7, 9] and [8] for lack of an adequate opportunity for discovery. Now, after discovery has concluded, defendant Amtrak has again filed Motions for Summary Judgment [43, 44].

Upon consideration of the defendant's motions, the opposition thereto, the reply briefs, the applicable law, and the entire record herein, the Court concludes that the defendant's motions shall be granted. Accordingly, summary judgment shall be issued in favor of the defendant on all of the plaintiffs' claims, and those claims will be dismissed with prejudice.

## I. BACKGROUND

### A. Mae Whitley

Plaintiff Mae Whitley was hired by Amtrak in 1977 as a coach cleaner. (Whitley's Resp. ¶ 1.) Whitley was promoted to Foreman I in 1985. (*Id*. at ¶ 2.) The Foreman I position is responsible for supervising car cleaners. (*Id*. at ¶ 3.) In 2003, Whitley filed a complaint in this Court alleging sexual harassment and gender discrimination against Amtrak. (*Id*. at ¶ 4.) On June 9, 2004, this Court granted summary judgment in favor of Amtrak and dismissed Whitley's claims with prejudice. (*Id*. at ¶ 5.)

Whitley repeatedly sought promotion to a Foreman II position. (*Id*. at ¶ 8.) Employees in the Foreman II position supervise Amtrak's skilled craft employees, specifically, the carmen, machinists, electricians, and pipe fitter titles. (*Id*. at ¶ 9.) To hold a Foreman II position, an employee must have direct experience working in the mechanical crafts. (Decl. Sarah Ray Ex. A.) Additionally, an employee must hold an air brake certification. (*Id*.) However, applicants can be promoted to the Foreman II position without the air brake certification. (Whitley's State. ¶ 18) In those cases, the applicant is placed on a 90-day probationary period during which she must obtain the airbrake certification. (*Id*. at ¶ 19-20.) While the Foreman II position entails

supervising employees, selection requires no supervisory experience. (Def.'s Reply Mem. Ex. E.)

Whitley's supervisor, Bernard Campbell, encouraged her to attend the classes that she needed in order to become certified. (Whitley's Resp. ¶ 16.) Amtrak agreed to pay her for the time that she spent in the training classes. (*Id*.) Whitley took the relevant classes, completed them, and became certified on March 17, 2004. (*Id*. at ¶ 17.)

Whitley received two interviews for the Foreman II position. (*Id*. at ¶ 18.) The first interview was conducted by Sarah Ray, Amtrak's Human Resources manager; Robert Frank, Assistant Superintendent of the Maintenance Department; Al Aronson; and Paul Higgs, a Union representative. (Whitley's State. ¶ 18) Whitley's second interview was conducted by Joe Tana, General Chairman of the Union representing the foremen; Lavar Freeman, a Human Resources Representative; and Frank. (*Id*.) Her interview performance was consistently evaluated as poor, particularly on the mechanical questions asked in the interviews. (Decl. Robert Frank ¶¶ 12-13; Decl. Levar Freeman. ¶¶ 5-7; Dep. Joseph Tana 97-98.) One interviewer in particular, Mr. Freeman, identified other problems with Ms. Whitley's interview performance, such as her inability to identify examples of her ability to make work related decisions. (Decl. Levar Freeman ¶ 7.)

In April 2004, Campbell disciplined all of the Foreman I employees, including Whitley, for following improper maintenance procedures. (Dep. Mae Whitley Ex. 7; Dep. Bernard Campbell 44.) Whitley, however, did not challenge her disciplinary action through Amtrak's grievance process. (Whitley's Resp. ¶ 29.) Rather, she executed a waiver and accepted a written reprimand, dated April 6, 2004. (Dep. Mae Whitley Ex. 8; Dep. Joseph Tana 63.) In accordance

with Amtrak policy, she was consequently barred from consideration for any promotion opportunities between April 6, 2004 and April 5, 2005.  (Dep. Sarah Ray 144-145.)

Whitley alleges that in August 2004 she asked Campbell why she was not promoted. (Whitley's Opp'n 26.)  She claims that he referred her to her prior lawsuit, "reminding her that she had gone after 'those white motherfuckers,' and asking her: 'do you think those motherfuckers are gonna forget?'" (*Id.*)  She replied that "she was not surprised that upper management would retaliate against her because she went after them." (*Id.*)  "Campbell's response was to the effect that they were not retaliating, but rather were 'just not moving' her." (*Id.*)  He continued, "to retaliate, they would have to do something like fire her . . . 'It's a thing they say to you in court: no harm, no foul.'" (*Id.*)  Campbell has no knowledge of this conversation.  (Dep. Bernard Campbell 69-71.)  Furthermore, he denies making these statements. (*Id.*)  Whitley claims that she recorded her conversation with Campbell.  (Whitley's Opp'n 12.) She has provided the Court with an audio CD of the purported conversation.

Amtrak hired 11 applicants for the Foreman II position in 2004 and early 2005.  (Decl. Sarah Ray ¶ 14.)  Seven of the applicants were Amtrak employees who were hired internally. (*Id.* at ¶ 15.)  Four of the candidates were hired externally.  (*Id.*)  Two of the successful applicants were women.  (*Id.* at ¶ 16.)  All of the successful applicants had significant experience working in skilled craft positions.  (*Id.* at ¶ 17.)  None of the successful internal applicants had received disqualifying disciplinary action within a year prior to their application for promotion. (*Id.* at ¶ 20.)

Whitley stopped working for Amtrak on June 2, 2005, after she was injured when she fell off of a sidewalk.  (Whitley's Resp. ¶ 31.)  She has not returned to work since this injury.  (*Id.* at

¶ 32.)  Since November 2005, Whitley has been on long-term disability and has been taken off of Amtrak's payroll.  (*Id.* at ¶ 33.)

Whitley claims that Amtrak refused to promote her to the Foreman II position in retaliation for her prior lawsuit.  Additionally, she claims that Amtrak discriminated against her by not promoting her.

### B.  David Stevens

Plaintiff David Stevens began working for Amtrak in 1990 as a mechanical cleaner at Amtrak's Ivy Center Station.  (Stevens' Opp'n 1.)  In 2003, Stevens failed a drug test by testing positive for cocaine.  (Stevens' Resp. ¶ 3.)  He subsequently entered a drug rehabilitation program and took a leave of absence from work.  (*Id.*)  On March 10, 2003, Stevens signed a waiver agreement, known as a Rule G waiver, that stipulated that a future positive drug test would result in his employment termination.  (Dep. David Stevens Ex. 14; Dep. Bernard Campbell 222-223.)

Stevens returned to work around February 26, 2004 and was assigned to the Union Station facility.  (Stevens' Resp. ¶ 3.)  He claims that upon his return to work, an Amtrak co-worker, Shirley Snider, inappropriately divulged to other Amtrak employees that Stevens had AIDS.  (*Id.* at ¶ 4.)  He in fact had been diagnosed as HIV-positive in 1988.  (Stevens' Opp'n 1.)  In March 2004, Stevens filed an internal complaint with Amtrak's Diversity Office.  (*Id.* at ¶ 5.)  In it, he claimed that his co-workers were subjecting him to a hostile work environment based on his HIV-postive status.  (*Id.*)  Following the complaint, Stevens alleges that his supervisors assigned him to less desirable, increasingly difficult work assignments.  (*Id.*)  Around April 9, 2004, Stevens consulted his mental health professional, Eric LeHot.  (*Id.* at ¶ 6.)  LeHot advised

Stevens to take a medical leave of absence. (*Id*.) Stevens agreed and subsequently spent the next five months on medical leave. (*Id*.)

On May 30, 2004, Stevens went to the Amtrak Ivy City facility to retrieve some medication he had left in his friend Darryl Hollis' car. (Stevens' Opp'n 4.) His friend, Terrell Williams, had driven him to the facility. (*Id*.) While there, Bernard Campbell told Stevens that he was not allowed on the premises. (*Id*.) According to Mr. Williams' sworn statement, Campbell subsequently yelled at Stevens: "You know you're wrong. You are going to put my name in that shit, but you are better off fucking with those goddamn white people than fucking with me. I will fucking destroy your ass!" (Decl. Terrell Williams ¶ 3.)

While on leave, in June 2004, Stevens filed a charge of discrimination with the Equal Employment Opportunity Commission. (Stevens' Resp. ¶ 6.) The EEOC subsequently issued a finding of no probable cause. (*Id*.)

In December 2004, Stevens prepared to return to work. On December 13, 2004, as part of his return to duty physical and drug screening at Concentra Medical Center, Stevens provided a urine specimen that was outside of the acceptable temperature range of 90 to 100 degrees Fahrenheit that is stipulated by the Department of Transportation Federal Guidelines. (Stevens' Opp'n Ex. 81; Dep. Demetria Hudley 60.) Concentra Medical Center employee Demetria Hudley, who collected the urine sample, notified Stevens that his specimen was not within the guidelines and that, as a result, he would have to provide a second specimen under direct observation. (*Id*.) Stevens acknowledged these instructions in writing. (Stevens' Opp'n Ex. 42.)

Stevens claims that he was ready and willing to immediately provide his second specimen, but that Hudley had him wait for a doctor before providing the second specimen.

(Stevens' Opp'n 9.) After waiting "a long time," Stevens inquired of Concentra employee Ebony Beaty as to the delay. (*Id*.) According to Stevens, Beaty notified him that a doctor would be with him shortly. (*Id*.) He then waited at least another 20 minutes, but no one came to see him. (Stevens' State. ¶ 120.) Stevens asserts he feared that something was wrong with his urine and that, because he was HIV-positive, he believed that his health was in jeopardy. (Stevens' Opp'n 9.) Stevens subsequently notified Beaty that he was HIV-positive. (*Id*.) Additionally, he told her that he needed to leave the facility and go to the emergency room. (*Id*. at 12.) She informed him that he needed to submit the second specimen before leaving. (Dep. David Stevens Ex. 16.) Stevens gave Beaty his cell phone number and went to George Washington Medical Center where he was diagnosed with bronchitis. (Stevens' Opp'n 12.)

     Once Stevens departed the Concentra facility without providing the second specimen, his specimen was disqualified. (Dep. David Stevens Ex. 16; Hudley Dep. 43:7-15) The next day, Hudley and Beaty presented this information to Margaret Ann Tierney, a Human Resources Officer in Amtrak's Drug and Alcohol Programs department. (Stevens' Opp'n Ex. 44.) According to Amtrak policy, refusing a drug testing event shall result in the employee's termination from Amtrak. (Dep. Bernard Campbell 207-208; Amtrak Drug and Alcohol Policy, ¶¶ 4.2.1.7, 4.2.2.) On December 15, 2004, Tierney notified Stevens' supervisor, Bernard Campbell, that "[a]ny employee who refuses or intentionally interferes with the testing process will be subject to the same consequences as testing positive." (Dep. David Stevens Ex. 20.) As per Amtrak policy, she also notified Campbell that his department was "responsible for taking disciplinary action." (*Id*.) Campbell subsequently filed a personnel action requesting Stevens' termination. (Stevens Opp'n 17.)

In February 2005, Amtrak conducted an investigative hearing at which it concluded that Stevens had left the testing facility without completing his drug test. (Dep. Bernard Campbell 234.) Consequently, Amtrak terminated Stevens' employment for violating Amtrak's drug policy and Stevens' Rule G waiver. (*Id.*)

Stevens claims that Amtrak terminated him in retaliation for complaining to the Diversity Office and for filing his EEOC complaint.

## II.  DISCUSSION

### A.  Applicable Legal Standard

#### 1. Summary Judgment

Summary Judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  When ruling on a motion for summary judgment, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Moreover, "statements made by the party opposing summary judgment must be accepted as true for the purpose of ruling on that motion." *Green v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).  However, "some statements are so conclusory as to come within an exception to that rule." *Id*.  The nonmoving parties must establish more than "a mere scintilla of evidence" in support of their claims. *Anderson*, 477 U.S. at 252.  Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986). "[T]he central purpose of the summary judgment device . . . is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Green*, 164 F.3d at 675.

### 2. Claims Under the District of Columbia Human Rights Act (DCHRA)

"The DCHRA prohibits an 'employer' from discriminating against its employees. In analyzing a claim of employment discrimination under the DCHRA, courts look to Title VII and its jurisprudence." *Regan v. Grill Concepts-DC., Inc.*, 338 F. Supp. 2d 131, 134 (D.D.C. 2004). Additionally, "[u]nder the DCHRA, it is unlawful for an employer 'to retaliate against an employee due to [his] opposition to any practice made lawful by the DCHRA.'" *Regan*, 338 F. Supp. 2d at 138 (quoting *Grant v. May Dep't Stores Co.*, 786 A.2d 580 (D.C. 2001).

The Supreme Court has established "a burden-shifting framework that governs the analysis of discrimination and retaliation claims." *Regan*, 338 F. Supp. 2d at 134 (citing *McDonnell Douglas v. Green*, 411 U.S. 792, 792 (1973)). First, the plaintiffs bear the burden of proving a prima facie case. *Id.* Next, the burden shifts to the employer to justify the action based on a legitimate reason. *Id*. at 134-135. Finally, if the employer meets this burden, the plaintiff must show that the defendant's proffered reason was a pretext and that the actual reason was discriminatory or retaliatory. *Id*. at 135.

To establish a prima facie case of gender discrimination, Whitley must show that: "(1) she is a member of a protected class; (2) she applied for and was qualified for an available position; (3) despite her qualifications, she was rejected; and (4) either someone filled the position or it remained vacant and the employer continued to seek applicants." *Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). "To establish a prima facie case of retaliation, the plaintiff must establish: (1) that he engaged in statutorily protected activity; (2) that adverse

personnel action was taken by the employer against the plaintiff; and (3) that a causal connection exists between the two." *Regan*, 338 F. Supp. 2d at 138.

### B.  Analysis

#### 1.  Mae Whitley

**Retaliation**

Amtrak argues that Whitley has failed to establish a prima facie case of retaliation because she cannot prove that there is a causal connection between her previous lawsuit and her non-selection for the Foreman II position. The Court agrees. Whitley relies on a purportedly recorded conversation during which Campbell stated that Amtrak did not promote her out of retaliation. Campbell denies having any knowledge of the conversation. He also denies making the statements that she attributes to him. Unfortunately, because it is unintelligible, the recording is not helpful in resolving this issue. Even if it is true that Campbell did make the comments that Whitley attributes to him, however, the evidence fails to raise a genuine issue because Campbell was not part of the hiring process. His statements, even if made, constitute hearsay. Generally, hearsay evidence is not admissible. Fed. R. Evid. 802; *Bortell v. Eli Lilly and Co.*, 406 F. Supp. 2d 1, 11 (D.D.C. 2005).

In addition to the purported recording, Whitley asserts that interviewers Ray, Frank, and Freeman had knowledge of her prior lawsuit. (Whitley's Opp'n 16-17.) The Court is not persuaded that mere knowledge of her prior lawsuit alone suffices as a causal connection.

**Gender Discrimination**

According to Amtrak, she was not qualified for the Foreman II position and cannot therefore establish a prima facie case for gender discrimination. In support of this assertion,

Amtrak argues (1) that she lacked the position's requisite certifications until March, 17, 2004; (2) that Amtrak policy precluded her from receiving any promotions during her disciplinary period from April 6, 2004 to April 5, 2005; and (3) that she lacked the position's requisite mechanical experience.

Whitley refutes Amtrak's assertion and argues that she was qualified for the Foreman II position. First, she argues that her lack of the requisite certifications did not preclude her selection because some successful applicants were given a 90-day probationary period during which they could acquire the certifications. Second, she points out that the position requires only *some* mechanical experience, which, she argues, she acquired by "working closely with the Foreman IIs" and by working closely with persons employed in the mechanical crafts, including car repairmen, electricians, and pipe fitters. Third, she argues that Amtrak considered her to be qualified for the Foreman II position because it selected her for two interviews.

Regardless of whether Whitley has established a prima facie case for gender discrimination, the Court is satisfied that Amtrak declined to promote her for legitimate, non-discriminatory reasons. According to Amtrak, all 11 of the successful Foreman II applicants who were selected between 2004 and 2005, two of whom were women, were better qualified than she. All 11 had extensive mechanical experience. None of the successful applicants had received disqualifying disciplinary action within a year prior to consideration for promotion, as Whitley had. Moreover, Whitley performed poorly in her interviews.

Whitley has presented no evidence sufficient to raise a genuine issue whether Amtrak's legitimate, non-discriminatory reasons for not selecting her for promotion to a Foreman II position was a pretext.

### 2. David Stevens

Amtrak argues that Stevens has failed to establish a prima facie case for retaliation because he cannot prove a causal connection between his complaining to his supervisors, the Amtrak Diversity Office, and the EEOC and his subsequent termination for violating Amtrak's drug policy. Stevens challenges this argument by asserting that he never *refused* to provide a second urine specimen. Rather, he argues that he waited in vain for a male chaperone and that he had a legitimate reason in departing Concentra Medical Center for the George Washington University emergency room. Furthermore, he points to Campbell's threat to destroy him if Stevens used his name in Stevens' paperwork.

Neither of these assertions, however, raises a genuine issue of material fact. Stevens' evidence, which this Court assumes to be true, fails to show that Amtrak terminated him for any reason other than violating its drug and alcohol policy. Rather, Amtrak's evidence shows that Stevens tested positive for cocaine in 2003. He subsequently signed a waiver by which he agreed not to again violate the drug and alcohol policy. His waiver stipulated that he would be terminated for subsequently violating the policy. Yet, in December 2004, he took but did not complete a drug test. Concentra Medical Center employee Ebonie Beaty informed him that he was required to provide his second urine specimen prior to leaving the medical center. He chose to leave without providing the second specimen. This action violated Amtrak's drug and alcohol policy and it violated his waiver agreement. He was terminated accordingly. Stevens' evidence does not dispute these facts.

Furthermore, Stevens' evidence cannot prove that Amtrak's reason for terminating him was a pretext for retaliation. Even if his evidence were sufficient to prove that the Concentra

personnel applied company and federal policies erroneously, which it is not, his evidence cannot prove that Amtrak personnel enforced company policies arbitrarily or capriciously.

### III.  CONCLUSION

For the foregoing reasons, the Court finds that the defendant's Motions for Summary Judgment [43, 44] shall be GRANTED.

A separate order accompanies this Memorandum Opinion.


Signed by Royce C. Lamberth, United States District Judge, on June 26, 2007.